**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE WACHOVIA PREFERRED SECURITIES AND BOND/NOTES LITIGATION | Master File No. 09 Civ. 6351 (RJS) |
| | **CONSOLIDATED CLASS ACTION COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| | **ECF CASE** |

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................ 2

II.   JURISDICTION AND VENUE ......................................................................... 5

III.  PARTIES ............................................................................................................ 6

      A.    Plaintiffs ................................................................................................... 6

            1.    Lead Plaintiffs ............................................................................... 6

            2.    Additional Plaintiffs ...................................................................... 7

      B.    Defendants ................................................................................................ 8

            1.    The Wachovia Issuer Defendants .................................................. 8

            2.    Defendant Wells Fargo ................................................................ 10

            3.    The Individual Defendants ........................................................... 10

            4.    The Underwriter Defendants ........................................................ 17

            5.    Defendant KPMG ........................................................................ 25

IV.   FACTUAL BACKGROUND ............................................................................ 26

      A.    The Offering Materials Contained Material Misstatements and Omissions
            Concerning the Pick-A-Pay Mortgage Portfolio ..................................... 27

            1.    Beginning in 2006, the Housing Market Plummets ...................... 27

            2.    Wachovia's Inadequate Due Diligence of Golden West ............... 29

            3.    Wachovia's Materially Untrue and Misleading Statements Concerning the
                  Acquisition of Golden West and Its Largely Pick-A-Pay Loan Portfolio ...... 32

            4.    After Acquiring the Pick-A-Pay Portfolio, Wachovia Originates Billions of
                  Dollars of Additional High Risk Toxic Loans ............................... 38

            5.    Wachovia Begins To Reveal The Low Credit Quality and Risky Underwriting
                  of the Pick-A-Pay Portfolio ......................................................... 44

      B.    The Offering Materials Reported Materially Understated Loss Reserves ............... 48

      C.    Wachovia Misstated the Amount and Value of Its CDO and RMBs Holdings ....... 54

i

        1.    Overview of CDOs and RMBS.......................................................... 56

        2.    Wachovia Misstated its CDO Exposure .......................................... 57

        3.    Wachovia Overstated the Value of its CDO Portfolio .................... 59

    D.    The Offering Materials Erroneously Assured Investors that Wachovia was Well-Capitalized, and Omitted to Disclose that Its Mortgage-Related Exposures Jeopardized Its Tier 1 Capital ....................................................... 66

    E.    Wachovia Misstated Its Goodwill............................................................ 71

V.    SUMMARY OF WACHOVIA'S SECURITIES OFFERINGS...................................... 74

VI.    MATERIALLY UNTRUE STATEMENTS AND OMISSIONS IN THE OFFERING MATERIALS ...................................................................................................... 76

        1.    Defendants' Materially Untrue Statements Made On or Before the Closing of the Golden West Acquisition on October 2, 2006.......................................... 76

        2.    Defendants' Materially Untrue and Misleading Statements from November 3, 2006 through July 30, 2007 ........................................................ 78

        3.    Wachovia's Materially Untrue and Misleading November 9, 2007 Form 10-Q .............................................................................................. 83

        4.    Wachovia's Materially Untrue and Misleading January 22, 2008 Form 8-K and 2007 Form 10-K........................................................................ 85

        5.    Wachovia's April 14, 2008 Form 8-K .......................................... 87

VII.    CLASS ACTION ALLEGATIONS ................................................................ 89

VIII.    CAUSES OF ACTION .................................................................................. 90

COUNT I

For Violations of Section 11 of the Securities ActAgainst the Wachovia Issuer Defendants And Wells Fargo as successor-in-interest.................................................................. 90

COUNT II

For Violations of Section 11 of the Securities Act
Against The Individual Defendants .............................................................. 92

COUNT III

For Violations of Section 11 of the Securities Act
Against The Underwriter Defendants and KPMG......................................................... 94

COUNT IV

For Violations of Section 12(a)(2) of the Securities Act
Against The Wachovia Issuer Defendants
And Wells Fargo as successor-in-interest ....................................................................... 97

COUNT V

For Violations of Section 12(a)(2) of the Securities Act
Against The Underwriter Defendants .......................................................................... 99

COUNT VI

For Violations of Section 15 of the Securities Act
Against Wachovia And Wells Fargo as successor in interest .................................................... 101

COUNT VII

For Violations of Section 15 of the Securities Act
Against Thompson, Truslow and Wurtz ...................................................................... 103

IX.    JURY TRIAL DEMANDED ........................................................................... 104

Lead Plaintiffs Orange County Employees' Retirement System ("Orange County"), Louisiana Sheriffs' Pension and Relief Fund ("Louisiana Sheriffs"), and Southeastern Pennsylvania Transportation Authority ("SEPTA") (collectively, "Plaintiffs"), bring this action individually and on behalf of all persons and entities, except Defendants (listed at ¶¶20-127 below) and their affiliates, who purchased or otherwise acquired certain Wachovia bonds or preferred securities ("Bond Class Securities") in or traceable to the publicly registered offerings set forth in the Appendix attached hereto and further described herein at ¶¶244-249 below (the "Offerings"), and were damaged by the circumstances described herein. The Offerings were conducted between July 31, 2006 and May 29, 2008 (the "Offering Period") pursuant to five separate shelf registration statements which incorporated by reference numerous prospectuses and filings with the Securities Exchange Commission ("SEC") (the "Offering Materials"). The Offering Materials contained untrue statements of material fact or omitted to state material facts that were required to be stated therein or were necessary to make the statements therein not misleading.

The allegations in this complaint are made upon Plaintiffs' personal knowledge with regard to their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief is based upon, *inter alia,* the investigation by Court-appointed Co-Lead Counsel, Bernstein Litowitz Berger & Grossmann LLP, Barroway Topaz Kessler Meltzer & Check, LLP, and Coughlin Stoia Geller Rudman & Robbins LLP (collectively, "Co-Lead Counsel"). Based on the material misstatements and omissions alleged in this Complaint, Plaintiffs, on behalf of themselves and all others who purchased Bond Class Securities in or traceable to the Offerings, allege strict liability claims against Wachovia Corporation ("Wachovia" or the "Company") and certain of its directors, officers, affiliates, underwriters and

auditors pursuant to Sections 11, 12 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k(a), 77l(a) and 77o. Wachovia's and the other Defendants' state of mind is not an element of any of the claims stated herein. Plaintiffs do not accuse any Defendants of making misstatements or omissions with fraudulent intent.

## I.    <u>INTRODUCTION</u>

1.      Between July 31, 2006 and May 29, 2008 (defined above as the "Offering Period"), Wachovia sold to investors more than $35 billion of Bond Class Securities pursuant to the Offering Materials. Because this was a period characterized by declining housing values and concern about financial institutions' exposure to mortgage-based (and especially subprime mortgage-based) assets, it was particularly important that Wachovia present accurate and complete information about its exposure to such assets in the Offering Materials that it used to raise tens of billions of dollars from the investing public. Nevertheless, throughout the Offering Period, Wachovia's Offering Materials materially and repeatedly misstated and failed to disclose the true nature and quality of Wachovia's mortgage loan portfolio, and materially misled investors as to the Company's exposure to tens of billions of dollars of losses on mortgage-related assets. Accordingly, far from investing in a risk-averse financial institution characterized by careful underwriting and risk management, strong liquidity and adequate loan loss reserves as described in the Offering Materials, Plaintiffs and the members of the Class were actually investing in a Company plagued by lax loan underwriting, tens of billions of dollars of exposure to high risk subprime mortgages, woefully inadequate loan loss reserves and large undisclosed holdings of "toxic" subprime-backed securities, which combined to bring Wachovia to the brink of insolvency by late summer 2008 – just months after the last Offering at issue in this action.

2.      Throughout the Offering Period, Wachovia operated with a high degree of leverage, so that losses in even a small portion of its assets could materially jeopardize its

financial condition.  For example, in 2007 Wachovia reported more than $780 billion of assets, but only $43.5 billion of readily available capital (or less than 6% of its total assets) that could be used to absorb losses in its large asset base.  For this reason as well, it was critical to investors in the Offerings that Wachovia comply with the federal securities laws and make full, complete and accurate disclosures concerning the quality of its mortgage-related assets.  It failed to do so.

3.    Of particular relevance here, a significant portion of Wachovia's reported mortgage-related assets included its:

(a)    $120 billion portfolio of option adjustable rate mortgages ("Option ARMs"), known as the "Pick-A-Pay" portfolio, which Wachovia acquired through its May 2006 purchase of Golden West Financial Corp. ("Golden West");

(b)    $8 billion portfolio of collateralized debt obligations ("CDOs") and residential mortgage backed securities ("RMBS"), which were backed by subprime mortgages; and

(c)    $15 billion of "goodwill" that Wachovia recorded in connection with its acquisition of Golden West, and which Wachovia continued to carry on its balance sheet throughout the Offering Period.

4.    The Offering Materials made repeated untrue statements and material omissions concerning these assets.  With respect to the "Pick-A-Pay" loans, the Offering Materials represented that the Pick-A-Pay portfolio was of "pristine credit quality," that Golden West had a "singular focus as a risk-averse residential mortgage portfolio lender," and that Wachovia and Golden West engaged in "prudent lending practices."  In reality, the opposite was true. Approximately $51 billion – or almost half – of the Pick-A-Pay portfolio consisted of loans to borrowers with *subprime* credit scores.  In addition, although not disclosed in the Offering Materials, virtually all of these loans had been made to borrowers without income verification, and Golden West's and Wachovia's sales forces had routinely used inflated and unverified borrower incomes and job titles to obtain approval of loans which borrowers actually did not qualify for and could not afford to repay.  As further described below, senior Golden

West/Wachovia sales representatives also routinely overrode decisions by the Company's underwriting department denying mortgages as part of a practice euphemistically referred to as "Exception to Policy" or "ETP."  Moreover, Wachovia's exposure to high risk mortgage loans was not limited to its massive direct mortgage portfolio; for example, unbeknownst to investors, by mid-2006 Wachovia had also accumulated billions of dollars of unsold subprime-backed collateralized debt obligations (CDOs) and residential mortgage-backed securities (RMBS) on its balance sheet.

5.     Although Wachovia made various partial disclosures concerning some aspects of its exposure to subprime mortgage-related assets during the latter part of the Offerings Period, these disclosures were inadequate because documents incorporated into the Offering Materials continued to materially misstate the true value of these assets, failed to record write-downs and impairments to these assets that were required under generally accepted accounting principles ("GAAP"), and failed to disclose the full extent to which the Company's prior mortgage underwriting had been plagued by dangerous underwriting practices.  Instead, even as the Company was sliding towards insolvency, the Offering Materials reassured investors that Wachovia's capital and liquidity positions were "strong," and that it was so "well capitalized" that it was actually a "provider of liquidity" to the market.  Such assurances were materially untrue and misleading.

6.     The extent of the decay at Wachovia relating to its mortgage-related assets did not begin to be apparent until September 2008, when the U.S. Government was forced to take unprecedented action to prevent Wachovia's imminent collapse.  On September 28, 2008, the Government brokered a deal in which Wachovia agreed to sell its banking operations to Citigroup for a mere $1 per share, with the Federal Deposit Insurance Corporation ("FDIC") agreeing as

part of the deal to indemnify Citigroup for any loan losses exceeding $42 billion. Days later, on October 2, 2008 – in the wake of a new Internal Revenue Service rule that would allow financial institutions to recognize accelerated tax benefits on certain financial losses – Wells Fargo announced that it would acquire Wachovia for $7 per share, but that it expected to incur staggering losses of *more than $30 billion* on the Pick-A-Pay portfolio (and ultimately disclosed that $59.8 billion – *or more than half* – of the Pick-A-Pay portfolio was credit-impaired). Shortly thereafter, Wachovia announced a devastating loss of $23.88 billion – *one of the largest quarterly losses ever reported by a U.S. company*.

7.    By this complaint, for the reasons summarized above and set forth in greater detail below, Plaintiffs seek relief under the Securities Act of 1933 ("Securities Act") on behalf of themselves and a Class of similarly situated investors for the enormous damages that they have suffered as a result of the allegations described herein.

## II.    JURISDICTION AND VENUE

8.    This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1331. The claims alleged herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.

9.    Venue is proper in this district pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b) and (c). Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts or statements that omitted to state material facts necessary to make the statements therein not misleading, occurred in this District.

10.   In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

to, the United States mails and interstate telephone communications.

## III.    PARTIES

### A.    Plaintiffs

#### 1.    Lead Plaintiffs

11.    Lead Plaintiff Orange County provides retirement and disability benefits to the active, deferred, and retired government members of Orange County, California.  Orange County's principal offices are located at 2223 Wellington Avenue, Suite 100, Santa Ana, California.  As indicated on the certification attached hereto as Exhibit A, Orange County acquired certain Bond Class Securities pursuant or traceable to Offering Materials that contained material misstatements and omissions of fact, and suffered damages as a result of the circumstances described herein.

12.    Lead Plaintiff Louisiana Sheriffs is a defined-benefit pension plan that provides retirement benefits to active and retired sheriffs and their family members throughout the State of Louisiana.  Louisiana Sheriffs' principal offices are located at 1225 Nicholson Drive, Baton Rouge, Louisiana.  As indicated on the certification attached hereto as Exhibit B Louisiana Sheriffs acquired certain Bond Class Securities pursuant or traceable to Offering Materials that contained material misstatements and omissions of fact, and suffered damages as a result of the circumstances described herein.

13.    Lead Plaintiff SEPTA is the nation's fifth largest public transportation system and maintains a pension fund for the benefit of its current and former employees.  SEPTA's principal offices are located at 1234 Market Street, Philadelphia, Pennsylvania.  As indicated on the certification attached hereto as Exhibit C, SEPTA acquired certain Bond Class Securities pursuant or traceable to Offering Materials that contained material misstatements and omissions of fact, and suffered damages as a result of the circumstances described herein.

2.     **Additional Plaintiffs**

14.     Plaintiff Norman Levin ("Levin") is a resident of California.  As indicated on the certification attached hereto as Exhibit D, Levin acquired certain Wachovia Capital Trust X securities pursuant or traceable to Offering Materials that contained material misstatements and omissions of fact, and suffered damages as a result of the circumstances described herein.

15.     Plaintiff Arlette Miller ("Miller") is a resident of New York.  As indicated on the certification attached hereto as Exhibit E, Miller acquired certain Wachovia Capital Trust IX securities pursuant or traceable to Offering Materials that contained material misstatements and omissions of fact, and suffered damages as a result of the circumstances described herein.

16.     Plaintiff Michael Swiskay ("Swiskay") is a resident of New York.  As indicated on the certification attached hereto as Exhibit F, Swiskay acquired Wachovia 8.00% Non-Cumulative Perpetual Class A Preferred Stock, Series J securities pursuant or traceable to Offering Materials that contained material misstatements and omissions of fact, and suffered damages as a result of the circumstances described herein.

17.     Plaintiff Michael Swiskay, as trustee of the Judith R. Swiskay Irrevocable Trust U/A 7/16/2007 (the "Judith Swiskay Trust"), is a resident of New York.  As indicated on the certification attached hereto as Exhibit G, the Judith Swiskay Trust acquired certain Wachovia Capital Trust IX securities pursuant or traceable to Offering Materials that contained material misstatements and omissions of fact, and suffered damages as a result of the circumstances described herein.

18.     Plaintiff Michael Swiskay, as trustee of the Trust U/W/O Hanan Swiskay FBO Jeffrey Swiskay (the "Jeffrey Swiskay Trust"), is a resident of New York.  As indicated on the certification attached hereto as Exhibit H, the Jeffrey Swiskay Trust acquired certain Wachovia Capital Trust IV securities pursuant or traceable to Offering Materials that contained material

misstatements and omissions of fact, and suffered damages as a result of the circumstances described herein.

19.     Plaintiff Michael Swiskay, as trustee of the Trust U/W/O Hanan Swiskay, (the "Hanan Swiskay Trust"), is a resident of New York.  As indicated on the certification attached hereto as Exhibit I, the Hanan Swiskay Trust acquired certain Wachovia Capital Trust IX securities pursuant or traceable to Offering Materials that contained material misstatements and omissions of fact, and suffered damages as a result of the circumstances described herein.

**B.**    **Defendants**

**1.**    **The Wachovia Issuer Defendants**

20.     Prior to its merger with Wells Fargo described in ¶25 below, Defendant Wachovia was a financial holding company incorporated pursuant to North Carolina law and a bank holding company under the Bank Holding Company Act of 1956, with its principal executive offices located at One Wachovia Center, 301 South College Street, Charlotte, North Carolina 28288.  According to its public filings, Wachovia offered a comprehensive line of consumer and commercial banking products and services, investment banking, and other financial services.  As set forth in the Appendix, Wachovia was the statutory issuer or co-issuer of each of the Offerings.

21.     Defendant Wachovia Capital Trust IV is a statutory trust formed under Delaware law pursuant to a trust agreement between Wachovia, as sponsor of the trust, a property trustee, a Delaware trustee and administrative trustees.  Wachovia Capital Trust IV's principal executive offices are located at Wachovia's former corporate headquarters at 301 South College Street, Charlotte, North Carolina, 28288.  The administrative trustees, who are responsible for the day-to-day operations of the Trust, were employees or officers of, or affiliated with, Wachovia, and Wachovia had the sole right to vote to appoint, remove, or replace them.  Wachovia directly or indirectly owned all of the common securities of Wachovia Capital Trust IV and fully and

unconditionally guaranteed the preferred securities that Wachovia Capital Trust IV issued. Wachovia Capital Trust IV was also a "finance subsidiary" of Wachovia within the meaning of Rule 3-10 of Regulation S-X under the Securities Act, and its assets consist solely of debt obligations of Wachovia. Wachovia Capital Trust IV, along with Wachovia, was the issuer of the 6.375% Trust Preferred Securities, as identified in the Appendix.

22. Defendant Wachovia Capital Trust IX is a statutory trust formed under Delaware law pursuant to a trust agreement between Wachovia, as sponsor of the trust, a property trustee, a Delaware trustee and administrative trustees. Wachovia Capital Trust IX's principal executive offices are located at Wachovia's former corporate headquarters at 301 South College Street, Charlotte, North Carolina, 28288. The administrative trustees, who are responsible for the day-to-day operations of the Trust, were employees or officers of, or affiliated with, Wachovia, and Wachovia had the sole right to vote to appoint, remove, or replace them. Wachovia directly or indirectly owned all of the common securities of Wachovia Capital Trust IX and fully and unconditionally guaranteed the preferred securities that Wachovia Capital Trust IX issued. Wachovia Capital Trust IX was also a "finance subsidiary" of Wachovia within the meaning of Rule 3-10 of Regulation S-X under the Securities Act, and its assets solely consist of debt obligations of Wachovia. Wachovia Capital Trust IX, along with Wachovia, was the issuer of the 6.375% Trust Preferred Securities, as identified in the Appendix.

23. Defendant Wachovia Capital Trust X is a statutory trust formed under Delaware law pursuant to a trust agreement between Wachovia, as sponsor of the trust, a property trustee, a Delaware trustee and administrative trustees. Wachovia Capital Trust X's principal executive offices are located at Wachovia's former corporate headquarters at 301 South College Street, Charlotte, North Carolina, 28288. The administrative trustees, who are responsible for the day-to-

9

day operations of the Trust, were employees or officers of, or affiliated with, Wachovia, and Wachovia had the sole right to vote to appoint, remove, or replace them. Wachovia directly or indirectly owned all of the common securities of Wachovia Capital Trust X and fully and unconditionally guaranteed the preferred securities that Wachovia Capital Trust X issued. Wachovia Capital Trust X was also a "finance subsidiary" of Wachovia within the meaning of Rule 3-10 of Regulation S-X under the Securities Act, and its assets solely consist of debt obligations of Wachovia. Wachovia Capital Trust X, along with Wachovia, was the issuer of the 7.85% Trust Preferred Securities, as identified in the Appendix.

24.     Wachovia, Wachovia Capital Trust IV, Wachovia Capital Trust IX and Wachovia Capital Trust X are collectively referred to as the "Wachovia Issuer Defendants." Wachovia Capital Trust IV, Wachovia Capital Trust IX and Wachovia Capital Trust X are collectively referred to as the "Wachovia Capital Trusts."

### 2.     Defendant Wells Fargo

25.     Defendant Wells Fargo is a financial services company incorporated pursuant to Delaware law and a bank holding company under the federal Bank Holding Company Act of 1956, with its principal executive offices located at 420 Montgomery Street, San Francisco, California 94163. On December 31, 2008, Wachovia merged with and into Wells Fargo, which was the surviving corporation in the merger (the "Wells Fargo Merger"). As a result of the merger, Wells Fargo acquired all of Wachovia's businesses and assets and undertook Wachovia's obligations, including all of Wachovia's outstanding debt. Wells Fargo is named herein as the successor-in-interest to Wachovia.

### 3.     The Individual Defendants

26.     Defendant G. Kennedy Thompson ("Thompson") was the Company's President, Chief Executive Officer ("CEO") and a member of its Board of Directors from 1999 through June

1, 2008, when the Board of Directors asked Thompson to resign. Thompson also served as Chairman of Wachovia's Board of Directors. Thompson is liable under the Securities Act for the Offerings that occurred pursuant to the Registration Statements dated March 14, 2005, May 26, 2005, February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Wachovia director.

27.    Defendant Peter M. Carlson ("Carlson") joined Wachovia in 2002 as the Director of External Reporting. From October 19, 2006 through June 27, 2007, Carlson served as Interim Controller and Principal Accounting Officer, and since June 27, 2007 as Wachovia's Controller and Principal Accounting Officer. At all relevant times, he was also a Senior Vice President of the Company. Carlson is liable under the Securities Act for the Offerings that occurred pursuant to the Registration Statements dated February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which he signed.

28.    Defendant Ross E. Jeffries, Jr. ("Jeffries") was the Senior Vice President, Assistant Secretary and Deputy General Counsel of Wachovia from no later than November 2004 through at least August 2008. Jeffries is liable under the Securities Act for the Offerings that occurred pursuant to the Registration Statements dated March 5, 2007 and the April 14, 2008, filed with the SEC on Form S-3, which he signed.

29.    Defendant David M. Julian ("Julian") was the Executive Vice President and Corporate Controller/Principal Accounting Officer of Wachovia from 2001 through October 19, 2006, when he was appointed Chief Operating Officer of Wachovia's Finance Division. Julian is liable under the Securities Act for the Offerings that occurred pursuant to the Registration Statements dated March 14, 2005 and May 26, 2005, filed with the SEC on Form S-3, which he signed.

30.     Defendant Mark C. Treanor ("Treanor") served as the Company's Senior Executive Vice President, Secretary and General Counsel from September 2001 until his retirement in mid-2008.  Treanor is liable under the Securities Act for the Offerings that occurred pursuant to the Registration Statements dated March 14, 2005, May 26, 2005 and February 7, 2007, filed with the SEC on Form S-3, which he signed.

31.     Defendant Donald K. Truslow ("Truslow") served as Wachovia's Treasurer and Controller, and became its Chief Risk Officer in 2000, a position he held with Wachovia until October 2008.  Truslow is named as a Defendant only with respect to Plaintiffs' claims arising under Section 15 of the Securities Act.

32.     Defendant Thomas J. Wurtz ("Wurtz") joined Wachovia in 1994 and was the Senior Executive Vice President and Chief Financial Officer ("CFO") of Wachovia from January 2006 through September 2008.  Prior to that, Wurtz served as Executive Vice President and Treasurer of Wachovia from October 2002 to January 2006.  Wurtz is liable under the Securities Act for the Offerings that occurred pursuant to the Registration Statements dated February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which he signed.

33.     Defendant John D. Baker, II ("Baker") was, at all times relevant herein, a member of Wachovia's Board of Directors.  Baker is liable under the Securities Act for the Offerings pursuant to the Registration Statements dated March 14, 2005, May 26, 2005, February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Wachovia director.

34.     Defendant Robert J. Brown ("Brown") was, at all times relevant herein, a member of Wachovia's Board of Directors.  Brown is liable under the Securities Act for the Offerings that occurred pursuant to the Registration Statements dated March 14, 2005, May 26, 2005, February

7, 2007 and March 5, 2007, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Wachovia director.

35.    Defendant Peter C. Browning ("Browning") was, at all times relevant herein, a member of Wachovia's Board of Directors.  Browning is liable under the Securities Act for the Offerings pursuant to the Registration Statements dated March 14, 2005, May 26, 2005, February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Wachovia director.

36.    Defendant John T. Casteen, III ("Casteen") was, at all times relevant herein, a member of Wachovia's Board of Directors.  Casteen is liable under the Securities Act for the Offerings pursuant to the Registration Statements dated March 14, 2005, May 26, 2005, February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Wachovia director.

37.    Defendant Jerome A. Gitt ("Gitt") was, at all times relevant herein, a member of Wachovia's Board of Directors.  Gitt was a member of the Board of Directors of Golden West prior to its merger with Wachovia.  Gitt's election to Wachovia's Board was made pursuant to the merger agreement between Wachovia and Golden West, and became effective October 1, 2006. Gitt is liable under the Securities Act for the Offerings pursuant to the Registration Statements dated February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Wachovia director.

38.    Defendant William H. Goodwin, Jr. ("Goodwin") was, at all times relevant herein, a member of Wachovia's Board of Directors.  Goodwin is liable under the Securities Act for the Offerings pursuant to the Registration Statements dated March 14, 2005, May 26, 2005, February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which he signed, and

for all Offerings completed during his tenure as a Wachovia director.

39.    Defendant Mary Ellen C. Herringer ("Herringer") was, at all times relevant herein, a member of Wachovia's Board of Directors.  Herringer was a member of the Board of Directors of Golden West, prior to its merger with Wachovia.  Herringer's election to Wachovia's Board was made pursuant to the merger agreement between Wachovia and Golden West, and became effective October 1, 2006.  Herringer is liable under the Securities Act for the Offerings pursuant to the Registration Statements dated February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which she signed, and for all Offerings completed during her tenure as a Wachovia director.

40.    Defendant Robert A. Ingram ("Ingram") was, at all times relevant herein, a member of Wachovia's Board of Directors.  Ingram is liable under the Securities Act for the Offerings pursuant to the Registration Statements dated March 14, 2005, May 26, 2005, February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Wachovia director.

41.    Defendant Donald M. James ("James") was, at all times relevant herein, a member of Wachovia's Board of Directors.  James is liable under the Securities Act for the Offerings pursuant to the Registration Statements dated March 14, 2005, February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Wachovia director.

42.    Defendant Mackey J. McDonald ("McDonald") was, at all times relevant herein, a member of Wachovia's Board of Directors.  McDonald is liable under the Securities Act for the Offerings pursuant to the Registration Statements dated May 26, 2005, February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which he signed, and for all

Offerings completed during his tenure as a Wachovia director.

43.     Defendant Joseph Neubauer ("Neubauer") was, at all times relevant herein, a member of Wachovia's Board of Directors.  Neubauer is liable under the Securities Act for the Offerings pursuant to the Registration Statements dated March 14, 2005, May 26, 2005, February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Wachovia director.

44.     Defendant Timothy D. Proctor ("Proctor") was elected to Wachovia's Board of Directors on September 29, 2006, effective November 1, 2006.  At all relevant times after his appointment, Proctor was a member of Wachovia's Board of Directors.  Proctor is liable under the Securities Act for the Offerings pursuant to the Registration Statements dated February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Wachovia director.

45.     Defendant Ernest S. Rady ("Rady") was, at all times relevant herein, a member of Wachovia's Board of Directors.  Rady is liable under the Securities Act for the Offerings pursuant to the Registration Statements dated February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Wachovia director.

46.     Defendant Van L. Richey ("Richey") was, at all times relevant herein, a member of Wachovia's Board of Directors.  Richey is liable under the Securities Act for the Offerings pursuant to the Registration Statements dated March 14, 2005, February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Wachovia director.

47.     Defendant Ruth G. Shaw ("Shaw") was, at all times relevant herein, a member of

Wachovia's Board of Directors.   Shaw is liable under the Securities Act for the Offerings pursuant to the Registration Statements dated March 14, 2005, May 26, 2005, February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which she signed, and for all Offerings completed during her tenure as a Wachovia director.

48.     Defendant Lanty L. Smith ("Smith") was, at all times relevant herein, a member of Wachovia's Board of Directors.   Smith also served as Chairman of Wachovia's Board from June 2008 and as interim CEO of Wachovia from June 1, 2008 to July 9, 2008, following the resignation of Defendant Thompson.   Prior to his appointment as interim CEO of Wachovia, Smith was a member of the Board's Audit Committee and Corporate Governance & Nominating Committee.   Smith is liable under the Securities Act for the Offerings pursuant to the Registration Statements dated March 14, 2005, May 26, 2005, February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Wachovia director.

49.     Defendant John C. Whitaker, Jr. ("Whitaker") was a member of Wachovia's Board of Directors through December 31, 2007.   Whitaker is liable under the Securities Act for the Offerings pursuant to the Registration Statements dated March 14, 2005, May 26, 2005, February 7, 2007 and March 5, 2007, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Wachovia director.

50.     Defendant Dona Davis Young ("Young") was, at all times relevant herein, a member of Wachovia's Board of Directors.   Young is liable under the Securities Act for the Offerings pursuant to the Registration Statements dated March 14, 2005, May 26, 2005, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which she signed, and for all Offerings completed during her tenure as a Wachovia director.

