**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE WACHOVIA PREFERRED SECURITIES AND BOND/NOTES LITIGATION | Master File No. 09 Civ. 6351 (RJS)<br><br>**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>**ECF CASE** |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................ 2

II. JURISDICTION AND VENUE ........................................................................ 5

III. PARTIES ........................................................................................................... 6

    A. Plaintiffs.................................................................................................... 6

        1. Lead Plaintiffs ................................................................................ 6

        2. Additional Plaintiffs....................................................................... 7

    B. Defendants ................................................................................................ 9

        1. The Wachovia Issuer Defendants ................................................... 9

        2. Defendant Wells Fargo ................................................................. 11

        3. The Individual Defendants............................................................ 12

        4. The Underwriter Defendants......................................................... 18

        5. Defendant KPMG ......................................................................... 21

IV. FACTUAL BACKGROUND............................................................................ 22

    A. The Offering Materials Contained Material Misstatements and Omissions Concerning the Pick-A-Pay Mortgage Portfolio.................................................... 24

        1. Beginning in 2006, the Housing Market Plummets................................. 24

        2. Wachovia's Inadequate Due Diligence of Golden West ......................... 26

        3. Wachovia's Misstatements and Omissions Concerning the Acquisition of Golden West and Its Pick-A-Pay Loan Portfolio.............. 31

            a. Wachovia Touts the Merger and Golden West's Mortgage Portfolio ....................................................................... 31

            b. The Serious Undisclosed Problems With Golden West's Pick-A-Pay Portfolio................................................... 32

        4. After Acquiring the Pick-A-Pay Portfolio, Wachovia Originates Billions of Dollars of Additional High-Risk, Toxic Loans....................... 41

i

5.  Wachovia Embraces the Pick-A-Pay Program with a Combination of Inadequate Training and Flawed Incentive Compensation Practices ................................................................................ 42

6.  High Risk Underwriting Practices in the Field Continue – and Indeed Worsen – After Wachovia Acquires Golden West ...................... 49

    a.  Continued Widespread Fabrication of Borrowers' Income and Employment Information ........................................................ 50

    b.  Continued Rampant Use of "Exceptions to Policy" to Approve Loans that Fail to Meet Stated Underwriting Standards .................................................................................... 60

    c.  Continued Heavy Lending to Subprime Pick-A-Pay Borrowers .................................................................................. 66

    d.  Continued Use of "Instant Underwriting" Events to Approve High-Risk Loans With Minimal Review ...................... 69

    e.  Qualifying Mortgage Applicants Against the Pick-A-Pay Loan's "Teaser" Rate, Rather than Its Fully Indexed Rate .......... 70

    f.  Continued Use of Inflated Appraisals and Resulting Understatement of LTV Ratios, and Blindness to Second Mortgages ("Silent Seconds") in the Underwriting Process ........ 74

    g.  The Foregoing Rampant Deviations from Stated Underwriting Policies and Guidelines Were All the More Dangerous Given that Wachovia Had Lowered Minimum Pick-A-Pay Loan Standards Soon After the Merger .................... 81

    h.  Wachovia's Internal Consumer Risk Management Group Belatedly Concludes that Underwriting Guidelines Were Being "Blissfully Ignored" in Key Regions ................................ 85

7.  Wachovia Begins to Publicly Reveal the Low Credit Quality and Risky Underwriting of the Pick-A-Pay Portfolio ..................................... 87

B.  The Offering Materials Reported Materially Understated Loss Reserves ........... 92

C.  Wachovia Misstated the Amount and Value of Its CDO and RMBS Holdings ........................................................................................................ 98

    1.  Overview of CDOs and RMBS ............................................................. 100

    2.  Wachovia Misstated Its CDO Exposure ................................................ 101

3.  Wachovia Overstated the Value of Its CDO Portfolio............................ 104

D.  The Offering Materials Erroneously Assured Investors that Wachovia Was Well-Capitalized, and Omitted to Disclose that Its Mortgage-Related Exposures Jeopardized Its Tier 1 Capital............................................. 110

E.  Wachovia Misstated Its Goodwill..................................................... 116

V.  SUMMARY OF WACHOVIA'S SECURITIES OFFERINGS................................... 119

VI.  MATERIALLY UNTRUE STATEMENTS AND OMISSIONS IN THE OFFERING MATERIALS ............................................................................. 121

1.  Defendants' Materially Untrue Statements Made On or Before the Closing of the Golden West Acquisition On October 1, 2006 .............. 121

2.  Defendants' Materially Untrue and Misleading Statements from November 3, 2006 through July 30, 2007.............................................. 123

3.  Wachovia's Materially Untrue and Misleading November 9, 2007 Form 10-Q........................................................................................... 128

4.  Wachovia's Materially Untrue and Misleading January 22, 2008 Form 8-K and 2007 Form 10-K ............................................................ 130

5.  Wachovia's Materially Untrue and Misleading April 14, 2008 Form 8-K ...................................................................... 133

VII.  CLASS ACTION ALLEGATIONS .......................................................... 135

VIII.  CAUSES OF ACTION.......................................................................... 136

COUNT I ............................................................................................. 136

For Violations Of Section 11 Of The Securities Act Against The Wachovia Issuer Defendants And Wells Fargo As Successor-In-Interest.......... 136

COUNT II ............................................................................................ 138

For Violations of Section 11 of the Securities Act Against The Individual Defendants Other Than Truslow....................................................... 138

COUNT III........................................................................................... 140

For Violations Of Section 11 Of The Securities Act Against The Underwriter Defendants And KPMG ............................................... 140

COUNT IV...................................................................................................... 143

    For Violations Of Section 12(a)(2) Of The Securities Act Against The
    Wachovia Issuer Defendants And Wells Fargo As Successor-In-Interest.......... 143

COUNT V........................................................................................................ 145

    For Violations of Section 12(a)(2) of the Securities Act Against The
    Underwriter Defendants..................................................................................... 145

COUNT VI....................................................................................................... 147

    For Violations Of Section 15 Of The Securities Act Against Wachovia
    And Wells Fargo As Successor-In-Interest......................................................... 147

COUNT VII ..................................................................................................... 149

    For Violations Of Section 15 Of The Securities Act Against Thompson,
    Truslow And Wurtz .......................................................................................... 149

IX.    JURY TRIAL DEMANDED ........................................................................ 151

Lead Plaintiffs Orange County Employees' Retirement System ("Orange County"), Louisiana Sheriffs' Pension and Relief Fund ("Louisiana Sheriffs"), and Southeastern Pennsylvania Transportation Authority ("SEPTA") (collectively, "Plaintiffs"), bring this action individually and on behalf of all persons and entities, except Defendants (listed at ¶¶ 22-73 below) and their affiliates, who purchased or otherwise acquired certain Wachovia Corporation bonds or preferred securities ("Bond Class Securities") in or traceable to the publicly registered offerings set forth in the Appendix attached hereto and further described herein at ¶¶ 210-215 below (the "Offerings"), and were damaged by the circumstances described herein.    The Offerings were conducted between July 31, 2006 and May 29, 2008 (the "Offering Period") pursuant to five separate shelf registration statements which incorporated by reference numerous prospectuses and filings with the Securities and Exchange Commission ("SEC") (the "Offering Materials").    The Offering Materials contained untrue statements of material fact or omitted to state material facts that were required to be stated therein or were necessary to make the statements therein not misleading.

The allegations in this Amended Consolidated Class Action Complaint ("Amended Complaint") are made upon Plaintiffs' personal knowledge with regard to their own acts and upon information and belief as to all other matters.    Plaintiffs' information and belief is based upon, *inter alia*, the investigation by Court-appointed Co-Lead Counsel, Bernstein Litowitz Berger & Grossmann LLP, Barroway Topaz Kessler Meltzer & Check, LLP, and Robbins Geller Rudman & Dowd LLP (collectively, "Co-Lead Counsel").    Co-Lead Counsel's investigation has included, among other things, interviews of numerous former employees of Wachovia Corporation ("Wachovia" or the "Company") and Golden West Financial Corp. ("Golden West"), including numerous former employees that Co-Lead Counsel has interviewed or re-

interviewed since the filing of the Consolidated Class Action Complaint (the "Consolidated Complaint") in this action on September 4, 2009.

Based on the material misstatements and omissions alleged in this Amended Complaint, Plaintiffs, on behalf of themselves and all others who purchased Bond Class Securities in or traceable to the Offerings, allege only strict liability claims against Wachovia and certain of its directors, officers, affiliates, underwriters and auditors pursuant to Sections 11, 12 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k(a), 77l(a) and 77o. Wachovia's and the other Defendants' state of mind is not an element of any of the claims stated herein. Plaintiffs do not accuse any Defendant of making misstatements or omissions with fraudulent intent.

## I.    <u>INTRODUCTION</u>

1.      Between July 31, 2006 and May 29, 2008 (defined above as the "Offering Period"), Wachovia sold to investors Bond Class Securities with a face value of more than $35 billion pursuant to the Offering Materials. Because this was a period characterized by declining housing values and concern about financial institutions' exposure to mortgage-based (and especially subprime mortgage-based) assets, it was particularly important that Wachovia present accurate and complete information about its exposure to such assets in the Offering Materials that it used to raise tens of billions of dollars from the investing public. Nevertheless, throughout the Offering Period, Wachovia's Offering Materials materially and repeatedly misstated and failed to disclose the true nature and quality of Wachovia's mortgage loan portfolio, and materially misled investors as to the Company's exposure to tens of billions of dollars of losses on mortgage-related assets. Accordingly, far from investing in a risk-averse financial institution characterized by careful underwriting and risk management, strong liquidity and adequate loan loss reserves as described in the Offering Materials, Plaintiffs and the other members of the Class

were actually investing in a Company plagued by lax loan underwriting, tens of billions of dollars of exposure to high risk subprime mortgages, woefully inadequate loan loss reserves and large undisclosed holdings of "toxic" subprime-backed securities, which combined to bring Wachovia to the brink of insolvency by late summer 2008 – just months after the last Offering at issue in this action.

2.      Throughout the Offering Period, Wachovia operated with a high degree of leverage, so that losses in even a small portion of its assets could materially jeopardize its financial condition.  For example, in 2007 Wachovia reported more than $780 billion of total assets, but only $43.5 billion of readily available capital (or less than 6% of its total assets) that could be used to absorb losses in its large asset base.  For this reason as well, it was critical to investors in or traceable to the Offerings that Wachovia comply with the federal securities laws and make full, complete and accurate disclosures concerning the quality of its mortgage-related assets.  It failed to do so.

3.      Of particular relevance here, a significant portion of Wachovia's reported mortgage-related assets included its:

(a)      $120 billion portfolio of option adjustable rate mortgages ("Option ARMs"), known as the "Pick-A-Pay" portfolio, which Wachovia acquired through its May 2006 purchase of Golden West;

(b)      $8 billion portfolio of collateralized debt obligations ("CDOs") and residential mortgage backed securities ("RMBS"), which were backed by subprime mortgages; and

(c)      $15 billion of "goodwill" that Wachovia recorded in connection with its acquisition of Golden West, and which Wachovia continued to carry on its balance sheet throughout the Offering Period.

4.      The Offering Materials made repeated untrue statements and material omissions concerning these assets.  With respect to the "Pick-A-Pay" loans, the Offering Materials represented that the Pick-A-Pay portfolio was of "pristine credit quality," that Golden West had a

3

"singular focus as a risk-averse residential mortgage portfolio lender," and that Wachovia and Golden West engaged in "prudent lending practices." In reality, the opposite was true. Approximately $51 billion – or almost half – of the Pick-A-Pay portfolio consisted of loans to borrowers with **subprime** credit scores. In addition, although not disclosed in the Offering Materials, virtually all of these loans had been made to borrowers without income verification, and Golden West's and Wachovia's sales forces had routinely used inflated and unverified borrower incomes and job titles to obtain approval of loans which borrowers actually did not qualify for and could not afford to repay. As further described below, senior Golden West/Wachovia sales representatives also routinely overrode decisions by their company's underwriting department denying mortgages as part of a practice euphemistically referred to as "Exception to Policy" or "ETP." Moreover, Wachovia's exposure to high risk mortgage loans was not limited to its massive direct mortgage portfolio; for example, unbeknownst to investors, by mid-2006 Wachovia had also accumulated billions of dollars of unsold subprime-backed collateralized debt obligations ("CDOs") and residential mortgage-backed securities ("RMBS") on its balance sheet.

5.  Although Wachovia made various partial disclosures concerning some aspects of its exposure to subprime mortgage-related assets during the latter part of the Offering Period, these disclosures were inadequate because documents incorporated into the Offering Materials continued to materially misstate the true value of these assets, failed to record write-downs and impairments to these assets that were required under generally accepted accounting principles ("GAAP"), and failed to disclose the full extent to which Golden West/Wachovia's prior mortgage underwriting had been plagued by dangerous underwriting practices. Instead, even as the Company was sliding towards insolvency, documents incorporated into the Offering

Materials reassured investors that Wachovia's capital and liquidity positions were "strong," and that it was so "well capitalized" that it was actually a "provider of liquidity" to the market. Such assurances were materially untrue and misleading.

6. The extent of the decay at Wachovia relating to its mortgage-related assets did not begin to become apparent until September 2008, when the U.S. Government was forced to take unprecedented action to prevent Wachovia's imminent collapse. On September 28, 2008, the Government brokered a deal in which Wachovia agreed to sell its banking operations to Citigroup for a mere $1 per share, with the Federal Deposit Insurance Corporation ("FDIC") agreeing as part of the deal to indemnify Citigroup for any loan losses exceeding $42 billion. Days later, on October 2, 2008 – in the wake of a new Internal Revenue Service rule that would allow financial institutions to recognize accelerated tax benefits on certain financial losses – Wells Fargo announced that it would acquire Wachovia for $7 per share, but that it expected to incur staggering losses of ***more than $30 billion*** on the Pick-A-Pay portfolio (and ultimately disclosed that $59.8 billion – ***or more than half*** – of the Pick-A-Pay portfolio was credit-impaired). Shortly thereafter, Wachovia announced a devastating loss of $23.88 billion – ***one of the largest quarterly losses ever reported by a U.S. company***.

7. By this Amended Complaint, for the reasons detailed herein, Plaintiffs seek relief under the Securities Act of 1933 ("Securities Act") on behalf of themselves and a Class of similarly situated investors for the enormous damages that they have suffered as a result of the allegations described herein.

## II.  <u>JURISDICTION AND VENUE</u>

8. This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1331. The claims alleged herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2)

and 77o.  In connection with the acts alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails and interstate telephone communications.

9.      Venue is proper in this district pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b) and (c).  Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts or statements that omitted to state material facts necessary to make the statements therein not misleading, occurred in this District.

## III.    PARTIES

### A.    Plaintiffs

#### 1.    Lead Plaintiffs

10.     Lead Plaintiff Orange County provides retirement and disability benefits to the active, deferred, and retired government members of Orange County, California.  Orange County's principal offices are located at 2223 Wellington Avenue, Suite 100, Santa Ana, California.  As indicated on its certification filed with the Consolidated Complaint, Orange County acquired certain Bond Class Securities pursuant or traceable to Offering Materials that contained material misstatements and omissions of fact, and suffered damages as a result of the circumstances described herein.

11.     Lead Plaintiff Louisiana Sheriffs is a defined-benefit pension plan that provides retirement benefits to active and retired sheriffs and their family members throughout the State of Louisiana.  Louisiana Sheriffs' principal offices are located at 1225 Nicholson Drive, Baton Rouge, Louisiana.  As indicated on the certification filed with the Consolidated Complaint, Louisiana Sheriffs acquired certain Bond Class Securities pursuant or traceable to Offering

Materials that contained material misstatements and omissions of fact, and suffered damages as a result of the circumstances described herein.

12. Lead Plaintiff SEPTA is the nation's fifth largest public transportation system and maintains a pension fund for the benefit of its current and former employees. SEPTA's principal offices are located at 1234 Market Street, Philadelphia, Pennsylvania. As indicated on the certification filed with the Consolidated Complaint, SEPTA acquired certain Bond Class Securities pursuant or traceable to Offering Materials that contained material misstatements and omissions of fact, and suffered damages as a result of the circumstances described herein.

### 2. Additional Plaintiffs

13. Plaintiff Hawaii Sheet Metal Workers Pension Fund ("Hawaii") is a multi-employer defined-benefit fund. Hawaii's principal offices are located at 1405 North King Street, Honolulu, Hawaii. Hawaii acquired Wachovia's 5.75% Notes due February 1, 2018 (CUSIP # 92976WBH8) and Wachovia's Three-Month LIBOR Floating Rate Notes Due April 23, 2012 (CUSIP # 929903DF6) pursuant or traceable to Offering Materials that contained material misstatements and omissions of fact, and suffered damages as a result of the circumstances described herein.

14. Plaintiff Iron Workers Locals 40, 361, 417 Union Security Funds ("Iron Workers") provides pension benefits to Ironworkers in the New York area. Iron Workers acquired Wachovia's 5.50% Fixed Rate Notes due May 1, 2013 (CUSIP # 92976WBJ4) pursuant or traceable to Offering Materials that contained material misstatements and omissions of fact, and suffered damages as a result of the circumstances described herein.

15. Plaintiff Norman Levin ("Levin") is a resident of California. As indicated on the certification filed with the Consolidated Complaint, Levin acquired certain Wachovia Capital Trust X securities pursuant or traceable to Offering Materials that contained material

misstatements and omissions of fact, and suffered damages as a result of the circumstances described herein.

16.     Plaintiff City of Livonia Employees' Retirement System ("Livonia") is a defined-benefit public retirement fund.  Livonia's principal offices are located at 33000 Civic Center Drive, Livonia, Michigan.   Livonia acquired Wachovia's 5.75% Notes due June 15, 2017 (CUSIP # 929903DT6) and Wachovia's 5.75% Notes due February 1, 2018 (CUSIP # 92976WBH8) pursuant or traceable to Offering Materials that contained material misstatements and omissions of fact, and suffered damages as a result of the circumstances described herein.[1]

17.     Plaintiff Arlette Miller ("Miller") is a resident of New York.  As indicated on the certification filed with the Consolidated Complaint, Miller acquired certain Wachovia Capital Trust IX securities pursuant or traceable to Offering Materials that contained material misstatements and omissions of fact, and suffered damages as a result of the circumstances described herein.

18.     Plaintiff Michael Swiskay ("Swiskay") is a resident of New York.  As indicated on the certification filed with the Consolidated Complaint, Swiskay acquired Wachovia 8.00% Non-Cumulative Perpetual Class A Preferred Stock, Series J securities pursuant or traceable to Offering Materials that contained material misstatements and omissions of fact, and suffered damages as a result of the circumstances described herein.

19.     Plaintiff Michael Swiskay, as trustee of the Judith R. Swiskay Irrevocable Trust U/A 7/16/2007 (the "Judith Swiskay Trust"), is a resident of New York.  As indicated on the certification filed with the Consolidated Complaint, the Judith Swiskay Trust acquired certain

---

[1] Plaintiffs recognize that although the *Livonia* action has been consolidated for pretrial purposes with the remainder of this action, pursuant to the Court's order of December 11, 2009, if Defendants' motion to dismiss the consolidated action is denied, Defendants may move to dismiss the *Livonia* claims on grounds unique to those claims, if any.

Wachovia Capital Trust IX securities pursuant or traceable to Offering Materials that contained material misstatements and omissions of fact, and suffered damages as a result of the circumstances described herein.

20.     Plaintiff Michael Swiskay, as trustee of the Trust U/W/O Hanan Swiskay FBO Jeffrey Swiskay (the "Jeffrey Swiskay Trust"), is a resident of New York.  As indicated on the certification filed with the Consolidated Complaint, the Jeffrey Swiskay Trust acquired certain Wachovia Capital Trust IV securities pursuant or traceable to Offering Materials that contained material misstatements and omissions of fact, and suffered damages as a result of the circumstances described herein.

21.     Plaintiff Michael Swiskay, as trustee of the Trust U/W/O Hanan Swiskay, (the "Hanan Swiskay Trust"), is a resident of New York.  As indicated on the certification filed with the Consolidated Complaint, the Hanan Swiskay Trust acquired certain Wachovia Capital Trust IX securities pursuant or traceable to Offering Materials that contained material misstatements and omissions of fact, and suffered damages as a result of the circumstances described herein.

B.      **Defendants**

1.      **The Wachovia Issuer Defendants**

22.     Prior to its merger with Wells Fargo described in ¶ 27 below, Defendant Wachovia was a financial holding company incorporated pursuant to North Carolina law and a bank holding company under the Bank Holding Company Act of 1956, with its principal executive offices located at One Wachovia Center, 301 South College Street, Charlotte, North Carolina 28288.  According to its SEC filings, Wachovia offered a comprehensive line of consumer and commercial banking products and services, investment banking, and other financial services.  As set forth in the Appendix, Wachovia was the statutory issuer or co-issuer of each of the Offerings.

23.     Defendant Wachovia Capital Trust IV is a statutory trust formed under Delaware law pursuant to a trust agreement between Wachovia, as sponsor of the trust, a property trustee, a Delaware trustee and administrative trustees.  Wachovia Capital Trust IV's principal executive offices are located at Wachovia's former corporate headquarters at 301 South College Street, Charlotte, North Carolina 28288.  The administrative trustees, who are responsible for the day-to-day operations of the trust, were employees or officers of, or affiliated with, Wachovia, and Wachovia had the sole right to vote to appoint, remove, or replace them.  Wachovia directly or indirectly owned all of the common securities of Wachovia Capital Trust IV and fully and unconditionally guaranteed the preferred securities that Wachovia Capital Trust IV issued.  Wachovia Capital Trust IV was also a "finance subsidiary" of Wachovia within the meaning of Rule 3-10 of Regulation S-X under the Securities Act, and its assets consist solely of debt obligations of Wachovia.  Wachovia Capital Trust IV, along with Wachovia, was the issuer of the 6.375% Trust Preferred Securities, as identified in the Appendix.

24.     Defendant Wachovia Capital Trust IX is a statutory trust formed under Delaware law pursuant to a trust agreement between Wachovia, as sponsor of the trust, a property trustee, a Delaware trustee and administrative trustees.  Wachovia Capital Trust IX's principal executive offices are located at Wachovia's former corporate headquarters at 301 South College Street, Charlotte, North Carolina 28288.  The administrative trustees, who are responsible for the day-to-day operations of the trust, were employees or officers of, or affiliated with, Wachovia, and Wachovia had the sole right to vote to appoint, remove, or replace them.  Wachovia directly or indirectly owned all of the common securities of Wachovia Capital Trust IX and fully and unconditionally guaranteed the preferred securities that Wachovia Capital Trust IX issued.  Wachovia Capital Trust IX was also a "finance subsidiary" of Wachovia within the meaning of

Rule 3-10 of Regulation S-X under the Securities Act, and its assets solely consist of debt obligations of Wachovia. Wachovia Capital Trust IX, along with Wachovia, was the issuer of the 6.375% Trust Preferred Securities, as identified in the Appendix.

25. Defendant Wachovia Capital Trust X is a statutory trust formed under Delaware law pursuant to a trust agreement between Wachovia, as sponsor of the trust, a property trustee, a Delaware trustee and administrative trustees. Wachovia Capital Trust X's principal executive offices are located at Wachovia's former corporate headquarters at 301 South College Street, Charlotte, North Carolina 28288. The administrative trustees, who are responsible for the day-to-day operations of the trust, were employees or officers of, or affiliated with, Wachovia, and Wachovia had the sole right to vote to appoint, remove, or replace them. Wachovia directly or indirectly owned all of the common securities of Wachovia Capital Trust X and fully and unconditionally guaranteed the preferred securities that Wachovia Capital Trust X issued. Wachovia Capital Trust X was also a "finance subsidiary" of Wachovia within the meaning of Rule 3-10 of Regulation S-X under the Securities Act, and its assets solely consist of debt obligations of Wachovia. Wachovia Capital Trust X, along with Wachovia, was the issuer of the 7.85% Trust Preferred Securities, as identified in the Appendix.

26. Wachovia, Wachovia Capital Trust IV, Wachovia Capital Trust IX and Wachovia Capital Trust X are collectively referred to as the "Wachovia Issuer Defendants." Wachovia Capital Trust IV, Wachovia Capital Trust IX and Wachovia Capital Trust X are collectively referred to as the "Wachovia Capital Trusts."

**2.    Defendant Wells Fargo**

27. Defendant Wells Fargo is a financial services company incorporated pursuant to Delaware law and a bank holding company under the federal Bank Holding Company Act of 1956, with its principal executive offices located at 420 Montgomery Street, San Francisco,

California 94163.  On December 31, 2008, Wachovia merged with and into Wells Fargo, which was the surviving corporation in the merger (the "Wells Fargo Merger").  As a result of the merger, Wells Fargo acquired all of Wachovia's businesses and assets and undertook Wachovia's obligations, including all of Wachovia's outstanding debt.  Wells Fargo is named herein as the successor-in-interest to Wachovia.

### 3.	The Individual Defendants

28.	Defendant G. Kennedy Thompson ("Thompson") was the Company's President, Chief Executive Officer ("CEO") and a member of its Board of Directors from 1999 through June 1, 2008, when the Board of Directors asked Thompson to resign.  Thompson also served as Chairman of Wachovia's Board of Directors.  Thompson is liable under the Securities Act for the Offerings that occurred pursuant to the Registration Statements dated March 14, 2005, May 26, 2005, February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Wachovia director.

29.	Defendant Peter M. Carlson ("Carlson") joined Wachovia in 2002 as the Director of External Reporting.  From October 19, 2006 through June 27, 2007, Carlson served as Interim Controller and Principal Accounting Officer, and since June 27, 2007 as Wachovia's Controller and Principal Accounting Officer.  At all relevant times, he was also a Senior Vice President of the Company.  Carlson is liable under the Securities Act for the Offerings that occurred pursuant to the Registration Statements dated February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which he signed.

30.	Defendant Ross E. Jeffries, Jr. ("Jeffries") was the Senior Vice President, Assistant Secretary and Deputy General Counsel of Wachovia from no later than November 2004 through at least August 2008.  Jeffries is liable under the Securities Act for the Offerings

that occurred pursuant to the Registration Statements dated March 5, 2007 and the April 14, 2008, filed with the SEC on Form S-3, which he signed.

31.     Defendant David M. Julian ("Julian") was the Executive Vice President and Corporate Controller/Principal Accounting Officer of Wachovia from 2001 through October 19, 2006, when he was appointed Chief Operating Officer of Wachovia's Finance Division.  Julian is liable under the Securities Act for the Offerings that occurred pursuant to the Registration Statements dated March 14, 2005 and May 26, 2005, filed with the SEC on Form S-3, which he signed.

32.     Defendant Mark C. Treanor ("Treanor") served as the Company's Senior Executive Vice President, Secretary and General Counsel from September 2001 until his retirement in mid-2008.  Treanor is liable under the Securities Act for the Offerings that occurred pursuant to the Registration Statements dated March 14, 2005, May 26, 2005 and February 7, 2007, filed with the SEC on Form S-3, which he signed.

33.     Defendant Donald K. Truslow ("Truslow") served as Wachovia's Treasurer and Controller, and became its Chief Risk Officer in 2000, a position he held with Wachovia until October 2008.  Truslow is named as a Defendant only with respect to Plaintiffs' claims arising under Section 15 of the Securities Act.

34.     Defendant Thomas J. Wurtz ("Wurtz") joined Wachovia in 1994 and was the Senior Executive Vice President and Chief Financial Officer ("CFO") of Wachovia from January 2006 through September 2008.  Prior to that, Wurtz served as Executive Vice President and Treasurer of Wachovia from October 2002 to January 2006.  Wurtz is liable under the Securities Act for the Offerings that occurred pursuant to the Registration Statements dated February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which he signed.

35.     Defendant John D. Baker, II ("Baker") was, at all times relevant herein, a member of Wachovia's Board of Directors.  Baker is liable under the Securities Act for the Offerings pursuant to the Registration Statements dated March 14, 2005, May 26, 2005, February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Wachovia director.

36.     Defendant Robert J. Brown ("Brown") was, at all times relevant herein, a member of Wachovia's Board of Directors.  Brown is liable under the Securities Act for the Offerings that occurred pursuant to the Registration Statements dated March 14, 2005, May 26, 2005, February 7, 2007 and March 5, 2007, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Wachovia director.

37.     Defendant Peter C. Browning ("Browning") was, at all times relevant herein, a member of Wachovia's Board of Directors.  Browning is liable under the Securities Act for the Offerings pursuant to the Registration Statements dated March 14, 2005, May 26, 2005, February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Wachovia director.

38.     Defendant John T. Casteen, III ("Casteen") was, at all times relevant herein, a member of Wachovia's Board of Directors.  Casteen is liable under the Securities Act for the Offerings pursuant to the Registration Statements dated March 14, 2005, May 26, 2005, February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Wachovia director.

39.     Defendant Jerome A. Gitt ("Gitt") was, at all times relevant herein, a member of Wachovia's Board of Directors.  Gitt was a member of the Board of Directors of Golden West prior to its merger with Wachovia.  Gitt's election to Wachovia's Board was made pursuant to

14

the merger agreement between Wachovia and Golden West, and became effective October 1, 2006.  Gitt is liable under the Securities Act for the Offerings pursuant to the Registration Statements dated February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Wachovia director.

40.     Defendant William H. Goodwin, Jr. ("Goodwin") was, at all times relevant herein, a member of Wachovia's Board of Directors.  Goodwin is liable under the Securities Act for the Offerings pursuant to the Registration Statements dated March 14, 2005, May 26, 2005, February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Wachovia director.

41.     Defendant Mary Ellen C. Herringer ("Herringer") was, at all times relevant herein, a member of Wachovia's Board of Directors.  Herringer was a member of the Board of Directors of Golden West, prior to its merger with Wachovia.  Herringer's election to Wachovia's Board was made pursuant to the merger agreement between Wachovia and Golden West, and became effective October 1, 2006.  Herringer is liable under the Securities Act for the Offerings pursuant to the Registration Statements dated February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which she signed, and for all Offerings completed during her tenure as a Wachovia director.

42.     Defendant Robert A. Ingram ("Ingram") was, at all times relevant herein, a member of Wachovia's Board of Directors.  Ingram is liable under the Securities Act for the Offerings pursuant to the Registration Statements dated March 14, 2005, May 26, 2005, February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Wachovia director.

43. Defendant Donald M. James ("James") was, at all times relevant herein, a member of Wachovia's Board of Directors. James is liable under the Securities Act for the Offerings pursuant to the Registration Statements dated March 14, 2005, February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Wachovia director.

44. Defendant Mackey J. McDonald ("McDonald") was, at all times relevant herein, a member of Wachovia's Board of Directors. McDonald is liable under the Securities Act for the Offerings pursuant to the Registration Statements dated May 26, 2005, February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Wachovia director.

45. Defendant Joseph Neubauer ("Neubauer") was, at all times relevant herein, a member of Wachovia's Board of Directors. Neubauer is liable under the Securities Act for the Offerings pursuant to the Registration Statements dated March 14, 2005, May 26, 2005, February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Wachovia director.

46. Defendant Timothy D. Proctor ("Proctor") was elected to Wachovia's Board of Directors on September 29, 2006, effective November 1, 2006. At all relevant times after his appointment, Proctor was a member of Wachovia's Board of Directors. Proctor is liable under the Securities Act for the Offerings pursuant to the Registration Statements dated February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Wachovia director.

47. Defendant Ernest S. Rady ("Rady") was, at all times relevant herein, a member of Wachovia's Board of Directors. Rady is liable under the Securities Act for the Offerings

pursuant to the Registration Statements dated February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Wachovia director.

48.     Defendant Van L. Richey ("Richey") was, at all times relevant herein, a member of Wachovia's Board of Directors. Richey is liable under the Securities Act for the Offerings pursuant to the Registration Statements dated March 14, 2005, February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Wachovia director.

49.     Defendant Ruth G. Shaw ("Shaw") was, at all times relevant herein, a member of Wachovia's Board of Directors. Shaw is liable under the Securities Act for the Offerings pursuant to the Registration Statements dated March 14, 2005, May 26, 2005, February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which she signed, and for all Offerings completed during her tenure as a Wachovia director.

50.     Defendant Lanty L. Smith ("Smith") was, at all times relevant herein, a member of Wachovia's Board of Directors. Smith also served as Chairman of Wachovia's Board from June 2008 and as interim CEO of Wachovia from June 1, 2008 to July 9, 2008, following the resignation of Defendant Thompson. Prior to his appointment as interim CEO of Wachovia, Smith was a member of the Board's Audit Committee and Corporate Governance & Nominating Committee. Smith is liable under the Securities Act for the Offerings pursuant to the Registration Statements dated March 14, 2005, May 26, 2005, February 7, 2007, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Wachovia director.

51. Defendant John C. Whitaker, Jr. ("Whitaker") was a member of Wachovia's Board of Directors through December 31, 2007. Whitaker is liable under the Securities Act for the Offerings pursuant to the Registration Statements dated March 14, 2005, May 26, 2005, February 7, 2007 and March 5, 2007, filed with the SEC on Form S-3, which he signed, and for all Offerings completed during his tenure as a Wachovia director.

52. Defendant Dona Davis Young ("Young") was, at all times relevant herein, a member of Wachovia's Board of Directors. Young is liable under the Securities Act for the Offerings pursuant to the Registration Statements dated March 14, 2005, May 26, 2005, March 5, 2007 and April 14, 2008, filed with the SEC on Form S-3, which she signed, and for all Offerings completed during her tenure as a Wachovia director.

53. Defendants Baker, Brown, Browning, Carlson, Casteen, Gitt, Goodwin, Herringer, Ingram, James, Jeffries, Julian, McDonald, Neubauer, Proctor, Rady, Richey, Shaw, Smith, Thompson, Treanor, Whitaker, Wurtz, and Young are collectively referred to herein as the "Individual Defendants."

### 4. The Underwriter Defendants

54. Defendant Wachovia Capital Markets, LLC ("WCM") is a registered broker/dealer and was an indirect wholly owned subsidiary of Wachovia until December 31, 2008, when WCM became an indirect wholly owned subsidiary of Wells Fargo. WCM's principal executive offices are located at 375 Park Avenue, New York, NY 10152. Until the Wells Fargo Merger, WCM's principal executive offices were located at Wachovia's corporate headquarters at 301 South College Street, Charlotte, North Carolina 28288, and a senior officer of Wachovia and member of Wachovia's operating committee acted at all relevant times as WCM's managing director. According to various Wachovia prospectus supplements, including one dated November 14, 2007, "Wachovia conducts its investment banking, institutional and

capital market business through its various bank, broker-dealer and nonbank subsidiaries (including Wachovia Capital Markets LLC)…." WCM was a lead or co-lead underwriter for each of the Offerings.

55. Defendant Banc of America Securities LLC ("Banc of America"), based in New York, New York, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.

56. Defendant Barclays Capital Inc. ("Barclays"), based in New York, New York, is the investment banking division of Barclays Bank PLC, and provides large corporate, government and institutional clients with solutions for their strategic advisory, financing and risk management needs.

57. Defendant BB&T Capital Markets ("BB&T"), based in Richmond, Virginia, is a division of Scott & Stringfellow LLC. Scott & Stringfellow LLC is a wholly owned non-bank subsidiary of BB&T Corporation, one of the nation's largest bank holding companies serving the Southeast and national markets.

58. Defendant Citigroup Global Markets, Inc. ("CGMI"), based in New York, New York, is a subsidiary of Citigroup Inc., a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.

59. Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse"), based in New York, New York, is an investment bank.

60. Defendant Deutsche Bank Securities Inc. ("Deutsche Bank"), with headquarters in New York, New York, is an investment bank.

61.    Defendant Goldman, Sachs & Co. ("Goldman Sachs"), based in New York, New York, is a bank holding company which announced in August 2009 that it had received approval from the Federal Reserve to become a financial holding company, and is a leading global investment banking, securities and investment management firm that provides a wide range of services worldwide.

62.    Defendant Guzman & Company ("Guzman"), based in Coral Gables, Florida, is a securities broker-dealer.

63.    Defendant Jackson Securities, LLC ("Jackson"), based in Atlanta, Georgia, provides investment banking and brokerage services.

