UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
                                            :
                                            :
IN RE WACHOVIA EQUITY                       :    No. 08 Civ. 6171 (RJS)
SECURITIES LITIGATION                       :    ECF CASE
                                            :
                                            :
----------------------------------------------------------------:
                                            :
                                            :
IN RE WACHOVIA PREFERRED SECURITIES         :    Master File No. 09 Civ. 6351 (RJS)
AND BOND/NOTES LITIGATION                   :    ECF CASE
                                            :
                                            :
----------------------------------------------------------------x


**CONSOLIDATED MEMORANDUM OF LAW IN SUPPORT OF THE
WACHOVIA DEFENDANTS' MOTIONS TO DISMISS THE AMENDED
CONSOLIDATED CLASS ACTION COMPLAINTS**

Douglas H. Flaum
Israel David
Eric A. Hirsch
Courtney A. Jean
FRIED, FRANK, HARRIS SHRIVER
  & JACOBSON LLP
One New York Plaza
New York, New York 10004
(212) 859-8000
douglas.flaum@friedfrank.com

*Attorneys for the Wachovia Defendants*

## <u>TABLE OF CONTENTS</u>

Page(s)

TABLE OF AUTHORITIES ................................................................................................. iii

TABLE OF SOURCES.......................................................................................................... xii

TABLE CROSS-REFERENCING CONFIDENTIAL WITNESSES IN THE
BOND NOTES COMPLAINTS ......................................................................................... xviii

PRELIMINARY STATEMENT ............................................................................................1

FACTUAL BACKGROUND ..................................................................................................5

ARGUMENT ..........................................................................................................................13

I.     COUNTS I AND II OF THE EQUITY ACTION SHOULD BE  DISMISSED FOR
       FAILURE TO ADEQUATELY ALLEGE SCIENTER..................................................13

       A.     The Motive and Opportunity Allegations Fail.....................................................15

              1.     The Stock "Sales" Do Not Support an Inference of Scienter ...................16

              2.     Allegations Concerning Corporate Acquisitions & Offerings Do
                     Not Support an Inference of Scienter......................................................24

              3.     The Economic Irrationality of the Supposed Scheme Undercuts
                     an Inference of Scienter ............................................................................25

       B.     There Is No Circumstantial Evidence of Scienter.................................................25

              1.     No Contact with the Individual Defendants..............................................26

              2.     Fraudulent Underwriting Allegations Fail ................................................27

              3.     The Bond Notes Confidential Witnesses Undermine Any Scienter
                     Claim..........................................................................................................30

              4.     Another Institution's Cumulative Loss Estimate Does Not Support an
                     Inference of Scienter .................................................................................31

              5.     Wachovia's Risk Management Structure Does Not Support an
                     Inference of Scienter .................................................................................32

              6.     Wachovia's April 2008 Adjustments to Its Underwriting Standards
                     Add Nothing to Plaintiffs' Scienter Claims .............................................34

              7.     Unspecified Internal Reports Do Not Support an Inference of
                     Scienter ......................................................................................................35

II.     THE CLASS ACTION COMPLAINTS FAIL TO PLEAD FALSITY ...........................36

        A.      Plaintiffs' Securities Act Claims Sound in Fraud and Are Subject to the
                Heightened Pleading Requirements of Rule 9(b) ..................................................36

        B.      Plaintiffs' Conclusory Allegations Fail ................................................................38

        C.      The Unchallenged Characteristics of the Pick-a-Pay Portfolio ...........................38

        D.      The Confidential Witness Allegations Do Not Plead Falsity ...............................41

                1.      Plaintiffs' Unsupported or Empty Allegations Should Be
                        Disregarded ...............................................................................................42

                2.      Plaintiffs' Inadequately Described Witnesses Should Be Ignored ...........47

                3.      Paul Bishop's Observations Do Not Support Plaintiffs' Claims ..............48

                4.      Plaintiffs' Confidential Witness-Based Underwriting Claims Fail ..........49

        E.      Plaintiffs' Allegations of Materially Misstated LTV Ratios Fail .........................60

        F.      Plaintiffs' Loan Loss Reserves Claim Fails..........................................................65

        G.      7.5% Annual Cap and Loan Recast Features Were Accurately Described ..........67

        H.      Loan Charge-Off Policies Were Accurately Described.........................................68

        I.      Plaintiffs Fail to Plead Facts Supporting the Assertion  that Wachovia
                Misrepresented Its Underwriting and Risk Profile ..............................................69

        J.      Referenced Documents Do Not Show Falsity .......................................................70

        K.      Plaintiffs' CDO Allegations Fail to State a Claim................................................71

        L.      Plaintiffs' GAAP Allegations Fail to State a Claim .............................................77

III.    THE EXCHANGE ACT CLAIMS MUST BE DISMISSED FOR FAILURE TO PLEAD
        LOSS CAUSATION.........................................................................................................80

IV.     BOND NOTES PLAINTIFFS' CLAIMS SUFFER FROM STANDING AND
        STATUTE OF LIMITATIONS DEFECTS.......................................................................82

V.      PLAINTIFFS' SECONDARY LIABILITY CLAIMS SHOULD BE
        DISMISSED .....................................................................................................................83

CONCLUSION...........................................................................................................................84

### TABLE OF AUTHORITIES

CASES                                                                    Page(s)

*Acito v. IMCERA Group, Inc.*,
   47 F.3d 47 (2d Cir. 1995) ..........................................................................19, 72

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009) .....................................................................................38

*ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007)...........................................................................5 n.3

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)..........................................................................................38

*Blue Chip Stamps v. Manor Drug Stores*,
   421 U.S. 723 (1975)............................................................................................4

*Caiafa v. Sea Containers Ltd.*,
   525 F. Supp. 2d 398 (S.D.N.Y. 2007)......................................................26 n.33

*Cal. Pub. Employees Ret. Sys. v. Chubb Corp.*,
   394 F.3d 126 (3d Cir. 2004).......................................................................42, 56

*Campo v. Sears Holdings Corp.*,
   635 F. Supp. 2d 323 (S.D.N.Y. 2009), *aff'd*,
   2010 WL 1292329 (2d Cir. Apr. 6, 2010) ............................................................26

*Chill v. General Elec. Co.*,
   101 F.3d 263 (2d Cir. 1996)..............................................................................15

*City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*,
   388 F. Supp. 2d 932 (S.D. Ind. 2005) ................................................................52

*Coronel v. Quanta Capital Holdings, Ltd.*,
   2009 WL 174656 (S.D.N.Y. Jan. 23, 2009) ............................................. 63-64, 78

*Davidoff v. Farina*,
   2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005).....................................................25

*DiLeo v. Ernst & Young*,
   901 F.2d 624 (7th Cir. 1990) .............................................................................72

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)...........................................................14, 69 n.71, 80, 82

*Durham v. Whitney Info. Network, Inc.*,
   2009 WL 3783375 (M.D. Fla. Nov. 10, 2009) ....................................................60

*ECA v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009) ............................................................... *passim*

*Epirus Capital Management LLC v. Citigroup Inc.*,
   2010 WL 1779348 (S.D.N.Y. Apr. 29, 2010) ........................................ 31

*Fadem v. Ford Motor Co.*,
   2003 WL 22227961 (S.D.N.Y. Sept. 25, 2003) ............................... 50, 76

*Fait v. Regions Fin. Corp.*,
   2010 WL 1883487 (S.D.N.Y. May 10, 2010) ................................... 66, 79

*First Nationwide Bank v. Gelt Funding Corp.*,
   27 F.3d 763 (2d Cir. 1994) ...................................................................... 81

*Garber v. Legg Mason, Inc.*,
   537 F. Supp. 2d 597 (S.D.N.Y. 2008), *aff'd*,
   347 Fed. App'x 665 (2d Cir. 2009) ................................................ 72 n.73

*Garr v. U.S. Healthcare, Inc.*,
   22 F.3d 1274 (3d Cir. 1994) .......................................................... 26 n.33

*Glover v. DeLuca*,
   2006 WL 2850448 (W.D. Pa. Sept. 29, 2006) ....................................... 28

*Grandon v. Merrill Lynch & Co.*,
   147 F.3d 184 (2d Cir. 1998) .................................................................... 75

*Green Tree Fin. Corp. v. Honeywood Dev. Corp.*,
   2001 WL 62603 (N.D. Ill. Jan. 24, 2001) ....................................... 48 n.49

*Hammerstone NV, Inc. v. Hoffman*,
   2010 WL 882887 (S.D.N.Y. Mar. 10, 2010) .......................................... 20

*Hinerfeld v. United Auto Group*,
   1998 WL 397852 (S.D.N.Y. July 15, 1998) ........................................... 65

*In re 2007 Novastar Fin., Inc. Sec. Litig.*,
   2008 WL 2354367 (W.D. Mo. Jun. 4, 2008), *aff'd*,
   579 F.3d 878 (8th Cir. 2009) .......................................................... *passim*

*In re Advanta Corp. Sec. Litig.*,
   180 F.3d 525 (3d Cir. 1999) .................................................................... 18

*In re Allied Capital Corp. Sec. Litig.*,
   2003 WL 1964184 (S.D.N.Y. Apr. 25, 2003) .................................... 31, 75

*In re Am. Express Co. Sec. Litig.*,
   2008 WL 4501928 (S.D.N.Y. Sept. 26, 2008), *aff'd*,
   604 F.3d 758 (2d Cir. 2010)..................................................................27 n.34

*In re Apple Computer, Inc. Sec. Litig.*,
   243 F. Supp. 2d 1012 (N.D. Cal. 2002) ....................................................42 n.47

*In re Apple Computer Sec. Litig.*,
   886 F.2d 1109 (9th Cir. 1989) ...............................................................21 n.23

*In re AstraZeneca Sec. Litig.*,
   559 F. Supp. 2d 453 (S.D.N.Y. 2008), *aff'd sub nom.*
   *State Univ. Ret. Sys. of Ill. v. AstraZeneca PLC*,
   334 Fed. App'x 404 (2d Cir. 2009)..............................................................19, 24

*In re AXIS Capital Holdings Ltd. Sec. Litig.*,
   456 F. Supp. 2d 576 (S.D.N.Y. 2006) ............................................................73

*In re Bausch & Lomb, Inc. Sec. Litig.*,
   592 F. Supp. 2d 323 (W.D.N.Y. 2008) ......................................20, 27 n.34, 69 n.71

*In re Bristol-Myers Squibb Sec. Litig.*,
   312 F. Supp. 2d 549 (S.D.N.Y. 2004).........................................................16, 20

*In re Career Educ. Corp. Sec. Litig.*,
   2006 WL 999988 (N.D. Ill. Mar. 28, 2006)....................................................54

*In re Career Educ. Corp. Sec. Litig.*,
   2007 WL 1029092 (N.D. Ill. Mar. 29, 2007)..........................................42 n.47, 60

*In re Carter-Wallace, Inc. Sec. Litig.*,
   1999 WL 1029713 (S.D.N.Y. Nov. 10, 1999), *aff'd*,
   220 F.3d 36 (2d Cir. 2000)..........................................................................2

*In re CIT Group, Inc. Sec. Litig.*,
   349 F. Supp. 2d 685 (S.D.N.Y. 2004)........................................................ *passim*

*In re Corning Inc. Sec. Litig.*,
   2004 WL 1056063 (W.D.N.Y. Apr. 9, 2004), *aff'd sub nom.*
   *Levi v. Corning, Inc.*, 2005 WL 714352 (2d Cir. Mar. 30, 2005).....................79-80

*In re Countrywide Fin. Corp. Sec. Litig.*,
   588 F. Supp. 2d 1132 (C.D. Cal. 2008) ...........................................................42

*In re Dot Hill Sys. Corp. Sec. Litig.*,
   2007 WL 935469 (S.D. Cal. Mar. 15, 2007) .....................................................43

*In re Downey Sec. Litig*,
    2009 WL 2767670 (C.D. Cal. Aug. 21, 2009)..............................................................*passim*

*In re Downey Sec. Litig.*,
    2009 WL 736802 (C.D. Cal. Mar. 18, 2009)....................................................................43, 81

*In re Elan Corp. Sec. Litig.*,
    543 F. Supp. 2d 187 (S.D.N.Y. 2008)............................................................................27 n.34

*In re eSpeed, Inc. Sec. Litig.*,
    457 F. Supp. 2d 266 (S.D.N.Y. 2006)............................................................................18 n.19

*In re Fuwei Films Sec. Litig.*,
    634 F. Supp. 2d 419 (S.D.N.Y. 2009)............................................................................37

*In re GlaxoSmithKline PLC Sec. Litig.*,
    2006 WL 2871968 (S.D.N.Y. Oct. 6, 2006)....................................................................19, 69 n.71

*In re Hardinge, Inc. Sec. Litig.*,
    2010 WL 447397 (W.D.N.Y. Feb. 2, 2010) ....................................................................20

*In re HomeBanc Corp. Sec. Litig.*,
    2010 WL 1524836 (N.D. Ga. Apr. 13, 2010) ..................................................................51

*In re Huntington Bancshares, Inc. Sec. Litig*,
    674 F. Supp. 2d 951 (S.D. Oh. 2009) ............................................................................39

*In re IAC/InterActiveCorp Sec. Litig.*,
    478 F. Supp. 2d 574 (S.D.N.Y. 2007)............................................................................51

*In re IAC/InterActiveCorp. Sec. Litig.*,
    2010 WL 996483 (S.D.N.Y. Mar. 19, 2010) ..................................................................38, 40

*In re KeySpan Corp. Sec. Litig.*,
    383 F. Supp. 2d 358 (E.D.N.Y. 2003) ............................................................................18

*In re Livent, Inc. Noteholders Sec. Litig.*,
    151 F. Supp. 2d 371 (S.D.N.Y. 2001)............................................................................41

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    289 F. Supp. 2d 416 (S.D.N.Y. 2003)............................................................................5 n.3

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    273 F. Supp. 2d 351 (S.D.N.Y. 2003)............................................................................59

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    2008 WL 2324111 (S.D.N.Y. June 4, 2008) ..................................................................81

vi

*In re MSC Indust. Direct Co.*,
    283 F. Supp. 2d 838 (E.D.N.Y. 2003) .................................................................43

*In re NVE Corp. Sec. Litig.*,
    551 F. Supp. 2d 871 (D. Minn. 2007), *aff'd*,
    527 F.3d 749 (8th Cir. 2008) .......................................................................20

*In re N.Y. Cmty. Bancorp, Inc.*
    448 F. Supp. 2d 466 (E.D.N.Y. 2006) .............................................................73

*In re Omnicom Group, Inc. Sec. Litig.*,
    541 F. Supp. 2d 546 (S.D.N.Y. 2008), *aff'd*,
    597 F.3d 501 (2d Cir. 2010).........................................................................80

*In re Pixar Sec. Litig.*,
    450 F. Supp. 2d 1096 (N.D. Cal. 2006) .........................................................23

*In re PXRE Group, Ltd. Sec. Litig.*,
    600 F. Supp. 2d 510 (S.D.N.Y. Mar. 4, 2009), *aff'd sub nom.*
    *Condra v. PXRE Group, Ltd.*, 357 Fed. App'x 393 (2d Cir. 2009)................................24, 26

*In re Radian Sec. Litig.*,
    2010 WL 1767195 (E.D. Pa. Apr. 30, 2010) ..........................................................18

*In re Security Capital Assurance, Ltd. Sec. Litig.*,
    2010 WL 1372688 (S.D.N.Y. Mar. 31, 2010) .................................................... *passim*

*In re Sina Corp. Sec. Litig.*,
    2006 WL 2742048 (S.D.N.Y. Sept. 26, 2006) .......................................................17

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008)...........................................................34 n.40

*In re Tibco Software Sec. Litig.*,
    2006 WL 1469654 (N.D. Cal. May 25, 2006) ................................................21 n.23

*In re Vantive Corp. Sec. Litig*,
    283 F.3d 1079 (9th Cir. 2002) ....................................................................23

*Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*,
    32 F.3d 697 (2d Cir. 1994)........................................................................83

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001).......................................................................24

*Ladmen Partners, Inc. v. Globalstar, Inc.*,
    2008 WL 4449280 (S.D.N.Y. Sept. 30, 2008).......................................................37

*Landmen Partners Inc. v. Blackstone Group, LP*,
659 F. Supp. 2d 532 (S.D.N.Y. 2009) ...........................................................72 n.73

*Lattanzio v. Deloitte & Touche LLP*,
476 F.3d 147 (2d Cir. 2007) ..........................................................................82

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005) ......................................................................80, 82

*Leykin v. AT&T Corp.*,
423 F. Supp. 2d 229 (S.D.N.Y. 2006), *aff'd*,
216 Fed. App'x 14 (2d Cir. 2007) ..................................................................81

*Malin v. XL Capital Ltd.*,
499 F. Supp. 2d 117 (D. Conn. 2007), *aff'd*,
312 Fed. App'x (2d Cir. 2009) ................................................................ *passim*

*Mathews v. Centex Telemanagement, Inc.*,
1994 WL 269734 (N.D. Cal. June 8, 1994) ...............................................17 n.18

*McNamara v. Pre-Paid Legal Servs., Inc.*,
189 F. App'x 702 (10th Cir. 2006) ...........................................................17 n.18

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*,
547 U.S. 71 (2006) .........................................................................................14

*N.Y. State Teachers' Ret. Sys. v. Fremont Gen. Corp.*,
2009 WL 3112574 (C.D. Cal. Sept. 25, 2009) ...........................................52, 56

*N.Y. State Teachers' Ret. Sys. v. Fremont Gen. Corp.*,
2010 WL 1473265 (C.D. Cal. Mar. 29, 2010) ............................................42 n.47

*Nolte v. Capital One Fin. Corp.*,
390 F.3d 311 (4th Cir. 2004) ....................................................................55, 73

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000) ...........................................................................47

*Parnes v. Gateway 2000, Inc.*,
122 F.3d 539 (8th Cir. 1997) ..........................................................................84

*Pavelic & LeFlore v. Marvel Entm't Group*,
493 U.S. 120 (1989) ................................................................................26 n.33

*Pittleman v. Impac Mortgage Holdings, Inc.*,
2009 WL 648983 (C.D. Cal. Mar. 9, 2009), *aff'd sub nom.*
*Sharenow v. Impac Mortgage Holdings, Inc.*,
2010 WL 2640195 (9th Cir. June 29, 2010) ....................................................36

*Plumbers & Steamfitters Local 773 Pension Fund v. Can. Imperial Bank of Commerce*,
    694 F. Supp. 2d 287 (S.D.N.Y. 2010) ............................................................................ *passim*

*Pyramid Holdings, Inc. v. Inverness Med. Innovations Inc.*,
    638 F. Supp. 2d 120 (D. Mass. 2009) ...................................................................................58

*Rapoport v. Asia Elecs. Holding Co.*,
    88 F. Supp. 2d 179 (S.D.N.Y. 2000) .............................................................................21 n.24

*Ressler v. Liz Claiborne Inc.*,
    75 F. Supp. 2d 43 (S.D.N.Y. 1999) ................................................................................20, 23

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ........................................................................................ *passim*

*S.E.C. v. Steadman*,
    967 F.2d 636 (D.C. Cir. 1992) ...............................................................................................3

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*,
    75 F.3d 801 (2d Cir. 1996) ............................................................18 n.19, 35, 64 n.65

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977) ...............................................................................................4, 31

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994) ..................................................................................................25

*SRM Global Fund Ltd. P'ship. v. Countrywide Fin. Corp.*,
    2010 WL 2473595 (S.D.N.Y. June 17, 2010) ................................................................. 62-63

*Starr v. Georgeson S'holder, Inc.*,
    412 F.3d 103 (2d Cir. 2005) ................................................................................................61

*Steinberg v. Ericsson LM Tel. Co.*,
    2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008) .........................................................27 n.34, 47

*Tabor v. Bodisen Biotech, Inc.*,
    579 F. Supp. 2d 438 (S.D.N.Y. 2008) ..................................................................................77

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex*,
    531 F.3d 190 (2d Cir. 2008) ................................................................................................35

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ................................................................................................... *passim*

*Thor Power Tool Co. v. Commissioner*,
    439 U.S. 522 (1979) ...............................................................................................77 n.81

*Waterford Twp. Gen. Employees Ret. Sys. v. BankUnited Fin. Corp.*,
   2010 WL 1332574 (S.D. Fla. Mar. 30, 2010)....................................................29, 70

## STATUTES, RULES & REGULATIONS

Securities Act Section 11, 15 U.S.C. § 77k ........................................................... *passim*

Securities Act Section 12(a)(2), 15 U.S.C. § 77l ...................................... 12 & n.13, 78

Securities Act Section 15, 15 U.S.C. § 77o ......................................................13, 83

Securities Exchange Act Section 10(b), 15 U.S.C. § 78j(b) ................................. *passim*

Securities Exchange Act Section 20(a), 15 U.S.C. § 78t(a) .........................................83

Securities Exchange Act Section 20A, 15 U.S.C. § 78t-1 .....................................80, 83

Securities Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5 .........................13, 77, 79

Private Securities Litigation Reform Act of 1995 ...........................................13, 14, 84

Fed. R. Civ. P. 8(a) ...................................................................................................84

Fed. R. Civ. P. 9(b) ............................................................................................ *passim*

Fed. R. Civ. P. 11 ..............................................................................................26 n.33

Fed. R. Civ. P. 12(b)(6).....................................................................................5 n.3, 84

## OTHER AUTHORITIES

Office of the Comptroller of the Currency, *et al.*, *Proposed Agency Information
   Collection Activities; Comment Request*, 67 Fed. Reg. 46,250, 46,253 (July 12, 2002).........55

Ownership Reports and Trading by Officers, Directors and Principal Security Holders,
   61 Fed. Reg. 30376, 30395 (June 14, 2006) ...................................................19 n.20

Standard & Poors/Case Shiller Home Price Index ...............................................7 n.5

*The Financial Crisis and The Role of Federal Regulators: Hearing Before the House
   Committee on Oversight and Government Reform*, 110th Cong. (2008)
   (statement of A. Greenspan) ................................................................................8

*Don't mark to Markit*, ECONOMIST, Mar. 8, 2008 .......................................................75

*S&P 500 Financial Sector Market Cap Continues to Sink*,
   SEEKING ALPHA, Jan. 14, 2009 .....................................................................11 n.12

*The End of Wall Street*, WALL ST. J., Sept. 23, 2008.........................................11 n.10

*Wachovia Adjusts Mortgage Underwriting Guidelines*, SACRAMENTO BUS. J.,
    Apr. 11, 2008 ...................................................................................................35 n.41

Susanne Craig, *et al*., *The Weekend That Wall Street Died*, WALL ST. J.,
    Dec. 29, 2008 ..................................................................................................10 n.7

Carl Dincesen, *Ambac MBIA: The Rating Shoes Drop*, SEEKING ALPHA,
    June 24, 2008 .................................................................................................77 n.80

Robert Stowe England, *The Big Scramble*, MORTGAGE BANKING, Dec. 2007 .......................55, 56

FRANK J. FABOZZI, THE HANDBOOK OF MORTGAGE-BACKED SECURITIES
    (6th ed. 2006) .................................................................................................41 n.46

LAURIE S. GOODMAN, *et al*., SUBPRIME MORTGAGE CREDIT DERIVATIVES (2008) .........74 n.77, 75

Alan Greenspan, *The Roots of the Mortgage Crisis*, WALL ST. J., Dec. 12, 2007 ..........................8

James R. Hagerty, *et al*., *U.S. Seizes Mortgage Giants – Government Ousts
    CEOs of Fannie, Freddie; Promises Up to $200 Billion in Capital*,
    WALL ST. J., Sept. 8, 2008 .............................................................................10 n.6

Greg Hitt & Deborah Solomon, *Historic Bailout Passes As Economy Slips Further*,
    WALL ST. J., Oct. 4, 2008 .............................................................................11 n.11

Erik Holm & Jesse Westbrook, *N.Y. Regulator Pushes Banks to Rescue Bond Insurers*,
    BLOOMBERG, Jan. 24, 2008 ...........................................................................77 n.80

Matthew Karnitschnig, *et al*., *U.S. to Take Over AIG in $85 Billion Bailout; Central
    Banks Inject Cash as Credit Dries Up*, WALL ST. J., Sept. 17, 2008 ...............10 n.9

MICHAEL LEWIS, THE BIG SHORT (2010) ..........................................................................64 n.66

Ben Logan, *The ABX Index: A Pricing Conundrum*, CREDIT, May 1, 2008 ................................75

ROGER LOWENSTEIN, THE END OF WALL STREET (2010) .....................................................32 n.38

Deborah Solomon, *et al.*, *Shock Forced Paulson's Hand*, WALL ST. J.,
    Sept. 20, 2008 ...............................................................................................11 n.11

James B. Stewart, *A Year Later, How Safe Is Safe?*, WALL ST. J., Sept. 16, 2009 .................10 n.8