51.     Defendants Baker, Brown, Browning, Carlson, Casteen, Gitt, Goodwin, Herringer, Ingram, James, Jeffries, Julian, McDonald, Neubauer, Proctor, Rady, Richey, Shaw, Smith, Thompson, Treanor, Whitaker, Wurtz, and Young are collectively referred to herein as the "Individual Defendants."

### 4.    The Underwriter Defendants

52.     Defendant Wachovia Capital Markets, LLC ("WCM") is a registered broker/dealer and was an indirect wholly owned subsidiary of Wachovia until December 31, 2008, when WCM became an indirect wholly owned subsidiary of Wells Fargo.  WCM's principal executive offices are located at 375 Park Avenue, New York, NY 10152.  Until the Wells Fargo Merger, WCM's principal executive offices were located at Wachovia's corporate headquarters at 301 South College Street, Charlotte, North Carolina 28288, and a senior officer of Wachovia and member of Wachovia's operating committee acted at all relevant times as WCM's managing director. According to various Wachovia prospectus supplements, including one dated November 14, 2007, "Wachovia conducts its investment banking, institutional and capital market business through its various bank, broker-dealer and nonbank subsidiaries (including Wachovia Capital Markets LLC)…."  WCM was a lead or co-lead underwriter for each of the Offerings.

53.     Defendant ABN AMRO Incorporated ("ABN AMRO"), based in Greenwich, Connecticut, is a registered broker-dealer.  In October 2007, ABN AMRO was acquired by the consortium of Fortis, RBS and Santander, and in October 2008 the Dutch State bought Fortis Netherlands, including its interests in ABN AMRO.

54.     Defendant A.G. Edwards & Sons, Inc. ("A.G. Edwards"), based in St. Louis, Missouri, operates as a full-service securities broker-dealer in the United States and Europe, and provides a variety of financial services to individual, governmental, and institutional clients.  On October 1, 2007, Wachovia acquired A.G. Edwards.  The retail brokerage operations of A.G.

Edwards were consolidated with Wachovia's subsidiary, Wachovia Securities, LLC, on January 1, 2008.

55.    Defendant Bank of America Corporation ("BofA"), based in Charlotte, North Carolina, is a financial services firm and is the successor-in-interest to Defendant Countrywide (defined *infra*).

56.    Defendant Banc of America Securities LLC ("Banc of America"), based in New York, New York, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.

57.    Defendant Barclays Capital Inc. ("Barclays"), based in New York, New York, is the investment banking division of Barclays Bank PLC, and provides large corporate, government and institutional clients with solutions for their strategic advisory, financing and risk management needs.

58.    Defendant BB&T Capital Markets ("BB&T"), based in Richmond, Virginia, is a division of Scott & Stringfellow LLC.  Scott & Stringfellow LLC is a wholly owned non-bank subsidiary of BB&T Corporation, one of the nation's largest bank holding companies serving the Southeast and national markets.

59.    Defendant B.C. Ziegler and Company ("B.C. Ziegler"), based in Chicago, Illinois, is a registered broker-dealer and an investment advisor firm.

60.    Defendant Bear, Stearns & Co., Inc. ("Bear Stearns") was, during certain relevant times, a Delaware corporation based in New York, New York.  On March 24, 2008, Defendant JPMorgan Chase (defined *infra*) acquired Bear Stearns.

61.    Defendant BNP Paribas Securities Corp. ("BNP Paribas") is a securities broker-dealer with corporate offices in New York and California and a subsidiary of BNP Paribas.

62.     Defendant Cabrera Capital Markets, LLC ("Cabrera"), based in Chicago, Illinois, is a full-service broker-dealer with offices throughout the United States.

63.     Defendant CastleOak Securities, L.P. ("CastleOak"), based in New York, New York, is an investment bank with regional offices in Chicago and Atlanta.

64.     Defendant Charles Schwab & Co., Inc. ("Charles Schwab"), based in San Francisco, California, is a securities broker-dealer.

65.     Defendant C.L. King & Associates, Inc. ("C.L. King"), based in Albany, New York, is a securities broker-dealer.

66.     Defendant Citigroup Global Markets, Inc. ("CGMI"), based in New York, New York, is a subsidiary of Citigroup Inc., a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.

67.     Defendant Comerica Securities, Inc. ("Comerica"), based in Detroit, Michigan, is a securities broker-dealer and a subsidiary of Comerica Bank.

68.     Defendant Countrywide Securities Corporation ("Countrywide"), based in Calabasas, California, is an underwriter.  In July 2008, Countrywide was acquired by Defendant BofA.

69.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse"), based in New York, New York, is an investment bank.

70.     Defendant D.A. Davidson & Co. ("D.A. Davidson") is an investment bank with its principal offices located in Great Falls, Montana.

71.     Defendant Davenport & Company LLC ("Davenport"), based in Richmond, Virginia, is an independent investment firm.

72.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank"), with headquarters in New York, New York, is an investment bank.

73.     Defendant E*TRADE Securities LLC ("E*TRADE"), based in New York, New York, provides security underwriting services.

74.     Defendant Ferris, Baker Watts, Incorporated ("Ferris Baker"), based in Baltimore, Maryland and incorporated in Delaware, is a full service investment banking firm.

75.     Defendant Fidelity Capital Markets Services, a division of National Financial Services LLC ("Fidelity"), based in Boston, Massachusetts, is a security brokerage firm.

76.     Defendant Fifth Third Securities, Inc. ("Fifth Third"), based in Cincinnati, Ohio, provides municipal securities brokerage, underwriting and dealing services.

77.     Defendant Fixed Income Securities, L.P. ("Fixed Income Securities"), based in Monument, Colorado, provides services related to bond market investments.

78.     Defendant FTN Financial Securities Corp. ("FTN Financial"), based in Nashville, Tennessee, is a full-service investment banking firm.

79.     Defendant Goldman, Sachs & Co. ("Goldman Sachs"), based in New York, New York, is a bank holding company which announced in August 2009 that it had received approval from the Federal Reserve to become a financial holding company, and is a leading global investment banking, securities and investment management firm that provides a wide range of services worldwide.

80.     Defendant Greenwich Capital Markets, Inc. ("Greenwich Capital"), based in Greenwich, Connecticut, is a capital markets firm.

81.     Defendant Guzman & Company ("Guzman"), based in Coral Gables, Florida, is a securities broker-dealer.

82.    Defendant Howe Barnes Hoefer & Arnett, Inc. ("Howe Barnes"), based in Chicago, Illinois, is a full-service brokerage firm.

83.    Defendant H&R Block Financial Advisors, Inc. ("H&R Block"), based in Detroit, Michigan, is a full-service securities broker-dealer.  On August 12, 2008, H&R Block was sold to Ameriprise Financial Inc.

84.    Defendant HSBC Securities (USA) Inc. ("HSBC"), based in New York, New York, is a registered broker-dealer.

85.    Defendant Jackson Securities, LLC ("Jackson"), based in Atlanta, Georgia, provides investment banking and brokerage services.

86.    Defendant Janney Montgomery Scott LLC ("Janney"), based in Philadelphia, Pennsylvania, is a full service financial firm.

87.    Defendant J.B. Hanauer & Co ("J.B. Hanauer"), based in Parsippany, New Jersey, is a full service brokerage firm.

88.    Defendant Jefferies & Company, Inc. ("Jefferies"), based in Los Angeles, California, is an investment bank.

89.    Defendant J.J.B. Hilliard, W.L. Lyons, Inc. ("J.J.B. Hilliard"), based in Louisville, Kentucky, is an investment firm.

90.    Defendant JPMorgan Chase ("JPMorgan Chase") based in New York, New York, is a financial services firm, and is named as a defendant in its capacity as the successor in interest to Bear Stearns.  JPMorgan Chase is liable to the same extent as Bear Stearns for the conduct and violations of law alleged herein.

91.    Defendant J.P. Morgan Securities Inc. ("J.P. Morgan"), based in New York, New York, is an investment bank and a subsidiary of JPMorgan Chase.

92.    Defendant JVB Financial Group, LLC ("JVP Financial"), based in Boca Raton, Florida, is an investment firm.

93.    Defendant Keefe, Bruyette & Woods, Inc. ("Keefe Bruyette"), based in New York, New York and incorporated in Delaware, is a securities broker-dealer and full service investment bank.

94.    Defendant KeyBanc Capital Markets, a division of McDonald Investments Inc. ("KeyBanc"), based in Cleveland, Ohio, is a boutique investment bank.

95.    Defendant Loop Capital Markets, LLC ("Loop"), based in Chicago, Illinois, is a boutique investment banking and brokerage firm. Loop Capital offers corporate and public finance, financial advisory, municipal finance, equity research, and securities sales and trading services.

96.    Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), based in New York, New York, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.

97.    Defendant Mesirow Financial, Inc. ("Mesirow"), based in Chicago, Illinois, is an investment banking firm.

98.    Defendant Morgan Keegan & Company, Inc. ("Morgan Keegan"), based in Memphis, Tennessee, is a subsidiary of Regions Financial Corporation.

99.    Defendant Morgan Stanley & Co., Incorporated ("Morgan Stanley"), based in New York, New York, is an investment bank.

100.    Defendant M.R. Beal & Company ("M.R. Beal"), based in New York, New York, is a full service investment banking firm.

101.    Defendant Muriel Siebert & Co., Inc. ("Muriel Siebert"), based in New York, New York, is a discount brokerage firm.

102.    Defendant NatCity Investments, Inc. ("NatCity"), based in Cleveland, Ohio, is a financial holding company whose core businesses include commercial and retail banking, mortgage financing and servicing, consumer finance and asset management.

103.    Defendant Oppenheimer & Co. Inc. ("Oppenheimer"), based in New York, New York, is an investment bank and full-service investment firm that provides financial services and advice to high net worth investors, individuals, businesses and institutions.

104.    Defendant Pershing LLC ("Pershing"), based in Jersey City, New Jersey, is an affiliate of Bank of New York Mellon, which provides prime brokerage solutions to its clients.

105.    Defendant Piper Jaffray & Co. ("Piper Jaffray"), based in Minneapolis, Minnesota, is an investment bank.

106.    Defendant Popular Securities, Inc. ("Popular"), based in San Juan, Puerto Rico, is an investment company.

107.    Defendant RBC Capital Markets Corporation ("RBC Capital Markets"), based in New York, New York, is a securities broker-dealer.

108.    Defendant RBC Dain Rauscher Inc. ("RBC Dain Rauscher"), based in New York, New York, is an investment bank.

109.    Defendant Samuel A. Ramirez & Company, Inc. ("Ramirez"), based in New York, New York, is an investment company.

110.    Defendant Raymond James & Associates, Inc. ("Raymond James"), based in St. Petersburg, Florida, is a financial services holding company with subsidiaries engaged in investment banking and asset management.

111.    Defendant Robert W. Baird & Co. Incorporated ("Robert Baird"), based in Milwaukee, Wisconsin, is an investment company.

112.    Defendant Ross, Sinclair & Associates, LLC ("Ross Sinclair"), based in Cincinnati, Ohio, is an investment banking firm.

113.    Defendant Ryan Beck & Co., Inc. ("Ryan Beck"), based in Florham Park, New Jersey, is an investment banking and brokerage firm.   In February 2007, Defendant Stifel Nicolaus (defined *infra*) acquired Ryan Beck.

114.    Defendant Sandler O'Neill & Partners, L.P. ("Sandler O'Neill"), based in New York, New York, is an investment banking firm.

115.    Defendant Sterne, Agee & Leach, Inc. ("Sterne Agee"), based in Birmingham, Alabama, is a brokerage firm.

116.    Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel Nicolaus"), based in St. Louis, Missouri, is an investment banking firm.  Stifel Nicolaus is also the successor in interest to Defendant Ryan Beck.

117.    Defendant SunTrust Capital Markets, Inc. ("SunTrust"), based in Atlanta, Georgia, is a commercial bank and financial holding company that provides investment services through its banking and other subsidiaries.

118.    Defendant TD AMERITRADE, Inc. ("TD AMERITRADE"), based in Bellevue, Nebraska, is a security brokerage firm.

119.    Defendant Toussaint Capital Partners, LLC ("Toussaint"), based in New York, New York, is an investment banking boutique.

120.    Defendant UBS Securities LLC ("UBS"), based in Stamford, Connecticut, is a financial services institution that, through its subsidiaries and divisions, provides commercial and

investment banking services.

121.    Defendant Utendahl Capital Partners, L.P. ("Utendahl"), based in New York, New York, is an investment bank.

122.    Defendant Wedbush Morgan Securities Inc. ("Wedbush Morgan"), based in Los Angeles, California, is a boutique investment banking firm.

123.    Defendant Wells Fargo Securities, LLC ("Wells Fargo Securities"), based in San Francisco, California, is a financial services institution that, through its subsidiaries and divisions, provides investment banking services.

124.    Defendant William Blair & Company, L.L.C. ("William Blair"), based in Chicago, Illinois, is a global investment firm.

125.    Defendant The Williams Capital Group, L.P. ("Williams Capital"), based in New York, New York, is an investment banking firm providing debt and equity underwriting and corporate finance advisory services.

126.    The Defendants identified above at ¶¶52-126 are collectively referred to herein as the "Underwriter Defendants."  Each of the Underwriter Defendants acted as an underwriter (or is the successor-in-interest of an entity that acted as an underwriter) for certain of the Offerings as specified in the Appendix attached hereto.   As an underwriter of Offerings, each of the Underwriter Defendants was responsible for ensuring the completeness and accuracy of the various statements contained in, or incorporated by reference into, the related Offering Materials.

### 5.    **Defendant KPMG**

127.    Defendant KPMG LLP ("KPMG") is a limited liability partnership with its headquarters at 345 Park Avenue, New York, New York 10154.  KPMG is a member firm of KPMG International, an international accounting and auditing firm offering audit, tax and advisory services.  KPMG was responsible for, among other things, auditing Wachovia's financial

statements and internal controls during 2006 through 2008. KPMG rendered unqualified audit opinions on Wachovia's 2006 and 2007 year-end financial statements and consented to Wachovia's incorporation of KPMG's audit opinions on these financial statements in the Offering Materials.

## IV.   FACTUAL BACKGROUND

128.   Between July 2006 and May 2008, Wachovia conducted the 30 public offerings of the Bond Class Securities at issue in the Complaint. The Offering Materials for each Offering contained material misstatements of fact and/or omitted to disclose material facts concerning (i) the risk profile and purportedly "pristine" quality of Wachovia's portfolio of residential mortgage loans (including its $120 billion of "Pick-A-Pay" loans), and the supposed adequacy of its reserves for that portfolio; (ii) Wachovia's exposure to, and the impairment in value of, approximately $8 billion of subprime mortgage-backed CDOs and RMBS; (iii) the impaired value of Wachovia's Golden West franchise and related goodwill; (iv) Wachovia's purported net income and assets; (v) Wachovia's purportedly "well capitalized" status; and (vi) various other metrics related to its financial performance.

129.   Each of these material misstatements or omissions also misled investors as to the supposed adequacy of Wachovia's capital and the extent to which Wachovia's financial viability and solvency was at risk. The Company's capital adequacy was expressed as a "Tier 1 capital ratio." The Tier 1 capital ratio purported to measure Wachovia's disclosed cash reserves and other capital paid for by the sale of bank equity ("Tier 1 capital") as a percentage of the bank's assets that were potentially at risk of default (known as its "risk-adjusted assets"). In order to be considered "well capitalized," federal regulations require a bank to maintain a Tier 1 capital ratio of at least 6% (*i.e.*, Tier 1 capital equal to at least 6% of its risk-adjusted assets). Maintaining its "well-capitalized" status was critical to Wachovia and of vital concern to its potential investors,

and the failure to maintain this ratio would have led investors to conclude that Wachovia's solvency was in doubt and to lose faith in its viability. In each of its SEC filings on Form 10-Q and 10-K issued during the Offerings Period, all of which were incorporated into the Offering Materials, Wachovia represented that it was "well capitalized."

130.    Wachovia operated with a very high degree of leverage, and held only a small amount of Tier 1 capital against a massive asset base (which consisted primarily of its outstanding loans). For example, in 2007 the Company reported $592 billion of risk-adjusted assets and only $43.5 billion of Tier 1 capital. Thus, Wachovia operated on razor-thin margins, and losses in even a small portion of its risk-adjusted assets could wipe out much or even all of its Tier 1 capital, rendering the Company under-capitalized.

131.    Consequently, especially in the face of a plummeting housing market, it was material to investors that Wachovia fully and adequately disclose in its Offering Materials the nature and extent of risks in its mortgage-related exposures, and that it accurately account for any impairments to or losses in the value of those assets, so that investors could in turn assess Wachovia's true financial condition and – in particular – the adequacy of its capital and whether it faced a meaningful (let alone serious) risk of insolvency. As set forth below, throughout the Offering Period, the Offering Materials failed to do so.

A.    **The Offering Materials Contained Material Misstatements and Omissions Concerning the Pick-A-Pay Mortgage Portfolio**

1.    **Beginning in 2006, the Housing Market Plummets**

132.    Beginning no later than early 2006, the U.S. housing market began to collapse. As illustrated in the chart below, the growth in U.S. home prices, which had been increasing at an unprecedented pace in the mid-2000s, slowed beginning in 2005 and then fell precipitously throughout 2006 and 2007:



133.    The root cause of this collapse was the record number of borrowers who began to default on their mortgage payments.  Over the course of the preceding few years, various mortgage lenders had severely loosened underwriting standards to extend loans to millions of "subprime" high-risk borrowers who did not meet traditional underwriting standards to qualify for a loan.  In 2001, banking regulators, including the Office of the Comptroller of the Currency, the Federal Reserve Board, the FDIC and the Office of Thrift Supervision, issued guidance which stated that a Fair Isaac & Co. ("FICO") credit score of 660 or below established that a borrower possessed a "[r]elatively high default probability," and thus was "subprime."  Loans made to subprime borrowers pose an especially high risk of default because the borrower, as evidenced in part by his or her low FICO score, has demonstrated an inability to repay his or her debts.  By early 2006, such subprime borrowers had begun to default in record numbers.

134.    Not surprisingly, at about the same time as defaults rose, investors became

increasingly concerned with the mortgage and banking industry's exposure to loans made to subprime and other high risk borrowers, and the effect that such loans could have on the financial condition of banks which held those loans on their balance sheet. For example, in November 2005, *The Wall Street Journal* reported that the "much less demanding" mortgage underwriting standards of the immediately preceding years were "putting everyone . . . at risk" who had invested in the market for subprime mortgages and mortgage-backed securities. Similarly, in February 2006, *Barron's* published an article entitled "Coming Home to Roost," which reported that investors were experiencing "much anxiety" over subprime mortgage exposure given the "loosening in underwriting standards" and "easy lending practices" that had prevailed in recent years. As the article stated, "[v]arious doomsday scenarios are being posited" regarding the effect that subprime defaults would have on lenders and investors. On August 21, 2006, *Barron's* similarly reported that, "A housing crisis approaches. … By any traditional valuation, housing prices at the end of 2005 were 30% to 50% too high." Significantly, *Barron's* reported that this "housing bubble" had been caused by "[i]rresponsible financing" by mortgage lenders, which led "individuals to buy houses they can't afford."

135.    In light of the severe deterioration of the residential real estate market, it was critically important to investors in the Offerings that a prominent mortgage originator like Wachovia fully and accurately disclose the true nature, condition and extent of its mortgage-related (and especially its subprime mortgage-related) exposures, and that it accurately account for any impairments to or declines in the value of those assets. Wachovia failed to do so.

## 2.    Wachovia's Inadequate Due Diligence of Golden West

136.    On May 7, 2006, Wachovia announced that it had agreed to buy Golden West, a California-based thrift specializing in residential mortgage lending, for approximately $25.5 billion in cash and stock. The transaction closed on October 1, 2006. The final purchase price at

closing was $24.3 billion.

137.    Golden West's principal asset was its approximately $120 billion portfolio of thirty year "option ARM" (adjustable rate mortgage) loans, which was commonly referred to as the "Pick-A-Pay" portfolio.  The Pick-A-Pay loans carried an initial, low "teaser" interest rate for a predetermined period of time.  After this initial time period expired, however, the interest rate on the loan "reset" to a higher (and typically much higher) interest rate.

138.    The Pick-A-Pay loan product allowed borrowers to elect from the following monthly payment options: (i) a large payment that paid off the loan in fifteen years; (ii) a traditional payment that paid off the loan in thirty years; (iii) a payment that was only large enough to cover the monthly interest (without paying down any principal); or (iv) a "minimum" payment that was substantially less than the calculated monthly interest.  When borrowers picked the fourth option and elected to pay less than the calculated monthly interest, the remaining interest was added back into the principal balance of the loan each month, causing the size of the outstanding loan balance to grow rather than shrink – a circumstance commonly referred to as "negative amortization."

139.    In addition, depending on the loan's original loan-to-value ratio ("LTV ratio"), certain levels of negative amortization caused the mortgage to automatically "recast" to require much higher fully-amortizing payments over the remaining life of the loan.  The LTV ratio measures the balance of the loan as a percentage of the value of the property.  Thus, a loan of $85,000 drawn against a property with an appraised value of $100,000 would have an LTV of 85% at the time of origination.  For Pick-A-Pay loans with original LTV ratios of 85% or lower, a loan would "recast" to require fully-amortizing payments once the outstanding loan balance ballooned to 125% of the property's appraised value.  For Pick-A-Pay loans with original LTV

30

ratios higher than 85%, a loan would "recast" to require fully-amortizing payments once the outstanding loan balance ballooned to 110% of the property's appraised value.

140.     Because of the features described in ¶¶137-139 above, Pick-A-Pay loans were potentially much riskier than traditional mortgage loans, and thus required conservative underwriting in order to limit the lender's risk from borrower defaults and resulting losses.  For example, not only did Pick-A-Pay loans have the potential to increase (rather than decrease) the bank's outstanding dollar exposure, such loans were also particularly attractive to high risk borrowers who could afford only the minimum payments.  Such borrowers were also likely to run up their indebtedness through "negative amortization," as well as likely to default when their payments rose – as occurred when the initial "teaser" interest rate expired, and/or when certain levels of negative amortization triggered their obligation to make fully-amortizing payments over the remaining term of the loan.

141.     Moreover, once negative amortization caused the loan balance to approach or exceed the value of the home, the risk of borrower default increased substantially.  The August 21, 2006 *Barron's* article described this heightened risk of default: "Negative amortization … [doesn't] work because eventually too many borrowers are unable to pay the loans down – or are unwilling to keep paying for an asset that has declined in value relative to their outstanding balance."  To mitigate this risk, it was crucial that a lender (such as Wachovia or Golden West) extend such loans only to borrowers who could make regular payments large enough to keep the LTV ratio from approaching 100% for any extended period of time.

142.     Despite these potential risks, Wachovia failed to adequately evaluate the quality of the Pick-A-Pay portfolio or Golden West's underwriting practices when it agreed to buy Golden West in May 2006.  For example, as the *Charlotte Observer* reported on December 21, 2008,

more than seven months after the Offering Period, "the deal seemed out of character. It came together in a matter of days. Some key executives weren't consulted." According to the article, Golden West contacted Wachovia's outside attorneys on April 27, 2006, and the $24.3 billion acquisition deal, "from first contact to announcement, took 11 days, with the formal due diligence covering no more than 6 days." As the *Observer* also reported, Defendants Thompson and Wurtz flew out to California only once to meet with top Golden West executives over lunch, which "concluded with a deal well underway…." Moreover, Wachovia did not include its top mortgage executives in the due diligence process – precisely the people who should have been deeply involved. "Top mortgage executives were notified the purchase was in the works but they weren't drawn deeply into the due diligence. That contrasted with earlier deals investigated by the bank.…"

143.    A former high-ranking employee of Wachovia independently confirms that Wachovia failed to conduct a proper due diligence investigation into Golden West's loan portfolio. Confidential Witness 1 ("CW 1") was a Wachovia Senior Vice President in the risk department at the time of the Golden West acquisition who left the Company in 2008, and whose responsibilities included managing Wachovia's financial risk. CW 1 reported that after Golden West approached Wachovia, Defendant Thompson flew out to California without a due diligence team, and almost immediately thereafter "the deal was done." Rather than seeking input from his top mortgage executives, Thompson merely told his "level one" reports to finalize the deal. According to CW 1, Wachovia actually conducted only three days of due diligence before agreeing to buy Golden West – due diligence that CW 1 characterized as "poor to non-existent."

### 3.    Wachovia's Misstatements and Omissions Concerning the Acquisition of Golden West and Its Pick-A-Pay Loan Portfolio

144.    Following the announcement of the Golden West acquisition, Wachovia conducted

the Offerings at issue in this action.  Having failed to undertake any meaningful due diligence to properly investigate Golden West's mortgage portfolio and underwriting practices, Wachovia inaccurately assured investors in the Offering Materials that the Pick-A-Pay portfolio was of high credit quality and was conservatively underwritten.  For example, in a Form 8-K filed on May 8, 2006 and subsequently incorporated into the Offering Materials, Wachovia stated that the Pick-A-Pay portfolio was of "***pristine credit quality***" and that Golden West had a "singular focus as a ***risk-averse*** residential mortgage portfolio lender." (Emphasis added.)[1]  As set forth more fully below in Section VI, the Offering Materials also inaccurately stated that Wachovia's "credit quality" was "very strong," reflecting "strong underwriting" and "prudent lending practices," and that its loans were "well collateralized" so that any losses would be minimal.

145.    These and other misstatements in the Offering Materials repeatedly assured investors and Wall Street analysts that the Pick-A-Pay portfolio was of high credit quality and therefore posed little risk to Wachovia despite the housing downturn.  For example, on May 8, 2006, Morgan Keegan & Co. Inc. rated Wachovia "Outperform" because Golden West's portfolio supposedly had "no sub-prime component" and thus was "very low risk."  Similarly, on May 11, 2006, Bernstein Research rated Wachovia "Outperform" because "GDW's [Golden West's] Option ARM product structure and ***conservative underwriting practices*** have and will continue to shield [Wachovia] from the credit cycle experienced by other mortgage lenders," and because the "GDW management also claims that it does not lend to subprime borrowers."

146.    However, directly contrary to Wachovia's descriptions of "pristine credit quality," at the time of the Offerings the Pick-A-Pay portfolio contained ***tens of billions*** of dollars of high-risk loans that were likely to default.  Indeed, the Company disclosed for the first time on April 14, 2008, that, as of the end of 2006, approximately $34.3 billion of the outstanding Pick-A-Pay

---

[1]        Throughout the Complaint, the emphasis of quoted language in bold and italics is added.

loan balances – or roughly 28% of the entire portfolio – was owed by subprime borrowers with FICO scores of 660 or less.  ***Nearly half*** of this amount, or approximately $17 billion, was owed by borrowers with FICO scores below 620 – well below the banking regulators' FICO score cutoff of 660 for subprime status.  But even these belated partial disclosures fell far short of fully or adequately disclosing the true state of the Pick-A-Pay portfolio.  That information did not begin to emerge with any clarity until September 2008 when Wachovia almost failed and Wells Fargo announced that, in connection with its acquisition of Wachovia, it would take $32 billion of further writedowns on the Pick-A-Pay portfolio.

147.    The Offering Materials' representation that the Pick-A-Pay portfolio was the product of "risk averse" underwriting was also not true.  In fact, Golden West's underwriters routinely failed to verify the accuracy of borrower information on mortgage applications.  Such practices were especially widespread with respect to Golden West's "stated income" or "Quick Qualifier" loans, which did not require the borrower to submit ***any*** income documentation.  As Co-Lead Counsel's investigation has recently discovered, representatives of Golden West's and Wachovia's sales department and outside mortgage brokers exploited this lax standard and routinely misstated critical information on mortgage applications (for example, by reporting inflated incomes for borrowers) in order to gain approval for the loans, and the Company's loan underwriters routinely failed to check the misstated information.  Investors did not begin to learn of the scope of these underwriting problems until (i) April 11, 2008, when *Bloomberg* reported that, beginning April 26, Wachovia would require proof of borrower assets and employment for all loans, and (ii) mid-June 2008, when Wachovia admitted that the large number of Pick-A-Pay loans generated through outside brokers were of such concern that Wachovia had decided to call the borrowers on all such loans directly to verify key information concerning the ability to repay

and to ascertain whether the borrowers actually understood the risks and terms of their loans.

148.    Former employees of Golden West have independently confirmed that (i) Golden West routinely originated loans to subprime borrowers; (ii) Golden West's sales representatives routinely inflated borrowers' incomes on mortgage applications and other loan documents; and (iii) Golden West's underwriters routinely failed to verify borrowers' information before approving the loan.

149.    For example, Paul Bishop was a loan consultant, or loan salesperson, at Golden West in San Francisco from November 2, 2002 until May 30, 2006. In that capacity, he regularly interacted with numerous other employees with knowledge of Golden West's lending operations, including the rest of the San Francisco loan sales force, the staff responsible for instructing the sales force on how to sell its loans, the underwriters responsible for approving the loans, and the managers responsible for approving any exceptions to underwriting standards.