64.    Defendant Loop Capital Markets, LLC ("Loop"), based in Chicago, Illinois, is a boutique investment banking and brokerage firm. Loop Capital offers corporate and public finance, financial advisory, municipal finance, equity research, and securities sales and trading services.

65.    Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), based in New York, New York, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.

66.    Defendant Morgan Stanley & Co., Incorporated ("Morgan Stanley"), based in New York, New York, is an investment bank.

67.    Defendant M.R. Beal & Company ("M.R. Beal"), based in New York, New York, is a full service investment banking firm.

68.    Defendant Muriel Siebert & Co., Inc. ("Muriel Siebert"), based in New York, New York, is a discount brokerage firm.

69.     Defendant Samuel A. Ramirez & Company, Inc. ("Ramirez"), based in New York, New York, is an investment company.

70.     Defendant Sandler O'Neill & Partners, L.P. ("Sandler O'Neill"), based in New York, New York, is an investment banking firm.

71.     Defendant UBS Securities LLC ("UBS"), based in Stamford, Connecticut, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services.

72.     Defendant Wells Fargo Securities, LLC ("Wells Fargo Securities"), based in San Francisco, California, is a financial services institution that, through its subsidiaries and divisions, provides investment banking services.

73.     Defendant The Williams Capital Group, L.P. ("Williams Capital"), based in New York, New York, is an investment banking firm providing debt and equity underwriting and corporate finance advisory services.

74.     The Defendants identified above at ¶¶ 54-73 are collectively referred to herein as the "Underwriter Defendants."[2]  Each of the Underwriter Defendants acted as an underwriter (or is the successor-in-interest of an entity that acted as an underwriter) for certain of the Offerings as specified in the Appendix attached hereto.  As an underwriter of Offerings, each of the Underwriter Defendants was responsible for ensuring the completeness and accuracy of the various statements contained in, or incorporated by reference into, the related Offering Materials.

### 5.     **Defendant KPMG**

75.     Defendant KPMG LLP ("KPMG") is a limited liability partnership with its headquarters at 345 Park Avenue, New York, New York 10154.  KPMG is a member firm of

---

[2] Various additional entities, previously named as Underwriter Defendants, have been dismissed without prejudice from this action subject to the terms of a tolling agreement, as set forth in a Stipulation So Ordered by the Court on November 3, 2009.

KPMG International, an international accounting and auditing firm offering audit, tax and advisory services. KPMG was responsible for, among other things, auditing Wachovia's financial statements and internal controls during 2006 through 2008. KPMG rendered unqualified audit opinions on Wachovia's 2006 and 2007 year-end financial statements and consented to Wachovia's incorporation of KPMG's audit opinions on these financial statements in the Offering Materials.

## IV.    FACTUAL BACKGROUND

76.    Between July 2006 and May 2008, Wachovia conducted the 30 public offerings of the Bond Class Securities at issue in the Amended Complaint. The Offering Materials for these Offerings contained material misstatements of fact and/or omitted to disclose material facts, as detailed below, concerning (i) the risk profile and purportedly "pristine" quality of Wachovia's portfolio of residential mortgage loans (including its $120 billion of "Pick-A-Pay" loans), and the supposed adequacy of its reserves for that portfolio; (ii) the purported "conservative in-house appraisal and underwriting approach" for the Pick-A-Pay portfolio; (iii) Wachovia's exposure to, and the impairment in value of, approximately $8 billion of subprime mortgage-backed CDOs and RMBS; (iv) the impaired value of Wachovia's Golden West franchise and related goodwill; (v) Wachovia's purported net income and assets; (vi) Wachovia's purported "well capitalized" status; and/or (vii) various other metrics related to its financial performance.

77.    Each of these material misstatements or omissions also misled investors as to the supposed adequacy of Wachovia's capital and the extent to which Wachovia's financial viability and solvency was at risk. The Company's capital adequacy was expressed as its "Tier 1 capital ratio." The Tier 1 capital ratio purported to measure Wachovia's disclosed cash reserves and other capital paid for by the sale of bank equity ("Tier 1 capital") as a percentage of the bank's

assets that were potentially at risk of default (known as its "risk-adjusted assets"). In order to be considered "well capitalized," federal regulations require a bank to maintain a Tier 1 capital ratio of at least 6% (*i.e.*, Tier 1 capital equal to at least 6% of its risk-adjusted assets). Maintaining its "well-capitalized" status was critical to Wachovia and of vital concern to its potential investors, and the failure to maintain this ratio would have led investors to conclude that Wachovia's solvency was in doubt and to lose faith in its viability. In each of its SEC filings on Form 10-Q and 10-K issued during the Offering Period, all of which were incorporated into the Offering Materials, Wachovia represented that it was "well capitalized."

78.     Wachovia operated with a very high degree of leverage, and held only a small amount of Tier 1 capital against a massive asset base (which consisted primarily of its outstanding loans). For example, in 2007 the Company reported $592 billion of risk-adjusted assets (out of a total of approximately $780 billion in aggregate assets) and only $43.5 billion of Tier 1 capital. Thus, Wachovia operated on razor-thin margins, and losses to even a small percentage of its risk-adjusted assets could wipe out much or even all of its Tier 1 capital, rendering the Company under-capitalized.

79.     Consequently, especially in the face of a plummeting housing market, it was material to investors that Wachovia fully and adequately disclose in its Offering Materials the nature and extent of risks in its mortgage-related exposures, and that it accurately account for any impairments to or losses in the value of those assets, so that investors could in turn assess Wachovia's true financial condition and – in particular – the adequacy of its capital and whether it faced a meaningful (let alone serious) risk of insolvency. As set forth below, throughout the Offering Period, the Offering Materials failed to do so.

### A. The Offering Materials Contained Material Misstatements and Omissions Concerning the Pick-A-Pay Mortgage Portfolio

#### 1. Beginning in 2006, the Housing Market Plummets

80.     Beginning no later than early 2006, the U.S. housing market began to collapse. As illustrated in the chart below, the growth in U.S. home prices, which had been increasing at an unprecedented pace in the mid-2000s, slowed beginning in 2005 and then fell precipitously throughout 2006 and 2007:



81.     The root cause of this collapse was the record number of borrowers who began to default on their mortgage payments. Over the course of the preceding few years, various mortgage lenders had severely loosened underwriting standards to extend loans to millions of "subprime" and other high-risk borrowers who did not meet traditional underwriting standards to qualify for a loan. In 2001, banking regulators, including the Office of the Comptroller of the Currency, the Federal Reserve Board, the FDIC and the Office of Thrift Supervision, issued

guidance which stated that a Fair Isaac & Co. ("FICO") credit score of 660 or below established that a borrower possessed a "[r]elatively high default probability," and thus was "subprime." Loans made to subprime borrowers pose an especially high risk of default because the borrower, as evidenced in part by his or her low FICO score, has demonstrated an inability to repay his or her debts. By early 2006, such subprime borrowers had begun to default in record numbers.

82. Not surprisingly, at about the same time as defaults rose, investors became increasingly concerned with the mortgage and banking industry's exposure to loans made to subprime and other high risk borrowers, and the effect that such loans could have on the financial condition of banks which held those loans on their balance sheet. For example, in November 2005, *The Wall Street Journal* reported that the "much less demanding" mortgage underwriting standards of the immediately preceding years were "putting everyone . . . at risk" who had invested in the market for subprime mortgages and mortgage-backed securities. Similarly, in February 2006, *Barron's* published an article entitled "Coming Home to Roost," which reported that investors were experiencing "much anxiety" over subprime mortgage exposure given the "loosening in underwriting standards" and "easy lending practices" that had prevailed in recent years. As the article stated, "[v]arious doomsday scenarios are being posited" regarding the effect that subprime defaults would have on lenders and investors. On August 21, 2006, *Barron's* similarly reported that, "A housing crisis approaches. … By any traditional valuation, housing prices at the end of 2005 were 30% to 50% too high." Significantly, *Barron's* reported that this "housing bubble" had been caused by "[i]rresponsible financing" by mortgage lenders, which allowed "individuals to buy houses they can't afford."

83. In light of the severe deterioration of the residential real estate market, it was critically important to investors in the Offerings that a prominent mortgage originator like

Wachovia fully and accurately disclose the true nature, condition and extent of its mortgage-related (and especially its subprime mortgage-related) exposures, and that it accurately account for any impairments to or declines in the value of those assets. Wachovia failed to do so.

### 2. Wachovia's Inadequate Due Diligence of Golden West

84.    On May 7, 2006, Wachovia announced that it had agreed to buy Golden West, a California-based thrift specializing in residential mortgage lending, for approximately $25.5 billion in cash and stock. The transaction closed on October 1, 2006. The final purchase price at closing was $24.3 billion.

85.    Golden West's principal asset was its approximately $120 billion portfolio of thirty year "option ARM" (adjustable rate mortgage) loans, which was commonly referred to as the $120 billion "Pick-A-Pay" portfolio. The Pick-A-Pay loans carried an initial, low "teaser" interest rate for a predetermined period of time. After this initial time period expired, however, the interest rate on the loan "reset" to a higher (and typically much higher) interest rate.

86.    The Pick-A-Pay loan product allowed borrowers to elect from the following monthly payment options: (i) a large payment that paid off the loan in fifteen years; (ii) a traditional payment that paid off the loan in thirty years; (iii) a payment that was only large enough to cover the monthly interest (without paying down any principal); or (iv) a "minimum" payment that was substantially less than the calculated monthly interest. When borrowers picked the fourth option and elected to pay less than the calculated monthly interest, the remaining interest was added back into the principal balance of the loan each month, causing the size of the outstanding loan balance to grow rather than shrink – a circumstance commonly referred to as "negative amortization."

87.    In addition, depending on the loan's original loan-to-value ratio ("LTV ratio"), certain levels of negative amortization caused the mortgage to automatically "recast" to require

much higher fully-amortizing payments over the remaining life of the loan. The LTV ratio measures the balance of the loan as a percentage of the value of the property. Thus, a loan of $85,000 drawn against a property with an appraised value of $100,000 would have an LTV of 85% at the time of origination. For Pick-A-Pay loans with original LTV ratios of 85% or lower, a loan would "recast" to require fully-amortizing payments once the outstanding loan balance ballooned to 125% of the property's appraised value. For Pick-A-Pay loans with original LTV ratios higher than 85%, a loan would "recast" to require fully-amortizing payments once the outstanding loan balance ballooned to 110% of the property's appraised value.

88. Because of the features described in ¶¶ 85-87 above, Pick-A-Pay loans were potentially much riskier than traditional mortgage loans, and thus required conservative underwriting in order to limit the lender's risk from borrower defaults and resulting losses. For example, not only did Pick-A-Pay loans have the potential to increase (rather than decrease) the bank's outstanding dollar exposure, such loans were also particularly attractive to high risk borrowers who could afford only the minimum payments. Such borrowers were also likely to run up their indebtedness through "negative amortization," as well as likely to default when their payments rose – as occurred when the initial "teaser" interest rate expired, and/or when certain levels of negative amortization triggered their obligation to make fully-amortizing payments over the remaining term of the loan.

89. Moreover, once negative amortization caused the loan balance to approach or exceed the value of the home, the risk of borrower default increased substantially. The August 21, 2006 *Barron's* article described this heightened risk of default: "Negative amortization … [doesn't] work because eventually too many borrowers are unable to pay the loans down – or are unwilling to keep paying for an asset that has declined in value relative to their outstanding

balance." To mitigate this risk, it was crucial that a lender (such as Wachovia or Golden West) extend such loans only to borrowers who could make regular payments large enough to keep the LTV ratio from approaching 100% for any extended period of time.

90. Despite these potential risks, Wachovia failed to adequately evaluate the quality of the $120 billion Pick-A-Pay portfolio or Golden West's underwriting practices when it hastily agreed to buy Golden West in May 2006. For example, as the *Charlotte Observer* reported on December 21, 2008, more than seven months after the Offering Period, "the deal seemed out of character. It came together in a matter of days. Some key executives weren't consulted." According to the article, Golden West contacted Wachovia's outside attorneys on April 27, 2006, and the $24.3 billion acquisition deal, "from first contact to announcement, took 11 days, with the formal due diligence covering no more than 6 days." As the *Observer* also reported, Defendants Thompson and Wurtz flew out to California only once to meet with top Golden West executives over lunch, which "concluded with a deal well underway…." Moreover, Wachovia did not include its top mortgage executives in the due diligence process – precisely the people who should have been deeply involved. "Top mortgage executives were notified the purchase was in the works but they weren't drawn deeply into the due diligence. That contrasted with earlier deals investigated by the bank.…"

91. As set forth below, various former Wachovia employees have also independently confirmed for Plaintiffs' counsel press accounts that Wachovia failed to conduct a proper due diligence investigation into Golden West's loan portfolio before agreeing to the merger:

> (a) Confidential Witness 1 ("CW 1") was a Wachovia Senior Vice President of Operational Risk at the time of the Golden West acquisition, whose responsibilities included managing Wachovia's financial risk. CW 1 reported that after Golden West approached Wachovia, Defendant Thompson

flew out to California to meet with Golden West without a due diligence team, and that almost immediately thereafter "the deal was done." Ultimately, according to CW 1, Wachovia actually conducted only *three days* of due diligence before agreeing to buy Golden West – due diligence that CW 1 characterized as "poor to non-existent." Indeed, rather than seeking input from his top mortgage executives, Thompson simply told his "level one" reports to finalize the deal – although several executives at the time understandably questioned the amount of due diligence that was done. For example, David Carroll (a Wachovia Senior Executive Vice President, who had headed acquisitions for many years at Wachovia and was familiar with the acquisitions process), opposed the Golden West acquisition as a "bad idea," expressed his belief that Golden West's Pick-A-Pay loan portfolio was "not what it was purported to be," and urged that Wachovia should do more due diligence. In response, Carroll was "told to stay out of it." Similarly, CW 1 reported that Russell Playford, another Wachovia Executive Vice President (with responsibility for risk management), was suspicious of the acquisition and wanted to do more due diligence, and then "sold his stock and quit" soon after the merger because "he feared what was coming." Nonetheless, Thompson pushed through the merger to obtain an immediate presence in the West, and to become a bigger presence in the mortgage industry. CW 1 further reported that beginning about a year after the merger, senior management gradually began to worry that Golden West's portfolio was in fact not as strong as the merger advocates had thought, and CW 1 now believes that the Sandlers (Golden West's founders and top executives) had sold Wachovia a "bad bill of goods" and were "a bunch of ****  crooks" who had falsely represented to Wachovia that "everybody who was in the [Pick-A-Pay] loans was credit worthy."[3] CW 1 acknowledged, however, that Wachovia was ultimately responsible for having done so little due diligence before agreeing to the merger.

---

[3] *See also* CW 19 (suggesting that the Sandlers may not have been fully aware of how their senior managers had allowed underwriting standards to deteriorate in the year prior to their sale of Golden West).

(b)     CW 2 was a Senior Financial Analyst in Corporate Development for Wachovia from 1993 to 2007, and was responsible for preparing "pre- and post-merger due diligence analysis of bank and non-bank merger and acquisition candidates" for Wachovia.  CW 2 reported to the head of corporate development at Wachovia.  CW 2 confirmed that Thompson was committed to expanding Wachovia's national presence by acquiring a bank in California, because doing so was considered necessary for Wachovia to become a "national franchise."  Thus, six months before the Golden West acquisition, CW 2 and another colleague prepared a report for Wachovia's CFO, Tom Wurtz, that analyzed potential bank acquisition targets in California and was entitled "Market Survey: Banks in California."  Notably, this report did not include Golden West as a potential target because of Golden West's significant exposure to the residential housing market in California.  In the end, the due diligence his department performed "wasn't much" and was mainly just enough to "CYA" – and the prevailing sentiment within the corporate development department was "why say anything" to criticize the deal given that Wachovia's CEO, Thompson, had already decided to do it.

(c)     CW 3 was the Senior Director of Loan Compliance for Golden West before assuming the same position at Wachovia from January 2006 to November 2008.  CW 3 described how Golden West took various steps through aggressively refinancing or otherwise modifying loans before they fell into delinquency or default, with the result that the delinquency rates that Golden West reported on paper were "artificial."  Had Wachovia known or understood the significance of Golden West's practice of constantly modifying at-risk loans, CW 3 believes that Senior Wachovia management might have changed its mind on the merger.  As CW 3 added: "I don't know if anyone [from Wachovia] performed any due diligence at all, because I would have known if they had.  And I was just thinking, Wachovia can't know what they were buying, because they wouldn't have bought it."  In her opinion, the merger seemed like just a "handshake deal."

(d)     Similarly, CW 4, a former manager in the Consumer Risk Management Group who supervised staff in Wachovia's National Loan Quality Review Department from late 2007 through 2008, and who had earlier been an Underwriting Administration Business Manager from 2003 to 2006 at Golden West, stated that "poor Wachovia got duped" (likely by Golden West's founders, the Sandlers), and that Wachovia CEO Thompson was likely told things about how Golden West was operating when "it was not actually operating that way in reality." CW 4 felt that Wachovia senior executives were being honest when they made statements about the merger in 2006 because they believed in the quality of the acquisition at the time "based on what they were told," but that these senior Wachovia executives did not know the overall practices at Golden West and did not know the right questions to ask during their due diligence. "I don't think they knew how Pick-A-Pay operated." As CW 4 added, the biggest problem that Wachovia's due diligence missed was that although Golden West's formal Pick-A-Pay guidelines were fairly consistent, the company's operations were divided among a group of senior Area National Managers (ANMs) – and "certain areas of World Savings adhered to guidelines while others did not" – notably in California. As a result, senior Wachovia management did not appreciate how the guidelines for the Pick-A-Pay product were "blissfully ignored" in some very critical regions.

**3.      Wachovia's Misstatements and Omissions Concerning the Acquisition of Golden West and Its Pick-A-Pay Loan Portfolio**

**a.      Wachovia Touts the Merger and Golden West's Mortgage Portfolio**

92.     Following the announcement of the Golden West acquisition, Wachovia conducted the Offerings at issue in this action. Having failed to undertake any meaningful due diligence to properly investigate Golden West's mortgage portfolio and underwriting practices, Wachovia inaccurately assured investors in the Offering Materials that the Pick-A-Pay portfolio was of high credit quality and was conservatively underwritten. For example, in a Form 8-K

31

filed on May 8, 2006 and subsequently incorporated into the Offering Materials (as set forth in the attached Appendix), Wachovia stated that the Pick-A-Pay portfolio was of "***pristine credit quality***" and that Golden West had a "singular focus as a ***risk-averse*** residential mortgage portfolio lender." (Emphasis added.)[4]  As set forth more fully below in Section VI and in the attached Appendix, the Offering Materials also inaccurately stated that Wachovia's "credit quality" was "very strong," reflecting "strong underwriting" and "prudent lending practices," and that its loans were "well collateralized" so that any losses would be minimal.

93.     These and other misstatements in the Offering Materials repeatedly assured investors and Wall Street analysts that the Pick-A-Pay portfolio was of high credit quality and therefore posed little risk to Wachovia despite the housing downturn.  As a result, on May 8, 2006, Morgan Keegan & Co. Inc. rated Wachovia "Outperform" because Golden West's portfolio supposedly had "no sub-prime component" and thus was "very low risk."  Similarly, on May 11, 2006, Bernstein Research rated Wachovia "Outperform" because "GDW's [Golden West's] Option ARM product structure and ***conservative underwriting practices*** have and will continue to shield [Wachovia] from the credit cycle experienced by other mortgage lenders," and because the "GDW management also claims that it does not lend to subprime borrowers."

### b.     The Serious Undisclosed Problems With Golden West's Pick-A-Pay Portfolio

94.     However, directly contrary to Wachovia's descriptions of "pristine credit quality," at the time of the Offerings the Pick-A-Pay portfolio contained ***tens of billions*** of dollars of high-risk loans that were likely to default.  Indeed, as the Company disclosed for the first time on April 14, 2008, as of the end of 2006, approximately $34.3 billion of the outstanding Pick-A-Pay loan balances – or roughly 28% of the entire portfolio – was owed by subprime borrowers with

---

[4]          Throughout the Amended Complaint, the emphasis of quoted language in bold and italics is added.

FICO scores of 660 or less. ***Nearly half*** of this amount, or approximately $17 billion, was owed by borrowers with FICO scores below 620 – well below the banking regulators' FICO score cutoff of 660 for subprime status.[5]

95.     The Offering Materials' representations that the Pick-A-Pay portfolio was the product of "risk averse" and "prudent" underwriting and lending practices was also not true. As Co-Lead Counsel's investigation has confirmed, contrary to such representations, Golden West's regular underwriting and lending practices were dangerously lax. For example, Golden West's loan sales force routinely inflated borrowers' income and misrepresented their employment information on mortgage applications, and Golden West's underwriters routinely failed to verify this misstated information. Such practices were especially widespread with respect to Golden West's "stated income" or "Quick Qualifier" loans, which did not require the borrower to submit ***any*** income documentation. Investors did not begin to learn of the scope of these underwriting deficiencies until (i) April 11, 2008, when *Bloomberg* reported that, beginning April 26, Wachovia would require proof of borrower assets and employment for all loans, and (ii) mid-June 2008, when Wachovia admitted that the large number of Pick-A-Pay loans generated through outside brokers were of such concern that Wachovia had decided to call the borrowers on all such loans directly to verify key information concerning their ability to repay, and to ascertain whether the borrowers actually understood the risks and terms of their loans.

96.     As set forth below, numerous former employees of Golden West have independently confirmed that: (i) Golden West routinely originated Pick-A-Pay loans to subprime borrowers; (ii) Golden West's sales representatives routinely inflated and falsified

---

[5] As discussed in Section IV.A.5 below, however, even these belated partial disclosures fell far short of fully or adequately disclosing the true state of the Pick-A-Pay portfolio. That information did not begin to emerge with any clarity until September 2008, when Wachovia almost failed and Wells Fargo announced that, in connection with its acquisition of Wachovia, it would record $32 billion of further writedowns on the Pick-A-Pay portfolio.

borrowers' incomes on Pick-A-Pay mortgage applications and other loan documents; and (iii) Golden West's underwriters routinely failed to verify borrowers' information before approving loans. Adequate due diligence by Wachovia could have uncovered these material facts (among others). Also, the Individual Defendants' negligent oversight of the Company permitted these improper and unsound business practices to persist even after the acquisition of Golden West had closed.

97. For example, Paul Bishop was a loan consultant/loan salesperson, at Golden West in San Francisco, California from November 2, 2002 until May 30, 2006. In that capacity, he regularly interacted with numerous other employees with knowledge of Golden West's lending operations, including the rest of the San Francisco loan sales force as well as the staff responsible for instructing the sales force on how to sell its loans, the underwriters responsible for approving the loans, and the managers responsible for approving any exceptions to underwriting standards.

98. According to a February 15, 2009 *60 Minutes* interview of Bishop, Golden West significantly lowered its underwriting standards in order to increase its volume of loans during the housing boom. As Bishop told *60 Minutes*, "[i]t was all about volume – quantity over quality." To generate an increasing number of loans, Bishop explained that Golden West salespeople regularly inflated borrowers' incomes on loan documents. The term for this, Bishop stated, was "packaging the loan" so that it ostensibly met underwriting standards. In an interview with Co-Lead Counsel, Bishop similarly stated that loan sales people "would take a look at whatever [the borrower's] income was and just adjust it" in order to "make sure their income matche[d] the loan payment.… In other words, doctor it." Bishop also reported that Golden West "easily" made loans to subprime borrowers with FICO scores as low as the "mid-500s," and that the loan sales force played "fast and loose" with the incomes listed on these

subprime loan applications as well. According to Bishop, this practice routinely occurred at Golden West throughout his entire tenure, and "accelerated" from 2004 through his departure in May 2006. Bishop also confirmed that Golden West's sales force did not verify the borrowers' information during the underwriting process. Bishop told *60 Minutes* that Golden West conducted "instant underwriting events in an office where we would assemble five underwriters right there," and would "approve between 80-100 loans per day." Thus, lending at Golden West was "one grand wink, wink, nod, nod" between the borrower, the loan salesman, and the underwriter. According to Bishop, the result of these practices was that Golden West was "granting too many people loans who simply can't qualify." Indeed, as *60 Minutes* reported, "By 2005, 38% of [Golden West's] clients had subprime credit scores, and customers were shown fliers that told them that their income would not be checked by the bank."

99.     In his interview with Co-Lead Counsel, Bishop confirmed that loan officers would "adjust" borrowers' stated income "all the time" on an "as needed basis" in order to get loans approved by Golden West's underwriters, knowing that the borrower's income would not be checked – and reiterated that, as part of the "wink, wink, nod, nod" process, loan sales officers were instructed to "make sure" that the stated income on the application always matched whatever was needed to cover the proposed loan amount (even if, as Bishop noted laughing, that meant reporting doubtful incomes for persons who listed "selling items on eBay" or "taking in boarders" as their primary source of income). Bishop also stated that Golden West created a specific "policy exception" allowing more senior sales representatives to override decisions by the underwriting department denying mortgage applications. This practice was euphemistically known as "Exception to Policy" or "ETP." Because sales personnel earned commissions when the loans they sold were ultimately approved, they had a powerful financial incentive to use –

and in fact routinely abused – the ETP to override rejections of loans to borrowers who were highly likely to default. Bishop stated that approximately 50% of loans in his office were approved pursuant to the ETP program – begging the question of whether the "exception to policy" had effectively become the policy – and that the ETP program became a highly effective "way [to] get around" stated minimum underwriting requirements. As set forth at Section IV.A.4.d below, the ETP practice also continued after Golden West was acquired by Wachovia in 2006.

100. Additional former Golden West employees with first-hand knowledge of its mortgage operations confirm that Golden West's loan sales force and outside brokers regularly fabricated borrowers' income and employment information on loan applications, that underwriters failed to check this false information, and that the ETP program was abused as a mechanism for approving loans that failed to satisfy Golden West's underwriting standards. For example:

(a) CW 5 served as a mortgage consultant for Golden West and then Wachovia on the East Coast from April 2005 until October 2008.

(i) CW 5 stated that from the "first week" of his employment, he was "instructed" in "courses" by his managers on how to "package the loans [according to] whatever was needed" to obtain underwriter approval, and to "make sure the borrower got the loan." "Doing whatever was needed" included "making things up," and specifically included using bogus stated income figures (which were higher than what the borrower had initially represented) and listing more impressive sounding (but false) job titles on the borrowers' loan application in order to bolster the fabricated incomes – practices which CW 5 described as "fraudulent." CW 5 gave the following example: "If someone was working as a cashier at McDonald's making $40,000 a year, and we saw from their file that they needed to make $60,000 [to be approved for the

loan],” then the loan salesperson would list a $60,000 income and “we’d change their title to manager so it would look right.” Similarly, if a borrower’s actual annual income was $60,000 but the loan required an income of $75,000, a loan salesperson would say to the borrower, “If you made $75,000 a year, that would work,” and the borrower would typically respond to this prompt by saying, “Yeah, I make $75,000.” In sum, as CW 5 reported, the sales force for Golden West was routinely “overstating income and qualifying [borrowers] at the wrong jobs.” According to CW 5, these practices were firmly entrenched and widely accepted at Golden West: “It was my managers who taught me how to do it. My underwriting manager knew, too.”

(ii)     CW 5 further confirmed that when a loan could not satisfy even its lax underwriting guidelines, Golden West/Wachovia’s ETP program would frequently be used to approve the loan. The most common exceptions, CW 5 stated, were to the required minimum FICO score and maximum LTV limits, and those exceptions were made “every single day.” “This is stuff I was taught from day one. One of the things we were taught to sell was our underwriting, that we could make and break our own rules. It was in our [sales] slides. We would get [loans] done.”

(iii)     In addition, CW 5 reported that it was “very common” for home values to be “fudged” in appraisals to reflect “whatever value [was] needed” to close the loan.

(iv)     CW 5 explained that the reason the foregoing practices were so prevalent was because of “intense” sales pressure from his managers. “It felt like guerila sales almost. You had to hit your numbers every week. Your manager would call you and ask, ‘What are your numbers?’” As corroborated by the first-hand accounts of numerous additional former employees set forth below in Section IV.A.4, CW 5 further stated that all of the practices described in subparagraphs (i)-(iv) above continued unabated after the merger:

"Everything we did continued. There were rumors it would go away, but it never did."

(b)     CW 6 was a California-based underwriting manager for Golden West and later Wachovia from October 2002 to October 2008. CW 6 explained that, throughout her entire tenure with Golden West and Wachovia, exceptions were "constantly" made to underwriting guidelines in order to approve loans that otherwise would have been rejected. Exceptions were made to FICO scores, LTV ratios, cash reserve requirements – literally all the "things that were going to stand in the way of a deal closing." Further, CW 6 reported that whenever an underwriter said "I don't feel comfortable" with making a loan, the loan salesperson simply appealed to a higher manager, who routinely overrode the underwriter and said "it will be done" in order to generate loan volume and increase their pay. As CW 6 stated, "When you have a manager that can override a decision because they want bottom line results, even if the underwriter wanted to deny a loan … the underwriter's decision was not the final word."[6] CW 6 also reported that, following the Merger, Wachovia allowed the Pick-A-Pay loan operation to continue these high-risk mortgage origination practices: "They pretty much let us run things the way we were running them [all along.]"

(c)     CW 7 worked for Golden West and later Wachovia from 1991 to 2008, and served as a Vice President, Division Underwriting Manager and Division Origination Manager from 2001 through 2006, and Vice President and Operations Manager of Portfolio Retention in San Antonio, Texas, from 2006 to 2008. In that capacity, CW 7 helped oversee Golden West's and Wachovia's refinancing operations, and was responsible for the underwriting of Pick-A-Pay loan refinancings and approving exceptions made to refinanced loans. CW 7 reported that Golden West had "always been an exception-driven company," but that over the course of this source's 17-year career the exceptions became ever more prevalent and aggressive. As CW 7 described it, this process of increased

---

[6] As noted below, other CWs confirmed that senior loan sales managers had the authority to override denials made by the underwriters, creating a "fox in charge of the henhouse" conflict.

use of "exceptions to policy" was like "Chinese water torture" because it occurred gradually over many years until, by the beginning of the Offering Period, it had become the dominant characteristic of the Company's Pick-A-Pay mortgage origination process, and this source's colleagues reported that at least 50% of the Pick-A-Pay loans were approved pursuant to one or more exceptions. Particularly in California, senior managers in the loan department became increasingly more aligned with the sales part of the business than the underwriting part of the business, and pressed the underwriting department to become more aggressive. The same people in charge of the loan department had direct management control over the appraisal group as well.

(d)     CW 8 also confirmed that the practices described above were long-standing at Golden West. CW 8 worked at Golden West/Wachovia from September 1972 through September 2008, and from 1991 to 2002 was a Vice President and Loan Audit Manager who co-headed Golden West's Texas-based Loan Audit Department. In the late 1990s and early 2000s prior to the merger, CW 8 conducted several audits of Golden West's stated income loan operation and found "so much crap you wouldn't believe." Specifically, the audits found widespread borrower and broker fraud in the form of fabricated income and employment information. The audits also concluded that Golden West's stated income borrowers in southern California were generally not creditworthy and posed a high risk of default, and that Golden West's underwriting standards in southern California needed to be significantly improved. However, CW 8's reports were ignored, and CW 8 was told by CW 8's manager "to keep their mouth shut" because Golden West was focused on increasing the volume of loans made.[7]

---

[7] Numerous additional confidential witnesses who worked at Golden West – and who then continued to participate in Pick-A-Pay operations at Wachovia as "legacy" employees – have also provided plaintiffs with descriptions of the deficient and high risk underwriting practices that characterized Pick-A-Pay operations both before *and* after the 2006 merger. *See, e.g.*, CWs 6, 7, 9, 20, 21, 22, 23, 25, 28, 29, 30, 31, 32, 33, 34, 35, 36, 38, and 39, discussed below at Section IV.A.4. To minimize unnecessary repetition, the experiences and observations of these additional CWs are not repeated here. In general, as discussed in greater detail below, most of these additional CWs described how the same types of serious problems plagued Pick-A-Pay operations both before and after the merger – except that the deficiencies identified tended to become even more widespread and serious in the post-merger period.

101.     Multiple former senior employees reported that Golden West also employed a practice of proactively "modifying" the troubled loans that its high-risk lending practices produced, which enabled Golden West to report artificially low delinquency rates, and allowed the true credit risk of its loan portfolio to remain undisclosed.  For example:

(a)     CW 3 was the Senior Director of Loan Compliance for Golden West before assuming the same position at Wachovia from January 2006 to November 2008.  Based in San Antonio, Texas, CW 3 was responsible for reviewing Golden West's and then Wachovia's legacy Pick-A-Pay loan origination operation and ensuring that it complied with Company policies and applicable law.  As CW 3 reported, Golden West "had a false reading on their delinquency rate" because they "had a habit of modifying [or refinancing] loans before they went into delinquency.  It was easy for them to say they had a good delinquency rate, because they were just fixing [the loans]."  In particular, whenever a borrower who could not afford to repay their loan called Golden West's loan servicing center (which, like CW 3, was based in San Antonio), Golden West's practice was to "rewrite the loan to make sure it didn't go into delinquency."  For example, to "modify" the loan and forestall delinquency or default, Golden West frequently lowered the interest rate, and, in some cases, wrote "off some or all of the principal."  Because Golden West held its loans in its own portfolio, the company "could do whatever it wanted" to lower the borrower's monthly payments by initiating refinancing or otherwise.  The Servicing Department was responsible for initiating refinancing when loans approached default or bankruptcy.  According to CW 3, Golden West's/Wachovia's delinquency rates rose to the level of a compliance issue, because the delinquency rates that Golden West/Wachovia put on paper were "artificial."  Indeed, CW 3 added, senior Wachovia management might well have changed its mind regarding the merger if it had known or understood the significance of constantly modifying loans in the Pick-A-Pay portfolio – but if Wachovia did not perform proper due diligence prior to the acquisition it would not have known that Golden West's reported delinquency rates were artificial.

(b)     CW 9 worked for Golden West and then Wachovia from 1999 until 2008, as an Operations Manager and Assistant Vice President at the Company's San Antonio, Texas loan servicing center.  This source stated that most of the calls she received at the servicing center were from borrowers who could not afford to repay their loans.  Prior to the merger, Golden West's practice was to "modify" these loans to prevent them from becoming delinquent or defaulting, and part of CW 9's job was to advise borrowers on how they might refinance or modify their loans.

(c)     CW 4 reported that Golden West's Portfolio Retention unit, also referred to as its "Tele-finance" unit, specialized in modifying and refinancing the loans of many of the company's least credit worthy existing borrowers.  CW 4 reported that, in refinancing these loans, the company made no meaningful effort to assess the borrowers' ability to repay the new debt.  The attitude, according to CW 4, was, "We already got 'em, let's just do it."  The lack of any reasonable underwriting was particularly severe with respect to this unit's refinancing of the company's California borrowers, CW 4 reported, as those loans were refinanced over and over again with no real due diligence or any analysis of the borrower's ability to actually repay the new debt.  "They [the customers] would use their houses like checkbooks and we had frequent flyers," CW 4 stated, adding that, in approving these refinanced California loans, the company "did not adhere to standard guidelines."

4.     **After Acquiring the Pick-A-Pay Portfolio, Wachovia Originates Billions of Dollars of Additional High-Risk, Toxic Loans**

102.    After the Golden West acquisition closed on October 1, 2006, Wachovia substantially expanded the origination of Pick-A-Pay loans.  As reported after the Offering Period in a December 25, 2008 *New York Times* article that quoted Russell W. Kettell, a former chief financial officer of Golden West's mortgage subsidiary (World Savings), "the [Wachovia/Golden West] merger created 'pressure' for 'a pretty good-sized increase in loan

volume,'" and Wachovia "'wanted volume and wanted growth.'" In 2007, Wachovia extended an additional $33.4 billion in Pick-A-Pay loans – a 34% increase over 2004 and 2005 – despite the fact that the housing market was already sharply contracting.