**TABLE OF SOURCES**

| ABBREVIATION | DESCRIPTION | EXHIBIT(S) |
|---|---|---|
| **Declarations and Briefs** | | |
| 2009 Hirsch Decl. | Declaration of Eric A. Hirsch in Support of Wachovia Defendants' Motion to Dismiss the Amended Class Action Complaint, filed in *In re Wachovia Equity Securities Litigation,* No. 08-CV-6171 (the "Equity Action"), on March 19, 2009 | N/A |
| Orig. Eq. Opp. | Lead Plaintiff's Memorandum of Law in Opposition to the Wachovia Defendants' Motion to Dismiss the Amended Class Action Complaint, filed in the Equity Action on June 2, 2009 | N/A |
| McNeela Decl. | Declaration of Andrew M. McNeela in Opposition to the Wachovia Defendants' Motion to Dismiss the Amended Class Action Complaint, filed in the Equity Action on June 2, 2009 | N/A |
| 2009 Jean Decl. | Declaration of Courtney A. Jean in Support of the Wachovia Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint, filed in *In re Wachovia Preferred Securities and Bond/Notes Litigation*, Master File No. 09-CV-6351 (the "Bond Notes Action"), on November 3, 2009 | N/A |
| Jean Reply Decl. | Reply Declaration of Courtney A. Jean in Further Support of the Wachovia Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint, filed in the Bond Notes Action on February 4, 2010 | N/A |
| 2010 Hirsch Decl. | Declaration of Eric A. Hirsch in Support of the Wachovia Defendants' Motions to Dismiss the Amended Consolidated Class Action Complaints, filed in the Equity Action and Bond Notes Action on July 14, 2010 | N/A |
| **Wachovia Exchange Act Filings** | | |
| 1/31/06 8-K | Wachovia Corp. Press Release filed with the SEC on Form 8-K on January 31, 2006 | 2009 Hirsch Decl. Ex. 2 |

| 5/8/06 8-K | Wachovia Corp. Press Release dated May 7, 2006 and Merger Presentation materials dated May 8, 2006, filed with the SEC on Form 8-K on May 8, 2006 | 2009 Jean Decl. Ex. 3 |
|---|---|---|
| 8/4/06 10-Q | Wachovia Corp. Quarterly Report on Form 10-Q for the quarter ending June 30, 2006, filed with the SEC on August 4, 2006 | 2009 Hirsch Decl. Ex. 4 |
| 11/3/06 10-Q | Wachovia Corp. Quarterly Report on Form 10-Q for the quarter ending September 30, 2006, filed with the SEC on November 3, 2006 | 2009 Hirsch Decl. Ex. 5 |
| 2006 10-K | Wachovia Corp. Annual Report on Form 10-K for the year ending December 31, 2006, filed with the SEC on February 28, 2007 | 2009 Hirsch Decl. Ex. 6 |
| 4/16/07 8-K | Wachovia Corp. First Quarter 2007 Quarterly Earnings Report dated April 16, 2007, filed with the SEC on Form 8-K on April 16, 2007 | 2010 Hirsch Decl. Ex. 1 |
| 7/30/07 10-Q | Wachovia Corp. Quarterly Report on Form 10-Q for the quarter ending June 30, 2007, filed with the SEC on July 30, 2007 | 2009 Hirsch Decl. Ex. 8 (Ex. 19 at 20, 46) & Jean Reply Decl. Ex. 2 (Ex. 19 at 2, 5, 16) |
| 11/9/07 10-Q | Wachovia Corp. Quarterly Report on Form 10-Q for the quarter ending September 30, 2007, filed with the SEC on November 9, 2007 | 2009 Hirsch Decl. Ex. 9 (Ex. 19 at 54) & Jean Reply Decl. Ex. 3 (Ex. 19 at 5) |

| 2007 10-K | Wachovia Corp. Annual Report on Form 10-K for the year ending December 31, 2007, filed with the SEC on February 28, 2008 | 2009 Hirsch Decl. Ex. 10 (Items 1A, 5; Ann. Rpt at Overview, 4, 14,-16, 30, 50, 54, 69-71, 97) & 2010 Hirsch Decl. Ex. 2 (Ann. Rpt. at 38, 40) |
|---|---|---|
| 3/10/08 Form 14A | Wachovia Corp. Definitive Proxy Statement for 2008, filed with the SEC on Form 14A on March 10, 2008 | 2009 Jean Decl. Ex. 4 |
| 4/14/08 8-K | Wachovia Corp. 1Q08 Financial Highlights dated April 14, 2008, filed with the SEC on Form 8-K on April 14, 2008 | 2010 Hirsch Decl. Ex. 3 |
| 5/12/08 10-Q | Wachovia Corp. Quarterly Report on Form 10-Q for the quarter ending March 31, 2008, filed with the SEC on May 12, 2008 | 2009 Hirsch Decl. Ex. 12 |
| 7/22/08 8-K | Wachovia Corp. 2Q08 Financial Highlights dated July 22, 2008, filed with the SEC on Form 8-K on July 22, 2008 | 2010 Hirsch Decl. Ex. 4 |
| 8/11/08 10-Q | Wachovia Corp. Quarterly Report on Form 10-Q for the quarter ending June 30, 2008, filed with the SEC on August 11, 2008 | 2009 Hirsch Decl. Ex. 13 |
| 10/30/08 10-Q | Wachovia Corp. Quarterly Report on Form 10-Q for the quarter ending September 30, 2008, filed with the SEC on October 30, 2008 | 2009 Hirsch Decl. Ex. 14 |
| **Conference Call Transcripts & Investor Presentations** | | |
| 5/12/06 Conf. Call | Transcript of Wachovia Corp. Conference Call on Golden West Merger, May 12, 2006 | 2009 Hirsch Decl. Ex. 17 |
| 5/16/06 Conf. Call | Transcript of UBS Financial Services Conference, May 16, 2006 | 2009 Hirsch Decl. Ex. 18 |
| 4/16/07 Conf. Call | Transcript of Wachovia Corp. First Quarter 2007 Earning Conference Call, April 16, 2007 | 2009 Hirsch Decl. Ex. 19 |

| 7/20/07 Conf. Call | Transcript of Wachovia Corp. Second Quarter 2007 Earnings Conference Call, July 20, 2007 | 2009 Hirsch Decl. Ex. 20 |
|---|---|---|
| 9/10/07 Conf. Call | Transcript of Wachovia Corp. at Lehman Brothers 5th Annual Financial Services Conference, September 10, 2007 | 2009 Hirsch Decl. Ex. 21 |
| 10/19/07 Conf. Call | Transcript of Wachovia Corp. Third Quarter Earnings Conference Call, October 19, 2007 | 2009 Hirsch Decl. Ex. 22 |
| 11/9/07 Conf. Call | Transcript of Wachovia Corp. at BancAnalysts Association of Boston Conference, November 9, 2007 | 2009 Hirsch Decl. Ex. 23 |
| 11/14/07 Conf. Call | Transcript of Wachovia Corp. at Merrill Lynch Banking and Financial Services Investor Conference, November 14, 2007 | 2009 Hirsch Decl. Ex. 24 |
| 1/22/08 Conf. Call | Transcript of Wachovia Corp. Forth Quarter 2007 Earnings Conference Call, January 22, 2008 | 2009 Hirsch Decl. Ex. 25 |
| 1/30/08 Conf. Call | Transcript of Wachovia Corp. at Citigroup Financial Services Conference, January 30, 2008 | 2009 Hirsch Decl. Ex. 26 |
| 2/13/08 Conf. Call | Transcript of Wachovia Corp. Fixed Income Update, February 13, 2008 | 2009 Hirsch Decl. Ex. 27 |
| 3/12/08 Conf. Call | Transcript of Wachovia Corp., Deutsche Bank Conference Call, March 12, 2008 | 2009 Hirsch Decl. Ex. 28 |
| 4/14/08 Conf. Call | Transcript of Wachovia Corp. First Quarter 2008 Earnings Conference Call, April 14, 2008 | 2009 Hirsch Decl. Ex. 29 |
| 7/22/08 Conf. Call | Transcript of Wachovia Corp. Second Quarter Earnings Conference Call, July 22, 2008 | 2009 Hirsch Decl. Ex. 30 |
| 6/12/07 Investor Presentation | Wachovia Corp. Mortgage Update Presentation, June 12, 2007 | 2009 Hirsch Decl. Ex. 31 |
| **Forms 4 and 5** | | |
| Thompson Forms 4 | G. Kennedy Thompson Forms 4 and Form 5 | 2009 Hirsch Decl. Ex. 33 |
| Truslow Forms 4 | Donald K. Truslow Forms 4 and Form 5 | 2009 Hirsch Decl. Ex. 34 |

| Wurtz Forms 4 | Thomas J. Wurtz Forms 4 | 2009 Hirsch Decl. Ex. 35 |
|---|---|---|
| **SEC Filings For Other Entities** | | |
| Golden West 2005 10-K | Golden West Annual Report on Form 10-K for the year ending December 31, 2005, filed with the SEC on March 8, 2006 | 2009 Hirsch Decl. Ex. 44 |
| Golden West 7/25/06 14A | Golden West Financial Corp. Proxy Statement dated July 24, 2006, filed with the SEC on Form 14A on July 25, 2006 | 2009 Hirsch Decl. Ex. 45 |
| Barclays Bank PLC 2007 20-F | Barclays Bank PLC Annual Report on Form 20-F for the year ending December 31, 2007, filed with the SEC on March 26, 2007 | 2009 Hirsch Decl. Ex. 46 |
| **Other Sources** | | |
| N/A | FRANK J. FABOZZI, THE HANDBOOK OF MORTGAGE-BACKED SECURITIES (6th ed. 2006) | 2010 Hirsch Decl. Ex. 6 |
| N/A | Longshore CDO Funding 2006-2 Offering Memorandum, August 3, 2006 | 2009 Hirsch Decl. Ex. 48 |
| N/A | Robert Stowe England, *The Big Scramble,* MORTGAGE BANKING, December 2007 | 2009 Jean Decl. Ex. 7 |
| N/A | Alan Greenspan, *The Roots of the Mortgage Crisis*, THE WALL STREET JOURNAL, December 12, 2007 | 2009 Hirsch Decl. Ex. 41 |
| N/A | LAURIE S. GOODMAN, *et al.*, SUBPRIME MORTGAGE CREDIT DERIVATIVES (Frank J. Fabozzi, ed., 2008) | 2009 Hirsch Decl. Ex.37 |
| N/A | Erik Holm & Jesse Westbrook, *N.Y. Regulator Pushes Banks to Rescue Bond Insurers*, BLOOMBERG, January 24, 2008 | 2009 Jean Decl. Ex. 8 |
| N/A | *Wachovia Adjusts Mortgage Underwriting Guidelines*, SACRAMENTO BUSINESS JOURNAL, April 11, 2008 | 2010 Hirsch Decl. Ex. 7 |
| N/A | *Don't mark to Market*, THE ECONOMIST, March 6, 2008 | 2009 Hirsch Decl. Ex. 38 |
| N/A | Ben Logan, *The ABX Index: A Pricing Conundrum*, CREDIT, May 1, 2008 | 2009 Hirsch Decl. Ex. 36 |

| N/A | Carl Dincesen, *Ambac, MBIA: The Rating Shoes Drop*, SEEKING ALPHA, June 24, 2008 | 2009 Jean Decl. Ex. 9 |
|---|---|---|
| N/A | James R. Hagerty, *et al.*, *U.S. Seizes Mortgage Giants – Government Ousts CEOs of Fannie, Freddie; Promises Up to $200 Billion in Capital*, THE WALL STREET JOURNAL, September 8, 2008 | Jean Reply Decl. Ex. 10 |
| N/A | Matthew Karnitschnig, *et al.*, *U.S. to Take over AIG in $85 Billion Bailout; Central Banks Inject Cash as Credit Dries Up*, THE WALL STREET JOURNAL, September 17, 2008 | Jean Reply Decl. Ex. 12 |
| N/A | Deborah Solomon, *et al.*, *Shock Forced Paulson's Hand*, THE WALL STREET JOURNAL, September 20, 2008 | Jean Reply Decl. Ex. 13 |
| N/A | Op-Ed, *The End of Wall Street*, THE WALL STREET JOURNAL, September 23, 2008 | Jean Reply Decl. Ex. 14 |
| N/A | Greg Hitt & Deborah Solomon, *Historic Bailout Passes As Economy Slips Further*, THE WALL STREET JOURNAL, October 4, 2008 | Jean Reply Decl. Ex. 15 |
| N/A | *The Financial Crisis and Role of Federal Regulators: Hearing Before the House Committee on Oversight and Government Reform*, 110th Cong. (2008) | 2009 Hirsch Decl. Ex. 42 |
| N/A | Susanne Craig, *et al.*, The Weekend That Wall Street Died, THE WALL STREET JOURNAL, December 29, 2008 | Jean Reply Decl. Ex. 16 |
| N/A | *S&P 500 Financial Sector Market Cap Continues to Sink*, SEEKING ALPHA, January 14, 2009 | 2009 Hirsch Decl. Ex. 43 |
| N/A | James B. Steward, *A Year Later, How Safe is Safe?*, THE WALL STREET JOURNAL, September 16, 2009 | Jean Reply Decl. Ex. 17 |
| N/A | ROGER LOWENSTEIN, THE END OF WALL STREET (2010) | 2010 Hirsch Decl. Ex. 8 |
| N/A | MICHAEL LEWIS, THE BIG SHORT (2010) | 2010 Hirsch Decl. Ex. 9 |

| TABLE CROSS-REFERENCING<br>CONFIDENTIAL WITNESSES IN THE BOND NOTES COMPLAINTS | |
|---|---|
| **Designation in<br>Original Bond Notes Complaint** | **Designation in<br>Amended Bond Notes Complaint** |
| CW 1 | CW 1 |
| CW 2 | CW 5 |
| CW 3 | CW 10 |
| CW 4 | CW 18 |
| CW 5 | CW 27 |
| CW 6 | CW 36 |
| CW 7 | CW 34 |
| CW 8 | CW 48 |
| CW 9 | CW 41 |
| CW 10 | CW 28 |
| CW 11 | CW 39 |
| CW 12 | CW 50 |
| CW 13 | CW 40 |

*"One might be tempted to think that a complaint spanning more than 100 pages and consisting of more than 200 paragraphs could not fail to be specific. The temptation is dangerous and must be resisted."[1]*

## PRELIMINARY STATEMENT

The United States recently experienced a crushing meltdown in its financial, housing, and credit markets — the likes of which has not been seen since the Great Depression. Not surprisingly, Wachovia Corporation ("Wachovia"), which during the class period was the country's fourth largest bank, suffered enormous losses, along with its stockholders. Against this historic backdrop — which plaintiffs ignore, without so much as a nod to the critical context — plaintiffs in the Equity and Bond Notes Actions have filed their amended complaints which, at their core, allege that Wachovia's public disclosures during the 29-month period from May 2006 through September 2008 were false or misleading because Wachovia failed to disclose that the underwriting for its portfolio of adjustable rate Pick-a-Payment ("Pick-a-Pay") mortgages was not as stringent as represented. Not a single concrete factual allegation sustains these claims.

***No Actionable Misstatement or Omission***. All of the claims asserted by the Bond Notes and the Equity Plaintiffs require plaintiffs to factually allege the existence of a material misstatement or an omission of material fact. Yet, nothing in plaintiffs' massive complaints remotely suggests that plaintiffs have met this burden. Indeed, despite the fact that the Court provided plaintiffs with the opportunity to amend their complaints to present their most potent allegations of falsity or fraud, the complaints are unable to point to any contemporaneous facts that suggest that Wachovia's underwriting for its Pick-a-Pay portfolio rendered Wachovia's statements regarding that portfolio, or its financial statements, false or misleading. The only

---

1   *In re 2007 Novastar Fin., Inc. Sec. Litig.*, 2008 WL 2354367, at *2 (W.D. Mo. Jun. 4, 2008), *aff'd*, 579 F.3d 878 (8th Cir. 2009).

difference of note in the amended complaints is that the Bond Notes Plaintiffs have rounded up a cadre of new confidential witnesses in addition to those in their prior complaint.  However, like their earlier counterparts, these new witnesses offer nothing but the most overbroad generalities, anecdotal observations and after-the-fact speculation regarding Wachovia's underwriting process.  Adding several dozen additional insufficient witnesses to the prior witnesses — particularly in the context of a company that employed over 120,000 individuals during the period at issue — does not salvage plaintiffs' claims.  As Judge Duffy stated:  "[f]our cubic zirconias will never add up to one real diamond…." *In re Carter-Wallace, Inc. Sec. Litig*., 1999 WL 1029713, at *5 (S.D.N.Y. Nov. 10, 1999), *aff'd*, 220 F.3d 36 (2d Cir. 2000).  The Bond Notes Action and the Equity Action fail to state a claim for this reason alone.

    ***No Cogent Allegations of Scienter***.  The Equity Action, which (unlike the Bond Notes Action) asserts claims under the Securities Exchange Act of 1934, fails for an even more fundamental reason.  The crux of any securities fraud claim is the intent to defraud, commonly referred to as scienter.  In *Tellabs*, the Supreme Court mandated that, in evaluating whether plaintiffs have pled facts "giving rise to a strong inference of scienter," the Court must weigh competing inferences arising from the facts alleged and matters subject to judicial notice and may permit the case to go forward only if the inference that the defendants acted with scienter is both "cogent and <u>at least as compelling as any opposing inference of nonfraudulent intent</u>." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

    Here, despite the Equity Plaintiffs' claim that scienter can be inferred from "insider sales," plaintiffs conspicuously ignore that the Individual Defendants' behavior is irreconcilable with any intent to defraud.  The publicly-available trading data tells a clear and compelling story:  each of the Individual Defendants owned <u>more</u> Wachovia stock at the end of the Class Period

than at the beginning.  Indeed, Wachovia CEO Ken Thompson and Chief Risk Officer Don Truslow purchased over $4 million and $500,000, respectively, of Wachovia stock on the open market during the heart of the Class Period: *i.e.*, if the Equity Plaintiffs' theory is to be credited, Wachovia's top executives bought shares at precisely the same time that they were orchestrating a scheme to inflate the price of those shares.  These transactions alone eviscerate any suggestion of scienter — in fact, they affirmatively establish the <u>absence</u> of scienter.

Beyond its specious allegations of insider sales, the Equity Complaint does not plead a single fact suggesting that any of the Individual Defendants acted with scienter.  None of the confidential witnesses whom either of the plaintiffs parade through the complaints are alleged to have ever communicated with, or even been in the presence of, the Individual Defendants during the Class Period.  Nor do plaintiffs identify any document (internal or otherwise) communicated to or by the Individual Defendants that contradicts any of their public statements.

*          *          *

The essence of both complaints boils down to the implausible charge that Wachovia violated the securities laws by originating over $100 billion of extremely risky mortgages that it retained <u>for its own account</u> and did not sell into the secondary market.  And therein lies yet another gaping hole in the complaints, which plaintiffs simply gloss over:  What was there to gain by originating and holding risky loans that, according to plaintiffs, defendants knew would fail?  Especially when those loans would lead to the losses that plaintiffs now claim defendants knew were inevitable, which Wachovia would have been forced to report.  Hence, the Equity Plaintiffs' claims of fraud make no sense: "[i]f we were to conclude that the [defendants] meant to defraud investors, we would have to believe that they did so for the sheer joy of it rather than for profit." *S.E.C. v. Steadman*, 967 F.2d 636, 642 (D.C. Cir. 1992).

3

What plaintiffs are really complaining about are Wachovia's business decisions to purchase Golden West Financial Corporation (with its Pick-a-Pay portfolio) and then to continue to make and retain Pick-a-Pay mortgage loans for its own portfolio.  These were business decisions by Wachovia, and a fully-informed bet by all shareholders based on Wachovia's profuse on-point disclosures.  Undoubtedly plaintiffs — with the benefit of 20/20 hindsight — would not have made these same business judgments.  Even if true, however, claims of mismanagement do not constitute securities violations under the Supreme Court's decision in *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977).  The critical issue here is not whether Wachovia's decision to invest heavily in the home mortgage market was a wise one.  Rather, the question is whether plaintiffs have set forth sufficient factual allegations that Wachovia made materially false statements; for the Equity Plaintiffs, the additional question is whether those statements were made with a conscious intent to deceive.  The answer to these questions is a resounding no.

Long before *Tellabs*, the Supreme Court stressed the importance of strict adherence to pleading rules and standards in the unique context of securities litigation, where "even a complaint which by objective standards may have very little chance of success at trial has a settlement value to the plaintiff out of any proportion to its prospect of success at trial so long as [plaintiff] may prevent the suit from being resolved against [plaintiff] by dismissal or summary judgment."  *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 740 (1975).  This is especially apt in the context of the current economic meltdown.

In the end, plaintiffs have not alleged facts suggesting that any of the challenged statements were false or misleading, and they come woefully short of alleging any inference of fraud, much less the "strong inference" which is both "cogent and at least as compelling as any

opposing inference of nonfraudulent intent."  Plaintiffs' claims should be dismissed.

FACTUAL BACKGROUND[2]

*Wachovia and Its Business*.[3]  Wachovia (the "Company") no longer exists as a separate legal entity, having been acquired by Wells Fargo & Company ("Wells Fargo").  B/N ¶ 27.  Prior to the acquisition, Wachovia operated as a financial and bank holding company offering a range of financial services, including commercial and retail banking, mortgage banking, investment banking, investment advisory, asset-based lending, leasing, insurance, and securities brokerage services.  Eq. ¶ 61.  As of December 31, 2007, Wachovia ranked as the fourth-largest bank in the United States with total assets exceeding $780 billion, total revenue of approximately $32 billion and managed client assets of approximately $1.2 trillion.  2007 10-K, Ann. Rpt. at Overview, 14, 16, 71.  The Company employed some 121,000 individuals, operated more than 3,400 retail locations, and provided financial services to 15 million customers.  *Id.* at Overview, 50.

As of December 31, 2007, Wachovia maintained a loan portfolio of more than $460

---

2    Unless otherwise noted, emphasis is added and internal citations are omitted throughout. References herein to the "Equity Complaint" and the "Bond Notes Complaint" are to the amended complaints filed on May 28, 2010.  Citations to "Eq. ¶" are to paragraphs of the Equity Complaint, and citations to "B/N ¶" are to paragraphs of the Bond Notes Complaint. Copies of cited documents are attached to the declarations identified in the Table of Sources. The term "Class Period" is the period between May 8, 2006 and September 29, 2008, the class period alleged in the Equity Complaint.

3    For purposes of this motion only, all of the factual — as opposed to conclusory — allegations in the Complaints are assumed to be true.  However, in addition to the allegations in the Complaints, the Court "<u>must</u> consider … sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs*, 551 U.S. at 322; *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (court may consider "legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit"); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 421 n.6 (S.D.N.Y. 2003) (taking notice of "the internet bubble and its subsequent crash").

5

billion, less than one-half of which consisted of consumer mortgages (with the rest consisting of

non-mortgage loans, *e.g.*, auto, student, credit card, and commercial loans). Wachovia held $228

billion in consumer mortgages at the close of 2007, approximately $120 billion of which were

option adjustable-rate mortgages known as "Pick-a-Pay" loans. Eq. ¶ 7; 2007 10-K, Ann. Rpt. at

30. Importantly, and in contrast to many lenders, Wachovia retained the overwhelming majority

of these loans on its balance sheet for long-term profit, not for immediate sale in the secondary

market. Eq. ¶¶ 218, 232. Thus, Wachovia had every motivation to make sure that its borrowers

could satisfy their payment obligations.

   ***The Acquisition of Golden West.*** On May 8, 2006, Wachovia announced its intention to

acquire California-based thrift Golden West Financial Corporation ("Golden West"). Eq. ¶ 169.

The acquisition was completed in October 2006 for $24.3 billion in cash and stock. *Id.* ¶ 62. At

the time of the acquisition, Golden West's banking subsidiary, World Savings Bank FSB

("World Savings") operated 285 retail offices and maintained a $123 billion mortgage portfolio.

Golden West 7/24/06 14A at 10, 20; Golden West 2005 10-K, Item 7 at 31. Most of these loans

were residential mortgages secured by properties in California (58%) and Florida (10%). Eq.

¶ 7. As was fully disclosed in connection with the acquisition, 99% of World Saving's loan

portfolio consisted of adjustable rate mortgages. 5/8/06 8-K, Ex. 99(b) at 24. The Golden West

acquisition substantially grew Wachovia's mortgage portfolio and, relevant here, added World

Saving's Pick-a-Pay loans to Wachovia's portfolio.

   ***The "Pick-a-Pay" Loan Portfolio.*** The Pick-a-Pay loan permitted the borrower to select

a minimum payment amount for a limited time and subject to certain conditions. In particular,

for each payment, the borrower could choose from four options. Borrowers could (i) make a

fully amortized interest and principal payment such that the loan would be satisfied in the

traditional 30-year term; (ii) make a 15-year fully amortized payment; (iii) make an "interest-only" payment; or (iv) make a lesser, minimum payment.  Eq. ¶ 5.  Borrowers could also choose any payment amount between these numbers.  When a payment was insufficient to satisfy the interest owed, unpaid interest was added to the loan balance and the outstanding loan balance grew (or experienced "negative amortization").  *Id*. ¶ 6.

The Pick-a-Pay loans, at origination, had an average loan-to-value ratio ("LTV") of approximately 71%.[4]  *Id*. ¶ 103.  This reduced the risk of default because borrowers had a powerful incentive to make monthly payments: default would result in borrowers forfeiting their substantial equity investments.  Equally significant, this "equity cushion" meant that, in the event of foreclosure, Wachovia likely could recover the amount originally lent and foreclosure costs.

***The Credit Crisis.***  After years of housing-price appreciation fueled by relatively low interest rates, the market leveled-off in 2006.  *Id*. ¶ 63.  Housing prices remained relatively stable throughout 2006 and the first two quarters of 2007, including in California and Florida:[5]

| DATE | NATIONAL | LOS ANGELES (CA) | MIAMI (FL) |
|---|---|---|---|
| 2006 (Q1) | $188,660 | $268,230 | $274,020 |
| 2006 (Q2) | $189,930 | $273,220 | $278,220 |
| 2006 (Q3) | $188,110 | $273,940 | $277,230 |
| 2006 (Q4) | $186,440 | $270,030 | $280,870 |
| 2007 (Q1) | $184,700 | $264,580 | $276,890 |
| 2007 (Q2) | $182,980 | $262,120 | $264,890 |

---

4   LTV refers to the amount lent (*e.g.*, $70,000) compared to the value of the property (*e.g.*, $100,000), in which case the LTV would be 70%.  Eq. ¶ 19.

5   *See* Standard & Poors/Case Shiller Home Price Index *available at* http://www2.standardandpoors.com/spf/pdf/index/csnational_values_022445.xls and http://www2.standardandpoors.com/spf/pdf/index/CSHomePrice_History_022445.xls. Quarterly results reflect the monthly median price of the last month of each quarter.

| DATE | NATIONAL | LOS ANGELES (CA) | MIAMI (FL) |
|---|---|---|---|
| **Decline for First 15 Months of Class Period** | **-3.0%** | **-2.3%** | **-3.3%** |

The perfect storm arrived later.  As former Federal Reserve Chairman Alan Greenspan remarked:  "On August 9, 2007, and the days immediately following, financial markets in much of the world seized up.  <u>Virtually overnight</u> the seemingly insatiable desire for financial risk came to an <u>abrupt halt</u> as the price of risk <u>unexpectedly surged</u>."  Alan Greenspan, *The Roots of the Mortgage Crisis*, WALL ST. J., Dec. 12, 2007, at A19.  Through the end of 2008, the United States experienced a precipitous and unprecedented decline in housing prices.

| DATE | NATIONAL | LOS ANGELES (CA) | MIAMI (FL) |
|---|---|---|---|
| 2007 (Q3) | $179,750 | $254,790 | $249,610 |
| 2007 (Q4) | $170,160 | $233,030 | $231,710 |
| 2008 (Q1) | $158,930 | $207,110 | $208,880 |
| 2008 (Q2) | $155,440 | $195,700 | $189,870 |
| 2008 (Q3) | $150,000 | $184,540 | $178,720 |
| 2008 (Q4) | $139,140 | $171,460 | $165,010 |
| **Total Decline** | **-23%** | **-33%** | **-34%** |

The financial sector had not suffered comparable losses at any time since the Great Depression.  As Mr. Greenspan now-famously testified, "<u>We are in the midst of a once in a century credit tsunami</u>."  *The Financial Crisis and The Role of Federal Regulators: Hearing Before the House Committee on Oversight and Government Reform*, 110th Cong. (2008).