150.    According to a February 15, 2009 *60 Minutes* interview of Bishop, Golden West significantly lowered its underwriting standards in order to increase its volume of loans during the housing boom. As Bishop told *60 Minutes*, "[i]t was all about volume – quantity over quality." To generate an increasing number of loans, Bishop stated that Golden West salespeople regularly inflated borrowers' incomes on loan documents. The term for this, Bishop stated, was "packaging the loan" so that it ostensibly met underwriting standards. In an interview with Co-Lead Counsel, Bishop similarly stated that loan sales people "would take a look at whatever [the borrower's] income was and just adjust it" in order to "make sure their income matche[d] the loan payment.… In other words, doctor it." Bishop also reported that Golden West "easily" made loans to subprime borrowers with FICO scores as low as the "mid-500s," and that the loan sales force played "fast and loose" with the incomes listed on these subprime loan applications as well.

According to Bishop, this practice routinely occurred at Golden West throughout his entire tenure, and "accelerated" from 2004 through his departure in May 2006. Bishop also confirmed that Golden West's sales force did not verify the borrowers' information during the underwriting process. Bishop told *60 Minutes* that Golden West conducted "instant underwriting events in an office where we would assemble five underwriters right there," and would "approve between 80-100 loans per day." Thus, lending at Golden West was "one grand wink, wink, nod, nod" between the borrower, the loan salesman, and the underwriter. According to Bishop, the result of these practices was that Golden West was "granting too many people loans who simply can't qualify." Indeed, as *60 Minutes* reported, "By 2005, 38% of [Golden West's] clients had subprime credit scores, and customers were shown fliers that told them that their income would not be checked by the bank."

151. In his interview with Co-Lead Counsel, Bishop also stated that Golden West created a specific "policy exception" allowing more senior sales representatives to override decisions by the underwriting department denying mortgage applications. This practice was euphemistically known as "Exception to Policy" or "ETP." Because sales personnel earned commissions when the loans they sold were ultimately approved, they had a powerful financial incentive to use – and in fact routinely abuse – the ETP to override rejections of loans to borrowers who were highly likely to default. Bishop stated that approximately 50% of loans in his office were approved pursuant to the ETP program – begging the question of whether the "exception to policy" had effectively become the policy – and that the ETP program became a highly effective "way [to] get around" stated minimum underwriting requirements. As set forth below, the ETP practice also continued after Golden West was acquired by Wachovia in 2006.

152. The facts reported by Bishop are supported by CW 2, who served as a mortgage

consultant for Golden West (both before and after Wachovia acquired it) on the East Coast from April 2005 until October 2008. CW 2 stated that from the "first week" of his employment, he learned that the practice at Golden West was to "package the loans [according to] whatever was needed" to obtain underwriter approval, and to "make sure the borrower got the loan." "Doing whatever was needed" included "making things up," and specifically using bogus stated income figures (which were higher than what the borrower had initially represented) and providing more impressive sounding (but false) job titles that would be reported on the borrowers' loan application in order to bolster the fabricated incomes. CW 2 gave the following example: "If someone was working as a cashier at McDonald's making $40,000 a year, and we saw from their file that they needed to make $60,000 [to be approved for the loan]," then the loan salesperson would list a $60,000 income and "we'd change their title to manager so it would look right." Similarly, if a borrower's actual annual income was $60,000 but the loan required an income of $75,000, a loan salesperson would say to the borrower, "If you made $75,000 a year, that would work," and the borrower would typically respond to this prompt by saying, "Yeah, I make $75,000." In sum, as CW 2 reported, the sales force for Golden West/Wachovia was routinely "overstating income and qualifying [borrowers] at the wrong jobs."

153. CW 2 also confirmed that when a loan could not satisfy even its lax underwriting guidelines, Golden West/Wachovia's guidelines and exceptions would frequently be used to approve the loan. The most common exceptions, CW 2 stated, were to the required minimum FICO score and maximum LTV limits, and those exceptions were made "every single day." "This is stuff I was taught from day one. One of the things we were taught to sell was our underwriting, that we could make and break our own rules."

### 4. After Acquiring the Pick-A-Pay Portfolio, Wachovia Originates Billions of Dollars of Additional High-Risk, Toxic Loans

154. After the Golden West acquisition closed on October 1, 2006, Wachovia substantially expanded the origination of Pick-A-Pay loans. As reported after the Offering Period in a December 25, 2008 *New York Times* article that quoted Russell W. Kettell, a former chief financial officer of Golden West's mortgage subsidiary (World Savings), "the [Wachovia/Golden West] merger created 'pressure' for 'a pretty good-sized increase in loan volume,'" and Wachovia "'wanted volume and wanted growth.'" In 2007, Wachovia extended an additional $33.4 billion in Pick-A-Pay loans – a 34% increase over 2004 and 2005 – despite the fact that the housing market was already sharply contracting.

155. Multiple sources confirm that, while pursuing this expansion, Wachovia did not adequately educate and train its managers and employees with respect to the underwriting guidelines and financial risks associated with Pick-A-Pay loans. For example, CW 3 was a mortgage consultant for Golden West (and later Wachovia) in California from 1992 to 2007, and a senior training manager at Wachovia until October 2008. As senior training manager, CW 3 was tasked with training Wachovia employees about the Pick-A-Pay loans. CW 3 stated that Wachovia's "upper management" did not complete the training program and "never cared to learn" about underwriting Pick-A-Pay loans. Likewise, according to CW 4, a Mortgage Consultant and Territory Manager for Golden West (and later Wachovia) in the Midwest from 2004 to 2007, Wachovia incentivized its employees to sell a higher volume of Pick-A-Pay loans by paying them extra commissions to do so, even though Wachovia's employees "didn't understand the product."

156. As a result of Wachovia's failure to adequately educate and train its employees and upper management about the risks of the Pick-A-Pay product and the proper loan

underwriting procedures to mitigate those risks, Wachovia continued to misrepresent the risk of the Pick-A-Pay loan portfolio and the quality of its underwriting. Moreover, Wachovia originated literally tens of billions of additional Pick-A-Pay loans in the year and half following the Golden West acquisition, nearly *half* of which were made to patently subprime and high-risk borrowers without verification of income and other key borrower information. Indeed, as Wachovia belatedly disclosed on April 14, 2008, it had originated an additional $16.5 billion of Pick-A-Pay loans to subprime borrowers (with FICO scores below 660) during 2007 and the first quarter of 2008.

157.    Wachovia documents also confirm that the Company's already lax underwriting standards for the Pick-A-Pay portfolio were further lowered following the Golden West acquisition. For example, according to a December 2006 presentation prepared by a Wachovia account executive for outside brokers, newly originated thirty-year fixed rate Pick-A-Pay loans were offered on both a "NINA" and "NINANE" basis – terms that referred, respectively, to "No Income, No Asset" verification, and "No Income, No Asset, No Employment" verification. The presentation trumpeted the fact that such loans required **"No Minimum FICO!"** and no credit history because **"No Credit is Good Credit!"** In addition, the document also advised that such loans were available at an LTV ratio of up to 95%. Despite the obvious risks associated with such loans, the document promised "48 Hour Fully-Underwritten Approval."

158.    Thus, Wachovia's sales representatives and mortgage brokers continued the Golden West practice of "packaging the loan" by misstating borrower information on the documents sent to Wachovia underwriters. Similarly, Wachovia's underwriters continued Golden West's practice of failing to routinely and consistently verify critical borrower information. Indeed, numerous former employees independently confirmed that Wachovia's sales force and

underwriters degraded the already-poor credit quality of the Pick-A-Pay portfolio through these means, as well as by qualifying borrowers only at the initial "teaser" interest rate, rather than the rate that would apply once the "teaser" rate period expired (known as the "fully-indexed rate"). For example, CW 2 confirmed that the falsification of borrower incomes which occurred at Golden West continued unabated after its acquisition by Wachovia. "Everything we did continued. There were rumors it would go away, but it never did."

159.    Indeed, CW 5, a mortgage underwriter who worked in Wachovia's operations center in its Charlotte, North Carolina headquarters from September 2005 until November 2008, reported that after an application had been submitted to the underwriting department, loan salespeople routinely increased the borrower income listed on the loan application. Moreover, CW 5 stated that underwriters were precluded from requesting proof of income even when they discovered that the borrower's income had been revised upward. Further, CW 5 reported that when she rejected an application because the borrower's income was obviously fabricated – such as a janitor claiming to make a $100,000 salary – Wachovia sales managers would override her rejection of the loan and approve it instead. CW 5 also stated that Wachovia personnel continued to make use of the liberal "Exception to Policy" or ETP protocol, and that approximately 30% of all loans were approved by salespeople or their superiors making exceptions to normal underwriting criteria.

160.    Similarly, CW 6, who worked for Golden West/Wachovia as wholesale mortgage loan salesperson in Connecticut from April 2005 until April 2008, reported that the Company was always "hyping up" the "flexible" underwriting guidelines and its ability to make rampant exceptions, stating that the motto was, "Our guidelines are set in sand, not stone." CW 6 reported that approximately 50% of the loans he sold were approved pursuant to an exception. In similar

vein, CW 7, who worked for Golden West/Wachovia primarily as an underwriter in San Diego from February 2003 to October 2008, stated that approximately 25% of the loans she underwrote were approved pursuant to an exception. Notably, CW 7 reported that her decisions to reject loan applications were overruled approximately 70% of the time.

161.    Additional former Wachovia employees have also independently confirmed that Wachovia lowered the Pick-A-Pay loan underwriting standards even further following the acquisition of Golden West. For example, CW 8 worked at Golden West and Wachovia from 1979 until January 2008, primarily as a Senior Vice President and Senior Underwriting Manager in Golden West's San Antonio underwriting center, which underwrote the highest volume of loans of all of Golden West's underwriting centers. CW 8 supervised approximately 450 employees. CW 8 reported that, after the merger, underwriting managers were instructed to use the ETP program to approve Pick-A-Pay loans that otherwise would have been denied. CW 8 reported that underwriting managers were instructed that "there's no such thing as a 'no,'" and that they were to "approve anything."

162.    Likewise, CW 9 worked for Golden West from 1984 to 2007 in Texas and California, including as a Vice President and Director of Finance and Operations. CW 9 stated that in order to boost loan volume after acquiring Golden West, *Wachovia combed Golden West's catalogue of rejected borrowers – who had been denied mortgages even under the aforementioned lax standards – and extended them loans*. To do so, Wachovia "lowered their [underwriting] standards" by qualifying borrowers only at the initial "teaser" interest rate, and by lowering the minimum required credit score. Similarly, according to CW 10, who worked for Golden West and Wachovia from 2005 to 2007 as a loan salesman in California, the loan sales force was given "impossible" sales quotas and was instructed to "make it work"; in other words

"[it was] almost like the loan officers were inadvertently told to lie on applications to pull in more loans." As a result, CW 10 stated, the loan sales force routinely "play[ed] with the numbers to fit the model of an approved loan." CW 10 added that a number of loan officers "were very honest and refused to do that – in which case, they didn't last very long."

163. CW 11 also confirmed Wachovia's deteriorating underwriting practices. CW 11 worked for Golden West and Wachovia from July 2004 until October 2008 as a Division Sales Manager and Assistant Vice President who supervised sales and operations for five loan offices in Connecticut and New York, which closed 150-200 loans per month and generated $800 million in loans per year. After the Golden West acquisition, CW 11 reported that "underwriting loosened up significantly." As CW 11 reported, after the merger virtually all new Pick-A-Pay loans included stated income, but because the Company failed to verify any income or employment information "there was no way of telling" if such stated income or employment information was correct. Moreover, CW 11 reported that when a loan application couldn't pass muster under the already lax underwriting standards, exceptions to those standards were regularly made in order to approve the loan – most commonly by waiving "limits" (where applicable) on LTV ratios, minimum credit scores, and maximum loan amount. CW 11 was responsible for approving all the underwriting exceptions for loans originated through the branches that CW 11 oversaw, and stated that approximately 20% of all loans contained such exceptions.

164. Similarly, according to CW 12, a loan processor for the Company in California from August 2005 to February 2007 who reviewed loan files and applications for completeness, Wachovia lowered its minimum FICO credit score to the mid-to-high 500s in late 2006 or early 2007. CW 13, who worked for Golden West and then Wachovia in California from 2000 to 2008 primarily as a mortgage underwriting manager, also confirmed that in the fourth quarter of 2006

the Company lowered minimum FICO scores to the mid-500 level – well below the FICO subprime cut-off score of 660 – and allowed borrowers with these low credit scores to obtain loans based on their stated income, without verification.   As a result of such lowering of underwriting standards, Wachovia's sales representatives succeeded in originating even more Pick-A-Pay loans, and the Company's underwriters were "getting loans coming out of our ears." CW 13 further reported that, after the Golden West acquisition, the generous ETP program remained in place, and the number of exceptions to negative underwriting decisions denying the mortgage application increased.

165.   In addition, after the Golden West merger, Wachovia **lowered** the minimum required payments on newly originated Pick-A-Pay loans, resulting in a situation where borrowers would rapidly begin to owe more principal on their homes and accelerating the build-up of negative amortization (*i.e.*, increasing loan balances) with respect to many of the Company's least creditworthy borrowers.   Specifically, as reported by a *New York Times* article on May 14, 2009: "Wachovia made things worse. [Golden West] had demanded minimum annual payments of *1.95 to 2.85 percent* of the loan balance, but that fell to *1.5 percent* soon after the merger was announced.   After the deal closed, Wachovia cut the minimum payment to *1 percent*…."

166.   As a direct result of the underwriting practices described above, during the Offering Period Wachovia originated tens of billions of dollars of additional, acutely high risk Pick-A-Pay mortgages.   At the same time, Wachovia's Offering Materials repeatedly assured investors of the Company's "very strong" credit quality and "prudent lending practices" (*see* ¶¶144-147 and Section VI).   Unfortunately for investors, these assurances were untrue, culminating in tens of billions of dollars of Pick-A-Pay losses and in Wachovia's near failure as a company (*see* ¶¶226-234).

5.    **Wachovia Begins to Reveal the Low Credit Quality and Risky Underwriting of the Pick-A-Pay Portfolio**

167.    In late February 2008, certain analysts began to report that approximately 20% of Wachovia's Pick-A-Pay portfolio consisted of loans made to borrowers with subprime credit scores.  However, analysts continued to be mollified – for the time being – by Wachovia's reassurances that this portion of its portfolio did not meaningfully impact its financial condition in light of the Company's purportedly strong underwriting.  Over the course of the next several months, however, Wachovia gradually disclosed more and more information casting doubt on its prior statements.

168.    On April 11, 2008, Wachovia effectively acknowledged that, contrary to its prior assurances, the Pick-A-Pay underwriting guidelines were neither "prudent" nor "risk averse."  On that day, Wachovia announced that it would significantly tighten its underwriting requirements by always verifying its borrowers' assets and employment, and requiring minimum FICO scores.

169.    On April 14, 2008, Wachovia filed a Form 8-K (the "April 14, 2008 Form 8-K") in which it disclosed that it was increasing its credit reserves by $2.1 billion, thereby reducing its income by a corresponding amount and causing it to suffer a quarterly loss of $350 million.  This was Wachovia's first reported loss in six years.  Wachovia also announced that it was cutting its common stock dividend and would be raising an additional $7 billion of capital through further public offerings of its common and preferred stock.

170.    In its April 14, 2008 Form 8-K, Wachovia also stated that "the scope of credit disclosures was increased to provide enhanced insight into the payment option consumer real estate portfolio."  For example, in a slide included in an exhibit to the Form 8-K and that Wachovia characterized during a conference call that day as containing "new information," Wachovia disclosed that *$51 billion* worth of Pick-A-Pay loans (or approximately *62%* of the

44

total portfolio) had been made to borrowers with FICO scores below 660 and that, of this amount, $25 billion was made to borrowers with FICO scores below 620. The total amount of this exposure alone exceeded the Company's Tier 1 capital as of year-end 2007 by $7.5 billion. Moreover, in another slide, Wachovia disclosed that, as of February 2008, *$17 billion of its Pick-A-Pay loans, or 14% of the portfolio, had LTV ratios above 100%*, which directly contradicted Wachovia's previous assurances about its purportedly "well-collateralized" loan portfolio.

171. In a third slide, Wachovia tacitly acknowledged that its losses were caused by lax underwriting guidelines, and assured investors that, in an effort to avoid such high-risk loans, Wachovia was "[s]ignificantly tightening underwriting standards" by requiring that its borrowers have minimum prime FICO scores of between 660 and 700, and by requiring *significantly* lower LTV ratios of between 60-80% before future Pick-A-Pay loan applications would be approved.

172. Analysts immediately understood that Wachovia's April 2008 disclosures contradicted its prior statements. For example, on April 14, 2008, Bear Stearns issued an analyst report stating that Wachovia's $2.8 billion loan loss provision for the quarter was "<u>nearly three times what we had estimated" based on prior disclosures and illustrated Wachovia's "lagging recognition of problems</u>." Bear Stearns concluded that ongoing market deterioration was not a plausible excuse for the late disclosure of the problems in Wachovia's loan portfolio because "other banks, starting with Wells Fargo last November, had acknowledged problems in mortgage portfolios. … It is unclear why it took longer for the situation to become clear to Wachovia, though it may have something to do with Wachovia's lesser familiarity with California or the option-ARM portfolio." Likewise, on April 14, 2008, a Deutsche Bank analyst reported that Wachovia had failed to adequately acknowledge "the industry risks (esp. in regards to U.S. housing) when it came to reserves, capital, and the operating environment," and that Wachovia's

45

decision to increase its loan loss reserves in first quarter (*see* ¶¶179-192) was "belated" and "leave[s] an issue as to the degree that management is on top of the problems."

173.    Wachovia's April 14, 2008 Form 8-K constituted only a partial disclosure of the truth concerning the nature and extent of the credit quality problems with its Pick-A-Pay portfolio. Indeed, at the same time that Wachovia began to disclose the true nature of its Pick-A-Pay portfolio, it took steps to assure investors that the portfolio did not pose a financial risk to the Company. For example, in its April 14, 2008 Form 8-K Wachovia again stated that it had a "strong liquidity and capital position" and a "very prudent liquidity profile." These statements were materially untrue because in reality, *inter alia,* the value of the Pick-A-Pay portfolio was then impaired by tens of billions of dollars, thereby jeopardizing Wachovia's "well capitalized" status and posing a significant risk of insolvency.

174.    The last of the Offerings closed on May 29, 2008. Just three days later, on June 2, Wachovia announced that its chief executive officer, Defendant Thompson, had "retired at the request of the Board." The next day, *The Wall Street Journal* reported that Thompson had been "forced out" because the Company had failed to disclose the dangerously poor credit condition of the Pick-A-Pay portfolio. As *The Wall Street Journal* reported: "Mr. Thompson was slow to acknowledge how seriously the bank's credit profile was deteriorating, according to people close to the [Wachovia] board. Data on the performance of Golden West's adjustable-rate mortgage portfolio – which Wachovia did not disclose separately after the acquisition – were far worse than internal projections had indicated, one of these people says. Mr. Thompson remained too optimistic about the company's prospects, this person says. '***What he has been telling the board hasn't been realistic****....*'" Wachovia announced Robert K. Steel as its new CEO roughly five weeks later.

175.    On June 18, 2008, Wachovia acknowledged that its loans were underwritten so poorly that it had to effectively re-underwrite them from scratch.  Specifically, on that day, *Bloomberg* reported that Wachovia was contacting borrowers who had applied through third-party brokers, which accounted for 30% of the Company's loan production, to "verify information" concerning the borrowers' ability to pay the loan and to ensure that the borrowers "understand" that their loans were negatively amortizing.  *Bloomberg* quoted a mortgage banking expert as stating that Wachovia's need to re-contact borrowers to verify this basic information was "very unusual and almost unprecedented."

176.    Soon thereafter, Wachovia effectively admitted that it was not capable of accurately valuing the Pick-A-Pay portfolio at all.  On June 23, 2008, Wachovia disclosed that it had hired Goldman Sachs to analyze the value of its loan portfolio.  The next day, June 24, Ladenburg Thalmann wrote in an analyst report that Wachovia was "supposed to be adept in what Goldman was hired to do.  Basically it is in the DNA of every bank to know how to handle troubled credits.  [By hiring Goldman Sachs,] ***Wachovia is admitting it does not know how to do this***."

177.    Just six days later, on June 30, 2008, Wachovia announced that it would stop originating Pick-A-Pay loans altogether and would waive all prepayment penalties for Pick-A-Pay borrowers so that they could refinance into conventional mortgage loans.  According to the *Charlotte Observer*, an analyst at Sandler O'Neil Partners described this concession as "a capitulation on the Golden West model."  Similarly, *BusinessWeek* reported that the move was "an admission that a lot of borrowers were put into loans that they either didn't understand or couldn't afford," and further noted that "in recent weeks, the deficiencies in Golden West's underwriting – for one, the [company] didn't call employers to verify income – came to light."

178.    As set forth more fully below in Section IV.D, in September 2008 the severe credit impairment in the Pick-A-Pay portfolio caused Wachovia to go into a death spiral, which culminated in the stunning revelations that the value of the portfolio was impaired by tens of billions of dollars, that Wachovia was effectively insolvent, and that it would require extraordinary action by the U.S. Government to prevent Wachovia's imminent collapse into bankruptcy.  Unfortunately for investors, Wachovia's disclosures up to the end of the Offering Period about its Pick-A-Pay portfolio were materially untrue.

### B.    The Offering Materials Reported Materially Understated Loss Reserves

179.    Each quarter, Wachovia was required under GAAP to establish a loan loss reserve sufficient to cover probable losses in its mortgage portfolio.  The level of Wachovia's loan loss reserve was material to investors because it reflected the Company's assessment of the quality of its mortgage portfolio.  Further, Wachovia was required to account for any increase in its reserves by taking a charge against its income.  The financial information contained or incorporated in each of the Offering Materials after the closing of the Golden West acquisition materially understated the Company's loss reserves.

180.    Under Statement of Financial Auditing Standards ("SFAS") No. 5, Wachovia was required to establish a reserve when (i) "it is probable that an asset had been impaired . . . at the date of the financial statements," and (ii) "the amount of the loss can be reasonably estimated."  A loan is impaired when it was probable that the lender is unable to collect all amounts due according to the contractual terms of the loan agreement.  SFAS No. 5 also requires detailed disclosures, including estimates of losses, even when losses on mortgage exposures are only "reasonably possible."

181.    During the Offering Period, Wachovia failed to establish an adequate level of reserves.  The following chart shows Wachovia's allowance for loans losses as a percentage of the

total amount of its outstanding loans – including the significant decline in its reserves as measured by various key metrics that occurred beginning immediately after the closing of the Golden West acquisition during the fourth quarter of 2006:

| Period Ending | Allowance for Loan Losses (millions) | As % of net loans | As % of nonaccrual/ restructured loans | As % of nonperforming assets |
|---|---|---|---|---|
| 12-31-2004 | $2,757 | 1.23% | 289% | 251% |
| 3-31-2005 | $2,732 | 1.20% | 300% | 262% |
| 6-30-2005 | $2,718 | 1.18% | 332% | 284% |
| 9-30-2005 | $2,719 | 1.13% | 347% | 303% |
| 12-31-2005 | $2,724 | 1.05% | 439% | 378% |
| 3-31-2006 | $3,036 | 1.08% | 452% | 389% |
| 6-31-2006 | $3,021 | 1.07% | 488% | 421% |
| 9-30-2006 | $3,004 | 1.03% | 520% | 396% |
| Golden West acquisition closes (October 2006)- | | | | |
| 12-31-2006 | $3,360 | 0.80% | 272% | 246% |
| 3-31-2007 | $3,378 | 0.80% | 213% | 194% |
| 6-30-2007 | $3,552 | 0.79% | 182% | 164% |
| 9-30-2007 | $3,505 | 0.78% | 135% | 120% |
| 12-31-2007 | $4,717 | 0.98% | 90% | 84% |
| 3-31-2008 | $6,567 | 1.37% | 84% | 78% |
| Offering Period Ends in May 2008 (before release of Q2 financial statements)- | | | | |
| 6-30-2008 | $10,744 | 2.20% | 95% | 90% |
| 9-30-2008 | $15,351 | 3.18% | 109% | 102% |

182.    As the above chart shows, from the end of 2006 through the end of 2007 – as the housing market was collapsing and defaults were increasing – Wachovia reported *significantly lower* reserves as a percentage of outstanding loans than it had maintained before acquiring Golden West's Pick-A-Pay portfolio.  Indeed, from the closing of the Golden West acquisition until the beginning of 2008, Wachovia reserved less than 1% of its outstanding loan amounts to cover losses associated with defaulting loans and loans whose default was probable – a decline from pre-merger levels.   Wachovia's loan loss reserves as a percentage of non-accrual/restructured loans, and as a percentage of non-performing loans, declined even more sharply in the financial reporting periods following the closing of the Golden West acquisition in

October 2006.

183.    Notwithstanding these ratios, Wachovia assured investors in the Offerings that its reserve levels were adequate on the ground that the Company's loan portfolio was of higher quality than its competitors' portfolios.  For example, in its 2006 Form 10-K, issued after the Golden West acquisition closed, Wachovia told investors that its reserve levels were appropriate because "[o]ur credit quality remained among the best in the banking industry."  Similarly, in its 2007 Form 10-K, Wachovia stated that, when evaluating the adequacy of its reserves, "it is important to note the high percentage of our portfolio that is collateralized and our low level of uncollateralized loans on which industry-wide losses are typically high, such as credit card loans."  Similarly, in its Form 10-Q for the first quarter of 2007, Wachovia assured investors in the Offerings that its modest reserve levels were appropriate because, "Credit quality remained strong…."   Wachovia's repeated statements that its reserves were "maintained at levels that are adequate to absorb probable losses inherent in the loan portfolio" were also untrue.

184.    It was only in the first quarter of 2008 that Wachovia began to increase its reserves in an effort to catch up to the reality of the Pick-A-Pay portfolio's low credit quality. Nonetheless, even as of March 31, 2008 (the end of the first quarter), Wachovia's reserves as a percentage of net loans were still only marginally higher than in 2004 when the housing market was still robust.  Wachovia's drastic increase in its reserves after the end of the Offering Period – and Wells Fargo's subsequent disclosure that more than **half** of the Pick-A-Pay portfolio was impaired (see ¶234) – confirm the inadequacy of Wachovia's allowance for loan losses.

185.    The amount of reserves specifically allocated to the Pick-A-Pay portfolio illustrates a similar story.  In the fourth quarter of 2007, Wachovia's loan loss reserve on its Pick-A-Pay portfolio of $824 million equaled only 0.68% of the outstanding loan balances represented

by that portfolio.  By comparison, Wachovia reserved almost forty percent more for its overall loan portfolio (0.98%), which was less risky and more creditworthy than the Pick-A-Pay portfolio.  Although Wachovia increased its reserve by approximately $1 billion (from $824 million) to $1.96 billion (or 1.6%) on its Pick-A-Pay portfolio as of the end of the first quarter of 2008, this increase was also patently insufficient.  At the end of the next two quarters (*i.e.*, after the Offering Period), Wachovia increased its Pick-A-Pay reserve first to $5.21 billion (or 4.23%) and then to $8.65 billion (or 7.22%) – representing a four-fold increase compared to the end of the first quarter of 2008.

186.    Even Wachovia's September 30, 2008 reserve for the Pick-A-Pay portfolio was clearly insufficient, as Wells Fargo announced on October 2, 2008, before Wachovia's third quarter 2008 earnings release, that expected losses on that portfolio would be more than ***$30 billion***.  Indeed, as part of its purchase accounting in connection with its acquisition of Wachovia, Wells Fargo took an immediate writedown of $24.3 billion on the value of the Pick-A-Pay portfolio – an amount that was almost three times as high as Wachovia's third quarter 2008 Pick-A-Pay loan loss reserve and $9 billion larger than Wachovia's entire third quarter 2008 allowance for loan losses.

187.    Significantly, as Wells Fargo stated in its Form 10-K for 2008, filed on February 27, 2009, Wells Fargo took these massive write-downs because "[c]ertain of the loans acquired from Wachovia have evidence of credit deterioration since origination and it is probable that we will not collect all contractually required principal and interest payments."  In sum, Wells Fargo's independent reserve analysis confirmed that Wachovia's previously reported reserve levels for the Pick-A-Pay loan portfolio were woefully inadequate.

188.    Moreover, during the Offering Period, Wachovia failed to take into account

fundamental factors that were necessary for any reasonably reliable reserve computation.  For example, Wachovia's methodology for calculating its reserves failed to take into account the deteriorating housing market and the specific characteristics of Pick-A-Pay borrowers – a failure that Wachovia first disclosed in the April 14, 2008 Form 8-K.  There, Wachovia announced that it had changed the manner in which it calculated reserves to take into account two pre-existing conditions: (i) the sharp deterioration in housing prices which had been ongoing since 2006, and (ii) the common-sense proposition that borrowers are more likely to default when (as a result of declining real estate values and/or negative amortization) the borrower's mortgage balance approaches (or even exceeds) the market value of the underlying property.   Wachovia acknowledged that, as a result of these "refinements," it would "substantially" increase its loan loss reserves (and take a corresponding charge against income) in the first quarter of 2008.

189.    In its subsequently filed Form 10-Q for the first quarter of 2008, Wachovia explained for the first time that its "new" loan loss methodology "strongly correlates forward expected losses to changes in the home prices and the resulting change in borrower behavior, and is less reliant on historical delinquency trends."  Additionally, it stated that "the new model incorporates approximately 20 loan and/or borrower characteristics to further enhance loss forecasting by correlating borrower propensity to default and resulting loss severity to a widely used home price index, and it connects borrower equity to projected changes in home prices by geographic region."