### 5. Wachovia Embraces the Pick-A-Pay Program with a Combination of Inadequate Training and Flawed Incentive Compensation Practices

103. As set forth below, multiple sources confirm that, while pursuing its expansion of the Pick-A-Pay business, Wachovia did not adequately educate and train its executives – and did not adequately train (or retrain) its managers and employees in the field – with respect to appropriate underwriting guidelines for Pick-A-Pay loans or the financial risks associated with Pick-A-Pay loans that made careful underwriting practices so important. As noted below, numerous CWs commented that Wachovia personnel at all levels had little or no idea how to run the Pick-A-Pay business, thereby contributing to a further weakening of underwriting practices and the origination of huge amounts of additional high-risk loans following the merger. In sum, at best Wachovia's training was inadequate and, at worst, in the field it effectively promoted even further loosening of underwriting standards and a culture that continued to breed heavy reliance on "exceptions to policy" and fabrication of borrower information. For example:

(a) CW 10 was a mortgage consultant for Golden West (and later Wachovia) in California from 1992 to 2007, and a senior training manager at Wachovia until October 2008. As a senior training manager, CW 10 was tasked with training Wachovia personnel about the Pick-A-Pay loans. However, CW 10 stated that Wachovia's "upper management" "never cared to learn" about underwriting Pick-A-Pay loans, did not complete the training program and, as a result, the training they received "was not enough to understand [the Pick-A-Pay product]." Lacking adequate understanding of the product, Wachovia management pushed to have its loan sales force sell as many Pick-A-Pay loans as possible, and effectively told its sales force to "make it work," *i.e.*, "to fill the portfolios any way you can" with as many loans as possible. As a result, the

Company's policies and practices were exploited to allow clients with poor credit quality to obtain mortgages, and loan sales staff were selling loans to borrowers who did not qualify, thereby "putting clients and Wachovia in a bad situation."

(b)     CW 11, an experienced loan salesman who had been a loan officer in the mortgage industry for a decade before joining the Company's Bloomfield, Michigan branch in the spring of 2007, confirmed that Wachovia offered its loan sales force no serious training on the Pick-a-Pay product – even though loan officers in his office were effectively allowed to sell only Pick-a-Pay loans. When asked about the training he received from the Company, CW 11 laughed out loud and exclaimed "If you can call that training! It wasn't training at all." "They wanted you to use this sales pitch, this very standardized sales pitch that they wanted you to use with everyone. I've never been in a position like that. It was really weird. It all boiled down to that one product – Pick-a-Pay." Whenever CW 11 asked any questions about the nature of the product or the proper way to extend the loan, his immediate supervisor (the branch manager) and the regional manager who conducted the "training" of CW 11 (and the other loan officers in CW 11's training group) effectively ignored them. Similarly, the section of his training manual entitled "issues" provided examples of questions that realtors might ask loan officers about the Pick-A-Pay program, including (1) "Is this one of those NegAm loans?"; (2) "Aren't you giving them more house than they can afford;" and (3) "Is my client going to go into foreclosure with these loans?" – but unfortunately there were no answers to these questions or information on how to answer them anywhere in the manual. The loan officers were, however, told in CW 11's training sessions that there were "workarounds" for situations where applicants did not satisfy written underwriting guidelines, although questions in this area were answered with vague responses such as "once you understand the process and how to process the loan, everything will just make sense to you." "They just wanted us to sell, sell, sell this Pick-a-Pay product and don't worry about anything else," CW 11 reported. CW 11 added, "I kept telling myself [throughout my training] 'this is Wachovia, there has to be something

more to this' – but there wasn't."  CW 11 "did not feel comfortable from the moment I attended training," and left the Company soon afterwards.

(c)     CW 12, a mortgage consultant banker for Wachovia from early 2006 through mid-2008 in Costa Mesa, California, similarly described how Wachovia was so bent on pushing Pick-A-Pay loans that Wachovia did not even train loan officers on how to process more conventional loan products that would have been more appropriate for many borrowers.

(d)     As CW 13 (former underwriter, Lead Underwriter and Mortgage Consultant in San Leandro, California from 1999 to 2009) reported, underwriting managers often did not have the qualifications or training to be in managerial positions, but the Company would "find people who they knew would do what they wanted" – which was to close a high volume of loans.  As this CW added, "I don't think [the managers] were knowledgeable.  They didn't even know how to underwrite."

(e)     CW 14 worked for Golden West/Wachovia from 1998 until 2008, and from 2004 through 2008 was a District Loan Origination Manager and Regional Director overseeing loan sales and underwriting in Miami and nine other South Florida offices.  CW 14 confirmed that, immediately after the merger, Wachovia decided to aggressively expand the Pick-a-Pay loan operation.  As CW 14 put it, Wachovia was a "glutton" and "greedy" when it came to wanting to do more option ARMs.   To accomplish this expansion, Wachovia lowered underwriting standards after the merger – but Wachovia "had no idea what they were doing – they didn't have a clue what they were doing."  As a result (and as discussed further in Sections IV.A.4.b-j below), Wachovia's expansion of the Pick-A-Pay business resulted in the origination of massive amounts of additional high-risk loans.

104.    Other CWs specifically commented on some of the dubious marketing strategies that were taught in order to pitch Pick-A-Pay loans to potential borrowers.  For example, as CW

15, a former Wachovia account executive based in California from 2007 to 2008 reported, one of the Company's training videos (presented by one of the Company's top sales reps) told loan officers to stress how a primary advantage of the Pick-A-Pay product was that it allowed a borrower who would otherwise have to make a $1,000 monthly payment the ability to pay only $500, and that borrowers should be pitched on how they could then take the $500 they "saved" and invest it in something that would give them a better investment return. CW 15 (who also had a securities license), found the emphasis on this type of sales pitch for general usage to be "mind-boggling," as this type of strategy was only appropriate for sophisticated borrowers. CW 15 recalled wondering and asking "what if people only pay the minimum and don't start investing?" However, the Company's stance was that you could only show people what they needed to do "and whether they did it or not was up to them." As this CW concluded, it was not so much that Wachovia senior executives were unaware that the Pick-A-Pay business was being pushed to grow, but "rather a lack of [their] understanding [of Golden West's products and practices]."

105. CW 16 worked as a field consultant and loan processor for Golden West/Wachovia in Temecula, California from 2005 until approximately the end of 2006. CW 16 reported that, as a field consultant, she was trained to market Pick-A-Pay loans to borrowers who were not likely to be of high credit quality, and who likely did not understand the risks of the loan they were getting in to. For example, CW 16 reported that she was trained to advertise the perceived benefit of making the minimum payment, and was told to pitch this perceived benefit as a way for borrowers to free up cash that they might need to buy gifts at Christmas or want to spend on vacations. However, CW 16 was also trained not to mention the corresponding negative amortization that inevitably would result from making these minimum payments. For

example, CW 16 was trained not to mention that, if the monthly principal and interest charges for the mortgage totaled $3,000, but the borrower elected to make only the minimum payment of $1,000 per month in order to free up cash for other things, the $2,000 difference would be added back into the outstanding mortgage balance. CW 16 ultimately left the Company because CW 16 "did not feel right taking advantage of borrowers" who were ignorant of the risks of their Pick-A-Pay loans and had been pitched on the loan as a mechanism to free up cash they needed to spend on other things, rather than as a conservative method for purchasing a home.

106. Numerous other CW's confirmed, in words or substance, that Wachovia's personnel generally lacked the knowledge or training to run the Pick-A-Pay portfolio, whether in the field or at headquarters. These CWs included, *inter alia*, CW 18 (Wachovia loan personnel selling the product "didn't understand it," but blamed the [managers] "who hired these idiots" for "putting a lot of the wrong borrowers into the Pick-A-Pay product") (background described at ¶ 120(c) below); CW 4 ("I don't think [Wachovia senior executive management] knew how Pick-A-Pay operated. I don't think they understood anything."); CW 33 (Wachovia and Golden West were "totally different companies" and Wachovia did not understand Golden West's business "and did not think they really cared to either") (background described at ¶ 113(p) below); CW 48 ("Wachovia did not have the knowledge or experience to operate a mortgage company like [Golden West]") (background described at ¶ 128(b) below); CW 9 (Wachovia management and employees did not understand the Pick-A-Pay loan process); CW 32 ("when Wachovia purchased World Savings, they did not know what they were purchasing") (background described at ¶ 113(o) below).

107. Compounding the dangers of Wachovia's lax training programs, Wachovia management also adopted ***flawed incentive compensation structures*** that strongly incentivized

its personnel in the field to close as many Pick-A-Pay loans as possible, regardless of whether the borrower was a good credit risk. For example:

(a)     According to CW 11, many Wachovia loan officers were paid 100% commission only, with no base salary. As a result, they would not make money unless they were closing mortgages. (In contrast, CW 11's prior employer paid a base salary of $28,000 to $35,000 so loan officers were not completely dependent on closing loans.) Although Wachovia told CW 11 that CW 11 would be paid a base salary of $28,000 plus commissions, in fact CW 11 soon learned that the $28,000 was not a base salary at all, but merely a draw against future commissions – and that CW 11's salary would effectively last only as long as he was closing loans. Furthermore, CW 11 also explained how the commission structure filtered up through all layers in the field: the branch manager was paid commission based on how his branch performs; and the regional manager was paid commission based on how his region performs. It all starts with the loan officers in the field. If the loan officer is closing loans (and therefore making commissions), then everyone above him is making commissions – and the branch manager presses his loan officers so he can get his commissions, and the regional manager in turn pressures his branch managers so he can get his commissions.

(b)     As CW 17, a former Wachovia wholesale account executive in California during 2007 put it, "Everything, in my humble opinion, was based on profits and volume. There were huge incentives for the sales staff as well as for management." Compensation was based on volume, and "when you have such great volume incentives in front of you, you're going to do as many as you can."

(c)     Numerous other former Wachovia employees, including CW 18, a Mortgage Consultant and Territory Manager for Golden West (and later Wachovia) in the Midwest from 2004 to 2007, and CW 15, similarly confirmed that Wachovia incentivized its employees to sell a higher volume of Pick-A-Pay

loans by paying them extra commissions to do so, even if other mortgage products would have been more suitable for borrowers. For example, as CW 15 recalled, the commission for a conventional loan "was about $700 to $900 per every $1 million funded, compared to about $2,500 per $1 million funded for the Pick-a-Pay product."

108. Given (a) the emphasis that Wachovia senior management placed on pushing Pick-A-Pay loans, (b) the lack of a disciplined training program and (c) the Company's compensation structures, it is not surprising that – as was the case prior to the merger (*see* accounts of Paul Bishop and CWs 5 and 8 at ¶¶ 100(a) and 100(d) above) – loan officers in the field in various parts of the country continued to receive coaching in the post-merger period in how to falsify loan origination documents in order to "help" unqualified borrowers close their loans.

109. For example, CW 19, a loan originator in Wachovia's direct lending group in San Antonio, Texas during 2006, and who had had more than 20 years of experience in the industry (including as an executive of a small savings and loan), reported how a manager in Wachovia's Home Loan Experts Division (Matt Trombley) and a mid-level manager from Wachovia's offices in North Carolina (where Wachovia was headquartered) taught a class on loan origination and how to sell loans at the San Antonio office. As CW 19 described, Trombley was "teaching fraud," which included telling originators how to lie and generate phony information in order to close mortgage loans. For example, the loan officers were told to initially avoid any discussion of income with a potential borrower; instead, they were told to first discuss what the payment would be, what the interest rate would be, how much money the borrower needed – and then to ask the borrower "You have an income of such and such, don't you?" It got so bad at times that the manager from North Carolina would throw up his hands, walk out of the classroom, and say

"I didn't hear that." Although CW 19 complained to one of Twombley's colleagues that he was "teaching fraud," CW 19 was told to "go with the flow." CW 19 also spoke to a senior vice president at Golden West who had come over to Wachovia as a member of mid-level management after the merger, but the senior vice president did not appear to care, even though he indicated that this type of "training" was also being pushed by others within the Pick-A-Pay operation.

110. For further discussion of the widespread use of falsified or fabricated loan information and other decidedly other-than-conservative underwriting practices employed by the Company's personnel in the field, see Sections IV.A.4.b-j, immediately below.

### 6. High Risk Underwriting Practices in the Field Continue – and Indeed Worsen – After Wachovia Acquires Golden West

111. As a result of (a) Wachovia's failure to adequately educate its upper management and to train (or retrain) legacy Golden West employees and other Wachovia employees in the field about the risks of the Pick-A-Pay product and the proper loan underwriting procedures to mitigate those risks, and (b) incentive compensation structures that put a premium on closing deals rather than careful and prudent underwriting, after the merger Wachovia continued (and indeed expanded upon) prior high-risk underwriting practices with respect to the Pick-A-Pay business, and thus generated tens of billions of dollars of additional high risk loans that were likely to default. In particular, following the merger, Wachovia's Pick-A-Pay underwriting was characterized by, among other things: (a) widespread falsification of borrower income and employment information; (b) rampant resort to "exceptions to policy," which were frequently approved by senior loan managers who overruled the Company's underwriters; (c) extensive lending to borrowers with FICO scores that fell below – and often far below – the subprime cutoff level of 660; (d) use of regular, large-scale "instant underwriting events" during which

high-risk loans were approved *en masse* and without any meaningful review; and (e) reliance on tainted appraisals prepared by appraisers who knew what appraisal values were needed to get a given loan approved, and who were pressured to give values that would allow the loans to go through.

112.    These deficient Pick-A-Pay underwriting practices, and the resulting high risks of default and severe credit losses, directly contradicted the Defendants' public representations to investors in the Offering Materials that the Company's underwriting remained "prudent" and "risk averse," and that the "credit quality" of its loan portfolio remained "very strong" and "pristine."   Indeed, as CW 20, a Senior Underwriter in California from 2001-2008 put it, although Golden West and Wachovia touted the Pick-A-Pay business as "conservative," the Company was routinely approving loans that were "no brainer denials," and "there was nothing conservative about it."   Likewise, as CW 21, a former senior account executive and manager based in California from 1997 through 2007, commented, contrary to the Company's assertions that it practiced conservative underwriting, the Company would "approve anything," and "if they [Wachovia] said they had strict underwriting guidelines, that was misleading, no question about it."   The most serious deficiencies and problems in the Pick-A-Pay operation which carried over from the Golden West period (and got even worse under Wachovia after the merger) are described in further detail below.

        **a.**      **Continued Widespread Fabrication of Borrowers' Income and Employment Information**

113.    As detailed in the numerous first-hand accounts of former Golden West/Wachovia employees set forth below, following the merger Wachovia's sales representatives and mortgage brokers continued the Golden West practice of "packaging the loan" by misstating borrowers' income and employment information on the documents that were sent to the Company's

underwriters. At the same time, Wachovia's underwriters (including its legacy Golden West underwriters) continued Golden West's practice of routinely failing to check this misstated information, thus approving borrowers for loans they could not afford to repay.

(a) CW 19 was an underwriter and later a loan officer for Golden West from 1995 to 2000, and, shortly after the Merger was announced, returned to the Company as a loan officer in San Antonio, Texas until mid-2007. Upon CW 19's return, as described in ¶ 109 above, CW 19 was shocked to find that regional managers and other mid-level management were training the loan sales staff in San Antonio to practice "plain, old-fashioned fraud, deceit, and trickery." As described in detail by CW 19, this training included instructing loan officers to avoid asking for accurate income information from borrowers, and to instead "literally lead the customer to where he needed to go" by asking leading questions designed to elicit the desired income figures. As a result, loan officers were instructed to ask borrowers "You have an income of such and such, don't you?," even though there was "no way in hell" the borrower made that amount. In sum, "they were teaching fraud," and CW 18's efforts to get more senior managers to put a stop to such practices were either ignored or met with comments to simply "go with the flow."

(b) CW 17, an account executive for the Company in San Diego, California during 2007 with 27 years of experience in the mortgage industry, similarly reported that there was "blatant fraud" in the income and employment information listed on Wachovia's loan applications, and that this fraud "was pretty prevalent," mainly on the part of other brokers. In addition to approving stated income loans with fabricated information (*e.g.*, Taco Bell workers listed as "managers" to support inflated monthly stated income levels), Wachovia's sales force and underwriters also "condoned" the practice of changing defective full documentation loans that failed to meet income verification standards into stated income loans that required no documentation to support the claimed income. "If [an application] came through for a full-doc loan," but was going to be rejected because the borrower did not actually make

his claimed income, the Company's practice was to "take out the full-doc [paperwork] and just do stated income because stated [loans] were easier and they knew [the borrower] wouldn't qualify" otherwise. The Company's loan sales force and underwriters were "definitely" aware of this falsified information, but underwriters, under pressure from sales, would "turn a blind eye" to it and approve the loans in order to boost loan volume. "There were huge volume incentives for sales staff as well as for management" and "compensation was based on volume," CW 17 explained. "When you have such great volume incentives in front of you, you are going to do as many [loans] as you can. There were quotas they were trying to meet."

(c)     CW 22, a senior account executive from 2002 to 2008 in Scottsdale, Arizona, confirmed that the practice of destroying documentation which contradicted the incomes listed on loan applications occurred outside of California as well, both before and after the merger. CW 22 reported that if there were documents in a loan file that reflected the borrower's true income – such as tax returns – and that contradicted the borrower's claimed income on the loan application, underwriters "would take them out and shred them" so the loan could be approved on a "stated income" basis. CW 22 reported that the Company "had no conventional underwriting system" for its Pick-A-Pay loans. Instead, the approach "was, 'Let's make this work.'" As a result, there was "horrible, horrific" underwriting on these loans.

(d)     CW 23, an underwriter in Sacramento, California for Golden West/Wachovia from June 2005 until March 2008 with 15 years experience in the industry, also reported that mortgage brokers regularly would "do their own figuring and they'd back into an income" for their borrowers that would allow them to get their loans approved. Because underwriters were not permitted to verify these inflated incomes, CW 23 reported, the loans containing this misstated information were invariably approved. The level of income inflation was extreme, as CW 23 gave specific examples of borrowers who worked at fast food restaurants claiming to make $4,500 per month and borrowers

who delivered lumber claiming to make $8,000 per month. When CW 23 was suspicious of the listed income, he would "kick it up" to his manager for her review, but "inevitably they'd get [the loan] through" anyway because the ultimate authority to approve a loan rested with a senior sales manager who made commission only on loans that closed. As CW 23 added, "It seems kind of like the fox in the henhouse to me. You have an origination manager, who depends on a bonus, overseeing the underwriting department? Of course they're going to push it through."

        (e)     CW 24 was an account executive for the Company in San Jose, California from 2007 until early 2008, and was responsible for selling Pick-a-Pay loans through outside mortgage brokers. According to CW 24, the Company's stated income program was riddled with widespread income and job title fabrication. "We just did a lot of stated loans – pretty much liar loans," CW 24 reported. CW 24 stated that "there was a lot of fraud on the origination side" because borrowers' employment and income information on the loan application file was simply "made up." "Brokers were a problem. When you deal with brokers and you don't meet the actual borrowers, they can get away with a ton." The Company's "lenient" underwriting guidelines "allowed everything without documentation, and that's what led to all of these problems" at Wachovia, CW 24 stated. There would be lots of applications from various types of "self-employed" borrowers, *e.g.*, borrowers reporting to work as "landscapers," but later "we'd find out they weren't." But loans were pushed through and approved because "everyone wants to make more money [on commissions]."

        (f)     CW 12, a mortgage consultant banker for Golden West/Wachovia from March 2006 to June 2008 in Costa Mesa, California, also reported how Wachovia branch managers "wanted everything to go through" and would often say "make it happen" with questionable loans. This source confirmed that branch managers were aware, for example, that loan applications would regularly reflect significantly inflated borrower incomes (*e.g.*, incomes of $85,000 rather than $45,000), but instead of correcting such applications, the

branch managers in the field actually *encouraged* loan consultants to "kick up" reported income to get the loan approved. As this source commented sarcastically, "it's amazing" how everyone in the Sacramento area made over $100,000 per year! This source also recalled various specific examples of clearly fabricated stated income loans being approved, such as a borrower who worked in a sandwich shop (and really made only $30,000 per year) being put into a $600,000 loan. The source also noted how it was "typical" to see someone making $45,000 a year having five or six Pick-A-Pay loans out on condominiums.

(g) CW 21, a former Golden West and Wachovia senior account executive and manager in San Diego from 1997 to 2002, also described various types of fraud in the loan application process in which both Company loan officers and outside brokers participated. CW 21 noted that stated income loans were a large percentage of their loans, and income "was absolutely over inflated." For example, account executives would ask the borrower what they made gross in their *best* year (rather than most recent year), and would then put down the number they said.

(h) CW 25 was an underwriter at Golden West and Wachovia in the Company's San Leandro, California Exception Center from 2005 to June 2009. CW 25 was responsible for underwriting loans that were originally generated on the East Coast, including Florida. CW 25 reported that on a "daily" basis, brokers submitted loan applications with obviously fabricated incomes – such as a self-employed housecleaner claiming to earn $8,000 per month – but once the Company had a stated income policy, the underwriters had no way of verifying falsified incomes, and these high-risk loans were almost always approved. If an underwriter was suspicious of a listed income, the most an underwriter could do to attempt to verify the income was to check a website that listed the national average incomes for various jobs. However, even if an underwriter rejected the loan because the stated income was materially above the national average (as CW 25 would), the loan sales person would simply appeal to the office manager, and "nine times out of ten," the manager would approve the

loan over the underwriter's head. Indeed, CW 25 stated, the loan sales force at Wachovia had more influence than underwriters in determining whether a loan was approved, and if underwriters questioned anything on a loan application, the response from the sales staff was "How dare you?" Moreover, as CW 25 explained, to incentivize underwriters to "process" as many loans as possible, the Company awarded a bonus to the underwriter who approved the most loans each month, and there was so much pressure on loan reps to produce that they were doing anything to get loans through. Consequently, throughout 2007, both loan reps and underwriters generally took an "all systems go" approach to approving the stated income loans described above throughout all of 2007.

(i)     CW 26, an account executive in Florida from 2006 to 2008, also reported that incomes were "fudged" on the Company's stated income loans. Indeed, rather than seeking to prevent income falsification, CW 26 reported that CW 26's manager would advise his loan officers that a borrower's listed income did not need to be correct – it only needed to "be believable," and "we were taught to make everything look as believable as possible," CW 26 stated. Moreover, if the income initially reported by a mortgage broker was not enough to qualify a borrower for a loan, CW 26 stated that the loan officers would "go back to the mortgage broker and ask him to try to find more money" in the form of "more assets" so that the loan amount would appear to "make sense" and could be approved. However, CW 26 reported that, as was the case with falsified incomes, no effort was made to verify the accuracy of the information provided by the brokers.

(j)     CW 27 was a mortgage underwriter who worked in Wachovia's operations center in its Charlotte, North Carolina headquarters from September 2005 until November 2008. As CW 27 reported, in addition to falsifying income figures at the time loan applications were initially filled out, loan salespeople routinely increased the borrower income listed on loan applications after applications had been submitted to the underwriting department. However, underwriters did not need to see income documentation, even when

they discovered that the borrower's income had been revised upward. CW 27 also confirmed that there was "a lot" of misrepresentation of borrower income. But even when CW 27 would reject an application because the borrower's income was obviously fabricated – such as a janitor claiming to make a $100,000 salary – Wachovia sales managers would override her requests for additional information and approve the loan instead. Sales managers had the authority to override underwriters' decisions, and this happened "frequently," despite "red flags."

(k) According to CW 28, who worked for Golden West and Wachovia from 2005 to 2007 as a loan salesman in California, the loan sales force was given "impossible" sales quotas that could be met only by selling loans to people who could not afford to repay them. Thus, "[it was] like the loan officers were inadvertently told to lie on applications to pull in more loans." CW 28 added that a number of loan officers "were very honest and refused to do that – in which case, they didn't last very long." CW 28 also described how there were certain things that were done and then "brushed under the rug." For example, in general meetings and conference calls, branch and district managers would strongly hint and imply that loan officers should inflate a borrower's income or assets on loan application documents in order to get their loans approved and enable everyone to meet their quotas. "Everyone felt in a rush to sell these loans. It was go, go, go." Indeed, later in their interview, CW 28 also recalled a week long training program that he attended at which "a lot" of district managers were also present. In the training, loan officers were told that they could "do a lot" with stated income Pick-A-Pay loans, and to "play with the numbers to fit the model of an approved loan." CW 28 said that the district managers there all "pretty much told the loan officers the same things," which was to "make it work."

(l) CW 29, who was a Senior Mortgage Consultant with Golden West/Wachovia from 2004 to 2009 in San Leandro, California, similarly reported that the incomes listed on the Company's stated loan applications were "just ridiculous" but were approved anyway. An example of a "ridiculous" stated

income loan that she recalled was someone who worked at McDonald's claiming to make between $5,000 and $10,000 per month.

(m)     CW 30 worked for Wachovia as a loan sales executive from 1991 to 2007, and specialized in conventional mortgage loans (which were commonly referred to as "marketable loans" because they could be sold on the secondary market). CW 30 was one of three marketable loan sales executives in the United States tasked with integrating Wachovia and Golden West after the merger. CW 30 reported that, after the merger, Wachovia required its marketable loan sales force to generate enormous volumes of Pick-A-Pay loans. "The mission was to turn the Wachovia [conventional] sales force into a force to sell the option ARM product, the Pick-A-Pay," and everyone had to "drink the Kool-Aid and go out and sell it to everybody." CW 30 attributed Wachovia's "eventual downfall" to Wachovia/Golden West's heavy reliance on "Quick Qualifier" loans, which made her "uncomfortable" and involved minimal income verification. In mid-2008, CW 30 described how Wachovia started a program to try to help its Pick-A-Pay borrowers refinance into conforming Fannie/Freddie loans, but the project "failed miserably" because their borrowers did not qualify for refinancing. As CW 30 stated, this was not surprising "because these borrowers had initially been given Quick Qualifier loans that did not verify income, and many borrowers did not, in fact, state their income truthfully."

(n)     CW 31, a senior underwriting manager for Golden West and Wachovia from October 2003 to April 2008 in Hollywood, California, reported that the Company regularly approved stated loan applications with inflated incomes, such as from landscapers or housekeepers who claimed to make $30,000 per month, but in reality did not make anything approaching that figure.

(o)     CW 32 was a California-based underwriter and later Underwriting Auditor for the Company from 2003 to 2008. As CW 32 stated, the reason she left being an underwriter was due to the practices CW 32 saw, and "and how some of the regional and district managers made decisions." "They

were stretching [the Pick-A-Pay loan] and I could see it was fraudulent activity and not making sense." As an underwriting auditor, both before and after the merger, CW 32 repeatedly told regional officers and vice-presidents to "pay attention to this," but CW 32's concerns were ignored by these mid-level executives.

(p)     CW 33, another California-based underwriter for Golden West and later Wachovia from 1993 to August 2007, reported that, after the merger, there was a significant increase in the number of loan applications which contained incomes that underwriters believed were fabricated. Even though the Company's underwriters routinely suspected that the Company's borrowers did not actually make the income listed on the loan applications, they were told by their managers in the field to "just take the income off the applications" and were told to take the borrower's word. Instead, "it was like everything goes," and the message conveyed by their managers was "just go ahead and do the loan."

(q)     CW 34, who worked for Golden West/Wachovia primarily as an underwriter in San Diego from February 2003 to October 2008, similarly reported instances of fabricated employment information on loan applications, which were nevertheless approved. For example, CW 34 recalled a borrower who claimed to be a "supervisor" at a well-known landscaping company in San Diego. When CW 34 called to verify his employment, CW 34 was told that no one at the company had ever heard of the borrower and the borrower did not, in fact, work at the company. The loan officer then provided CW 34 with 3-4 additional phone numbers of the borrower's supposed employer, but each time CW 34 called, no one at the putative employer had ever heard of the borrower. When the loan officer attempted to provide CW 34 with yet another, different number to call, CW 34 said "forget it" and refused to approve the loan because that number could have been for anyone – including the broker himself. Even though CW 34 had rejected the loan due this fabricated employment information, CW 34's manager approved it.

(r)     CW 35, a Customer Service Supervisor and Loan Specialist for Golden West and Wachovia in Sonora, California from 2004 through August 2007, was responsible for originating Pick-A-Pay loans.  CW 35 reported that he was constantly being reprimanded by his district managers for *not* selling "bad loans" to customers whom CW 35 knew could not afford to repay them.  When CW 35 questioned the borrower's ability to repay a loan, CW 35's supervisors would respond by saying "nobody has a crystal ball."   Despite CW 35's objections, borrowers with clearly fabricated stated income would be sold on loans they could not pay back.  For example, CW 35 recalled a borrower with a job at a nursery that CW believed could not have paid more than $6.00 per hour, but who was approved for a $250,000 mortgage.  CW 35 would give disclaimers to applicants, such as Wal-Mart workers, that he could take their applications, but that they almost certainly could not afford their Pick-A-Pay mortgages after they were no longer eligible to make the teaser minimum payments and had to start making fully indexed monthly payments.   In response, CW 35's supervisors would "ask what [CW 35] was thinking" by giving such honest advice to customers, and warning CW 35 that "if Wachovia is not a good match for you, what can we do to find you employment elsewhere?"

114.    The first-hand accounts of the numerous CWs cited in the foregoing paragraph not only corroborate each other, but are also corroborated by internal Wachovia documents.  For example, according to a December 2006 presentation prepared by a Wachovia account executive for outside brokers, Wachovia offered thirty-year fixed rate Pick-A-Pay loans on both a "NINA" and "NINANE" basis (terms that referred, respectively, to "No Income, No Asset" verification, and "No Income, No Asset, No Employment" verification).  The presentation proclaimed that this product required ***"No Minimum FICO!"*** and required no credit history because ***"No Credit is Good Credit!"*** Notably, the presentation touted the fact that the underwriting package was ***"The Easiest Loan Package in America!!!"*** inasmuch as virtually no information was required besides a stated income form (and, thus, as the presentation aptly noted, there was really ***"No***

***'Package' to Submit!!!"*** at all).  In sum, far from being pitched to a carefully screened group of sophisticated and creditworthy borrowers who had significant but uneven income flows – or who were likely to invest the money they "saved" on minimum payments in higher returning alternative investments – Pick-A-Pay loans were being aggressively pitched to outside brokers as solutions for persons of dubious credit who were looking for the "easiest loan" in America.

**b.     Continued Rampant Use of "Exceptions to Policy" to Approve Loans that Fail to Meet Stated Underwriting Standards**

115.    After the merger, Wachovia also continued the Golden West practice of employing the ETP program on a rampant basis.  Through the use of this program, as numerous confidential witnesses confirmed, Golden West's/Wachovia's sales force was routinely able, over the objections of their underwriters, to obtain approval of loans that failed to satisfy the business's nominal underwriting standards.  This practice further boosted the volume-based compensation of employees but, unbeknownst to investors, further increased the business's significant exposure to dubious loans that were highly likely to default.  For example:

(a)     CW 13, an underwriter at Golden West and Wachovia at the Company's "exception center" in San Leandro, California from October 2002 to May 2009, stated that "Usually an underwriter [in the mortgage business] just follows the guidelines – whatever the guideline is – but we had so, so many exceptions."  Indeed, CW 13 said that exceptions were so frequent that between "80 to 85%" of the approved loans in her office were approved pursuant to an exception.  CW 13 further stated that one of the most common exceptions was for approving loans to borrowers with "very low, very bad FICO" scores – as low as 500 (far below the 660 subprime cutoff) – adding there were "a lot of these" subprime loans, especially after 2005.  Another of the most common "exceptions to policy" was to allow loan-to-value ratios above 80%.  In fact, exceptions were so prevalent that her managers effectively altered the Company's underwriting guidelines "to make a particular exception the rule" in all situations once that

exception had been approved in one situation. In other words, as CW 13 stated, after an exception was granted, CW 13's manager would instruct CW 13 that the guidelines had been changed so that "we can go ahead and do this from now on." As noted earlier, CW 13 also described how the managers who were evaluating whether to go ahead with loans did not necessarily have the qualifications or training to be in managerial positions, but the Company would "find [managers] they know will do what they want," which was to close a high volume of loans. In any event, "usually [the managers] found some way" to grant exceptions when needed to approve a loan, resulting in a loan approval process that was "way too lenient."

(b)     CW 36, who worked for Golden West/Wachovia as a wholesale mortgage account executive in Shelton, Connecticut from April 2005 until April 2008, reported that in his area the Company was always "hyping up" the "flexible" underwriting guidelines (*i.e.*, its ability to make exceptions), stating that the motto was, "Our guidelines are set in sand, not stone." CW 36 reported that at least 50% of the loans in his office were approved pursuant to an exception, and the most common types of exceptions involved highly important credit criteria such as exceptions to minimum FICO score, maximum LTV ratios, minimum borrower asset requirements, and maximum number of prior delinquencies by the borrower.

(c)     As referenced earlier, CW 7, a longtime underwriting manager and Vice President/Division Underwriting Manager at Golden West and then Wachovia based in San Antonio, Texas, reported that even in the beginning a very high percentage of Pick-A-Pay loans had exceptions, but as time went on more exceptions were being made, and the exceptions became more aggressive. CW 7 heard in corridor conversation with his colleagues that over 50% of loans were approved with some type of exception. CW 7 described the changes as "Chinese water torture" because the changes just built up gradually over the course of his long tenure with Golden West.

(d)     CW 34, who worked for Golden West/Wachovia primarily as an underwriter in San Diego from February 2003 to October 2008 and who reported to a regional manager, stated that managers would routinely sign off on loans she turned down, and made the real underwriting decisions.  Indeed, CW 34 reported that her decisions to reject loan applications were overruled by managers approximately 70% of the time, and that "sometimes even though [I thought a loan I had rejected] was dead, it [would] come back to life" because her managers would revive and approve it.   Ultimately, approximately 25% of the loans originated in her office were approved pursuant to an exception, while many others were approved despite obvious fraud in the loan application (*see* ¶113(q), above).  She added that what was taught in underwriting school was different than what was going on in the field.  In sum, "a lot" of loans were pushed through that CW 34 was uncomfortable with.

(e)     CW 21, a ten year veteran of the Company who served as a senior account executive and then sales manager in the San Diego office from 2002 to 2007 – and whose spouse was also an account executive with Golden West/Wachovia – confirmed that the Company's underwriting guidelines were abandoned through extensive and aggressive use of the ETP program, stating, "It was 'exception city;' there were exceptions for exceptions; it was crazy."  For example, leniency in approving borrowers with subprime FICO scores was "rampant."  Account executives would "just package it nice and pretty for the underwriters, and they'll approve anything."   And if an underwriter would not approve a file, the loan officer would take it straight to a manager to get approval.

(f)     CW 37 worked for Golden West and then Wachovia as a mortgage auditor, sales support specialist, and then mortgage processor from May 2005 to November 2008 in San Antonio, Texas.  As a mortgage processor, CW 37 reviewed loan files for closing and was able to see any exceptions that had been made to get the loans approved.   CW 37 reported that the Company's underwriting guidelines were "really, really loose" because there were "a lot of exceptions."  CW 37 stated that no less than 20% of the loans he processed were

approved pursuant to an exception, and "a lot" of exceptions were made to FICO score requirements.  CW 37 added that exceptions were also commonly made to LTV requirements.  One of the reasons that exceptions to LTV requirements were so prevalent, CW 37 explained, was that "[a] lot of different underwriting managers had the signing authority to get [around LTV requirements]," so if a loan processor or underwriter wanted to get a given loan approved, they "knew who they could call to get the job done."  Ultimately, CW 37 stated, "My understanding was that a lot of the reason [Golden West/Wachovia] went down was the underwriting.  They were approving everything.  The underwriters and processors were on commission, so whatever we had to do to get the files out, we'd do."

(g)     Asked whether underwriting standards were regularly evaded through the ETP program, CW 29 similarly stated, "Oh God, yes!  For every rule, there was always an exception."

(h)     CW 20 similarly reported that there were "a lot of exceptions to the guidelines," and his boss would "more often than not" overturn "no brainer denials."  When his manager did so, CW 20 reported, the explanation was that "[our office] need[s] to get our piece of the pie" and that the approval of these dubious loans was "a business decision."