*Wachovia's Disclosures Regarding the Credit and Housing Crises*.  The credit and housing crises, and the risks those crises posed to Wachovia, did not escape the Company's attention.  Nor did the Company sugarcoat or bury bad news.  Instead, as bad news became

8

known, Wachovia repeatedly issued public warnings to investors and specifically cautioned that

losses on its retained mortgage portfolio would materially and adversely impact the Company's

performance, due in no small part to defaults in the Pick-a-Pay portfolio.  Wachovia's warnings

intensified as the housing crisis deepened, becoming particularly frequent during and after the

third quarter of 2007.  *Inter alia*, Wachovia disclosed to investors that:

- The vast majority of the properties securing Pick-a-Pay loans were located in
  California (60%) and Florida (8%), two regions suffering severe housing-price
  declines.  *See* 2006 10-K, Ann. Rpt. at 91; 2007 10-K, Ann. Rpt. at 97 (59%
  and 10%); *see also, e.g.*, 7/20/07 Conf. Call at 15 ("We are seeing some
  higher stress in [the central valley of California], particularly on housing
  values"); 10/19/07 Conf. Call at 10 ("the kind of hot spots driving the increase
  in non-perform are those certain California markets"); 11/9/07 Conf. Call at 3
  ("The most challenging markets, of course, are in several pockets in
  California.  We are also watching our book in several pockets in Florida").

- Housing-price declines were accelerating.  *See, e.g.*, 10/19/07 Conf. Call at 8
  ($380 million of loans currently in default have LTV "averages in the high
  90s … reflecting the dramatic decline of house prices in certain markets");
  1/22/08 Conf. Call at 7 ("And given the significant weaknesses in the
  California housing markets, we have seen a run-up in nonperforming loans, or
  loans past due 90 days or more, we moved them to non-perform, and a rise in
  losses as I've mentioned").

- Deferred interest was steadily increasing.  *See* 7/30/07 10-Q, Ex. 19 at 46
  (deferred interest of $2.3 billion, up from $1.9 billion the prior quarter);
  11/9/07 10-Q, Ex. 19 at 54 (deferred interest of $2.7 billion); 2007 10-K, Ann.
  Rpt. at 54 (deferred interest of $3.1 billion); 5/12/08 10-Q, Ex. 19 at 49
  (deferred interest of $3.5 billion); 8/11/08 10-Q, Ex. 19 at 65 (deferred interest
  of $3.9 billion).

- "Walk-aways" from Pick-a-Pay loans were increasing and difficult to predict
  because the circumstances were unprecedented.  *See, e.g.*, 11/14/07 Conf. Call
  at 7 ("It's not widespread or a trend.  But we have seen people walk away —
  people with good credit standing walk away from their house as their housing
  value has come down"); 2/13/08 Conf. Call at 15 ("The markets are different
  [than they were in the 90s].  We're seeing different behavior ... So one of our
  challenges in forecasting non-performance ... is we're a little bit in
  unchartered water ... and it just makes the forecasting process particularly
  tricky"); 3/12/08 Conf. Call at 10 ("Yes, we are seeing [people who can afford
  their mortgages walking away from homes with negative equity], and actually
  began talking about that last October ... I don't think that we know [how that
  behavior will change over time]").

- Defaults in the Pick-a-Pay portfolio were increasing. *See, e.g.*, 4/16/07 Conf. Call at 4 ("[non-performing assets] were up 28%, driven primarily by [the] Golden West mortgage portfolio"); 7/20/07 Conf. Call at 5 ("we did see a $341 million increase in non-performs [last] quarter, driven mainly by more delinquencies in the residential real-estate portfolio"); 10/19/07 Conf. Call at 10 ("most of the [$881 million] increase [in non-performing loans] does come out of the legacy Golden West portfolio"); 2/13/08 Conf. Call at 8 ("Non-performing loans, as we have discussed in the past, [are] up about $2.2 billion. That [is the] kind of number on the page that stands out.  That's up over the third quarter.  About half of that is driven by the consumer mortgage portfolio. A lot of that is in the Pick-a-Pay portfolio").

*September 2008.*  In September 2008, an unprecedented, systemic credit crisis rocked

every major financial institution in the country, including Wachovia:

- On September 7, the Treasury Department announced its plan to seize control of mortgage finance companies Fannie Mae and Freddie Mac.[6]

- One week later, on September 14 and 15 ("the weekend that Wall Street died"), two of the country's four largest investment banks ceased to exist when Merrill Lynch agreed to a rescue acquisition by Bank of America and Lehman Brothers filed for the largest bankruptcy in U.S. history.[7]

- The following day, the Reserve Primary Fund, one of the country's most prominent money-market mutual funds, became, in yet "another earth-shaking event," the first retail money-market ever to "break the buck."[8]

- That same day, the federal government seized control of insurance titan AIG — an "historic development" during "a tumultuous 10 days that … remade the American financial system."[9]

- Within a week of Lehman's collapse, "the era of the independent investment bank … ended" as both Morgan Stanley and Goldman Sachs converted

---

6   James R. Hagerty, *et al.*, *U.S. Seizes Mortgage Giants – Government Ousts CEOs of Fannie, Freddie; Promises Up to $200 Billion in Capital*, WALL ST. J., Sept. 8, 2008, at A1.

7   Susanne Craig, *et al.*, *The Weekend That Wall Street Died*, WALL ST. J., Dec. 29, 2008, at A1.

8   James B. Stewart, *A Year Later, How Safe Is Safe?*, WALL ST. J., Sept. 16, 2009, at D2.

9   Matthew Karnitschnig, *et al.*, *U.S. to Take Over AIG in $85 Billion Bailout; Central Banks Inject Cash as Credit Dries Up*, WALL ST. J., Sept. 17, 2008, at A1.

themselves into bank holding companies.[10]

- <u>Ten days</u> after Lehman's collapse, federal regulators seized Washington Mutual and arranged to sell most of its operations to JP Morgan Chase & Co.

- The panic led to contemporaneous, widely-disseminated public reports that government officials had concluded that America's credit markets had begun to fail, and culminated <u>less than two weeks later</u> with the enactment of an "<u>unprecedented $700 billion plan</u> to rescue the U.S. financial system, one of the largest-ever government interventions in the nation's economy."[11]

On December 31, 2008, Wachovia merged with and into Wells Fargo, which was the surviving corporation after the merger.  B/N ¶ 27.  By the end of 2008, a staggering $2 <u>trillion</u> in market capitalization had vanished from the financial sector alone.[12]  Wachovia and its shareholders, of course, were not insulated from this financial catastrophe.

*Wachovia's Financial Statements*.  Wachovia's financial statements were, at all relevant times, independently audited by KPMG LLP.  2006 10-K, Ann. Rpt. at 63-64; 2007 10-K, Ann. Rpt. at 69-70.  Each year during the Class Period, KPMG issued an unqualified audit opinion stating that it believed Wachovia's financial results were fairly presented.  KPMG has not withdrawn those audit opinions.  Moreover, neither Wachovia nor its acquirer, Wells Fargo, has restated or announced an intent to restate Wachovia's financial results for the Class Period.

*The Wachovia Corporate Defendants.*  The Equity Action asserts claims under both the Exchange Act and the Securities Act, and includes as defendants Wachovia and the underwriters of Wachovia's April 2008 stock offering, including Wachovia Capital Markets, LLC ("WCM").

---

10  Op-Ed, *The End of Wall Street*, WALL ST. J., Sept. 23, 2008, at A28.

11  Deborah Solomon, *et al.*, *Shock Forced Paulson's Hand*, WALL ST. J., Sept. 20, 2008, at A1; Greg Hitt & Deborah Solomon, *Historic Bailout Passes As Economy Slips Further*, WALL ST. J., Oct. 4, 2008, at A1.

12  *See S&P 500 Financial Sector Market Cap Continues to Sink*, SEEKING ALPHA, Jan. 14, 2009.

Eq. ¶¶ 33, 44.  The Bond Notes Action asserts Section 11 and Section 12(a)(2) claims against Wachovia and Wells Fargo, as well as Wachovia Capital Trusts IV, IX, and X (the "Wachovia Capital Trusts" or "Trusts") arising out of offerings of bonds, notes, and trust preferred securities during the Class Period.  B/N ¶¶ 22-27.[13]  Finally, the Bond Notes Action includes WCM and Wells Fargo Securities, LLC as defendants, both of which underwrote certain of the allegedly false and misleading offerings at issue in the Bond Notes Action.[14]

     ***The Individual Defendants.***  The Equity Action asserts claims under the Exchange Act against three individuals.  G. Kennedy Thompson served as CEO and President of Wachovia until his retirement on June 2, 2008.  Eq. ¶¶ 24, 34.  During the Class Period, Thomas J. Wurtz served as Wachovia's Chief Financial Officer (*Id.* ¶ 35) and Donald K. Truslow served as Wachovia's Chief Risk Officer (*Id.* ¶ 36).[15]  The 25 individual defendants in the Bond Notes Action include Messrs. Thompson, Truslow, and Wurtz and 22 additional Wachovia officers and directors.  B/N ¶¶ 28-52.  With the exception of Mr. Truslow, each of these individuals is alleged to have violated Section 11 of the Securities Act (none is alleged to have violated Section 12(a)(2)), either by signing a registration statement that was allegedly false or misleading, or by serving as a director when an allegedly false or misleading registration statement was filed.  *Id.*

---

13  Contrary to the Bond Notes Plaintiffs' allegations (B/N ¶¶ 23-25, 268), the Trusts, not Wachovia, issued the Trust Preferred Securities.  Furthermore, although plaintiffs assert all of their Section 11 and 12(a)(2) claims against the "Wachovia Issuer Defendants" (defined to include the Wachovia Capital Trusts), the Trusts are not alleged to have had any role in the bond and notes offerings at issue in the Complaint.

14  WCM and Wells Fargo Securities, LLC adopt the arguments made by the Underwriter Defendants in their memoranda of law in support of their motions to dismiss the Bond Notes Action ("Und. B/N Mem.") and Equity Action ("Und. Eq. Mem.").

15  Unless specifically noted otherwise, the defined term "Individual Defendants" as used herein refers exclusively to Messrs. Thompson, Truslow, and Wurtz.  The Equity Action also asserts claims under Section 11 of the Securities Act against Messrs. Thompson and Wurtz (but not Mr. Truslow) arising out of Wachovia's April 2008 stock offering.

A number of these officers and directors, however, had no such role in certain of the offerings at issue in the Bond Notes Action.[16]  In addition to their Section 11 claims, the Bond Notes Plaintiffs also assert control person claims under Section 15 of the Securities Act against Messrs. Thompson, Truslow, and Wurtz.  *Id.* ¶¶ 323-28.

**ARGUMENT**

I.     **COUNTS I AND II OF THE EQUITY ACTION SHOULD BE
        DISMISSED FOR FAILURE TO ADEQUATELY ALLEGE SCIENTER**

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, the plaintiff "must establish that 'the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff.'"  *ECA v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009).

The PSLRA "insists that securities fraud complaints 'specify' each misleading statement, that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted

---

16   19 of the 25 individual defendants served as Wachovia directors:  Mr. Thompson; John D. Baker, II; Robert J. Brown; Peter C. Browning; John T. Casteen, III; Jerome A. Gitt; William H. Goodwin, Jr.; Maryellen C. Herringer; Robert A. Ingram; Donald M. James; Mackey J. McDonald; Joseph Neubauer; Timothy D. Proctor; Ernest S. Rady; Van L. Richey; Ruth G. Shaw; Lanty L. Smith; John C. Whitaker, Jr.; and Dona Davis Young. Messrs. Brown and Whitaker, however, retired from the Board in April and December of 2007, respectively, and therefore cannot be liable for any statements in the April 14, 2008 registration statement or offerings made pursuant thereto.  3/10/08 Form 14A at 17.

The six non-director defendants are:  Peter M. Carlson; Ross E. Jeffries, Jr.; David M. Julian; Mark C. Treanor; Mr. Truslow; and Mr. Wurtz.  Certain of these officer defendants did not sign certain of the registration statements at issue and cannot be liable for statements contained therein.  Specifically (in chronological order): (i) Messrs. Carlson, Jeffries, and Wurtz did not sign the March 14, 2005 or May 26, 2005 registration statements; (ii) Messrs. Jeffries and Julian did not sign the February 7, 2007 registration statement; and (iii) Messrs. Julian and Treanor did not sign the March 5, 2007 or April 14, 2008 registration statements.

13

with the required state of mind.'"  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S.

71, 81-82 (2006) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005)); *see also* 15

U.S.C. § 78u-4(b)(1)-(2).  Thus, although courts "normally draw reasonable inferences in the

non-movant's favor on a motion to dismiss, the PSLRA establishes a more stringent rule for

inferences involving scienter because the PSLRA requires particular allegations giving rise to a

strong inference of scienter."  *ECA*, 553 F.3d at 196.

It is long settled that the "required state of mind" in any securities fraud case is scienter

— "a mental state embracing intent to deceive, manipulate, or defraud."  *Tellabs*, 551 U.S. at

319.  Under *Tellabs*, a securities fraud "complaint will survive … only if a reasonable person

would deem the inference of scienter cogent and at least as compelling as any opposing inference

one could draw from the facts alleged."  *Id.* at 324.  Stated differently, "an inference of scienter

[must be] at least as likely as any plausible opposing inference."  *Id*. at 328 (emphasis in

original).  In determining whether a plaintiff has met its statutory burden of pleading a "'strong

inference' of scienter, a court must consider plausible nonculpable explanations for the

defendant's conduct, as well as inferences favoring the plaintiff."  *Id*. at 323-24.

Plaintiffs in the Second Circuit can meet this high burden only by pleading particularized

facts showing "either (1) that defendants had the motive and opportunity to commit fraud, or

(2) strong circumstantial evidence of conscious misbehavior or recklessness."  *ECA*, 553 F.3d at

198.  In *Tellabs*, the Supreme Court held that "motive" allegations may not be considered in

isolation and that "the significance that can be ascribed to an allegation of motive, or lack

thereof, depends on the entirety of the complaint."  551 U.S. at 325.  Further, the Second Circuit

has made clear that recklessness in this context means "highly unreasonable" conduct that

"represents an extreme departure from the standards of ordinary care to the extent that the danger

was either known to the defendant or so obvious that the defendant must have been aware of it." *ECA*, 553 F.3d at 203.  Thus, recklessness "must, in fact, approximate an actual intent to aid in the fraud…."  *Chill v. General Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996).  Regardless of the pleading method used (*i.e.*, "motive and opportunity" or "circumstantial evidence"), scienter allegations must now satisfy the *Tellabs* test:  they must be "<u>cogent and at least as compelling</u> as any opposing inference one could draw from the facts alleged."  551 U.S. at 324.

Here, the Equity Complaint is wholly bereft of factual allegations giving rise to any inference that any Individual Defendant made a misleading statement or omission with scienter. Not a single specified internal document reviewed by the Individual Defendants is ever cited in the Equity Complaint, and not a single source (confidential or otherwise, in the Equity or Bond Notes Complaint) claims that he or she ever heard or saw anything communicated to, or by, the Individual Defendants suggesting that they ever knowingly or recklessly made any misleading statements.  Thus, the Equity Plaintiffs resort to "motive" allegations that are either misleading or so generalized as to have no relevance to the scienter inquiry, as well as to confidential witnesses — none of whom are alleged to have had any contact with the Individual Defendants during the Class Period — in a futile attempt to create an illusion of "circumstantial evidence" of scienter where none exists.  Applying *Tellabs*, plaintiffs do not come close to satisfying the statutory requirement of pleading a strong inference of scienter.

    A.    <u>The Motive and Opportunity Allegations Fail</u>

As with their original complaint, the Equity Plaintiffs principally attempt to plead motive and opportunity by alleging "highly unusual" and "suspicious" stock sales by the Individual Defendants.  Eq. ¶¶ 453-56.  Alternatively, plaintiffs contend that the Individual Defendants were motivated by the desire to use an inflated Wachovia stock price as "currency" for corporate acquisitions.  *Id.* ¶¶ 457-60.  These motive allegations do not yield a compelling inference of

15

scienter, nor could they:  the supposed fraudulent scheme is implausible on its face.

        1.      The Stock "Sales" Do Not Support an Inference of Scienter

The Equity Plaintiffs' stock sale "analysis" — indeed their entire scienter theory — is completely undermined by the Individual Defendants' SEC filings, which demonstrate that:

- The Individual Defendants actually increased their holdings of Wachovia stock by over 68% during the Class Period.

- In November 2007, Messrs. Thompson and Truslow both made substantial open-market purchases of Wachovia stock — at the very time plaintiffs claim that Wachovia and its management knew (but failed to disclose) that the business was in deep distress.

- At least 27 of the 33 "sales" cited in the Equity Complaint were actually part of purchase transactions.  They were dispositions made to fund options purchases and to satisfy tax obligations in connection with option exercises and the vesting of restricted stock.

- Plaintiffs' comparison of pre-Class Period and Class Period stock sales is misleading because it inexplicably omits a large number of pre-Class Period sales to create the appearance of unusual trading during the Class Period.

Considering these judicially-noticeable facts, the bottom line is that the Equity Plaintiffs do not plead a strong inference of scienter, and their Section 10(b) claims must be dismissed.

        a.      The Individual Defendants Increased Their Holdings

Each of the Individual Defendants acquired substantial additional amounts of Wachovia stock during the Class Period, collectively increasing their holdings by 306,006 shares, or over 68%.  Courts in this District have repeatedly held that it is "wholly inconsistent with fraudulent intent" for defendants to increase their total stock holdings during a class period.  *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004); *see also Plumbers & Steamfitters Local 773 Pension Fund v. Can. Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010) (where three of four defendants increased their stock holdings during the class period, it was "nonsensical to impute dishonest motives" because "each of them suffered

significant losses" when share prices declined); *In re Sina Corp. Sec. Litig.*, 2006 WL 2742048,

at *12 (S.D.N.Y. Sept. 26, 2006) (inference of scienter negated where "Individual Defendants

collectively held 31,532 <u>more</u> shares of [company] stock" after the class period) (emphasis in

original).  Such is the case here:

| Defendant[17] | Vested Stock at Start of Class Period | Vested Stock at End of Class Period | Percentage Increase |
|---|---|---|---|
| Mr. Wurtz | 13,310 | 54,021 | 305.87% |
| Mr. Truslow | 87,507 | 120,840 | 38.09% |
| Mr. Thompson | 345,741 | 577,703 | 67.09% |
| **Total** | **446,558** | **752,564** | **68.53%** |

Included in these figures — but once again omitted from the Equity Complaint — is the

fact that in November 2007 Mr. Thompson spent $4 million to purchase 100,000 Wachovia

shares on the open market, and Mr. Truslow spent $540,000 to purchase 13,000 Wachovia shares

on the open market.[18]  The Individual Defendants' holdings also grew throughout the Class

Period with the vesting of awards of restricted stock and the exercise of stock options.

The <u>only</u> inference that can be drawn from the Individual Defendants' substantial,

growing Wachovia holdings — including the substantial <u>additional</u> shares Messrs. Thompson

---

17  Wurtz Forms 4 dated 4/24/06 through 4/23/08; Truslow Forms 4 dated 4/24/06 through
4/23/08; Thompson Forms 4 dated 4/24/06 through 4/23/08.  Mr. Thompson's holdings are
calculated as of his retirement on June 2, 2008.  Eq. ¶ 34.

18  Wachovia itself repurchased more than $3 billion shares during the Class Period.  *See* 8/4/06
10-Q at Item 2; 11/3/06 10-Q at Item 2; 2006 10-K at Item 5; 2007 10-K at Item 5; 5/12/08
10-Q at Item 2; 8/11/08 10-Q at Item 2; 10/30/08 10-Q at Item 2.  This fact further
undermines any inference of scienter.  *McNamara v. Pre-Paid Legal Servs., Inc.*, 189 F.
App'x 702, 717 (10th Cir. 2006) (company's repurchase of its own stock at prices alleged
inflated by fraud presented "compelling" inference against scienter); *Mathews v. Centex
Telemanagement, Inc.*, 1994 WL 269734, at *8 (N.D. Cal. June 8, 1994) ("It would have
made no sense to purchase that stock if defendants knew the prices to be inflated").

and Truslow <u>purchased on the open market</u> — is that they believed Wachovia had a positive

future. *See In re KeySpan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 383 (E.D.N.Y. 2003) (finding

that the "acquisition of shares cuts against the notion that defendants sought to unload their

holdings of ... stock before their likely diminution in value following the disclosure of negative

insider information"). Faced with similar facts, the Second Circuit has found the inference of

scienter undermined or negated completely.[19] Far from having any motive to defraud investors,

the Individual Defendants were heavily invested in Wachovia as late as the summer of 2008 and

had "every incentive" to ensure the Company's long-term financial success. *In re Advanta Corp.*

*Sec. Litig.*, 180 F.3d 525, 540-41 (3d Cir. 1999); *see also In re Radian Sec. Litig.*, 2010 WL

1767195, at *12 (E.D. Pa. Apr. 30, 2010) ("It is undisputed that the defendants retained 88.6% of

their Radian securities during the class period, and to infer fraud from their trading history would

be to assume that the defendants intentionally defrauded the plaintiffs to their own ultimate

detriment…. Courts reject such an inference that makes little economic sense").

> b.    Individual Defendants'
>        <u>Class Period Sales Were Not "Unusual"</u>

Given the substantial <u>net increase</u> in the Individual Defendants' holdings of Wachovia

stock over the Class Period, there is no need to examine each of their Class Period stock sales in

isolation. Even such an examination, however, fails to give rise to any inference of scienter,

much less a "strong" one. The Second Circuit has made crystal clear that only "<u>unusual</u> insider

---

19  *See Rombach v. Chang*, 355 F.3d 164, 177 (2d Cir. 2004) (finding no scienter where
defendants, who were among the company's largest shareholders, did not sell any stock
during the class period and therefore "shared the pain when the company failed"); *San*
*Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801,
814 (2d Cir. 1996) (finding no scienter where the only defendant who sold stock in the
company retained a large investment and acquired more shares during the relevant time
period); *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 290 n.182 (S.D.N.Y. 2006)
(noting "dozens of cases" dismissing complaints where "motive allegations were
undermined by increases in total holdings").

trading activity during the class period may permit an inference of bad faith and scienter." *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995); *see also In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 468 (S.D.N.Y. 2008) (same), *aff'd sub nom. State Univ. Ret. Sys. of Ill. v. AstraZeneca PLC*, 334 Fed. App'x 404 (2d Cir. 2009).  Here, the Individual Defendants' Class Period sales were anything but unusual.

*The Equity Plaintiffs Erroneously Portray Transactions as "Sales."*  Information concerning the Individual Defendants' stock transactions is publicly available on Forms 4, which have a coding system that discloses the nature of the transaction.[20]  Plaintiffs fail to mention that 27 of the Individual Defendants' 33 Class Period dispositions are specifically coded as "F" transactions:  acquisition-related transactions undertaken to pay costs associated with exercising Wachovia stock options, or to pay tax liabilities incurred upon acquiring Wachovia shares through option exercises or the vesting of restricted stock.  The remaining six transactions are coded as open-market sales.  Of these six transactions, five took place contemporaneously with acquisitions of Wachovia securities (via stock option exercises) that had a net effect of increasing the individual's total holdings.[21]  *In re GlaxoSmithKline PLC Sec. Litig.*, 2006 WL 2871968, at *13 (S.D.N.Y. Oct. 6, 2006) (CEO's stock sale made in connection with an option exercise not unusual or suspicious where CEO retained a portion of shares acquired and net holdings increased as a result of the transaction).

Thus — whether it is 27 of 33, or 32 of 33 — virtually all of the Individual Defendants' Class Period sales were not "sales" at all, but were part of transactions that increased their

---

20  *See* Ownership Reports and Trading by Officers, Directors and Principal Security Holders, 61 Fed. Reg. 30376, 30395 (June 14, 2006).

21  Thompson Form 4 dated 2/6/07; Wurtz Forms 4 dated 10/24/06, 2/6/07.

holdings.[22]  As a matter of law, such sales, "undertaken primarily to make payments required for the exercise of stock options or to pay taxes" cannot, by definition, be used to "carry [plaintiffs'] burden of pleading that the Individual Defendants' transactions were 'unusual.'"  *Bristol-Myers*, 312 F. Supp. 2d at 561 (citing *Ressler v. Liz Claiborne Inc.*, 75 F. Supp. 2d 43, 59-60 (S.D.N.Y. 1999)); *see also Hammerstone NV, Inc. v. Hoffman*, 2010 WL 882887, at *9-10 (S.D.N.Y. Mar. 10, 2010) (defendant's "sale of less than 10% of his shares for tax purposes is not sufficiently unusual to demonstrate motive"); *In re Hardinge, Inc. Sec. Litig.*, 2010 WL 447397, at *16 (W.D.N.Y. Feb. 2, 2010) (rejecting allegation of motive where "sale" was part of the same transaction in which shares were acquired through the exercise of stock options).

***The Open-Market Sales Were Not Unusually Timed.***  Further weighing against any inference of scienter is that the last of the six dispositions coded as open-market sales took place in April 2007, only 11 months into the 29-month Class Period, and long before the first announcement of negative information on July 20, 2007.  Eq. ¶ 478.  This clearly demonstrates that the Individual Defendants were not seeking to recognize profits immediately before an expected drop in Wachovia's stock price.  *See In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 345 (W.D.N.Y. 2008) ("the law in this Circuit is clear that ... stock sales are not indicative of scienter when they are 'more than two months before the announcement' in question"); *In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d 871, 889-90 (D. Minn. 2007) (scienter allegations were insufficient when defendant's stock sales "occurred less than one year into the two-year Class Period," even though majority of stock was sold close to its peak price), *aff'd*, 527 F.3d 749 (8th Cir. 2008).

22  Thompson Forms 4 dated 4/3/07, 4/19/07, 4/20/07, 4/23/07, 2/22/08, 4/1/08, 4/21/08, 4/23/08; Truslow Forms 4 dated 10/19/06, 4/3/07, 4/19/07, 4/20/07, 4/23/07, 2/22/08, 4/1/08, 4/21/08, 4/23/08; Wurtz Forms 4 dated 12/18/06, 4/3/07, 4/19/07, 4/20/07, 4/23/07, 2/22/08, 4/1/08, 4/21/08, 4/23/08.