190.    Wachovia's change in its reserve methodology as of the end of the first quarter of 2008 amounted to a concession that it had previously failed to take into account: (i) the characteristics of its borrowers; (ii) the risky nature of its own underwriting and the ongoing sharp decline in housing prices; and (iii) that Wachovia had instead relied largely on outdated historical

mortgage delinquency data.  The trends reflected by that outdated data  were established during a period of rising housing prices, and were based on loans issued without the deficient underwriting standards that Golden West and Wachovia had employed to fuel an expansion of the Pick-A-Pay portfolio.  As a result, the historical data and trends upon which Wachovia's reserve methodology was largely predicated before April 2008 were not representative of the current portfolio, and therefore their application to the current portfolio materially understated Wachovia's reasonably estimable loan losses.  In addition, Wachovia's prior reserving methodology was contrary to SEC Staff Accounting Bulletin ("SAB") No. 102, Selected Loan Loss Allowance Methodology and Documentation Issues, which states that in setting reserves a Company's management is to consider the following factors:

- ***Levels of and trends in delinquencies and impaired loans;***
- Levels of and trends in charge-offs and recoveries;
- Trends in volume and terms of loans;
- ***Effects of any changes in risk selection and underwriting standards, and other changes in lending policies, procedures, and practices;***
- Experience, ability, and depth of lending management and other relevant staff;
- ***National and local economic trends and conditions;***
- ***Industry conditions;*** and
- Effects of changes in credit concentrations.

191.    Wachovia's prior reserve methodology also was contrary to the 2001 Expanded Guidance for Subprime Lending Programs issued by the Federal Deposit Insurance Corporation ("FDIC"), the Office of the Comptroller of the Currency, the Federal Reserve Board, and the Office of Thrift Supervision.  This guidance, which emphasized the importance of ensuring that a financial institution's loan loss allowance represented "a prudent [and] conservative estimate of losses," specifically provided that, when using historical loss experience to estimate expected credit losses, the historical loss experience "should be adjusted for changes in trends, conditions, and other relevant factors, including business volume, underwriting, risk selection, account

management practices, and current economic or business conditions that may alter such experience."

192.    As noted above in ¶¶184-86, Wachovia continued to report materially understated and inadequate reserves even after it adopted its revised reserving methodology.  Moreover, even as revised, Wachovia's methodology for determining the appropriate level of reserves continued to be neither prudent nor conservative.  For example, in its April 14, 2008 Form 8-K, Wachovia stated that it had relied on housing data from the Office of Federal Housing Enterprise Oversight ("OFHEO") to assess the decline in the housing market for purposes of determining its reserves.  However, the OFHEO index showed materially less severe declines in housing prices than other indices (such as the Case-Schiller index).  Had Wachovia used a more appropriate housing price index (and appropriately taken into account, among other things, the characteristics of its borrowers and the risky nature of its own past underwriting), its loan loss reserves would not have been so woefully inadequate.  Therefore, throughout the Offering Period, Wachovia reported materially inaccurate reserves.

### C.    Wachovia Misstated the Amount and Value of Its CDO and RMBS Holdings

193.    During 2006 and 2007, Wachovia created and underwrote approximately $10 billion of CDOs backed by subprime mortgages.  However, the Offering Materials failed to disclose that, by mid-2006, Wachovia was unable to sell billions of dollars of subprime-backed CDOs off its balance sheet.  Accordingly, unbeknownst to Wachovia's investors, Wachovia retained more than *$6 billion* of the CDOs it had underwritten (but had been unable to sell), plus an additional *$2 billion* of RMBS backed by subprime mortgages.  Until October 19, 2007, when it announced its first CDO write-down, the Offering Materials failed to disclose *any* information regarding the amount of this exposure, and Wachovia did not disclose the full extent of its CDO and RMBS holdings until January 22, 2008 – long after it had accumulated these positions.

54

194.    Wachovia's Offering Materials also failed to disclose the extent to which its CDO positions were impaired.  Wachovia's CDO holdings consisted of more than $2 billion of CDOs that were first disclosed in November 2007, and a further $4.2 billion in CDOs that were disclosed on January 22, 2008 and purportedly "hedged" with counterparties.  These "hedged" amounts included: (i) $2.2 billion of CDO exposure that was hedged with unnamed "monoline" insurers (which were in fact Ambac Financial Group, Inc. ("Ambac") and MBIA, Inc. ("MBIA")); (ii) $1.1 billion hedged with AIG; and (iii) $945 million hedged with an unidentified large European Bank.

195.    Until the third quarter of 2007, Wachovia maintained its CDO positions on its balance sheet at par, even though relevant market indices which Wachovia itself ultimately cited as pertinent to CDO valuations showed that its CDO positions had suffered a substantial decline in value.  Although Wachovia ultimately wrote down the value of its unhedged CDOs by more than $1.6 billion, or almost 80%, at the end of the second quarter of 2008, as set forth at ¶¶206-216 below, that degree of impairment had existed since at least the fourth quarter of 2007.

196.    Wachovia's assurances to investors that it had entered into effective hedging agreements and had transferred the risks of its "hedged" exposures were also materially untrue or misleading, because the monoline insurers with whom Wachovia had entered into hedging transactions did not have the resources to make good on their commitments.  Both Ambac and MBIA had insured CDO and non-prime RMBS issuances equal to many times the total amount of their respective firm's total capital and "claims paying resources."[2]  Indeed, by January 2008, the financial condition of these insurers was so weak that the New York State Department of Insurance held a series of meetings with Wachovia and other financial institutions in an effort to

---

[2]        "Claims paying resources" includes statutory capital, unearned premiums, the present value of future installment premiums, loss reserves and third party capital support facilities.

bail out both Ambac and MBIA. Throughout the Offering Period, however, Wachovia failed to take **any** writedowns on its "hedged" CDOs based on Ambac's and MBIA's supposed guarantees. Ultimately, Wachovia recognized an additional $411 million in losses from its purportedly hedged CDO exposure.

### 1.    Overview of CDOs and RMBS

197.    A CDO is a structured finance vehicle holding a pool of underlying cash generating assets and issuing certificates paying a fixed amount of principal and interest. The securities that were issued in each CDO were divided into "super senior," "senior" and lower tranches. Super senior "tranches" are paid first from the cash flow generated by the CDO's underlying assets, with more junior tranches paid only after the more senior obligations had been satisfied. The assets supporting the CDOs of asset backed securities relevant to this case consisted principally of Residential Mortgage Backed Securities ("RMBS") backed by pools of subprime mortgages, which Wachovia referred to as "ABS CDOs."[3]   The quality and performance of the underlying mortgages in the RMBS collateral was a key factor in determining the CDO's performance.

198.    Wachovia retained "super-senior" interests in both "mezzanine" and "high grade" CDOs. A mezzanine CDO is created by pooling together junior tranches (BBB and sub-BBB rated) of subprime RMBS and other collateral. This asset concentration means that a relatively small rise in underlying RMBS pool losses, *i.e.*, severe enough to wipe out the value of the junior RMBS tranches, would simultaneously destroy most of the value of the mezzanine CDO and impact the super-senior tranches. By contrast, a "high-grade" CDO is based on subprime RMBS and other collateral with a credit rating of "A" or better. However, the "super-senior tranches" in

---

[3]       *See* Wachovia's 2007 Form 10-Q, which states that "[i]n the second half of 2007, the financial markets experienced unprecedented deterioration, particularly the markets for subprime RMBS and for CDOs collateralized by subprime RMBS, which we refer to as ABS CDOs…"

Wachovia's high-grade CDOs were cushioned by only 14% of more junior tranches (compared to a 38% cushion for the "super senior" tranches of its mezzanine CDOs), and therefore were also exposed to heavy losses when only a small amount of the underlying collateral deteriorated.

## 2. Wachovia Misstated its CDO Exposure

199. By the end of 2005, as the housing market began its decline, investors had become increasingly concerned about the risks inherent in subprime-backed CDOs. For example, the November 12, 2005 article in *The Wall Street Journal*, noted above at ¶134, reported that the "much less demanding" mortgage underwriting standards of the prior years were "putting everyone . . . at risk," including the "bond investors" who purchased mortgage-backed securities. Specifically, the article noted that "[u]pon default, the lender loses. In many cases the ultimate lender isn't a bank but a bond investor whose securities provide a return based on payments made out of a pool of mortgages." Similarly, the February 15, 2006 *Barron's* article, also noted above at ¶134, reported that investors were experiencing "much anxiety" about "mortgage-backed securities," given the "easy lending practices" that had prevailed in recent years. The article reported that "[v]arious doomsday scenarios are being posited" regarding CDOs backed by subprime mortgages, and warned that "[t]hese CDOs . . . could get completely wiped [out]."

200. These problems continued – and grew worse – in 2006, as borrowers continued to default in record numbers. A Standard & Poor's report for the third quarter of 2006 noted that mortgage lenders were experiencing rising delinquencies and early payment defaults. In the first quarter of 2007, Moody's noted that "loans securitized in the first, second and third quarters of 2006 have experienced increasingly higher rates of early default than loans securitized in previous quarters."

201. On February 15, 2007, Joseph R. Mason (a professor at Drexel University) and Joshua Rosner (a managing director of the investment bank Graham Fischer & Co.) published a

widely circulated academic paper on CDOs.[4]  According to a February 18, 2007 article in *The New York Times*, Mason and Rosner found that "it is only a matter of time before defaults in mortgage pools hit returns in collateralized debt obligation pools."  Significantly, Mason and Rosner noted that "no one knows who is holding the risk," *i.e.*, who owned the CDOs.  *The New York Times* article concluded: "[u]nfortunately, the damage of the mortgage mania has been done and its effects will be felt.  It's only a matter of when."

202.    Despite the market's focus on the risks of subprime–related exposures, however, Wachovia did not disclose that it had retained any significant subprime CDO or RMBS exposure until late in the Offering Period, and stated that it had minimized its subprime exposure.  Indeed, the only references to subprime exposure of any sort in Wachovia's first and second quarter 2007 Form 10-Qs were statements that the Company's results "reflect the divestiture of our subprime mortgage servicing operation in late 2006."  In Wachovia's conference calls, the Company also downplayed its subprime exposure.  For example, on January 30, 2007, Defendant Thompson stated that "***we're not in the sub-prime market,***" and on July 20, 2007, Defendant Truslow stated that "***We don't have a subprime focus*** in our business" and that "we've actively managed our business to ***minimize our exposure to the subprime market***."[5]

203.    It was not until October 19, 2007 that Wachovia gave any indication of its exposure to substantial holdings of subprime CDOs and RMBS.  In a Form 8-K filed that day, Wachovia disclosed that it had suffered market valuation losses caused by "market disruption" in the capital markets, including "$438 million writedown of CDOs, collateralized loan obligations

---

[4]    *See* Mason & Rosner, *How Resilient Are Mortgage-Backed Securities to Collateralized Debt Obligation Market Disruptions?* (Feb. 15, 2007).

[5]    By contrast, once Wachovia disclosed its subprime CDO positions, it included the following additional belated disclosure in its 2007 Form 10-K:  "While we do not operate a subprime residential origination channel, we have purchased subprime residential assets such as RMBS as part of our CDO distribution strategy."

and other structured credit products." However, Wachovia did not disclose the amount of its CDO or RMBS exposures, but only the aggregate amount of these and various write-downs.

204.    Wachovia's next disclosures relating to its CDO exposure were in a Form 8-K and Form 10-Q filed on November 9, 2007. In a table in the filings, Wachovia reported that its **net** ABS CDO and subprime RMBS exposures as of September 30, 2007 were $1.79 billion and $2.5 billion, respectively. These figures had never before been disclosed. Wachovia also reported that its net CDO exposures had been reduced to $680 million after factoring in a $1.1 billion October valuation decline. A footnote to the table stated that these totals excluded CDO exposures guaranteed by "AAA rated financial guarantors," but nothing warned investors that Wachovia's total remaining exposure was in fact many times greater than the $680 million that was disclosed.

205.    Wachovia finally disclosed its total CDO exposure in a presentation on January 22, 2008. On that date, Wachovia disclosed that, after subtracting its third and fourth quarter 2007 writedowns, Wachovia's remaining ABS CDO **gross** exposure was $5 billion – or more than **seven times greater** than the net amount identified in Wachovia's November disclosure.[6] The $5 billion included a previously undisclosed $4.178 billion of exposure "hedged with financial guarantors." As set forth below, however, the monoline financial insurers that guaranteed much of this "hedged" exposure were in financial distress, and lacked the ability to cover more than a fraction of defaults on these purportedly "hedged" CDOs.

### 3.    Wachovia Overstated the Value of its CDO Portfolio

206.    Even though Wachovia finally reported its gross CDO exposure beginning in January 22, 2008, it continued to significantly overstate the value of its CDOs by failing to record these subprime-related assets at fair market value. These misstatements, in turn, resulted in

---

[6]    Adding back write-downs, Wachovia's gross ABS CDO exposure was $6 billion and its net (*i.e.*, unhedged) ABS CDO exposure was more than $2 billion.

corresponding overstatements of Wachovia's pre-tax income, net income, earnings per share, total assets, retained earnings and total shareholders' equity on the Company's financial statements. They also inflated Wachovia's reported Tier 1 capital ratios.

207.    Wachovia reported that it primarily recorded its structured investments, which included its CDOs, at fair value.  Pursuant to SFAS No. 115, "*Accounting for Investments in Certain Debt and Equity Securities*," securities that are bought and held principally for the purpose of being sold in the near term are to be classified as "trading securities." This includes all mortgage-backed securities retained after the securitization of mortgage loans held for sale, regardless of whether the enterprise intended to sell those securities or hold them as long-term investments.  (*See* SFAS No. 134, "*Accounting for Mortgage-Backed Securities Retained after the Securitization of Mortgage Loans Held for Sale by a Mortgage Banking Enterprise*.")  GAAP requires such trading securities to be carried at fair value in a Company's statement of financial condition, and all mark-to-market (unrealized) gains and losses on trading securities must be recognized in the current period's income statement. Consequently, Wachovia was required to carry its subprime assets at "fair value" in its Statement of Financial Position.

208.    SFAS No. 157, "*Fair Value Measurement*," issued in September 2006 and effective January 1, 2008, defines "fair value" as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."  "At the measurement date" means that fair value must reflect the conditions that exist as of the date of the relevant balance sheet.  SFAS No. 157 emphasizes that fair value is "not an entity specific measurement," and "should be determined based on the assumptions that market participants would use in pricing the asset or liability."  Although SFAS No. 157 did not become formally effective until January 1, 2008, it reflected essentially the same definition of fair

value as had previously existed under GAAP, including FAS 107, "Disclosures about Fair Value of Financial Instruments."

209. Under SFAS No. 107, quoted market prices are the best indication of fair value. In the absence of quoted market prices, a company is required to develop its "best estimate" using comparable values or pricing models, including using values based on similarly traded instruments or information obtained from pricing services. As set forth below, however, Wachovia's reported valuations for its CDO holdings were inflated and not presented in accordance with GAAP because they were inconsistent with readily available market data.

210. In January 2006, some of the leading commercial and investment banks, including Wachovia, entered into a collaborative effort with Markit Group Ltd., a provider of financial data, to launch the first asset-backed securities index, which came to be known as the "ABX Index." The ABX Index measures the value of subprime RMBS by measuring the cost of purchasing "credit protection" or "insurance" for representative subprime RMBS that are part of the Index. As the price of buying credit protection for the RMBS increases, the ABX index declines. Separate ABX Indices exist for each of the main underlying tranches within the underlying RMBS, based on those tranches' credit-ratings, with the result that there is an AAA ABX Index, an AA ABX Index, etc., down to the BBB- ABX Index. Each Index's RMBS tranches (reflecting ratings from AAA to BBB-) are considered to be representative of other RMBS product tranches backed by subprime collateral with the same rating.

211. The "TABX Index," launched in February 2007, tracks the value of the BBB and BBB- tranches of the ABX indices, but *also* takes into account varying levels of subordination. Like CDOs, which include senior and junior tranches, the TABX Index accounts for high levels of subordination and therefore provides a benchmark for the valuation of senior CDO positions

such as those owned by Wachovia. The most senior index is the TABX.HE 07-1 06-2 40-100 (the "40-100 TABX"), because that index is tied to underlying RMBS collateral with a subordination level of 40%. The 40% subordination level is actually somewhat higher than the subordination level associated with Wachovia's CDO holdings, and therefore provides a conservative benchmark against which to assess the value of the Company's CDOs.

212.    The ABX and TABX indices were objective, directly observable, **real-time** indicators of the value of Wachovia's closely analogous CDO holdings. These indices were closely tracked by banks, investment banks, and other market participants in the mortgage market. Similarly, the SEC considered the ABX a "relevant market ind[ex]" for CDO valuation[7] and Wachovia **itself** noted the relevance of these indices beginning in its November 9, 2007 Form 10-Q and Form 8-K, in which it stated:

> In October, rising defaults and delinquencies in subprime residential mortgages and rating agencies' downgrades of a large number of subprime residential mortgage-related securities led to unprecedented declines in the ABX subprime indices that contributed to a rapid decline in the valuations of subprime RMBS and ABS CDOs.

213.    By February and March 2007, the ABX Index for RMBS tranches rated BBB and BBB- had suffered serious declines, with some BBB- tranches dropping as much as 60%. By September 30, 2007, the ABX BBB Index had fallen to 30% of par, and this decline continued during subsequent quarters.

214.    The TABX indices also plunged. From inception in February 2007 until June 30, 2008, the 40-100 TABX simply collapsed, falling to less than 35% of par by September 28, 2007, to less than 18% of par by December 31, 2007, and to less than 10% of par by March 31, 2008:

---

[7]    *See* March 2008 "Dear CFO" letter from SEC to public companies, available at http://www.sec.gov/divisions/corpfin/guidance/fairvalueltr0308.htm.

| Date | Value (100 = 100% of par) |
|------|---------------------------|
| 3/30/2007 | 83.8 |
| 6/29/2007 | 69.08 |
| 9/28/2007 | 34.25 |
| 12/31/2007 | 17.25 |
| 3/31/2008 | 9.22 |
| 6/30/2008 | 5.75 |

215.    The downward spiral of the ABX and TABX indices, combined with the collapse of the U.S. housing market, made it clear that the value of ABS CDOs were declining significantly beginning no later than the first half of 2007.  GAAP required Wachovia to timely write-down the value of its CDO holdings to fair value in accordance with SFAS No. 115 and, later, No. 157.  Nonetheless, Wachovia did not take its first write-downs of its CDO holdings until October 19, 2007, at which time Wachovia reported a $430 million "market disruption loss" from CDOs and other structured credit products.  As Wachovia later disclosed, $230 million of this amount related to its ABS CDO and other subprime-related holdings.[8]  Even allocating the entire $230 million writedown to Wachovia's net (*i.e.*, non-"hedged") ABS CDO-related exposure, that writedown was hundreds of millions of dollars less than required as indicated by the collapse of the applicable market indices.  For example, using the decline in the TABX 40-100 as a reasonable proxy for the decline in the value of Wachovia's CDO holdings, the cumulative writedown as of September 30, 2007 should have been ***$1 billion*** larger.

216.    The same pattern continued throughout the balance of the Offering Period. Specifically, as of the fourth quarter of 2007 and first quarter of 2008, Wachovia took cumulative

---

[8]    On November 9, 2007, Wachovia disclosed that $347 million of this writedown was for its ABS CDO portfolio.  However, on April 22, 2008, Wachovia corrected that amount to $230 million.  The $350 million total included writedowns on Wachovia's ABS CDO portfolio and also a $120 million writedown of the value of Wachovia's investment in its its BluePoint Re insurance subsidiary ("BluePoint").

writedowns on its non-"hedged" ABS CDO-related positions of $1.048 billion and $1,387 billion, respectively. Based on the 40-100 TABX index, however, these writedowns should have been closer to $1.7 billion and $1.9 billion, respectively. As a result, the value of Wachovia's net ABS CDO holdings, even after taking into account Wachovia's writedowns, were overstated by ***more than 50%*** for the fourth quarter of 2007 and first quarter of 2008.

217.    Wachovia also overstated the value of its "hedged" CDOs by failing to consider the counterparty credit risk associated with the significant amount of monoline "hedges" it maintained on its positions. The monoline insurers' traditional business had been insuring bonds issued by government authorities. However, the monoline insurers turned increasingly to insuring CDOs and RMBS, issuing guarantees on these assets that were equal to many times their available capital or claims paying resources. The monoline insurers therefore had a very small margin for error, as losses in the riskiest portions of their insured CDO and RMBS portfolios would wipe out their capital and destroy their ability to operate.

218.    MBIA, for example, was one of the largest monoline insurers (and one that Wachovia used to "hedge" its exposure). As of June 30, 2007, MBIA insured nearly $1 ***trillion*** in obligations, including $36.3 billion principal amount of U.S. RMBS and $53.4 billion of U.S. CDOs. By contrast, however, MBIA's capital base was only $6.55 billion, and its total "claims paying resources" amounted to only $14.6 billion. Similarly, Ambac's statutory capital as of June 30, 2007 was $6.7 billion and its total "claims paying resources" were $13.5 billion – yet Ambac issued $943 billion of financial guarantees, which included guarantees on $50.5 billion principal of U.S. CDOs and $47 billion principal of U.S. RMBS. In other words, Wachovia was hedging its exposure with entities that posed as great a risk of default as that of the underlying securities that Wachovia held.

219.    The paper thin margin for error at the monoline insurers was noted at the time by investment community commentators.  On March 14, 2007, *The Wall Street Journal* reported that "[t]raders were looking for trouble in two insurers with exposure to the mortgage industry, MBIA Inc. and MGIC Investment Corp., which were perceived as vulnerable to a wave of defaults." Similarly, in a May 2007 presentation entitled "Who's Holding the Bag?," which was widely reported in the financial press, hedge fund manager William Ackman asserted that MBIA and Ambac were "effectively insolvent" on account of predicted losses arising from their insurance of CDOs and RMBS.

220.    On January 24, 2008, *The Wall Street Journal* reported that New York State regulators were "trying to spur a Wall Street bailout of bond insurers," and that "[t]he bond insurers' solvency has become one of Wall Street's biggest preoccupations."  A *Bloomberg* article the same day reported that representatives from Wachovia and other financial institutions attended a two-hour meeting convened by the New York State Insurance Superintendent to discuss a rescue of the bond insurers.

221.    Indeed, Wachovia's own wholly-owned monoline subsidiary, BluePoint, was one of the first to collapse under the weight of CDO guarantees.  Wachovia created and initially capitalized BluePoint with $300 million.  BluePoint functioned not only as a primary monoline, in which capacity it guaranteed counterparties' CDO exposures, but also as a reinsurer, in which capacity it re-insured other monolines' exposure.  Over the third and fourth quarters of 2007, Wachovia was forced to write down the entirety of its investment in BluePoint and subsequently refused to provide any further funding.  BluePoint's financial collapse beginning in the third quarter of 2007 provided further confirmation that Wachovia's monoline CDO hedges were impaired.

65

222.    Wachovia did not report any reserves based on its monoline exposures until after the end of the second quarter, when in its August 11, 2008 Form 10-Q it reported that, "in the first half of 2008, we recorded $166 million of reserves based on monoline exposure profiles and our assessments of the credit quality of each monoline."   Wachovia recorded an additional $245 million of reserves for monoline exposure at the end of the third quarter.   The more than $400 million in reserves that Wachovia eventually established represented approximately 20% of the gross value of the ABS CDO positions that Wachovia had previously represented were fully hedged by "highly rated" monoline insurers.   Combined with Wachovia's losses on its non-"hedged" CDOs, Wachovia ultimately recognized CDO-related losses totaling more than $2.2 billion by the end of the third quarter of 2008.

### D.    The Offering Materials Erroneously Assured Investors that Wachovia Was Well-Capitalized, and Omitted to Disclose that Its Mortgage-Related Exposures Jeopardized Its Tier 1 Capital

223.    By no later than the end of 2007, Wachovia's exposure to billions of dollars of severely impaired mortgage-related assets had substantially impaired the Company's Tier 1 capital ratio.   Nevertheless, Wachovia inaccurately assured investors in the Offering Materials that Wachovia maintained a comfortably "well capitalized" position, with excess liquidity that it could make available to financial markets notwithstanding recent market disruptions.

224.    For example, in Wachovia's 2007 Form 10-K, it represented that "[o]ur balance sheet is strong and well capitalized under regulatory guidelines with a tier 1 capital ratio of 7.35 percent."   The 2007 Form 10-K also stated that "[w]e remain well positioned in a challenging environment with a strong liquidity position and capital levels."   Further, in a press release attached to the April 14, 2008 Form 8-K, Wachovia's chief executive officer, Defendant Thompson, stated that Wachovia's capital position was so strong that "[w]e have generally been a provider of liquidity to the market during the period of market disruption."   The Form 8-K itself

underscored Wachovia's "strong liquidity and capital position" and "very prudent liquidity profile," and stated that the purpose of the April 17, 2008 Offering was "to invest and drive future earnings growth," rather than to remedy a capital shortfall.

225.    Based on these statements, analysts and investors were repeatedly reassured that Wachovia was indeed well capitalized.  For example, on April 27, 2008, Deutsche Bank upgraded Wachovia from "hold" to "buy" "for the first time in seven years" precisely because "[n]o more capital raises are needed."  Likewise, on April 15, 2008, an analyst report issued by Punk Ziegel reported that management had stressed that "there will be no likelihood of further capital increases and that ultimately the new capital can be leveraged to drive earnings higher," and concluded that Wachovia was "a healthy bank."

226.    Shortly after the Offering Period ended on May 29, 2008, financial analysts questioned whether Wachovia's Tier 1 capital levels and "well capitalized" status were in jeopardy due to undisclosed losses and related problems in its mortgage portfolio.  On July 15, 2008, Oppenheimer downgraded Wachovia from "Perform" to "Underperform," and questioned whether Wachovia's loss assumptions for its Pick-A-Pay portfolio were "too aggressive," noting that the Company's peer banks had used lower "asset value assumptions."  Oppenheimer noted that the "disparity" between Wachovia's accounting and that of its peer banks raised "concerns" about Wachovia's "capital." Later that day, Wachovia issued a statement, reported in *Bloomberg*, dismissing these concerns and reassuring investors that Wachovia was "fundamentally strong."

227.    On September 14, 2008, Deutsche Bank downgraded Wachovia and questioned whether losses in the Pick-A-Pay portfolio were significantly larger than the Company had disclosed, causing "concerns about its capital."  The next day, September 15, Lehman Brothers announced plans to file for bankruptcy and Merrill Lynch was purchased by Bank of America,

both because of toxic mortgage exposures.  An Oppenheimer analyst appeared on CNBC and was asked, "Who's next and most vulnerable?"  The analyst specifically cited Wachovia because her most recent analysis indicated that the Company's mortgage-related assets were worth significantly less than reported, stating that she was "curious … of their math" regarding reserves and asset values, and that Wachovia "will have to play catch-up" in properly reporting its losses. In response, Wachovia's new chief executive officer, Mr. Steel, appeared on CNBC later that day and countered that only "$10 billion out of over $500 billion" of Wachovia's loans were "problematic," and that these troubled loans were in the *commercial* portfolio.  The Pick-A-Pay portfolio, he stated, "will yield quite attractive returns over time," and thus, Wachovia had a "great future as an independent company."

228.    Just ten days later, on September 25, 2008, federal regulators seized the country's second-largest holder of option ARMs behind Wachovia, Washington Mutual ("WaMu"), and engineered its sale to JPMorgan Chase.  JPMorgan Chase immediately marked WaMu's option ARM portfolio down by more than 20%. Because WaMu's and Wachovia's option ARM portfolios were similar, market analysts immediately expressed concern that Wachovia's mortgage portfolio was similarly impaired by 20%  – or by approximately $24 billion.  On September 26, Deutsche Bank reported that JPMorgan's accounting for WaMu's portfolio provided "increased visibility of the likely embedded risks in [Wachovia's] ARM portfolio," and caused concern "about [Wachovia's] liquidity and solvency."  On September 27, 2008, *The Wall Street Journal* reported that "it's hard to make the case that [Wachovia's] portfolio is going to perform better" than WaMu's.

229.    After the September 25, 2008 announcement, Wachovia's executives quickly engaged in expedited merger discussions with Citigroup and Wells Fargo, but neither company

was willing to assume Wachovia's toxic assets, leaving a Government-engineered bailout or bankruptcy as Wachovia's only options. According to an affidavit filed by Steel in connection with subsequent litigation between Citigroup and Wells Fargo, the Chairman of the FDIC contacted Steel on Sunday, September 28, 2008 (three days after regulators had seized WaMu and less than two weeks after Steel's appearance on CNBC), to inform him that Wachovia's financial condition was so dire that it "posed a systemic risk to the banking system," that "no transaction with Citigroup or Wells Fargo could be effected without substantial government assistance," and that the Government would therefore provide such assistance to try to prevent Wachovia's dire financial situation from bringing down the rest of the U.S. banking system. Steel's affidavit further stated that without the subsequent guarantees provided by the Government, Wachovia would have been immediately "[placed] into **bankruptcy** and its banking subsidiaries into **receivership**."

230. On or about September 29, 2008, the Government brokered a deal between Wachovia and Citigroup in which Wachovia agreed to sell its operations, excluding its retail brokerage and capital management business, to Citigroup for $1 per share. As part of the deal, the FDIC agreed to indemnify Citigroup for any loan losses exceeding $42 billion – which (i) indicated that that there was serious risk that the total amount of Wachovia's probable losses on its loan portfolio was even greater than this amount, and (ii) effectively confirmed in any event that the total amount of Wachovia's probable losses on its loan portfolio was vastly in excess of Wachovia's current reserves.