(i)     CW 32, a California-based loan processor, underwriter and underwriting auditor for Golden West and underwriting auditor for Wachovia during 2000 through 2008, reported that the Company effectively abandoned its underwriting guidelines through the rampant use of exceptions.  "There were exceptions to the exceptions!" CW 32 stated, and they were so common that CW 32 rhetorically asked, "If I can get exceptions, what's the use of the guidelines?"  After more than eight years with the Company, CW 32 became sufficiently disgusted with the Company's underwriting practices, and the lack of response from the regional managers to whom she repeatedly expressed concerns, that she decided to leave the Company in 2008.

(j) CW 27, an underwriter from September 2005 to late 2008 at first Golden West and then Wachovia based at the Company's Charlotte, North Carolina operations center, also reported that legacy Golden West and Wachovia personnel continued to make use of the liberal use of ETPs after the merger, and that approximately 30% of all loans were approved by salespeople or their superiors pursuant to exceptions – notably LTV exceptions and debt-to-income ("DTI") exceptions. As CW 27 added, she was "uncomfortable" with the exceptions practices she saw in her office.

(k) CW 30, a former Wachovia sales executive who was involved in 2008 in Wachovia's abortive program to try to refinance distressed borrowers into government loans (known as "Project Green Earth"), concluded that the Company's sales force had made widespread exceptions to the underwriting guidelines on critical underwriting criteria, and that income was a common exception. "A lot of exceptions were made. If a loan didn't qualify just based on income, they'd be able to override that," CW 30 stated. As CW 30 also noted, from what CW 30 could tell, the underwriting practices and exceptions had been like this "for years and years" – and there were more exceptions made in California and Florida than in other parts of the country.

(l) CW 38 was an Underwriting Manager with Golden West and then Wachovia from 2004 until January 2008 in Tampa, Florida, and specialized in underwriting Pick-A-Pay loans. CW 38 reported that exceptions to underwriting standards were widespread in her office. The Company "did exceptions all the time," including exceptions to minimum FICO score requirements and maximum LTV ratios. Exceptions were up to a manager's discretion; there were not set parameters for exceptions. In this CW's opinion, the rampant use of "exceptions to policy" was driven by the managers in her region, who were legacy Golden West employees, rather than from Wachovia headquarters. As CW 38 put it, the former Golden West offices were simply continuing to "do[] their own thing."

(m)     When asked about exceptions to underwriting guidelines, CW 23, a former Sacramento-based Golden West and Wachovia underwriter from 2005 through 2008, first commented: "I really didn't see any guidelines."  CW 23 then clarified that "there were guidelines – they were just easy to override."

(n)     Similarly, as CW 22, the former Wachovia senior account executive from Arizona, commented on the personnel who worked on the Pick-A-Pay loans, "I just don't think they had a real grasp on guidelines.  It was more, 'Let's make this work,' rather than guidelines."

(o)     As CW 5, a former Wachovia mortgage consultant from 2005 to 2008 in Connecticut stated, "All the exceptions were on this Pick-A-Pay loan," and exceptions were made "every single day," most commonly to accept higher LTV and lower FICO.  "One of the things we were taught to sell was our underwriting, that we could make and break our own rules.  It was in our [sales] slides.  We would get [loans] done."  Exceptions were "not really" documented or tracked, to CW 5's knowledge.  There were written forms to be filled out for exceptions, and these were "sometimes" used, but "lots of times a manager would just sign off on an email or in a face-to-face conversation with an underwriter, saying it was okay to proceed."

(p)     CW 39 worked for Golden West and then Wachovia from 2004 until 2008 first as a district manager, and then as a Division Sales Manager and Assistant Vice President who supervised sales and operations for five loan offices in Connecticut and New York that generated $800 million in loans per year.  CW 39 stated that he would review loan files that had not been approved by lower-level personnel, and estimated that about 40% of the loans he reviewed were marked with a request for an "ETP," although not all would be approved (he estimated that about 20% of the loans he approved would have an ETP).  Later in the interview, this CW said "I'm not going to say every single file was an exception," but he probably saw exceptions "on a dozen loans every day."  The most common exceptions were made to waive "limits" on LTV ratios, minimum

credit scores, and maximum loan amount.  More generally, as CW 39 commented, exceptions became "a lot more frequent" after the merger.  "Golden West should have had their guidelines [written] in stone rather than sand," adding:  "It's the old cliché, if you give someone an inch, they're going to take a mile."

        **c.**        **Continued Heavy Lending to Subprime Pick-A-Pay Borrowers**

116.    Also contrary to the Company's representations to investors that the credit quality of the Pick-A-Pay portfolio was "very strong," after the merger Wachovia's Pick-A-Pay operation continued to lend heavily to high-risk borrowers with subprime credit scores of 660 or less (and often much less).

117.    Indeed, as Wachovia itself belatedly disclosed on April 14, 2008, it originated an additional $16.5 billion of Pick-A-Pay loans to subprime borrowers with FICO scores of 660 or less during just 2007 and the first quarter of 2008.

118.    The first-hand accounts of numerous former employees, set forth below, similarly confirm that, despite Defendants' public portrayal of the Pick-A-Pay portfolio as having "pristine" credit quality, after the merger Wachovia continued Golden West's practice of extending a very large percentage of its Pick-A-Pay loans to subprime borrowers, especially in California.  For example:

        (a)        According to CW 31, the Southern California-based senior underwriting manager at Golden West and then Wachovia from 2003 through April 2008, approximately 80% of the Pick-A-Pay loans approved in CW 31's office during their tenure were made to subprime borrowers with FICO scores of 660 or lower.  CW 31 added that he has a lot of friends who are mortgage brokers who reported that it was widely understood among brokers in the region that "if you can't send a [borrower] anywhere else [and get approved], send it to [Golden West/Wachovia] and harass them.  That's what we were known for."  In other

words, many of the most problematic loan applications in Southern California were being sent to Golden West.

(b)     According to CW 6, another California-based senior underwriting manager at Golden West and then Wachovia from 2002 to 2008, approximately 95% of the Pick-A-Pay loans approved in CW 6's office during their tenure were made to subprime borrowers with FICO scores of 660 or lower. When asked about the quality of the underwriting on these loans, CW 6 replied: "My colleagues' underwriting skills were average. But when you have a manager that can override a decision because they want bottom line results…. Even if the underwriter wanted to deny the loan, it could be over-ridden. The underwriter's decision was not the final word." Everyone knew that they were "judged on the bottom line [*i.e.*, loans closed] monthly."

(c)     CW 34, another Golden West/Wachovia underwriter based in California, estimated that approximately 60% of the loans she approved were made to borrowers with subprime FICO scores of 660/650 or below.

(d)     Similarly, CW 23, another Golden West/Wachovia underwriter based in California, reported that the "vast majority" of the loans he underwrote were made to subprime borrowers. He added: "We were known as the Pick-A-Pay lender, and that was the loan [that was] pushed, even after Wachovia took over…. It was popular for people with lower credit."

(e)     CW 15, a California-based account executive for the Company from May 2007 to January 2008, was asked if he found that the Company was putting borrowers into Pick-A-Pay loans who were not well-suited for the loan. CW 15 responded yes, and explained: "I sold subprime and what happened [as the housing market declined was that] the only place they would fit was the Pick-A-Pay loans because the underwriting guidelines were lax." As CW 15 stated, it was easy for him to get subprime borrowers approved for Pick-a-Pay loans because the borrower needed only "a submission form, basically," and the underwriting guidelines were so inconsistently enforced and riddled with

exceptions that approval depended not on whether the borrower was truly creditworthy, but whether the underwriter "had a good breakfast or not." CW 15 would complain to his sales manager that "you guys are selling Pick-A-Pays but that's to the subprime borrower," but "it wasn't one of those concerns you could really raise and say 'I don't want to sell these Pick-A-Pays'.… Everyone had drunk the Kool-Aid already."

(f) CW 11, the former Wachovia retail account executive who was based in Michigan during 2007 and who had a decade of prior experience in the mortgage business, was asked what percentage of loans they saw were subprime. This source replied "Pretty much everything I saw that came in." CW 11 said he had been excited about coming to Wachovia (which this source had previously always thought of as more of prime lender) thinking that he'd be able to walk into realtors' offices and be able to say "you can't beat what I'm offering." What he had not expected to say to people while working for Wachovia was "if you've got 660 FICO, I can get you a loan."

(g) CW 22, the former Golden West and Wachovia account executive who worked in Arizona from 2002 to 2008, reported that, in her experience, Golden West/Wachovia did stated income Pick-A-Pay loans with subprime FICO scores as low as 580, further contributing to the "horrible, horrific" underwriting on these loans.

(h) According to CW 13, a Golden West/Wachovia underwriter in California from 2002 to 2008, it was "common" to make exceptions for low FICO scores, even for "very low, very bad FICO" (as low as 500 in the 2005-2006 period), and there were "a lot of these" subprime loans.

(i) CW 16, the California-based field consultant and loan processor at Golden West/Wachovia during 2005 and 2006, reported that all of the loans CW 16 processed following the merger's announcement were for subprime borrowers with FICO scores under 660, and that the majority of these loans were approved on a stated income basis.

(j)     Similarly, CW 40, a former Golden West/Wachovia assistant branch manager and mortgage underwriting manager based in Glendale, California from 2000 to 2008, confirmed that around 2006 the Company was approving borrowers with FICO scores in the mid-500s, and this occurred "often" for stated income Pick-A-Pay loans.

(k)     Similarly, CW 35, a Golden West/Wachovia customer service supervisor and loan specialist based in Sonora, California from 2004 to late 2007,  confirmed that at one time standards were lowered to the point that a borrower could get a loan with a FICO credit score as low as 500.

(l)     As CW 26, the former Wachovia account executive who worked in Florida from 2006 to 2008 reported, "in the beginning" of this CW's tenure "there were a lot of loans that were under 660."

(m)     As CW 7, a longtime underwriting manager and Vice president/Division Underwriting Manager at Golden West and then Wachovia based in San Antonio, Texas, reported, probably a "good 25%" of Golden West first loans were made to borrowers with FICO sores of 660 or less – and underwriting by legacy Wachovia personnel after the merger was worse ("unbelievably" low).

**d.     Continued Use of "Instant Underwriting" Events to Approve High-Risk Loans With Minimal Review**

119.    After the merger, at least in California, the personnel involved in the Pick-A-Pay operation also continued to routinely hold "instant underwriting" events during which they collected large groups of the high-risk loans of the types described above from outside mortgage brokers, and approved them in mass underwriting sessions.  As multiple former senior Wachovia employees reported, these events were abused by the Company's sales force as a mechanism to obtain approval of as many loans as possible, without regard for their credit risk.

(a)     For example, CW 21, the former California-based senior account executive and manager at Golden West and then Wachovia from 1997 to 2007, confirmed the Company's practice of having "instant underwritings" to bring in more loans, and stated that they were a method for account executives to "go out and tell brokers to bring in all your crap loans that are sitting on your desk that you don't want that you are having trouble getting through" so they could be approved in mass underwriting sessions.  During these regular events, the Company's loan officers in the area would literally gather dozens of "seedy" mortgage brokers in one room, collect all the high risk loans they had accumulated – which typically had an average FICO of just 600, far below the subprime cutoff – and get them approved.  The loans would be reviewed by actual underwriters at these events, but they "had to underwrite loads and loads of loans," which fostered mistakes and easier underwriting.

(b)     CW 20, another California-based Senior Underwriter who worked first for Golden West and then Wachovia from 2001 to 2009, similarly confirmed that mass "instant underwriting" events with underwriters, loan officers and brokers collected together were a "regular practice" that occurred at least once a quarter throughout the entire time this source was with the business, and which were a means for getting poor credit files rushed through the approval process.  CW 20 had particular issues with the poor quality of the underwriting done at these events.  For example, he recalled one of his managers bringing an entire stack of mortgages back in which many of the approved borrowers were delinquent on everything except their mortgage.  As CW 20 stated, instant underwriting is basically telling the brokers "Yeah, we can do the loan.  We'll bring it back and get it done."  There was limited documentation with most of those loans, but "within a day or two" the loans would be closed.

**e.      Qualifying Mortgage Applicants Against the Pick-A-Pay Loan's "Teaser" Rate, Rather than Its Fully Indexed Rate**

120.     Following the merger, several sources also reported that, in at least some regions, Pick-A-Pay sales managers and underwriters in the field also permitted borrowers to be

"qualified" (approved) for loans based on their ability to make monthly loan payments at the loan's initial "teaser" rate – rather than at the "fully indexed" rate that reflected the amount that borrowers could be expected to pay once the initial "teaser" period was over.   For example:

(a)      CW 41 worked for Golden West and then Wachovia from 1984 to 2007 in Texas and California, including as a Vice President and Director of Operations at the San Antonio call center.  CW 41 reported that although in his experience Golden West consistently qualified Pick-A-Pay borrowers at the fully indexed rate, after the merger he determined that in at least some regions these same borrowers were now being qualified at the "teaser rate" or "initial payment rate" in order for loan officers in those regions to compete better against rival lenders such as Countrywide and Washington Mutual (which were also qualifying borrowers at teaser rates).

(b)      CW 13, a former loan underwriter with Golden West and later a lead underwriter and loan consultant with Wachovia in California during the period 2002 to 2009, described how the Pick-A-Pay product had a minimum payment option that allowed borrowers to make payments of less than interest on the loan.  "It's one thing if the borrower can afford to pay principal plus interest," but CW 13 reported seeing borrowers who were qualified at the minimum payment rate, rather than the fully indexed rate.  As CW 13 observed, "[i]f the borrower can only afford to pay the minimum payment, that's already very, very risky."

(c)      CW 18, a former Ohio-based Golden West and later Wachovia mortgage consultant and Territory Manager during 2004 to 2007, provided a similar report.  CW 18 similarly described how a lot of "the wrong borrowers" were put into Pick-A-Pay loans, and that this was especially true after the merger.  According to this source, "Wachovia had people working for them who didn't understand the product," and qualified many people in those loans "who didn't deserve them" at the minimum payment rate – a situation that CW 18 characterized as "just stupid."   As described elsewhere, this was just one of the

reasons why CW 18 "did not feel comfortable" with a lot of the loans that Wachovia-hired underwriters ("those idiots") would approve.

(d)     CW 19, who had served a previous stint at Golden West and returned to Golden West/Wachovia around 2006 and worked in the Company's customer service center in San Antonio, Texas, reported hearing so many stories from borrowers calling about Pick-A-Pay loans that CW 19 concluded that "something is wrong here."   CW 19 started going back and looking at documents.   There were a lot of files where the applicable standards had not been met.   CW 19 recalled one borrower, an 80-year old woman, who received $1,200 a month from Social Security as her only income.   This woman was going to lose her home because her payment had jumped to $1,900.   When CW 19 had left her first position (in loan origination) at Golden West in 2000, borrowers had to qualify for the Pick-A-Pay loan based on the highest (*i.e.*, fully-indexed) interest rate, but the borrowers CW 19 saw when she returned were plainly not qualified for those payments.   After raising these concerns to CW 19's superiors, the response from mid-level managers was that it was "expected" that these borrowers would ultimately be able to refinance and get a better interest rate.   However, as CW 19 put it, "sh*t, there was no way [these borrowers] could refinance."

121.   Moreover, additional confidential witnesses described how, even if applicants were not formally qualified using only the teaser minimum payment rate, they were instructed to aggressively "pitch" Pick-A-Pay loans to borrowers on the *assumption* that they would never end up having to pay the fully-indexed rate.   As a result, borrowers for whom a Pick-A-Pay loan plainly did not make sense – notably less creditworthy borrowers who had only a dubious ability to make fully-indexed payments – were enticed to enter into loans that they could not afford.   For example:

(a)     According to CW 21, a former California-based senior account executive and branch manager with Golden West and branch manager

with Wachovia during 2002 to 2007, loan officers should have sold the Pick-A-Pay loan based on its fully-indexed rate. Instead, however, employees were instructed to sell the product by telling customers that (a) they could get the low "teaser" minimum payments (which dropped to as low as 1.25% during his tenure) for three years, that (b) they could then refinance out of the Pick-A-Pay and switch to a fixed rate loan, and (c) that in those three years they would save themselves some money in payments so "go have fun" or use the "savings" to invest in a 401(k). Emphasis on this type of sales pitch to borrowers who should not have been given Pick-A-Pay loans was just one of the reasons why CW 21 "wants nothing to do with the mortgage industry anymore."

(b)     CW 5, a former Golden West/Wachovia mortgage consultant based in Connecticut from 2005 to 2008, similarly described how in his area "We told people, 'Look, if you can make this minimum payment, you can take all the money you're saving on your mortgage payments and pay off your credit card, which has a higher interest rate, or put it in the stock market for average gains of 10% or whatever.' We'd pitch it and make it seem like it made sense." In reality, however, CW 5 and his managers "knew [borrowers would] never do the right thing," and that "nine out of ten borrowers aren't saving that extra money or putting it in their 401(k)'s; they're spending it. That's the problem." CW 5 added, "It kinda does [tick] me off that I was instructed to do all these [questionable loans]. I feel like I was used as a pawn."

(c)     Similarly, CW 28, a former Golden West/Wachovia loan officer based in California from 2005 to 2008, described how the Pick-A-Pay loan was a good product for people who could clearly afford it, but the "problem" was that the company's loan sales force would use that loan to say, "You don't have to make a [regular] payment, you can make the minimum payment" – and then would not explain to people that principal would add up and that their monthly payments would ultimately be a lot more.

(d)     Similarly, as described above at ¶ 113(r), CW 35, a former California-based customer service supervisor first with Golden West and later with Wachovia from 2004 to 2007, reported how he was repeatedly reprimanded by his supervisors for actually advising borrowers not to apply for Pick-A-Pay loans when they were unlikely to able to afford the fully indexed payments.  CW 35 liked the fact that the Pick-A-Pay loan gives options for people who legitimately make a great income during the summer but no income during the winter.  But, contrary to the practices in his area, the loan was not meant to be used as a vehicle for telling marginal borrowers "today we can get you into a $400,000 house instead of a $200,000 house."

(e)     CW 42 was a mortgage planner for Wachovia in Madison, Wisconsin from early 2005 to mid-2007.  CW 42 also reported that he and loan account executives were instructed to market the Pick-A-Pay product as a financial investment instrument which would enable borrowers to "invest" the "savings" they would reap from making only the minimum payments.  However, most borrowers were not that diligent and, in CW 42's words, took the money "saved" by making only minimum payments and "drunk it at the bar" instead of actually saving and investing it.  CW 42 was encouraged to tell borrowers "Don't worry about the neg am [negative amortization]; we'll just refinance in a few years and start all over again."  As long as property values were going up nicely each year, refinancing wasn't an issue – however, there was never discussion about what would happen if property values stopped going up.

**f.     Continued Use of Inflated Appraisals and Resulting Understatement of LTV Ratios, and Blindness to Second Mortgages ("Silent Seconds") in the Underwriting Process**

122.     Following the Merger, in various regions Wachovia's loan sales staff and outside brokers also were able to pressure the Company's appraisers to inflate the appraised value of the mortgaged property so that loans would fall within the maximum allowable LTV ratio, and be approved.  This practice further exposed the Pick-A-Pay portfolio to significant losses because it

further diminished the amount of the "cushion" available to Wachovia to absorb some portion of the Company's losses if (or, more accurately, when) loans defaulted and the Company had to foreclose on their borrowers' property.[8]  Inflating appraisals was an especially risky practice during the Offering Period, because home prices began to decline, and then collapse, during that time, thus widening the losses to which the Company was exposed if its loans were under-collateralized to begin with.  Confidential witnesses who described this serious problem included the following:

(a)     CW 4, as a manager of the Consumer Risk Management Group from late 2007 through 2008 (and who had earlier been an Underwriting Administration Business Manager from 2003 to 2006 at Golden West), periodically reviewed Wachovia's loan portfolio and underwriting practices, and she stated that she had personally seen "major problems" with Golden West's/Wachovia's appraisals in California.  Prior to the merger, Golden West had built up its own internal staff of appraisers in most national regions.  According to CW 4, although the purpose of hiring in-house appraisers was supposed to be to protect the business's own interests, "certain Area National Managers" who ran the territories – and notably the Area National Managers who ran field operations in California and who had come over to Wachovia from Golden West after the merger – "were more concerned with funding a loan than [getting] an accurate appraisal value."  This was particularly dangerous given that it became clear to CW 4 that the approach in California under these managers was to rely heavily on stated appraisal values to justify significant and widespread departures from stated guidelines in other aspects of the loan underwriting process.  CW 4 added, "I know [there were] influences put on appraisal staff, making sure they made every effort to achieve [appraisal values needed to approve loans]."  As CW 4 explained, even though someone was just a staff

[8] It is widely recognized in the industry that when real estate properties go into default and foreclosure, the lien holder will typically recover only a fraction of the property's appraised value.  For example, loan losses depend on both the number of defaults and the cost of each default (including transaction costs) – and as a rule of thumb in the event of default a mortgage lender collects roughly 50 cents on the dollar.

appraiser, that person had an appraisal manager, and that person reported to another manager, all the way up the chain to the Area National Managers who ran loan operations in the field. There were Area National Managers (and their senior lieutenants) who managed territories all over California. Originators, underwriters and appraisers in each national territory all reported up to the same Area National Manager for that territory. "These national managers were not just dedicated to one vein, such as the appraisal; they were dedicated to the [loan] transaction as a whole and the funding of said transaction." This CW identified Tim Wilson and Dan Dawson (including Dawson's deputy, Doug Arnett), Area National Managers for California, as four of the absolute worst in this regard. Wilson, the most senior Area National Manager to whom other national managers in California informally reported, was later "let go" [after mid-2008], along with Dawson and Arnett, after senior Wachovia management "started to understand how [Wilson] had run things." While a manager in the Consumer Risk Management group during late 2007 to 2008, CW 4's group prepared reports analyzing the credit quality and underwriting of the Pick-A-Pay portfolio in the various national territories for the various Area National Managers. But in California, these managers "wouldn't even look at" their reports and simply "didn't care" – even though CW 4 recalled that as much as 33% of California loan files reviewed had questionable audit values. To the extent that Wilson (an already powerful field manager in California who was viewed as likely to rise to more senior positions) or the other area managers in California cared at all about these reports, it was only to apply pressure (which was successful) on CW 4's group to insure that any written findings were watered down "because they did not want [certain] information going out to their staff."

(b) CW 43 was an appraiser for Golden West/Wachovia in San Leandro, California from 2003 to September 2008. CW 43 confirmed to Plaintiffs that, after the merger, the common practice at Wachovia was to inflate appraisals to increase loan volume. Wachovia "didn't care about being conservative" in its appraisals, and forced its appraisers to "push values, push values, push values, do more loans. It got worse and worse." As CW 43

explained, "The loan brokers just wanted to do a loan; they didn't care what it was or who it hurt," and an appraiser "wouldn't have a job if you didn't" inflate property values. CW 43 stated that, although underwriters were not supposed to contact appraisers, they regularly called and harassed them to "get the value they wanted." Thus, appraisers regularly valued the property at an amount that satisfied the permissible LTV cut-off even though they "knew the house wasn't even worth that much." When an appraiser refused to value a property at an amount sufficient to close the loan, the branch manager simply chose another appraiser who was willing to inflate the value: "If they couldn't get one appraiser to do it, they'd get someone else to do it. They'd get the value no matter what."

(c) From September 2007 to 2008, CW 44 worked in Wachovia's appraisal department in Rock Hill, South Carolina, which handled all of the Company's appraisals for the South Atlantic States. CW 44 was responsible for arranging for the appraisal to be performed, verifying that it was complete, and arranging for any corrections to the appraised value of the home. CW 44 reported to a senior manager, Craig Julian, the Appraisal Team Leader. CW 44 stated that Wachovia's appraisal practices were meant to ensure that the appraisals it ordered were high enough to justify the loan amount. When CW 44 started at Wachovia, the Company's practice was to select an appraiser for a property by entering the property address into a computer system and then selecting the appraiser located closest to that address, without informing the appraiser beforehand of the amount of the loan that the borrower was seeking for the property. However, within weeks of joining the Company, these policies and practices were altered in CW 44's region. First, Julian started requiring that all appraisers should be selected from a list of appraisers that he had prepared, which consisted of those appraisers that he felt would "hit" the values he wanted, and the office personnel were thereafter required effectively told which appraisers to use, even if they were located 3 or 4 counties away from the property to be appraised. CW 44 was aware that offices in other regions still used the system of picking a close appraiser, but the Rock Hill center could not. And second, for appraisals solicited by CW 44's office, the appraisers were also now informed of the amount

of the requested loan before they conducted the appraisal – so that the appraiser knew what property value had to be reported to allow the loan to close. As CW 44 also reported, it was thereafter rare for an appraisal not to hit the value required for the loan to be approved, because the center where CW 44 worked would simply order a new appraisal from another appraiser if the first one did not work.

(d)     CW 45 confirmed that Wachovia's appraisal practices were manipulated to ensure that the Company could close loans, without regard for whether the appraised value of the home was accurate. CW 45 was the office manager for the Rock Hill, South Carolina office that handled appraisals for the South Atlantic States from 2007 to 2008. CW 45 confirmed that Craig Julian (see preceding paragraph) refused to use appraisers who did not consistently appraise properties at values that were sufficiently high to allow the company to close its mortgage loans, and instead selected appraisers whom he knew would report the necessary values. CW 45 further reported that whenever an appraisal came in below the necessary value, rather than rejecting the loan or decreasing the loan amount, the South Atlantic States appraisal center at Rock Hill would simply order a second appraisal, that Julian would hand-pick the appraiser that was selected to perform the second appraisal, and that this second appraiser would invariably report the value that was needed to approve the loan.

(e)     CW 46 was also a member of the South Atlantic States Appraisal Team based in Rock Hill, South Carolina, from just after the merger through the end of 2008. This CW also confirmed that her team was provided with a list of appraisers that could be used by Craig Julian. In addition, Wachovia underwriters would routinely call the center to request that specific appraisers be used (typically appraisers that the mortgage broker on the loan had requested). Where another appraiser had already been selected but the underwriter called to say they did not like that appraiser, CW 46's office would invariably get a new appraiser – a practice that CW 46 did not understand, and believed that it was against the law for underwriters to interfere in the selection of an appraiser in this manner. CW 46 said that she fought this practice "repeatedly," but was

repeatedly met with resistance.   And if a loan officer or broker was unhappy with a first appraisal, CW 46 would be required to get another appraisal, from an appraiser selected by Julian.   Based on the way this office assigned appraisals, CW 46 said it was "the most unethical office I have ever worked in."

(f)      CW 15 was a Wachovia mortgage account executive in California from 2007 to 2008.  Asked about appraisals, CW 15 commented that with in-house appraisals, it was often a judgment call depending on how the appraiser felt.  CW 15 noted that there was an appraiser whose office was just a few doors away from his who would go to lunch with the sales representatives. There was camaraderie between the appraiser and the representatives – and representatives would say to the appraiser things like "I just need $10,000 more to get this loan approved."  CW 15 pointed out that now there are laws in place to prevent loan officers from even trying to influence an appraiser, but this was "not uncommon" at Wachovia while he was there.

(g)      CW 16, the California based field consultant and loan processor at Golden West/Wachovia during 2005 and 2006, reported that Wachovia's appraisers "bent the rules" by increasing appraisal values in response to pressure by underwriters.  Specifically, CW 16 reported that, in order to ensure that loans would fall within the permissible LTV ratio and be approved, appraisers would boost the appraised value of properties by 5% or more in response to pressure from underwriters.

123.   Moreover, even when appraisers were not being pressured to alter their valuations, Wachovia lowered some of the standards for conducting appraisals after the merger. For example:

(a)      CW 41, who worked for first Golden West and then Wachovia from 1984 to 2007 in Texas and California, including as a Vice President and Director of Operations at the San Antonio call center, stated that in order to boost loan volume after acquiring Golden West, Wachovia offices began

to perform appraisals "remotely" (so-called "drive-by" "desk-top" appraisals), rather than through having appraisers personally visit and inspect the property.

(b)     CW 47 worked for Golden West and later Wachovia from 1978 until 2008, most recently as a mid-level vice president in Wachovia's Loan Audit Group, starting just before the merger. In that capacity, CW 47 would make reports and recommendations to the heads of Wachovia's underwriting and appraisal departments. CW 47 confirmed that after the merger "underwriting and appraisal guidelines" became looser in order to generate more loan volume. Carter felt his reports were taken seriously, and expressed particular concern about loose lending practices in Las Vegas and California, but although the Company would try to implement changes to tighten up lending in some areas, at the same time they ask for more volume. As a result, standards, including appraisal standards, became looser over all.

124.    Many Golden West and Wachovia-originated Pick-A-Pay loans were also not nearly as conservatively underwritten as their stated LTV ratios (based on appraised values) might appear. The term "silent seconds" refers to a second mortgage that is used, together with a first mortgage, to finance the purchase of a house. It is "silent" when the lender who makes the first loan is unaware of it – although as a result of the "silent second" the first lender is at increased risk of non-payment and default, because the borrower will have invested less of his own equity in the house. Such a borrower is thus less likely to have any financial stake (or meaningful financial stake) in his own home, and hence much more likely to default in the event he has trouble making his loan payments. Moreover, "silent seconds" tend to be an indicator of a financially stretched buyer, who is unable to come up with more than a token downpayment other than from additional borrowed funds. *See, e.g.*, Michael Lewis, *The Big Short* (Norton 2010) at 195.

125.    Numerous confidential witnesses reported that Golden West/Wachovia commonly made loans (based on purported appraised values at origination) at LTVs of 75% to 80% – and at LTVs of 90% or more in various regions at various times under lowered guidelines, or pursuant to an "exception to policy." *See, e.g.*, CWs 5, 6, 13, 27, 36, 37, 38, 39.   However, as noted above, these figures did not necessarily mean that the borrower had 25%, 20% or even 10% equity in the property.   To the contrary, as disclosed to plaintiffs by CW 36, a former Senior Wholesale Account Executive at Golden West and later Wachovia in the Northeast from early 2005 through late 2008, it was common for borrowers to have such "silent seconds" from other lenders, and even for the Company's loan officers to help them get such second mortgages. *However, the Company's underwriters were not required to be informed of any second mortgages,* and if another loan company was willing to do a second loan behind Golden West's/Wachovia's, they could fund it and not tell the underwriters – and Golden West's/Wachovia's loan sales officers would "keep it on the down low" (*i.e.*, "silent").

### g.    The Foregoing Rampant Deviations from Stated Underwriting Policies and Guidelines Were All the More Dangerous Given that Wachovia Had Lowered Minimum Pick-A-Pay Loan Standards Soon After the Merger

126.    As if the rampant use of "exceptions to policy" and other deviations from prudent underwriting practices discussed above were not bad enough, their impact was compounded by the fact that Wachovia's senior management – which as discussed earlier never seemed to be able to understand the risks involved in the Pick-A-Pay business – had, out of ignorance or negligence, authorized the lowering of the Company's stated minimum standards for underwriting Pick-A-Pay loans in several material respects.   These formal written standards were lowered shortly after the merger, due to the desire of CEO Thompson and other senior Wachovia executives (however well-intentioned it might have been) to achieve increased loan volumes.   As

a result, although the widespread resort to "exceptions to policy" in the field had been bad enough in the *pre*-merger period, the impact of "exceptions to policy" as applied in the field became even more serious in the *post*-merger period, for the simple reason that ETPs now involved exceptions to the formal "policies" and standards that Wachovia had watered down beginning in 2006.   In addition, the newly lowered standards allowed loan officers, who would have previously been required to obtain an ETP, to obtain loan approvals without having to even request an exception from the Company's underwriters.

127.   For example, Wachovia lowered the minimum required payments on newly originated mortgages, resulting in a situation where borrowers would rapidly begin to owe more principal on their homes, thereby effectively accelerating the build-up of negative amortization (*i.e.*, increasing loan balances) with respect to many of the Company's *least* creditworthy borrowers.   As reported by the *New York Times* on May 14, 2009:   "Wachovia made things worse. [Golden West] had demanded minimum annual payments of *1.95 to 2.85 percent* of the loan balance, but that fell to *1.5 percent* soon after the merger was announced.   After the deal closed, Wachovia cut the minimum payment to *1 percent*…."

128.   Moreover, as set forth below, Wachovia also lowered several basic underwriting standards, notably by lowering stated minimum required FICO scores and raising stated maximum permitted LTV ratios.   For example:

(a)   CW 41 worked for Golden West and later Wachovia from 1984 to 2007 in Texas and California, including as a regional Vice President and Director of Finance and Operations.   CW 41 stated that in order to boost loan volume after acquiring Golden West, Wachovia lowered the stated minimum required credit score, and lowered the stated required minimum loan payment. Wachovia personnel then combed Golden West's catalogue of rejected borrowers (who had been denied mortgages even under Golden West's lax and exception-

ridden standards), to try to extend them loans under the Company's newly lowered credit standards. Moreover, as CW 41 as noted, "the higher the loan volumes, the higher the bonuses." The result, as CW 41 stated, was "problem loans" And loans to people who did not deserve to have them.

(b) CW 48 worked at Golden West/Wachovia from 1979 until January 2008, primarily as a Senior Vice President and Senior Underwriting Manager in Golden West's San Antonio underwriting center, which underwrote the highest volume of loans of all of Golden West's underwriting centers. CW 48 supervised approximately 450 employees. CW 48 reported that Wachovia allowed additional types of exceptions to policy to be made after the merger that Golden West would not have permitted; for example, Wachovia allowed exceptions to be made on non-arms-length transactions, and on historical properties. In sum, Wachovia wanted to use the most liberal standards from its fixed rate products and the most liberal standards from the Pick-A-Pay adjustable products and put them together, which turned out to be "like breeding a horse and a donkey, and ending up with a mule." CW 48 confirmed that the word that this source got from managers in the field was that "there's no such thing as a 'no,'" and that the practice was accordingly to "approve anything." CW 48 stated that this loosening of standards began within 90 days of Wachovia having taken over.

(c) CW 49 was a Golden West/Wachovia account executive in Florida from the early 1990's until late 2008, and was responsible for selling Pick-a-Pay loans through outside mortgage brokers. CW 49 reported that, after the merger, Wachovia sought to loosen the "flood gates" and increase the volume of loans it originated, and therefore relaxed its underwriting guidelines substantially. For example, CW 49 confirmed that Wachovia allowed Pick-A-Pay loan-to-value ratios of up to 95%, lowered the required minimum payment to 1%, and began generating an increasing amount of Pick-A-Pay loans with FICO scores significantly below 660 – all of which caused the Company to generate high-risk loans that were likely to default.

(d)     CW 40, who worked for Golden West and then Wachovia in California from 2000 to 2008 primarily as a mortgage underwriting manager, also confirmed that, after the merger, Wachovia wanted to increase the volume of Pick-A-Pay loans and accordingly "opened up" the guidelines to achieve this goal.  For example, in 2006, the Company lowered the stated minimum FICO score standard to the mid-500 level – well below the FICO subprime cut-off score of 660 – and allowed borrowers with these low credit scores to obtain loans based on their stated income, without verification.  As a result of this lowering of stated underwriting standards, Wachovia's sales representatives succeeded in originating even more Pick-A-Pay loans, and the Company's underwriters were "getting loans coming out of our ears."  CW 40 further reported that, after the merger, and notwithstanding the subsequent lowering of stated underwriting standards by Wachovia, the generous ETP program remained in place, and the number of loans approved pursuant to "exceptions to policy" actually increased.

(e)     CW 50 was a loan processor for the Company in California from August 2005 to February 2007, and reviewed loan files and applications for completeness and accuracy.  CW 50 further confirmed that, after the merger, Wachovia materially lowered its underwriting standards, which helped to give rise to "so many bad loans."  Most notably, CW 50 reported that by late 2006 or early 2007, Wachovia had lowered its stated minimum FICO score to the mid-to-high 500s.

(f)     CW 39, the Division Sales Manager who supervised sales and operations for five loan offices in Connecticut and New York, reported that "underwriting loosened up significantly [after the merger].  With the pressure to do more business, I saw them loosen up quite a bit," and Wachovia began making "a lot of aggressive loans" by relaxing its standards for LTV ratios, minimum credit scores, and maximum loan amount.