***The Equity Plaintiffs' Comparison of Sales Is Inaccurate***.  Even if this Court were to accept that the Code F transactions were actual sales, the Equity Plaintiffs' method for comparing Class Period sales to pre-Class Period sales is flawed.  Plaintiffs claim to have "analyzed the trading by insiders that occurred during the class period and during an approximately equal-length period immediately preceding the Class Period…."  Eq. ¶ 454.  The Equity Plaintiffs are not being candid.  Indeed, although the law requires a comparison of equal timeframes,[23] plaintiffs analyze sales by the Individual Defendants for only 16 months (January 8, 2005 through May 8, 2006) preceding the almost 29-month long Class Period.  The reason for this sleight-of-hand is obvious:  by analyzing only 16 months, plaintiffs understate Mr. Thompson's, Mr. Truslow's, and Mr. Wurtz's pre-Class Period stock sales by 9,518 shares, 10,969 shares, and 24,886 shares, respectively.

Even more significantly, however, plaintiffs misstate the total number of shares sold in the 16 months before the Class Period.  The Equity Plaintiffs claim that Messrs. Thompson and Truslow sold approximately 61,000 and 25,730 shares of Wachovia common stock, respectively, during that period.  SEC filings reveal, however, that Messrs. Thompson and Truslow sold 85,321 and 90,015 shares, respectively, during that time — *i.e.*, 40% and 250% more than the Equity Plaintiffs allege.[24]  By failing to accurately account for all of the transactions in the 16

---

23   *See In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989) (no inference of scienter based on an analysis of sales "during an equal period of time just before the class period"); *In re Tibco Software Sec. Litig.*, 2006 WL 1469654, at *20 (N.D. Cal. May 25, 2006) (class period sales not "dramatically out of line" with sales during "the same time period in the preceding year").

24   *See Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000) ("If these documents [properly being considered on a motion to dismiss] contradict the allegations of the amended complaint, the documents control and this Court need not accept as true the allegations in the amended complaint"); *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 128 (D. Conn. 2007) (same), *aff'd*, 312 Fed. App'x (2d Cir. 2009).

months before the Class Period (and by failing to present the full 29 months before the Class Period), plaintiffs understate the Individual Defendants' pre-Class Period sales by 134,424 shares, or more than 140%.  Regrettably, the Equity Plaintiffs have not corrected this mistake despite having had an opportunity to do so in their amended complaint.

| Defendant | Pre-Class Period Shares Sold (Eq. ¶ 456) | Pre-Class Period Shares Sold (Actual)[25] | Class Period Shares Sold |
|---|---|---|---|
| Mr. Truslow | 25,730 | 100,984 | 68,790 |
| Mr. Thompson | 61,000 | 94,839 | 116,506 |
| Mr. Wurtz | 8,255 | 33,586 | 67,760 |
| **Total** | **94,985** | **229,409** | **253,056** |

After correcting for these discrepancies, it is clear that the Individual Defendants' Class Period stock sales are far from unusual or suspicious compared to their pre-Class Period sales.

*Mr. Truslow*:  Compared to the 29 months before the Class Period, Mr. Truslow actually decreased the amount of shares that he sold by 32% and received approximately $1.7 million less in gross proceeds.[26]

*Mr. Thompson*:  Mr. Thompson disposed of 94,839 shares in the 29 months before the Class Period (receiving total proceeds of $4.9 million) and sold 116,506 shares during the Class Period (receiving total proceeds of $5.2 million) — *i.e.*, his Class Period proceeds were

---

25  These totals (i) account for sales between December 8, 2003 and May 7, 2006 (the 29 months before the 29-month Class Period) and (ii) correct for the Equity Plaintiffs' understatement of sales in the 16 months before the Class Period.

26  *See* Truslow Forms 4.  The term "proceeds" is used loosely in the following discussion.  The vast majority of the transactions at issue were made to cover taxes and option exercise expenses, and therefore cannot reasonably be characterized as transactions that generated "proceeds" in the sense of actual profits for the Individual Defendants.

essentially the same as his pre-Class Period proceeds.[27]  Such a *de minimis* difference is not capable of giving rise to any inference of scienter even where (unlike here) a defendant's total holdings <u>decrease</u> during a class period.  *See In re Vantive Corp. Sec. Litig*, 283 F.3d 1079, 1095 (9th Cir. 2002) (finding sales during the class period "not dramatically out of line" with prior trading practices although defendant sold 10,000 shares of stock for $400,000 in gross proceeds in the nine months before the class period and 61,000 shares of stock for $1.6 million during the class period); *In re Pixar Sec. Litig.*, 450 F. Supp. 2d 1096, 1105 (N.D. Cal. 2006) (defendant's sales of 33% more shares during class period than in the months prior to the class period "were not dramatically out of line with his prior trading practices").

    ***Mr. Wurtz*:**  Mr. Wurtz disposed of 33,586 shares in the 29 months before the Class Period (receiving total proceeds of $1.8 million) and sold 67,760 shares during the Class Period (receiving total proceeds of $3.7 million).[28]  This less than $2 million difference is neither unusual nor suspicious when placed in context.  Mr. Wurtz was promoted from Treasurer to CFO on January 31, 2006, less than five months before the start of the Class Period.[29]  Following that promotion, for the years 2006 and 2007, Mr. Wurtz's compensation included significant grants of Wachovia stock.[30]  The more compelling inference is not that he was engaged in fraud, but simply that he had more Wachovia stock to sell.  Moreover (as noted above), Mr. Wurtz's total holdings of Wachovia stock increased by <u>306</u>% during the Class Period.  *See Ressler*, 75 F. Supp. 2d at 59-60 ("Inferences of scienter can be undermined when an insiders' sales of stock

---

27  *See* Thompson Forms 4.

28  *See* Wurtz Forms 4.

29  1/31/06 8-K, Item 5.02, Ex. 99.

30  *See* 3/10/08 Form 14A at 40.

are offset by even larger stock acquisitions during the relevant time periods").

In short, far from leading to a compelling inference of fraud, the paucity of open-market sales, the prevalence of transactions in connection with the <u>acquisition</u> of Wachovia stock, and the substantial net increase in the Individual Defendants' holdings during the Class Period eviscerate any conceivable inference of scienter.

2.     Allegations Concerning Corporate Acquisitions &
       <u>Offerings Do Not Support an Inference of Scienter</u>

The Equity Plaintiffs speculate that the Wachovia Defendants had a motive to inflate Wachovia's stock price so that Wachovia could acquire Golden West and AG Edwards and conduct its April 2008 offering of common stock (without even attempting to explain why Wachovia would have needed to fraudulently inflate its stock price in order to do these transactions).  Eq. ¶¶ 457-60.  As this Court has recognized, however, "to plead motive a securities plaintiff must plead a '<u>concrete and personal</u>' benefit to be realized from the allegedly improper behavior."  *In re PXRE Group, Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 533 (S.D.N.Y. Mar. 4, 2009), *aff'd sub nom. Condra v. PXRE Group, Ltd.*, 357 Fed. App'x 393 (2d Cir. 2009); *see also ECA*, 553 F.3d at 200-01 & n.6; *Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001) (rejecting motive to "artificially inflate stock price to get more favorable terms in stock-for-stock transactions").  Plaintiffs' corporate finance motive has been roundly rejected because every corporation can always be alleged to have this generic motive.  *See ECA*, 553 F.3d at 201 (desire to profit from acquisition "fail[s] to establish the requisite scienter because the desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired, or to acquire another"); *AstraZeneca*, 559 F. Supp. 2d at 469 (desire to conduct stock offering "when the stock was near its class period high" rejected as "a generalized motive that any officer or director who desires to operate a successful company will have").

24

3.      The Economic Irrationality of the Supposed
Scheme Undercuts an Inference of Scienter

At bottom, the Equity Plaintiffs' failure to plead facts showing motive stands to reason:

the alleged fraudulent scheme defies all economic sense.  If, as plaintiffs contend, the Wachovia

Defendants knew that the Pick-a-Pay portfolio was doomed to fail, why did they purchase

Wachovia stock and increase their holdings throughout the Class Period?  And why did

Wachovia retain the overwhelming majority of Pick-a-Pay loans for its own portfolio rather than

immediately sell them on the secondary market?[31]  As the Second Circuit aptly noted in *Shields*

*v. Citytrust Bancorp, Inc*., 25 F.3d 1124, 1130 (2d Cir. 1994): it is "hard to see what benefits

accrue from a short respite from an inevitable day of reckoning."

The only compelling inference here is that there was no fraud.  Rather, Wachovia — like

nearly everyone else, including the Federal Reserve and United States Treasury Department —

did not anticipate the enormity of the credit and housing crises.  *ECA*, 553 F.3d at 203 (scienter

allegations "suffer[ed] from a basic problem concerning plausibility ….  Plaintiffs fail to allege

facts explaining why, if [defendant] was aware of Enron's problems, [defendant] would have

continued to lend Enron billions of dollars'"); *Davidoff v. Farina*, 2005 WL 2030501, at *11

n.19 (S.D.N.Y. Aug. 22, 2005) ("it would have made no economic sense for defendants to invest

literally billions of dollars in a venture that they knew would fail").

B.      There Is No Circumstantial Evidence of Scienter

The Equity Plaintiffs' confidential witness allegations fall far short of providing an

"inference of scienter that is cogent and at least as compelling as any opposing inference one

could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.  This remains the case even though

---

31   *See* Eq. ¶¶ 218, 232; *see also*, *e.g.*, 9/10/07 Conf. Call at 3 ("[O]ur option ARM product is
originated for our portfolio.  That's extremely important.  We are not chasing gain on sale
accounting treatment.  We are not pressed to do volume just to keep the wheels turning").

they have incorporated each of the original Bond Notes Confidential Witnesses into their amended complaint.[32]  These confidential witness allegations add nothing that suggests that any of the Individual Defendants made any statement (or omission) with an intent to defraud.[33]

1.     No Contact with the Individual Defendants

What was glaringly missing from the Equity Plaintiffs' original complaint remains absent here:  there are no allegations whatsoever that <u>any</u> of the witnesses (in <u>either</u> of the amended complaints) <u>ever</u> (i) met any of the Individual Defendants, (ii) reported any concerns to them, (iii) received any instructions from them, or (iv) had any contact with them whatsoever during the Class Period.  These witnesses thus are not alleged to have <u>any</u> insight into what Wachovia's senior management (including the Individual Defendants) knew or should have known during the Class Period.  *See PXRE*, 600 F. Supp. 2d at 537 (scienter not pled where there was no allegation that an employee's concerns, expressed to a confidential witness, "were ever brought to the

---

[32]  The Equity Plaintiffs refer to Bond Notes Confidential Witnesses using CW numbers from the Original Bond Notes Complaint.  These CWs' numbers are different in the Amended Bond Notes Complaint.  So that each CW is consistently referred to within the four corners of this brief, the Wachovia Defendants will use the numbers designated in the Amended Bond Notes Complaint.  For the convenience of the Court, attached hereto is a chart cross-referencing the original and updated Bond Notes Confidential Witness numbers.  *See* p. xviii, *supra*.

[33]  Moreover, the Equity Plaintiffs' attempt to rely on confidential witnesses from the Bond Notes Action is improper and these allegations should be stricken from the Equity Complaint.  The Supreme Court has held that the duty to investigate the factual basis for allegations in a complaint is "nondelegable."  *Pavelic & LeFlore v. Marvel Entm't Group*, 493 U.S. 120, 126 (1989).  Nowhere does the Equity Complaint state that Lead Counsel for the Equity Plaintiffs interviewed the Bond Notes Confidential Witnesses, or could even identify — let alone produce — them should the Equity Complaint survive this motion to dismiss.  *See Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 398, 411 (S.D.N.Y. 2007) ("allegations about [defendant] contained in pleadings from an unrelated lawsuit … are inadmissible"); *see also Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274, 1279-81 (3d Cir. 1994) (securities fraud allegations violated Rule 11 where plaintiffs' attorneys copied other complaints' allegations of fraud based on *Wall Street Journal* article and failed to conduct any inquiry of the underlying facts in the complaints or news article).

26

attention of the individual defendants, or anyone else at PXRE"); *Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 335 (S.D.N.Y. 2009) (rejecting confidential witness-based scienter allegations where "none [of the CWs] had any contact with either" of the individual defendants), *aff'd*, 2010 WL 1292329 (2d Cir. Apr. 6, 2010).[34]

2.    Fraudulent Underwriting Allegations Fail

Nineteen months have passed since the Original Equity Complaint was filed in December 2008.  In that time, the Equity Plaintiffs have not identified a single new source to support their allegations of fraudulent underwriting at Wachovia.  Instead, they rely exclusively on Equity CWs 2 and 3 and on three CWs poached from the Bond Notes Complaint (B/N CWs 5, 27, and 28).  Eq. ¶¶ 91-92, 95, 110-111, 152-154, 278, 439-444, 449.  None of these CWs allege that they had any contact with the Individual Defendants, or suggest that any allegedly fraudulent practices occurred on a sufficiently wide scale to support an inference that the Individual Defendants must have known of, or recklessly disregarded, them.

- Equity CW 2 states that, during her tenure at Wachovia (which ended in November 2006, *see* p. 48, *infra*), it "became clear" to her that "a lot of the time" borrowers had falsified application documents "at the behest of the loan officer[s]."  Eq.  ¶¶ 111, 154, 439.  But Equity CW 2 explains neither what "a lot of the time" means (*e.g.*, how many such loans she encountered), nor when such loans were originated.  Furthermore, Equity CW 2 (a loan servicing specialist) is not alleged to have had any role in the loan origination process.  *Id.* ¶¶ 53, 140.

---

34  *See also Steinberg v. Ericsson LM Tel. Co.*, 2008 WL 5170640, at *13 (S.D.N.Y. Dec. 10, 2008) (scienter not pled where plaintiff's confidential sources were mid-level managers who had no contact with any of the defendants); *Bausch & Lomb*, 592 F. Supp. 2d at 342 (scienter not pled where the confidential sources did not have "any contact with the Individual Defendants or would have knowledge of what they knew or should have known during the Class Period"); *In re Am. Express Co. Sec. Litig.*, 2008 WL 4501928, at *8 (S.D.N.Y. Sept. 26, 2008) (rejecting allegations based on confidential sources where those sources had no contact with the individual defendants), *aff'd*, 604 F.3d 758 (2d Cir. 2010); *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 220-21 (S.D.N.Y. 2008) (rejecting allegations based on confidential sources without any facts indicating that sources would have reason to know what was communicated to senior management).

- Equity CW 3 supports his pronouncement that underwriting at Wachovia was "nothing short of fraud" (*Id*. ¶¶ 110, 152, 449) by describing <u>a single</u> incident of alleged income inflation, and then more generally claiming that he and other loan officers "were instructed" to overstate income, without alleging any details about those purported instructions or who gave them. *Id*. ¶¶ 111, 278, 449. Most significantly, the Equity Plaintiffs do not allege that Equity CW 3 (or anyone else) ever reported these incidents to senior management or that — except in the most conclusory, sweeping, and unsupported terms — these incidents were widespread at the Company.

- B/N CWs 5, 27, and 28 similarly rely on broad, generalized allegations that Wachovia had a "practice" or "routine[ ]" of falsifying loan applications, without providing any detail about the number of loans allegedly falsified or any facts suggesting that such "practices" or "routines" — if they existed — were known to, or condoned by, management. *Id*. ¶¶ 91-92, 95, 442-444.

Indeed, in a telling attempt to manufacture detail where there is none, Equity CW 3 and B/N CWs 5, 27, and 28 resort to hypotheticals to describe fictional conversations between a loan officer and borrower (*Id*. ¶ 153), to describe what "would" happen — <u>but not what did happen</u> — in the loan origination process, and to describe implicit but "inadvertent[ ]" instructions to loan officers. *Id*. ¶¶ 92, 95, 443-44. Real facts, however, not hypothetical ones, must be alleged to generate a strong inference of scienter. *Glover v. DeLuca*, 2006 WL 2850448, at *24 (W.D. Pa. Sept. 29, 2006) (allegations were insufficient to establish misrepresentations or scienter "because the loan covenant violations alleged by Plaintiff are entirely hypothetical").

The new Bond Notes Confidential Witnesses do not change this calculus:

- <u>None</u> of the new B/N CWs who allege that fraudulent underwriting practices took place claim that they ever met with, emailed, or spoke to any of the Individual Defendants (or even attempted to) about anything, let alone about the fraudulent practices that they now claim were occurring.[35] Indeed, <u>the only CWs</u> (B/N CWs 19 and 32) who ever claim that they raised any concerns about inflated income during the Class Period admit that they spoke only to mid-level officers and provide no details as to who those supervisors were, when they spoke to them, or what they told them. B/N ¶ 113(a), (o).

---

35  *See* B/N ¶¶ 100(a) (B/N CW 5), 100(d) (B/N CW 8), 113 (B/N CWs 19, 17, 22-24, 12, 21, 25-35), 131 (B/N CW 4).

- None of the new B/N CWs state that they personally engaged in fraudulent underwriting — only that other, unnamed employees or brokers did so. *See, e.g.*, *Id.* ¶¶ 113(b) (B/N CW 17), 113(e) (B/N CW 24), 113(g) (B/N CW 21). And of all these CWs, not a single one names a member of management that was aware of or condoned the allegedly fraudulent underwriting practices.

- Finally, the new B/N CWs continue to use general hypotheticals in an attempt to provide the illusion of references to specific loans. For example, B/N CW 12 states that "loan applications would regularly reflect significantly inflated borrower incomes (*e.g.*, incomes of $85,000 rather than $45,000)." *Id.* ¶ 113(f)). Similarly, B/N CW 25 points to "loan applications with obviously fabricated incomes – such as a self-employed housecleaner claiming to earn $8,000 per month" (*Id.* ¶ 113(h)), and B/N CW 31 alleges that "the Company regularly approved stated loan applications with inflated incomes, such as from landscapers or housekeepers who claimed to make $30,000 per month." *Id.* ¶ 113(n).[36]

These types of allegations are woefully insufficient. *See Waterford Twp. Gen. Employees Ret. Sys. v. BankUnited Fin. Corp.*, 2010 WL 1332574, at *15-16 (S.D. Fla. Mar. 30, 2010) (confidential witness statements lacking "any specific allegation that any of the defendants were approached by [the CW] or anybody else, about a problem with overstated property values, or insufficient appraisal reviews" did not support an inference of scienter). Accordingly, the new Bond Notes Confidential Witnesses do not detail facts that give rise to any — let alone a cogent and compelling — inference that the Individual Defendants acted with an intent to defraud, as required by *Tellabs*.

---

[36]  Those B/N CWs who do claim to recall specific examples (five examples in total) of allegedly inflated income fail to provide any other details about the loans allegedly approved (such as their principal amount or LTV). B/N CW 35, for example, describes an allegedly fraudulent application ("a borrower with a job at a nursery that CW [35] believed could not have paid more than $6.00 per hour, but who was approved for a $250,000 mortgage), but alleges no facts concerning when this loan was approved (*i.e.*, pre- or post-Golden West acquisition), the LTV of the loan, whether the borrower had other assets, or any basis for the CW's belief that the borrower only earned $6.00 per hour. *See* B/N ¶ 113(r); *see also id.* ¶¶ 113(d) (B/N CW 23), 113(f) (B/N CW 12), 113(l) (B/N CW 29), 113(q) (B/N CW 34).

3.     The Bond Notes Confidential
       Witnesses Undermine Any Scienter Claim

Not only have the Equity Plaintiffs failed to locate any new confidential witnesses of

their own, but several of the new Bond Notes Confidential Witnesses in fact <u>undermine</u> the

Equity Plaintiffs' claim that the Individual Defendants acted with scienter.

- ***Wachovia Believed in the Golden West Acquisition***.  B/N CW 4 states that
  "Wachovia senior executives were being honest when they made statements
  about the merger in 2006 because they believed in the quality of the
  acquisition at the time 'based on what they were told.'"  B/N ¶ 91(d).

- ***Regional, Not Company-Wide, Issues***.  B/N CW 38 states that the use of
  exceptions to policy were "driven by the managers in her region, who were
  legacy Golden West employees, rather than from Wachovia headquarters."
  *Id.* ¶ 115(l).  Similarly, B/N CW 4 states that "Area National Managers in
  some regions appear to have generally followed stated underwriting
  guidelines, but the problem was others did not" (B/N CW 91(d)), and B/N
  CW 44, an employee from South Carolina who claims to have witnessed
  faulty appraisal practices in her region, states that "other regions" employed
  better practices (*Id.* ¶ 122(c)).

- ***When Senior Management Learned of Issues, They Acted.***  Citing issues in
  California under certain Area National Managers, B/N CW 4 states that
  "senior Wachovia management did not appreciate how the guidelines for the
  Pick-a-Pay product were 'blissfully ignored' in some very critical regions"
  (B/N ¶ 91(d)) and that when management "gradually came to understand how
  [the managers] had run things in California under Golden West and after the
  merger, all of them were let go."  B/N ¶ 131; *see also* B/N ¶ 122(a).

- ***Reports Were Taken Seriously.***  Although providing no detail as to what was
  in his reports, B/N CW 47 states that his reports and recommendations to the
  heads of Wachovia's underwriting and appraisal departments "were taken
  seriously" and that in response "the Company would try to implement changes
  to tighten up lending in some areas …."  B/N ¶ 123(b).

At best, viewing the confidential witness claims across both cases, plaintiffs allege that

Wachovia did not understand the Pick-a-Pay mortgage or properly oversee its integration into

Wachovia's product line.  These are not claims that senior management acted knowingly or

recklessly in making any alleged misrepresentations.  These are allegations of mismanagement

and lack of oversight, and as the Supreme Court has held, such allegations cannot state a claim

30

for securities fraud.  *See Santa Fe Indus.*, 430 U.S. at 479-80.

4.      Another Institution's Cumulative Loss
        Estimate Does Not Support an Inference of Scienter

Having combed the recent wave of literature concerning the 2008 collapse, the Equity

Plaintiffs have added allegations derived from a single paragraph in Roger Lowenstein's 300-

page book *The End of Wall Street* concerning Morgan Stanley's estimate of expected cumulative

losses on the Pick-a-Pay portfolio.[37]  Eq. ¶¶ 461-62.  The Equity Plaintiffs allege that, on the

evening of September 17, 2008, following a merger proposal from Wachovia earlier that day,

"Morgan Stanley cracked open 400,000 Wachovia mortgages and calculated an estimated loss

ratio of 30 percent, rather than the 12 percent Wachovia had suggested."  *Id.* ¶ 462.  Thus,

Morgan Stanley allegedly saw "Wachovia's true financial condition" and "refused to take on

losses of that scale."  *Id.*  Even accepting this third-hand account as true, it cannot give rise to an

inference of scienter.

First, Morgan Stanley was not "provided" loss information contrary to Wachovia's public

disclosures; Mr. Lowenstein's book does not say this, but instead makes clear that Morgan

Stanley recalculated Wachovia's estimated loss ratio.  *Id.*; *see In re Allied Capital Corp. Sec.*

*Litig.*, 2003 WL 1964184, at *4 (S.D.N.Y. Apr. 25, 2003) ("That some other company reached a

different valuation provides no reason to believe that its valuation was correct and Allied's

wrong"); *see also Epirus Capital Management LLC v. Citigroup Inc.*, 2010 WL 1779348, at *6

(S.D.N.Y. Apr. 29, 2010) (disagreement over valuation methods "does not equate to alleging

fraud").

_____

37  A cumulative loan loss estimates losses on loans in a portfolio through the date of their
    maturity — which can be 30 years away.  A significant number of assumptions regarding
    the future need to be made in arriving at a cumulative loss estimate, including assumptions
    about future housing prices which — in the late summer and fall of 2008 — were
    exceedingly difficult to predict.  7/22/08 8-K, Ex. 99(b), at 15, 17.

Moreover, the circumstances as a whole do not support a plausible inference of scienter:

- The Equity Plaintiffs provide no specifics whatsoever — because there are none in Mr. Lowenstein's book — concerning (i) how Wachovia calculated its estimated cumulative loss ratio; (ii) how Morgan Stanley calculated its alternative estimate; and (iii) any facts as to why Morgan Stanley's estimate, hastily done overnight, better reflected the objective characteristics of Wachovia's loan portfolio.

- The Equity Plaintiffs also ignore the context of Morgan Stanley's review: Morgan Stanley's professed view of Wachovia's loan portfolio was undoubtedly colored by the fact that it was in the process of negotiating a purchase price for Wachovia. Morgan Stanley — which itself was in dire financial straits — had every reason to present Wachovia with a high cumulative loss estimate not only to secure the lowest price possible, but also to position itself to secure as much government aid as possible in the connection with any potential transaction.[38]

In short, the fact that a team of bankers from a competing institution concerned about going out of business any day spent one evening looking at Wachovia's mortgages and came up with a different cumulative loss estimate does not support an inference of scienter.

> 5.   Wachovia's Risk Management Structure
>        Does Not Support an Inference of Scienter

One of the stated reasons that the Equity Plaintiffs sought to amend their complaint was to add allegations that Wachovia's risk management structure supports an inference of scienter. These new allegations rest on nothing more than out-of-context excerpts from Wachovia's public disclosures and the most general descriptions of Wachovia's risk management structure, none of which show that any of the Individual Defendants learned, at any time, information suggesting that Wachovia's statements concerning its underwriting practices were false when made.

The Equity Plaintiffs' description of Wachovia's risk management structure and senior risk committee ("SRC") is taken from Wachovia's 2007 10-K. Of course, the mere fact of the

---

38   *See* ROGER LOWENSTEIN, THE END OF WALL STREET 226 (2010) (In the words of its CEO that same day, Morgan Stanley was an institution that "could go out of business Tuesday.")

Individual Defendants' membership on a committee cannot by itself support a claim of scienter. Recognizing this, the Equity Plaintiffs cherry-pick statements from the 2007 10-K that have nothing to do with residential mortgage lending, or that describe risk functions that are layers removed from the SRC, in order to manufacture a claim that the Individual Defendants had detailed involvement in the day-to-day operations of the residential mortgage business.  For example, the Equity Plaintiffs allege that Wachovia "bragged" about:

- *"'Track[ing]' a 'regularly updated' 'centralized database' relating to the company's credit risk exposure."* (Eq. ¶ 469).  The 2007 10-K makes clear, however, that the centralized database referred to was a database of <u>general policies and procedures</u> — not a repository of data relating to credit risk exposure.  2007 10-K, Ann. Rpt. at 38.

- *"[C]lose monitoring of daily activities"* (Eq. ¶ 465).  The operational risk team, not the Individual Defendants or members of the SRC, was responsible for "closely monitoring" operational risk.  2007 10-K, Ann. Rpt. at 40.