231. Analysts and the financial press immediately recognized that these events demonstrated that Wachovia's repeated prior representations about its loan portfolio and capital adequacy could not have been true. On September 29, CNBC reported that chief executive

officer Steel "couldn't see how bad his own balance sheet was. He just didn't know what was there." "If the truth about Wachovia's bad loans had been on the books, then there would have been no way Steel could have been so positive about his bank's situation. The only thing investors can trust is a company's financials, [CNBC's Jim] Cramer said, and like Lehman Brothers, Wachovia's financials 'just didn't reflect reality.'"

232.    On September 30, the Internal Revenue Service announced a change in its tax regulations which allowed an acquirer of a banking corporation to accelerate the deduction of the banking corporation's pre-existing losses as an offset against the acquirer's own income, rather than having to take partial deductions of those losses over 20 years. This change in tax law effectively meant that an acquirer of Wachovia could use all of Wachovia's pre-existing losses to immediately reduce the acquirer's tax liabilities. As a direct result of this change, three days later, on October 3, 2008, Wells Fargo announced that it had agreed to purchase Wachovia in its entirety for $7 per share. Wells Fargo also immediately announced that, directly contrary to statements in the Offering Materials that the Company was well-capitalized and that the Pick-A-Pay portfolio posed no threat to its capital, Wells Fargo would have to recognize *$31 billion* in losses on the Pick-A-Pay portfolio.

233.    On October 22, 2008, Wachovia disclosed additional information regarding the significant impairment to its mortgage-related assets. That day, the Company reported that, for the quarter ended September 30, it had recognized a staggering loss of $23.9 billion. The loss included charges to income to reflect the belated recognition of a $12.3 billion impairment to goodwill (which was related largely to the Golden West acquisition and is described further below), and a $6.6 billion credit loss provision, of which $3.4 billion related to an increase in the loan loss reserves on the Pick-A-Pay portfolio. On October 22, Ladenburg Thalmann described

the resulting loss as ***"one of the largest losses recorded by any bank in history*."**

234.    After closing the Wachovia acquisition, Wells Fargo recorded substantial write-downs that further confirmed that Wachovia's mortgage-related assets were far more impaired than the Company had previously disclosed.  Specifically, on January 28, 2009, Wells Fargo reported that, as part of its purchase accounting, it had identified an immediate "credit impaired loan balance" of almost ***$94 billion*** with respect to Wachovia's residential mortgages and real-estate related commercial loans, and that ***$59.8 billion*** of this amount involved pre-existing impairments in the Pick-A-Pay portfolio.  In other words, of Wachovia's $117.5 billion portfolio of outstanding Pick-A-Pay loans, ***more than half*** ($59.8 billion or approximately 50.8%) had been credit impaired.  Wells Fargo also took an immediate write-down on the value of the Pick-A-Pay loan portfolio of ***$24.3 billion*** – on top of a $1.2 billion year-end charge-off taken in Wachovia's year-end financial statements – resulting in total additional year-end write-downs on the Pick-A-Pay portfolio alone of ***$25.5 billion***.

### E.    <u>Wachovia Misstated Its Goodwill</u>

235.    In addition to increasing the size of Wachovia's loan portfolio, Wachovia's acquisition of Golden West dramatically increased the size of the reported "goodwill" on the Company's balance sheet by almost $15 billion.  Yet, Wachovia did not write down ***any*** of the goodwill related to the Golden West acquisition until October 2008, after Wachovia's near-collapse.

236.    Goodwill represents the excess of the purchase price over the fair value of the net assets acquired in a business combination.  Companies account for their business combinations using the purchase method of accounting as set forth in FASB Statement of Financial Accounting Standards ("SFAS") No. 141, *Business Combinations*.  The assigned amounts may be adjusted for a period of up to one year after the date of the acquisition if new information becomes

available as to the actual fair value amounts of the assets or liabilities as of the date of the acquisition. The excess of the purchase price over the fair value of the net assets acquired is recognized as an asset called goodwill. SFAS No. 141 ¶¶B101 - 114.1.

237.    Thereafter, companies are required to account for their goodwill in accordance with SFAS No. 142, *Goodwill and Other Intangibles*. Companies must test goodwill annually for impairment and on an interim basis when "circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount." "A significant adverse change in legal factors or in the business climate" is an event or indicator that would require a company to test its goodwill on a more frequent basis than once a year. SFAS No. 142 ¶28. Given the deteriorating mortgage market, that clearly happened here.

238.    Testing for goodwill impairment is a two-step process. The first step compares the fair value of a reporting unit with its carrying amount. SFAS 142 ¶19. If the carrying value of the reporting unit including goodwill exceeds its fair value, then, in the second step, the amount of impairment (*i.e.*, excess over fair value) is determined. SFAS 142 ¶19. Fair value is "the amount at which the unit as a whole could be bought or sold in a current transaction between willing parties." SFAS No. 142 ¶23. If quoted market prices are not available, the estimate of fair value must be "based on the best information available" including for example "prices for similar assets and liabilities." SFAS No. 142 ¶24.

239.    For purposes of Wachovia's goodwill impairment analysis, the $15 billion of goodwill from the Golden West acquisition was allocated to Wachovia's General Bank Retail and Small Business unit (the "Retail and Small Business Unit"). In conducting goodwill testing for this unit, Wachovia failed to properly value its Pick-A-Pay loan portfolio by understating loan loss provisions. At the time of the acquisition, an astounding 95% of Golden West's reported fair

value of its assets belonged to its loan portfolio.  As of October 1, 2006, Golden West reported a total loan portfolio of $124 billion while only recording an allowance for loan losses of $303 million or *less than a quarter of a percent* **(0.24%).**  Golden West's assets were therefore grossly overstated on Wachovia's balance sheet due to the gross understatement of its loan loss reserves from the moment the acquisition closed.

240.    Wachovia first publicly reported goodwill associated with Golden West in its 2006 Form 10-K, which was filed on March 1, 2007.  By year-end 2006 and throughout 2007, the quality and condition of the Pick-A-Pay loan portfolio continued to deteriorate materially.  This deterioration, along with the significant disruption in the real estate market, clearly indicated that the fair value of the goodwill for the Retail and Small Business Unit was less than its carrying amount.

241.    In fact, Wachovia actually increased the goodwill balance for the Retail and Small Business unit by a net $19 million during 2007.  It did so despite the growing evidence indicating that serious problems existed at the time of the acquisition with the Pick-A-Pay portfolio, which had only worsened as the housing market continued to decline.  Indeed, even though interim impairment testing should have been conducted, Wachovia failed to conduct impairment tests as of March 31, 2007, June 30, 2007 and September 30, 2007, and it failed to record required goodwill impairment charges in those quarters.  Even at March 31, 2008 – a time when Wachovia was seeking to reign in its Pick-A-Pay underwriting and starting to recognize more substantial losses on the Pick-A-Pay portfolio – Wachovia – even though it conducted impairment testing – failed to recognize any impairment to the Retail and Small Business Unit's goodwill.

242.    Ultimately, in the third quarter of 2008, Wachovia reported an astonishing $23.88 billion loss – one of the largest quarterly losses ever reported by a U.S. company, including an

$18.8 billion write-down of goodwill.[9]  The goodwill impairment was prompted in part by Wells Fargo's agreement to acquire all of Wachovia for approximately $15.1 billion – a sum that was $9 billion *less* than Wachovia had paid for Golden West only two years earlier.  On October 23, 2008, in a *Wall Street Journal* article entitled "Crisis on Wall Street – Wachovia's Last Act: $23.88 Billion Loss," banking analyst Nancy Bush of NAB Research LLC responded to the Company's goodwill impairment charge: "It is the absolutely positive, objective confirmation of how bad a deal that actually was.  It was a company killer."

243.    Of the $18.8 billion goodwill write-down, $12.3 billion related to the Retail and Small Business Unit.  Because the $12.3 billion writedown was equal to 51% of that unit's total goodwill, at a minimum, *at least* $7.6 billion ($15 billion times 51%) related to Golden West. Had Wachovia recorded the Pick-a-Pay losses on a timely basis, then such losses would have been recorded in substantially earlier periods, reducing the fair value of the Retail and Small Business Unit, and resulting in substantially earlier goodwill impairment charges.

## V.    SUMMARY OF WACHOVIA'S SECURITIES OFFERINGS

244.    The Securities Act claims are brought on behalf of investors who purchased Bond Class Securities pursuant or traceable to the Offerings set forth in the Appendix.

245.    Each of the Offerings was conducted pursuant to (a) a Shelf Registration Statement and Prospectus, filed with the SEC on Form S-3 on either (i) March 14, 2005, (ii) May 26, 2005, (iii) February 7, 2007, (iv) March 5, 2007, or (v) April 14, 2008, and (b) either a prospectus supplement or pricing supplement issued in connection with such Offering. (The documents referred to in (a) and (b) above for each respective Offering are collectively referred to herein as the "Shelf Registration Statements").  The "effective date" of each of the Shelf Registration

---

[9]    The $18.8 billion includes $12.3 billion related to the Retail and Small Business reporting unit and $6.5 billion related to other reporting units.

Statements, as that term is defined under the Securities Act, is the date of the relevant Offering, rather than the earlier date on which the Shelf Registration Statement itself was filed. *See* 17 C.F.R. § 230.415 and 17 C.F.R. § 229.512(a)(2).

246.    A so-called "shelf registration" pursuant to Form S-3 permits an issuer to register numerous different securities for later issuance in a single SEC filing.  Once this "shelf" is established, the issuer may later "take down" securities from the shelf by issuing them to the public pursuant to a later-filed prospectus, prospectus supplement, and/or pricing supplement that refers investors to the underlying and previously filed Form S-3.

247.    Each of the Prospectuses expressly incorporated by reference Wachovia's most recent Form 10-K and certain Form 10-Qs and 8-Ks filed before the date of the Prospectus. Additionally, each of the Prospectuses contained the following or materially similar language:

> The SEC allows us to "incorporate by reference" into this prospectus the information in documents we file with it. This means that we can disclose important information to you by referring you to those documents. The information incorporated by reference is considered to be a part of this prospectus and should be read with the same care. When we update the information contained in documents that have been incorporated by reference by making future filings with the SEC, the information incorporated by reference in this prospectus is considered to be automatically updated and superseded. …  We incorporate by reference the documents listed below and any documents we file with the SEC after the date of this prospectus under Section 13(a), 13(c), 14, or 15(d) of the Securities Exchange Act of 1934 (the "Exchange Act") and before the date that the offering of securities by means of this prospectus is completed (other than, in each case, documents or information deemed to have been furnished and not filed in accordance with SEC rules)[.]

248.    Wachovia's financial results were filed with the SEC pursuant to Forms 8-K, 10-Q, and 10-K.  In its Form 8-Ks reporting the Company's earnings, Wachovia often limited the portions of exhibits that were to be deemed "filed" (and thereby incorporated by reference into the Offering Materials) to Wachovia's income statement and balance sheet, rather than the full texts of attached press releases and other materials.  In its Forms 10-Q and 10-K, Wachovia generally

incorporated by reference the Management Discussion of Results & Operations ("MD&A") and financial statements contained in its quarterly earnings supplements and annual reports.

249.    For each Offering, the Shelf Registration Statement and Prospectus on Form S-3, and the prospectus supplement or pricing supplement, together with all of the portions of other SEC filings incorporated by reference therein, are referred to collectively as the "Offering Materials."    The SEC filings containing material misstatements or omissions that were incorporated in the Shelf Registration Statement and Prospectuses for each of the respective Offerings are set forth in the attached Appendix.

## VI.    MATERIALLY UNTRUE STATEMENTS AND OMISSIONS IN THE OFFERING MATERIALS

### 1.    Defendants' Materially Untrue Statements Made On or Before the Closing of the Golden West Acquisition on October 1, 2006

250.    On May 8, 2006, Wachovia filed a Form 8-K with the SEC announcing its intent to merge with Golden West (the "May 8, 2006 Form 8-K").  The May 8, 2006 Form 8-K included as an exhibit a press release, dated May 7, 2006, entitled "Wachovia to Acquire Golden West Financial, Nation's Most Admired and 2nd Largest Savings Institution," which was incorporated by reference into the Form 8-K.  The press release stated, in relevant part, that "[t]he combined company … will have assets of $669 billion and a market capitalization of $117 billion."  The press release quoted Defendant Thompson stating that both Wachovia and Golden West were "known for exceptional customer service and *pristine credit quality*" and that, "[f]or four decades, Golden West has taken industry-wide challenges in stride and maintained a singular focus as a *risk-averse residential mortgage* portfolio lender."  The press release further stated that Golden West was one of the nation's largest financial institutions with assets over $125 billion as of March 31, 2006.

251.    On May 19, 2006, Wachovia filed a Form 8-K with the SEC (the "May 19, 2006

Form 8-K") reporting certain financial information and further describing Wachovia's pending merger with Golden West.  The May 19, 2006 Form 8-K incorporated by reference an exhibit showing "Pro Forma Financial Information" regarding the Wachovia-Golden West merger as of March 31, 2006.  According to the exhibit, the pro forma value of the merged company's loans net of unearned income as of March 31, 2006 was $402 billion, with an allowance for loan losses of only $3.3 billion.

252.    The statements from May 2006 set forth above in ¶¶250-251 above were materially untrue and misleading because, *inter alia*: (i) far from having "pristine credit quality" that reflected a "risk averse residential mortgage portfolio lender," Golden West engaged in high risk underwriting and had massive exposure to borrowers who were at high risk of default, as set forth in greater detail in ¶¶136-166 above; and (ii) Wachovia's statements concerning the value of Golden West's assets and of the combined companies' loans net of unearned income were massively overstated, and the combined companies' pro forma allowance for loan losses was massively understated (particularly with respect to Golden West's Pick-A-Pay portfolio), for the reasons set forth in ¶¶179-192.

253.    On October 2, 2006, Wachovia filed a Form 8-K with the SEC reporting the completion of its merger with Golden West (the "October 2, 2006 Form 8-K").  The October 2, 2006 Form 8-K incorporated by reference an exhibit showing "Pro Forma Financial Information" regarding the Wachovia-Golden West merger as of June 30, 2006.  According to the October 2, 2006 Form 8-K, the pro forma value of the merged company's loans net of unearned income as of June 30, 2006 was $405 billion, with an allowance for loan losses of $3 billion.  The October 2, 2006 Form 8-K also incorporated by reference the July 24, 2006 Proxy Statement for the Wachovia acquisition of Golden West (the "GW Proxy Statement"), which made a series of

statements about the quality of Golden West's "Pick-A-Pay" mortgage portfolio, including that the merger would "diversify Wachovia's balance sheet into *higher yielding low-risk assets*," that the "two companies have … *strong credit culture and credit quality*," and that "Golden West's financial condition and assets are *very sound*."

254.    The statements from the October 2, 2006 Form 8-K set forth in ¶253 above were materially untrue and misleading because, *inter alia*: (i) far from diversifying Wachovia's balance sheet into "higher yielding low-risk assets" or involving a merger with a company that had "strong credit culture and credit quality," the merger caused Wachovia to acquire a company (Golden West) that engaged in high risk underwriting and had massive exposure to borrowers who were at high risk of default, as set forth in greater detail in ¶¶136-166 above; and (ii) Wachovia's statements concerning the pro forma value of the merged companies' loans net of unearned income were massively overstated, and the combined companies' pro forma allowance for loan losses was massively understated (particularly with respect to Golden West's Pick-A-Pay portfolio), for the reasons set forth in ¶¶179-192.

## 2.    Defendants' Materially Untrue and Misleading Statements from November 3, 2006 through July 30, 2007

255.    Wachovia's Form 10-Q for the third quarter of 2006 (the "November 3, 2006 Form 10-Q"), its Form 10-K for the year ended December 31, 2006 (the "2006 Form 10-K"), and its Forms 10-Q for first quarter of 2007 (the "May 4, 2007 Form 10-Q") and second quarter of 2007 (the "July 30, 2007 Form 10-Q"), were materially untrue and misleading for substantially the same reasons, as summarized below.

256.    First, each of these filings materially misrepresented the quality of Wachovia's loan portfolio, including Wachovia's "Pick-A-Pay" loans.  For example, each of the above Form 10-Qs and the 2006 Form 10-K represented that Wachovia's "[c]redit quality remained strong,"

that Wachovia "continue[s] to mitigate risk and volatility on [its] balance sheet by actively monitoring and reducing potential problem loans, including their sale when prudent," and that Wachovia maintained a "highly collateralized … loan portfolio."  In addition, the 2006 Form 10-K represented that Wachovia's "strong" credit quality "remained among the best in the banking industry in 2006," and that

> The low level of net charge-offs reflects a continuing robust credit environment and the highly collateralized nature of our portfolio, and our ***careful management of the inherent credit risk in our loan portfolio.***  Golden West has a long record of extremely low net charge-offs, including none for the past eight years, reflecting their ***strong underwriting and credit risk management***. Accordingly, the addition of Golden West also reduced our annual charge-off percentage.

257.    However, the statements in the preceding paragraph were materially untrue and omitted material facts because they misrepresented the risk of default in Wachovia's loan portfolio, including Wachovia's "Pick-A-Pay" loans, because, *inter alia*: (i) far from having "strong underwriting and credit risk management," "careful risk management," or "strong" credit quality, Golden West and, after its acquisition on October 1, 2006, Wachovia engaged in high risk underwriting and had massive exposure to borrowers who were at high risk of default, as set forth in greater detail in ¶¶136-166 above; and (ii) Wachovia's statements concerning the value of its assets and net loans were massively overstated, (particularly with respect to the Pick-A-Pay portfolio), for the reasons set forth in ¶¶136-178.

258.    Second, the 2006 Form 10-K and the May 4, 2007 Form 10-Q also represented that the portfolio was "well-collateralized" and that, of Wachovia's consumer real estate portfolio, "83 percent has a loan-to-value ratio of 80 percent or less" and "95 percent has a loan-to-value ratio of 90 percent or less."  The July 30, 2007 Form 10-Q made a virtually identical representation, except that it stated that "82 percent has a loan-to-value ratio of 80 percent or less" and "95 percent has a loan-to-value ratio of 90 percent or less."

259.    The statements in the preceding paragraph were materially untrue and omitted material facts, and Wachovia's reported loan-to-value ratios were materially understated, because Wachovia's stated LTV ratios were based on loan-to-value ratios at *origination*, rather than based on then-current, actual loan-to-value ratios.   Thus, the LTV ratios set forth in the preceding paragraph did not reflect either (i) the accumulation of negative amortization that had added to outstanding loan balances or (ii) the collapse in housing prices that had occurred after the loans had been originated.   It was not until April 14, 2008 that Wachovia disclosed that the LTV ratios that it had previously reported were based on **original** loan-to-values and that, using then-current loan-to-values, more than **$17 billion** – or 14% – of its Pick-A-Pay portfolio alone exceeded a **100%** loan to value ratio.

260.    Third, the 2006 Form 10-K, and the May 4, 2007 and July 30, 2007 Forms 10-Q reported (as of December 31, 2006, March 30, 2007 and June 30, 2007, respectively) allowances for loan losses of $3.360 billion, $3.378 billion and $3.390 billion, respectively.   However, each of these statements was materially untrue and misleading because it failed to disclose that Wachovia's loss reserves (particularly with respect to its Pick-A-Pay portfolio) were massively understated, for the reasons set forth in greater detail at ¶¶179-192.

261.    Fourth, the 2006 Form 10-K and the November 3, 2006, May 4, 2007 and July 30, 2007 Forms 10-Q failed to disclose Wachovia's exposure to billions of dollars of subprime-related CDOs and RMBS, and the May 4, 2007 and July 30, 2007 Form 10-Qs failed to disclose the impairment in the value of those CDOs and RMBS, for the reasons set forth in ¶¶193-222.

262.    Fifth, the 2006 Form 10-K and the May 4, 2007 and July 30, 2007 Forms 10-Q failed to disclose the substantial impairments to Wachovia's goodwill, for the reasons set forth in ¶¶235-243.

263.    Sixth, because Wachovia's reserves were understated and its assets were overstated, and because Wachovia failed to take the charges against earnings required to bring its reserves to adequate levels and to record the proper write-downs in the value of its assets, Wachovia's publicly reported net income and Tier 1 capital as set forth in its 2006 Form 10-K and its May 4, 2007 and July 30, 2007 Forms 10-Q were also materially overstated.

264.    Wachovia's 2006 Form 10-K and May 4, 2007 and July 30, 2007 Forms 10-Q each represented that Wachovia's financial statements were prepared in accordance with generally accepted accounting principles ("GAAP").  Each of those representations was materially untrue for the reasons set forth above and at ¶¶179-243.

265.    Because Wachovia's Forms 8-K filed on January 23, 2007, April 16, 2007 and July 20, 2007 each incorporated by reference Wachovia's consolidated balance sheets and statements of income as of the end of the prior quarter, each of those Forms 8-K was also materially untrue and misleading for the same reasons as set forth in ¶¶255-264 above.

266.    KMPG audited Wachovia's year-end 2006 financial statements contained in the 2006 10-K and issued a report dated February 23, 2007 (the "2006 Audit Report") on the consolidated balance sheets, income statement and statements of financial condition of Wachovia, which stated in relevant part as follows:

> We have audited the accompanying consolidated balance sheets of Wachovia Corporation and subsidiaries as of December 31, 2006 and 2005, and the related consolidated statements of income, changes in stockholders' equity and cash flows for each of the years in the three-year period ended December 31, 2006.  These consolidated financial statements are the responsibility of the Company's management.  Our responsibility is to express an opinion on these consolidated financial statements based on our audits.
>
> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the

financial statements.  An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Wachovia Corporation and subsidiaries as of December 31, 2006 and 2005, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2006, in conformity with U.S. generally accepted accounting principles.

267.    KPMG consented to the inclusion of its 2006 Audit Report in each Offering made between February 23, 2007 and February 25, 2008.  In an exhibit attached to the 2006 Form 10-K, KPMG also consented to the inclusion of its 2006 Audit Report in future offerings made pursuant to the May 2005 Registration Statement, and certain other registration statements, including those for the Wachovia Capital Trust IX and X offerings.   In addition, the Prospectuses for the Offerings made pursuant to the March 2007 Registration Statement and for the Wachovia Capital Trust IX and X Offerings each stated (under the heading "Experts") as follows:

The consolidated balance sheets of Wachovia Corporation as of December 31, 2006 and 2005, and the related consolidated statements of income, changes in stockholders' equity and cash flows for each of the years in the three-year period ended December 31, 2006, and management's assessment of the effectiveness of internal control over financial reporting as of December 31, 2006, included in Wachovia's 2006 Annual Report which is incorporated by reference in Wachovia's Annual Report on Form 10-K for the year ended December 31, 2006, and incorporated by reference herein, have been incorporated by reference herein *in reliance upon the reports of KPMG LLP*, independent registered public accounting firm, incorporated by reference herein, and upon the authority of said firm as experts in accounting and auditing.

268.    For the reasons set forth above, Wachovia's 2006 financial statements did not fairly present the Company's financial condition and were not prepared in accordance with GAAP.  In addition, KPMG's 2006 Audit Report was materially untrue and misleading for the same reasons.

### 3.    Wachovia's Materially Untrue and Misleading November 9, 2007 Form 10-Q

269.    On November 9, 2007, Wachovia filed a Form 10-Q for the third quarter of 2007 (the "November 9, 2007 Form 10-Q"), which represented that Wachovia had increased its allowance for loan losses by $145 million over the past nine months, and that the increase "was driven by *modest* deterioration in credit quality and loan growth."  In its November 9, 2007 Form 10-Q,Wachovia further assured investors that "we will continue to actively monitor loan quality and take proactive steps to reduce risk when warranted," and represented that it was well positioned due to "the well collateralized nature of our real-estate securities portfolio, our careful management of inherent risk and *strong underwriting*."

270.    The above statements were materially untrue and omitted material facts because, *inter alia,* (i) far from having engaged in strong underwriting, Wachovia (including its predecessors at Golden West) had and were continuing to engage in high risk underwriting and had massive exposure to borrowers who were at high risk of default, as set forth in greater detail in ¶¶136-166 above; and (ii) they failed to disclose that Wachovia's $145 million increase in its allowance for loan losses was woefully inadequate to bring its reserves to adequate levels (particularly with respect to the Pick-A-Pay portfolio), as set forth in greater detail at ¶¶179-192 above.

271.    In addition, the November 9, 2007 Form 10-Q repeated the same misstatements as the prior three Form 10-Qs and 2006 Form 10-K about the loan-to-value ratio of Wachovia' consumer mortgage loan portfolio, stating that of Wachovia's consumer real estate portfolio, "83 percent has a loan-to-value ratio of 80 percent or less" and "95 percent has a loan-to-value ratio of 90 percent or less."  These figures were materially inaccurate because Wachovia's stated LTV ratios were based on loan-to-value ratios at *origination*, rather than based on then-current, actual

loan-to-value ratios.  Thus, the LTV ratios set forth above did not reflect either (i) the accumulation of negative amortization that had added to outstanding loan balances or (ii) the collapse in housing prices that had occurred after the loans had been originated.  It was not until April 14, 2008 that Wachovia disclosed that the LTV ratios that it had previously reported were based on *original* loan-to-values and that, using then-current loan-to-values, more than *$17 billion* – or 14% – of its Pick-A-Pay portfolio alone exceeded a *100%* loan to value ratio.

272.    Also, the November 9, 2007 Form 10-Q reported an allowance for loan losses of $3.505 billion.  However, this statement was materially untrue and misleading because it failed to disclose that Wachovia's loss reserves (particularly with respect to its Pick-A-Pay portfolio) were massively understated, for the reasons set forth in greater detail at  ¶¶179-192.  The November 8, 2007 Form 10-Q failed to disclose Wachovia's exposure to more than $4 billion of additional subprime-related CDOs and failed to accurately disclose the impairment the value of those CDOs, for the reasons set forth in ¶¶193-222.

273.    The November 9, 2007 Form 10-Q failed to disclose the substantial impairments to Wachovia's goodwill, for the reasons set forth in ¶¶235-243.

274.    Because Wachovia's reserves were understated and its assets were overstated, and because Wachovia failed to take the charges against earnings required to bring its reserves to adequate levels and record the proper write-downs in the value of its assets, Wachovia's publicly reported net income and Tier 1 capital as set forth in its November 9, 2007 Form 10-Q were materially overstated.

275.    The November 9, 2007, Form 10-Q also represented that Wachovia's financial statements were prepared in accordance with GAAP.  That statement was materially untrue for the reasons set forth in ¶¶179-243 above.

4.     **Wachovia's Materially Untrue and Misleading January 22, 2008 Form 8-K and 2007 Form 10-K**

276.     On January 22, 2008, Wachovia filed a Form 8-K with the SEC (the January 22, 2008 Form 8-K"), which incorporated by reference Wachovia's consolidated balance sheet and statement of income for the year ended December 31, 2007.  Wachovia reported (i) total assets of approximately $783 billion, including a net loan balance of approximately $457 billion; (ii) total stockholders' equity of approximately $77 billion; (iii) and net income of $51 million for the fourth quarter of 2007 and $6.3 billion for the full year.  These financial results were also reported in Wachovia's Form 10-K for the year ended December 31, 2007, which was filed with the SEC on February 28, 2008

277.     Each of these figures was materially inaccurate because Wachovia's assets and equity were worth a fraction of their reported value, and its net income was overstated, as a result of (i) the severe impairments in Wachovia's residential mortgage portfolio, including its Pick-A-Pay portfolio, as set forth above at ¶¶136-166; (ii) the impairments in Wachovia's portfolio of CDOs and RMBS, as set forth above at ¶¶193-222; and (iii) the impairments to Wachovia's goodwill, as set forth above at ¶¶235-243.  Moreover, these figures and related financial disclosures were also materially untrue and misleading and omitted material facts because they failed to disclose that Wachovia's reported Tier 1 capital had been impaired and was substantially diminished.

278.     Wachovia's 2007 Form 10-K stated that, notwithstanding an increase in its net charge offs in 2007, its loan portfolio remained "***highly collateralized***," that Wachovia "continue[s] to mitigate the risk and volatility of our balance sheet through ***prudent risk management practices***, including ***tighter underwriting*** and enhanced collection efforts," and that "the ***well-collateralized*** nature of our real estate-secured portfolio, our ***careful management of***

*credit risk and strong underwriting* position us relatively well in this credit environment." The Form 10-K further stated that of its $227.7 billion consumer real estate portfolio, "82 percent has a loan-to-value ratio of 80 percent or less," and "95 percent has a loan-to-value ratio of 90 percent or less."

279.    The above statements were materially untrue and omitted material facts because, *inter alia,* (i) far from having engaged in strong or prudent underwriting, Wachovia (including its predecessors at Golden West) had and were continuing to engage in high risk underwriting and had massive exposure to borrowers who were at high risk of default, as set forth in greater detail in ¶¶136-166 above; (ii) Wachovia's loan portfolio was not "well-collateralized," and its reported loan-to-value ratios were materially understated, because they actually were the loan-to-values at origination, and did not reflect either (a) the accumulation of negative amortization that had added to outstanding loan balances or (b) the collapse in housing prices that had occurred after its loans had been originated.  Indeed, as Wachovia finally acknowledged for the first time on April 14, 2008, based on February 2008 data, more than *$17 billion* – or 14% – of its Pick-A-Pay portfolio alone exceeded a *100%* loan to value ratio.