(g)     CW 51 was a Senior Wholesale Account Executive at Golden West/Wachovia from 1998 until October 2008, who specialized in selling

Pick-a-Pay loans in Tampa, Florida. CW 51 reported that, immediately after the merger, Wachovia began allowing individual borrowers to take out as many as four or five Pick-a-Pay loans (whereas the limit had previously been one), and allowed higher LTV ratios on properties purchased for investment – practices which ended up leading to the Company approving "all kinds of junk."

129. Documents, such as Wachovia's December 2006 presentation (discussed above), further confirm that the Company lowered underwriting standards after the merger by allowing subprime FICO scores and increased LTV ratios. For example, that presentation, which introduced Wachovia's new 30-year fixed-rate Pick-A-Pay loan, expressly stated that this Pick-A-Pay product required "no minimum FICO," and was available at an LTV ratio of up to 95%. Despite the obvious risks associated with such loans, the document also promised "48 Hour Fully-Underwritten Approval."

  **h.** **Wachovia's Internal Consumer Risk Management Group Belatedly Concludes that Underwriting Guidelines Were Being "Blissfully Ignored" in Key Regions**

130. After the merger, the Company's internal consumer risk managers belatedly began to confirm the existence of many of the widespread underwriting problems described above.

131. For example, by 2008 members of Wachovia's Consumer Risk Management Department had identified serious underwriting and credit quality problems, and that they were particularly prevalent in the Company's California territories. According to CW 4, a manager of Wachovia's Consumer Risk Management Group who supervised a 40 member team in Wachovia's National Loan Quality Review group from October 2007 through 2008, during her tenure there CW 4's group conducted periodic reviews of the Company's loan portfolio and underwriting practices in the various territories. As CW 4 explained, the legacy Golden

West/Pick-A-Pay operations at Wachovia continued to be managed after the merger by legacy Golden West "Area National Managers," who were responsible for operations in the field within their respective territories (and who reported up through Jim Judd and his successor, who ran Golden West's mortgage operations, who in turn reported to Wachovia's senior executives). CW 4 reported that Area National Managers in some regions appeared to have generally followed stated underwriting guidelines, but the problem was that others did not – and unfortunately for Wachovia the Area National Managers in the California territories (which accounted for a huge percentage of the total Pick-A-Pay loan portfolio) were "among the worst," and had "blissfully ignored" underwriting guidelines. As a result (and as discussed earlier at ¶ 122(a)), CW 4's group eventually determined that the national managers who managed territories all over California "were more concerned with funding a loan than an accurate appraisal value," with the result that approximately 33% of the California Pick-A-Pay loans had questionable audit values. When asked how she would characterize the credit quality and underwriting of the portfolio as a whole, CW 4 replied "poor." Although there were "pockets" which were run "tightly" (CW 4 mentioned Nevada as an example), the Midwest was "50-50." However, "anything under Tim Wilson" [the senior Area National Manager for California, to whom other California ANM's effectively reported] was "of great concern," and the underwriting problems were so bad in California that the collapse of the Pick-A-Pay portfolio's California loan portfolio was "inevitable." As CW 4 added, the top field managers who oversaw that territory, which included Wilson and other California ANM's and their deputies, such as Dan Dawson and Doug Arnett (all legacy employees from Golden West), had "very, very aggressive" attitudes towards underwriting. For example, Wilson "claim[ed] to be conservative," but in reality "he thought the overall risk of a loan was a side note," was solely

"dedicated to the [loan] transaction and the funding of said transaction" rather than to careful underwriting, and effectively turned a "blind eye" to the problems in California – including the rampant lending on a "stated income" basis to unqualified borrowers (*e.g.*, "guys at Blockbuster" who claimed to make a lot of money). California was also one of the areas where "you were not told what was [really] going on." Unfortunately for Wachovia, senior Wachovia management did not understand how the Pick-A-Pay product worked or what questions needed to be asked ("I don't think they understood anything"); however, when senior Wachovia management gradually came to understand how Wilson, Dawson and Arnett had run things in California under Golden West and after the merger, all of them were let go.

*     *     *

132.    In sum, as a result of all the seriously deficient underwriting practices described above, on top of all the bad Pick-A-Pay loans that were underwritten by Golden West and that Wachovia acquired as a result of the merger in 2006, during the subsequent Offering Period Wachovia originated tens of billions of dollars of additional, acutely high risk Pick-A-Pay mortgages. At the same time, Wachovia's Offering Materials repeatedly assured investors of the Company's "very strong" credit quality and "prudent lending practices" (*see* ¶¶ 92-95 and Section VI). Unfortunately for investors, these assurances were untrue, culminating in tens of billions of dollars of Pick-A-Pay losses and in Wachovia's near bankruptcy and total collapse in September 2008 (*see* ¶¶ 189-200).

### 7.    <u>Wachovia Begins to Publicly Reveal the Low Credit Quality and Risky Underwriting of the Pick-A-Pay Portfolio</u>

133.    In late February 2008, certain analysts began to report that approximately 20% of Wachovia's Pick-A-Pay portfolio consisted of loans made to borrowers with subprime credit scores. However, analysts continued to be mollified – for the time being – by Wachovia's

reassurances that this portion of its portfolio did not meaningfully impact its financial condition in light of the Company's purportedly strong underwriting. Over the course of the next several months, however, Wachovia gradually disclosed more and more information casting doubt on its prior statements.

134. On April 11, 2008, Wachovia effectively acknowledged that, contrary to its prior assurances, the Pick-A-Pay underwriting guidelines were neither "prudent" nor "risk averse." On that day, Wachovia announced that it would significantly tighten its underwriting requirements by always verifying its borrowers' assets and employment, and requiring minimum FICO scores.

135. On April 14, 2008, Wachovia filed a Form 8-K (the "April 14, 2008 Form 8-K") in which it disclosed that it was increasing its credit reserves by $2.1 billion, thereby reducing its income by a corresponding amount and causing it to suffer a quarterly loss of $350 million. This was Wachovia's first reported loss in six years. Wachovia also announced that it was cutting its common stock dividend and would be raising an additional $7 billion of capital through further public offerings of its common and preferred stock.

136. In its April 14, 2008 Form 8-K, Wachovia also stated that "the scope of credit disclosures was increased to provide enhanced insight into the payment option consumer real estate portfolio." For example, in a slide included in an exhibit to the Form 8-K and that Wachovia characterized during a conference call that day as containing "new information," Wachovia disclosed that *$51 billion* worth of Pick-A-Pay loans (or approximately *62%* of the total portfolio) had been made to borrowers with FICO scores below 660 and that, of this amount, $25 billion was made to borrowers with FICO scores below 620. The total amount of this exposure alone exceeded the Company's Tier 1 capital as of year-end 2007 by $7.5 billion.

Moreover, in another slide, Wachovia disclosed that, as of February 2008, *$17 billion of its Pick-A-Pay loans, or 14% of the portfolio, had LTV ratios above 100%*, which directly contradicted Wachovia's previous assurances about its purportedly "well-collateralized" loan portfolio.

137.    In a third slide, Wachovia tacitly acknowledged that its losses were caused by lax underwriting guidelines, and assured investors that, in an effort to avoid such high-risk loans, Wachovia was "[s]ignificantly tightening underwriting standards" by requiring that its borrowers have minimum prime FICO scores of between 660 and 700, and by requiring *significantly* lower LTV ratios of between 60-80% before future Pick-A-Pay loan applications would be approved.

138.    Analysts immediately understood that Wachovia's April 2008 disclosures contradicted its prior statements.  For example, on April 14, 2008, Bear Stearns issued an analyst report stating that Wachovia's $2.8 billion loan loss provision for the quarter was "<u>nearly three times what we had estimated" based on prior disclosures and illustrated Wachovia's "lagging recognition of problems</u>."  Bear Stearns concluded that ongoing market deterioration was not a plausible excuse for the late disclosure of the problems in Wachovia's loan portfolio because "other banks, starting with Wells Fargo last November, had acknowledged problems in mortgage portfolios. …  It is unclear why it took longer for the situation to become clear to Wachovia, though it may have something to do with Wachovia's lesser familiarity with California or the option-ARM portfolio."  Likewise, on April 14, 2008, a Deutsche Bank analyst reported that Wachovia had failed to adequately acknowledge "the industry risks (esp. in regards to U.S. housing) when it came to reserves, capital, and the operating environment," and that Wachovia's decision to increase its loan loss reserves in the first quarter (*see* ¶¶145-158) was "belated" and "leave[s] an issue as to the degree that management is on top of the problems."

139.     Wachovia's April 14, 2008 Form 8-K constituted only a partial disclosure of the truth concerning the nature and extent of the credit quality problems with its Pick-A-Pay portfolio.  Indeed, at the same time that Wachovia began to disclose the true nature of its Pick-A-Pay portfolio, it took steps to assure investors that the portfolio did not pose a financial risk to the Company.  For example, in its April 14, 2008 Form 8-K, Wachovia assured investors that, notwithstanding the Form 8-K's new disclosures about the Pick-A-Pay portfolio, Wachovia maintained a "[c]onservative in-house appraisal and underwriting approach" for the Pick-A-Pay portfolio.  In addition, the Form 8-K again stated that Wachovia had a "strong liquidity and capital position" and a "very prudent liquidity profile."  These statements were materially untrue because in reality, *inter alia*, for all the reasons set forth above, Wachovia's underwriting and appraisal approach to the Pick-A-Pay portfolio was acutely high-risk rather than conservative, resulting in a massive exposure to borrowers who posed a significant risk of default.  Further, the value of the Pick-A-Pay portfolio was then impaired by tens of billions of dollars, thereby jeopardizing Wachovia's "well capitalized" status and posing a significant risk of insolvency.

140.     The last of the Offerings closed on May 29, 2008.  Just three days later, on June 2, Wachovia announced that its chief executive officer, Defendant Thompson, had "retired at the request of the Board."  The next day, *The Wall Street Journal* reported that Thompson had been "forced out" because the Company had failed to adequately disclose the dangerously poor credit condition of the Pick-A-Pay portfolio.  As *The Wall Street Journal* reported: "Mr. Thompson was slow to acknowledge how seriously the bank's credit profile was deteriorating, according to people close to the [Wachovia] board.  Data on the performance of Golden West's adjustable-rate mortgage portfolio – which Wachovia did not disclose separately after the acquisition – were far worse than internal projections had indicated, one of these people says.  Mr. Thompson

remained too optimistic about the company's prospects, this person says. '***What he has been telling the board hasn't been realistic****....*'" Wachovia announced Robert K. Steel as its new CEO roughly five weeks later.

141.    On June 18, 2008, Wachovia acknowledged that its loans were underwritten so poorly that it had to effectively re-underwrite them from scratch.  Specifically, on that day, *Bloomberg* reported that Wachovia was contacting borrowers who had applied through third-party brokers, which accounted for 30% of the Company's loan production, to "verify information" concerning the borrowers' ability to pay the loan and to ensure that its borrowers actually "understand" the key features of their loans, including how their loans were negatively amortizing.  *Bloomberg* quoted a mortgage banking expert as stating that Wachovia's need to re-contact borrowers to verify this basic information was "very unusual and almost unprecedented." As another commentator asked in the wake of this astonishing announcement, "Is it [their] customers who do not understand the risk of this product or Wachovia?"

142.    Soon thereafter, Wachovia effectively admitted that it was not capable of accurately valuing the Pick-A-Pay portfolio at all.  On June 23, 2008, Wachovia disclosed that it had hired Goldman Sachs to analyze the value of its loan portfolio.  The next day, June 24, Ladenburg Thalmann wrote in an analyst report that Wachovia was "supposed to be adept in what Goldman was hired to do.  Basically it is in the DNA of every bank to know how to handle troubled credits.  [By hiring Goldman Sachs,] ***Wachovia is admitting it does not know how to do this***."

143.    Just six days later, on June 30, 2008, Wachovia announced that it would stop originating Pick-A-Pay loans altogether and would waive all prepayment penalties for Pick-A-Pay borrowers so that they could refinance into conventional mortgage loans.  According to the

*Charlotte Observer*, an analyst at Sandler O'Neil Partners described this concession as "a capitulation on the Golden West model." Similarly, *BusinessWeek* reported that the move was "an admission that a lot of borrowers were put into loans that they either didn't understand or couldn't afford," and further noted that "in recent weeks, the deficiencies in Golden West's underwriting – for one, the [Company] didn't call employers to verify income – came to light."

144. As set forth more fully below in Section IV.D, in September 2008 the severe credit impairment in the Pick-A-Pay portfolio caused Wachovia to go into a death spiral, which culminated in the stunning revelations that the value of the portfolio was impaired by tens of billions of dollars, that Wachovia was effectively insolvent, and that it would require extraordinary action by the U.S. Government to prevent Wachovia from collapsing into bankruptcy. Unfortunately for investors, Wachovia's disclosures up to the end of the Offering Period about its Pick-A-Pay portfolio were materially untrue.

### B. The Offering Materials Reported Materially Understated Loss Reserves

145. Each quarter, Wachovia was required under GAAP to establish a loan loss reserve sufficient to cover probable losses in its mortgage portfolio. The level of Wachovia's loan loss reserve was material to investors because it reflected the Company's assessment of the quality of its mortgage portfolio. Further, Wachovia was required to account for any increase in its reserves by taking a charge against its income. The financial information contained or incorporated in each of the Offering Materials after the closing of the Golden West acquisition materially understated the Company's loss reserves.

146. Under Statement of Financial Auditing Standards ("SFAS") No. 5, Wachovia was required to establish a reserve when (i) "it is probable that an asset had been impaired . . . at the date of the financial statements," and (ii) "the amount of the loss can be reasonably estimated." A loan is impaired when it is probable that the lender is unable to collect all amounts due

according to the contractual terms of the loan agreement. SFAS No. 5 also requires detailed disclosures, including estimates of losses, even when losses on mortgage exposures are only "reasonably possible."

147. During the Offering Period, Wachovia failed to establish an adequate level of reserves. The following chart shows Wachovia's allowance for loans losses as a percentage of the total amount of its outstanding loans – including the significant decline in its reserves as measured by various key metrics that occurred beginning immediately after the closing of the Golden West acquisition during the fourth quarter of 2006:

| Period Ending | Allowance for Loan Losses (millions) | As % of net loans | As % of non-accrual/ restructured loans | As % of non-performing assets |
|---|---|---|---|---|
| 12-31-2004 | $2,757 | 1.23% | 289% | 251% |
| 3-31-2005 | $2,732 | 1.20% | 300% | 262% |
| 6-30-2005 | $2,718 | 1.18% | 332% | 284% |
| 9-30-2005 | $2,719 | 1.13% | 347% | 303% |
| 12-31-2005 | $2,724 | 1.05% | 439% | 378% |
| 3-31-2006 | $3,036 | 1.08% | 452% | 389% |
| 6-31-2006 | $3,021 | 1.07% | 488% | 421% |
| 9-30-2006 | $3,004 | 1.03% | 520% | 396% |
| -Golden West acquisition closes (October 2006)- | | | | |
| 12-31-2006 | $3,360 | 0.80% | 272% | 246% |
| 3-31-2007 | $3,378 | 0.80% | 213% | 194% |
| 6-30-2007 | $3,552 | 0.79% | 182% | 164% |
| 9-30-2007 | $3,505 | 0.78% | 135% | 120% |
| 12-31-2007 | $4,717 | 0.98% | 90% | 84% |
| 3-31-2008 | $6,567 | 1.37% | 84% | 78% |
| -Offering Period Ends in May 2008 (before release of Q2 financial statements)- | | | | |
| 6-30-2008 | $10,744 | 2.20% | 95% | 90% |
| 9-30-2008 | $15,351 | 3.18% | 109% | 102% |

148. As the above chart shows, from the end of 2006 through the end of 2007 – as the housing market was collapsing and defaults were increasing – Wachovia reported **significantly lower** reserves as a percentage of outstanding loans than it had maintained before acquiring Golden West's Pick-A-Pay portfolio. Indeed, from the closing of the Golden West acquisition

until the beginning of 2008, Wachovia reserved less than 1% of its outstanding loan amounts to cover losses associated with defaulting loans and loans whose default was probable – a decline from pre-merger levels. Wachovia's loan loss reserves as a percentage of non-accrual/restructured loans, and as a percentage of non-performing loans, declined even more sharply in the financial reporting periods following the closing of the Golden West acquisition in October 2006.

149. Notwithstanding these ratios, Wachovia assured investors in the Offerings that its reserve levels were adequate because the Company's loan portfolio was of higher quality than its competitors' portfolios. For example, in its 2006 Form 10-K, issued after the Golden West acquisition closed, Wachovia told investors that its reserve levels were appropriate because "[o]ur credit quality remained among the best in the banking industry." Similarly, in its 2007 Form 10-K, Wachovia stated that, when evaluating the adequacy of its reserves, "it is important to note the high percentage of our portfolio that is collateralized and our low level of uncollateralized loans on which industry-wide losses are typically high, such as credit card loans." Similarly, in its Form 10-Q for the first quarter of 2007, Wachovia assured investors in the Offerings that its modest reserve levels were appropriate because, "Credit quality remained strong…." Wachovia's repeated statements that its reserves were "maintained at levels that are adequate to absorb probable losses inherent in the loan portfolio" were also untrue.

150. It was only in the first quarter of 2008 that Wachovia began to increase its reserves in an effort to catch up to the reality of the Pick-A-Pay portfolio's low credit quality. Nonetheless, even as of March 31, 2008 (the end of the first quarter), Wachovia's reserves as a percentage of net loans were still only marginally higher than in 2004 when the housing market was still robust. Wachovia's drastic increase in its reserves after the end of the Offering Period –

and Wells Fargo's subsequent disclosure that more than *half* of the Pick-A-Pay portfolio was impaired (*see* ¶ 200) – confirm the inadequacy of Wachovia's allowance for loan losses.

151.    The amount of reserves specifically allocated to the Pick-A-Pay portfolio tells a similar story.  In the fourth quarter of 2007, Wachovia's loan loss reserve on its Pick-A-Pay portfolio of $824 million equaled only 0.68% of the outstanding loan balances represented by that portfolio.  By comparison, Wachovia reserved almost forty percent more for its overall loan portfolio (0.98%), which was less risky and more creditworthy than the Pick-A-Pay portfolio.  Although Wachovia increased its reserve by approximately $1 billion (from $824 million) to $1.96 billion (or 1.6%) on its Pick-A-Pay portfolio as of the end of the first quarter of 2008, this increase was also patently insufficient.  At the end of the next two quarters (*i.e.*, after the Offering Period), Wachovia increased its Pick-A-Pay reserve first to $5.21 billion (or 4.23%) and then to $8.65 billion (or 7.22%) – representing a four-fold increase compared to the end of the first quarter of 2008.

152.    Even Wachovia's September 30, 2008 reserve for the Pick-A-Pay portfolio was clearly insufficient, as Wells Fargo announced on October 2, 2008, before Wachovia's third quarter 2008 earnings release, that expected losses on that portfolio would be more than ***$30 billion***.  Indeed, as part of its purchase accounting in connection with its acquisition of Wachovia, Wells Fargo took an immediate writedown of $24.3 billion on the value of the Pick-A-Pay portfolio – an amount that was almost three times as high as Wachovia's third quarter 2008 Pick-A-Pay loan loss reserve and $9 billion larger than Wachovia's entire third quarter 2008 allowance for loan losses.

153.    Significantly, as Wells Fargo stated in its Form 10-K for 2008, filed on February 27, 2009, Wells Fargo took these massive write-downs because "[c]ertain of the loans acquired

from Wachovia have evidence of credit deterioration since origination and it is probable that we will not collect all contractually required principal and interest payments." In sum, Wells Fargo's independent reserve analysis confirmed that Wachovia's previously reported reserve levels for the Pick-A-Pay loan portfolio were woefully inadequate.

154. Moreover, during the Offering Period, Wachovia failed to take into account fundamental factors that were necessary for any reasonably reliable reserve computation. For example, Wachovia's methodology for calculating its reserves failed to take into account the deteriorating housing market and the specific characteristics of Pick-A-Pay borrowers – a failure that Wachovia first disclosed in the April 14, 2008 Form 8-K. There, Wachovia announced that it had changed the manner in which it calculated reserves to take into account two pre-existing conditions: (i) the sharp deterioration in housing prices which had been ongoing since 2006, and (ii) the common-sense proposition that borrowers are more likely to default when (as a result of declining real estate values and/or negative amortization) the borrower's mortgage balance approaches (or even exceeds) the market value of the underlying property. Wachovia acknowledged that, as a result of these new "refinements," it would "substantially" increase its loan loss reserves (and take a corresponding charge against income) in the first quarter of 2008.

155. In its subsequently filed Form 10-Q for the first quarter of 2008, Wachovia explained for the first time that its "new" loan loss methodology "strongly correlates forward expected losses to changes in the home prices and the resulting change in borrower behavior, and is less reliant on historical delinquency trends." Additionally, it stated that "the new model incorporates approximately 20 loan and/or borrower characteristics to further enhance loss forecasting by correlating borrower propensity to default and resulting loss severity to a widely

used home price index, and it connects borrower equity to projected changes in home prices by geographic region."

156.    Wachovia's change in its reserve methodology as of the end of the first quarter of 2008 amounted to a concession that it had previously failed to take into account: (i) the characteristics of its borrowers; (ii) the risky nature of its own underwriting and the ongoing sharp decline in housing prices; and (iii) that Wachovia had instead relied largely on outdated historical mortgage delinquency data.    The trends reflected by that outdated data were established during a period of rising housing prices, and were based on loans issued without the deficient underwriting standards that Golden West and Wachovia had employed to fuel an expansion of the Pick-A-Pay portfolio.    As a result, the historical data and trends upon which Wachovia's reserve methodology was largely predicated before April 2008 were not representative of the current portfolio, and therefore their application to the current portfolio materially understated Wachovia's reasonably estimable loan losses.    In addition, Wachovia's prior reserving methodology was contrary to SEC Staff Accounting Bulletin ("SAB") No. 102, Selected Loan Loss Allowance Methodology and Documentation Issues, which states that in setting reserves a company's management is to consider the following factors:

- *Levels of and trends in delinquencies and impaired loans;*
- Levels of and trends in charge-offs and recoveries;
- Trends in volume and terms of loans;
- *Effects of any changes in risk selection and underwriting standards, and other changes in lending policies, procedures, and practices;*
- Experience, ability, and depth of lending management and other relevant staff;
- *National and local economic trends and conditions;*
- *Industry conditions;* and
- Effects of changes in credit concentrations.

157.    Wachovia's prior reserve methodology also was contrary to the 2001 Expanded Guidance for Subprime Lending Programs issued by the Federal Deposit Insurance Corporation

("FDIC"), the Office of the Comptroller of the Currency, the Federal Reserve Board, and the Office of Thrift Supervision. This guidance, which emphasized the importance of ensuring that a financial institution's loan loss allowance represented "a prudent [and] conservative estimate of losses," specifically provided that, when using historical loss experience to estimate expected credit losses, the historical loss experience "should be adjusted for changes in trends, conditions, and other relevant factors, including business volume, underwriting, risk selection, account management practices, and current economic or business conditions that may alter such experience."

158. As noted above in ¶¶ 150-152, Wachovia continued to report materially understated and inadequate reserves even after it adopted its revised reserving methodology. Moreover, even as revised, Wachovia's methodology for determining the appropriate level of reserves continued to be neither prudent nor conservative. For example, in its April 14, 2008 Form 8-K, Wachovia stated that it had relied on housing data from the Office of Federal Housing Enterprise Oversight ("OFHEO") to assess the decline in the housing market for purposes of determining its reserves. However, the OFHEO index showed materially less severe declines in housing prices than other indices (such as the Case-Schiller index). Had Wachovia used a more appropriate housing price index (and appropriately taken into account, among other things, the characteristics of its borrowers and the risky nature of its own past underwriting), its loan loss reserves would not have been so woefully inadequate. Therefore, throughout the Offering Period, Wachovia reported materially inaccurate reserves.

## C. **Wachovia Misstated the Amount and Value of Its CDO and RMBS Holdings**

159. During 2006 and 2007, Wachovia created and underwrote approximately $10 billion of CDOs backed by subprime mortgages. However, the Offering Materials failed to disclose that, by mid-2006, Wachovia was unable to sell billions of dollars of subprime-backed

CDOs off its balance sheet. Accordingly, unbeknownst to Wachovia's investors, Wachovia retained more than *$6 billion* of the CDOs it had underwritten (but had been unable to sell), plus an additional *$2 billion* of RMBS backed by subprime mortgages. Until October 19, 2007, when it announced its first CDO write-down, the Offering Materials failed to disclose *any* information regarding the amount of this exposure, and Wachovia did not disclose the full extent of its CDO and RMBS holdings until January 22, 2008 – long after it had accumulated these unfavorable positions.

160. Wachovia's Offering Materials also failed to disclose the extent to which its CDO positions were impaired. Wachovia's CDO holdings consisted of more than $2 billion of CDOs that were first disclosed in November 2007, and a further $4.2 billion in CDOs that were disclosed on January 22, 2008 and purportedly "hedged" with counterparties. These "hedged" amounts included: (i) $2.2 billion of CDO exposure that was hedged with unnamed "monoline" insurers (which were in fact Ambac Financial Group, Inc. ("Ambac") and MBIA, Inc. ("MBIA"); (ii) $1.1 billion hedged with AIG; and (iii) $945 million hedged with an unidentified large European Bank.

161. Until the third quarter of 2007, Wachovia maintained its CDO positions on its balance sheet at par, even though relevant market indices which Wachovia itself ultimately cited as pertinent to CDO valuations showed that its CDO positions had suffered a substantial decline in value. Although Wachovia later wrote down the value of its unhedged CDOs by more than $1.6 billion, or almost 80%, at the end of the second quarter of 2008, as set forth at ¶¶ 172-182 below, that degree of impairment had existed since at least the fourth quarter of 2007.

162. Wachovia's assurances to investors that it had entered into effective hedging agreements and had transferred the risks of its "hedged" exposures were also materially untrue or

misleading, because the monoline insurers with whom Wachovia had entered into hedging transactions did not have the resources to make good on their commitments. Both Ambac and MBIA had insured CDO and non-prime RMBS issuances equal to many times the total amount of their respective firm's total capital and "claims paying resources."[9] Indeed, by January 2008, the financial condition of these insurers was so weak that the New York State Department of Insurance held a series of meetings with Wachovia and other financial institutions in an effort to bail out both Ambac and MBIA. Throughout the Offering Period, however, Wachovia failed to take *any* writedowns on its "hedged" CDOs based on Ambac's and MBIA's supposed guarantees. Ultimately, by the end of the third quarter of 2008, Wachovia recognized an additional $411 million in losses from its purportedly hedged CDO exposure.

### 1.     Overview of CDOs and RMBS

163.    A CDO is a structured finance vehicle holding a pool of underlying cash generating assets and issuing certificates paying a fixed amount of principal and interest. The securities that were issued in each CDO were divided into "super senior," "senior" and lower tranches. Super senior "tranches" are paid first from the cash flow generated by the CDO's underlying assets, with more junior tranches paid only after the more senior obligations had been satisfied. The assets supporting the CDOs of asset backed securities relevant to this case consisted principally of Residential Mortgage Backed Securities ("RMBS") backed by pools of subprime mortgages, which Wachovia referred to as "ABS CDOs." The quality and performance of the underlying mortgages in the RMBS collateral was a key factor in determining the CDO's performance.

---

[9]        "Claims paying resources" includes statutory capital, unearned premiums, the present value of future installment premiums, loss reserves and third party capital support facilities.

164.    Wachovia retained "super-senior" interests in both "mezzanine" and "high grade" CDOs.  A mezzanine CDO is created by pooling together junior tranches (BBB and sub-BBB rated) of subprime RMBS and other collateral.  This asset concentration means that a relatively small rise in underlying RMBS pool losses, *i.e.*, severe enough to wipe out the value of the junior RMBS tranches, would simultaneously destroy most of the value of the mezzanine CDO and impact the super-senior tranches.  By contrast, a "high-grade" CDO is based on subprime RMBS and other collateral with a credit rating of "A" or better.  However, the "super-senior tranches" in Wachovia's high-grade CDOs were cushioned by only 14% of more junior tranches (compared to a 38% cushion for the "super senior" tranches of its mezzanine CDOs), and therefore were also exposed to heavy losses when only a small amount of the underlying collateral deteriorated.

### 2.    Wachovia Misstated Its CDO Exposure

165.    By the end of 2005, as the housing market began its decline, investors had become increasingly concerned about the risks inherent in subprime-backed CDOs.  For example, the November 12, 2005 article in *The Wall Street Journal*, noted above at ¶ 82, reported that the "much less demanding" mortgage underwriting standards of the prior years were "putting everyone . . . at risk," including the "bond investors" who purchased mortgage-backed securities.  Specifically, the article noted that "[u]pon default, the lender loses.  In many cases the ultimate lender isn't a bank but a bond investor whose securities provide a return based on payments made out of a pool of mortgages."  Similarly, the February 15, 2006 *Barron's* article, also noted above at ¶ 82, reported that investors were experiencing "much anxiety" about "mortgage-backed securities," given the "easy lending practices" that had prevailed in recent years.  The article reported that "[v]arious doomsday scenarios are being posited" regarding CDOs backed by subprime mortgages, and warned that "[t]hese CDOs . . . could get completely wiped [out]."

166.     These problems continued – and grew worse – in 2006, as borrowers continued to default in record numbers.  A Standard & Poor's report for the third quarter of 2006 noted that mortgage lenders were experiencing rising delinquencies and early payment defaults.  In the first quarter of 2007, Moody's noted that "loans securitized in the first, second and third quarters of 2006 have experienced increasingly higher rates of early default than loans securitized in previous quarters."

167.     On February 15, 2007, Joseph R. Mason (a professor at Drexel University) and Joshua Rosner (a managing director of the investment bank Graham Fischer & Co.) published a widely circulated academic paper on CDOs.[10]  According to a February 18, 2007 article in *The New York Times*, Mason and Rosner found that "it is only a matter of time before defaults in mortgage pools hit returns in collateralized debt obligation pools."  Significantly, Mason and Rosner noted that "no one knows who is holding the risk," *i.e.*, who owned the CDOs.  *The New York Times* article concluded: "[u]nfortunately, the damage of the mortgage mania has been done and its effects will be felt.  It's only a matter of when."

168.     Despite the market's focus on the risks of subprime–related exposures, however, Wachovia did not disclose that it had retained any significant subprime CDO or RMBS exposure until late in the Offering Period, and stated then that it had minimized its subprime exposure.  Indeed, the only references to subprime exposure of any sort in Wachovia's first and second quarter 2007 Form 10-Qs were statements that the Company's results "reflect the divestiture of our subprime mortgage servicing operation in late 2006."  In Wachovia's conference calls, the Company also downplayed its subprime exposure.  For example, on January 30, 2007, Defendant Thompson stated that "***we're not in the sub-prime market,***" and on July 20, 2007, Defendant

---

[10]     *See* Mason & Rosner, *How Resilient Are Mortgage-Backed Securities to Collateralized Debt Obligation Market Disruptions?* (Feb. 15, 2007).

Truslow stated that "*We don't have a subprime focus* in our business" and that "we've actively managed our business to *minimize our exposure to the subprime market*."[11]

169.    It was not until October 19, 2007 that Wachovia gave any indication of its exposure to substantial holdings of subprime CDOs and RMBS.  In a Form 8-K filed that day, Wachovia disclosed that it had suffered market valuation losses caused by "market disruption" in the capital markets, including "$438 million writedown of CDOs, collateralized loan obligations and other structured credit products."  However, Wachovia did not disclose the amount of its CDO or RMBS exposures, but only the aggregate amount of these and various write-downs.

170.    Wachovia's next disclosures relating to its CDO exposure were in a Form 8-K and Form 10-Q filed on November 9, 2007.  In a table in the filings, Wachovia reported that its *net* ABS CDO and subprime RMBS exposures as of September 30, 2007 were $1.79 billion and $2.5 billion, respectively.  These figures had never before been disclosed.  Wachovia also reported that its net CDO exposures had been reduced to $680 million after factoring in a $1.1 billion October valuation decline.  A footnote to the table stated that these totals excluded CDO exposures guaranteed by "AAA rated financial guarantors," but nothing warned investors that Wachovia's total remaining exposure was in fact many times greater than the $680 million that was disclosed.

171.    Wachovia finally disclosed its total CDO exposure in a presentation on January 22, 2008.  On that date, Wachovia disclosed that, after subtracting its third and fourth quarter 2007 writedowns, Wachovia's remaining ABS CDO *gross* exposure was $5 billion – or more

---

[11]        By contrast, once Wachovia disclosed its subprime CDO positions, it included the following additional belated disclosure in its 2007 Form 10-K:  "While we do not operate a subprime residential origination channel, we have purchased subprime residential assets such as RMBS as part of our CDO distribution strategy."

than *seven times greater* than the net amount identified in Wachovia's November disclosure.[12] The $5 billion included a previously undisclosed $4.178 billion of exposure "hedged with financial guarantors." As set forth below, however, the monoline financial insurers that guaranteed much of this "hedged" exposure were in financial distress, and lacked the ability to cover more than a fraction of defaults on these purportedly "hedged" CDOs.

### 3.    Wachovia Overstated the Value of Its CDO Portfolio

172.    Even though Wachovia finally reported its gross CDO exposure beginning in January 22, 2008, it continued to significantly overstate the value of its CDOs by failing to record these subprime-related assets at fair market value. These misstatements, in turn, resulted in corresponding overstatements of Wachovia's pre-tax income, net income, earnings per share, total assets, retained earnings and total shareholders' equity on the Company's financial statements. They also inflated Wachovia's reported Tier 1 capital ratios.

173.    Wachovia reported that it primarily recorded its structured investments, which included its CDOs, at fair value. Pursuant to SFAS No. 115, "*Accounting for Investments in Certain Debt and Equity Securities*," securities that are bought and held principally for the purpose of being sold in the near term are to be classified as "trading securities." This includes all mortgage-backed securities retained after the securitization of mortgage loans held for sale, regardless of whether the enterprise intended to sell those securities or hold them as long-term investments. (*See* SFAS No. 134, "*Accounting for Mortgage-Backed Securities Retained after the Securitization of Mortgage Loans Held for Sale by a Mortgage Banking Enterprise*.") GAAP requires such trading securities to be carried at fair value in a Company's statement of financial condition, and all mark-to-market (unrealized) gains and losses on trading securities must be

---

[12]    Adding back write-downs, Wachovia's gross ABS CDO exposure was $6 billion and its net (*i.e.*, unhedged) ABS CDO exposure was more than $2 billion.

recognized in the current period's income statement. Consequently, Wachovia was required to carry its subprime assets at "fair value" in its Statement of Financial Position.

174.    SFAS No. 157, "*Fair Value Measurement*," issued in September 2006 and effective January 1, 2008, defines "fair value" as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."  "At the measurement date" means that fair value must reflect the conditions that exist as of the date of the relevant balance sheet.  SFAS No. 157 emphasizes that fair value is "not an entity specific measurement," and "should be determined based on the assumptions that market participants would use in pricing the asset or liability."  Although SFAS No. 157 did not become formally effective until January 1, 2008, it reflected essentially the same definition of fair value as had previously existed under GAAP, including SFAS 107, "Disclosures about Fair Value of Financial Instruments."

175.    Under SFAS No. 107, quoted market prices are the best indication of fair value. In the absence of quoted market prices, a company is required to develop its "best estimate" using comparable values or pricing models, including using values based on similarly traded instruments or information obtained from pricing services.  As set forth below, however, Wachovia's reported valuations for its CDO holdings were inflated and not presented in accordance with GAAP because they were inconsistent with readily available market data.

176.    In January 2006, some of the leading commercial and investment banks, including Wachovia, entered into a collaborative effort with Markit Group Ltd., a provider of financial data, to launch the first asset-backed securities index, which came to be known as the "ABX Index."  The ABX Index measures the value of subprime RMBS by measuring the cost of purchasing "credit protection" or "insurance" for representative subprime RMBS that are part of

the Index.  As the price of buying credit protection for the RMBS increases, the ABX index declines.  Separate ABX Indices exist for each of the main underlying tranches within the underlying RMBS, based on those tranches' credit-ratings, with the result that there is an AAA ABX Index, an AA ABX Index, etc., down to the BBB- ABX Index.  Each Index's RMBS tranches (reflecting ratings from AAA to BBB-) are considered to be representative of other RMBS product tranches backed by subprime collateral with the same rating.