- *"[C]lear lines of sight for decision-making and accountability."* (Eq. ¶ 465).  Taken from the "Four Components of Risk Governance" section of Wachovia's 10-K, this description, in context, describes how Wachovia's "business units are responsible for identifying, acknowledging, quantifying, mitigating and managing all risks" and is not a representation regarding senior management or the SRC.  2007 10-K, Ann. Rpt. at 38.

Thus, considered in their proper context, these allegations — like the anecdotal observations of CWs who had no contact with senior management — add nothing to the scienter analysis.

Further, the Equity Complaint includes no allegations concerning any particulars of any SRC meetings, such as what internal documents or reports (written or oral) the Individual Defendants received while serving on the SRC, much less how any SRC communications contradicted Wachovia's public statements at any time.[39]  As recent decisions in the Second Circuit have made clear, bare allegations that individual defendants monitored a business line

---

[39]  The Equity Plaintiffs' references to earnings and conference call transcripts that discuss Wachovia's risk management policies and practices in only the most general of terms are equally ineffective.  *See*, *e.g.*, Eq. ¶¶ 463, 467, 468.

cannot state a claim absent allegations describing the contradictory information they received while performing that function. *See Plumbers & Steamfitters*, 694 F. Supp. 2d at 296, 298-300 (argument that defendants acted with scienter because they were "expert" in or were "ultimately in charge of all CIBC's activities related to subprime exposure," or because they had discussed during the class period "CIBC's subprime exposure, risk levels, and counterparty protection" rejected where plaintiffs did not "provide specific instances in which defendants received information that was contrary to their public declarations"); *In re Security Capital Assurance, Ltd. Sec. Litig.*, 2010 WL 1372688, at *11, 25-26 (S.D.N.Y. Mar. 31, 2010) (argument that defendants acted with scienter because they publicly stated that they "actively monitor[ed] the performance of the credits [they] insure[d]" and "fully investigated and stress tested each security before agreeing to insure it" rejected where plaintiffs failed to show that defendants' public statements reflected anything other than "a fundamental misunderstanding and underestimate of the true risks presented by investment in the housing market").[40]

6. Wachovia's April 2008 Adjustments to Its Underwriting Standards Add Nothing to Plaintiffs' Scienter Claims

The Equity Plaintiffs' allegation that Wachovia "effectively admitted" that it never followed conservative or prudent lending standards through its April 2008 announcement that it was requiring a minimum FICO score and income and asset verification for all borrowers is unfounded. Eq. ¶¶ 473-76. Wachovia never previously stated that it required a minimum FICO score or income and asset verification — in fact, it publicly disavowed any reliance on FICO scores and disclosed its use of stated income loans. *See* Parts II.C & II.D.4, *infra*. Moreover, as

---

[40]   In addition, without facts demonstrating that the Individual Defendants received specific information contradicting their public statements, the Equity Plaintiffs' attempt to use Wachovia's SOX filings (Eq. ¶ 472) as a basis of inferring scienter fails. *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 304-05 (S.D.N.Y. 2008).

the articles the Equity Plaintiffs refer to make clear, Wachovia's underwriting adjustments were a direct result of current "market conditions, as the nationwide housing slump has worsened over the past year."[41]  That Wachovia tightened underwriting in the face of dramatically different market conditions — and publicly disclosed those changes — is not an "admission" of securities fraud, but rather compelling evidence of defendants' openness and lack of scienter.

> 7.   Unspecified Internal Reports Do
>       Not Support an Inference of Scienter

The Equity Complaint also employs the repeatedly rejected stratagem of attempting to allege scienter by making vague allegations that the Individual Defendants received "various reports" that allegedly reflected the "true facts regarding Wachovia."  *See* Eq. ¶¶ 435-38; *see also id*. ¶¶ 37-40 ("because of [their] positions within the Company, they had access to adverse undisclosed information").  The Equity Plaintiffs (as was the case with their original pleading) do not attach these reports to their complaint, do not provide the dates of the reports, and do not describe the contents of the reports to show how they contradicted any public statements.  Nor do the Equity Plaintiffs even bother to allege which of the Individual Defendants received these reports, or when (or how) they received them.  These conclusory allegations fail to establish scienter under Second Circuit law:  "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex*, 531 F.3d 190, 196 (2d Cir. 2008) (absence of particularized allegations regarding internal reports defeated inference of scienter); *see also, e.g.*, *San Leandro*, 75 F.3d at 812 (dismissing securities complaint for failure to allege scienter where complaint provided an "unsupported general claim of the existence of confidential company sales reports that revealed [a] larger decline in sales"); *Plumbers & Steamfitters*, 694 F.

---

41   *Wachovia Adjusts Mortgage Underwriting Guidelines*, SACRAMENTO BUS. J., Apr. 11, 2008.

Supp. 2d at 299-300 (plaintiff's "broad reference to raw data is not sufficient" where plaintiff "has not specifically identified any reports or statements or any dates or time frame in which [d]efendants were put on notice of contradictory information").

\* \* \*

In short, the Equity Complaint simply does not add up to fraud or even come close. The Equity Plaintiffs' theory of fraud makes no rational, economic sense and, not surprisingly, they fail to come forward with allegations (old or new) supporting motive or providing circumstantial evidence of fraud. The Equity Complaint certainly does not provide an inference of fraud "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. The more compelling inference is that Wachovia found itself "involved in a volatile industry at the onset of a long, destructive economic downturn." *Pittleman v. Impac Mortgage Holdings, Inc.*, 2009 WL 648983, at \*4 (C.D. Cal. Mar. 9, 2009), *aff'd sub nom. Sharenow v. Impac Mortgage Holdings, Inc.*, 2010 WL 2640195 (9th Cir. June 29, 2010).

## II.     THE CLASS ACTION COMPLAINTS FAIL TO PLEAD FALSITY

### A.     Plaintiffs' Securities Act Claims Sound in Fraud and Are Subject to the Heightened Pleading Requirements of Rule 9(b)

Both plaintiffs' claims under the Securities Act rely on "wording and imputations ... classically associated with fraud" and therefore must comply with the heightened pleading standard of Rule 9(b). *Rombach*, 355 F.3d at 172 (allegations that registration statement contained "materially <u>false</u> and <u>misleading</u> written statements," "<u>untrue</u> statements of material fact," and were "inaccurate <u>and</u> misleading" sounded in fraud).[42] Plaintiffs cannot avoid Rule 9(b) by repeatedly disclaiming fraud or (as the Equity Plaintiffs attempt) by placing their

---

[42]  Both complaints repeatedly use such wordings and imputations. *See, e.g.*, Eq. ¶¶ 537, 539, 542, 547 ("materially false or misleading"); 557, 562 ("untrue statements of material fact"); B/N ¶¶ 1, 77 ("misled"); 266, 276, 287 ("materially untrue and misleading").

Securities Act claims in a separate section of their complaint.  These pleading techniques have been consistently rejected for the reasons set forth in the Underwriter Defendants' memoranda.  *See* Und. B/N Mem. at Part IV.A; Und. Eq. Mem. at Part I.A.

Furthermore, it is well settled that "a complaint may sound in fraud even where … no fraud claims under the Exchange Act are asserted."  *Ladmen Partners, Inc. v. Globalstar, Inc.*, 2008 WL 4449280, at *11 (S.D.N.Y. Sept. 30, 2008); *see also In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 436 (S.D.N.Y. 2009); *In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 691 n.4 (S.D.N.Y. 2004) (Securities Act claims based on allegations of inadequate loan loss reserves "unquestionably sound[ed] in fraud").  Here, not only is the Bond Notes Complaint replete with the same wording and imputations held in *Rombach* to require compliance with Rule 9(b), but its central theory is that the Wachovia Defendants purposefully (not negligently or inadvertently) hid allegedly inadequate underwriting and weak borrower profiles from the Company's investors.  For example, they allege that:

- Wachovia <u>intentionally</u> lowered its underwriting standards after the acquisition of Golden West (B/N ¶¶ 100 n.7, 103, 111-13, 115, 118, 127-29);

- Wachovia <u>purposefully</u> disregarded its underwriting guidelines by inappropriately originating loans through the exception to policy process (*Id.* ¶¶ 4, 99-100, 103, 111, 113, 115, 118, 125, 128);

- Wachovia employees were allegedly <u>encouraged to falsify</u> borrower income and employment information on loan applications in order to originate a high volume of Pick-a-Pay loans (*Id.* ¶¶ 4, 98-100, 103, 108-11, 113, 115); and

- Wachovia's compensation structure and sale quotas were <u>consciously designed</u> to inappropriately incentivize employees to sell a high volume of Pick-a-Pay loans (*Id.* ¶¶ 99-100, 107-08, 111, 113, 115, 118, 128).

The Bond Notes Plaintiffs chose to allege that Wachovia engaged in a fraudulent scheme to mislead the public.  The consequence of that decision is that their allegations must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where

and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach*, 355 F.3d at 170.  Plaintiffs fall well short of this exacting standard.

## B.    Plaintiffs' Conclusory Allegations Fail

Even if Rule 9(b) did not apply to both plaintiffs' Securities Act claims (and it does), two recent — and seminal — Supreme Court decisions demonstrate that plaintiffs must do a lot more than assert conclusory allegations.  In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), the Supreme Court held that a claim should be dismissed if the complaint fails to provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action …." *Id.*  Rather, to survive dismissal, a plaintiff must plead factual allegations sufficient "to raise a right to relief above the speculative level."  *Id.*  In *Ashcroft v. Iqbal*, the Supreme Court held that "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not shown — that the pleader is entitled to relief."  129 S. Ct. 1937, 1950 (2009); *see also In re IAC/InterActiveCorp. Sec. Litig.*, 2010 WL 996483, at *7 (S.D.N.Y. Mar. 19, 2010) (dismissing Section 11 claims where plaintiffs failed to provide sufficient details to "nudge [their] claims across the line from conceivable to plausible"). Measured by this standard, both complaints' Securities Act claims must be dismissed because they do not "raise the right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

## C.    The Unchallenged Characteristics of the Pick-a-Pay Portfolio

Plaintiffs' core theory of falsity is that Wachovia's underwriting of Pick-a-Pay loans was, contrary to Wachovia's public statements, not conservative but rather so weak on a national scale that it rendered a variety of Wachovia's statements concerning its overall financial performance misleading.  This theory ignores several undisputed facts concerning the Pick-a-Pay portfolio.

Critically, Wachovia has not restated its financials for any portion of the Class Period, and neither its outside auditor, the SEC, nor Wells Fargo has ever suggested that it should.  The

absence of any restatement undermines allegations that Wachovia's underwriting caused its financial statements to be materially false when issued. *See In re Huntington Bancshares, Inc. Sec. Litig*, 674 F. Supp. 2d 951, 973 (S.D. Oh. 2009) (absence of restatement "lends credence" that financial statements were correct "based on the then-available information"); *Malin*, 499 F. Supp. 2d at 148 (considering lack of restatement in finding falsity not plead).

Moreover, plaintiffs' efforts to allege falsity based on CWs' assertions that Wachovia originated loans to individuals with FICO scores below 660 are misguided.[43] Wachovia disclosed throughout the Class Period that its lending philosophy was to heavily discount FICO scores when evaluating borrowers, and that other factors including, most prominently, the LTV of the loan at origination, must be considered in evaluating whether a loan is "subprime."[44] Moreover, Wachovia disclosed "for sake of discussion" in April 2007 that approximately $1.3 billion in loans that it held in its consumer mortgage portfolio were to borrowers with FICO scores of 620 or below and LTVs over 80%. *See* 4/16/07 Conf. Call at 6. Given this disclosure (the accuracy of which plaintiffs do not challenge), it is not surprising that plaintiffs have located former employees who state that Wachovia originated loans to borrowers with FICO scores below 660 (although none say anything about the LTVs of those loans, or, more importantly,

---

43   *See* B/N ¶¶ 118 (B/N CWs 6, 7, 11, 13, 16, 22, 26, 31, 34, 35, 40), 128 (B/N CWs 49, 50); Eq. ¶¶ 112 (Eq. CW 8), 177, 196, 210 (Eq. CWs 1, 3, 9), 209 (Eq. CW 5).

44   *See* Eq. ¶ 68 (citing 5/12/06 Conf. Call at 16) ("I don't think Fair Isaac is going to ask the Sandlers to do many commercials for them because they view the FICO score as just a very, very small component of their credit decisioning"); 5/16/06 Conf. Call at 5 ("[I]f you are relying on FICO scores, you may be missing that boat … [Golden West doesn't] use a lot of black box kinds of things like FICO scores"); 4/16/07 Conf. Call at 6 ("[I]n reality, we as many lenders use a lot of different factors in underwriting consumer loans, to include the … borrowers' net worth, [its] relationship history with them, debt to income, etc"); 6/12/07 Investor Presentation at 4 (cited at Eq. ¶ 160) (Wachovia employs a "'common sense' customer credit analysis.  Not a 'Black Box,' FICO-driven credit scoring model and approval process").

claim that this fact was withheld from investors).  And although $1.3 billion may be a large balance in absolute terms, it was only 1% of the then-outstanding $118.6 billion in Pick-a-Pay loans and 0.5% of Wachovia's entire consumer mortgage portfolio.  *See id.*; 4/16/07 8-K, Ex. 99(b) at 20.  Accordingly, these FICO score allegations do not support plaintiffs' theories concerning Wachovia's underwriting.

Likewise without merit are plaintiffs' allegations that Wachovia "loosened" its underwriting standards on a national scale during the Class Period.  These allegations fail because they are irreconcilable with Wachovia's underlined April 2008 disclosures concerning its Pick-a-Pay portfolio.  *IAC/InterActiveCorp.*, 2010 WL 996483, at *9 (rejecting CW allegations where defendants' financial results, whose accuracy plaintiffs did not challenge, belied the CW's statements).  In particular, if (as plaintiffs claim) Wachovia embarked on a company-wide campaign during the Class Period to loosen underwriting standards in order to maximize Pick-a-Pay sales, then Wachovia's April 2008 disclosures concerning Pick-a-Pay credit risk metrics (which appear late in the Class Period and which plaintiffs do not allege are false) should reflect the decrease in standards.  Instead, these disclosures show that the average original FICO score and LTV ratio for all then-outstanding Pick-a-Pay loans was 674 and 71%, respectively, or well above any "subprime" threshold.  *See* 4/14/08 8-K, Ex. 99(b) at 20. Similarly, loans to borrowers with FICO scores below 620 actually decreased from 2006 through 2008, and there was only a *de minimis* increase in loans with original CLTVs over 80% (all of which were in the 81% to 90% range).  *Id.* at 38-39.[45]

---

[45]  Indeed, this is consistent with the statements attributed to B/N CW 26, who observes that a lot of loans "in the beginning" of his tenure (*i.e.*, 2006) had FICO scores below 660, implying that FICO scores improved thereafter.  B/N ¶ 118(l).

| Year Originated | FICO < 620 at Origination | CLTV > 80% at Origination[46] |
|:---:|:---:|:---:|
| 2006 | 25% | 2% |
| 2007 | 22% | 4% |
| 2008 (1Q) | 12% | 4% |

These unchallenged disclosures concerning the Pick-a-Pay portfolio as a whole belie

plaintiffs' allegations — based entirely on confidential witness accounts replete with overbroad

generalizations and lacking in specifics — that Wachovia systematically loosened its

underwriting standards after the Golden West acquisition. *See, e.g.*, B/N ¶ 103(e) (B/N CW 14

stating, without any detail, that Wachovia "lowered underwriting standards after the merger");

*Id.* ¶ 118(e) (B/N CW 15 stating that "the underwriting guidelines were lax"); *Id.* ¶ 128(f) (B/N

CW 39 claiming that "underwriting loosened up significantly after the merger"); *Id.* ¶ 123(b)

(B/N CW 47 stating that "after the merger 'underwriting and appraisal guidelines' became

looser"); *Id.* ¶ 128(c) (B/N CW 49 alleging that Wachovia "relaxed its underwriting guidelines

substantially"). This Court is not required to — and should not — credit allegations that are

"contradicted either by statements in the Complaint itself or by documents upon which its

pleadings rely, or by facts of which the court may take judicial notice." *In re Livent, Inc.

Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001).

      D.     The Confidential Witness Allegations Do Not Plead Falsity

Mistaking quantity for quality, the amended complaints cite dozens of CWs whose

musings and anecdotes leave plaintiffs no closer to pleading falsity than in their original

---

46  The "CLTV," or "combined loan-to-value ratio," reflects the relationship between the
combined amount of <u>all</u> loans on a property (*i.e.*, first and second mortgages) and the
appraised value of that property. FRANK J. FABOZZI, THE HANDBOOK OF MORTGAGE-
BACKED SECURITIES 19 (6th ed. 2006) ("the combined LTV (or CLTV) ratio … accounts for
the existence of any second liens").

complaints.  *See Cal. Pub. Employees Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 155 (3d Cir. 2004)

("The sheer volume of confidential sources cited cannot compensate for [their] inadequacies").[47]

This is particularly the case where, as already discussed, none of these CWs are alleged ever to

have communicated with the Individuals Defendants (or other members of Wachovia senior

management) concerning Wachovia's underwriting standards.

> 1.   Plaintiffs' Unsupported or Empty Allegations Should Be Disregarded

Many of plaintiffs' CW allegations suffer from significant substantive deficiencies,

including allegations that are riddled with unsupported speculation, pejorative descriptions of

ordinary course business practices, and colorful phrases designed to capture attention but which

lack any substance.  What is most remarkable about the CW allegations is that plaintiffs are

unable to allege that any of these CWs possess documents supporting their claims regarding

Wachovia's underwriting practices.  Indeed, the only identified witness, Paul Bishop, was unable

to substantiate any of his underwriting claims before an arbitrator, causing the arbitrator to award

judgment against him in his suit against World Savings, as detailed below.  Thus, this case stands

in stark contrast to cases such as *In re Countrywide Fin. Corp. Sec. Litig.*, where confidential

witnesses identified specific documents (such as underwriting matrices) and emails showing both

that underwriting standards deteriorated over time, and that senior executives directed those

changes.  *See* 588 F. Supp. 2d 1132, 1145 (C.D. Cal. 2008).

**Repetition and Irrelevancy.**  In an effort to create the illusion of even more confidential

---

[47]   *See also, e.g.*, *N.Y. State Teachers' Ret. Sys. v. Fremont Gen. Corp.*, 2010 WL 1473265, at *1, 4 (C.D. Cal. Mar. 29, 2010) (dismissing third amended complaint notwithstanding plaintiffs' reliance on <u>forty-three</u> confidential witnesses); *In re Career Educ. Corp. Sec. Litig.*, 2007 WL 1029092, at *3 (N.D. Ill. Mar. 29, 2007) (dismissing complaint with twenty-seven confidential witnesses whose allegations were not well pleaded because "zero plus zero is zero"); *In re Apple Computer, Inc. Sec. Litig.*, 243 F. Supp. 2d 1012, 1017, 1028 (N.D. Cal. 2002) (dismissing securities fraud complaint that relied on at least thirty-seven confidential witnesses).

witness allegations, both the Bond Notes and Equity Plaintiffs cite the same CWs repeatedly for the same proposition, as if restating an allegation lends it credence.[48]  The Court should reject this tactic.  *See In re Dot Hill Sys. Corp. Sec. Litig.*, 2007 WL 935469, at *4 (S.D. Cal. Mar. 15, 2007) ("Redundancy does not help to establish the strong inference necessary to survive a motion to dismiss….").  The Equity Plaintiffs employ another tactic to inflate their CW numbers — they include two witnesses (Equity CWs 6 and 7) that add nothing to their claims.  The only allegation Equity Plaintiffs make based on these CWs is that all underwriting for Pick-a-Pay loans was performed by legacy Golden West employees; it is not clear what this allegation is meant to establish.  Eq. ¶¶ 82, 177.

*Unsupported Speculation.*  Plaintiffs cannot base their securities claims on water cooler gossip.  Yet that is precisely what the Bond Notes Plaintiffs try to do through B/N CW 7, who claims that Wachovia's loans had a 50% exception rate according to "corridor conversation with his colleagues."  B/N ¶ 115(c).  *See, e.g.*, *In re Downey Sec. Litig.*, 2009 WL 736802, at *13 (C.D. Cal. Mar. 18, 2009) (discounting allegation that "everyone knew that any loan that came from Bullhead was to be approved" as mere rumor and speculation); *In re MSC Indust. Direct Co.*, 283 F. Supp. 2d 838, 846 (E.D.N.Y. 2003) (allegation by confidential witness who "heard that [defendants] played all kinds of games" disregarded as conclusory rumor).  Other CWs whose similarly speculative statements should be disregarded include:

- B/N CW 31, stating in conclusory fashion, that it was "<u>widely understood</u> among brokers in the region" that problematic loan applications should be sent to Golden West (B/N ¶ 118(a));

---

[48]  *See* B/N CW 4 (B/N ¶¶ 91(d), 106, 122(a), 131); B/N CW 5 (*Id.* ¶¶ 100(a)(ii); 115(o)); B/N CW 7 (*Id.* ¶¶ 100(c), 115(c)); B/N CW 13 (*Id.* ¶¶ 103(d), 115(a), 118(h)); B/N CW 17 (*Id.* ¶¶ 107(b), 113(b)); B/N CW 18 (*Id.* ¶¶ 106, 120(c)); B/N CW 19 (*Id.* ¶¶ 109, 113(a)); B/N CW 22 (*Id.* ¶¶ 113(c), 115(n), 118(g)); Eq. CW 1 (Eq. ¶¶ 113, 177, 196, 210); Eq. CW 2 (*Id.* ¶¶ 111, 154, 438, 448); Eq. CW 3 (*Id.* ¶¶ 110, 111, 113, 126, 151, 152, 278, 449, 451, 452); Eq. CW 9 (*Id.* ¶¶ 171, 177, 278).

- B/N CW 13, opining, without support, that "the Company [found managers] who they knew would do what they wanted," even if those unidentified managers were not qualified (*Id.* ¶ 103(d));

- B/N CW 16, stating that borrowers were not "<u>likely</u> to be of high credit quality" and "<u>likely</u> did not understand the risks of the loan" (*Id.* ¶ 105);

- B/N CW 33, noting an increase in loan applications containing incomes that underwriters "<u>suspected</u>" or "<u>believed</u> were fabricated" (*Id.* ¶ 113(p)); and

- Eq. CW 4, reporting that outside appraisers had "a <u>reputation</u> for assigning higher values to homes" (Eq. ¶¶ 199, 450).

***Pejorative Descriptions of Ordinary Business Practices.***  A number of Bond Notes CWs describe practices that, once stripped of their pejorative labels, fall short of showing that Wachovia's underwriting was deficient.  For example, according to B/N CW 9, a former <u>loan servicing center</u> employee, "most of the calls she received … were from borrowers who could not afford to repay…."  B/N ¶ 101(b).  This unremarkable allegation — that struggling borrowers called an office whose very purpose was to assist them — does not support an inference that Wachovia falsely represented its overall underwriting practices.

Similarly, B/N CW 28 states that branch and district managers "implicitly" instructed loan officers to commit mortgage fraud by telling them that they could "do a lot" with Pick-a-Pay loans and to "play with the numbers" and "make it work."  *Id.* ¶ 113(k).  But without further explanation, such phrases are as susceptible to benign interpretations — such as requiring a larger down payment — as they are to nefarious ones.  *See also id.* ¶ 113(i) (B/N CW 26 stating that a manager's efforts to ensure that reported income and assets were "believable" or "made sense" was a signal to mortgage brokers to commit fraud rather than, for example, to verify whether the borrower had more assets to support the claimed income).

Likewise, B/N CW 5's criticism that borrowers were free to ignore his advice to "take all the money you're saving on your mortgage payments and pay off your credit card, which has a

44

higher interest rate, or put it in the stock market for average gains of 10% or whatever" is nothing more than an objection to the Pick-a-Pay product itself.  It does not support a claim that Wachovia's underwriting standards were inappropriate or inaccurately described.  *Id.* ¶ 121(b).

*Colorful But Empty Allegations.*  Apparently trying to masquerade hyperbole for fact-based pleading, many of the Bond Notes CW allegations also rely on dramatic exaggerations that are never explained or substantiated, such as:

- B/N CW 21's claim that Wachovia "gather[ed] dozens of 'seedy' mortgage brokers" to participate in instant underwriting events without any explanation of what is meant by "seedy," who qualifies as a "seedy" broker, or how that is relevant (*id.* ¶ 119(a));

- B/N CW 15's claim that appraisals were inflated because an appraiser in his office "would go to lunch with [mortgage] sales representatives" without any claim that this person knows the substance of those lunchtime conversations, or explaining why sharing a meal is wrongful (*id.* ¶ 122(f));

- B/N CW 20's claim that Wachovia approved "no brainer denials," without stating any examples or explaining what a "no brainer denial" is (*id.* ¶ 112);

- B/N CW 15's claim that loan approvals "depended not on whether the borrower was truly creditworthy, but whether the underwriter 'had a good breakfast or not'" (*id.* ¶ 118(e)), without any explanation of how this meal-based activity led to loans being improperly approved;

- B/N CW 51's claim that Wachovia approved "all kinds of junk" without any specifics as to what is meant by "junk"  (*id.* ¶ 128(g)); and

- B/N CW 48's claim that allowing legacy Wachovia's exceptions on Pick-a-Pay loans that were "non-arms length transactions, and on historical properties" was "like breeding a horse and a donkey, and ending up with a mule," without any explanation as to why such exceptions were inappropriate (*id.* ¶ 128(b)).

Perhaps the most striking example of the Bond Notes Plaintiffs' unrestrained "kitchen sink" approach to their CW allegations is the assertion of B/N CW 42 (purportedly a mortgage planner for Wachovia in Madison, Wisconsin) that "most borrowers" took their savings from Pick-a-Pay loans and "drunk it at the bar" (*id.* ¶ 121(e)).  Even assuming this person has first-

hand knowledge of the drinking proclivities of "most borrowers" in the Madison, Wisconsin area, it says nothing about Pick-a-Pay borrowers as a whole.

***Allegations Undermining Plaintiffs' Claims.***  Despite adding 38 new confidential witnesses, the Bond Notes Plaintiffs are unable to identify even a single internal report showing a change in underwriting standards, or any witness who can both state that senior management lowered underwriting standards on a company-wide basis and describe how.  The only confidential witness alleged to have some basis to speak to the Pick-a-Pay portfolio as a whole — B/N CW 4 — thoroughly undermines any claims that Wachovia had company-wide issues with its underwriting.  The Bond Notes Plaintiffs allege that B/N CW 4 was a manager of the Consumer Risk Management Group from late 2007 through 2008.  Although this CW states that she would characterize the credit quality and underwriting of the Pick-a-Pay portfolio as a whole as "poor" (without giving any detail whatsoever for this conclusion), she also states that Area National Managers "in some regions appeared to have generally followed stated underwriting guidelines," and adds that "there were 'pockets' which were run 'tightly.'"  *Id.* ¶ 131.