280.    The 2007 Form 10-K also reported that Wachovia maintained a Tier 1 capital ratio of 7.35% as of December 31, 2007, a figure that was substantially above the 6% ratio required to be "well capitalized."  Further, the 2007 Form 10-K described Wachovia's purportedly strong capital position and balance sheet, even in the face of deteriorating market conditions, as follows: "We remain well positioned in a challenging environment with a strong liquidity position and capital levels. … Our balance sheet is strong and well capitalized under regulatory guidelines…."

281.    However, these statements about Wachovia's purportedly "well capitalized" status, "strong" balance sheet and Tier 1 capital levels were materially untrue and misleading because, as

set forth above at ¶¶223-234, the Company's mortgage-related and other assets were so impaired that Wachovia's stated Tier 1 capital had been substantially eroded.

282.   Wachovia's 2007 Form 10-K stated that Wachovia's financial statements were prepared in accordance with generally accepted accounting principles ("GAAP").  That statement was materially untrue for the reasons set forth above.

283.   KMPG audited Wachovia's year-end 2007 financial statements contained in the 2007 Form 10-K and issued a report dated February 25, 2008 (the "2007 Audit Report") on the consolidated balance sheets, income statement and statements of financial condition of Wachovia as of December 31, 2006 and 2007 and certain earlier periods.  The 2007 Audit Report was substantially in the form set forth at ¶266.  In addition, KPMG consented to the inclusion of the 2007 Audit Report in each Offering made after February 25, 2008, and the Prospectus for the Series L Preferred Stock Offering specifically stated that Wachovia's year-end 2006 and 2007 financial statements were "incorporated by reference herein upon the reports of KPMG, LLP … and upon the authority of said firm as experts in accounting and auditing."

284.   For the reasons set forth above, Wachovia's 2007 financial statements did not fairly present the Company's financial condition and were not prepared in accordance with GAAP.  In addition, KPMG's 2007 Audit Report was materially untrue and misleading for the same reasons.

### 5.    Wachovia's April 14, 2008 Form 8-K

285.   On April 14, 2008, Wachovia filed a Form 8-K to which it attached:  (i) its earnings press release for the first quarter of 2008; (ii) a first quarter financial results presentation; and (iii) its quarterly earnings report for the first quarter of 2008 (collectively, the "April 14, 2008 Form 8-K"), all of which were incorporated by reference into Offerings made on or after April 14, 2008.

286.    In its April 14, 2008 Form 8-K, Wachovia reported (i) total assets of approximately $784 billion (including a net loan balance of approximately $466 billion); (ii) total stockholders' equity of approximately $78 billion; and (iii) a net loss of $350 million for the first quarter of 2008.  However, each of these figures was materially inaccurate because the value of Wachovia's assets and shareholders' equity were materially overstated, and its net loss for the first quarter of 2008 was materially understated, as a result of (i) the severe impairments in Wachovia's residential mortgage portfolio, including its Pick-A-Pay portfolio, as set forth above at ¶¶136-166; (ii) the impairments in Wachovia's portfolio of CDOs and RMBS, as set forth above at ¶¶193-222; and (iii) the impairments to Wachovia's goodwill, as set forth above at ¶¶235-243.

287.    In addition, the April 14, 2008 Form 8-K reported that Wachovia maintained a Tier 1 capital ratio of 7.5% as of March 31, 2008 – an increase over its Tier 1 ratio as of December 31, 2007, and substantially above the 6% ratio required to be "well capitalized." However, these representations were materially untrue and misleading because they failed to disclose that Wachovia's Tier 1 capital had been impaired and that, as a result, the Company's stated Tier I Capital had been substantially eroded, as set forth in greater detail above at ¶¶223-234.

288.    Further, the April 14, 2008 Form 8-K set forth numerous statements describing Wachovia's purportedly strong capital position and balance sheet, even in the face of deteriorating market conditions, as follows.  For example, the April 14, 2008 Form 8-K stated that:

> (i)  The Company possessed a "***strong liquidity and capital position***."
>
> (ii) "Wachovia Corporation continues to maintain a ***very prudent liquidity profile.***"
>
> (iii)The Company's "[p]roactive actions provide solid foundation in order to further strengthen the balance sheet and build capital to ***top tier levels***"

(iv) The Company's "capital preservation and build … [p]rovides ability to operate from a ***position of strength***."

289.    However, these statements concerning Wachovia's purportedly "strong capital position" and "prudent liquidity profile" were materially untrue and misleading because, *inter alia,* as set forth above at ¶¶223-234, the Company's mortgage-related and other assets were so impaired that Wachovia was precariously close to insolvency.  Indeed, as set forth above, only five months after Wachovia made these representations to investors concerning its purportedly "strong" balance sheet and capital position, investors learned that Wachovia's mortgage-related assets were actually impaired by ***tens of billions*** of dollars, that Wachovia lacked the capital to absorb these losses, and that it was therefore on the brink of insolvency.

## VII.    CLASS ACTION ALLEGATIONS

290.    Plaintiffs bring this action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure individually and on behalf of all persons and entities who purchased or otherwise acquired the "Bond Class Securities" set forth in the Appendix, and who were damaged thereby (the "Bond Class").  Excluded from the Bond Class are Defendants and their respective current or former officers, directors, immediate family members, legal representatives, heirs, successors or assigns, any entity in which any Defendant has or had a controlling interest, and any person or entity who has entered into a tolling agreement in connection with this action and the affiliates thereof.

291.    The members of the Bond Class are so numerous that joinder of all members is impracticable.  While the exact number of Bond Class members is presently unknown to Plaintiffs and can only be ascertained through appropriate discovery, Plaintiffs reasonably believe that there are thousands of members of the Bond Class.  Record owners and other members of the Bond Class may be identified by records maintained by Defendants and their transfer agents, and may

be notified of the pendency of the action by mail, the internet, or publication using the form of notice similar to that customarily used in securities class actions.

292. Plaintiffs' claims are typical of the claims of the members of the Bond Class as all members of the Class are similarly affected by Defendants' violations of the Securities Act.

293. Plaintiffs will fairly and adequately represent the interests of the members of the Bond Class and have retained counsel competent and experienced in class and securities litigation.

294. Common questions of law and fact exist as to all members of the Bond Class and predominate over any questions solely affecting individual members of the Bond Class. These common questions of law and fact include:

> a. whether Defendants violated the Securities Act as alleged herein;
>
> b. whether the Shelf Registration Statements and the Offering Materials contained misstatements or omissions of material fact; and
>
> c. the proper measure of damages.

295. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Bond Class to obtain individual redress. There will be no difficulty in the management of this action as a class action.

## VIII. <u>CAUSES OF ACTION</u>

### COUNT I

**FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT
AGAINST THE WACHOVIA ISSUER DEFENDANTS
<u>AND WELLS FARGO AS SUCCESSOR-IN-INTEREST</u>**

296. Plaintiffs repeat and reallege each and every allegation contained above as if set

forth fully herein.

297.    This Count is asserted against the Wachovia Issuer Defendants and Wells Fargo for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Plaintiffs and all members of the Class, who purchased or otherwise acquired the Bond Class Securities pursuant or traceable to the materially untrue and misleading Registration Statements and Offering Materials incorporated by reference in those Registration Statements, and were damaged thereby.

298.    This claim is not based on and does not sound in fraud.  For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that any Defendant acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.  Each of the Registration Statements, including the Offering Materials incorporated by reference therein at the time of each Offering, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

299.    Wachovia was the issuer of all the Offerings.  Wachovia Capital Trust IV, Wachovia Capital Trust IX and Wachovia Capital Trust X were also issuers of the 2/15/07 6.375% TPS Offering, the 5/8/07 6.375% TPS Offering and the 11/21/07 7.85% TPS Offering, respectively.  Wachovia also signed each of the Registration Statements for the Offerings.

300.    Each Wachovia Issuer Defendant, with respect to each Offering of Bond Class Securities issued by it, is strictly liable under Section 11 for the materially untrue statements and omissions in the Registration Statement and incorporated Offering Materials for that Offering.  Wells Fargo is liable as successor-in-interest to Wachovia after merging with Wachovia on or about December 31, 2008.

301.    Plaintiffs and the members of the Class purchased Bond Class Securities issued in

the Offerings pursuant or traceable to the Registration Statements.

302.    At the time they purchased or acquired their Bond Class Securities, Plaintiffs and the members of the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the Registration Statements and incorporated Offering Materials.

303.    The value of the Bond Class Securities declined substantially subsequent to the consummation of the Offerings, and Plaintiffs and the other members of the Class have sustained damages.

304.    Less than one year elapsed between the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based and the time that the first complaint was filed asserting claims arising out of the falsity of each of the Registration Statements.  Less than three years elapsed between the time that each of the securities at issue in this complaint was bona fide offered to the public and the time that the first complaint was filed asserting claims arising out of the falsity of each relevant Registration Statement for such securities.

305.    By reason of the foregoing, the Wachovia Issuer Defendants are liable for violations of Section 11 of the Securities Act to Plaintiffs and the other members of the Class who purchased or otherwise acquired Bond Class Securities pursuant to or traceable to the Registration Statements.  Wells Fargo is liable as successor-in-interest to Wachovia.

## COUNT II

### FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT
### AGAINST THE INDIVIDUAL DEFENDANTS OTHER THAN TRUSLOW

306.    Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

307.    This Count is asserted against the Individual Defendants other than Truslow for

violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Plaintiffs and all members of the Class, who purchased or otherwise acquired the Bond Class Securities pursuant or traceable to the materially untrue and misleading Registration Statements and Offering Materials incorporated by reference in those Registration Statements, and were damaged thereby.

308.    This claim is not based on and does not sound in fraud.  For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that any Defendant acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

309.    Each of the Registration Statements, including the Offering Materials incorporated by reference therein at the time of each Offering, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

310.    Each Individual Defendant named in this Count is liable in connection with those Offerings: (a) made at a time when the Defendant was a director of the issuer, or (b) made pursuant to a Registration Statement that the Defendant signed as set forth in Section III.B.3 above.  .

311.    Each of these Individual Defendants is unable to establish an affirmative defense based on a reasonable and diligent investigation of the statements contained in the Registration Statements and incorporated Offering Materials.  These Individual Defendants did not make a reasonable investigation or possess reasonable grounds to believe that those statements were true and that there were no omissions of any material fact.  Accordingly, they acted negligently and are liable to Plaintiffs and the other members of the Class.

312.    Plaintiffs and the Class acquired the Wachovia securities issued in the Offerings pursuant or traceable to the Registration Statements.

313.    At the time they purchased or acquired their Bond Class Securities, Plaintiffs and the members of the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the Registration Statements and incorporated Offering Materials.

314.    The value of the Bond Class securities declined substantially subsequent to the consummation of the Offerings, and Plaintiffs and the other members of the Class have sustained damages.

315.    Less than one year elapsed between the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based and the time that the first complaint was filed asserting claims arising out of the falsity of each of the Registration Statements.  Less than three years elapsed between the time that the securities at issue in this complaint were bona fide offered to the public and the time that the first complaint was filed asserting claims arising out of the falsity of each of the Registration Statements.

316.    By reason of the foregoing, the Individual Defendants, other than Defendant Truslow, are liable for violations of Section 11 of the Securities Act to Plaintiffs and the other members of the Class who purchased or otherwise acquired Bond Class Securities issued pursuant or traceable to the Registration Statements.

## COUNT III

### FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT
### AGAINST THE UNDERWRITER DEFENDANTS AND KPMG

317.    Plaintiffs repeat and reallege each and every allegation contained above as if set forth fully herein.

318.    This Count is asserted against the Underwriter Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of members of the Class who purchased or

otherwise acquired the Bond Class Securities pursuant or traceable to the materially untrue and misleading Registration Statements and Offering materials incorporated by reference in those Registration Statements, and who were damaged thereby.

319.    This Count is also asserted against KPMG for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of members of the Class who purchased or otherwise acquired the Bond Class Securities pursuant to or traceable to the materially inaccurate Registration Statements issued in connection with the Offerings, which incorporated Wachovia's 2006 or 2007 financial statements audited by KPMG and KPMG's audit opinions, and who were damaged thereby.

320.    Each of the Registration Statements, including the Offering Materials incorporated by reference therein at the time of each Offering, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

321.    As set forth in the Appendix, each of the Underwriter Defendants acted as an underwriter of certain Offerings of the Bond Class Securities.

322.    KPMG audited Wachovia's 2006 and 2007 financial statements, which were incorporated by reference into the materially inaccurate Registration Statements issued in connection with the Offerings, and consented to its audit opinions being included in those Registration Statements.  As such, KPMG is liable for the material misstatements or omissions in those financial statements and in its 2006 and 2007 Audit Opinions.

323.    Each of the Underwriter Defendants and KPMG is unable to establish an affirmative defense based on a reasonable and diligent investigation of the statements contained in the Registration Statements and incorporated Offering Materials.  These Defendants did not make

a reasonable investigation and did not posses reasonable grounds to believe that those statements contained in the Registration Statements and incorporated Offering Materials were true and that there were no omissions of material fact. Plaintiffs and the Class purchased Bond Class Securities issued in the Offerings pursuant and/or traceable to the Registration Statements.

324.    Plaintiff and the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the Registration Statements and incorporated Offering Materials when they purchased or acquired their Bond Class Securities.

325.    The value of the Bond Class Securities declined substantially subsequent to the consummation of the Offerings, and Plaintiffs and the other members of the Class have sustained damages.

326.    Less than one year elapsed between the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based and the time that the first complaint was filed asserting claims arising out of the falsity of each of the Registration Statements. Less than three years elapsed between the time that the securities at issue in this complaint were bona fide offered to the public and the time that the first complaint was filed asserting claims arising out of the falsity of each of the Registration Statements.

327.    By reason of the foregoing, the Underwriter Defendants and KPMG are liable for violations of Section 11 of the Securities Act to Plaintiffs and the other members of the Class who purchased or otherwise acquired Bond Class Securities issued pursuant or traceable to the Registration Statements.

## COUNT IV

### FOR VIOLATIONS OF SECTION 12(a)(2) OF THE SECURITIES ACT AGAINST THE WACHOVIA ISSUER DEFENDANTS AND WELLS FARGO AS SUCCESSOR-IN-INTEREST

328.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

329.    This Count is asserted against the Wachovia Issuer Defendants for having promoted and sold the Wachovia Securities issued in the Offerings pursuant to the Prospectuses, which contained untrue statements of material facts and material omissions as alleged herein. Wells Fargo is liable as successor-in-interest to Wachovia after merging with Wachovia on or about December 31, 2008.

330.    This claim does not sound in fraud.  For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

331.    The Wachovia Issuer Defendants directly solicited the purchase of Bond Class Securities by Plaintiffs and other members of the Class by means of the Shelf Registration Statements and related Prospectuses and financially benefitted thereby.  Their acts included but are not limited to the following:

(a) Wachovia prepared and approved the Registration Statements, Prospectuses and Offering Materials incorporated by reference for each Offering, made the decisions to conduct the Offerings and to do so at the stated price, and directly benefitted from the Offerings. The proceeds of three Offerings of Trust Preferred Securities were paid to Wachovia for Wachovia subordinated notes that were the sole assets of the Wachovia Trusts.

(b) The Wachovia Trusts approved and participated in the preparation of the

Registration Statements and Prospectuses for their respective Offerings, participated in the decisions to conduct the Offerings and to do so at the stated price, and received the proceeds of the Offerings to purchase Wachovia subordinated notes.  The only purpose of the Wachovia Trusts was to serve as the vehicle to accomplish the Offerings.

332.    The Wachovia Issuer Defendants used the means and instrumentalities of interstate commerce and the U.S. mails.

333.    The Wachovia Issuer Defendants are unable to establish an affirmative defense based upon a reasonable or diligent investigation of the statements contained in the Registration Statements, Prospectuses and incorporated Offering Materials.  The Wachovia Issuer Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained therein and incorporated by reference in the Prospectuses at the time of each Offering were true and that there were no omissions of any material fact.

334.    Plaintiffs and other members of the Class purchased or otherwise acquired Wachovia securities issued in the Offerings pursuant to the materially inaccurate Shelf Registration Statements and incorporated Public Offering Materials and did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained therein.

335.    The value of the Bond Class securities declined substantially subsequent to the consummation of the Offerings, and Plaintiffs and the other members of the Class have sustained damages.

336.    Less than one year elapsed between the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based and the time that the first complaint was filed asserting claims arising out of the falsity of each of the Registration

Statements.  Less than three years elapsed between the time that the securities at issue in this complaint were bona fide offered to the public and the time that the first complaint was filed asserting claims arising out of the falsity of each of the Registration Statements.

337.    By reason of the foregoing, the Wachovia Issuer Defendants are liable under Section 12(a)(2) of the Securities Act to Plaintiffs and other members of the Class who purchased the Bond Class Securities in the Offerings, and Wells Fargo is liable as successor in interest to Wachovia.  Plaintiffs and other members of the Class have the right to rescind and recover the consideration paid for their Bond Class Securities on which they have suffered damages.  In addition, Plaintiffs and the members of the Class who have sold and suffered damages on their Bond Class Securities that they originally purchased through the Offerings are entitled to rescissory damages.

## COUNT V

### FOR VIOLATIONS OF SECTION 12(a)(2) OF THE SECURITIES ACT AGAINST THE UNDERWRITER DEFENDANTS

338.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

339.    This Count is asserted against the Underwriter Defendants for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all members of the Class who purchased or otherwise acquired Bond Class Securities in the Offerings and were damaged thereby.

340.    This claim is not based on and does not sound in fraud.  For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

341.    The Underwriter Defendants were sellers of the Bond Class Securities within the

meaning of the Securities Act because they (i) transferred title to Plaintiffs and other members of the Class who purchased in the Offerings; and (ii) solicited the purchase of the Bond Class Securities by Plaintiffs and other members of the Class and were financially benefitted thereby, including but not limited to receiving underwriting fees, commissions or discounts in connection with the Offerings.  The Offering Materials contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth herein.

342.    The Underwriter Defendants used the means and instrumentalities of interstate commerce and the U.S. mails.

343.    The Underwriter Defendants are unable to establish an affirmative defense based upon a reasonable or diligent investigation of the statements contained in the Registration Statements, Prospectuses and incorporated Offering Materials.  The Underwriter Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained therein and incorporated by reference in the Prospectuses at the time in each Offering were true and that there were no omissions of any material fact.  Accordingly, each of the Underwriter Defendants is liable to Plaintiffs and other members of the Class who purchased Bond Class Securities in the Offerings in which that Defendant acted as an underwriter.

344.    Plaintiffs and other members of the Class purchased or otherwise acquired Wachovia securities issued in the Offerings pursuant to the materially inaccurate Shelf Registration Statements and incorporated Public Offering Materials and did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained therein.

345.    The value of the Bond Class securities declined substantially subsequent to the

consummation of the Offerings, and Plaintiffs and the other members of the Class have sustained damages.

346.    Less than one year elapsed between the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based and the time that the first complaint was filed asserting claims arising out of the falsity of each of the Registration Statements.  Less than three years elapsed between the time that the securities at issue in this complaint were bona fide offered to the public and the time that the first complaint was filed asserting claims arising out of the falsity of each of the Registration Statements.

347.    By reason of the foregoing, the Underwriter Defendants are liable under Section 12(a)(2) of the Securities Act to Plaintiffs and other members of the Class who purchased the Bond Class Securities in the Offerings.  Plaintiffs and other members of the Class have the right to rescind and recover the consideration paid for their Bond Class Securities on which they have suffered damages.  In addition, Plaintiffs and the members of the Class who have sold and suffered damages on their Bond Class Securities that they originally purchased through the Offerings are entitled to rescissory damages.

## COUNT VI

### FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT
### AGAINST WACHOVIA AND WELLS FARGO AS SUCCESSOR IN INTEREST

348.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

349.    This Count is asserted against Wachovia and Wells Fargo (as successor to Wachovia) for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiffs and the other members of the Class who have asserted claims pursuant to Sections 11 or 12(a)(2) of the Securities Act, as set forth above.

350.    This claim does not sound in fraud.  For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

351.    At all relevant times, Wachovia was, by virtue of its ownership and its actual control of the Wachovia Trusts' activities, a controlling person of the Wachovia Trusts within the meaning of Section 15 of the Securities Act.  Wachovia had the power and influence, and exercised that power and influence, to cause the Wachovia Trusts to engage in the acts and violations of law complained of herein, including the power and influence to control (a) the Trusts' participation as an issuer in the Offerings, (b) the Trusts' role in the preparation and review of the Registration Statements and other Offering Materials, and (c) the Trust's solicitation, offer and sale of the Bond Class Securities.

352.    At all relevant times, Wachovia was also, by virtue of its ownership and actual control of WCM's activities, a controlling person of WCM within the meaning of Section 15 of the Securities Act.  Wachovia had the power and influence, and exercised that power and influence, to cause WCM to engage in the acts and violations of the Securities Act complained of herein, including the power and influence to control (a) WCM's participation as an underwriter in the Offerings, (b) WCM's role in the preparation and review of the Registration Statements and other Offering Materials, and (c) WCM's solicitation, offer and sale of the Bond Class Securities.

353.    By reason of the foregoing, Defendant Wachovia is liable under Section 15 of the Securities Act to Plaintiffs and the other members of the Class who purchased or otherwise acquired Bond Class securities issued by the Wachovia Trusts or underwritten or sold by WCM, and who were damaged thereby.  Wells Fargo is liable as successor-in-interest to Wachovia.

## COUNT VII

### FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT
### AGAINST THOMPSON, TRUSLOW AND WURTZ

354.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

355.    This Count is asserted against Individual Defendants Thompson, Truslow and Wurtz for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiffs and the other members of the Class who have asserted claims pursuant to Sections 11 or 12(a)(2) of the Securities Act, as set forth above.

356.    This claim does not sound in fraud.  For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

357.    Defendants Thompson, Truslow and Wurtz, through their positions as Wachovia's Chief Executive Officer, Chief Risk Officer and Chief Financial Officer, respectively, were each controlling persons of Wachovia within the meaning of Section 15 of the Securities Act at the times of each of the Offerings.  Because of their positions of control and authority as senior officers of Wachovia and their control of the contents of Wachovia's financial statements and SEC disclosures, Thompson, Truslow and Wurtz were able to, and did, control the contents of the Registration Statements and the incorporated Offering Materials, which contained materially untrue or misleading information and omitted material facts.

358.    By virtue of Defendants Thompson's, Truslow's and Wurtz's control over Wachovia, and by virtue of Wachovia's control over the Wachovia Trusts and WCM, Defendants Thompson, Truslow and Wurtz were also controlling persons of the Wachovia Capital Trusts and WCM within the meaning of Section 15 of the Securities Act with respect to the actions of the

Wachovia Trusts as issuers of, and with respect to the actions of WCM as an underwriter and seller of, Bond Class Securities.

359.     By reason of the foregoing, Defendants Thompson, Truslow and Wurtz are liable under Section 15 of the Securities Act to Plaintiffs and the other members of the Class who purchased or otherwise acquired the Bond Class Securities pursuant or traceable to the Registration Statements, and who were damaged thereby.

360.     **WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

a.     Determining that this action is a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Bond Class defined herein;

b.     Awarding all damages and other remedies set forth in the Securities Act in favor of Plaintiffs and all members of the Bond Class against Defendants in an amount to be proven at trial, including interest thereon;

c.     Awarding Plaintiffs and the Bond Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.     Such other and further relief as the Court may deem just and proper.

## IX.     <u>JURY TRIAL DEMANDED</u>

361.     Plaintiffs hereby demand a jury trial.

DATED: September 4, 2009
      New York, New York

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**


By:       /s/
       John P. Coffey (sean@blbglaw.com)
       William C. Fredericks (bill@blbglaw.com)
       Kurt Hunciker (kurt@blbglaw.com)
       John Rizio-Hamilton (johnr@blbglaw.com)
       Jeroen van Kwawegen
       (Jeroen@blbglaw.com)

1285 Avenue of the Americas, 38th Floor
New York, New York 10019
Tel:  212-554-1400
Fax:  212-554-1444

*Counsel for Lead Plaintiffs Orange County Employees' Retirement System and Louisiana Sheriffs'  Pension and Relief Fund, and Co-Lead Counsel for the Class*


**BARROWAY TOPAZ KESSLER MELTZER & CHECK, LLP**

David Kessler
John A. Kehoe (jkehoe@btkmc.com)
Benjamin J. Sweet
John J. Gross
280 King of Prussia Road
Radnor, Pennsylvania 19087
Tel: 610-667-7706
Fax: 610-667-7056

*Counsel for Lead Plaintiff Southeastern Pennsylvania Transportation Authority and Co-Lead Counsel for the Class*

105

**COUGHLIN STOIA GELLER RUDMAN &
ROBBINS LLP**

John J. Rice
Lucas F. Otis
Maureen E. Mueller
655 West Broadway, Suite 1900
San Diego, CA 92101
Tel.: 619-231-1058
Fax: 619-231-7423

*Co-Lead Counsel for the Class*

**KLAUSNER & KAUFMAN, P.A.**

Robert D. Klausner
10059 Northwest 1st Court
Plantation, Florida 33324
Tel: 954-916-1202
Fax: 954-916-1232

*Additional Counsel for Plaintiff Louisiana
Sheriffs' Pension and Relief Fund*

**GLANCY BINKOW & GOLDBERG LLP**

Lionel Z. Glancy
Michael Goldberg
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Tel.:  310-201-9150
Fax:   310 201-9160

*Counsel for Plaintiffs Norman Levin, Arlette Miller,
Michael Swiskay, as trustee of the Judith R. Swiskay
Irrevocable Trust U/A 7/16/2007; Michael Swiskay,
as trustee of the Trust U/W/O Hanan Swiskay FBO
Jeffrey Swiskay; and Michael Swiskay, as trustee of
the Trust U/W/O Hanan Swiskay*

# APPENDIX

**PREFERRED STOCK OFFERINGS**

| ISSUE DATE | ISSUER/SECURITY (CUSIP) | AMOUNT | VOLUME (PRICE) | UNDERWRITER DEFENDANTS (VOLUME)[1] | INCORPORATED DOCUMENTS[2] | REGISTRATION STATEMENT/SIGNATORIES[3] |
|---|---|---|---|---|---|---|
| 2/15/07 | Wachovia Capital Trust IV (unconditionally guaranteed by Wachovia)/6.375% Trust Preferred Securities (92978U207) | 32 million Trust Preferred Securities (TPS); plus 4,800,000 TPS to cover over-allotments | $920,000,000 ($25 per TPS) | WCM ($106,000,000), Banc of America ($98,400,000), CGMI ($98,400,000), Merrill Lynch ($98,400,000), Morgan Stanley ($98,400,000), UBS ($98,400,000), ABN AMRO ($6,000,000), Barclays ($6,000,000), BB&T ($6,000,000), Countrywide ($6,000,000), Deutsche Bank ($6,000,000), Fifth Third ($6,000,000), Greenwich Capital ($6,000,000), ING ($6,000,000), J.P. Morgan ($6,000,000), KeyBanc ($6,000,000), Lehman Brothers Inc. | 5/8/06 8-K 5/19/06 8-K 10/2/06 8-K 10/16/06 8-K 11/3/06 10-Q 1/23/07 8-K | February 7, 2007 Peter M. Carlson G. Kennedy Thompson Mark C. Treanor Thomas J. Wurtz John D. Baker, II Robert J. Brown Peter C. Browning John T. Casteen, III Jerome A. Gitt William H. Goodwin, Jr. Mary Ellen C. Herringer Robert A. Ingram Donald M. James Mackey J. McDonald Joseph Neubauer Timothy D. Proctor Ernest S. Rady Van L. Richey Ruth G. Shaw Lanty L. Smith |

A-1

[1] The volume sold by each Underwriter Defendant reflects only the volume sold in the initial offering, excluding any overallotment. Where an offering includes overallotments, on information and belief, each underwriter sold an equivalent percentage of additional securities pursuant to the authorized overallotment.

[2] The documents listed are incorporated into the Offering Materials for each Offering include only those that Lead Plaintiffs challenge as materially inaccurate or misleading, as set forth more fully in the Complaint.

[3] As set forth above in Section III.B.3, each Individual Defendant is liable for Offerings conducted pursuant to a Registration Statement that he or she signed, as well as for Offerings completed during his or her tenure as a Director.

John C. Whitaker, Jr.