177.    The "TABX Index," launched in February 2007, tracks the value of the BBB and BBB- tranches of the ABX indices, but *also* takes into account varying levels of subordination. Like CDOs, which include senior and junior tranches, the TABX Index accounts for high levels of subordination and therefore provides a benchmark for the valuation of senior CDO positions such as those owned by Wachovia.  The most senior index is the TABX.HE 07-1 06-2 40-100 (the "40-100 TABX"), because that index is tied to underlying RMBS collateral with a subordination level of 40%.  The 40% subordination level is actually somewhat higher than the subordination level associated with Wachovia's CDO holdings, and therefore provides a conservative benchmark against which to assess the value of the Company's CDOs.

178.    The ABX and TABX indices were objective, directly observable, ***real-time*** indicators of the value of Wachovia's closely analogous CDO holdings.  These indices were closely tracked by banks, investment banks, and other market participants in the mortgage market.  Similarly, the SEC considered the ABX a "relevant market ind[ex]" for CDO valuation[13] and Wachovia ***itself*** noted the relevance of these indices beginning in its November 9, 2007 Form 10-Q and Form 8-K, in which it stated:

> In October, rising defaults and delinquencies in subprime residential mortgages and rating agencies' downgrades of a large number of subprime

---

[13]    *See* March 2008 "Dear CFO" letter from SEC to public companies, available at http://www.sec.gov/divisions/corpfin/guidance/fairvalueltr0308.htm.

residential mortgage-related securities led to unprecedented declines in the ABX subprime indices that contributed to a rapid decline in the valuations of subprime RMBS and ABS CDOs.

179. By February and March 2007, the ABX Index for RMBS tranches rated BBB and BBB- had suffered significant declines, with some BBB- tranches dropping as much as 60%. By September 30, 2007, the ABX BBB Index had fallen to 30% of par, and this decline continued during subsequent quarters.

180. The TABX indices also plunged. From inception in February 2007 until June 30, 2008, the 40-100 TABX simply collapsed, falling to less than 35% of par by September 28, 2007, to less than 18% of par by December 31, 2007, and to less than 10% of par by March 31, 2008:

| Date | Value (100 = 100% of par) |
|---|---|
| 3/30/2007 | 83.8 |
| 6/29/2007 | 69.08 |
| 9/28/2007 | 34.25 |
| 12/31/2007 | 17.25 |
| 3/31/2008 | 9.22 |
| 6/30/2008 | 5.75 |

181. The downward spiral of the ABX and TABX indices, combined with the collapse of the U.S. housing market, made it clear that the value of ABS CDOs were declining significantly beginning no later than the first half of 2007. GAAP required Wachovia to timely write-down the value of its CDO holdings to fair value in accordance with SFAS No. 115 and, later, No. 157. Nonetheless, Wachovia did not take its first write-downs of its CDO holdings until October 19, 2007, at which time Wachovia reported a $430 million "market disruption loss" from CDOs and other structured credit products. As Wachovia later disclosed, $230 million of

this amount related to its ABS CDO and other subprime-related holdings.[14] Even allocating the entire $230 million writedown to Wachovia's net (*i.e.*, non-"hedged") ABS CDO-related exposure, that writedown was hundreds of millions of dollars less than required as indicated by the collapse of the applicable market indices. For example, using the decline in the TABX 40-100 as a reasonable proxy for the decline in the value of Wachovia's CDO holdings, the cumulative writedown as of September 30, 2007 should have been ***$1 billion*** larger.

182. The same pattern continued throughout the balance of the Offering Period. Specifically, as of the fourth quarter of 2007 and first quarter of 2008, Wachovia took cumulative writedowns on its non-"hedged" ABS CDO-related positions of $1.048 billion and $1.387 billion, respectively. Based on the 40-100 TABX index, however, these writedowns should have been closer to $1.7 billion and $1.9 billion, respectively. As a result, the value of Wachovia's net ABS CDO holdings, even after taking into account Wachovia's writedowns, were overstated by ***more than 50%*** for the fourth quarter of 2007 and first quarter of 2008.

183. Wachovia also overstated the value of its "hedged" CDOs by failing to consider the counterparty credit risk associated with the significant amount of monoline "hedges" it maintained on its positions. The monoline insurers' traditional business had been insuring bonds issued by government authorities. However, the monoline insurers turned increasingly to insuring CDOs and RMBS, issuing guarantees on these assets that were equal to many times their available capital or claims paying resources. The monoline insurers therefore had a very small margin for error, as losses in the riskiest portions of their insured CDO and RMBS portfolios would wipe out their capital and destroy their ability to operate.

---

[14]    On November 9, 2007, Wachovia disclosed that $347 million of this writedown was for its ABS CDO portfolio. However, on April 22, 2008, Wachovia corrected that amount to $230 million. The $347 million total included writedowns on Wachovia's ABS CDO portfolio and also a $120 million writedown of the value of Wachovia's investment in its BluePoint Re insurance subsidiary ("BluePoint").

184.     MBIA, for example, was one of the largest monoline insurers (and one that Wachovia used to "hedge" its exposure).  As of June 30, 2007, MBIA insured nearly $1 ***trillion*** in obligations, including $36.3 billion principal amount of U.S. RMBS and $53.4 billion of U.S. CDOs.  By contrast, however, MBIA's capital base was only $6.55 billion, and its total "claims paying resources" amounted to only $14.6 billion.  Similarly, Ambac's statutory capital as of June 30, 2007 was $6.7 billion and its total "claims paying resources" were $13.5 billion – yet Ambac issued $943 billion of financial guarantees, which included guarantees on $50.5 billion principal of U.S. CDOs and $47 billion principal of U.S. RMBS.  In other words, Wachovia was hedging its exposure with entities that posed an enormous risk of default themselves.

185.     The paper thin margin for error at the monoline insurers was noted at the time by investment community commentators.  On March 14, 2007, *The Wall Street Journal* reported that "[t]raders were looking for trouble in two insurers with exposure to the mortgage industry, MBIA Inc. and MGIC Investment Corp., which were perceived as vulnerable to a wave of defaults."  Similarly, in a May 2007 presentation entitled "Who's Holding the Bag?," which was widely reported in the financial press, hedge fund manager William Ackman asserted that MBIA and Ambac were "effectively insolvent" on account of predicted losses arising from their insurance of CDOs and RMBS.

186.     On January 24, 2008, *The Wall Street Journal* reported that New York State regulators were "trying to spur a Wall Street bailout of bond insurers," and that "[t]he bond insurers' solvency has become one of Wall Street's biggest preoccupations."  A *Bloomberg* article the same day reported that representatives from Wachovia and other financial institutions attended a two-hour meeting convened by the New York State Insurance Superintendent to discuss a rescue of the bond insurers.

187.    Indeed, Wachovia's own wholly-owned monoline subsidiary, BluePoint, was one of the first to collapse under the weight of CDO guarantees. Wachovia created and initially capitalized BluePoint with $300 million. BluePoint functioned not only as a primary monoline, in which capacity it guaranteed counterparties' CDO exposures, but also as a reinsurer, in which capacity it re-insured other monolines' exposure. Over the third and fourth quarters of 2007, Wachovia was forced to write down the entirety of its investment in BluePoint and subsequently refused to provide any further funding. BluePoint's financial collapse beginning in the third quarter of 2007 provided further confirmation that Wachovia's monoline CDO hedges were impaired.

188.    Wachovia did not report any reserves based on its monoline exposures until after the end of the second quarter, when in its August 11, 2008 Form 10-Q it reported that, "in the first half of 2008, we recorded $166 million of reserves based on monoline exposure profiles and our assessments of the credit quality of each monoline." Wachovia recorded an additional $245 million of reserves for monoline exposure at the end of the third quarter. The more than $400 million in reserves that Wachovia eventually established represented approximately 20% of the gross value of the ABS CDO positions that Wachovia had previously represented were fully hedged by "highly rated" monoline insurers. Combined with Wachovia's losses on its non-"hedged" CDOs, Wachovia ultimately recognized CDO-related losses totaling more than $2.2 billion by the end of the third quarter of 2008.

**D.    The Offering Materials Erroneously Assured Investors that Wachovia Was Well-Capitalized, and Omitted to Disclose that Its Mortgage-Related Exposures Jeopardized Its Tier 1 Capital**

189.    By no later than the end of 2007, Wachovia's exposure to billions of dollars of severely impaired mortgage-related assets had substantially impaired the Company's Tier 1 capital ratio. Nevertheless, Wachovia inaccurately assured investors in the Offering Materials

that Wachovia maintained a comfortably "well capitalized" position, with excess liquidity that it could make available to financial markets notwithstanding recent market disruptions.

190.    For example, in Wachovia's 2007 Form 10-K, it represented that "[o]ur balance sheet is strong and well capitalized under regulatory guidelines with a tier 1 capital ratio of 7.35 percent."  The 2007 Form 10-K also stated that "[w]e remain well positioned in a challenging environment with a strong liquidity position and capital levels."  Further, in a press release attached to the April 14, 2008 Form 8-K, Wachovia's chief executive officer, Defendant Thompson, stated that Wachovia's capital position was so strong that "[w]e have generally been a provider of liquidity to the market during the period of market disruption."  The Form 8-K itself underscored Wachovia's "strong liquidity and capital position" and "very prudent liquidity profile," and stated that the purpose of the April 17, 2008 Offering was "to invest and drive future earnings growth," rather than to remedy a capital shortfall.

191.    Based on these statements, analysts and investors were repeatedly reassured that Wachovia was indeed well capitalized.  For example, on April 27, 2008, Deutsche Bank upgraded Wachovia from "hold" to "buy" "for the first time in seven years" precisely because "[n]o more capital raises are needed."  Likewise, on April 15, 2008, an analyst report issued by Punk Ziegel reported that management had stressed that "there will be no likelihood of further capital increases and that ultimately the new capital can be leveraged to drive earnings higher," and concluded that Wachovia was "a healthy bank."

192.    Shortly after the Offering Period ended on May 29, 2008, financial analysts questioned whether Wachovia's Tier 1 capital levels and "well capitalized" status were in jeopardy due to undisclosed losses and related problems in its mortgage portfolio.  On July 15, 2008, Oppenheimer downgraded Wachovia from "Perform" to "Underperform," and questioned

whether Wachovia's loss assumptions for its Pick-A-Pay portfolio were "too aggressive," noting that the Company's peer banks had used lower "asset value assumptions."  Oppenheimer noted that the "disparity" between Wachovia's accounting and that of its peer banks raised "concerns" about Wachovia's "capital."  Later that day, Wachovia issued a statement, reported in *Bloomberg*, dismissing these concerns and reassuring investors that Wachovia was "fundamentally strong."

193.    On September 14, 2008, Deutsche Bank downgraded Wachovia and questioned whether losses in the Pick-A-Pay portfolio were significantly larger than the Company had disclosed, causing "concerns about its capital."  The next day, September 15, Lehman Brothers announced plans to file for bankruptcy and Merrill Lynch was purchased by Bank of America, both because of toxic mortgage exposures.  An Oppenheimer analyst appeared on CNBC and was asked, "Who's next and most vulnerable?"  The analyst specifically cited Wachovia because her most recent analysis indicated that the Company's mortgage-related assets were worth significantly less than reported, stating that she was "curious … of their math" regarding reserves and asset values, and that Wachovia "will have to play catch-up" in properly reporting its losses. In response, Wachovia's new chief executive officer, Mr. Steel, appeared on CNBC later that day and countered that only "$10 billion out of over $500 billion" of Wachovia's loans were "problematic," and that these troubled loans were in the *commercial* portfolio.  The Pick-A-Pay portfolio, he stated, "will yield quite attractive returns over time," and thus, Wachovia had a "great future as an independent company."

194.    Just ten days later, on September 25, 2008, federal regulators seized the country's second-largest holder of option ARMs behind Wachovia, Washington Mutual ("WaMu"), and engineered its sale to JPMorgan Chase.  JPMorgan Chase immediately marked WaMu's option

ARM portfolio down by more than 20%. Because WaMu's and Wachovia's option ARM portfolios were similar, market analysts immediately expressed concern that Wachovia's mortgage portfolio was similarly impaired by 20% – or by approximately $24 billion. On September 26, Deutsche Bank reported that JPMorgan's accounting for WaMu's portfolio provided "increased visibility of the likely embedded risks in [Wachovia's] ARM portfolio," and caused concern "about [Wachovia's] liquidity and solvency." On September 27, 2008, *The Wall Street Journal* reported that "it's hard to make the case that [Wachovia's] portfolio is going to perform better" than WaMu's.

195.    After the September 25, 2008 announcement, Wachovia's executives quickly engaged in expedited merger discussions with Citigroup and Wells Fargo, but neither company was willing to assume Wachovia's toxic assets, leaving a Government-engineered bailout or bankruptcy as Wachovia's only options. According to an affidavit filed by Steel in connection with subsequent litigation between Citigroup and Wells Fargo, the Chairman of the FDIC contacted Steel on Sunday, September 28, 2008 (three days after regulators had seized WaMu and less than two weeks after Steel's appearance on CNBC), to inform him that Wachovia's financial condition was so dire that it "posed a systemic risk to the banking system," that "no transaction with Citigroup or Wells Fargo could be effected without substantial government assistance," and that the Government would therefore provide such assistance to try to prevent Wachovia's dire financial situation from bringing down the rest of the U.S. banking system. Steel's affidavit further stated that without the subsequent guarantees provided by the Government, Wachovia would have been immediately "[placed] into ***bankruptcy*** and its banking subsidiaries into ***receivership***."

196.     On or about September 29, 2008, the Government brokered a deal between Wachovia and Citigroup in which Wachovia agreed to sell its operations, excluding its retail brokerage and capital management business, to Citigroup for $1 per share.  As part of the deal, the FDIC agreed to indemnify Citigroup for any loan losses exceeding $42 billion – which (i) indicated that there was serious risk that the total amount of Wachovia's probable losses on its loan portfolio was even greater than this amount, and (ii) effectively confirmed in any event that the total amount of Wachovia's probable losses on its loan portfolio was vastly in excess of Wachovia's current reserves.

197.     Analysts and the financial press immediately recognized that these events demonstrated that Wachovia's repeated prior representations about its loan portfolio and capital adequacy could not have been true.  On September 29, CNBC reported that chief executive officer Steel "couldn't see how bad his own balance sheet was.  He just didn't know what was there."  "The only thing investors can trust is a company's financials, [CNBC's Jim] Cramer said, and like Lehman Brothers, Wachovia's financials 'just didn't reflect reality.'"

198.     On September 30, the Internal Revenue Service announced a change in its tax regulations which allowed an acquirer of a banking corporation to accelerate the deduction of the banking corporation's pre-existing losses as an offset against the acquirer's own income, rather than having to take partial deductions of those losses over 20 years.  This change in tax law effectively meant that an acquirer of Wachovia could use all of Wachovia's pre-existing losses to immediately reduce the acquirer's tax liabilities.  As a direct result of this change, three days later, on October 3, 2008, Wells Fargo announced that it had agreed to purchase Wachovia in its entirety for $7 per share.  Wells Fargo also immediately announced that, directly contrary to statements in the Offering Materials that the Company was well-capitalized and that the Pick-A-

Pay portfolio posed no threat to its capital, Wells Fargo would have to recognize ***$31 billion*** in losses on the Pick-A-Pay portfolio.

199. On October 22, 2008, Wachovia disclosed additional information regarding the significant impairment to its mortgage-related assets. That day, the Company reported that, for the quarter ended September 30, it had recognized a staggering loss of $23.9 billion. The loss included charges to income to reflect the belated recognition of a $12.3 billion impairment to goodwill (which was related largely to the Golden West acquisition and is described further below), and a $6.6 billion credit loss provision, of which $3.4 billion related to an increase in the loan loss reserves on the Pick-A-Pay portfolio. On October 22, Ladenburg Thalmann described the resulting loss as **"one of the largest losses recorded by any bank in history**."

200. After closing the Wachovia acquisition, Wells Fargo recorded substantial write-downs that further confirmed that Wachovia's mortgage-related assets were far more impaired than the Company had previously disclosed. Specifically, on January 28, 2009, Wells Fargo reported that, as part of its purchase accounting, it had identified an immediate "credit impaired loan balance" of almost ***$94 billion*** with respect to Wachovia's residential mortgages and real-estate related commercial loans, and that ***$59.8 billion*** of this amount involved pre-existing impairments in the Pick-A-Pay portfolio. In other words, of Wachovia's $117.5 billion portfolio of outstanding Pick-A-Pay loans, ***more than half*** ($59.8 billion or approximately 50.8%) had been credit impaired. Wells Fargo also took an immediate write-down on the value of the Pick-A-Pay loan portfolio of ***$24.3 billion*** – on top of a $1.2 billion year-end charge-off taken in Wachovia's year-end financial statements – resulting in total additional year-end write-downs on the Pick-A-Pay portfolio alone of ***$25.5 billion***.

### E.     <u>Wachovia Misstated Its Goodwill</u>

201.    In addition to increasing the size of Wachovia's loan portfolio, Wachovia's acquisition of Golden West dramatically increased the size of the reported "goodwill" on the Company's balance sheet by almost $15 billion. Yet, Wachovia did not write down ***any*** of the goodwill related to the Golden West acquisition until October 2008, after Wachovia's near-collapse.

202.    Goodwill represents the excess of the purchase price over the fair value of the net assets acquired in a business combination. Companies account for their business combinations using the purchase method of accounting as set forth in FASB Statement of Financial Accounting Standards ("SFAS") No. 141, *Business Combinations*. The assigned amounts may be adjusted for a period of up to one year after the date of the acquisition if new information becomes available as to the actual fair value amounts of the assets or liabilities as of the date of the acquisition. The excess of the purchase price over the fair value of the net assets acquired is recognized as an asset called goodwill. SFAS No. 141 ¶¶B101 - 114.1.

203.    Thereafter, companies are required to account for their goodwill in accordance with SFAS No. 142, *Goodwill and Other Intangibles*. Companies must test goodwill annually for impairment and on an interim basis when "circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount." "A significant adverse change in legal factors or in the business climate" is an event or indicator that would require a company to test its goodwill on a more frequent basis than once a year. SFAS No. 142 ¶28. Given the deteriorating mortgage market, that clearly happened here.

204.    Testing for goodwill impairment is a two-step process. The first step compares the fair value of a reporting unit with its carrying amount. SFAS 142 ¶19. If the carrying value of the reporting unit including goodwill exceeds its fair value, then, in the second step, the

amount of impairment (*i.e.*, excess over fair value) is determined.  SFAS 142 ¶19.  Fair value is "the amount at which the unit as a whole could be bought or sold in a current transaction between willing parties."  SFAS No. 142 ¶23.  If quoted market prices are not available, the estimate of fair value must be "based on the best information available" including for example "prices for similar assets and liabilities."  SFAS No. 142 ¶24.

205.     For purposes of Wachovia's goodwill impairment analysis, the $15 billion of goodwill from the Golden West acquisition was allocated to Wachovia's General Bank Retail and Small Business unit (the "Retail and Small Business Unit").  In conducting goodwill testing for this unit, Wachovia failed to properly value its Pick-A-Pay loan portfolio by understating loan loss provisions.  At the time of the acquisition, an astounding 95% of Golden West's reported fair value of its assets belonged to its loan portfolio.  As of October 1, 2006, Golden West reported a total loan portfolio of $124 billion while only recording an allowance for loan losses of $303 million or *less than a quarter of a percent* **(0.24%).**  Golden West's assets were therefore grossly overstated on Wachovia's balance sheet due to the gross understatement of its loan loss reserves from the moment the acquisition closed.

206.     Wachovia first publicly reported goodwill associated with Golden West in its 2006 Form 10-K, which was filed on March 1, 2007.  By year-end 2006 and throughout 2007, the quality and condition of the Pick-A-Pay loan portfolio continued to deteriorate materially.  This deterioration, along with the significant disruption in the real estate market, clearly indicated that the fair value of the goodwill for the Retail and Small Business Unit was less than its carrying amount.

207.     In fact, Wachovia actually increased the goodwill balance for the Retail and Small Business unit by a net $19 million during 2007.  It did so despite the growing evidence indicating

that serious problems existed at the time of the acquisition with the Pick-A-Pay portfolio, which had only worsened as the housing market continued to decline. Indeed, even though interim impairment testing should have been conducted, Wachovia failed to conduct impairment tests as of March 31, 2007, June 30, 2007 and September 30, 2007, and it failed to record required goodwill impairment charges in those quarters. Even at March 31, 2008 – a time when Wachovia was seeking to reign in its Pick-A-Pay underwriting and starting to recognize more substantial losses on the Pick-A-Pay portfolio – Wachovia – even though it conducted impairment testing – failed to recognize any impairment to the Retail and Small Business Unit's goodwill.

208. Ultimately, in the third quarter of 2008, Wachovia reported an astonishing $23.88 billion loss – one of the largest quarterly losses ever reported by a U.S. company, including an $18.8 billion write-down of goodwill.[15] The goodwill impairment was prompted in part by Wells Fargo's agreement to acquire all of Wachovia for approximately $15.1 billion – a sum that was $9 billion *less* than Wachovia had paid for Golden West only two years earlier. On October 23, 2008, in a *Wall Street Journal* article entitled "Crisis on Wall Street – Wachovia's Last Act: $23.88 Billion Loss," banking analyst Nancy Bush of NAB Research LLC responded to the Company's goodwill impairment charge: "It is the absolutely positive, objective confirmation of how bad a deal that actually was. It was a company killer."

209. Of the $18.8 billion goodwill write-down, $12.3 billion related to the Retail and Small Business Unit. Because the $12.3 billion writedown was equal to 51% of that unit's total goodwill, at a minimum, *at least* $7.6 billion ($15 billion times 51%) related to Golden West. Had Wachovia recorded the Pick-a-Pay losses on a timely basis, then such losses would have

---

[15] The $18.8 billion includes $12.3 billion related to the Retail and Small Business reporting unit and $6.5 billion related to other reporting units.

been recorded in substantially earlier periods, reducing the fair value of the Retail and Small Business Unit, and resulting in substantially earlier goodwill impairment charges.

## V.    SUMMARY OF WACHOVIA'S SECURITIES OFFERINGS

210.    The Securities Act claims are brought on behalf of investors who purchased Bond Class Securities pursuant or traceable to the Offerings set forth in the Appendix.

211.    Each of the Offerings was conducted pursuant to (a) a Shelf Registration Statement and Prospectus, filed with the SEC on Form S-3 on either (i) March 14, 2005, (ii) May 26, 2005, (iii) February 7, 2007, (iv) March 5, 2007, or (v) April 14, 2008, and (b) either a prospectus supplement or pricing supplement issued in connection with such Offering. (The documents referred to in (a) and (b) above for each respective Offering are collectively referred to herein as the "Shelf Registration Statements"). The "effective date" of each of the Shelf Registration Statements, as that term is defined under the Securities Act, is the date of the relevant Offering, rather than the earlier date on which the Shelf Registration Statement itself was filed. *See* 17 C.F.R. § 230.415 and 17 C.F.R. § 229.512(a)(2).

212.    A so-called "shelf registration" pursuant to Form S-3 permits an issuer to register numerous different securities for later issuance in a single SEC filing. Once this "shelf" is established, the issuer may later "take down" securities from the shelf by issuing them to the public pursuant to a later-filed prospectus, prospectus supplement, and/or pricing supplement that refers investors to the underlying and previously filed Form S-3.

213.    Each of the Prospectuses expressly incorporated by reference Wachovia's most recent Form 10-K and certain Form 10-Qs and 8-Ks filed before the date of the Prospectus. Additionally, each of the Prospectuses contained the following or materially similar language:

The SEC allows us to "incorporate by reference" into this prospectus the information in documents we file with it. This means that we can disclose important information to you by referring you to those documents. The information incorporated by reference is considered to be a part of this prospectus and should be read with the same care. When we update the information contained in documents that have been incorporated by reference by making future filings with the SEC, the information incorporated by reference in this prospectus is considered to be automatically updated and superseded. … We incorporate by reference the documents listed below and any documents we file with the SEC after the date of this prospectus under Section 13(a), 13(c), 14, or 15(d) of the Securities Exchange Act of 1934 (the "Exchange Act") and before the date that the offering of securities by means of this prospectus is completed (other than, in each case, documents or information deemed to have been furnished and not filed in accordance with SEC rules)[.]

214.    Wachovia's financial results were filed with the SEC pursuant to Forms 8-K, 10-Q, and 10-K.  In its Form 8-Ks reporting the Company's earnings, Wachovia often limited the portions of exhibits that were to be deemed "filed" (and thereby incorporated by reference into the Offering Materials) to Wachovia's income statement and balance sheet, rather than the full texts of attached press releases and other materials.  In its Forms 10-Q and 10-K, Wachovia generally incorporated by reference the Management Discussion of Results & Operations ("MD&A") and financial statements contained in its quarterly earnings supplements and annual reports.

215.    For each Offering, the Shelf Registration Statement and Prospectus on Form S-3, and the prospectus supplement or pricing supplement, together with all of the portions of other SEC filings incorporated by reference therein, are referred to collectively as the "Offering Materials."  The SEC filings containing material misstatements or omissions that were incorporated in the Shelf Registration Statement and Prospectuses for each of the respective Offerings are set forth in the attached Appendix.

## VI.  MATERIALLY UNTRUE STATEMENTS AND OMISSIONS IN THE OFFERING MATERIALS

### 1.  Defendants' Materially Untrue Statements Made On or Before the Closing of the Golden West Acquisition On October 1, 2006

216.    On May 8, 2006, Wachovia filed a Form 8-K with the SEC announcing its intent to merge with Golden West (the "May 8, 2006 Form 8-K").  The May 8, 2006 Form 8-K included as an exhibit a press release, dated May 7, 2006, entitled "Wachovia to Acquire Golden West Financial, Nation's Most Admired and 2nd Largest Savings Institution," which was incorporated by reference into the Form 8-K.  The press release stated, in relevant part, that "[t]he combined company … will have assets of $669 billion and a market capitalization of $117 billion."  The press release quoted Defendant Thompson stating that both Wachovia and Golden West were "known for exceptional customer service and *pristine credit quality*" and that, "[f]or four decades, Golden West has taken industry-wide challenges in stride and maintained a singular focus as a *risk-averse residential mortgage* portfolio lender."  The press release further stated that Golden West was one of the nation's largest financial institutions with assets over $125 billion as of March 31, 2006.

217.    On May 19, 2006, Wachovia filed a Form 8-K with the SEC (the "May 19, 2006 Form 8-K") reporting certain financial information and further describing Wachovia's pending merger with Golden West.  The May 19, 2006 Form 8-K incorporated by reference an exhibit showing "Pro Forma Financial Information" regarding the Wachovia-Golden West merger as of March 31, 2006.  According to the exhibit, the pro forma value of the merged company's loans net of unearned income as of March 31, 2006 was $402 billion, with an allowance for loan losses of only $3.3 billion.

218.    The statements from May 2006 set forth above in ¶¶ 216-217 above were materially untrue and misleading because, *inter alia*: (i) far from having "pristine credit quality"

that reflected a "risk averse residential mortgage portfolio lender," Golden West engaged in high risk underwriting and had massive exposure to borrowers who were at high risk of default, as set forth in greater detail in ¶¶ 94-132 above; and (ii) Wachovia's statements concerning the value of Golden West's assets and of the combined companies' loans net of unearned income were massively overstated, and the combined companies' pro forma allowance for loan losses was massively understated (particularly with respect to Golden West's Pick-A-Pay portfolio), for the reasons set forth in ¶¶ 145-158.

219.    On October 2, 2006, Wachovia filed a Form 8-K with the SEC reporting the completion of its merger with Golden West (the "October 2, 2006 Form 8-K"). The October 2, 2006 Form 8-K incorporated by reference an exhibit showing "Pro Forma Financial Information" regarding the Wachovia-Golden West merger as of June 30, 2006. According to the October 2, 2006 Form 8-K, the pro forma value of the merged company's loans net of unearned income as of June 30, 2006 was $405 billion, with an allowance for loan losses of $3 billion. The October 2, 2006 Form 8-K also incorporated by reference the July 24, 2006 Proxy Statement for the Wachovia acquisition of Golden West (the "GW Proxy Statement"), which made a series of statements about the quality of Golden West's "Pick-A-Pay" mortgage portfolio, including that the merger would "diversify Wachovia's balance sheet into *higher yielding low-risk assets*," that the "two companies have … *strong credit culture and credit quality*," and that "Golden West's financial condition and assets are *very sound*."

220.    The statements from the October 2, 2006 Form 8-K set forth in ¶ 219 above were materially untrue and misleading because, *inter alia*: (i) far from diversifying Wachovia's balance sheet into "higher yielding low-risk assets" or involving a merger with a company that had "strong credit culture and credit quality," the merger caused Wachovia to acquire a company

(Golden West) that engaged in high risk underwriting and had massive exposure to borrowers who were at high risk of default, as set forth in greater detail in ¶¶ 94-132 above; and (ii) Wachovia's statements concerning the pro forma value of the merged company's loans net of unearned income were massively overstated, and the combined company's pro forma allowance for loan losses was massively understated (particularly with respect to Golden West's Pick-A-Pay portfolio), for the reasons set forth in ¶¶ 145-158.

### 2. Defendants' Materially Untrue and Misleading Statements from November 3, 2006 through July 30, 2007

221. Wachovia's Form 10-Q for the third quarter of 2006 (the "November 3, 2006 Form 10-Q"), its Form 10-K for the year ended December 31, 2006 (the "2006 Form 10-K"), and its Forms 10-Q for first quarter of 2007 (the "May 4, 2007 Form 10-Q") and second quarter of 2007 (the "July 30, 2007 Form 10-Q"), were materially untrue and misleading for substantially the same reasons, as summarized below.

222. First, each of these filings materially misrepresented the quality of Wachovia's loan portfolio, including Wachovia's "Pick-A-Pay" loans. For example, each of the above Form 10-Qs and the 2006 Form 10-K represented that Wachovia's "[c]redit quality remained strong," that Wachovia "continue[s] to mitigate risk and volatility on [its] balance sheet by actively monitoring and reducing potential problem loans, including their sale when prudent," and that Wachovia maintained a "highly collateralized … loan portfolio." In addition, the 2006 Form 10-K represented that Wachovia's "strong" credit quality "remained among the best in the banking industry in 2006," and that

> The low level of net charge-offs reflects a continuing robust credit environment and the highly collateralized nature of our portfolio, and our ***careful management of the inherent credit risk in our loan portfolio.*** Golden West has a long record of extremely low net charge-offs, including none for the past eight years, reflecting their ***strong underwriting and credit risk management***. Accordingly, the addition of Golden West also reduced our annual charge-off percentage.

223. However, the statements in the preceding paragraph were materially untrue and omitted material facts because they misrepresented the risk of default in Wachovia's loan portfolio, including Wachovia's "Pick-A-Pay" loans, because, *inter alia*: (i) far from having "strong underwriting and credit risk management," "careful risk management," or "strong" credit quality, Golden West and, after its acquisition on October 1, 2006, Wachovia engaged in high risk underwriting and had massive exposure to borrowers who were at high risk of default, as set forth in greater detail in ¶¶ 94-132 above; and (ii) Wachovia's statements concerning the value of its assets and net loans were massively overstated, (particularly with respect to the Pick-A-Pay portfolio), for the reasons set forth in ¶¶ 94-158.

224. Second, the 2006 Form 10-K and the May 4, 2007 Form 10-Q also represented that the portfolio was "well-collateralized" and that, of Wachovia's consumer real estate portfolio, "83 percent has a loan-to-value ratio of 80 percent or less" and "95 percent has a loan-to-value ratio of 90 percent or less." The July 30, 2007 Form 10-Q made a virtually identical representation, except that it stated that "82 percent has a loan-to-value ratio of 80 percent or less" and "95 percent has a loan-to-value ratio of 90 percent or less."

225. The statements in the preceding paragraph were materially untrue and omitted material facts, and Wachovia's reported loan-to-value ratios were materially understated, because Wachovia's stated LTV ratios were based on loan-to-value ratios at *origination*, rather than based on then-current, actual loan-to-value ratios. Thus, the LTV ratios set forth in the preceding paragraph did not reflect either (i) the accumulation of negative amortization that had added to outstanding loan balances or (ii) the collapse in housing prices that had occurred after the loans had been originated. It was not until April 14, 2008 that Wachovia disclosed that the LTV ratios that it had previously reported were based on **original** loan-to-values and that, using

then-current loan-to-values, more than *$17 billion* – or 14% – of its Pick-A-Pay portfolio alone exceeded a *100%* loan to value ratio.

226.    Further, Wachovia's reported LTV ratios were materially inaccurate, and its loans were not "well-collateralized," because the appraisers used by Golden West and later Wachovia, particularly in its California and South Atlantic territories, reported inflated appraisal values, as described and confirmed by numerous CWs set forth above at ¶¶ 122-125.  Because the properties collateralizing the Company's loans (at least in California and the South Atlantic territory) were worth materially less than their appraised values, the true LTV ratio of the Company's Pick-A-Pay portfolio was materially higher than reported, even at origination.

227.    Third, the 2006 Form 10-K, and the May 4, 2007 and July 30, 2007 Forms 10-Q reported (as of December 31, 2006, March 30, 2007 and June 30, 2007, respectively) allowances for loan losses of $3.360 billion, $3.378 billion and $3.390 billion, respectively.  However, each of these statements was materially untrue and misleading because it failed to disclose that Wachovia's loss reserves (particularly with respect to its Pick-A-Pay portfolio) were massively understated, for the reasons set forth in greater detail at ¶¶ 145-158.

228.    Fourth, the 2006 Form 10-K and the November 3, 2006, May 4, 2007 and July 30, 2007 Forms 10-Q failed to disclose Wachovia's exposure to billions of dollars of subprime-related CDOs and RMBS, and the May 4, 2007 and July 30, 2007 Form 10-Qs failed to disclose the impairment in the value of those CDOs and RMBS, for the reasons set forth in ¶¶ 165-188.

229.    Fifth, the 2006 Form 10-K and the May 4, 2007 and July 30, 2007 Forms 10-Q failed to disclose the substantial impairments to Wachovia's goodwill, for the reasons set forth in ¶¶ 201-209.

230.     Sixth, because Wachovia's reserves were understated and its assets were overstated, and because Wachovia failed to take the charges against earnings required to bring its reserves to adequate levels and to record the proper write-downs in the value of its assets, Wachovia's publicly reported net income and Tier 1 capital as set forth in its 2006 Form 10-K and its May 4, 2007 and July 30, 2007 Forms 10-Q were also materially overstated.

231.     Wachovia's 2006 Form 10-K and May 4, 2007 and July 30, 2007 Forms 10-Q each represented that Wachovia's financial statements were prepared in accordance with generally accepted accounting principles ("GAAP"). Each of those representations was materially untrue for the reasons set forth above and at ¶¶ 94-209.

232.     Because Wachovia's Forms 8-K filed on January 23, 2007, April 16, 2007 and July 20, 2007 each incorporated by reference Wachovia's consolidated balance sheets and statements of income as of the end of the prior quarter, each of those Forms 8-K was also materially untrue and misleading for the same reasons as set forth in ¶¶ 223-231 above.

233.     KMPG audited Wachovia's year-end 2006 financial statements contained in the 2006 10-K and issued a report dated February 23, 2007 (the "2006 Audit Report") on the consolidated balance sheets, income statement and statements of financial condition of Wachovia, which stated in relevant part as follows:

> We have audited the accompanying consolidated balance sheets of Wachovia Corporation and subsidiaries as of December 31, 2006 and 2005, and the related consolidated statements of income, changes in stockholders' equity and cash flows for each of the years in the three-year period ended December 31, 2006. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the

financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Wachovia Corporation and subsidiaries as of December 31, 2006 and 2005, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2006, in conformity with U.S. generally accepted accounting principles.