Other CWs likewise undermine plaintiffs' overall theory of falsity, and at most allege that issues with underwriting at Wachovia related not to the underwriting standards themselves or to any change to those standards during the Class Period, but to issues with particular employees, offices, or regions.  *See Id.* ¶ 115(l) (B/N CW 38 stating that the "rampant use of 'exceptions to policy' was driven by the managers in her region … [not] from Wachovia headquarters"); *id.* ¶ 122(c) (B/N CW 44 noting that allegedly problematic appraisal practices did not exist in other regions); *id.* ¶ 123(b) (B/N CW 47 stating that he felt that managers took his reports concerning underwriting and appraisal practices "seriously" and that "the Company would try to implement changes to tighten up lending in some areas").  Plaintiffs cannot convert what is, at most, a claim

of mismanagement related to isolated offices or regions into a claim that Wachovia publicly misrepresented its underwriting standards on a nationwide basis.

2.     Plaintiffs' Inadequately Described Witnesses Should Be Ignored

Plaintiffs' CW-based allegations also suffer from foundational defects.  In the Second Circuit, confidential sources must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000).  Further, plaintiffs may not rely on information from a prior period to support their claims of falsity during the Class Period. *See Malin*, 499 F. Supp. 2d at 141-42 (finding CW allegations substantively inadequate where "the information relayed … relate[d] to the time prior to the start of the Class Period…."). Here, there are a number of descriptions of CWs that do not meet these basic requirements.

***Inadequate Identification.***  Plaintiffs fail to adequately identify several of their CWs, offering conflicting descriptions as to these CWs' tenures and job responsibilities at the Company.  *See* B/N ¶¶ 109, 113(a), 120(d) (providing three different descriptions of B/N CW 19); *id* ¶¶ 112, 113(g), 115(e), 121(a) (providing four different descriptions of B/N CW 21); *id.* ¶¶ 113(o), 115(i) (providing two different descriptions of B/N CW 32).  Because these CWs are not adequately identified, any allegations based on these witnesses should be rejected.

***No Basis for Knowledge.***  With respect to several other CWs, plaintiffs fail to allege facts supporting the probability that a person in the CW's position would have had knowledge of the facts alleged.  *See Novak*, 216 F.3d at 314; *Steinberg*, 2008 WL 5170640, at *6 (rejecting confidential witness allegations that lacked a basis for direct knowledge).  Specifically, plaintiffs fail to allege:

- how B/N CW 5 (a mortgage consultant in <u>Connecticut</u> during the Class Period) and B/N CW 8 (an employee whose job title during the Class Period <u>is not identified</u>) would have known that "loan officers in the field in various

parts of the country continued to receive coaching in the post-merger period in how to falsify loan origination documents…."  B/N ¶ 108.

- the basis of observations by B/N CWs 4, 9, 33, and 48 that Wachovia or its "senior executive management" did not understand the Pick-a-Pay product, or were insufficiently experienced to operate Golden West, particularly where none of these CWs are alleged to have had any interactions of any type whatsoever with "Wachovia executive management."  *Id.* ¶ 106.

- the relevance of observations by Equity CW 2, who worked at HomeEq Servicing Corporation, a business that Wachovia <u>sold</u> to Barclays Bank PLC on November 1, 2006, six months into the 29-month Class Period.  Eq. ¶ 53; Barclays Bank PLC 2007 20-F at 159.

***Irrelevant Time Periods.***  Both sets of plaintiffs include allegations from CWs that are irrelevant on their face because they speak only to events wholly (or, charitably, mostly) outside of the relevant time period.  *See* B/N ¶ 100(d) (B/N CW 8 opining on the quality of Wachovia's underwriting based on audits conducted in the late 1990s and early 2000s); *id.* ¶ 118(h) (B/N CW 13 stating that exceptions were made for FICO scores as low as 500 "in the 2005-2006" period); *id.* ¶ 122(g) (B/N CW 16 reporting inflated appraisals during his tenure at Company in "2005 and 2006"); Eq. ¶¶ 53, 141 (Eq. CW 2 opinion on the quality of loans reviewed during her tenure in the Loss Mitigation Department in 2004 and earlier).

### 3.    Paul Bishop's Observations Do Not Support Plaintiffs' Claims

The <u>only</u> named witness in either the Bond Notes Complaint or the Equity Complaint, Paul Bishop, is a disgruntled former Golden West employee who unsuccessfully sued World Savings and Golden West for wrongful termination.[49]  B/N ¶¶ 97-99.  Mr. Bishop claimed that he was wrongfully terminated because he was a whistleblower — but during his arbitration he was

---

[49]  *See Bishop v. World Savings, Inc., et al.*, Case No. 741600054607 JOG, American Arbitration Association Employment Arbitration Tribunal (Mar. 18, 2010) (awarding judgment to World Savings), attached as Exhibit 5 to the 2010 Hirsch Declaration.  This Court may take judicial notice of the outcome of the arbitration.  *See Green Tree Fin. Corp. v. Honeywood Dev. Corp.*, 2001 WL 62603, at *3 (N.D. Ill. Jan. 24, 2001) (taking judicial notice of an American Arbitration Association decision).

unable to identify a single loan that was improperly underwritten.  As the arbitrator wrote in the

decision dismissing Mr. Bishop's claims in their entirety:

- Mr. Bishop was unable to substantiate his claims that World's lending policies
  changed for the worse after his friend Lyn Olsen left the company, and "the
  company's records revealed the contrary was true.  While default ratios and
  bad loans were excellent under Olsen, they actually improved after he left."
  *Bishop*, at 2.

- When Mr. Bishop was asked "if he could point to or name one loan or
  employee to be checked for [alleged loan origination] illegalities, Bishop
  could come up with no specifics.  He could not name any violations but had a
  'gut feeling' that all these violations were occurring."  *Id*. at 5.

- "Rather than ignoring Bishop, World lived up to its 'open door' policy and
  Bishop was contacted by Tim Wilson [the same Area National Manager
  attacked by B/N CW 4] ... Bishop made many charges but could not come up
  with a single incident or person to cite.  In spite of this Wilson had audits done
  in all of the areas Bishop listed and no irregularities came to light."  *Id*. at 5-6.

The same unsubstantiated and generalized accusations of wrongdoing that were rejected

in the *Bishop* arbitration run throughout plaintiffs' confidential witness allegations, and despite

having been given the opportunity to amend their complaints, plaintiffs have not provided the

specifics necessary to tie any of their accusations to reality, much less to any specific public

statement that is alleged to be false.[50]

### 4.    Plaintiffs' Confidential Witness-Based Underwriting Claims Fail

Plaintiffs' confidential witnesses attack Wachovia's due diligence for the Golden West

acquisition and describe an array of purported deficiencies in Wachovia's underwriting practices

that allegedly caused Wachovia's statements describing its Pick-a-Pay portfolio to be false.

---

50  Mr. Bishop's observations are unavailing for an additional reason: World Savings
    terminated Mr. Bishop on June 1, 2006, months before Wachovia acquired Golden West.
    *See Bishop*, at 5.  Mr. Bishop thus has no basis to speak about Wachovia's policies or
    practices.  *In re Downey Sec. Litig.*, 2009 WL 2767670, at *10 (C.D. Cal. Aug. 21, 2009)
    ("CW 10 and CW 20 have no basis to opine about [the company's] underwriting or lending
    practices after they left the company, and both CW 10 and CW 20 left [the company] before
    the start of the Class Period").

These confidential witnesses' observations, however, are rife with numerous flaws that render them incapable of supporting plaintiffs' falsity claims. *Downey*, 2009 WL 2767670, at *6 (falsity claims rejected in the absence of "particularized factual allegations evidencing … a systemic disregard for proper underwriting").

 ***Due Diligence.*** The Bond Notes Plaintiffs assert that Wachovia's due diligence in connection with the Golden West acquisition is somehow relevant to the truthfulness of Wachovia's Class Period statements concerning the credit quality or underwriting of the Pick-a-Pay portfolio. B/N ¶ 91 (citing B/N CWs 1, 2, 3 and 4). Yet claims concerning the adequacy of Wachovia's due diligence are nothing more than claims of mismanagement that are not actionable under the securities laws. *See Malin*, 499 F. Supp. 2d at 146 (confidential witness-based allegation that defendant acquired assets without adequate due diligence, "although not a sound business decision, does not establish the falsity of [defendant's] statements"); *Fadem v. Ford Motor Co.*, 2003 WL 22227961, at *4 (S.D.N.Y. Sept. 25, 2003) ("[i]t is not the role of courts to second guess the decisions made in the course of business operations, lest every strategy that goes awry becomes subject to a lawsuit, and corporations are inhibited from following all but the most conservative path").[51]

 ***Delinquency Rates.*** Based on statements by B/N CW 3, Bond Notes Plaintiffs allege that Golden West's loan delinquency rate was "artificial" because Golden West aggressively

---

51 Taking a quote completely out of context, Bond Notes Plaintiffs allege that, in Wachovia's May 7, 2006 press release announcing the Golden West acquisition, Mr. Thompson characterized the Golden West portfolio as having "pristine credit quality." B/N ¶ 216. What Mr. Thompson actually stated was that Golden West, like Wachovia, was "known for exceptional customer service and pristine credit quality." 5/8/06 8-K, Ex. 99(a). Placed in context, it is clear that neither this statement, nor Mr. Thompson's other remarks in the press release concerning Golden West's reputation, were false, much less actionable. Such general statements regarding a bank's reputation are made so universally that "[n]o investor would take [them] seriously in assessing a potential investment." *ECA*, 553 F.3d at 206.

refinanced troubled mortgages, and Wachovia would not have purchased Golden West if it had known Golden West's "true" delinquency rate.  B/N ¶¶ 91(c), 101(a).  But B/N CW 3 neither claims that any particular delinquency disclosure was misstated, nor alleges what Golden West's "true" delinquency rate should have been.  *See also id.* ¶¶ 101(b)-(c) (B/N CWs 4 and 9); *In re HomeBanc Corp. Sec. Litig.*, 2010 WL 1524836, at *12 (N.D. Ga. Apr. 13, 2010) (rejecting falsity claims where plaintiff made "conclusory allegations of falsity without establishing contrary true facts").

Furthermore, Golden West's policy concerning troubled loans was no secret.  Wachovia publicly disclosed that Golden West intervened early to refinance or otherwise modify loans before they fell into delinquency or default.  *See* 4/16/07 Conf. Call at 6 ("[T]he customer outreach process at Golden West emphasizes early intervention at the first signs of delinquency. And the company's been very successful at counseling borrowers through difficult times").

*The Pick-a-Pay Product.*  Bond Notes CWs 4, 9, 18, 32, 33, and 48 summarily conclude that neither Wachovia nor its employees understood the Pick-a-Pay product, but fatally fail to explain how they reached this conclusion, which (or how many) of Wachovia's more than 120,000 employees they are referring to, or what about the Pick-a-Pay product these other employees purportedly did not understand.  *See* B/N ¶¶ 106, 120(c); *In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 592 (S.D.N.Y. 2007) (confidential witness observations regarding "bad business practices" insufficient to plead falsity under Rule 9(b) where they were "stated in the most general terms," "without names, dates, places, or other details," and were "uncorroborated by other facts").  B/N CW 10 similarly fails to explain how he or she knew that Wachovia's "upper management" (who allegedly did not complete B/N CW 10's Pick-a-Pay training programs) did not "care to learn" about the product, or did not learn about it through

other means.  B/N ¶ 103(a); *see N.Y. State Teachers' Ret. Sys. v. Fremont Gen. Corp.*, 2009 WL

3112574, at *11 (C.D. Cal. Sept. 25, 2009) (neither falsity nor scienter pled where nothing in

confidential witness-based allegations "establish[ed] that any of the confidential witnesses were

in a position to gain personal knowledge of what Defendants saw, knew, or thought").

   ***Sales Training.***  Likewise, plaintiffs' attempt to plead that Wachovia's underwriting

practices were less than conservative through vague and general assertions that training was

"inadequate" is unavailing, particularly when none of the former employees relied on (i) were

responsible for leading or developing materials for training sessions, (ii) claim to have attended,

or to have any first-hand knowledge concerning, training sessions conducted in other locations,

or (iii) articulate anything suggesting that Wachovia condoned poor or improper training

techniques on a national scale.  B/N ¶¶ 103(b)-(d), 104-105, 109, 113(k) (B/N CWs 11-13, 15-

16, 19, 28); *City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*, 388 F. Supp. 2d 932, 942-45

(S.D. Ind. 2005) (confidential witness allegations insufficiently particularized where "plaintiff

relie[d] on statements by former employees who worked in *local* … institutes …. to raise an

inference of fraud concerning [defendant]'s business on a national scale") (emphasis in original).

   Even those Bond Notes CWs who attempt to describe Wachovia's training sessions (B/N

CWs 11, 19, and 28) fall well short of supporting plaintiffs' claims that Wachovia taught loan

originators to fabricate borrower information.  *See* B/N ¶ 103(b) (B/N CW 11 stating that there

were "'workarounds' for situations where applicants did not satisfy written underwriting

guidelines," but not describing those "workarounds" or how they were inappropriate); *id.* ¶¶ 109,

113(a) (B/N CW 19 stating that he was "taught fraud," but describing, at worst, that originators

were instructed to ask borrowers leading questions); *id.* ¶ 113(k) (B/N CW 28 stating that

officers were told that they "could 'do a lot' with stated income Pick-a-Pay loans" and could

"play with the numbers," but not explaining why these instructions implied that officers should commit fraud rather than, for example, legitimately work with a borrower to make a higher down payment).  Most importantly, none of these CWs admit to using any improper techniques in practice themselves, or explain how any training program failures led to such a systemic nationwide failure of underwriting standards as to render false Wachovia's public disclosures.

**Pick-a-Pay Marketing.**  Several of plaintiffs' witnesses (B/N CWs 5, 15, 16, 21, 28, 35, 42 and Eq. CW 3) and two news articles (Eq. ¶¶ 133-136) criticize Wachovia's Pick-a-Pay sales pitches for emphasizing the products' advantages (*e.g.*, the ability to invest money saved by making minimum payments) to borrowers who purportedly did not understand or have the self-discipline to use the product as intended.  *See* B/N ¶ 104 (B/N CW15 stating only that he "recalled wondering and asking 'what if people only pay the minimum and don't start investing?'"); *see also id.* ¶¶ 105, 121; Eq. ¶ 151.  This is yet further unsupported conjecture.  None of these CWs or news articles provide any facts (such as whether any of these "unsuitable borrowers" defaulted on their loans, or failed to invest wisely) that validate their suspicions that certain borrowers — let alone a substantial majority — were ill-suited to the Pick-a-Pay loan.[52]  *See Downey*, 2009 WL 2767670, at *6 ("[a]gain, Plaintiff fails to plead any particularized facts supporting [its] claims, such as … any facts demonstrating that Downey engaged in systemic predatory lending practices").

**Qualification of Borrowers at Teaser Rates**.  Plaintiffs allege that Wachovia approved some Pick-a-Pay borrowers at the loan's teaser rate (as opposed to a fully-indexed rate), but none of the CWs used to support this allegation provide details adequate to suggest that teaser rates

---

[52]  B/N CW 16 and Eq. CW 3 state that they were taught not to mention negative amortization to borrowers, but even accepting this as true, plaintiffs do not allege that Wachovia failed to provide prospective borrowers with documents that clearly described the negative amortization feature of the Pick-a-Pay loan.  B/N ¶ 105; Eq. ¶ 151.

were used with sufficient frequency, in enough locations, to undermine the overall integrity of Wachovia's underwriting practices.[53]  B/N CW 41 states that he determined that teaser rates were used "in at least some regions" but does not state which regions, how many regions, over what period of time, or even how he made that determination.  B/N ¶ 120(a); *see also id.* ¶ 120(b) (CW 13 "reported seeing borrowers" qualified at the teaser rate, but not describing how many); *id.* ¶ 120 (c) (B/N CW 18 claiming Wachovia "qualified many people" at the minimum payment rate); *In re Career Educ. Corp. Sec. Litig.*, 2006 WL 999988, at *5 (N.D. Ill. Mar. 28, 2006) (allegations that "rely on imprecise terms such as 'many' [or] 'several' …. lack the specificity necessary for demonstrating the probability that … [the alleged] incidents had any effect on defendants' statements").  And here again, none of the CWs claim that they engaged in any of the conduct about which they now complain.  Indeed, B/N CW 35 states that he advised borrowers <u>not</u> to apply for Pick-a-Pay loans unless they could afford the fully-indexed rate.  B/N ¶¶ 113(r), 121(d). [54]

   ***Low-FICO Lending.***  Nearly all of plaintiffs' confidential witness observations concerning FICO scores focus on former employees' unsupported estimates, years after the fact, of the number of times that Wachovia extended loans to borrowers with scores below 660 (without alleging any other characteristics of the loans).  *See* B/N ¶¶ 118, 128; Eq. ¶¶ 112, 209. Plaintiffs cannot, however, pick a FICO score out of thin air and claim that lending to borrowers

---

53   The only witness who identifies a specific example where a troubled borrower's income could not support the fully-indexed interest rate (B/N CW 19) fails to state whether, at the time the borrower applied for the loan, she had other sources of income.  B/N ¶ 120(d).

54   Relying on a May 2009 *New York Times* article, Bond Notes Plaintiffs suggest that investors did not learn until May 2009 that Wachovia at one time lowered minimum payment rates on Pick-a-Pay loans to 1%.  B/N ¶ 127.  Wachovia, however, publicly disclosed the 1% payment rate to investors in June 2007.  *See* 6/12/07 Investor Presentation at 9 ("Pick-a-Payment loan – Beginning Minimum Payment Rate – 1.0%").

below that score rendered Wachovia's statements about conservative lending false.  Various

courts — and the Equity Plaintiffs themselves — have acknowledged that "subprime" has no

universal definition and that "additional factors" can outweigh a low FICO score to render the

loan "prime."  *See, e.g.*, Eq. ¶ 64 ("[t]he term 'subprime' does not have a singular meaning in the

mortgage and lending industry"); *Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 317 (4th Cir.

2004) (finding falsity not pled because the term "subprime" is "institution-specific") (citing

Office of the Comptroller of the Currency, *et al.*, *Proposed Agency Information Collection

Activities; Comment Request*, 67 Fed. Reg. 46,250, 46,253 (July 12, 2002) ("no standard

industry-wide approach to the definitions of either 'subprime' or 'program'")).  Furthermore, as

already discussed, (i) Wachovia disclosed that its lending practices heavily discounted FICO

scores, and (ii) Wachovia's own disclosures from near the end of the Class Period — which

plaintiffs do not contest — show that loans to low-FICO borrowers decreased during the Class

Period, eviscerating plaintiffs' claims of rampant low-FICO lending.  *See* Part II.C, *supra*.

    ***Stated Income Lending.***  Plaintiffs allege that, after the Golden West acquisition,

Wachovia's Pick-a-Pay portfolio was riskier than described because the Company permitted

stated income lending.  *See, e.g.*, B/N ¶¶ 100(a)(i) (B/N CW 5), 118(i) (B/N CW 16), 128(d)

(B/N CW 40); Eq. ¶¶ 113, 210 (Eq. CWs 1, 3, 9) .  This claim likewise does not withstand

scrutiny.  First, it was public knowledge that Wachovia originated stated income loans.  *See*

Robert Stowe England, *The Big Scramble*, MORTGAGE BANKING, Dec. 2007, at 13; *Downey*,

2009 WL 2767670, at *6 (finding falsity not pled where Downey disclosed the use of stated

income loans).  Second, the mere fact that Wachovia originated stated income loans says nothing

about their overall quality, and this Court need not accept the unsupported implication that every

person to whom Wachovia extended a stated income loan lied on his or her loan application.

*N.Y. State Teachers' Ret. Sys.*, 2009 WL 3112574, at *11 (confidential witness-based allegations that "'everyone' knew that stated-income loans were based on falsified documents .... [were] not sufficient to substantiate Plaintiffs' allegations of falsity or scienter"). Finally, it was Wachovia's self-described practice to mitigate the risks of stated income loans by, for example, requiring low LTV ratios, and plaintiffs' CWs present no facts showing otherwise.[55] *See* England, *The Big Scramble* at 13 ("With stated income loans, however, Wachovia looks at assets and the reasonableness of the claimed income. Typically, it requires a 20 percent down payment").[56]

*Appraisals.* Plaintiffs allege that Wachovia's appraisers routinely inflated appraisal values, causing Wachovia to misrepresent its underwriting and the risk of its entire Pick-a-Pay portfolio. B/N ¶¶ 122(a)-(f), 123(a) (B/N CWs 4, 15, 41, 43-46); Eq. ¶¶ 142, 199 (Eq. CW 4). But the CW statements concerning appraisals are not sufficient to support this claim.

- The only specifically alleged policy change concerning appraisals is that the Appraisal Team Leader in one region required appraisers to be selected from a pre-set list (rather than based on proximity to the property) and allowed appraisers to be told the amount of the requested loan. Plaintiffs' CWs acknowledge, however, that to the extent this practice was at all improper, it was not followed in other offices. B/N ¶ 122(c) (B/N CW 44 "was aware that offices in other regions still used the system of picking a close appraiser"); *Cal. Pub. Employees Ret. Sys.*, 394 F.3d at 155 (falsity not plead where

---

55  B/N CWs 17 and 22, from San Diego and Scottsdale, claim that stated income loans were substituted for full documentation loans when borrowers could not meet full documentation requirements. B/N ¶¶ 113(b)-(c). But there are no allegations that this practice, if it occurred at all, occurred outside of the San Diego or Scottsdale offices in which these CWs worked, nor any allegations that any borrowers who received such stated income loans — or, indeed, any stated income loans — did not have other credit enhancements and thus defaulted at a greater rate than those who received fully-documented loans.

56  The Equity Plaintiffs allege that Golden West and Wachovia failed to verify borrower income via IRS Form 4506T, but cite a *New York Times* article stating that this form was used less than 5% of the time industry-wide for loans funded in 2006. Eq. ¶¶ 118-119. Moreover, nowhere do the Equity Plaintiffs claim that Wachovia falsely represented that it was, in fact, using the form.

plaintiffs "repeatedly attribute[d] specific nationwide information and statistics regarding [the company]'s performance to former employees who worked in local branch offices").

- Second, none of the CWs provide specific examples of appraisals being improperly inflated, resorting instead to vague or hypothetical language stating that "every effort" was made to achieve needed appraisal values (B/N ¶ 122(a) (B/N CW 4)), that loan officers had "camaraderie" with and "tr[ied] to influence" appraisers (*id.* ¶ 122(f) (B/N CW 15)), or that appraisers "would boost the appraised values" in response to pressure (*id.* ¶ 122(g) (B/N CW 16)) — without specifying a single instance in which pressure actually resulted in an inflated appraisal, or attempting to quantify the extent to which appraisals were inflated.[57]

- Finally, the Equity Plaintiffs claim that appraisals were inflated because Wachovia resorted to third-party appraisers who had a "reputation for assigning higher value to homes" than in-house appraisers. Again, this is unsupported speculation. The Equity Plaintiffs do not specify any instance in which that "reputation" led to an inflated appraisal. *E.g.*, Eq. ¶ 199.

*Previously Rejected Borrowers.* Bond Notes Plaintiffs allege, based on B/N CW 41, that after the Golden West acquisition, Wachovia "combed Golden West's catalogue of rejected borrowers … and extend[ed] them loans." B/N ¶ 128(a). There is, of course, nothing inappropriate about reviewing a list of previously-rejected borrowers, and B/N CW 41 supplies none of the details required to suggest the contrary. Plaintiffs do not specify the number of loans ultimately approved, the terms pursuant to which they were approved, or even whether these borrowers — previously rejected for Golden West products — had improved their credit standing or were otherwise now found to qualify for Wachovia products, making it impossible to say that any such loans negatively impacted Wachovia's mortgage portfolio.

*Instant Underwriting.* The Bond Notes Plaintiffs claim that "multiple" former Wachovia

---

[57] B/N CW 41 claims that Wachovia began using "so-called 'drive-by' or 'desk-top'" appraisals to increase loan volume in the post-acquisition period. B/N ¶ 123(a). But based on the description of B/N CW 41, whom the Bond Notes Plaintiffs describe only as a Director of Operations in a San Antonio call center, this person has no basis to speak about Wachovia's appraisal practices.

employees describe "large-scale" underwriting events at which so-called "crap loans" were

instantly approved, thereby dragging down the overall quality of Wachovia's mortgage portfolio.

B/N ¶ 119.  But plaintiffs point to just <u>two</u> CWs (B/N CW 20 (*id.* ¶ 119(b)) and B/N CW 21 (*id.*

¶ 119(a))) who allege, at most, that that this type of event "fostered mistakes," without supplying

any details as to what underwriting "mistakes" the events supposedly caused.  Without more,

plaintiffs' allegations are insufficient.  *2007 Novastar Fin.*, 2008 WL 2354367, at *3 ("Plaintiff

emphasizes the many confidential witnesses who report changes in various policies [and]

procedures — changes the witnesses characterize as tending to increase risks faced by the

Company," however "[p]laintiff has not explained how these reports demonstrate the falsity of

any particular public statement").

   ***Exceptions to Underwriting Policies.***  Plaintiffs further allege that the Pick-a-Pay

portfolio was riskier than described because Wachovia overused its loan exception process

("ETP").  B/N ¶ 115.  However, bald statements from confidential witnesses that provide no

details as to how the process was used inappropriately are insufficient to support plaintiffs'

claims.  *Pyramid Holdings, Inc. v. Inverness Med. Innovations Inc.*, 638 F. Supp. 2d 120, 127-28

(D. Mass. 2009) (dismissing complaint that provided "'tales from the trenches' from a score of

former … employees" because the statements did not give "sufficient context for [their] true

meaning or impact to be discernable," such as "how many collections [the company] was forced

to write off [and] what the value of those collections was").[58]

---

58   For example, Bond Notes Plaintiffs cite eight CWs (CWs 5, 6, 13, 27, 36, 37, 38, 39) who
     state that Wachovia "commonly made loans (based on purported appraised values at
     origination) at LTVs of 75% to 80% — and at LTVs of 90% or more <u>in various regions at
     various times</u> under lowered guidelines, or pursuant to an 'exception to policy.'" B/N ¶ 125.
     It is hard to imagine a vaguer allegation.  Plaintiffs do not specify which of the eight CWs
     described loans originated at LTVs of 90% or more (*i.e.*, with down payments of 10% or
     less) as opposed to LTVs of 75% to 80% (*i.e.*, with down payments of 25% – 20%), or

Particularly telling is the fact that none of the Bond Notes CWs state that they personally abused Wachovia's exceptions policy to sell, underwrite, or approve loans. For example, while B/N CW 39 states that he approved loans pursuant to exceptions "about 20%" of the time, he never states that any of the exceptions that he approved were improper. B/N ¶ 115(p). Similarly, B/N CW 48 states that Wachovia permitted exceptions that Golden West would not have used, but she does not state that she personally approved improper loans. *Id.* ¶ 128(b); *see also id.* ¶ 115(j) (B/N CW 27 stating only that she "saw" questionable exceptions in her office).