($6,000,000)
NatCity ($6,000,000)
Popular ($6,000,000)
RBC Dain Rausher
($6,000,000)
Wells Fargo Securities
($6,000,000)
Bear Stearns ($4,000,000)
BNP Paribas ($4,000,000)
Charles Schwab
($4,000,000)
Credit Suisse ($4,000,000)
Fidelity ($4,000,000)
FTN Financial
($4,000,000)
Goldman Sachs
($4,000,000)
H&R Block ($4,000,000)
HSBC ($4,000,000)
J.B. Hanauer ($4,000,000)
Janney ($4,000,000)
Jefferies ($4,000,000)
Morgan Keegan
($4,000,000)
Oppenheimer
($4,000,000)
Pershing ($4,000,000)
Piper Jaffray ($4,000,000)
Raymond James
($4,000,000)
Robert Baird ($4,000,000)
Sandler O'Neill
($4,000,000)

A-2

| 5/8/07 | Wachovia Capital Trust IX (unconditionally guaranteed by Wachovia)/6.375% Trust Preferred Securities (92978X201) | 30 million Trust Preferred Securities (TPS); plus 4,500,000 TPS to cover over-allotments | $862,500,000 ($25 per TPS) | WCM ($111,000,000) CGMI ($111,000,000) Merrill Lynch ($111,000,000) Morgan Stanley ($111,000,000) UBS ($111,000,000) ABN AMRO ($5,625,000) Banc of America TD AMERITRADE ($4,000,000) B.C. Ziegler ($2,000,000) Comerica ($2,000,000) D.A. Davidson ($2,000,000) Davenport ($2,000,000) Howe Barnes ($2,000,000) J.J.B. Hilliard ($2,000,000) JVB Financial ($2,000,000) Keefe Bruyette ($2,000,000) Loop ($2,000,000) Mesirow ($2,000,000) Muriel Siebert ($2,000,000) Ryan Beck ($2,000,000) Ramirez ($2,000,000) SunTrust ($2,000,000) Williams Capital ($2,000,000) Toussaint ($2,000,000) | 5/8/06 8-K 5/19/06 8-K 10/2/06 8-K 10/16/06 8-K 11/3/06 10-Q 1/23/07 8-K 2/28/07 10-K 5/4/07 10-Q | February 7, 2007 Peter M. Carlson G. Kennedy Thompson Mark C. Treanor Thomas J. Wurtz John D. Baker, II Robert J. Brown Peter C. Browning |

A-3

($5,625,000)
Barclays ($5,625,000)
BB&T ($5,625,000)
Countrywide ($5,625,000)
Deutsche Bank ($5,625,000)
Fifth Third ($5,625,000)
Greenwich Capital ($5,625,000)
ING ($5,625,000)
J.P. Morgan ($5,625,000)
KeyBanc ($5,625,000)
Lehman Brothers Inc. ($5,625,000)
NatCity ($5,625,000)
Popular ($5,625,000)
RBC Dain Rausher ($5,625,000)
Wells Fargo Securities ($5,625,000)
Bear Stearns ($3,750,000)
BNP Paribas ($3,750,000)
Charles Schwab ($3,750,000)
Credit Suisse ($3,750,000)
Fidelity ($3,750,000)
FTN Financial ($3,750,000)
Goldman Sachs ($3,750,000)
H&R Block ($3,750,000)
HSBC ($3,750,000)
J.B. Hanauer ($3,750,000)

John T. Casteen, III
Jerome A. Gitt
William H. Goodwin, Jr.
Mary Ellen C. Herringer
Robert A. Ingram
Donald M. James
Mackey J. McDonald
Joseph Neubauer
Timothy D. Proctor
Ernest S. Rady
Van L. Richey
Ruth G. Shaw
Lanty L. Smith
John C. Whitaker, Jr.

A-4

Janney ($3,750,000)
Jefferies ($3,750,000)
Morgan Keegan ($3,750,000)
Oppenheimer ($3,750,000)
Pershing ($3,750,000)
Piper Jaffray ($3,750,000)
Raymond James, Inc. ($3,750,000)
Robert Baird ($3,750,000)
Sandler O'Neill ($3,750,000)
TD AMERITRADE ($3,750,000)
B.C. Ziegler ($1,875,000)
Comerica ($1,875,000)
D.A. Davidson ($1,875,000)
Davenport ($1,875,000)
Howe Barnes ($1,875,000)
J.J.B. Hilliard ($1,875,000)
JVB Financial ($1,875,000)
Keefe Bruyette ($1,875,000)
Loop ($1,875,000)
Mesirow ($1,875,000)
Muriel Siebert ($1,875,000)
Ryan Beck ($1,875,000)
Ramirez ($1,875,000)

A-5

| | | | | SunTrust ($1,875,000)<br>Williams Capital ($1,875,000)<br>Toussaint ($1,875,000) | | February 7, 2007 |
|---|---|---|---|---|---|---|
| 11/21/07 | *Wachovia Capital Trust X (unconditionally guaranteed by Wachovia)/7.85%* Trust Preferred Securities (92979K208) | 30 million Trust Preferred Securities (TPS) | $750,000,000 ($25 per TPS) | WCM ($108,750,000)<br>GGMI ($108,750,000)<br>Merrill Lynch ($108,750,000)<br>Morgan Stanley ($108,750,000)<br>UBS ($108,750,000)<br>Banc of America ($5,625,000)<br>Barclays ($5,625,000)<br>Deutsche Bank ($5,625,000)<br>Fifth Third ($5,625,000)<br>Greenwich Capital ($5,625,000)<br>ING ($5,625,000)<br>KeyBanc ($5,625,000)<br>Lehman Brothers Inc. ($5,625,000)<br>NatCity ($5,625,000)<br>Popular ($5,625,000)<br>RBC Dain Rauscher ($5,625,000)<br>Wells Fargo Securities ($5,625,000)<br>BB&T ($3,750,000)<br>BNP Paribas ($3,750,000)<br>Bear Stearns ($3,750,000)<br>Charles Schwab | 5/8/06 8-K<br>5/19/06 8-K<br>10/2/06 8-K<br>10/16/06 8-K<br>11/3/06 10-Q<br>1/23/07 8-K<br>2/28/07 10-K<br>5/4/07 10-Q<br>7/20/07 8-K<br>7/30/07 10-Q<br>10/19/07 8-K<br>11/9/07 8-K<br>11/9/07 10-Q | Peter M. Carlson<br>G. Kennedy Thompson<br>Mark C. Treanor<br>Thomas J. Wurtz<br>John D. Baker, II<br>Robert J. Brown<br>Peter C. Browning<br>John T. Casteen, III<br>Jerome A. Gitt<br>William H. Goodwin, Jr.<br>Mary Ellen C. Herringer<br>Robert A. Ingram<br>Donald M. James<br>Mackey J. McDonald<br>Joseph Neubauer<br>Timothy D. Proctor<br>Ernest S. Rady<br>Van L. Richey<br>Ruth G. Shaw<br>Lanty L. Smith<br>John C. Whitaker, Jr. |

($3,750,000)
Countrywide ($3,750,000)
Credit Suisse ($3,750,000)
Ferris Baker ($3,750,000)
Fidelity ($3,750,000)
Goldman Sachs ($3,750,000)
H&R Block ($3,750,000)
HSBC ($3,750,000)
J.B. Hanauer ($3,750,000)
J.J.B. Hilliard ($3,750,000)
J.P. Morgan ($3,750,000)
Janney ($3,750,000)
Jefferies ($3,750,000)
Morgan Keegan ($3,750,000)
Oppenheimer ($3,750,000)
Pershing ($3,750,000)
Piper Jaffray ($3,750,000)
Raymond James ($3,750,000)
Robert Baird ($3,750,000)
Sandler O'Neill ($3,750,000)
Stifel Nicolaus ($3,750,000)
TD AMERITRADE ($3,750,000)
William Blair ($3,750,000)

| Date | Issuer / Security | Shares | Amount | Underwriters | Filing | |
|---|---|---|---|---|---|---|
| 12/21/07 | *Wachovia* /8.00% Non-Cumulative Perpetual Class A | 80 million Depositary Shares (DS), | $2,300,000,000 ($25 per DS, each | B.C. Ziegler ($1,875,000)<br>C.L. King ($1,875,000)<br>Cabrera ($1,875,000)<br>Comerica ($1,875,000)<br>D.A. Davidson ($1,875,000)<br>Davenport ($1,875,000)<br>E*TRADE ($1,875,000)<br>FTN Financial ($1,875,000)<br>Fixed Income ($1,875,000)<br>Howe Barnes ($1,875,000)<br>JVB Financial ($1,875,000)<br>Keefe Bruyette ($1,875,000)<br>M.R. Beal ($1,875,000)<br>Mesirow ($1,875,000)<br>Muriel Siebert ($1,875,000)<br>Ross Sinclair ($1,875,000)<br>Ramirez ($1,875,000)<br>Sterne Agee ($1,875,000)<br>SunTrust ($1,875,000)<br>Williams Capital ($1,875,000)<br>Toussaint ($1,875,000)<br>Wedbush Morgan ($1,875,000) | WCM  ($368,000,000)<br>CGMI ($368,000,000)<br>Merrill Lynch | 5/8/06 8-K<br>5/19/06 8-K<br>10/2/06 8-K<br><br>May 26, 2005<br><br>David M. Julian |

A-8

| | | | | | | |
|---|---|---|---|---|---|---|
| | Preferred Stock, Series J (929903276) | plus 12,000,000 DS to cover over-allotments | representing a 1/40th interest in a Share of Perpetual Class A Preferred Stock, Series J) | ($368,000,000) Morgan Stanley ($368,000,000) UBS ($368,000,000) Banc of America ($10,000,000) Barclays ($10,000,000) Cabrera ($10,000,000) Deutsche Bank ($10,000,000) Fifth Third ($10,000,000) Goldman Sachs ($10,000,000) Greenwich Capital ($10,000,000) ING ($10,000,000) KeyBanc ($10,000,000) Lehman Brothers Inc. ($10,000,000) NatCity ($10,000,000) RBC Dain Rausher ($10,000,000) Ramirez ($10,000,000) Sandler O'Neill ($10,000,000) Williams Capital ($10,000,000) Wells Fargo Securities ($10,000,000) | 10/16/06 8-K 11/3/06 10-Q 1/23/07 8-K 2/28/07 10-K 5/4/07 10-Q 7/20/07 8-K 7/30/07 10-Q 10/19/07 8-K 11/9/07 8-K 11/9/07 10-Q 12/12/2007 8-K | G. Kennedy Thompson Mark C. Treanor John D. Baker, II Robert J. Brown Peter C. Browning John T. Casteen, III William H. Goodwin, Jr. Robert A. Ingram Mackey J. McDonald Joseph Neubauer Ruth G. Shaw Lanty L. Smith John C. Whitaker, Jr. Dona Davis Young |
| 2/8/08 | *Wachovia* /Fixed-to-Floating Rate Non-Cumulative Perpetual Class A | 3.5 million Series K shares | $3,500,000,000 ($1,000 per Series K share) | WCM ($3,223,500,000) Barclays ($52,500,000) Cabrera ($52,500,000) Deutsche Bank | 5/8/06 8-K 5/19/06 8-K 10/2/06 8-K 10/16/06 8-K | May 26, 2005 David M. Julian G. Kennedy Thompson |

A-9

| Date | Security | Shares | Value | Underwriters | Filings | Directors/Officers |
|---|---|---|---|---|---|---|
| | Preferred Stock, Series K (929403243) (929903EF5) (corrected) | | | ($52,500,000) Sandler O'Neill ($52,500,000) UBS ($52,500,000) Utendahl ($14,000,000) | 11/3/06 10-Q<br>1/23/07 8-K<br>2/28/07 10-K<br>5/4/07 10-Q<br>7/20/07 8-K<br>7/30/07 10-Q<br>10/19/07 8-K<br>11/9/07 8-K<br>11/9/07 10-Q<br>12/12/2007 8-K<br>1/22/08 8-K | Mark C. Treanor<br>John D. Baker, II<br>Robert J. Brown<br>Peter C. Browning<br>John T. Casteen, III<br>William H. Goodwin, Jr.<br>Robert A. Ingram<br>Mackey J. McDonald<br>Joseph Neubauer<br>Ruth G. Shaw<br>Lanty L. Smith<br>John C. Whitaker, Jr.<br>Dona Davis Young |
| 4/17/08 | *Wachovia* / 7.50% Non-Cumulative Perpetual Convertible Class A Preferred Stock, Series L (929903219) | 3.5 million Series L shares, plus 525,000 Series L shares to cover over-allotments | $4,025,000,000 ($1,000 per Series L share) | WCM ($1,750,000,000) Goldman Sachs ($1,330,000,000) CGMI ($140,000,000) Credit Suisse ($140,000,000) UBS ($140,000,000) | 5/8/06 8-K<br>5/19/06 8-K<br>10/2/06 8-K<br>10/16/06 8-K<br>11/3/06 10-Q<br>1/23/07 8-K<br>2/28/07 10-K<br>5/4/07 10-Q<br>7/20/07 8-K<br>7/30/07 10-Q<br>10/19/07 8-K<br>11/9/07 8-K<br>11/9/07 10-Q<br>12/12/2007 8-K<br>1/22/08 8-K<br>2/28/08 10-K<br>4/14/08 8-K | April 14, 2008<br><br>Peter M. Carlson<br>Ross E. Jeffries, Jr.<br>G. Kennedy Thompson<br>Thomas J. Wurtz<br>John D. Baker, II<br>Peter C. Browning<br>John T. Casteen, III<br>Jerome A. Gitt<br>William H. Goodwin, Jr.<br>Mary Ellen C. Herringer<br>Robert A. Ingram<br>Donald M. James<br>Mackey J. McDonald<br>Joseph Neubauer<br>Timothy D. Proctor<br>Ernest S. Rady<br>Van L. Richey<br>Ruth G. Shaw |

## BOND/NOTE OFFERINGS

| Issue Date | Security (CUSIP) | Issuer | Volume | Underwriter Defendants (Volume) | Incorporated Documents[4] | Registration Statement/Signatories[5] |
|---|---|---|---|---|---|---|
| 7/31/06 | Three-Month LIBOR Floating Rate Notes Due August 1, 2013 (92976WBB1) | Wachovia | $400,000,000 | WCM ($368,000,000) BB&T ($8,000,000) Loop ($8,000,000) Ramirez ($8,000,000) Sandler O'Neill ($8,000,000) | 5/8/06 8-K 5/19/06 8-K | March 14, 2005<br><br>David M. Julian<br>G. Kennedy Thompson<br>Mark C. Treanor<br>John D. Baker, II<br>Robert J. Brown<br>Peter C. Browning<br>John T. Casteen, III<br>William H. Goodwin, Jr.<br>Robert A. Ingram<br>Donald M. James<br>Joseph Neubauer<br>Van L. Richey<br>Ruth G. Shaw<br>Lanty L. Smith<br>John C. Whitaker, Jr.<br>Dona Davis Young |
| 7/31/06 | 5.70% Notes Due | Wachovia | $600,000,000 | WCM | 5/8/06 8-K | March 14, 2005<br><br>Lanty L. Smith<br>Dona Davis Young |

---

[4] The documents listed as incorporated into the Offering Materials for each Offering include only those that Lead Plaintiffs challenge as materially inaccurate or misleading, as set forth more fully in the Complaint.

[5] As set forth above in Section III.B.3, each Individual Defendant is liable for Offerings conducted pursuant to a Registration Statement that he or she signed, as well as for Offerings completed during his or her tenure as a Director.

A-11

| | | | | | | |
|---|---|---|---|---|---|---|
| | August 1, 2013 (92976WBA3) | | | ($552,000,000) BB&T ($12,000,000) Loop ($12,000,000) Ramirez ($12,000,000) Sandler O'Neill ($12,000,000) | 5/19/06 8-K | David M. Julian G. Kennedy Thompson Mark C. Treanor John D. Baker, II Robert J. Brown Peter C. Browning John T. Casteen, III William H. Goodwin, Jr. Robert A. Ingram Donald M. James Joseph Neubauer Van L. Richey Ruth G. Shaw Lanty L. Smith John C. Whitaker, Jr. Dona Davis Young |
| 10/23/06 | Three-Month LIBOR Floating Rate Notes Due October 15, 2011 (929903CG5) | Wachovia | $1,000,000,000 | WCM ($895,000,000) BB&T ($15,000,000) CGMI ($15,000,000) Loop ($15,000,000) Morgan Stanley ($15,000,000) Muriel Siebert ($15,000,000) Ramirez ($15,000,000) Sandler O'Neill ($15,000,000) | 5/8/06 8-K 5/19/06 8-K 10/2/06 8-K | May 26, 2005 David M. Julian G. Kennedy Thompson Mark C. Treanor John D. Baker, II Robert J. Brown Peter C. Browning John T. Casteen, III William H. Goodwin, Jr. Robert A. Ingram Mackey J. McDonald Joseph Neubauer Ruth G. Shaw Lanty L. Smith John C. Whitaker, Jr. |

| 10/23/06 | 5.30% Notes Due October 15, 2011 (929903CF7) | Wachovia | $1,100,000,000 | WCM ($984,500,000) BB&T ($16,500,000) CGMI ($16,500,000) Loop ($16,500,000) Morgan Stanley ($16,500,000) Muriel Siebert ($16,500,000) Ramirez ($16,500,000) Sandler O'Neill ($16,500,000) | 5/8/06 8-K 5/19/06 8-K 10/2/06 8-K 10/16/06 8-K | May 26, 2005<br><br>David M. Julian G. Kennedy Thompson Mark C. Treanor John D. Baker, II Robert J. Brown Peter C. Browning John T. Casteen, III William H. Goodwin, Jr. Robert A. Ingram Mackey J. McDonald Joseph Neubauer Ruth G. Shaw Lanty L. Smith John C. Whitaker, Jr. Dona Davis Young |
| 10/23/06 | 5.625% Subordinated Notes Due October 15, 2016 (929903CH3) | Wachovia | $1,250,000,000 | WCM ($1,118,750,000) BB&T ($18,750,000) CGMI ($18,750,000) Loop ($18,750,000) Morgan Stanley ($18,750,000) Muriel Siebert ($18,750,000) Ramirez ($18,750,000) | 5/8/06 8-K 5/19/06 8-K 10/2/06 8-K 10/16/06 8-K | May 26, 2005<br><br>David M. Julian G. Kennedy Thompson Mark C. Treanor John D. Baker, II Robert J. Brown Peter C. Browning John T. Casteen, III William H. Goodwin, Jr. Robert A. Ingram Mackey J. McDonald Joseph Neubauer Ruth G. Shaw |

A-13

| Date | Description | Issuer | Amount | Underwriters | Filings | Directors/Officers |
|---|---|---|---|---|---|---|
| | | | | Sandler O'Neill ($18,750,000) | | Lanty L. Smith, John C. Whitaker, Jr., Dona Davis Young |
| 10/23/06 | Three-Month LIBOR Floating Rate Subordinated Notes Due October 15, 2016 (929903CJ9) | Wachovia | $650,000,000 | WCM ($581,750,000) BB&T ($9,750,000) CGMI ($9,750,000) Loop ($9,750,000) Morgan Stanley ($9,750,000) Muriel Siebert ($9,750,000) Ramirez ($9,750,000) Sandler O'Neill ($9,750,000) | 5/8/06 8-K 5/19/06 8-K 10/2/06 8-K 10/16/06 8-K | May 26, 2005 David M. Julian, G. Kennedy Thompson, Mark C. Treanor, John D. Baker, II, Robert J. Brown, Peter C. Browning, John T. Casteen, III, William H. Goodwin, Jr., Robert A. Ingram, Mackey J. McDonald, Joseph Neubauer, Ruth G. Shaw, Lanty L. Smith, John C. Whitaker, Jr., Dona Davis Young |
| 12/13/06 | Three-Month LIBOR Floating Rate Senior Notes Due December 1, 2009 (92976WBC9) | Wachovia | $1,500,000,000 | WCM ($1,470,000,000) CastleOak ($15,000,000) Guzman ($15,000,000) | 5/8/06 8-K 5/19/06 8-K 10/2/06 8-K 11/3/06 10-Q | March 14, 2005 David M. Julian, G. Kennedy Thompson, Mark C. Treanor, John D. Baker, II, Robert J. Brown, Peter C. Browning, John T. Casteen, III, William H. Goodwin, Jr., Robert A. Ingram |

A-14

| | | | | | | |
|---|---|---|---|---|---|---|
| 2/12/07 | The 10/23/06 Three-Month LIBOR Floating Rate Notes Due October 15, 2011 Offering (Supplemental) (929903CG5) | Wachovia | $500,000,000 | WCM ($480,000,000) Loop ($10,000,000) Muriel Siebert ($10,000,000) | 5/8/06 8-K 5/19/06 8-K 10/2/06 8-K 10/16/06 8-K 11/3/06 10-Q 1/23/07 8-K | May 26, 2005 David M. Julian G. Kennedy Thompson Mark C. Treanor John D. Baker, II Robert J. Brown Peter C. Browning John T. Casteen, III William H. Goodwin, Jr. Robert A. Ingram Mackey J. McDonald Joseph Neubauer Ruth G. Shaw Lanty L. Smith John C. Whitaker, Jr. Dona Davis Young |
| 2/12/07 | The 10/23/06 5.30% Notes Due October 15, 2011 Offering (Supplemental) (929903CF7) | Wachovia | $500,000,000 | WCM ($480,000,000) Loop ($10,000,000) Muriel Siebert ($10,000,000) | 5/8/06 8-K 5/19/06 8-K 10/2/06 8-K 10/16/06 8-K 11/3/06 10-Q 1/23/07 8-K | May 26, 2005 David M. Julian G. Kennedy Thompson Mark C. Treanor John D. Baker, II Robert J. Brown |

Donald M. James
Joseph Neubauer
Van L. Richey
Ruth G. Shaw
Lanty L. Smith
John C. Whitaker, Jr.
Dona Davis Young

A-15

| Date | Security | Issuer | Amount | Underwriters | Filings | Directors |
|---|---|---|---|---|---|---|
| | | | | | | Peter C. Browning<br>John T. Casteen, III<br>William H. Goodwin, Jr.<br>Robert A. Ingram<br>Mackey J. McDonald<br>Joseph Neubauer<br>Ruth G. Shaw<br>Lanty L. Smith<br>John C. Whitaker, Jr.<br>Dona Davis Young |
| 4/23/07 | Three-Month LIBOR Floating Rate Notes Due April 23, 2012 (929903DF6) | Wachovia | $1,500,000,000 | WCM ($1,365,000,000)<br>Barclays ($22,500,000)<br>Goldman Sachs ($22,500,000)<br>M.R. Beal ($22,500,000)<br>Merrill Lynch ($22,500,000)<br>Morgan Stanley ($22,500,000)<br>Ramirez ($22,500,000) | 5/8/06 8-K<br>5/19/06 8-K<br>10/2/06 8-K<br>10/16/06 8-K<br>11/3/06 10-Q<br>1/23/07 8-K<br>2/28/07 10-K<br>4/16/07 8-K | May 26, 2005<br><br>David M. Julian<br>G. Kennedy Thompson<br>Mark C. Treanor<br>John D. Baker, II<br>Robert J. Brown<br>Peter C. Browning<br>John T. Casteen, III<br>William H. Goodwin, Jr.<br>Robert A. Ingram<br>Mackey J. McDonald<br>Joseph Neubauer<br>Ruth G. Shaw<br>Lanty L. Smith<br>John C. Whitaker, Jr.<br>Dona Davis Young |
| 6/8/07 | Three-Month LIBOR Floating Rate Notes Due June 15, 2017 (929903DU3) | Wachovia | $900,000,000 | WCM ($810,000,000)<br>ABN AMRO ($13,500,000)<br>A.G. Edwards | 5/8/06 8-K<br>5/19/06 8-K<br>10/2/06 8-K<br>10/16/06 8-K<br>11/3/06 10-Q | May 26, 2005<br><br>David M. Julian<br>G. Kennedy Thompson<br>Mark C. Treanor |

A-16

| Date | Security | | Amount | Underwriters | Filings | Directors / Date |
|---|---|---|---|---|---|---|
| 6/8/07 | 5.75% Notes Due June 15, 2017 (929903DT6) | Wachovia | $1,350,000,000 | ($13,500,000) CGMI ($13,500,000) Loop ($13,500,000) Morgan Stanley ($13,500,000) Williams Capital ($13,500,000) Utendahl ($9,000,000) | 1/23/07 8-K 2/28/07 10-K 4/16/07 8-K 5/4/07 10-Q | John D. Baker, II Robert J. Brown Peter C. Browning John T. Casteen, III William H. Goodwin, Jr. Robert A. Ingram Mackey J. McDonald Joseph Neubauer Ruth G. Shaw Lanty L. Smith John C. Whitaker, Jr. Dona Davis Young |
| | | | | WCM ($1,215,000,000) ABN AMRO ($20,250,000) A.G. Edwards ($20,250,000) CGMI ($20,250,000) Loop ($20,250,000) Morgan Stanley ($20,250,000) Williams Capital ($20,250,000) Utendahl ($13,500,000) | 5/8/06 8-K 5/19/06 8-K 10/2/06 8-K 10/16/06 8-K 11/3/06 10-Q 1/23/07 8-K 2/28/07 10-K 4/16/07 8-K 5/4/07 10-Q | May 26, 2005  David M. Julian G. Kennedy Thompson Mark C. Treanor John D. Baker, II Robert J. Brown Peter C. Browning John T. Casteen, III William H. Goodwin, Jr. Robert A. Ingram Mackey J. McDonald Joseph Neubauer Ruth G. Shaw Lanty L. Smith John C. Whitaker, Jr. Dona Davis Young |
| 6/19/07 | The 4/23/07 Three-Month LIBOR | Wachovia | $100,000,000 | WCM ($97,000,000) | 5/8/06 8-K 5/19/06 8-K | May 26, 2005 |

A-17

| | | | | | | |
|---|---|---|---|---|---|---|
| | Floating Rate Notes Due April 23, 2012 Offering (Supplemental) (929903DF6) | | | Loop ($1,500,000) Muriel Siebert ($1,500,000) | 10/2/06 8-K 10/16/06 8-K 11/3/06 10-Q 1/23/07 8-K 2/28/07 10-K 4/16/07 8-K 5/4/07 10-Q | David M. Julian G. Kennedy Thompson Mark C. Treanor John D. Baker, II Robert J. Brown Peter C. Browning John T. Casteen, III William H. Goodwin, Jr. Robert A. Ingram Mackey J. McDonald Joseph Neubauer Ruth G. Shaw Lanty L. Smith John C. Whitaker, Jr. Dona Davis Young |
| 7/26/07 | Three-Month LIBOR Floating Rate Notes Due July 26, 2010 (92976WBD7) | Wachovia | $2,000,000,000 | WCM ($1,910,000,000) Jackson ($30,000,000) Muriel Siebert ($30,000,000) Ramirez ($30,000,000) | 5/8/06 8-K 5/19/06 8-K 10/2/06 8-K 10/16/06 8-K 11/3/06 10-Q 1/23/07 8-K 2/28/07 10-K 4/16/07 8-K 5/4/07 10-Q 7/20/07 8-K | March 5, 2007 Peter M. Carlson Ross E. Jeffries, Jr. G. Kennedy Thompson Thomas J. Wurtz John D. Baker, II Robert J. Brown Peter C. Browning John T. Casteen, III Jerome A. Gitt William H. Goodwin, Jr. Mary Ellen C. Herringer Robert A. Ingram Donald M. James Mackey J. McDonald Joseph Neubauer |

| Date | Security | Issuer | Amount | Underwriters | SEC Filings | Signatories |
|---|---|---|---|---|---|---|
| | | | | | | Timothy D. Proctor<br>Ernest S. Rady<br>Van L. Richey<br>Ruth G. Shaw<br>Lanty L. Smith<br>John C. Whitaker, Jr.<br>Dona Davis Young |
| 8/20/07 | Three-Month LIBOR Floating Rate Notes Due August 20, 2009 (929903EC2) | Wachovia | $1,750,000,000 | WCM ($1,671,250,000)<br>Guzman ($26,250,000)<br>Jackson ($26,250,000)<br>M.R. Beal ($26,250,000) | 5/8/06 8-K<br>5/19/06 8-K<br>10/2/06 8-K<br>10/16/06 8-K<br>11/3/06 10-Q<br>1/23/07 8-K<br>2/28/07 10-K<br>4/16/07 8-K<br>5/4/07 10-Q<br>7/20/07 8-K<br>7/30/07 10-Q | May 26, 2005<br><br>David M. Julian<br>G. Kennedy Thompson<br>Mark C. Treanor<br>John D. Baker, II<br>Robert J. Brown<br>Peter C. Browning<br>John T. Casteen, III<br>William H. Goodwin, Jr.<br>Robert A. Ingram<br>Mackey J. McDonald<br>Joseph Neubauer<br>Ruth G. Shaw<br>Lanty L. Smith<br>John C. Whitaker, Jr.<br>Dona Davis Young |
| 9/17/07 | The 6/8/07 5.75% Notes Due June 15, 2017 Offering (Supplemental) (929903DT6) | Wachovia | $350,000,000 | WCM ($339,500,000)<br>Ramirez ($5,250,000)<br>Utendahl ($5,250,000) | 5/8/06 8-K<br>5/19/06 8-K<br>10/2/06 8-K<br>10/16/06 8-K<br>11/3/06 10-Q<br>1/23/07 8-K<br>2/28/07 10-K<br>4/16/07 8-K | May 26, 2005<br><br>David M. Julian<br>G. Kennedy Thompson<br>Mark C. Treanor<br>John D. Baker, II<br>Robert J. Brown<br>Peter C. Browning |