234.    KPMG consented to the inclusion of its 2006 Audit Report in each Offering made between February 23, 2007 and February 25, 2008. In an exhibit attached to the 2006 Form 10-K, KPMG also consented to the inclusion of its 2006 Audit Report in future offerings made pursuant to the May 2005 Registration Statement, and certain other registration statements, including those for the Wachovia Capital Trust IX and X offerings. In addition, the Prospectuses for the Offerings made pursuant to the March 2007 Registration Statement and for the Wachovia Capital Trust IX and X Offerings each stated (under the heading "Experts") as follows:

The consolidated balance sheets of Wachovia Corporation as of December 31, 2006 and 2005, and the related consolidated statements of income, changes in stockholders' equity and cash flows for each of the years in the three-year period ended December 31, 2006, and management's assessment of the effectiveness of internal control over financial reporting as of December 31, 2006, included in Wachovia's 2006 Annual Report which is incorporated by reference in Wachovia's Annual Report on Form 10-K for the year ended December 31, 2006, and incorporated by reference herein, have been incorporated by reference herein *in reliance upon the reports of KPMG LLP*, independent registered public accounting firm, incorporated by reference herein, and upon the authority of said firm as experts in accounting and auditing.

235.    For the reasons set forth above, Wachovia's 2006 financial statements did not fairly present the Company's financial condition and were not prepared in accordance with GAAP. In addition, KPMG's 2006 Audit Report was materially untrue and misleading for the same reasons.

127

### 3. Wachovia's Materially Untrue and Misleading November 9, 2007 Form 10-Q

236.    On November 9, 2007, Wachovia filed a Form 10-Q for the third quarter of 2007 (the "November 9, 2007 Form 10-Q"), which represented that Wachovia had increased its allowance for loan losses by $145 million over the past nine months, and that the increase "was driven by *modest* deterioration in credit quality and loan growth."  In its November 9, 2007 Form 10-Q, Wachovia further assured investors that "we will continue to actively monitor loan quality and take proactive steps to reduce risk when warranted," and represented that it was well positioned due to "the well collateralized nature of our real-estate securities portfolio, our careful management of inherent risk and *strong underwriting*."

237.    The above statements were materially untrue and omitted material facts because, *inter alia,* (i) far from having engaged in strong underwriting, Wachovia (including its predecessors at Golden West) had and was continuing to engage in high risk underwriting and had massive exposure to borrowers who were at high risk of default, as set forth in greater detail in ¶¶ 94-132 above; and (ii) they failed to disclose that Wachovia's $145 million increase in its allowance for loan losses was woefully inadequate to bring its reserves to adequate levels (particularly with respect to the Pick-A-Pay portfolio), as set forth in greater detail at ¶¶ 145-158 above.

238.    In addition, the November 9, 2007 Form 10-Q repeated the same misstatements as the prior three Form 10-Qs and 2006 Form 10-K about the loan-to-value ratio of Wachovia' consumer mortgage loan portfolio, stating that of Wachovia's consumer real estate portfolio, "83 percent has a loan-to-value ratio of 80 percent or less" and "95 percent has a loan-to-value ratio of 90 percent or less."  These figures were materially inaccurate because Wachovia's stated LTV ratios were based on loan-to-value ratios at *origination*, rather than based on then-current, actual

loan-to-value ratios. Thus, the LTV ratios set forth above did not reflect either (i) the accumulation of negative amortization that had added to outstanding loan balances or (ii) the collapse in housing prices that had occurred after the loans had been originated. It was not until April 14, 2008 that Wachovia disclosed that the LTV ratios that it had previously reported were based on *original* loan-to-values and that, using then-current loan-to-values, more than *$17 billion* – or 14% – of its Pick-A-Pay portfolio alone exceeded a *100%* loan to value ratio.

239. Further, Wachovia's reported LTV ratios were materially inaccurate, and its loans were not "well-collateralized," because the appraisers used by Golden West and later Wachovia, particularly in its California and South Atlantic territories, reported inflated appraisal values, as described and confirmed by numerous CWs set forth above at ¶¶ 122-125. Because the properties collateralizing the Company's loans (at least in California and the South Atlantic territory) were worth materially less than their appraised values, the true LTV ratio of the Company's Pick-A-Pay portfolio was materially higher than reported, even at origination.

240. Also, the November 9, 2007 Form 10-Q reported an allowance for loan losses of $3.505 billion. However, this statement was materially untrue and misleading because it failed to disclose that Wachovia's loss reserves (particularly with respect to its Pick-A-Pay portfolio) were massively understated, for the reasons set forth in greater detail at ¶¶ 145-158. The November 9, 2007 Form 10-Q failed to disclose Wachovia's exposure to more than $4 billion of additional subprime-related CDOs and failed to accurately disclose the impairment the value of those CDOs, for the reasons set forth in ¶¶ 165-188.

241. The November 9, 2007 Form 10-Q failed to disclose the substantial impairments to Wachovia's goodwill, for the reasons set forth in ¶¶ 201-209.

242.     Because Wachovia's reserves were understated and its assets were overstated, and because Wachovia failed to take the charges against earnings required to bring its reserves to adequate levels and record the proper write-downs in the value of its assets, Wachovia's publicly reported net income and Tier 1 capital as set forth in its November 9, 2007 Form 10-Q were materially overstated.

243.     The November 9, 2007, Form 10-Q also represented that Wachovia's financial statements were prepared in accordance with GAAP.  That statement was materially untrue for the reasons set forth in ¶¶ 94-209 above.

### 4.     Wachovia's Materially Untrue and Misleading January 22, 2008 Form 8-K and 2007 Form 10-K

244.     On January 22, 2008, Wachovia filed a Form 8-K with the SEC (the January 22, 2008 Form 8-K"), which incorporated by reference Wachovia's consolidated balance sheet and statement of income for the year ended December 31, 2007.  Wachovia reported (i) total assets of approximately $783 billion, including a net loan balance of approximately $457 billion; (ii) total stockholders' equity of approximately $77 billion; and (iii) net income of $51 million for the fourth quarter of 2007 and $6.3 billion for the full year.  These financial results were also reported in Wachovia's Form 10-K for the year ended December 31, 2007, which was filed with the SEC on February 28, 2008

245.     Each of these figures was materially inaccurate because Wachovia's assets and equity were worth a fraction of their reported value, and its net income was overstated, as a result of (i) the severe impairments in Wachovia's residential mortgage portfolio, including its Pick-A-Pay portfolio, as set forth above at ¶¶ 94-158; (ii) the impairments in Wachovia's portfolio of CDOs and RMBS, as set forth above at ¶¶ 172-188; and (iii) the impairments to Wachovia's goodwill, as set forth above at ¶¶ 201-209.  Moreover, these figures and related financial

disclosures were also materially untrue and misleading and omitted material facts because they failed to disclose that Wachovia's reported Tier 1 capital had been impaired and was substantially diminished.

246.    Wachovia's 2007 Form 10-K stated that, notwithstanding an increase in its net charge offs in 2007, its loan portfolio remained "***highly collateralized***," that Wachovia "continue[s] to mitigate the risk and volatility of our balance sheet through ***prudent risk management practices***, including ***tighter underwriting*** and enhanced collection efforts," and that "the ***well-collateralized*** nature of our real estate-secured portfolio, our ***careful management of credit risk and strong underwriting*** position us relatively well in this credit environment." The Form 10-K further stated that of its $227.7 billion consumer real estate portfolio, "82 percent has a loan-to-value ratio of 80 percent or less," and "95 percent has a loan-to-value ratio of 90 percent or less."

247.    The above statements were materially untrue and omitted material facts because, *inter alia,* (i) far from having engaged in strong or prudent underwriting, Wachovia (including its predecessors at Golden West) had and were continuing to engage in high risk underwriting and had massive exposure to borrowers who were at high risk of default, as set forth in greater detail in ¶¶ 94-132 above; (ii) Wachovia's loan portfolio was not "well-collateralized," and its reported loan-to-value ratios were materially understated, because (a) they actually were the loan-to-values at origination, and did not reflect either the accumulation of negative amortization that had added to outstanding loan balances, or the collapse in housing prices that had occurred after its loans had been originated, and (b) the LTV ratios were materially inaccurate even at the time of origination because the appraised values of the mortgaged properties, especially in California and the South Atlantic territory, were materially lower than reported.  Indeed, as Wachovia

finally acknowledged for the first time on April 14, 2008, based on February 2008 data, more than *$17 billion* – or 14% – of its Pick-A-Pay portfolio alone exceeded a *100%* loan to value ratio.

248.    The 2007 Form 10-K also reported that Wachovia maintained a Tier 1 capital ratio of 7.35% as of December 31, 2007, a figure that was substantially above the 6% ratio required to be "well capitalized."    Further, the 2007 Form 10-K described Wachovia's purportedly strong capital position and balance sheet, even in the face of deteriorating market conditions, as follows: "We remain well positioned in a challenging environment with a strong liquidity position and capital levels. …  Our balance sheet is strong and well capitalized under regulatory guidelines…."

249.    However, these statements about Wachovia's purportedly "well capitalized" status,  "strong" balance sheet and Tier 1 capital levels were materially untrue and misleading because, as set forth above at ¶¶ 189-200, the Company's mortgage-related and other assets were so impaired that Wachovia's stated Tier 1 capital had been substantially eroded.

250.    Wachovia's 2007 Form 10-K stated that Wachovia's financial statements were prepared in accordance with generally accepted accounting principles ("GAAP").    That statement was materially untrue for the reasons set forth above.

251.    KMPG audited Wachovia's year-end 2007 financial statements contained in the 2007 Form 10-K and issued a report dated February 25, 2008 (the "2007 Audit Report") on the consolidated balance sheets, income statement and statements of financial condition of Wachovia as of December 31, 2006 and 2007 and certain earlier periods.    The 2007 Audit Report was substantially in the form set forth at ¶ 233.  In addition, KPMG consented to the inclusion of the 2007 Audit Report in each Offering made after February 25, 2008, and the Prospectus for the

Series L Preferred Stock Offering specifically stated that Wachovia's year-end 2006 and 2007 financial statements were "incorporated by reference herein upon the reports of KPMG, LLP … and upon the authority of said firm as experts in accounting and auditing."

252. For the reasons set forth above, Wachovia's 2007 financial statements did not fairly present the Company's financial condition and were not prepared in accordance with GAAP. In addition, KPMG's 2007 Audit Report was materially untrue and misleading for the same reasons.

**5.**      **Wachovia's Materially Untrue and Misleading
April 14, 2008 Form 8-K**

253. On April 14, 2008, Wachovia filed a Form 8-K to which it attached: (i) its earnings press release for the first quarter of 2008; (ii) a first quarter financial results presentation; and (iii) its quarterly earnings report for the first quarter of 2008 (collectively, the "April 14, 2008 Form 8-K"), all of which were incorporated by reference into Offerings made on or after April 14, 2008.

254. The April 14, 2008 Form 8-K continued to assure borrowers that, notwithstanding the Form 8-K's new disclosures about the Pick-A-Pay portfolio, Wachovia maintained its "*Conservative in-house appraisal and underwriting approach*." These statements were materially untrue because in reality, Wachovia's underwriting and appraisal approach to the Pick-A-Pay portfolio was acutely high-risk, resulting in a massive exposure to borrowers who were at high risk of default, for the reasons set forth ¶¶ 94-132.

255. In its April 14, 2008 Form 8-K, Wachovia also reported (i) total assets of approximately $784 billion (including a net loan balance of approximately $466 billion); (ii) total stockholders' equity of approximately $78 billion; and (iii) a net loss of $350 million for the first quarter of 2008. However, each of these figures was materially inaccurate because the value

of Wachovia's assets and shareholders' equity were materially overstated, and its net loss for the first quarter of 2008 was materially understated, as a result of (i) the severe impairments in Wachovia's residential mortgage portfolio, including its Pick-A-Pay portfolio, as set forth above at ¶¶ 94-158; (ii) the impairments in Wachovia's portfolio of CDOs and RMBS, as set forth above at ¶¶ 172-188; and (iii) the impairments to Wachovia's goodwill, as set forth above at ¶¶ 201-209.

256. In addition, the April 14, 2008 Form 8-K reported that Wachovia maintained a Tier 1 capital ratio of 7.5% as of March 31, 2008 – an increase over its Tier 1 ratio as of December 31, 2007, and substantially above the 6% ratio required to be "well capitalized." However, these representations were materially untrue and misleading because they failed to disclose that Wachovia's Tier 1 capital had been impaired and that, as a result, the Company's stated Tier I Capital had been substantially eroded, as set forth in greater detail above at ¶¶ 189-200.

257. Further, the April 14, 2008 Form 8-K set forth numerous statements describing Wachovia's purportedly strong capital position and balance sheet, even in the face of deteriorating market conditions, as follows. For example, the April 14, 2008 Form 8-K stated that:

(i)     The Company possessed a "***strong liquidity and capital position***."

(ii)    "Wachovia Corporation continues to maintain a ***very prudent liquidity profile.***"

(iii)   The Company's "[p]roactive actions provide solid foundation in order to further strengthen the balance sheet and build capital to ***top tier levels***."

(iv)    The Company's "capital preservation and build … [p]rovides ability to operate from a ***position of strength***."

134

258. However, these statements concerning Wachovia's purportedly "strong capital position" and "prudent liquidity profile" were materially untrue and misleading because, *inter alia,* as set forth above at ¶¶ 189-200, the Company's mortgage-related and other assets were so impaired that Wachovia was precariously close to insolvency. Indeed, as set forth above, only five months after Wachovia made these representations to investors concerning its purportedly "strong" balance sheet and capital position, investors learned that Wachovia's mortgage-related assets were actually impaired by ***tens of billions*** of dollars, that Wachovia lacked the capital to absorb these losses, and that it was therefore on the brink of insolvency.

## VII.     CLASS ACTION ALLEGATIONS

259. Plaintiffs bring this action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure individually and on behalf of all persons and entities who purchased or otherwise acquired the "Bond Class Securities" set forth in the Appendix, and who were damaged thereby (the "Bond Class"). Excluded from the Bond Class are Defendants and their respective current or former officers, directors, immediate family members, legal representatives, heirs, successors or assigns, any entity in which any Defendant has or had a controlling interest, and any person or entity who has entered into a tolling agreement in connection with this action and the affiliates thereof.

260. The members of the Bond Class are so numerous that joinder of all members is impracticable. While the exact number of Bond Class members is presently unknown to Plaintiffs and can only be ascertained through appropriate discovery, Plaintiffs reasonably believe that there are thousands of members of the Bond Class. Record owners and other members of the Bond Class may be identified by records maintained by Defendants and their transfer agents, and may be notified of the pendency of the action by mail, the internet, or publication using the form of notice similar to that customarily used in securities class actions.

261. Plaintiffs' claims are typical of the claims of the members of the Bond Class as all members of the Class are similarly affected by Defendants' violations of the Securities Act.

262. Plaintiffs will fairly and adequately represent the interests of the members of the Bond Class and have retained counsel competent and experienced in class and securities litigation.

263. Common questions of law and fact exist as to all members of the Bond Class and predominate over any questions solely affecting individual members of the Bond Class. These common questions of law and fact include:

        a. whether Defendants violated the Securities Act as alleged herein;

        b. whether the Shelf Registration Statements and the Offering Materials contained misstatements or omissions of material fact; and

        c. the proper measure of damages.

264. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Bond Class to obtain individual redress. There will be no difficulty in the management of this action as a class action.

## VIII. CAUSES OF ACTION

### COUNT I

**For Violations Of Section 11 Of The Securities Act
Against The Wachovia Issuer Defendants
And Wells Fargo As Successor-In-Interest**

265. Plaintiffs repeat and reallege each and every allegation contained above as if set forth fully herein.

266. This Count is asserted against the Wachovia Issuer Defendants and Wells Fargo for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Plaintiffs and all members of the Class, who purchased or otherwise acquired the Bond Class Securities pursuant or traceable to the materially untrue and misleading Registration Statements and Offering Materials incorporated by reference in those Registration Statements, and were damaged thereby.

267. This claim is not based on and does not sound in fraud. For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that any Defendant acted with scienter or fraudulent intent, which are not elements of a Section 11 claim. Each of the Registration Statements, including the Offering Materials incorporated by reference therein at the time of each Offering, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

268. Wachovia was the issuer of all the Offerings. Wachovia Capital Trust IV, Wachovia Capital Trust IX and Wachovia Capital Trust X were also issuers of the 2/15/07 6.375% TPS Offering, the 5/8/07 6.375% TPS Offering and the 11/21/07 7.85% TPS Offering, respectively. Wachovia also signed each of the Registration Statements for the Offerings.

269. Each Wachovia Issuer Defendant, with respect to each Offering of Bond Class Securities issued by it, is strictly liable under Section 11 for the materially untrue statements and omissions in the Registration Statement and incorporated Offering Materials for that Offering. Wells Fargo is liable as successor-in-interest to Wachovia after merging with Wachovia on or about December 31, 2008.

270. Plaintiffs and the members of the Class purchased Bond Class Securities issued in the Offerings pursuant or traceable to the Registration Statements.

271. At the time they purchased or acquired their Bond Class Securities, Plaintiffs and the members of the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the Registration Statements and incorporated Offering Materials.

272. The value of the Bond Class Securities declined substantially subsequent to the consummation of the Offerings, and Plaintiffs and the other members of the Class have sustained damages.

273. Less than one year elapsed between the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Amended Complaint is based and the time that the first complaint was filed asserting claims arising out of the falsity of each of the Registration Statements. Less than three years elapsed between the time that each of the securities at issue in this Amended Complaint was bona fide offered to the public and the time that the first complaint was filed asserting claims arising out of the falsity of each relevant Registration Statement for such securities.

274. By reason of the foregoing, the Wachovia Issuer Defendants are liable for violations of Section 11 of the Securities Act to Plaintiffs and the other members of the Class who purchased or otherwise acquired Bond Class Securities pursuant to or traceable to the Registration Statements. Wells Fargo is liable as successor-in-interest to Wachovia.

## COUNT II

### For Violations of Section 11 of the Securities Act
### Against The Individual Defendants Other Than Truslow

275. Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

276. This Count is asserted against the Individual Defendants other than Truslow for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Plaintiffs and all

members of the Class, who purchased or otherwise acquired the Bond Class Securities pursuant or traceable to the materially untrue and misleading Registration Statements and Offering Materials incorporated by reference in those Registration Statements, and were damaged thereby.

277.    This claim is not based on and does not sound in fraud.  For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that any Defendant acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

278.    Each of the Registration Statements, including the Offering Materials incorporated by reference therein at the time of each Offering, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

279.    Each Individual Defendant named in this Count is liable in connection with those Offerings: (a) made at a time when the Defendant was a director of the issuer, or (b) made pursuant to a Registration Statement that the Defendant signed as set forth in Section III.B.3 above.

280.    Each of these Individual Defendants is unable to establish an affirmative defense based on a reasonable and diligent investigation of the statements contained in the Registration Statements and incorporated Offering Materials.  These Individual Defendants did not make a reasonable investigation or possess reasonable grounds to believe that those statements were true and that there were no omissions of any material fact.  Accordingly, they acted negligently and are liable to Plaintiffs and the other members of the Class.

281.    Plaintiffs and the Class acquired the Wachovia securities issued in the Offerings pursuant or traceable to the Registration Statements.

282. At the time they purchased or acquired their Bond Class Securities, Plaintiffs and the members of the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the Registration Statements and incorporated Offering Materials.

283. The value of the Bond Class securities declined substantially subsequent to the consummation of the Offerings, and Plaintiffs and the other members of the Class have sustained damages.

284. Less than one year elapsed between the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Amended Complaint is based and the time that the first complaint was filed asserting claims arising out of the falsity of each of the Registration Statements. Less than three years elapsed between the time that the securities at issue in this Amended Complaint were bona fide offered to the public and the time that the first complaint was filed asserting claims arising out of the falsity of each of the Registration Statements.

285. By reason of the foregoing, the Individual Defendants, other than Defendant Truslow, are liable for violations of Section 11 of the Securities Act to Plaintiffs and the other members of the Class who purchased or otherwise acquired Bond Class Securities issued pursuant or traceable to the Registration Statements.

## COUNT III

### For Violations Of Section 11 Of The Securities Act
### Against The Underwriter Defendants And KPMG

286. Plaintiffs repeat and reallege each and every allegation contained above as if set forth fully herein.

287.     This Count is asserted against the Underwriter Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of members of the Class who purchased or otherwise acquired the Bond Class Securities pursuant or traceable to the materially untrue and misleading Registration Statements and Offering materials incorporated by reference in those Registration Statements, and who were damaged thereby.

288.     This Count is also asserted against KPMG for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of members of the Class who purchased or otherwise acquired the Bond Class Securities pursuant to or traceable to the materially inaccurate Registration Statements issued in connection with the Offerings, which incorporated Wachovia's 2006 or 2007 financial statements audited by KPMG and KPMG's audit opinions, and who were damaged thereby.

289.     Each of the Registration Statements, including the Offering Materials incorporated by reference therein at the time of each Offering, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

290.     As set forth in the Appendix, each of the Underwriter Defendants acted as an underwriter of certain Offerings of the Bond Class Securities.

291.     KPMG audited Wachovia's 2006 and 2007 financial statements, which were incorporated by reference into the materially inaccurate Registration Statements issued in connection with the Offerings, and consented to its audit opinions being included in those Registration Statements.  As such, KPMG is liable for the material misstatements or omissions in those financial statements and in its 2006 and 2007 Audit Opinions.

292.     Each of the Underwriter Defendants and KPMG is unable to establish an affirmative defense based on a reasonable and diligent investigation of the statements contained in the Registration Statements and incorporated Offering Materials.  These Defendants did not make a reasonable investigation and did not posses reasonable grounds to believe that those statements contained in the Registration Statements and incorporated Offering Materials were true and that there were no omissions of material fact.  Plaintiffs and the Class purchased Bond Class Securities issued in the Offerings pursuant and/or traceable to the Registration Statements.

293.     Plaintiff and the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the Registration Statements and incorporated Offering Materials when they purchased or acquired their Bond Class Securities.

294.     The value of the Bond Class Securities declined substantially subsequent to the consummation of the Offerings, and Plaintiffs and the other members of the Class have sustained damages.

295.     Less than one year elapsed between the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Amended Complaint is based and the time that the first complaint was filed asserting claims arising out of the falsity of each of the Registration Statements.  Less than three years elapsed between the time that the securities at issue in this Amended Complaint were bona fide offered to the public and the time that the first complaint was filed asserting claims arising out of the falsity of each of the Registration Statements.

296.     By reason of the foregoing, the Underwriter Defendants and KPMG are liable for violations of Section 11 of the Securities Act to Plaintiffs and the other members of the Class

who purchased or otherwise acquired Bond Class Securities issued pursuant or traceable to the Registration Statements.

## COUNT IV

**For Violations Of Section 12(a)(2) Of The Securities Act**
**Against The Wachovia Issuer Defendants**
**And Wells Fargo As Successor-In-Interest**

297. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

298. This Count is asserted against the Wachovia Issuer Defendants for having promoted and sold the Wachovia Securities issued in the Offerings pursuant to the Prospectuses, which contained untrue statements of material facts and material omissions as alleged herein. Wells Fargo is liable as successor-in-interest to Wachovia after merging with Wachovia on or about December 31, 2008.

299. This claim does not sound in fraud. For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

300. The Wachovia Issuer Defendants directly solicited the purchase of Bond Class Securities by Plaintiffs and other members of the Class by means of the Shelf Registration Statements and related Prospectuses and financially benefitted thereby. Their acts included but are not limited to the following:

(a) Wachovia prepared and approved the Registration Statements, Prospectuses and Offering Materials incorporated by reference for each Offering, made the decisions to conduct the Offerings and to do so at the stated price, and directly benefitted from the Offerings. The proceeds of three Offerings of Trust Preferred Securities were paid to Wachovia for Wachovia subordinated notes that were the sole assets of the Wachovia Trusts.

(b)     The Wachovia Trusts approved and participated in the preparation of the Registration Statements and Prospectuses for their respective Offerings, participated in the decisions to conduct the Offerings and to do so at the stated price, and received the proceeds of the Offerings to purchase Wachovia subordinated notes. The only purpose of the Wachovia Trusts was to serve as the vehicle to accomplish the Offerings.

301.    The Wachovia Issuer Defendants used the means and instrumentalities of interstate commerce and the U.S. mails.

302.    The Wachovia Issuer Defendants are unable to establish an affirmative defense based upon a reasonable or diligent investigation of the statements contained in the Registration Statements, Prospectuses and incorporated Offering Materials. The Wachovia Issuer Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained therein and incorporated by reference in the Prospectuses at the time of each Offering were true and that there were no omissions of any material fact.

303.    Plaintiffs and other members of the Class purchased or otherwise acquired Wachovia securities issued in the Offerings pursuant to the materially inaccurate Shelf Registration Statements and incorporated Public Offering Materials and did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained therein.

304.    The value of the Bond Class securities declined substantially subsequent to the consummation of the Offerings, and Plaintiffs and the other members of the Class have sustained damages.

305.    Less than one year elapsed between the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Amended Complaint is based and the time that the first complaint was filed asserting claims arising out of the falsity of each of the

Registration Statements. Less than three years elapsed between the time that the securities at issue in this Amended Complaint were bona fide offered to the public and the time that the first complaint was filed asserting claims arising out of the falsity of each of the Registration Statements.

306. By reason of the foregoing, the Wachovia Issuer Defendants are liable under Section 12(a)(2) of the Securities Act to Plaintiffs and other members of the Class who purchased the Bond Class Securities in the Offerings, and Wells Fargo is liable as successor in interest to Wachovia. Plaintiffs and other members of the Class have the right to rescind and recover the consideration paid for their Bond Class Securities on which they have suffered damages. In addition, Plaintiffs and the members of the Class who have sold and suffered damages on their Bond Class Securities that they originally purchased through the Offerings are entitled to rescissory damages.

## COUNT V

### For Violations of Section 12(a)(2) of the Securities Act
### Against The Underwriter Defendants

307. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

308. This Count is asserted against the Underwriter Defendants for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all members of the Class who purchased or otherwise acquired Bond Class Securities in the Offerings and were damaged thereby.

309. This claim is not based on and does not sound in fraud. For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

310. The Underwriter Defendants were sellers of the Bond Class Securities within the meaning of the Securities Act because they (i) transferred title to Plaintiffs and other members of the Class who purchased in the Offerings; and (ii) solicited the purchase of the Bond Class Securities by Plaintiffs and other members of the Class and were financially benefitted thereby, including but not limited to receiving underwriting fees, commissions or discounts in connection with the Offerings. The Offering Materials contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth herein.

311. The Underwriter Defendants used the means and instrumentalities of interstate commerce and the U.S. mails.

312. The Underwriter Defendants are unable to establish an affirmative defense based upon a reasonable or diligent investigation of the statements contained in the Registration Statements, Prospectuses and incorporated Offering Materials. The Underwriter Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained therein and incorporated by reference in the Prospectuses at the time in each Offering were true and that there were no omissions of any material fact. Accordingly, each of the Underwriter Defendants is liable to Plaintiffs and other members of the Class who purchased Bond Class Securities in the Offerings in which that Defendant acted as an underwriter.

313. Plaintiffs and other members of the Class purchased or otherwise acquired Wachovia securities issued in the Offerings pursuant to the materially inaccurate Shelf Registration Statements and incorporated Public Offering Materials and did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained therein.

314. The value of the Bond Class securities declined substantially subsequent to the consummation of the Offerings, and Plaintiffs and the other members of the Class have sustained damages.

315. Less than one year elapsed between the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Amended Complaint is based and the time that the first complaint was filed asserting claims arising out of the falsity of each of the Registration Statements. Less than three years elapsed between the time that the securities at issue in this Amended Complaint were bona fide offered to the public and the time that the first complaint was filed asserting claims arising out of the falsity of each of the Registration Statements.

316. By reason of the foregoing, the Underwriter Defendants are liable under Section 12(a)(2) of the Securities Act to Plaintiffs and other members of the Class who purchased the Bond Class Securities in the Offerings. Plaintiffs and other members of the Class have the right to rescind and recover the consideration paid for their Bond Class Securities on which they have suffered damages. In addition, Plaintiffs and the members of the Class who have sold and suffered damages on their Bond Class Securities that they originally purchased through the Offerings are entitled to rescissory damages.

## COUNT VI

### For Violations Of Section 15 Of The Securities Act
### Against Wachovia And Wells Fargo As Successor-In-Interest

317. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

318. This Count is asserted against Wachovia and Wells Fargo (as successor to Wachovia) for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of

Plaintiffs and the other members of the Class who have asserted claims pursuant to Sections 11 or 12(a)(2) of the Securities Act, as set forth above.

319.    This claim does not sound in fraud.  For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

320.    At all relevant times, Wachovia was, by virtue of its ownership and its actual control of the Wachovia Trusts' activities, a controlling person of the Wachovia Trusts within the meaning of Section 15 of the Securities Act.  Wachovia had the power and influence, and exercised that power and influence, to cause the Wachovia Trusts to engage in the acts and violations of law complained of herein, including the power and influence to control (a) the Trusts' participation as an issuer in the Offerings, (b) the Trusts' role in the preparation and review of the Registration Statements and other Offering Materials, and (c) the Trust's solicitation, offer and sale of the Bond Class Securities.

321.    At all relevant times, Wachovia was also, by virtue of its ownership and actual control of WCM's activities, a controlling person of WCM within the meaning of Section 15 of the Securities Act.  Wachovia had the power and influence, and exercised that power and influence, to cause WCM to engage in the acts and violations of the Securities Act complained of herein, including the power and influence to control (a) WCM's participation as an underwriter in the Offerings, (b) WCM's role in the preparation and review of the Registration Statements and other Offering Materials, and (c) WCM's solicitation, offer and sale of the Bond Class Securities.

322.    By reason of the foregoing, Defendant Wachovia is liable under Section 15 of the Securities Act to Plaintiffs and the other members of the Class who purchased or otherwise

acquired Bond Class securities issued by the Wachovia Trusts or underwritten or sold by WCM, and who were damaged thereby. Wells Fargo is liable as successor-in-interest to Wachovia.

### COUNT VII

**For Violations Of Section 15 Of The Securities Act
Against Thompson, Truslow And Wurtz**

323. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

324. This Count is asserted against Individual Defendants Thompson, Truslow and Wurtz for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiffs and the other members of the Class who have asserted claims pursuant to Sections 11 or 12(a)(2) of the Securities Act, as set forth above.

325. This claim does not sound in fraud. For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

326. Defendants Thompson, Truslow and Wurtz, through their positions as Wachovia's Chief Executive Officer, Chief Risk Officer and Chief Financial Officer, respectively, were each controlling persons of Wachovia within the meaning of Section 15 of the Securities Act at the times of each of the Offerings. Because of their positions of control and authority as senior officers of Wachovia and their control of the contents of Wachovia's financial statements and SEC disclosures, Thompson, Truslow and Wurtz were able to, and did, control the contents of the Registration Statements and the incorporated Offering Materials, which contained materially untrue or misleading information and omitted material facts.

327. By virtue of Defendants Thompson's, Truslow's and Wurtz's control over Wachovia, and by virtue of Wachovia's control over the Wachovia Trusts and WCM,

Defendants Thompson, Truslow and Wurtz were also controlling persons of the Wachovia Capital Trusts and WCM within the meaning of Section 15 of the Securities Act with respect to the actions of the Wachovia Trusts as issuers of, and with respect to the actions of WCM as an underwriter and seller of, Bond Class Securities.

328. By reason of the foregoing, Defendants Thompson, Truslow and Wurtz are liable under Section 15 of the Securities Act to Plaintiffs and the other members of the Class who purchased or otherwise acquired the Bond Class Securities pursuant or traceable to the Registration Statements, and who were damaged thereby.

329. **WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

a. Determining that this action is a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Bond Class defined herein;

b. Awarding all damages and other remedies set forth in the Securities Act in favor of Plaintiffs and all members of the Bond Class against Defendants in an amount to be proven at trial, including interest thereon;

c. Awarding Plaintiffs and the Bond Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d. Such other and further relief as the Court may deem just and proper.

## IX.  JURY TRIAL DEMANDED

Plaintiffs hereby demand a jury trial.

DATED: May 28, 2010
New York, New York

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

By: _____

Chad Johnson (Chad@blbglaw.com)
William C. Fredericks (Bill@blbglaw.com)
Kurt Hunciker (Kurt@blbglaw.com)
John Rizio-Hamilton (Johnr@blbglaw.com)
Jeroen van Kwawegen
(Jeroen@blbglaw.com)

1285 Avenue of the Americas, 38th Floor
New York, New York 10019
Tel:  212-554-1400
Fax:  212-554-1444

*Counsel for Lead Plaintiffs Orange County Employees' Retirement System and Louisiana Sheriffs' Pension and Relief Fund, and Co-Lead Counsel for the Class*

**BARROWAY TOPAZ KESSLER MELTZER & CHECK, LLP**

David Kessler (dkessler@btkmc.com)
John A. Kehoe (jkehoe@btkmc.com)
Christopher L. Nelson
John J. Gross
280 King of Prussia Road
Radnor, Pennsylvania 19087
Tel: 610-667-7706
Fax: 610-667-7056

*Counsel for Lead Plaintiff Southeastern Pennsylvania Transportation Authority and Co-Lead Counsel for the Class*

**ROBBINS GELLER RUDMAN & DOWD LLP**

John J. Rice
Lucas F. Olts
Maureen E. Mueller
655 West Broadway, Suite 1900
San Diego, CA 92101
Tel.: 619-231-1058
Fax: 619-231-7423

*Counsel for Hawaii Sheet Metal Workers Pension Fund, City of Livonia Employees' Retirement System, and Co-Lead Counsel for the Class*

**KLAUSNER & KAUFMAN, P.A.**

Robert D. Klausner
10059 Northwest 1st Court
Plantation, Florida 33324
Tel: 954-916-1202
Fax: 954-916-1232

*Additional Counsel for Plaintiff Louisiana Sheriffs' Pension and Relief Fund*

**GLANCY BINKOW & GOLDBERG LLP**

Lionel Z. Glancy
Michael Goldberg
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Tel.: 310-201-9150
Fax: 310 201-9160

*Counsel for Plaintiffs Norman Levin, Arlette Miller, Michael Swiskay, as trustee of the Judith R. Swiskay Irrevocable Trust U/A 7/16/2007; Michael Swiskay, as trustee of the Trust U/W/O Hanan Swiskay FBO Jeffrey Swiskay; and Michael Swiskay, as trustee of the Trust U/W/O Hanan Swiskay*

**POMERANTZ HAUDEK GROSSMAN & GROSS LLP**

Marc I. Gross
100 Park Avenue

New York, New York 10017
Tel.: 212-661-1100
Fax: 212661-8665

*Counsel for Plaintiff Iron Workers Locals 40, 361,
417 Union Security Funds*

**ABRAHAM FRUCHTER & TWERSKY, LLP**

Jack G. Fruchter
One Penn Plaza, Suite 2805
New York, New York 10119
Tel.: 212-279-5050
Fax: 212-279-3655

*Counsel for Plaintiff Arlette Miller*

# APPENDIX

# PREFERRED STOCK OFFERINGS

| ISSUE DATE | ISSUER/SECURITY (CUSIP) | AMOUNT | VOLUME (PRICE) | UNDERWRITER DEFENDANTS (VOLUME)[1] | INCORPORATED DOCUMENTS[2] | REGISTRATION STATEMENT/SIGNATORIES[3] |
|---|---|---|---|---|---|---|
| 2/15/07 | *Wachovia Capital Trust IV (unconditionally guaranteed by Wachovia)/6.375% Trust Preferred Securities (92978U207)* | 32 million Trust Preferred Securities (TPS); plus 4,800,000 TPS to cover over-allotments | $920,000,000 ($25 per TPS) | WCM ($106,000,000) Banc of America ($98,400,000) CGMI ($98,400,000) Merrill Lynch ($98,400,000) Morgan Stanley ($98,400,000) UBS ($98,400,000) Barclays ($6,000,000) BB&T ($6,000,000) Deutsche Bank ($6,000,000) Wells Fargo Securities ($6,000,000) Credit Suisse ($4,000,000) Goldman Sachs ($4,000,000) Sandler O'Neill ($4,000,000) Loop ($2,000,000) Muriel Siebert | 5/8/06 8-K 5/19/06 8-K 10/2/06 8-K 10/16/06 8-K 11/3/06 10-Q 1/23/07 8-K | February 7, 2007<br><br>Peter M. Carlson<br>G. Kennedy Thompson<br>Mark C. Treanor<br>Thomas J. Wurtz<br>John D. Baker, II<br>Robert J. Brown<br>Peter C. Browning<br>John T. Casteen, III<br>Jerome A. Gitt<br>William H. Goodwin, Jr.<br>Mary Ellen C. Herringer<br>Robert A. Ingram<br>Donald M. James<br>Mackey J. McDonald<br>Joseph Neubauer<br>Timothy D. Proctor<br>Ernest S. Rady<br>Van L. Richey<br>Ruth G. Shaw<br>Lanty L. Smith |

---

[1] The volume sold by each Underwriter Defendant reflects only the volume sold in the initial offering, excluding any overallotment. Where an offering includes overallotments, on information and belief, each underwriter sold an equivalent percentage of additional securities pursuant to the authorized overallotment.