**Incentive Compensation and Sales Quotas.** Plaintiffs allege that Wachovia relied on incentive compensation to sell Pick-a-Pay loans, implying that the mere fact of higher commissions, volume-based compensation, or sales quotas necessarily caused the above-described deficient (or even fraudulent) sales and underwriting practices to pervade the company. B/N ¶¶ 107, 113 (B/N CWs 11, 15, 17, 18); Eq. ¶¶ 126-128 (Eq. CW 3). Plaintiffs' attempts to show falsity through some type of "motive and opportunity"-based pleading should be rejected. It is plaintiffs' burden to plead factually supported allegations that Wachovia's employees in fact falsified loan applications, and they do not meet this burden. *See In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 273 F. Supp. 2d 351, 373 (S.D.N.Y. 2003) ("pleading of a motive to issue false statements does not establish that false statements were in fact issued").[59]

---

explain what is meant by "in various regions at various times."

59  If Wachovia had, in fact, been originating Pick-a-Pay loans as aggressively as alleged (*i.e.*, so that the Company's underwriters "were getting loans coming out of [their] ears" (B/N ¶ 128(d))), then the volume of Pick-a-Pay loans should have increased significantly over the Class Period. But this did not happen. As Wachovia disclosed in April 2008, the Pick-a-Pay portfolio grew only 2% between the first quarter of 2007 and the first quarter of 2008. *See* 4/14/08 Conf. Call at 5; *see also* 4/14/08 8-K, Ex. 99(b) at 8 ("Mortgage originations down 11%; higher marketable [*i.e.*, thirty-year, fixed-rate] production offset by lower Pick-a-Pay volumes"). There is no basis for the Equity Plaintiffs' assertion that Wachovia

It is not improper for a company to use incentive-based compensation to encourage employees to sell particular products, and it was never a secret that Wachovia sought to promote Pick-a-Pay loans.[60]  Indeed, why else would Wachovia have spent $25 billion (B/N ¶ 84) to purchase the Pick-a-Pay platform?  Without specific allegations as to why (or when) Wachovia's incentives actually caused sub-par loans to be underwritten, comments like those by B/N CW 30 that "everyone had to 'drink the Kool Aid and go out and sell [Pick-a-Pay] to everybody'" (*id.* ¶ 113(m)), fall flat.  *See Career Education Corp.*, 2007 WL 1029092, at *5 ("Pressure to meet performance goals, no matter how tough or unreasonable it might have been, is not evidence that CEC employees engaged in misconduct or fraud in order to meet those goals"); *see also Durham v. Whitney Info. Network, Inc.*, 2009 WL 3783375, at *16 (M.D. Fla. Nov. 10, 2009) (confidential witness allegations that "the objective was to close the sales" and that "it's a high-pressure sales environment" did not support plaintiff's theory of securities fraud because "any sales company would encourage its employees to close sales").

E.      Plaintiffs' Allegations of Materially Misstated LTV Ratios Fail

The Equity Plaintiffs repeatedly assert that, in an effort to mislead investors about the health of the Pick-a-Pay portfolio, Wachovia concealed rising LTV ratios in the portfolio.  *See, e.g.*, Eq. ¶¶ 21, 103, 226-27.  However, as detailed below, the record is replete with disclosures by Wachovia — not alleged to be false or misleading — describing the rate at which deferred interest was increasing, the extent to which Wachovia was experiencing weakness in the housing

---

originated $33.4 billion of new Pick-a-Pay loans in 2007; Wachovia's April 14, 2008 disclosures belie this claim.

60   Statements to the press by former Golden West CFO Russell Kettell that Wachovia "wanted volume and wanted growth" (Eq. ¶ 85) are entirely consistent with this notion.  *See also* Eq. ¶¶ 129, 131 (quoting former Wachovia employees' statements to the media about the undisputed fact that Wachovia offered sales incentives to sell Pick-a-Pay loans).

market, and, most importantly, the impact of those two factors on Pick-a-Pay LTVs.

*Negative Amortization.*  In the first instance, Wachovia repeatedly disclosed the amount of "deferred interest" or negative amortization in its Pick-a-Pay portfolio.  In May 2006 (the start of the Class Period), Wachovia informed investors that Pick-a-Pay loans had been experiencing — and were expected to continue experiencing — increasing levels of deferred interest through mid-2008.  *See* 5/12/06 Conf. Call at 6 ("Deferred interest has grown from about $90 million in the first quarter of '05 to $666 million in the first quarter of '06 and it's <u>likely to grow by $2 or $3 billion</u> more over the next 24 months"); 5/16/06 Conf. Call at 7 (same).  Wachovia then disclosed the amount of deferred interest in its Pick-a-Pay portfolio for each reporting period after the Golden West acquisition, comparing the amount of increasing deferred interest for that quarter to preceding quarters.[61]  The Equity Plaintiffs do not challenge these disclosures.

*Declining Property Values.*  The fact that housing prices dramatically declined in the second half of 2007 has hardly been a secret.  Housing prices are a matter of public record, and the Equity Plaintiffs cannot base a claim on allegations that Wachovia failed to disclose a fact known to all.  *See Starr v. Georgeson S'holder, Inc.*, 412 F.3d 103, 109-10 (2d Cir. 2005) (no material misrepresentation where allegedly concealed information was already "reasonably available" in the market).

Moreover, Wachovia never suggested that the properties collateralizing its Pick-a-Pay loans somehow were immune to the housing crisis, but instead warned investors about the difficulties that it could experience, and was experiencing, in the mortgage market:

- "[T]here's a broad range of things that could happen in the mortgage market overall and California would be one of the markets that has been more frothy

---

61   *See, e.g.*, 7/30/07 10-Q, Ex. 19 at 46 (deferred interest of $2.3 billion, $1.9 billion, and $1.6 billion at June 30 and March 31, 2007, and December 31, 2006, respectively); 8/11/08 10-Q, Ex. 19 at 65 (deferred interest of $3.9 billion at June 30, 2008).

than the vast majority of the country.  And so <u>at some point can there be some deterioration there?  Absolutely</u>."  5/12/06 Conf. Call at 25.

- "We're experiencing some of the same trends, obviously, seen in the overall mortgage market, which are <u>driving up delinquencies</u>…."  7/20/07 Conf. Call at 5.

- "Given our outlook for <u>continued weakness in the housing market</u> ... we anticipate that non-performing loans on our consumer mortgage book <u>will continue to increase</u>…."  10/19/07 Conf. Call at 8.

- "The housing market <u>certainly has been deteriorating very, very quickly</u> in certain parts of the country and we are not immune from that deterioration."  11/9/07 Conf. Call at 3.

- "The direct effect of this <u>troubled environment</u> on us is evident in <u>increased non-performing assets</u>…."  1/22/08 Conf. Call at 6.

- Mr. Thompson, when asked whether he expected <u>falling home values</u> to drive up LTV ratios throughout the year replied, "Yes."  1/30/08 Conf. Call at 5.

- "One area where we — and most economists and forecasts — were wrong, however, was in the extent and the rapidity with which the decline would occur in the U.S. housing market....  <u>We expect to recognize further credit losses and to earn less than we'd anticipated in our mortgage business</u> over the next year or two."  2007 10-K, Ann. Rpt. at 4.

- "Given the <u>serious weakness in the housing markets</u>, we are looking for the non-perform level to climb as we move through 2008…."  3/12/2008 Conf. Call at 3.

- "[C]redit metrics showed <u>pretty meaningful deterioration</u> throughout the quarter, primarily driven by <u>the continued slide in housing market</u>."  7/22/08 Conf. Call at 6.

Furthermore, although the Equity Plaintiffs suggest otherwise (Eq. ¶ 254), the fact that most of the Pick-a-Pay portfolio consisted of loans originated in California and Florida, and that those two regions were particularly impacted by the housing crisis, was likewise specifically — and repeatedly — disclosed.[62]  *See SRM Global Fund Ltd. P'ship. v. Countrywide Fin. Corp.*,

---

62  *See, e.g.*, Golden West 2005 10-K, Item 1 at 4 ("Our geographic concentration in California could increase our exposure to adverse conditions in the state...."); 2006 10-K, Ann. Rpt. at 91 (60 percent and 8 percent of Wachovia's Option ARMs originated in California and

2010 WL 2473595, at *8 (S.D.N.Y. June 17, 2010) ("It is indisputable that there can be no omission where the allegedly omitted facts are disclosed").

    ***Wachovia's Specific LTV Disclosures.***  In another fraud-by-hindsight claim, both plaintiffs cite the divergence between later, after-the-fact (or "current") LTV ratios and "at-origination" LTV ratios on Wachovia's Pick-a-Pay loans in April 2008, and claim that Wachovia's earlier disclosures concerning the LTV ratios of its consumer real estate portfolio must therefore have been false and misleading throughout the Class Period.  *See, e.g.*, B/N ¶¶ 224-25, 238-39, 246-47; Eq. ¶¶ 225-27, 248-50.

    These allegations fail for a fundamental reason.  Wachovia disclosed the difference between current and at-origination LTVs for the Pick-a-Pay portfolio as soon as the available data showed that they were beginning to diverge.[63]  Plaintiffs offer no contemporaneous facts to suggest that Wachovia should have disclosed the average current LTV for the Pick-a-Pay portfolio any earlier than it did, or to suggest what any current LTV disclosure should have been.[64]  *Coronel v. Quanta Capital Holdings, Ltd.*, 2009 WL 174656, at *14 (S.D.N.Y. Jan. 23,

---

    Florida, respectively); 2007 10-K, Ann. Rpt. at 97 (59 percent and 10 percent); 7/20/07 Conf. Call at 15 (Non-performing assets ("NPAs") were concentrated in areas of California that had seen "higher stress" on housing values and where the market "appear[ed] to have gotten ahead of itself in terms of supply"); 3/12/08 Conf. Call at 3 ("Housing-related credit, particularly driven by our geographic exposures, probably remains our biggest challenge, particularly our exposures in California, followed to a lesser extent at this point by Florida").

63   *Compare* 3/12/08 Conf. Call at 8 ("As of the November run … the average [LTV] on the Pick-a-Pay portfolio came back at about 72% or so, which was about pretty close to the original loan-to-value [71%]") *with* 4/14/08 8-K, Ex. 99(b) at 20 (using February data, current Pick-a-Pay LTV at 78%).

64   The Equity Plaintiffs' related argument that Wachovia's disclosures concerning current LTV ratios were themselves misleading because they were based on "outdated data" (*see, e.g.*, Eq. ¶¶ 103(b), 290), fails because Wachovia never claimed to update its LTV ratios in "real time" (or even at regularly occurring intervals) but instead <u>expressly</u> disclosed that the Company received updates only "periodically" by sending its loan information "out to a third party vendor to get estimates."  *See, e.g.*, 3/12/08 Conf. Call at 8 (average LTV ratios

2009) (dismissing complaint that plead "no factual allegations contradicting the veracity of the … loss estimate at the time that estimate was released").[65]

In their Amended Complaint, Bond Notes Plaintiffs attempt to shore up their LTV-related allegations by adding claims that Wachovia misstated its at-origination LTV ratios through improper appraisals.  These claims also fail.  First, Bond Notes Plaintiffs base their claim that Wachovia's appraisal process generated materially understated at-origination LTVs (B/N ¶¶ 226, 239, 247) solely on the observations of a few former employees whose statements do not support a falsity claim for the reasons discussed in Part II.D.4, *supra*.  Second, Bond Notes Plaintiffs plead no particular facts at all to support their claim that "silent seconds" (*e.g.*, undisclosed second mortgages) had any impact on reported LTV ratios.  B/N ¶ 124.[66]  B/N CW 36, the sole individual behind Bond Notes Plaintiffs' allegation concerning "silent seconds," offers nothing more than the vague observation that "silent seconds" were "common" in his Connecticut office and that loan officers would "keep [them] on the down low."  *Id.* ¶¶ 115(b), 125.  He provides no facts explaining what "common" means, let alone any concrete details concerning how many loan officers he is referring to, whether those loan officers took active steps to conceal second

---

were "as of the November run"); 4/14/08 Conf. Call at 9 ("we provided … estimated updated LTVs as of February").

65   The Bond Notes Plaintiffs offer a misleading, apples-to-oranges comparison by juxtaposing Wachovia's April 2008 disclosure of current Pick-a-Pay LTVs (B/N ¶¶ 225, 238, 247) against Wachovia's earlier disclosures regarding LTVs for its overall consumer real estate portfolio (*id.* ¶¶ 224, 238, 246).  Wachovia's $120 billion Pick-a-Pay portfolio represented only slightly more than half of its $228 billion consumer real estate portfolio at the end of 2007.  The Court should decline to draw inferences from disclosures concerning these two different data sets.  *See San Leandro*, 75 F.3d at 813 (no actionable omission where plaintiffs made a "false comparison" between wholesale shipments and retail sales).

66   This theory is apparently based on a passage from a recent book on the mortgage crisis.  *See* B/N ¶ 124 (citing MICHAEL LEWIS, THE BIG SHORT 195 (2010)).  The passage Bond Notes Plaintiffs refer to makes a general observation about the mortgage industry in 2005, and is not a reference to any specific company's (including Wachovia's) loan portfolio.

mortgages from underwriters, or whether he himself engaged in such practices (much less whether this occurred anywhere outside Connecticut). *Id.* The suggestion that Wachovia was unaware of second mortgages is also thoroughly undermined by Wachovia's April 2008 disclosures describing the <u>combined</u> LTVs of the Pick-a-Pay portfolio on a yearly basis. 4/14/08 8-K, Ex. 99(b) at 37-39. The Bond Notes Plaintiffs do not allege that these combined LTVs were at all inaccurate.

       F.       <u>Plaintiffs' Loan Loss Reserves Claim Fails</u>

Plaintiffs' assertions regarding understated loan loss reserves amount to nothing more than a claim that the Wachovia Defendants should have more accurately predicted the future. B/N ¶¶ 145-58; Eq. ¶¶ 383-99. It is well-established, however, that prognosticating the future is not a requirement of the securities laws. *See CIT Group*, 349 F. Supp. 2d at 689 (failure "to correctly gauge the adequacy of the loan loss reserves" is not actionable under the Securities Act); *Hinerfeld v. United Auto Group*, 1998 WL 397852, at *7 (S.D.N.Y. July 15, 1998) (failure "to anticipate the extent of necessary reserves, even if it amounts to mismanagement, is not actionable under federal securities laws"). This is because a "claim that loan loss reserves were inadequate is nothing more than an assertion that [the company] was incorrect or unskillful in determining exactly what amount of reserves would be adequate." *CIT Group*, 349 F. Supp. 2d at 689. As one court in this District recently held, "Plaintiffs' repeated assertions that SCA failed to maintain adequate loss reserves and to monitor the collateral underlying its CDOs, and understated mark-to-market losses are criticisms of Defendants' business judgment and management of SCA, not fraudulent misrepresentations." *Security Capital*, 2010 WL 1372688, at *28; *see also Malin*, 499 F. Supp. 2d at 146, *Downey*, 2009 WL 2767670, at *5; *2007 Novastar Fin.*, 2008 WL 2354367, at *3-4.

Neither set of plaintiffs allege facts showing that Wachovia's management did not

believe that Wachovia's reserves were appropriate.  Such allegations are critical even with

respect to Securities Act claims, because the adequacy of loan loss reserves is not a matter of

objective fact.  Rather, reserves are "statements of opinion by defendants," and whether they are

misstated depends on whether "defendants did not truly hold those opinions at the time they were

made public."  *Fait v. Regions Fin. Corp.*, 2010 WL 1883487, at *5 (S.D.N.Y May 10, 2010).

Although plaintiffs point to subsequent changes in Wachovia's reserve levels and methodology,

they set forth no particularized facts that Wachovia at any earlier time experienced or internally

predicted losses exceeding their reserves.  B/N ¶¶ 153, 156; Eq. ¶¶ 396, 399.  Wachovia's later

disclosures — especially in light of the unprecedented intervening collapse of the housing and

credit markets — "provide[ ] absolutely no reasonable basis for concluding that defendants did

not think reserves were adequate at the time the registration statement and prospectus became

effective."  *CIT Group*, 349 F. Supp. 2d at 690-91; *see also Security Capital*, 2010 WL 1372688,

at *26 ("Defendants, like so many other institutions floored by the housing market crisis could

not have been expected to anticipate the crisis with the accuracy [p]laintiffs enjoy in

hindsight").[67]

---

[67] In lieu of factual assertions, Bond Notes Plaintiffs — in classic fraud-by-hindsight fashion — include a chart of Wachovia's loan loss reserves as compared to net loans, restructured loans, and nonperforming assets.  B/N ¶ 147.  This chart, however, does nothing more than compare the level of reserves to other balance sheet items.  Plaintiffs cite absolutely no authority stating that loan loss reserves must be greater than some quantitative percentage of total loans or nonperforming assets.  Furthermore, it also incorrectly states Wachovia's loan loss reserve as of the end of the second quarter of 2007, creating the illusion that Wachovia decreased its reserves from $3.552 billion as of 6/30/07 to $3.505 billion as of 9/30/07.  *Compare* B/N ¶ 147 (alleging that Wachovia's loan loss reserve as of 6/30/07 was $3.552 billion) *with* 7/30/07 10-Q, Ex. 19 at 16 (disclosing that Wachovia's loan loss reserve as of 6/30/07 was $3.390 billion).  Regrettably, although confronted with their error in the Wachovia Defendants' prior brief, the Bond Notes Plaintiffs have not bothered to correct it in their amended complaint.

G.      7.5% Annual Cap and Loan Recast Features Were Accurately Described

The Equity Plaintiffs describe Pick-a-Pay's 7.5% annual cap on minimum payment increases and recast features as if these features by themselves somehow render false virtually all of Wachovia's representations regarding its Pick-a-Pay portfolio.  *See, e.g.*, Eq. ¶¶ 100-01, 105-06, 222-24.  These claims have no merit.  In its very first presentation to investors about Golden West, and then in a variety of other disclosures throughout the Class Period, Wachovia described the 7.5% annual cap and discussed how it mitigated yearly increases in monthly minimum mortgage payments.[68]  Similarly, Wachovia disclosed that Pick-a-Pay's recast feature caused monthly minimum payments to reset to fully-amortizing amounts after a ten-year period.[69] Plaintiffs do not claim that any of these disclosures were false or misleading, and they were not.

Unable to plead that Wachovia misrepresented how Pick-a-Pay's features were designed to work, the Equity Plaintiffs instead attempt to show that Wachovia made false statements about the "protective nature" of those features relative to other option ARMs.  *See, e.g.*, Eq. ¶¶ 100-01, 105-06.  Plaintiffs allege that Wachovia repeatedly told investors that Pick-a-Pay's features made it "immune" from, or would allow Wachovia to "escape," the problems being experienced by other Option ARMs lenders, when in reality (according to plaintiffs) Pick-a-Pay's features merely delayed the "payment shock-inspired defaults" that had begun to afflict others.  *See, e.g.*, Eq. ¶¶ 100-01, 105-06, 217, 222-24.  The problem with these allegations is that — as the Equity Complaint itself bears out — the quoted words "immune" and "escape" were never uttered by Wachovia.  The notion that Wachovia provided any such guarantees is a construct of the Equity Plaintiffs' imagination and zealotry.  Wachovia simply expressed the view that these features

---

68   *See* 5/8/06 8-K, Ex. 99(b) at 23; 7/20/07 Conf. Call at 5; 11/9/07 Conf. Call at 3; 11/14/07 Conf. Call at 4.

69   *See* 5/8/06 8-K, Ex. 99(b) at 23; 2/13/08 Conf. Call at 10-11, 18.

made the Pick-a-Pay loan a better product than competitors' option ARMs, and the Equity

Plaintiffs plead no particularized facts contradicting this proposition (or that such "puffery"

would be actionable in any event).  This claim is baseless, particularly since neither Wachovia

nor Wells Fargo has attributed any of the subsequently experienced losses to the failure of the

7.5% cap or recast features to work as described.

> H.   Loan Charge-Off Policies Were Accurately Described

The Equity Plaintiffs allege that Wachovia misrepresented the extent of defaults

occurring in its Pick-a-Pay portfolio by "represent[ing] at all times prior to late January 2008 that

consumer real estate secured loans were charged off when they became 180 days past due,"

when, in fact, prior to the fourth quarter of 2007, Wachovia recognized losses on nonperforming

legacy Golden West loans only after the properties associated with those loans had been sold at

foreclosure sales.  *See* Eq. ¶¶ 22, 183-84, 263.  This claim is based solely on a statement in

Wachovia's 2006 10-K that "[g]enerally, consumer loans that become 180 days past due are

charged off."  Eq. ¶¶ 183-84.

The Equity Plaintiffs misrepresent the timing of Wachovia's disclosure.  Wachovia

proactively disclosed the divergent charge-off policies applicable to nonperforming Wachovia

and legacy Golden West loans during the third quarter of 2007 (*e.g.*, prior to the reconciliation of

those policies during the fourth quarter of that year, and two months earlier than alleged):

> I also want to note for you a change in accounting charge-offs for the
> Pick-a-Pay portfolio that we will implement in the fourth quarter.... [T]he
> past practice at Golden West was to realize losses when the properties
> were actually taken in …. In the fourth quarter [we are going to] bring the
> Golden West portfolio onto a consistent methodology with the rest of the
> Company and how we treat these loans.  And we will take a write off at
> 180 days past due.

11/9/07 Conf. Call at 4.[70]

The Equity Plaintiffs' misrepresentation of the timing of this disclosure is telling and fatal to their fraud claim. On November 9, 2007, the day Wachovia made its proactive disclosure, its stock increased by $2.39 per share. *See* 2009 Hirsch Decl. Ex. 32 (showing 11/9/07 opening price of $38.26 per share, and closing price of $40.65). Fraud cannot exist without loss causation and, in turn, a "corrective" disclosure of a previously unknown fact is not actionable unless the plaintiff suffers economic losses as a result of the disclosure.[71] Because plaintiffs cannot demonstrate that they suffered any economic harm as a result of Wachovia's November 9, 2007 disclosure, these allegations should be dismissed.

I.    Plaintiffs Fail to Plead Facts Supporting the Assertion
      that Wachovia Misrepresented Its Underwriting and Risk Profile

The complaints allege that the adjectives and phrases used to describe the underwriting for the Pick-a-Pay portfolio throughout the Class Period were false and misleading because Wachovia purportedly underwrote loans to borrowers with low FICO scores, originated stated income loans, and relied on third party appraisers. In particular, the Equity Plaintiffs point to words and phrases including "conservative" (Eq. ¶¶ 169, 175-76, 192-93), "careful management of inherent credit risk and strong underwriting" (Eq. ¶¶ 201, 211, 216, 276), and "rigorous." Eq. ¶ 169. The Bond Notes Plaintiffs sprinkle in a handful of additional statements not attacked in

---

70  The effect of the policy change on Wachovia's financials, according to the Equity Plaintiffs, was $63 million (Orig. Eq. Opp. at 24), or less than two hundredths of one percent of Wachovia's $460 billion loan portfolio. There are no new allegations explaining how such a *de minimis* increase in charge offs could possibly have been material to investors.

71  *See, e.g.*, *Dura*, 544 U.S. at 347. For this reason, courts routinely grant motions to dismiss where a company's stock price does not fall after an allegedly corrective disclosure. *See, e.g.*, *Bausch & Lomb*, 592 F. Supp. 2d at 347 (no loss causation where "there was no significant diminution of the company's share price" following each allegedly corrective disclosure); *GlaxoSmithKline*, 2006 WL 2871968, at *42-43 (no loss causation where stock price increased after disclosure).

the Equity Complaint, such as Wachovia's statement that it "continue[s] to mitigate risk and

volatility on [its] balance sheet by actively monitoring and reducing potential problem loans,

including their sale when prudent" (B/N ¶ 222).  A claim for securities fraud cannot be based on

such general statements.[72]

As the Second Circuit confirmed, descriptive words like "conservative," "rigorous,"

"strong" and "careful" are precisely the type of "puffery" that is not actionable under the

securities laws.  *See ECA*, 553 F.3d at 205-06 (statements regarding "highly disciplined" risk

management and "standard-setting reputation for integrity" were non-actionable puffery);

*Security Capital*, 2010 WL 1372688, at *28 (allegations based on company's reference to "its

underwriting approach as 'disciplined' and 'conservative' and its overcollateralization triggers as

'robust' in the face of deterioration are classic examples of puffery"); *Waterford*, 2010 WL

1332574, at *8 ("Defendants' description of the Company's underwriting, appraisal, and credit

standards as 'strict,' 'stringent,' 'conservative,' and 'strong' is immaterial because these

commonplace statements of corporate puffery could not influence a reasonable investor's

investment decision") (citing *ECA*, 553 F.3d at 206).

J.      Referenced Documents Do Not Show Falsity

***Broker Presentation***.  The Bond Notes Plaintiffs refer to (but do not attach) a broker

presentation from December 2006 and claim that it corroborates their allegations concerning

Wachovia's underwriting standards.  *See* B/N ¶ 114.  As described in the Bond Notes Complaint,

however, the document is a sales pitch to outside brokers soliciting loans for review and potential

approval, and not an internal document detailing underwriting guidelines for loans that were

---

72   *See also* B/N ¶ 236 (Wachovia would "continue to actively monitor loan quality and take
     proactive steps to reduce risk when warranted"); B/N ¶ 246 (Wachovia would "continue[] to
     mitigate the risk and volatility of [its] balance sheet through prudent risk management
     practices, including tighter underwriting and enhanced collection efforts").