A-19

| | | | | | | |
|---|---|---|---|---|---|---|
| 11/14/07 | The 7/31/06 5.70% Notes Due August 1, 2013 Offering (Supplemental) (92976WBA3) | Wachovia | $200,000,000 | WCM ($194,000,000) Loop ($3,000,000) Ramirez ($3,000,000) | 5/4/07 10-Q<br>7/20/07 8-K<br>7/30/07 10-Q | John T. Casteen, III<br>William H. Goodwin, Jr.<br>Robert A. Ingram<br>Mackey J. McDonald<br>Joseph Neubauer<br>Ruth G. Shaw<br>Lanty L. Smith<br>John C. Whitaker, Jr.<br>Dona Davis Young |
| | | | | | 5/8/06 8-K<br>5/19/06 8-K<br>10/2/06 8-K<br>10/16/06 8-K<br>11/3/06 10-Q<br>1/23/07 8-K<br>2/28/07 10-K<br>4/16/07 8-K<br>5/4/07 10-Q<br>7/20/07 8-K<br>7/30/07 10-Q<br>10/19/07 8-K<br>11/9/07 8-K<br>11/9/07 10-Q | March 5, 2007<br><br>Peter M. Carlson<br>Ross E. Jeffries, Jr.<br>G. Kennedy Thompson<br>Thomas J. Wurtz<br>John D. Baker, II<br>Robert J. Brown<br>Peter C. Browning<br>John T. Casteen, III<br>Jerome A. Gitt<br>William H. Goodwin, Jr.<br>Mary Ellen C. Herringer<br>Robert A. Ingram<br>Donald M. James<br>Mackey J. McDonald<br>Joseph Neubauer<br>Timothy D. Proctor<br>Ernest S. Rady<br>Van L. Richey<br>Ruth G. Shaw<br>Lanty L. Smith<br>John C. Whitaker, Jr.<br>Dona Davis Young |

A-20

| 11/27/07 | Three-Month LIBOR Floating Rate Notes Due November 24, 2009 (92976WBG0) | Wachovia | $850,000,000 | WCM ($824,500,000) Jackson ($12,750,000) Williams Capital ($12,750,000) | 5/8/06 8-K 5/19/06 8-K 10/2/06 8-K 10/16/06 8-K 11/3/06 10-Q 1/23/07 8-K 2/28/07 10-K 4/16/07 8-K 5/4/07 10-Q 7/20/07 8-K 7/30/07 10-Q 10/19/07 8-K 11/9/07 8-K 11/9/07 10-Q | March 5, 2007 Peter M. Carlson Ross E. Jeffries, Jr. G. Kennedy Thompson Thomas J. Wurtz John D. Baker, II Robert J. Brown Peter C. Browning John T. Casteen, III Jerome A. Gitt William H. Goodwin, Jr. Mary Ellen C. Herringer Robert A. Ingram Donald M. James Mackey J. McDonald Joseph Neubauer Timothy D. Proctor Ernest S. Rady Van L. Richey Ruth G. Shaw Lanty L. Smith John C. Whitaker, Jr. Dona Davis Young |
| 11/27/07 | Three-Month LIBOR Floating Rate Notes Due November 24, 2009 (92976WBG0) | Wachovia | $260,000,000 | WCM ($248,300,000) Jackson ($3,900,000) RBC Capital Markets ($3,900,000) Williams Capital ($3,900,000) | 5/8/06 8-K 5/19/06 8-K 10/2/06 8-K 10/16/06 8-K 11/3/06 10-Q 1/23/07 8-K 2/28/07 10-K 4/16/07 8-K 5/4/07 10-Q | March 5, 2007 Peter M. Carlson Ross E. Jeffries, Jr. G. Kennedy Thompson Thomas J. Wurtz John D. Baker, II Robert J. Brown Peter C. Browning |

A-21

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 12/18/07 | The 6/8/07 5.75% Notes Due June 15, 2017 Offering (Supplemental) (929903DT6) | Wachovia | $250,000,000 | WCM ($242,500,000) Cabrera ($3,750,000) Guzman ($3,750,000) | 55/8/06 8-K<br>5/19/06 8-K<br>10/2/06 8-K<br>10/16/06 8-K<br>11/3/06 10-Q<br>1/23/07 8-K<br>2/28/07 10-K<br>4/16/07 8-K<br>5/4/07 10-Q<br>7/20/07 8-K<br>7/30/07 10-Q<br>10/19/07 8-K<br>11/9/07 8-K<br>11/9/07 10-Q<br>12/12/07 8-K | May 26, 2005<br><br>David M. Julian<br>G. Kennedy Thompson<br>Mark C. Treanor<br>John D. Baker, II<br>Robert J. Brown<br>Peter C. Browning<br>John T. Casteen, III<br>William H. Goodwin, Jr.<br>Robert A. Ingram<br>Mackey J. McDonald<br>Joseph Neubauer<br>Ruth G. Shaw<br>Lanty L. Smith<br>John C. Whitaker, Jr.<br>Dona Davis Young | 7/20/07 8-K<br>7/30/07 10-Q<br>10/19/07 8-K<br>11/9/07 8-K<br>11/9/07 10-Q | John T. Casteen, III<br>Jerome A. Gitt<br>William H. Goodwin, Jr.<br>Mary Ellen C. Herringer<br>Robert A. Ingram<br>Donald M. James<br>Mackey J. McDonald<br>Joseph Neubauer<br>Timothy D. Proctor<br>Ernest S. Rady<br>Van L. Richey<br>Ruth G. Shaw<br>Lanty L. Smith<br>John C. Whitaker, Jr.<br>Dona Davis Young |

| | | | | | | |
|---|---|---|---|---|---|---|
| 1/31/08 | 5.75% Notes due February 1, 2018 (92976WBH8) | Wachovia | $2,500,000,000 | WCM ($2,275,000,000) Barclays ($37,500,000) BB&T ($37,500,000) Loop ($37,500,000) Muriel Siebert ($37,500,000) Ramirez ($37,500,000) Sandler O'Neill ($37,500,000) | 5/8/06 8-K 5/19/06 8-K 10/2/06 8-K 10/16/06 8-K 11/3/06 10-Q 1/23/07 8-K 2/28/07 10-K 4/16/07 8-K 5/4/07 10-Q 7/20/07 8-K 7/30/07 10-Q 10/19/07 8-K 11/9/07 8-K 11/9/07 10-Q 12/12/07 8-K 1/22/08 8-K | March 5, 2007<br><br>Peter M. Carlson<br>Ross E. Jeffries, Jr.<br>G. Kennedy Thompson<br>Thomas J. Wurtz<br>John D. Baker, II<br>Robert J. Brown<br>Peter C. Browning<br>John T. Casteen, III<br>Jerome A. Gitt<br>William H. Goodwin, Jr.<br>Mary Ellen C. Herringer<br>Robert A. Ingram<br>Donald M. James<br>Mackey J. McDonald<br>Joseph Neubauer<br>Timothy D. Proctor<br>Ernest S. Rady<br>Van L. Richey<br>Ruth G. Shaw<br>Lanty L. Smith<br>John C. Whitaker, Jr.<br>Dona Davis Young |
| 4/25/08 | 5.50% Fixed Rate Notes Due May 1, 2013 (92976WBJ4) | Wachovia | $2,850,000,000 | WCM ($2,593,500,000) Barclays ($42,750,000) Deutsche Bank ($42,750,000) Guzman ($42,750,000) Morgan Keegan | 5/8/06 8-K 5/19/06 8-K 10/2/06 8-K 10/16/06 8-K 11/3/06 10-Q 1/23/07 8-K 2/28/07 10-K 4/16/07 8-K 5/4/07 10-Q | March 5, 2007<br><br>Peter M. Carlson<br>Ross E. Jeffries, Jr.<br>G. Kennedy Thompson<br>Thomas J. Wurtz<br>John D. Baker, II<br>Robert J. Brown<br>Peter C. Browning |

A-23

| Date | Security | Underwriter | Amount | Offering | Filing Dates | Names |
|---|---|---|---|---|---|---|
| | | | | ($42,750,000)<br>M.R. Beal<br>($42,750,000)<br>UBS<br>($42,750,000) | 7/20/07 8-K<br>7/30/07 10-Q<br>10/19/07 8-K<br>11/9/07 10-Q<br>12/12/07 8-K<br>1/22/08 8-K<br>2/28/08 10-K<br>4/14/08 8-K | John T. Casteen, III<br>Jerome A. Gitt<br>William H. Goodwin, Jr.<br>Mary Ellen C. Herringer<br>Robert A. Ingram<br>Donald M. James<br>Mackey J. McDonald<br>Joseph Neubauer<br>Timothy D. Proctor<br>Ernest S. Rady<br>Van L. Richey<br>Ruth G. Shaw<br>Lanty L. Smith<br>John C. Whitaker, Jr.<br>Dona Davis Young |
| 4/25/08 | Three Month LIBOR Floating Rate Notes due May 1, 2013 (92976WBK1) | Wachovia | $650,000,000 | WCM ($591,500,000)<br>Barclays ($9,750,000)<br>Deutsche Bank ($9,750,000)<br>Guzman ($9,750,000)<br>Morgan Keegan ($9,750,000)<br>M.R. Beal ($9,750,000)<br>UBS ($9,750,000) | 5/8/06 8-K<br>5/19/06 8-K<br>10/2/06 8-K<br>10/16/06 8-K<br>11/3/06 10-Q<br>1/23/07 8-K<br>2/28/07 10-K<br>4/16/07 8-K<br>5/4/07 10-Q<br>7/20/07 8-K<br>7/30/07 10-Q<br>10/19/07 8-K<br>11/9/07 8-K<br>11/9/07 10-Q<br>12/12/07 8-K<br>1/22/08 8-K<br>2/28/08 10-K<br>4/14/08 8-K | March 5, 2007<br><br>Peter M. Carlson<br>Ross E. Jeffries, Jr.<br>G. Kennedy Thompson<br>Thomas J. Wurtz<br>John D. Baker, II<br>Robert J. Brown<br>Peter C. Browning<br>John T. Casteen, III<br>Jerome A. Gitt<br>William H. Goodwin, Jr.<br>Mary Ellen C. Herringer<br>Robert A. Ingram<br>Donald M. James<br>Mackey J. McDonald<br>Joseph Neubauer<br>Timothy D. Proctor |

A-24

| 5/29/08 | The 4/25/08 5.50% Fixed Rate Notes Due May 1, 2013 Offering (Supplemental) (92976WBJ4) | Wachovia | $200,000,000 | WCM ($194,000,000) Guzman ($3,000,000) M.R. Beal ($3,000,000) | | |
|---|---|---|---|---|---|---|
| | | | | | 5/8/06 8-K | March 5, 2007 |
| | | | | | 5/19/06 8-K | |
| | | | | | 10/2/06 8-K | Peter M. Carlson |
| | | | | | 10/16/06 8-K | Ross E. Jeffries, Jr. |
| | | | | | 11/3/06 10-Q | G. Kennedy Thompson |
| | | | | | 1/23/07 8-K | Thomas J. Wurtz |
| | | | | | 2/28/07 10-K | John D. Baker, II |
| | | | | | 4/16/07 8-K | Robert J. Brown |
| | | | | | 5/4/07 10-Q | Peter C. Browning |
| | | | | | 7/20/07 8-K | John T. Casteen, III |
| | | | | | 7/30/07 10-Q | Jerome A. Gitt |
| | | | | | 10/19/07 8-K | William H. Goodwin, Jr. |
| | | | | | 11/9/07 8-K | Mary Ellen C. Herringer |
| | | | | | 11/9/07 10-Q | Robert A. Ingram |
| | | | | | 12/12/07 8-K | Donald M. James |
| | | | | | 1/22/08 8-K | Mackey J. McDonald |
| | | | | | 2/28/08 10-K | Joseph Neubauer |
| | | | | | 4/14/08 8-K | Timothy D. Proctor |
| | | | | | 5/12/08 10-Q | Ernest S. Rady |
| | | | | | | Van L. Richey |
| | | | | | | Ruth G. Shaw |
| | | | | | | Lanty L. Smith |
| | | | | | | John C. Whitaker, Jr. |
| | | | | | | Dona Davis Young |

Ernest S. Rady
Van L. Richey
Ruth G. Shaw
Lanty L. Smith
John C. Whitaker, Jr.
Dona Davis Young

A-25

**EXHIBIT A**

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Julie Wyne, on behalf of the Orange County Employees' Retirement System ("Orange County"), hereby certify that:

1.      I am the Assistant Chief Executive Officer, External & Legal Operations of Orange County. Orange County has retained Bernstein Litowitz Berger & Grossmann LLP in this matter. I have reviewed the consolidated complaint in this matter and authorized its filing.

2.      Orange County did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3.      Orange County is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.      Orange County's transactions in the securities issued by Wachovia Corporation or its affiliates that are the subject of this action are set forth in the chart (Schedule A) attached hereto.

5.      Other than in this action, Orange County has not sought to serve, or served, as a representative party on behalf of a class in an action under the federal securities laws filed during the three-year period preceding the date of this Certification.

6.      Orange County will not accept any payment for serving as a representative party on behalf of the Class beyond Orange County's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the court.

I declare under penalty of perjury that the foregoing are true and correct. Executed this 3rd day of September, 2009.

Julie Wyne
Assistant Chief Executive Officer, External & Legal
Operations
*Orange County Employees' Retirement System*

## Schedule A

| Three-Month LIBOR Floating Rate Senior Notes Due 12/1/2009 | | | |
|---|---|---|---|
| Cusip # 92976WBC9 | | | |
| **Transaction** | **Trade Date** | **Face Amount** | **Par Value** |
| Purchase | 12/6/2006 | 1,700,000.00 | 100.000 |
| Sale | 6/24/2009 | (1,700,000.00) | 99.908 |
| | | | |
| 5.50% Fixed Rate Notes Due 5/1/2013 | | | |
| Cusip # 92976WBJ4 | | | |
| **Transaction** | **Trade Date** | **Face Amount** | **Par Value** |
| Purchase | 4/22/2008 | 200,000.00 | 99.774 |
| Sale | 5/22/2009 | (200,000.00) | 101.303 |
| | | | |
| 5.625% Subordinated Notes Due 10/15/2016 | | | |
| Cusip # 929903CH3 | | | |
| **Transaction** | **Trade Date** | **Face Amount** | **Par Value** |
| Purchase | 10/18/2006 | 800,000.00 | 99.662 |
| Sale | 6/24/2009 | (800,000.00) | 93.335 |
| | | | |
| 7.50% Non-Cumulative Perpetual Convertible Class A Pfd Stock, Series L | | | |
| Cusip # 929903219 | | | |
| **Transaction** | **Trade Date** | **Shares** | **Price** |
| Purchase | 4/14/2008 | 6,000.00 | $1,000.000 |
| Purchase | 10/27/2008 | 1,200.00 | $620.000 |
| Purchase | 10/27/2008 | 600.00 | $620.000 |
| | | | |
| Fixed-to-Floating Rate Non-Cumulative Perpetual Class A Pfd Stock, Series K | | | |
| Cusip # 929903243 | | | |
| **Transaction** | **Trade Date** | **Shares** | **Price** |
| Purchase | 2/5/2008 | 9,300,000.00 | $100.000 |
| Purchase | 4/18/2008 | 200,000.00 | $98.625 |
| Purchase | 4/18/2008 | 100,000.00 | $99.000 |

# EXHIBIT B

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Osey McGee, on behalf of the Louisiana Sheriffs' Pension & Relief Fund ("LSPRF"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.      I am the Executive Director of LSPRF. LSPRF has retained Bernstein Litowitz Berger & Grossmann LLP in this matter. I have reviewed the consolidated complaint in this matter extensively with counsel and have relied on advice of LSPRF general counsel to authorize its filing.

2.      LSPRF did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3.      LSPRF is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.      LSPRF's transactions in the securities issued by Wachovia Corporation or its affiliates that are the subject of this action are set forth in the chart (Schedule A) attached hereto.

5.      Other than in this action, LSPRF has sought to serve, or served, as a representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *Louisiana Sheriffs' Pension and Relief Fund et al v. Merrill Lynch & Co. Inc. et al.*, Case No. 08-cv-9063 (JSR) (DFE) (S.D.N.Y.)

   *In re Citigroup Inc. Bond Litigation*, Master File No. 08-cv-9522 (SHS) (S.D.N.Y.)

   *City of Detroit v. The Wells Fargo Mortgage Backed Securities 2006-AR18 Trust, et al*, Case No. 09-cv-1376 (N.D. Cal.)

6.      LSPRF will not accept any payment for serving as a representative party on behalf of the Class beyond LSPRF's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the court.

   I hereby state that the following is true to the best of my knowledge and belief. Executed this 4th day of September, 2009.

_Osey McGee, Jr._
Executive Director
*Louisiana Sheriffs' Pension & Relief Fund*

## Schedule A

| 5.75% Notes due 2/1/2018 | | | |
|---|---|---|---|
| Cusip # 92976WBH8 | | | |
| **Transaction** | **Trade Date** | **Face Amount** | **Par Value** |
| Purchase | 1/28/2008 | 405,000.00 | 99.572 |
| Purchase | 1/28/2008 | 100,000.00 | 99.572 |
| Purchase | 1/28/2008 | 700,000.00 | 99.572 |
| Sale | 2/13/2008 | (55,000.00) | 100.161 |
| Sale | 2/13/2008 | (100,000.00) | 99.786 |
| Sale | 3/12/2008 | (105,000.00) | 95.731 |
| Sale | 3/14/2008 | (25,000.00) | 95.796 |
| Sale | 5/1/2008 | (220,000.00) | 99.938 |
| Sale | 7/9/2009 | (100,000.00) | 99.829 |
| | | | |
| 5.50% Fixed Rate Notes Due 5/1/2013 | | | |
| Cusip # 92976WBJ4 | | | |
| **Transaction** | **Trade Date** | **Face Amount** | **Par Value** |
| Purchase | 11/18/2008 | 75,000.00 | 95.692 |
| Purchase | 11/18/2008 | 125,000.00 | 95.500 |
| Purchase | 11/18/2008 | 100,000.00 | 95.500 |
| Purchase | 11/25/2008 | 100,000.00 | 94.750 |
| Purchase | 12/1/2008 | 25,000.00 | 96.000 |
| Purchase | 12/3/2008 | 50,000.00 | 96.250 |
| | | | |
| **Three Month LIBOR Floating Rate Notes due 5/1/2013** | | | |
| Cusip # 92976WBK1 | | | |
| **Transaction** | **Trade Date** | **Face Amount** | **Par Value** |
| Purchase | 4/22/2008 | 1,400,000.00 | 100.000 |
| | | | |
| 5.625% Subordinated Notes Due 10/15/2016 | | | |
| Cusip # 929903CH3 | | | |
| **Transaction** | **Trade Date** | **Face Amount** | **Par Value** |
| Purchase | 10/18/2006 | 190,000.00 | 99.662 |
| Sale | 10/26/2006 | (190,000.00) | 99.864 |
| | | | |
| **Three-Month LIBOR Floating Rate Notes Due 4/23/2012** | | | |
| Cusip # 929903DF6 | | | |
| **Transaction** | **Trade Date** | **Face Amount** | **Par Value** |
| Purchase | 4/18/2007 | 1,200,000.00 | 100.000 |
| Purchase | 10/4/2007 | 150,000.00 | 98.521 |

| Fixed-to-Floating Rate Non-Cumulative Perpetual Class A Pfd Stock, Series K | | | |
|---|---|---|---|
| Cusip # 929903243 | | | |
| **Transaction** | **Trade Date** | **Shares** | **Price** |
| Purchase | 2/5/2008 | 210,000.00 | $100.000 |
| Purchase | 2/5/2008 | 100,000.00 | $100.000 |
| Sale | 2/6/2008 | (25,000.00) | $104.375 |
| Sale | 2/6/2008 | (25,000.00) | $103.750 |
| Sale | 2/6/2008 | (25,000.00) | $104.250 |
| Sale | 2/7/2008 | (25,000.00) | $103.250 |
| Sale | 4/15/2008 | (30,000.00) | $97.000 |
| Sale | 4/25/2008 | (75,000.00) | $97.750 |
| Sale | 5/1/2008 | (105,000.00) | $98.750 |
| Purchase | 12/8/2008 | 30,000.00 | $69.750 |
| Purchase | 12/8/2008 | 40,000.00 | $70.250 |
| Purchase | 12/4/2008 | 55,000.00 | $68.500 |
| Purchase | 12/4/2008 | 65,000.00 | $68.000 |
| Purchase | 12/2/2008 | 30,000.00 | $70.000 |
| Purchase | 12/2/2008 | 150,000.00 | $71.000 |
| Purchase | 12/1/2008 | 145,000.00 | $70.250 |
| Sale | 2/11/2009 | (70,000.00) | $60.000 |
| Sale | 8/7/2009 | (85,000.00) | $91.000 |

**EXHIBIT C**

**CERTIFICATION OF NAMED PLAINTIFF PURSUANT
TO FEDERAL SECURITIES LAWS**

Southeastern Pennsylvania Transportation Authority ("SEPTA" or Plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.    SEPTA did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

2.    SEPTA is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

3.    SEPTA has fully reviewed the facts and allegations in the attached Complaint and authorizes its filing.

4.    Attached in Schedule A are SEPTA's transactions in the securities identified in the attached Complaint.

5.    SEPTA has full power and authority to bring suit to recover for investment losses suffered as a result of its investments.

6.    I, Nicholas J. Staffieri, am authorized to make legal decisions on behalf of SEPTA.

7.    SEPTA intends to actively monitor and vigorously pursue this action for the benefit of the class, and it has retained the law firm of Barroway Topaz Kessler Meltzer & Check, LLP which has extensive experience in securities litigation and in the representation of institutional investors, to represent SEPTA in this action.

8.    SEPTA will endeavor to provide fair and adequate representation and work directly with the efforts of Class counsel to ensure that the largest recovery for the Class consistent with good faith and meritorious judgment is obtained.

9.    SEPTA is currently serving as a lead plaintiff in the securities class actions styled as *In re Michael Baker Corp. Securities Litigation*, No. 08-370 (W.D. Pa.) and *Chamberlain v. Reddy Ice Holdings, Inc.*, No. 08-13451 (E.D. Mich.).

10.    SEPTA has sought to serve (but was not appointed) as a lead plaintiff in federal securities class actions filed during the three years prior to the date of this Certification styled as *Dees v. Colonial Bancgroup, Inc.*, No. 09-104 (M.D. Ala.), *In re Level 3 Communications, Inc. Securities Litigation*, No. 09-200 (D. Colo.), *In re Openwave Systems Securities Litigation*, No. 07-1309 (S.D.N.Y.); and *In re Marvell Technology Group Ltd. Securities Litigation*, No. 06-6286 (N.D. Cal.).

11.    SEPTA will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2 nd day of September, 2009.

> Southeastern Pennsylvania Transportation Authority
>
> By: _____
>
> Nicholas J. Staffieri
> *General Counsel*

**SCHEDULE A**

**CUSIP: 929903EF5**

| Transaction Type | Date | Units | Par Value |
|---|---|---|---|
| Purchase | 2/5/2008 | 70,000 | 100.000 |
| Purchase | 2/8/2008 | 45,000 | 102.620 |
| Purchase | 2/8/2008 | 85,000 | 102.270 |
| Sale | 2/6/2008 | 70,000 | 104.500 |
| Sale | 6/17/2008 | 35,000 | 92.500 |
| Sale | 7/22/2008 | 25,000 | 74.500 |
| Sale | 9/15/2008 | 70,000 | 48.750 |

**EXHIBIT D**

**GLANCY BINKOW & GOLDBERG LLP**
**SWORN CERTIFICATION OF PLAINTIFF**

I, Norman Levin, ("Plaintiff") declare, as to the claims asserted under the federal securities laws that

1.      Plaintiff has reviewed the complaint and authorizes its filing.

2.      Plaintiff did not purchase the securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, either individually or as part of a group, including providing testimony at deposition or trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

4.      Plaintiff's transaction(s) in the Wachovia Capital Trust X 7.85% securities that are the subject of this action is/are as follows:

| Type of Security | Number of Shares | Bought | Sold | Date | Price per share |
|---|---|---|---|---|---|
| Preferred | 400 | B | | 11/14/2007 | $25.00 |
| | | | | | |
| | | | | | |

**(Please list additional purchase and sale information on a separate sheet of paper, if necessary)**

5.      Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including Plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

6.      During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws, except as described below

_____.

7.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this  1st  day of  SEPT. , 2009.

_____
        Norman Levin

# EXHIBIT E

AMENDED CERTIFICATION OF ARLETTE MILLER
IN SUPPORT OF CLASS ACTION COMPLAINT

Arlette Miller ("plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed the amended complaint prepared by counsel in the above-captioned case and has authorized its filing.

2.  Plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.  During the proposed Class Period, plaintiff executed the following transactions in the securities of Wachovia Corporation. See Attachment A:

5.  In the three years prior to the original filing of this action, plaintiff sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws captioned *Miller v. Lazard Ltd., et al.*, 05-cv-5630 (S.D.N.Y.).

6.  Plaintiff will not accept payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 4th

day of September, 2009.

ARLETTE MILLER

ATTACHMENT A

| Date | Action | Amount | Price |
|------|--------|--------|-------|
| May 1, 2007 | Bought | 500 IX PFD 6.375% | $25.00 |
| February 25, 2008 | Sold | 500 IX PFD 6.375% | $23.69 |

# EXHIBIT F

**GLANCY BINKOW & GOLDBERG LLP**
**SWORN CERTIFICATION OF PLAINTIFF**

I, Michael Swiskay, ("Plaintiff") declare, as to the claims asserted under the federal securities laws that

1.    Plaintiff has reviewed the complaint and authorizes its filing.

2.    Plaintiff did not purchase the securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, either individually or as part of a group, including providing testimony at deposition or trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

4.    Plaintiff's transaction(s) in the Wachovia 8% Preferred non-cum. Series J securities that are the subject of this action is/are as follows:

| Type of Security | Number of Shares | Bought | Sold | Date | Price per share |
|---|---|---|---|---|---|
| Preferred | 160 | B | | 12/18/2007 | $25.00 |
| Preferred | 160 | | S | 9/29/2008 | $7.15 |
| | | | | | |
| | | | | | |

(Please list additional purchase and sale information on a separate sheet of paper, if necessary)

5.    Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including Plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

6.    During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws, except as described below

7.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2 day of September, 2009.

Michael Swiskay

# EXHIBIT G

**GLANCY BINKOW & GOLDBERG LLP**
**SWORN CERTIFICATION OF PLAINTIFF**

I, Michael Swiskay as trustee to the Judith R. Swiskay Irrevocable Trust U/A 7/16/2007, ("Plaintiff") declare, as to the claims asserted under the federal securities laws that

1.      Plaintiff has reviewed the complaint and authorizes its filing.

2.      Plaintiff did not purchase the securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, either individually or as part of a group, including providing testimony at deposition or trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

4.      Plaintiff's transaction(s) in the **Wachovia Capital Trust IX 6.375%** securities that are the subject of this action is/are as follows:

| Type of Security | Number of Shares | Bought | Sold | Date | Price per share |
|---|---|---|---|---|---|
| Preferred | 400 | B | | 5/1/2007 | $25.00 |
| Preferred | 400 | | S | 12/27/2007 | $19.79 |
| | | | | | |
| | | | | | |

(Please list additional purchase and sale information on a separate sheet of paper, if necessary)

5.      Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including Plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

6.      During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws, except as described below

_____

7.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___ day of September, 2009.

_____
Michael Swiskay, Trustee to the Judith R. Swiskay
Irrevocable Trust U/A 7/16/2007

**EXHIBIT H**

## GLANCY BINKOW & GOLDBERG LLP
## SWORN CERTIFICATION OF PLAINTIFF

I, Michael Swiskay Trustee, Trust U/W/O Hanan Swiskay FBO Jeffrey Swiskay, ("Plaintiff") declare, as to the claims asserted under the federal securities laws that

1.      Plaintiff has reviewed the complaint and authorizes its filing.

2.      Plaintiff did not purchase the securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, either individually or as part of a group, including providing testimony at deposition or trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

4.      Plaintiff's transaction(s) in the Wachovia Capital Trust IV 6.375% securities that are the subject of this action is/are as follows:

| Type of Security | Number of Shares | Bought | Sold | Date | Price per share |
|---|---|---|---|---|---|
| Preferred | 1000 | B | | 2/8/2007 | $25.00 |
| Preferred | 1000 | | S | 9/29/2008 | $8.75 |
| | | | | | |
| | | | | | |

(Please list additional purchase and sale information on a separate sheet of paper, if necessary)

5.      Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including Plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

6.      During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws, except as described below

_____

7.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2 day of September 2009.

_____

Michael Swiskay, Trustee, Trust U/W/O
Hanan Swiskay FBO Jeffrey Swiskay

# EXHIBIT I

**GLANCY BINKOW & GOLDBERG LLP**
**SWORN CERTIFICATION OF PLAINTIFF**

I, Michael Swiskay Trustee, Trust U/W/O Hanan Swiskay, ("Plaintiff") declare, as to the claims asserted under the federal securities laws that:

1.    Plaintiff has reviewed the complaint and authorizes its filing.

2.    Plaintiff did not purchase the securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, either individually or as part of a group, including providing testimony at deposition or trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

4.    Plaintiff's transaction(s) in the Wachovia Capital Trust IX 6.375% securities that are the subject of this action is/are as follows:

| Type of Security | Number of Shares | Bought | Sold | Date | Price per share |
|---|---|---|---|---|---|
| Preferred | 1000 | B | | 5/01/2007 | $25.00 |
| Preferred | 1000 | | S | 12/27/2007 | $20.27 |
| | | | | | |
| | | | | | |

(Please list additional purchase and sale information on a separate sheet of paper, if necessary)

5.    Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including Plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

6.    During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws, except as described below

_____

7.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __2__ day of __September__, 2009.

_____
Michael Swiskay, Trustee, Trust U/W/O
Hanan Swiskay