[2] The documents listed as incorporated into the Offering Materials for each Offering include only those that Lead Plaintiffs challenge as materially inaccurate or misleading, as set forth more fully in the Complaint.

[3] As set forth above in Section III.B.3, each Individual Defendant is liable for Offerings conducted pursuant to a Registration Statement that he or she signed, as well as for Offerings completed during his or her tenure as a Director.

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | ($2,000,000)<br>Ramirez ($2,000,000)<br>Williams Capital ($2,000,000) | | John C. Whitaker, Jr. |
| 5/8/07 | *Wachovia Capital Trust IX (unconditionally guaranteed by Wachovia)*/6.375% Trust Preferred Securities (92978X201) | 30 million Trust Preferred Securities (TPS); plus 4,500,000 TPS to cover over-allotments | $862,500,000 ($25 per TPS) | WCM ($111,000,000)<br>CGMI ($111,000,000)<br>Merrill Lynch ($111,000,000)<br>Morgan Stanley ($111,000,000)<br>UBS ($111,000,000)<br>Banc of America ($5,625,000)<br>Barclays ($5,625,000)<br>BB&T ($5,625,000)<br>Deutsche Bank ($5,625,000)<br>Wells Fargo Securities ($5,625,000)<br>Credit Suisse ($3,750,000)<br>Goldman Sachs ($3,750,000)<br>Sandler O'Neill ($3,750,000)<br>Loop ($1,875,000)<br>Muriel Siebert ($1,875,000)<br>Ramirez ($1,875,000)<br>Williams Capital ($1,875,000) | 1/23/07 8-K<br>2/28/07 10-K<br>5/4/07 10-Q | February 7, 2007<br><br>Peter M. Carlson<br>G. Kennedy Thompson<br>Mark C. Treanor<br>Thomas J. Wurtz<br>John D. Baker, II<br>Robert J. Brown<br>Peter C. Browning<br>John T. Casteen, III<br>Jerome A. Gitt<br>William H. Goodwin, Jr.<br>Mary Ellen C. Herringer<br>Robert A. Ingram<br>Donald M. James<br>Mackey J. McDonald<br>Joseph Neubauer<br>Timothy D. Proctor<br>Ernest S. Rady<br>Van L. Richey<br>Ruth G. Shaw<br>Lanty L. Smith<br>John C. Whitaker, Jr. |

| | | | | | | |
|---|---|---|---|---|---|---|
| 11/21/07 | *Wachovia Capital Trust X (unconditionally guaranteed by Wachovia)/7.85% Trust Preferred Securities (92979K208)* | 30 million Trust Preferred Securities (TPS) | $750,000,000 ($25 per TPS) | WCM ($108,750,000) GGMI ($108,750,000) Merrill Lynch ($108,750,000) Morgan Stanley ($108,750,000) UBS ($108,750,000) Banc of America ($5,625,000) Barclays ($5,625,000) Deutsche Bank ($5,625,000) Wells Fargo Securities ($5,625,000) BB&T ($3,750,000) Credit Suisse ($3,750,000) Goldman Sachs ($3,750,000) Sandler O'Neill ($3,750,000) M.R. Beal ($1,875,000) Muriel Siebert ($1,875,000) Ramirez ($1,875,000) Williams Capital ($1,875,000) | 1/23/07 8-K 2/28/07 10-K 5/4/07 10-Q 7/20/07 8-K 7/30/07 10-Q 10/19/07 8-K 11/9/07 8-K 11/9/07 10-Q | February 7, 2007  Peter M. Carlson G. Kennedy Thompson Mark C. Treanor Thomas J. Wurtz John D. Baker, II Robert J. Brown Peter C. Browning John T. Casteen, III Jerome A. Gitt William H. Goodwin, Jr. Mary Ellen C. Herringer Robert A. Ingram Donald M. James Mackey J. McDonald Joseph Neubauer Timothy D. Proctor Ernest S. Rady Van L. Richey Ruth G. Shaw Lanty L. Smith John C. Whitaker, Jr. |
| 12/21/07 | *Wachovia /8.00% Non-Cumulative Perpetual Class A Preferred Stock, Series J* | 80 million Depositary Shares (DS), plus 12,000,000 | $2,300,000,000 ($25 per DS, each representing a $1/40^{th}$ interest | WCM ($368,000,000) CGMI ($368,000,000) Merrill Lynch ($368,000,000) Morgan Stanley | 1/23/07 8-K 2/28/07 10-K 5/4/07 10-Q 7/20/07 8-K 7/30/07 10-Q | May 26, 2005  David M. Julian G. Kennedy Thompson Mark C. Treanor |

| | | | | | | |
|---|---|---|---|---|---|---|
| | (929903276) | DS to cover over-allotments | in a Share of Perpetual Class A Preferred Stock, Series J) | ($368,000,000) UBS ($368,000,000) Banc of America ($10,000,000) Barclays ($10,000,000) Deutsche Bank ($10,000,000) Goldman Sachs ($10,000,000) Ramirez ($10,000,000) Sandler O'Neill ($10,000,000) Williams Capital ($10,000,000) Wells Fargo Securities ($10,000,000) | 10/19/07 8-K 11/9/07 8-K 11/9/07 10-Q 12/12/2007 8-K | John D. Baker, II Robert J. Brown Peter C. Browning John T. Casteen, III William H. Goodwin, Jr. Robert A. Ingram Mackey J. McDonald Joseph Neubauer Ruth G. Shaw Lanty L. Smith John C. Whitaker, Jr. Dona Davis Young |
| 2/8/08 | *Wachovia* /Fixed-to-Floating Rate Non-Cumulative Perpetual Class A Preferred Stock, Series K (929403243) (929903EF5) (corrected) | 3.5 million Series K shares | $3,500,000,000 ($1,000 per Series K share) | WCM ($3,223,500,000) Barclays ($52,500,000) Deutsche Bank ($52,500,000) Sandler O'Neill ($52,500,000) UBS ($52,500,000) | 1/23/07 8-K 2/28/07 10-K 5/4/07 10-Q 7/20/07 8-K 7/30/07 10-Q 10/19/07 8-K 11/9/07 8-K 11/9/07 10-Q 12/12/2007 8-K 1/22/08 8-K | May 26, 2005<br><br>David M. Julian G. Kennedy Thompson Mark C. Treanor John D. Baker, II Robert J. Brown Peter C. Browning John T. Casteen, III William H. Goodwin, Jr. Robert A. Ingram Mackey J. McDonald Joseph Neubauer Ruth G. Shaw Lanty L. Smith John C. Whitaker, Jr. |

| | | | | | | Dona Davis Young |
|---|---|---|---|---|---|---|
| 4/17/08 | *Wachovia* /7.50% Non-Cumulative Perpetual Convertible Class A Preferred Stock, Series L (929903219) | 3.5 million Series L shares, plus 525,000 Series L shares to cover over-allotments | $4,025,000,000 ($1,000 per Series L share) | WCM ($1,750,000,000) Goldman Sachs ($1,330,000,000) CGMI ($140,000,000) Credit Suisse ($140,000,000) UBS ($140,000,000) | 1/22/08 8-K 2/28/08 10-K 4/14/08 8-K | April 14, 2008<br><br>Peter M. Carlson<br>Ross E. Jeffries, Jr.<br>G. Kennedy Thompson<br>Thomas J. Wurtz<br>John D. Baker, II<br>Peter C. Browning<br>John T. Casteen, III<br>Jerome A. Gitt<br>William H. Goodwin, Jr.<br>Mary Ellen C. Herringer<br>Robert A. Ingram<br>Donald M. James<br>Mackey J. McDonald<br>Joseph Neubauer<br>Timothy D. Proctor<br>Ernest S. Rady<br>Van L. Richey<br>Ruth G. Shaw<br>Lanty L. Smith<br>Dona Davis Young |

**BOND/NOTE OFFERINGS**

| ISSUE DATE | SECURITY (CUSIP) | ISSUER | VOLUME | UNDERWRITER DEFENDANTS (VOLUME) | INCORPORATED DOCUMENTS[4] | REGISTRATION STATEMENT/SIGNATORIES[5] |
|---|---|---|---|---|---|---|
| 7/31/06 | Three-Month LIBOR Floating Rate Notes Due August 1, 2013 (92976WBB1) | Wachovia | $400,000,000 | WCM ($368,000,000) BB&T ($8,000,000) Loop ($8,000,000) Ramirez ($8,000,000) Sandler O'Neill ($8,000,000) | 5/8/06 8-K 5/19/06 8-K | March 14, 2005<br><br>David M. Julian<br>G. Kennedy Thompson<br>Mark C. Treanor<br>John D. Baker, II<br>Robert J. Brown<br>Peter C. Browning<br>John T. Casteen, III<br>William H. Goodwin, Jr.<br>Robert A. Ingram<br>Donald M. James<br>Joseph Neubauer<br>Van L. Richey<br>Ruth G. Shaw<br>Lanty L. Smith<br>John C. Whitaker, Jr.<br>Dona Davis Young |
| 7/31/06 | 5.70% Notes Due August 1, 2013 (92976WBA3) | Wachovia | $600,000,000 | WCM ($552,000,000) BB&T ($12,000,000) Loop ($12,000,000) Ramirez ($12,000,000) Sandler O'Neill | 5/8/06 8-K 5/19/06 8-K | March 14, 2005<br><br>David M. Julian<br>G. Kennedy Thompson<br>Mark C. Treanor |

[4] The documents listed as incorporated into the Offering Materials for each Offering include only those that Lead Plaintiffs challenge as materially inaccurate or misleading, as set forth more fully in the Complaint.

[5] As set forth above in Section III.B.3, each Individual Defendant is liable for Offerings conducted pursuant to a Registration Statement that he or she signed, as well as for Offerings completed during his or her tenure as a Director.

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | ($12,000,000) | | John D. Baker, II<br>Robert J. Brown<br>Peter C. Browning<br>John T. Casteen, III<br>William H. Goodwin, Jr.<br>Robert A. Ingram<br>Donald M. James<br>Joseph Neubauer<br>Van L. Richey<br>Ruth G. Shaw<br>Lanty L. Smith<br>John C. Whitaker, Jr.<br>Dona Davis Young |
| 10/23/06 | Three-Month LIBOR Floating Rate Notes Due October 15, 2011 (929903CG5) | Wachovia | $1,000,000,000 | WCM ($895,000,000)<br>BB&T ($15,000,000)<br>CGMI ($15,000,000)<br>Loop ($15,000,000)<br>Morgan Stanley ($15,000,000)<br>Muriel Siebert ($15,000,000)<br>Ramirez ($15,000,000)<br>Sandler O'Neill ($15,000,000) | 5/8/06 8-K<br>5/19/06 8-K<br>10/2/06 8-K<br>10/16/06 8-K | May 26, 2005<br><br>David M. Julian<br>G. Kennedy Thompson<br>Mark C. Treanor<br>John D. Baker, II<br>Robert J. Brown<br>Peter C. Browning<br>John T. Casteen, III<br>William H. Goodwin, Jr.<br>Robert A. Ingram<br>Mackey J. McDonald<br>Joseph Neubauer<br>Ruth G. Shaw<br>Lanty L. Smith<br>John C. Whitaker, Jr.<br>Dona Davis Young |

| 10/23/06 | 5.30% Notes Due October 15, 2011 (929903CF7) | Wachovia | $1,100,000,000 | WCM ($984,500,000)<br>BB&T ($16,500,000)<br>CGMI ($16,500,000)<br>Loop ($16,500,000)<br>Morgan Stanley ($16,500,000)<br>Muriel Siebert ($16,500,000)<br>Ramirez ($16,500,000)<br>Sandler O'Neill ($16,500,000) | 5/8/06 8-K<br>5/19/06 8-K<br>10/2/06 8-K<br>10/16/06 8-K | May 26, 2005<br><br>David M. Julian<br>G. Kennedy Thompson<br>Mark C. Treanor<br>John D. Baker, II<br>Robert J. Brown<br>Peter C. Browning<br>John T. Casteen, III<br>William H. Goodwin, Jr.<br>Robert A. Ingram<br>Mackey J. McDonald<br>Joseph Neubauer<br>Ruth G. Shaw<br>Lanty L. Smith<br>John C. Whitaker, Jr.<br>Dona Davis Young |
| 10/23/06 | 5.625% Subordinated Notes Due October 15, 2016 (929903CH3) | Wachovia | $1,250,000,000 | WCM ($1,118,750,000)<br>BB&T ($18,750,000)<br>CGMI ($18,750,000)<br>Loop ($18,750,000)<br>Morgan Stanley ($18,750,000)<br>Muriel Siebert ($18,750,000)<br>Ramirez ($18,750,000)<br>Sandler O'Neill ($18,750,000) | 5/8/06 8-K<br>5/19/06 8-K<br>10/2/06 8-K<br>10/16/06 8-K | May 26, 2005<br><br>David M. Julian<br>G. Kennedy Thompson<br>Mark C. Treanor<br>John D. Baker, II<br>Robert J. Brown<br>Peter C. Browning<br>John T. Casteen, III<br>William H. Goodwin, Jr.<br>Robert A. Ingram<br>Mackey J. McDonald<br>Joseph Neubauer<br>Ruth G. Shaw |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | Lanty L. Smith<br>John C. Whitaker, Jr.<br>Dona Davis Young |
| 10/23/06 | Three-Month LIBOR Floating Rate Subordinated Notes Due October 15, 2016 (929903CJ9) | Wachovia | $650,000,000 | WCM ($581,750,000)<br>BB&T ($9,750,000)<br>CGMI ($9,750,000)<br>Loop ($9,750,000)<br>Morgan Stanley ($9,750,000)<br>Muriel Siebert ($9,750,000)<br>Ramirez ($9,750,000)<br>Sandler O'Neill ($9,750,000) | 5/8/06 8-K<br>5/19/06 8-K<br>10/2/06 8-K<br>10/16/06 8-K | May 26, 2005<br><br>David M. Julian<br>G. Kennedy Thompson<br>Mark C. Treanor<br>John D. Baker, II<br>Robert J. Brown<br>Peter C. Browning<br>John T. Casteen, III<br>William H. Goodwin, Jr.<br>Robert A. Ingram<br>Mackey J. McDonald<br>Joseph Neubauer<br>Ruth G. Shaw<br>Lanty L. Smith<br>John C. Whitaker, Jr.<br>Dona Davis Young |
| 12/13/06 | Three-Month LIBOR Floating Rate Senior Notes Due December 1, 2009 (92976WBC9) | Wachovia | $1,500,000,000 | WCM ($1,470,000,000)<br>Guzman ($15,000,000) | 5/8/06 8-K<br>5/19/06 8-K<br>10/2/06 8-K<br>10/16/06 8-K<br>11/3/06 10-Q | March 14, 2005<br><br>David M. Julian<br>G. Kennedy Thompson<br>Mark C. Treanor<br>John D. Baker, II<br>Robert J. Brown<br>Peter C. Browning<br>John T. Casteen, III<br>William H. Goodwin, Jr.<br>Robert A. Ingram |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | Donald M. James<br>Joseph Neubauer<br>Van L. Richey<br>Ruth G. Shaw<br>Lanty L. Smith<br>John C. Whitaker, Jr.<br>Dona Davis Young |
| 2/12/07 | The 10/23/06 Three-Month LIBOR Floating Rate Notes Due October 15, 2011 Offering (Supplemental) (929903CG5) | Wachovia | $500,000,000 | WCM ($480,000,000) Loop ($10,000,000) Muriel Siebert ($10,000,000) | 5/8/06 8-K<br>5/19/06 8-K<br>10/2/06 8-K<br>10/16/06 8-K<br>11/3/06 10-Q<br>1/23/07 8-K | May 26, 2005<br><br>David M. Julian<br>G. Kennedy Thompson<br>Mark C. Treanor<br>John D. Baker, II<br>Robert J. Brown<br>Peter C. Browning<br>John T. Casteen, III<br>William H. Goodwin, Jr.<br>Robert A. Ingram<br>Mackey J. McDonald<br>Joseph Neubauer<br>Ruth G. Shaw<br>Lanty L. Smith<br>John C. Whitaker, Jr.<br>Dona Davis Young |
| 2/12/07 | The 10/23/06 5.30% Notes Due October 15, 2011 Offering (Supplemental) (929903CF7) | Wachovia | $500,000,000 | WCM ($480,000,000) Loop ($10,000,000) Muriel Siebert ($10,000,000) | 5/8/06 8-K<br>5/19/06 8-K<br>10/2/06 8-K<br>10/16/06 8-K<br>11/3/06 10-Q<br>1/23/07 8-K | May 26, 2005<br><br>David M. Julian<br>G. Kennedy Thompson<br>Mark C. Treanor<br>John D. Baker, II<br>Robert J. Brown |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | Peter C. Browning<br>John T. Casteen, III<br>William H. Goodwin, Jr.<br>Robert A. Ingram<br>Mackey J. McDonald<br>Joseph Neubauer<br>Ruth G. Shaw<br>Lanty L. Smith<br>John C. Whitaker, Jr.<br>Dona Davis Young |
| 4/23/07 | Three-Month LIBOR Floating Rate Notes Due April 23, 2012 (929903DF6) | Wachovia | $1,500,000,000 | WCM ($1,365,000,000) Barclays ($22,500,000) Goldman Sachs ($22,500,000) M.R. Beal ($22,500,000) Merrill Lynch ($22,500,000) Morgan Stanley ($22,500,000) Ramirez ($22,500,000) | 5/8/06 8-K<br>5/19/06 8-K<br>10/2/06 8-K<br>10/16/06 8-K<br>11/3/06 10-Q<br>1/23/07 8-K<br>2/28/07 10-K<br>4/16/07 8-K | May 26, 2005<br><br>David M. Julian<br>G. Kennedy Thompson<br>Mark C. Treanor<br>John D. Baker, II<br>Robert J. Brown<br>Peter C. Browning<br>John T. Casteen, III<br>William H. Goodwin, Jr.<br>Robert A. Ingram<br>Mackey J. McDonald<br>Joseph Neubauer<br>Ruth G. Shaw<br>Lanty L. Smith<br>John C. Whitaker, Jr.<br>Dona Davis Young |
| 6/8/07 | Three-Month LIBOR Floating Rate Notes Due June 15, 2017 | Wachovia | $900,000,000 | WCM ($810,000,000) CGMI ($13,500,000) Loop ($13,500,000) Morgan Stanley | 5/8/06 8-K<br>5/19/06 8-K<br>10/2/06 8-K<br>10/16/06 8-K | May 26, 2005<br><br>David M. Julian<br>G. Kennedy Thompson |

| | | | | | | |
|---|---|---|---|---|---|---|
| | (929903DU3) | | | ($13,500,000)<br>Williams Capital<br>($13,500,000) | 11/3/06 10-Q<br>1/23/07 8-K<br>2/28/07 10-K<br>4/16/07 8-K<br>5/4/07 10-Q | Mark C. Treanor<br>John D. Baker, II<br>Robert J. Brown<br>Peter C. Browning<br>John T. Casteen, III<br>William H. Goodwin, Jr.<br>Robert A. Ingram<br>Mackey J. McDonald<br>Joseph Neubauer<br>Ruth G. Shaw<br>Lanty L. Smith<br>John C. Whitaker, Jr.<br>Dona Davis Young |
| 6/8/07 | 5.75% Notes Due<br>June 15, 2017<br>(929903DT6) | Wachovia | $1,350,000,000 | WCM ($1,215,000,000)<br>CGMI ($20,250,000)<br>Loop ($20,250,000)<br>Morgan Stanley<br>($20,250,000)<br>Williams Capital<br>($20,250,000) | 5/8/06 8-K<br>5/19/06 8-K<br>10/2/06 8-K<br>10/16/06 8-K<br>11/3/06 10-Q<br>1/23/07 8-K<br>2/28/07 10-K<br>4/16/07 8-K<br>5/4/07 10-Q | May 26, 2005<br><br>David M. Julian<br>G. Kennedy Thompson<br>Mark C. Treanor<br>John D. Baker, II<br>Robert J. Brown<br>Peter C. Browning<br>John T. Casteen, III<br>William H. Goodwin, Jr.<br>Robert A. Ingram<br>Mackey J. McDonald<br>Joseph Neubauer<br>Ruth G. Shaw<br>Lanty L. Smith<br>John C. Whitaker, Jr.<br>Dona Davis Young |

| 6/19/07 | The 4/23/07 Three-Month LIBOR Floating Rate Notes Due April 23, 2012 Offering (Supplemental) (929903DF6) | Wachovia | $100,000,000 | WCM ($97,000,000) Loop ($1,500,000) Muriel Siebert ($1,500,000) | 5/8/06 8-K<br>5/19/06 8-K<br>10/2/06 8-K<br>10/16/06 8-K<br>11/3/06 10-Q<br>1/23/07 8-K<br>2/28/07 10-K<br>4/16/07 8-K<br>5/4/07 10-Q | May 26, 2005<br><br>David M. Julian<br>G. Kennedy Thompson<br>Mark C. Treanor<br>John D. Baker, II<br>Robert J. Brown<br>Peter C. Browning<br>John T. Casteen, III<br>William H. Goodwin, Jr.<br>Robert A. Ingram<br>Mackey J. McDonald<br>Joseph Neubauer<br>Ruth G. Shaw<br>Lanty L. Smith<br>John C. Whitaker, Jr.<br>Dona Davis Young |
| 7/26/07 | Three-Month LIBOR Floating Rate Notes Due July 26, 2010 (92976WBD7) | Wachovia | $2,000,000,000 | WCM ($1,910,000,000) Jackson ($30,000,000) Muriel Siebert ($30,000,000) Ramirez ($30,000,000) | 1/23/07 8-K<br>2/28/07 10-K<br>4/16/07 8-K<br>5/4/07 10-Q<br>7/20/07 8-K | March 5, 2007<br><br>Peter M. Carlson<br>Ross E. Jeffries, Jr.<br>G. Kennedy Thompson<br>Thomas J. Wurtz<br>John D. Baker, II<br>Robert J. Brown<br>Peter C. Browning<br>John T. Casteen, III<br>Jerome A. Gitt<br>William H. Goodwin, Jr.<br>Mary Ellen C. Herringer<br>Robert A. Ingram |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | Donald M. James<br>Mackey J. McDonald<br>Joseph Neubauer<br>Timothy D. Proctor<br>Ernest S. Rady<br>Van L. Richey<br>Ruth G. Shaw<br>Lanty L. Smith<br>John C. Whitaker, Jr.<br>Dona Davis Young |
| 8/20/07 | Three-Month LIBOR Floating Rate Notes Due August 20, 2009 (929903EC2) | Wachovia | $1,750,000,000 | WCM ($1,671,250,000)<br>Guzman ($26,250,000)<br>Jackson ($26,250,000)<br>M.R. Beal ($26,250,000) | 5/8/06 8-K<br>5/19/06 8-K<br>10/2/06 8-K<br>10/16/06 8-K<br>11/3/06 10-Q<br>1/23/07 8-K<br>2/28/07 10-K<br>4/16/07 8-K<br>5/4/07 10-Q<br>7/20/07 8-K<br>7/30/07 10-Q | May 26, 2005<br><br>David M. Julian<br>G. Kennedy Thompson<br>Mark C. Treanor<br>John D. Baker, II<br>Robert J. Brown<br>Peter C. Browning<br>John T. Casteen, III<br>William H. Goodwin, Jr.<br>Robert A. Ingram<br>Mackey J. McDonald<br>Joseph Neubauer<br>Ruth G. Shaw<br>Lanty L. Smith<br>John C. Whitaker, Jr.<br>Dona Davis Young |
| 9/17/07 | The 6/8/07 5.75% Notes Due June 15, 2017 Offering (Supplemental) | Wachovia | $350,000,000 | WCM ($339,500,000)<br>Ramirez ($5,250,000) | 5/8/06 8-K<br>5/19/06 8-K<br>10/2/06 8-K<br>10/16/06 8-K | May 26, 2005<br><br>David M. Julian<br>G. Kennedy Thompson |

A-14

| | | | | | | |
|---|---|---|---|---|---|---|
| | (929903DT6) | | | | 11/3/06 10-Q<br>1/23/07 8-K<br>2/28/07 10-K<br>4/16/07 8-K<br>5/4/07 10-Q<br>7/20/07 8-K<br>7/30/07 10-Q | Mark C. Treanor<br>John D. Baker, II<br>Robert J. Brown<br>Peter C. Browning<br>John T. Casteen, III<br>William H. Goodwin, Jr.<br>Robert A. Ingram<br>Mackey J. McDonald<br>Joseph Neubauer<br>Ruth G. Shaw<br>Lanty L. Smith<br>John C. Whitaker, Jr.<br>Dona Davis Young |
| 11/14/07 | The 7/31/06 5.70% Notes Due August 1, 2013 Offering (Supplemental) (92976WBA3) | Wachovia | $200,000,000 | WCM ($194,000,000)<br>Loop ($3,000,000)<br>Ramirez ($3,000,000) | 1/23/07 8-K<br>2/28/07 10-K<br>4/16/07 8-K<br>5/4/07 10-Q<br>7/20/07 8-K<br>7/30/07 10-Q<br>10/19/07 8-K<br>11/9/07 8-K<br>11/9/07 10-Q | March 5, 2007<br><br>Peter M. Carlson<br>Ross E. Jeffries, Jr.<br>G. Kennedy Thompson<br>Thomas J. Wurtz<br>John D. Baker, II<br>Robert J. Brown<br>Peter C. Browning<br>John T. Casteen, III<br>Jerome A. Gitt<br>William H. Goodwin, Jr.<br>Mary Ellen C. Herringer<br>Robert A. Ingram<br>Donald M. James<br>Mackey J. McDonald<br>Joseph Neubauer<br>Timothy D. Proctor<br>Ernest S. Rady |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | Van L. Richey<br>Ruth G. Shaw<br>Lanty L. Smith<br>John C. Whitaker, Jr.<br>Dona Davis Young |
| 11/27/07 | Three-Month LIBOR Floating Rate Notes Due November 24, 2009 (92976WBG0) | Wachovia | $850,000,000 | WCM ($824,500,000)<br>Jackson ($12,750,000)<br>Williams Capital ($12,750,000) | 1/23/07 8-K<br>2/28/07 10-K<br>4/16/07 8-K<br>5/4/07 10-Q<br>7/20/07 8-K<br>7/30/07 10-Q<br>10/19/07 8-K<br>11/9/07 8-K<br>11/9/07 10-Q | March 5, 2007<br><br>Peter M. Carlson<br>Ross E. Jeffries, Jr.<br>G. Kennedy Thompson<br>Thomas J. Wurtz<br>John D. Baker, II<br>Robert J. Brown<br>Peter C. Browning<br>John T. Casteen, III<br>Jerome A. Gitt<br>William H. Goodwin, Jr.<br>Mary Ellen C. Herringer<br>Robert A. Ingram<br>Donald M. James<br>Mackey J. McDonald<br>Joseph Neubauer<br>Timothy D. Proctor<br>Ernest S. Rady<br>Van L. Richey<br>Ruth G. Shaw<br>Lanty L. Smith<br>John C. Whitaker, Jr.<br>Dona Davis Young |

| 11/27/07 | Three-Month LIBOR Floating Rate Notes Due November 24, 2009 (92976WBG0) | Wachovia | $260,000,000 | WCM ($248,300,000) Jackson ($3,900,000) Williams Capital ($3,900,000) | 1/23/07 8-K 2/28/07 10-K 4/16/07 8-K 5/4/07 10-Q 7/20/07 8-K 7/30/07 10-Q 10/19/07 8-K 11/9/07 8-K 11/9/07 10-Q | March 5, 2007 Peter M. Carlson Ross E. Jeffries, Jr. G. Kennedy Thompson Thomas J. Wurtz John D. Baker, II Robert J. Brown Peter C. Browning John T. Casteen, III Jerome A. Gitt William H. Goodwin, Jr. Mary Ellen C. Herringer Robert A. Ingram Donald M. James Mackey J. McDonald Joseph Neubauer Timothy D. Proctor Ernest S. Rady Van L. Richey Ruth G. Shaw Lanty L. Smith John C. Whitaker, Jr. Dona Davis Young |
| --- | --- | --- | --- | --- | --- | --- |
| 12/18/07 | The 6/8/07 5.75% Notes Due June 15, 2017 Offering (Supplemental) (929903DT6) | Wachovia | $250,000,000 | WCM ($242,500,000) Guzman ($3,750,000) | 5/8/06 8-K 5/19/06 8-K 10/2/06 8-K 10/16/06 8-K 11/3/06 10-Q 1/23/07 8-K 2/28/07 10-K | May 26, 2005 David M. Julian G. Kennedy Thompson Mark C. Treanor John D. Baker, II Robert J. Brown |

| | | | | | | 4/16/07 8-K | Peter C. Browning |
|---|---|---|---|---|---|---|---|
| | | | | | | 5/4/07 10-Q | John T. Casteen, III |
| | | | | | | 7/20/07 8-K | William H. Goodwin, Jr. |
| | | | | | | 7/30/07 10-Q | Robert A. Ingram |
| | | | | | | 10/19/07 8-K | Mackey J. McDonald |
| | | | | | | 11/9/07 8-K | Joseph Neubauer |
| | | | | | | 11/9/07 10-Q | Ruth G. Shaw |
| | | | | | | 12/12/07 8-K | Lanty L. Smith |
| | | | | | | | John C. Whitaker, Jr. |
| | | | | | | | Dona Davis Young |
| 1/31/08 | 5.75% Notes due February 1, 2018 (92976WBH8) | Wachovia | $2,500,000,000 | WCM ($2,275,000,000) Barclays ($37,500,000) BB&T ($37,500,000) Loop ($37,500,000) Muriel Siebert ($37,500,000) Ramirez ($37,500,000) Sandler O'Neill ($37,500,000) | | 1/23/07 8-K 2/28/07 10-K 4/16/07 8-K 5/4/07 10-Q 7/20/07 8-K 7/30/07 10-Q 10/19/07 8-K 11/9/07 8-K 11/9/07 10-Q 12/12/07 8-K 1/22/08 8-K | March 5, 2007 <br><br> Peter M. Carlson <br> Ross E. Jeffries, Jr. <br> G. Kennedy Thompson <br> Thomas J. Wurtz <br> John D. Baker, II <br> Robert J. Brown <br> Peter C. Browning <br> John T. Casteen, III <br> Jerome A. Gitt <br> William H. Goodwin, Jr. <br> Mary Ellen C. Herringer <br> Robert A. Ingram <br> Donald M. James <br> Mackey J. McDonald <br> Joseph Neubauer <br> Timothy D. Proctor <br> Ernest S. Rady <br> Van L. Richey <br> Ruth G. Shaw <br> Lanty L. Smith |

| | | | | | | John C. Whitaker, Jr.<br>Dona Davis Young |
|---|---|---|---|---|---|---|
| 4/25/08 | 5.50% Fixed Rate Notes Due May 1, 2013 (92976WBJ4) | Wachovia | $2,850,000,000 | WCM ($2,593,500,000)<br>Barclays ($42,750,000)<br>Deutsche Bank ($42,750,000)<br>Guzman ($42,750,000)<br>M.R. Beal ($42,750,000)<br>UBS ($42,750,000) | 1/23/07 8-K<br>2/28/07 10-K<br>4/16/07 8-K<br>5/4/07 10-Q<br>7/20/07 8-K<br>7/30/07 10-Q<br>10/19/07 8-K<br>11/9/07 8-K<br>11/9/07 10-Q<br>12/12/07 8-K<br>1/22/08 8-K<br>2/28/08 10-K<br>4/14/08 8-K | March 5, 2007<br><br>Peter M. Carlson<br>Ross E. Jeffries, Jr.<br>G. Kennedy Thompson<br>Thomas J. Wurtz<br>John D. Baker, II<br>Robert J. Brown<br>Peter C. Browning<br>John T. Casteen, III<br>Jerome A. Gitt<br>William H. Goodwin, Jr.<br>Mary Ellen C. Herringer<br>Robert A. Ingram<br>Donald M. James<br>Mackey J. McDonald<br>Joseph Neubauer<br>Timothy D. Proctor<br>Ernest S. Rady<br>Van L. Richey<br>Ruth G. Shaw<br>Lanty L. Smith<br>John C. Whitaker, Jr.<br>Dona Davis Young |
| 4/25/08 | Three Month LIBOR Floating Rate Notes due May 1, 2013 (92976WBK1) | Wachovia | $650,000,000 | WCM ($591,500,000)<br>Barclays ($9,750,000)<br>Deutsche Bank ($9,750,000)<br>Guzman ($9,750,000) | 1/23/07 8-K<br>2/28/07 10-K<br>4/16/07 8-K<br>5/4/07 10-Q<br>7/20/07 8-K | March 5, 2007<br><br>Peter M. Carlson<br>Ross E. Jeffries, Jr.<br>G. Kennedy Thompson |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | M.R. Beal ($9,750,000)<br>UBS ($9,750,000) | 7/30/07 10-Q<br>10/19/07 8-K<br>11/9/07 8-K<br>11/9/07 10-Q<br>12/12/07 8-K<br>1/22/08 8-K<br>2/28/08 10-K<br>4/14/08 8-K | Thomas J. Wurtz<br>John D. Baker, II<br>Robert J. Brown<br>Peter C. Browning<br>John T. Casteen, III<br>Jerome A. Gitt<br>William H. Goodwin, Jr.<br>Mary Ellen C. Herringer<br>Robert A. Ingram<br>Donald M. James<br>Mackey J. McDonald<br>Joseph Neubauer<br>Timothy D. Proctor<br>Ernest S. Rady<br>Van L. Richey<br>Ruth G. Shaw<br>Lanty L. Smith<br>John C. Whitaker, Jr.<br>Dona Davis Young |
| 5/29/08 | The 4/25/08 5.50% Fixed Rate Notes Due May 1, 2013 Offering (Supplemental) (92976WBJ4) | Wachovia | $200,000,000 | WCM ($194,000,000)<br>Guzman ($3,000,000)<br>M.R. Beal ($3,000,000) | 1/23/07 8-K<br>2/28/07 10-K<br>4/16/07 8-K<br>5/4/07 10-Q<br>7/20/07 8-K<br>7/30/07 10-Q<br>10/19/07 8-K<br>11/9/07 8-K<br>11/9/07 10-Q<br>12/12/07 8-K<br>1/22/08 8-K<br>2/28/08 10-K<br>4/14/08 8-K | March 5, 2007<br><br>Peter M. Carlson<br>Ross E. Jeffries, Jr.<br>G. Kennedy Thompson<br>Thomas J. Wurtz<br>John D. Baker, II<br>Robert J. Brown<br>Peter C. Browning<br>John T. Casteen, III<br>Jerome A. Gitt<br>William H. Goodwin, Jr.<br>Mary Ellen C. Herringer |

| | | | | | 5/12/08 10-Q | Robert A. Ingram |
|---|---|---|---|---|---|---|
| | | | | | | Donald M. James |
| | | | | | | Mackey J. McDonald |
| | | | | | | Joseph Neubauer |
| | | | | | | Timothy D. Proctor |
| | | | | | | Ernest S. Rady |
| | | | | | | Van L. Richey |
| | | | | | | Ruth G. Shaw |
| | | | | | | Lanty L. Smith |
| | | | | | | John C. Whitaker, Jr. |
| | | | | | | Dona Davis Young |