70

approved.  Wachovia's advertisement to brokers that some of its loans may not require income, asset, or employment verification says nothing about the other requirements for those loans, and does nothing to support plaintiffs' allegations that the Pick-A-Pay loans were an "aggressively pitched" "solution[ ] for persons of dubious credit."  B/N ¶ 114.  Moreover, given Wachovia's well-publicized views on FICO scores, the fact that it would advertise to brokers that FICO scores were not required on loan applications is not surprising.  Indeed, it merely underscores the fundamental weakness of plaintiffs' entire claim:  Wachovia openly, publicly, and repeatedly made clear to everyone that its Pick-a-Pay lending was not based on FICO scores.

*Lending Matrices.*  Similarly, none of the three internal lending matrices that Equity Plaintiffs cite in their Complaint corroborate plaintiffs' allegations.  Two of the documents are irrelevant.  The Wachovia California Wholesale Region Rate Sheet was published mere days after Wachovia closed its acquisition of Golden West, and the document does not apply to Pick-a-Pay loans.  *See* Eq. ¶¶ 118, 120-22; McNeela Decl. Ex. 3.  The equity submission form for Wachovia's Eastern Wholesale Operations Center provides guidelines for home equity loans; it also says nothing about Pick-a-Pay loans.  *See* Eq. ¶ 118; McNeela Decl. Ex. 4.  Plaintiffs cite a third internal document for the proposition that Wachovia offered stated income loans, yet this document only confirms, yet again, that FICO scores were not an important part of Wachovia's mortgage program.  Eq. ¶ 123; McNeela Decl. Ex. 2.

     K.    <u>Plaintiffs' CDO Allegations Fail to State a Claim</u>

Like their allegations concerning Wachovia's Pick-a-Pay portfolio, plaintiffs' tacked-on allegations concerning Wachovia's retained CDO interests all depend on hindsight.  Plaintiffs claim that Wachovia "concealed" until November 9, 2007 the fact that it had retained interests in nine CDOs it had underwritten that were backed by pools of subprime mortgages.  Eq. ¶ 164; B/N ¶¶ 159-60.  They also claim that Wachovia failed to properly value those interests, and that

Wachovia had misrepresented portions of those interests as adequately hedged when Wachovia should have known that its hedging counterparties were not creditworthy.  Eq. ¶¶ 340-41; B/N ¶ 162.  Nowhere, however, do plaintiffs allege facts showing that Wachovia had reason before the third quarter of 2007 to believe that these highly-rated retained CDO interests were unduly risky, were marked inappropriately, or that its fully-disclosed risk management strategies would fail to prevent losses in an historic market downturn.[73]

**No Requirement to Disaggregate.**  Plaintiffs allege that Wachovia "first revealed" the existence of the retained subprime CDO interests on October 19, 2007 (and did not disclose the total amount of those interests until November 9, 2007).  But there are no allegations showing that Wachovia was required to make these disclosures earlier.  As the Second Circuit has held, "[m]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud."  *Acito*, 47 F.3d at 53; *see also DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) ("If all that is involved is a dispute about the timing of the writeoff, based on estimates of the probability that a particular debtor will pay, we do not have fraud; we may not even have negligence").  Based on the information known at the time, Wachovia disclosed what it was required to disclose.

Wachovia fully and properly disclosed (i) that it retained interests in connection with

---

73  Given that Wachovia's subprime CDO exposure, even disregarding any hedges, amounted to $6.7 billion, or <u>less than 1%</u> of Wachovia's total assets, plaintiffs also fail to allege that Wachovia's subprime CDO exposure (particularly prior to the third quarter of 2007) was material.  *See* 2007 10-K, Ann. Rpt. at Overview, 15; *see also ECA*, 553 F.3d at 204 ("the five percent numerical threshold is a good starting place for assessing the materiality" of an alleged omission); *Landmen Partners Inc. v. Blackstone Group, LP*, 659 F. Supp. 2d 532, 541 (S.D.N.Y. 2009) (dismissing claims as immaterial because impact on 0.4% of total assets "does not even come close to the 5% threshold that serves as an appropriate starting place" for materiality analysis); *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 613-14 (S.D.N.Y. 2008) (alleged omission accounting for "only 0.4%" of annual revenue "is simply too small to be material as a matter of law when considered in the broader context of the company's revenues and expenses"), *aff'd*, 347 Fed. App'x 665 (2d Cir. 2009).

certain securitizations, as well as the total amount of those retained interests,[74] and (ii) that some

of its securitizations included subprime residential mortgage-backed securities.[75]  The securities

laws do not require corporations to "disaggregate" particular assets, line items or revenue or

costs, or other financial details simply because those items become problematic in hindsight.  *See*

*Nolte*, 390 F.3d at 316-17 (defendant not required to disclose the size of its subprime portfolio

under GAAP and standard industry practice of subprime lenders); *In re AXIS Capital Holdings*

*Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 590 (S.D.N.Y. 2006) ("As to any claim that AXIS was

nonetheless required to identify contingent commissions as a line item, plaintiffs point to no

accounting or reporting requirements which would require the disaggregation of acquisition

costs"); *In re N.Y. Cmty. Bancorp, Inc.*, 448 F. Supp. 2d, 466, 479 (E.D.N.Y. 2006) (additional

disclosure not required where "it is apparent from the quarterly reports disclosed to the public

that the company was heavily involved in investing in mortgage-backed securities").

Plaintiffs cannot, without using fraud-by-hindsight reasoning, point to the more detailed

disclosures Wachovia made in October 2007 as evidence of what Wachovia supposedly should

have disclosed earlier.  Those disclosures were made after the effects of the credit crisis on such

securities had become apparent to the market:  "In October, rising defaults and delinquencies in

subprime residential mortgages and rating agencies' downgrades of a large number of subprime

residential mortgage-related securities led to unprecedented declines in the ABX subprime

---

74  *See* 2006 10-K, Ann. Rpt. at 27 ("We retain interests in the form of either bonds or residual
interests in connection with certain securitizations.  The retained interests result primarily
from the securitization of <u>residential mortgage loans</u>, home equity lines, auto loans and
student loans"); *see also* 7/30/07 10-Q, Ex. 19 at 20 (disclosing $8.2 billion in total retained
interests from securitizations for the year ended 12/31/06).

75  *See, e.g.*, Longshore CDO Funding 2006-2 Offering Memorandum at A-26 (collateral assets
include "Residential Mortgage-Backed Securities ... that entitle the holders thereof to
receive payments that depend primarily ... on the cash flow from subprime residential
mortgage loans").

indices, that contributed to a rapid decline in the valuations of subprime RMBS and ABS

CDOs." 11/9/07 10-Q, Ex. 19 at 5. Indeed, plaintiffs do not allege that any of the relevant CDO

tranches were downgraded by ratings agencies before October 2007, or that any of the relevant

junior tranches defaulted on their obligations, signaling a potential threat to the cash flow of

Wachovia's "super senior" interests. Put simply, plaintiffs fail to allege any earlier-known facts

that would have required an earlier disclosure.[76]

      ***The ABX and TABX Indices.*** Plaintiffs next allege that Wachovia's write-downs of its

subprime CDO interests, beginning on October 19, 2007, were false and misleading because they

supposedly "continued" to overstate the value of the CDOs. *See* Eq. ¶ 340; B/N ¶ 172. Plaintiffs

allege no contemporaneous facts demonstrating this supposed falsity. Instead, they point to the

declining value of ABX and TABX indices as the sole support for their assertion that Wachovia

should have written down its subprime CDO interests even further than it already had. *See* Eq.

¶¶ 316-318; B/N ¶¶ 176-82. This assertion is unavailing.

      The ABX and TABX are indices that track a tiny fraction of the trillion dollar asset-

backed securities market.[77] Plaintiffs allege no facts suggesting that Wachovia's CDOs were

made up of the same handful of mortgage-backed securities included in these indices at any point

---

76  Plaintiffs have no claim based on the fact that Wachovia disclosed an additional $4.18 billion in super senior subprime CDO tranches for the first time on January 22, 2008. Plaintiffs allege <u>no facts</u> that indicate that defaults had so increased at any point before January 2008 that Wachovia should have known that these super senior tranches — the tranches most insulated from default — were at risk at any point before January 2008.

77  As one treatise describes them: The ABX.HE indices consist of five separate subindices, one for each of the rating categories AAA, AA, A, BBB, and BBB-  .... Each subindex consists of 20 tranches ... from the 20 [subprime] ABS deals, with each deal represented once in each subindex. A new set of ABX.HE indices is launched every six months on January 19 and July 19. LAURIE S. GOODMAN, *et al*., SUBPRIME MORTGAGE CREDIT DERIVATIVES 145 (2008). Each set of ABX.HE indices consists of one deal from each of the "top 20" issuers. *Id*. at 146. The TABX is essentially a sub-index of the BBB and BBB- tranches. *See id*. at 156-57.

in time, or that it would have been appropriate for Wachovia to mark down its retained interests based solely on movements in these indices.  Indeed, Markit, the company that created the ABX and TABX, has explained that it would be inappropriate to use its indices to value individual securities:

> The ABX may be a standardized and liquid tradable index but it was not designed to be uncritically extrapolated to the broader [Asset-Backed Securities] market, and it was <u>certainly not designed as a valuation tool for individual securities</u>.
>
> Compare the ABX to equity indices.  While movements in the Dow Jones Industrial Average, for example, may provide a snapshot of market performance, the index performance will not give an equity investor information on the performance or value of a specific stock.  You would not mark Vodafone stock using the Dow Jones, of which it is not even a member, nor would you mark Ford bonds using the Markit CDX IG, which does not contain Ford either.

Ben Logan, *The ABX Index: A Pricing Conundrum*, CREDIT, May 1, 2008, at 48; *Don't mark to Markit*, ECONOMIST, Mar. 8, 2008 (ABX indices have been "prone to distortion (mostly downwards) by heavy speculation" and were too illiquid to "take the weight of short-selling heaped on them").  As one treatise noted, "there is no way to use TABX pricing as the benchmark for CDO pricing."  GOODMAN, *et al.*, *supra* note 77, at 160.

Likewise, allegations that CDOs "were in imminent danger of severe write-downs, losses and ratings downgrades" (Eq. ¶¶ 315, 322) "establishes nothing more than that the plaintiffs disagree with some of [defendant's] investment valuations …."  *Allied Capital Corp.*, 2003 WL 1964184, at *4.  Courts have been loathe to second-guess highly judgmental accounting decisions such as the valuation of complex securities.  *See, e.g.*, *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 193-94 (2d Cir. 1998) ("A plaintiff's conclusory allegation that markups are excessive is similar to a barroom generality; it is insufficient to state a securities fraud claim").

**Monoline Insurers.**  Plaintiffs also claim that Wachovia created a false sense of security

when it disclosed on January 22, 2008 that it had hedged $2.2 billion of its super senior subprime CDO tranches[78] with monoline insurers because "[t]he reality was that the Monolines could not make good on their guarantees."[79]  Eq. ¶ 341; *see also* B/N ¶ 184.  However, there are no allegations that anyone at Wachovia knew or had information that should have led them to believe that they should immediately recognize losses because the monoline insurers would not be able to cover their guarantees.  *See Fadem*, 352 F. Supp. 2d 501 at 507 (allegations that disclosed hedging strategy ended up being "costly mistake" not actionable where facts undermining strategy were unknown at time statements were made).

Plaintiffs point to the failure of one of Wachovia's subsidiaries, BluePoint Re Ltd., a monoline insurer that was forced into bankruptcy and unable to honor its guarantees, to support the claim that Wachovia should have known that its hedges with other monoline insurers were worthless.  *See* Eq. ¶ 341; B/N ¶ 187.  BluePoint's failure proves nothing with respect to the other monoline insurers.  The only connection between BluePoint and Wachovia's insurers is that they all happen to be in the same line of business.  This fact cannot be used to allege that Wachovia's statements about its hedges were false and misleading when made.[80]

---

78  Plaintiffs suggest that Wachovia's total potential exposure in the event of a complete loss on these hedges was $2.2 billion or more.  Eq. ¶ 343.  Wachovia estimated, however, that it would lose only "about $400 million on these assets if the monoline protection was assumed to be worthless."  *See* 1/22/08 Conf. Call. at 5.

79  The Equity Plaintiffs' claim that Wachovia understated its exposure to two monoline insurers, Ambac and MBIA, Inc., is nonsensical.  Eq. ¶ 343.  That two of the monolines claimed an exposure of $7 billion on "Wachovia's CDOs" does not evidence that those insurers were exposed to <u>Wachovia</u> on those CDOs.  *Id.*  The obvious explanation for the discrepancy is that other entities that had purchased tranches of the Wachovia CDOs had also hedged their exposure with Ambac and MBIA.

80  Similarly misplaced is the Bond Notes Plaintiffs' assertion that, through Wachovia's attendance at a January 2008 meeting with New York's Insurance Superintendent, Wachovia purportedly knew that its monoline insurers were in need of a government bailout.  B/N ¶ 186.  Following that very meeting, one of the monoline's regulators stated

***No Allegations of Scienter Regarding CDO Claims.***  <u>None</u> of the scienter allegations in the Equity Complaint refer to Wachovia's disclosures regarding its CDO interests.  For this reason alone, the Equity Plaintiffs' Section 10(b) and Rule 10b-5 claims relating to Wachovia's CDO disclosures (which of course require a showing of scienter) should be dismissed.

L.   <u>Plaintiffs' GAAP Allegations Fail to State a Claim</u>

In a 30-page "GAAP Section" of the Equity Complaint (Eq. ¶¶ 357-434) the Equity Plaintiffs dress-up Wachovia's alleged failure to disclose risks associated with the Pick-a-Pay portfolio and CDOs as GAAP violations.  *See Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 452-53 (S.D.N.Y. 2008) (dismissing claims of inadequate internal controls and GAAP violations that were premised on underlying statements not found to be fraudulent).  These bootstrapped allegations fail.  Allegations of GAAP violations do not show a false or misleading statement where, as here, the GAAP provisions in question concern highly subjective assessments,[81] and no one — not the Company, its auditor (KPMG), Wells Fargo, or the SEC — has stated that Wachovia's financials should be restated.  Under these circumstances, plaintiffs must do far more than point to a series of judgmental items such as disclosures concerning credit risk concentration and allowances for loan losses and cry fraud.  *See 2007 Novastar Fin.*, 2008 WL 2354367, at *3 (rejecting claim that defendants violated GAAP where "nobody — the SEC, Novastar's auditors, or anyone else — has suggested Novastar should or must restate its financial

---

that "we feel comfortable [Ambac] can protect policyholders."  Erik Holm & Jesse Westbrook, *N.Y. Regulator Pushes Banks to Rescue Bond Insurers*, BLOOMBERG, Jan. 24, 2008.  Even in June 2008, Ambac and MBIA's regulators continued to state there was "no concern about the ability of Ambac and MBIA to pay current and future claims."  *See* Carl Dincesen, *Ambac MBIA:  The Rating Shoes Drop*, SEEKING ALPHA, June 24, 2008.

81   The Supreme Court has described GAAP as "far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions…. [GAAP] tolerate[s] a range of 'reasonable' treatments, leaving the choice among alternatives to management."  *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 544 (1979).

reports"); *Malin*, 499 F. Supp. 2d at 148 (same).

At bottom, all the Equity Plaintiffs do is offer their naked <u>opinion</u> that Wachovia's financial statements violated GAAP; plaintiffs do not come close to satisfying their burden of actually <u>pleading</u> underlying facts that demonstrate the falsity of any particular accounting entry.

- ***Credit Risk of Pick-a-Pay Portfolio*** (Eq. ¶¶ 365-74, 379-82).  The Equity Plaintiffs argue that Wachovia did not sufficiently disclose the "nature/terms" of the Pick-a-Pay loans.  *Id*. ¶ 372.  They "overlook" that Wachovia repeatedly disclosed, *inter alia*, the features of these loans (*e.g.*, negative amortization), the geographic concentration of the properties securing these loans (California and Florida), the rising levels of negative amortization, and the size of the Pick-a-Pay portfolio ($120 billion).  Moreover, Wachovia estimated its anticipated losses (*Id*. ¶ 382); the Equity Complaint alleges no contemporaneous document or other communication supporting the claim that these estimates were false at the time that they were made.

- ***Reserves for Credit Losses*** (*Id*. ¶¶ 383-99).  The Equity Plaintiffs' attempt to demonstrate the inadequacy of Wachovia's loan-loss reserves by pointing to later losses summarily must be rejected.  *See, e.g.*, *Coronel*, 2009 WL 174656, at *27 ("The Complaint alleges nothing to show that the reserves did not have a reasonable basis at the time they were made, and just because the Company later turned out to have underestimated hurricane losses by 15% does not support an inference of fraud"); *CIT Group*, 349 F. Supp. 2d at 691 (dismissing Section 11 and 12 claims where plaintiffs failed "to plead any facts from which it could be inferred that defendants' belief in the adequacy of the [loan loss] reserves was beyond the pale of reason").

- ***Valuation of Retained CDO Interests*** (Eq. ¶¶ 401-04).  Plaintiffs contend that Wachovia did not carry its retained CDO interests at "fair value."  *See id*. ¶¶ 375-77.  As is stated above, plaintiffs fail to identify any facts known to Wachovia — <u>at the time</u> as opposed to in hindsight — that would have required earlier or larger write-downs of these interests (representing less than 1% of Wachovia's assets).

The Equity Plaintiffs offer a hodge-podge of other supposed GAAP violations, including that Wachovia did not timely value its CDO interests (*id*. ¶¶ 400-08), did not timely disclose its exposure to certain variable interest entities (*id*. ¶¶ 409-22), and did not adequately disclose the effectiveness of its internal controls (*id*. ¶¶ 430-34).  These allegations are nothing more than hindsight-based attacks on the Wachovia Defendants' business judgment that do not set forth

contemporaneous information demonstrating how Wachovia's financial statements were false or misleading when they were issued.  *See, e.g.*, *Plumbers & Steamfitters*, 2010 WL 961596, at *12 ("allegations regarding CIBC's write-downs amount to fundamental disagreements with Defendants' business judgments in a tumultuous economic downturn — claims that are not actionable under Section 10(b) and Rule 10b-5").

   Both the Bond Notes and Equity Plaintiffs tack on claims that Wachovia falsely reported its net income and its Tier 1 capital ratio, and misstated its goodwill.  B/N ¶¶ 189-209; Eq. ¶¶ 185, 362, 423-29.  These allegations, however, are just ways to restate plaintiffs' other (insufficient) allegations, since they rest entirely upon the unsupported premise that Wachovia made false statements concerning the valuation of its Pick-a-Pay portfolio and the adequacy of its loan loss reserves.  *See* B/N ¶ 230 ("Wachovia's reserves were understated and its assets were overstated" such that "Wachovia's publicly reported net income and Tier 1 capital as set forth in its 2006 Form 10-K and its May 4, 2007 and July 30, 2007 Forms 10-Q were also materially overstated"); Eq. ¶ 428 (alleging the Company's analysis of goodwill did not reflect the "untimely reported losses discussed herein").  Because plaintiffs offer no facts to show that Wachovia's net income or Tier 1 capital ratio disclosures were materially false and misleading when made, or that Wachovia's goodwill analysis did not reflect the honest opinion of management, these claims should be dismissed.  *Fait*, 2010 WL 1883487, at *4 (dismissing Securities Act claim "[i]n the absence of particularized allegations that management believed that the goodwill figure was materially overstated"); *see also Downey*, 2009 WL 2767670, at *5 (dismissing allegations concerning the company's capital levels, which were premised upon plaintiff's other "plainly insufficient" allegations concerning loan loss reserves); *In re Corning Inc. Sec. Litig.*, 2004 WL 1056063, at *32 (W.D.N.Y. Apr. 9, 2004) (rejecting claim that

"defendants unreasonably delayed in writing down ... goodwill figures because, as it developed, the downturn in the telecommunications market was more severe than analysts had predicted"), *aff'd sub nom. Levi v. Corning, Inc.*, 2005 WL 714352 (2d Cir. Mar. 30, 2005).[82]

## III.   THE EXCHANGE ACT CLAIMS MUST BE DISMISSED FOR FAILURE TO PLEAD LOSS CAUSATION

The Equity Complaint also fails to allege the essential element of "a causal connection between the material misrepresentation and the loss." *Dura*, 544 U.S. at 342. Loss causation is generally pleaded by pointing to a "corrective disclosure" that reveals the falsity of the prior statements, followed by a drop in the stock price. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005). Plaintiffs must plead loss causation with sufficient specificity to enable the court to evaluate whether the necessary causal link exists. *Id.* at 172. In addition, the Supreme Court has recognized that a decline in stock price does not by itself indicate that the inaccuracy of a prior statement has been revealed, but may reflect a number of factors, such as "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events." *Dura*, 544 U.S. at 343.

***No Corrective Disclosure***. A disclosure is corrective only if it reveals the falsity of the prior statements at issue. *See, e.g.*, *In re Omnicom Group, Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 552 (S.D.N.Y. 2008) ("where a disclosure does not reveal the falsity of the alleged misstatements, it does not qualify as 'corrective'"), *aff'd*, 597 F.3d 501 (2d Cir. 2010). The

---

82   The Bond Notes Plaintiffs' claims that Wachovia's statements that it was "well-capitalized" or had "strong liquidity" were false are even more attenuated. They are based solely on their conclusory allegations that Wachovia misstated its Tier 1 capital and net income, which in turn are based solely on plaintiffs' unsupported claims regarding the inaccurate valuation of the Pick-a-Pay portfolio and inadequacy of Wachovia's loan loss reserves. *See* B/N ¶¶ 245, 248, 255, 257. These attacks fail for the same reason described above and because courts have held that such statements cannot form the basis of a securities fraud claim. *See Downey*, 2009 WL 2767670, at *5 (statements by a financial institution regarding its "strong" capital position too vague to be actionable).

section of the Equity Complaint titled "Loss Causation" (¶¶ 477-506) refers to several Wachovia announcements, analyst predictions, and media reports, and notes that the stock price dropped thereafter.  But none of these constitutes a corrective disclosure.  Wachovia never contradicted, corrected, or revised any descriptions of the Company's mortgage-related business or the risks associated with that business.  The Equity Complaint merely pleads that Wachovia's stock price fell following the disclosure of negative <u>developments</u> in the value of the Pick-a-Pay and CDO portfolios and quarterly results, rather than the necessary causal connection between the alleged fraud and the Equity Plaintiffs' losses.  *See Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 245 (S.D.N.Y. 2006) ("loss causation is not pled upon allegations of drops in stock price following an announcement of bad news that does not disclose the fraud"), *aff'd*, 216 Fed. App'x 14 (2d Cir. 2007); *Downey*, 2009 WL 736802, at *15 ( "the public disclosures … do not contain a disclosure of wrongdoing, and, at best, demonstrate only that the market learned of and reacted to [the company's] 'poor financial health' rather than any alleged fraud").  For this reason alone the Equity Complaint must be dismissed.

     ***Unforeseen and Uncontrollable Market Forces***.  In addition, in the face of a global market downturn, Plaintiffs "must distinguish the alleged fraud from the 'tangle of [other] factors' that affect a stock's price."  *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 2008 WL 2324111, at *7 (S.D.N.Y. June 4, 2008).  Courts have rejected securities fraud complaints on causation grounds when the claims coincided with market-wide declines.  *See First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994) (affirming dismissal of a claim brought in the wake of a real estate market downturn precisely because plaintiffs could not appropriately allege causation).  It is the Equity Plaintiffs' pleading burden to separate loss caused by alleged misstatements from loss caused by other events, yet they have

not alleged facts sufficient to show that their losses were caused by the purported misrepresentations, rather than by the unprecedented meltdown in the housing and credit markets.

Wachovia's stock collapsed amid a "once in a century credit tsunami," and the effect on other financial firms is undeniable.  Indeed, it is hard to think of a situation that better fits *Dura*'s recognition that stock losses may well be the result of "changed circumstances, … new industry-specific … facts, conditions, or other events."  The Equity Plaintiffs do not, and cannot, allege "facts sufficient to support an inference that it was defendant's fault" — rather than the sweeping market collapse — "that proximately caused plaintiff's loss."  *Lentell*, 396 F.3d at 177; *see also Lattanzio v. Deloitte & Touch LLP*, 476 F.3d 147, 158 (2d Cir. 2007) (plaintiff must "allege[] facts that would allow a factfinder to ascribe some rough proportion of the whole loss to [defendant's] misstatements").  Accordingly, for this reason too, the Equity Complaint fails to adequately plead loss causation.

## IV.   BOND NOTES PLAINTIFFS' CLAIMS SUFFER FROM STANDING AND STATUTE OF LIMITATIONS DEFECTS

For all of the reasons identified in the Underwriters' Memorandum of Law in Support of their Motion to Dismiss the Bond Notes Complaint, which the Wachovia Defendants hereby incorporate by reference, (i) the Bond Notes Plaintiffs lack standing to pursue 18 of the 30 offerings, and their claims concerning those offerings should be dismissed; and (ii) the belated claims by newly-added plaintiffs Iron Workers Locals 40, 361, 417 Union Security Funds, Hawaii Sheet Metal Workers Pension Fund, and the City of Livonia Employees' Retirement System should be dismissed as time-barred under the Securities Act. *See* Und. B/N Mem. at Parts I.A & I.B.

## V.       PLAINTIFFS' SECONDARY LIABILITY CLAIMS SHOULD BE DISMISSED

Counts II and IV of the Equity Complaint and Counts VI and VII of the Bond Notes Complaint, which allege control person liability claims against Wachovia and the Individual Defendants under Section 20(a) of the Exchange Act and Section 15 of the Securities Act, should be dismissed because plaintiffs have not pled a primary violation of the securities laws.  *ECA*, 553 F.3d at 207.  Count V of the Equity Complaint, which alleges that the Individual Defendants violated Section 20A of the Exchange Act, fails for the same reason.  *See Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 704 (2d Cir. 1994) (Section 20A claim "must plead as a predicate an independent violation of the '34 Act").

## CONCLUSION

As the Eighth Circuit observed in *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 551 (8th Cir. 1997): "While it is unfortunate that the Plaintiffs … lost money in their investments, their misfortune alone does not create a viable cause of action."

For all of the reasons stated above, the Equity and Bond Notes Complaints should be dismissed pursuant to Rules 8(a), 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, and the PSLRA.

Dated:   New York, New York
      July 14, 2010

FRIED, FRANK, HARRIS, SHRIVER
   & JACOBSON LLP

By:        */s/ Douglas H. Flaum*

Douglas H. Flaum
Israel David
Eric A. Hirsch
Courtney A. Jean
Keisha L. De Paz
Alfred L. Fatale, III
One New York Plaza
New York, New York 10004-1980
(212) 859-8000
douglas.flaum@friedfrank.com

*Attorneys for the Wachovia Defendants*

7740602