**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE WACHOVIA PREFERRED SECURITIES AND BOND/NOTES LITIGATION | Master File No. 09 Civ. 6351 (RJS) |
| | **ECF Case** |

**LEAD BOND PLAINTIFFS' MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR FINAL APPROVAL OF**
**CLASS ACTION SETTLEMENTS AND PLAN OF ALLOCATION**

**BERNSTEIN LITOWITZ**
**BERGER & GROSSMANN LLP**
Max W. Berger
Chad Johnson
William C. Fredericks
Kurt Hunciker
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
David Kessler
John Kehoe
Christopher L. Nelson
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**ROBBINS GELLER**
**RUDMAN & DOWD LLP**
Darren Robbins
John J. Rice
Keith Park
Luke Olts
 655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile (619) 231-7423

Co-Lead Counsel For Lead Bond Plaintiffs And The Settlement Class

**TABLE OF CONTENTS**

                                                                                                Page

I.      PRELIMINARY STATEMENT ........................................................................1

II.     HISTORY AND BACKGROUND OF THE ACTION .....................................5

III.    THE PROPOSED SETTLEMENTS ARE FAIR, REASONABLE AND
        ADEQUATE AND SHOULD BE APPROVED BY THE COURT ................5

        A.      The Law Favors and Encourages Settlement ...........................................5

        B.      The Settlements Are Procedurally Fair ....................................................6

        C.      The Second Circuit's Standards Governing the Substantive Fairness of
                Class Action Settlements ..........................................................................7

        D.      The Settlements Satisfy the Second Circuit Criteria for Approval ........8

                1.      The Complexity, Expense and Likely Duration of the Litigation
                        Justifies the Settlements ...............................................................8

                2.      The Reaction of the Settlement Class to the Settlements .........10

                3.      The Stage of the Proceedings and Discovery Completed ..........10

                4.      The Considerable Risk of Establishing Liability ......................11

                5.      The Considerable Risk of Establishing Damages .....................14

                6.      The Risks of Maintaining the Class Action Through Trial ........20

                7.      The Reasonableness of the Settlements in Light of the Best
                        Possible Recovery and the Attendant Risks of Litigation .........20

                8.      The Ability of the Defendants to Withstand a Greater Judgment .............22

IV.     THE PLAN OF ALLOCATION OF THE SETTLEMENT FUND IS FAIR AND
        REASONABLE AND SHOULD BE APPROVED ......................................24

V.      CONCLUSION ...............................................................................................25

i

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Beecher v. Able*,
575 F.2d 1010 (2d Cir. 1978)...............................................................................24

*Chatelain v. Prudential-Bache Sec.*,
805 F. Supp. 209 (S.D.N.Y. 1992)........................................................................20

*D'Amato v. Deutsche Bank*,
236 F.3d 78 (2d Cir. 2001)......................................................................................7

*Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974)...........................................................................*passim*

*Fait v. Regions Fin. Corp.*,
__ F.3d __, No. 10-cv-2311, 2011 WL 3667784
(2d Cir. Aug. 23, 2011)...............................................................................12, 19

*Hicks v. Morgan Stanley & Co.*,
No. 01 Civ. 10071 (RJH), 2005 WL 2757792
(S.D.N.Y. Oct. 24, 2005) ........................................................................................9

*In re "Agent Orange" Prod. Liab. Litig.*,
597 F. Supp. 740 (E.D.N.Y. 1984),
*aff'd*, 818 F.2d 145 (2d Cir. 1987) .......................................................................21

*In re Alloy, Inc. Sec. Litig.*,
No. 03 Civ. 1597 (WHP), 2004 WL 2750089
(S.D.N.Y. Dec. 2, 2004)...........................................................................................6

*In re Am. Bank Note Holographics*,
127 F. Supp. 2d 418 (S.D.N.Y. 2001)...................................................................11

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
No. 02 Cv. 5575(SWK), 2008 WL 2941219
(S.D.N.Y. July 30, 2008) .......................................................................................24

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
No. MDL 1500, 2006 WL 903236
(S.D.N.Y. Apr. 6, 2006).................................................................................11, 21

**Page**

*In re Austrian & German Bank Holocaust Litig.*,
    80 F. Supp. 2d 164 (S.D.N.Y. 2000),
    *aff'd sub. nom. D'Amato v. Deutsche Bank*,
    236 F.3d 781 (2d Cir. 2001).................................................................................12

*In re Cendant Corp. Litig.*,
    264 F.3d 201 (3d Cir. 2001)...............................................................................20

*In re Excess Value Ins. Coverage Litig.*,
    No. M-21-84RMB, 2004 WL 1724980
    (S.D.N.Y. July 30, 2004) .....................................................................................11

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    No. 02-CV-3400 (CM) (PED), 2010 WL 4537550
    (S.D.N.Y. Nov. 8, 2010) ......................................................................................10

*In re Global Crossing Sec. & ERISA Litig.*,
    225 F.R.D. 436 (S.D.N.Y. 2004) ......................................................................8, 25

*In re Holocaust Victim Assets Litig.*,
    413 F.3d 183 (2d Cir. 2001)................................................................................25

*In re Indep. Energy Holdings PLC Sec. Litig.*,
    No. 00 Civ. 6689(SAS), 2003 WL 22244676
    (S.D.N.Y. Sept. 29, 2003)...............................................................................14, 21

*In re Luxottica Group S.p.A. Sec. Litig.*,
    233 F.R.D. 306 (E.D.N.Y. 2006) ...................................................................6, 7, 25

*In re PaineWebber Ltd. P'ships Litig.*,
    171 F.R.D. 104 (S.D.N.Y.), *aff'd*,
    117 F.3d 721 (2d Cir. 1997)........................................................................ *passim*

*In re Sony SXRD Rear Projection Television Class Action Litig.*,
    No. 06 Civ 5173 (RPP), 2008 WL 1956267
    (S.D.N.Y. May 1, 2008)..................................................................................6, 9, 22

*In re The Mills Corp. Sec. Litig.*,
    265 F.R.D. 246 (E.D. Va. 2009) .........................................................................25

*In re Veeco Instruments, Inc. Sec. Litig.*,
    No. 05 MDL 01695 (CM), 2007 WL 4115809
    (S.D.N.Y. Nov. 7, 2007).............................................................................. *passim*

**Page**

*In re Visa Check/Mastermoney Antitrust Litig.*,
   297 F. Supp. 2d 503 (E.D.N.Y. 2003),
   *aff'd sub nom. Wal-Mart Stores, Inc. v. VISA U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005)..................................................................................24

*In re Warfarin Sodium Antitrust Litig.*,
   391 F.3d 516 (3d Cir. 2004)...............................................................................22

*In re Warner Commc'ns Sec. Litig.*,
   618 F. Supp. 735 (S.D.N.Y. 1985),
   *aff'd*, 798 F.2d 35 (2d Cir. 1986) .....................................................................20

*In re WorldCom, Inc. Sec. Litig.*,
   388 F. Supp. 2d 319 (S.D.N.Y. 2005)................................................................24

*Joel A. v. Giuliani*,
   218 F.3d 132 (2d Cir. 2000).................................................................................5

*Maley v. Del Global Techs. Corp.*,
   186 F. Supp. 2d 358 (S.D.N.Y. 2002)....................................................22, 24, 25

*Milstein v. Huck*,
   600 F. Supp. 254 (E.D.N.Y. 1984) .......................................................................8

*Newman v. Stein*,
   464 F.2d 689 (2d Cir. 1972)............................................................................6, 21

*Strougo v. Bassini*,
   258 F. Supp. 2d 254 (S.D.N.Y. 2003)...............................................................8, 9

*Taft v. Ackermans*,
   No. 02 Civ. 7951 (PKL), 2007 WL 414493
   (S.D.N.Y. Jan. 31, 2007).......................................................................................5

*Wal-Mart Stores, Inc. v. VISA U.S.A. Inc.*,
   396 F.3d 96 (2d Cir. 2005)...........................................................................5, 6, 21

*Weinberger v. Kendrick*,
   698 F.2d 61 (2d Cir. 1982)..............................................................................5, 6

*Wright v. Stern*,
   553 F. Supp. 2d 337 (S.D.N.Y. 2008)...................................................................5

**Page**

**STATUTES & RULES**

Section 11(e), 15 U.S.C.§ 77k(e)........................................................................14, 18

Fed. R. Civ. P. Rule 23(e)......................................................................................1, 5


**SECONDARY AUTHORITIES**

4 Alba Conte, Herbert B. Newberg, *Newberg on Class Actions* (4th ed. 2002)
      §11.45.............................................................................................................10

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Orange County Employees' Retirement System ("Orange County"), Louisiana Sheriffs' Pension and Relief Fund ("Louisiana Sheriffs") and Southeastern Pennsylvania Transportation Authority ("SEPTA") (collectively, "Lead Bond Plaintiffs"), by and through their counsel ("Lead Counsel"), respectfully move this Court for an order approving the proposed settlements reached in the above-captioned securities class action (the "Action") and approving the proposed Plan of Allocation of settlement proceeds.[1]

## I.    PRELIMINARY STATEMENT

The settlements before the Court for final approval provide for total settlement payments of $627 million in cash, plus interest thereon, and consist of (a) a $590 million cash settlement with the Wachovia Defendants (the "Wachovia Settlement"), and (b) a $37 million cash settlement with defendant KPMG LLP ("KPMG") (the "KPMG Settlement"), Wachovia's former outside auditor. The Wachovia Settlement and the KPMG Settlement are referred to collectively as the "Settlements," and the Wachovia Defendants and KPMG are collectively referred to as the "Settling Defendants."  If approved, the Settlements will resolve all claims asserted in the Action against the Settling Defendants by the Lead Bond Plaintiffs and the Settlement Class.  Approval of the Wachovia Settlement will (subject to certain conditions that Lead Counsel expect will be satisfied by the date of the Settlement Hearing) also resolve all claims asserted against the Underwriter Defendants.

Based on the exceptional size of the recoveries obtained – both in absolute dollar terms and as a percentage of reasonably recoverable damages, and all in the face of daunting litigation risks –

---

[1] All capitalized terms not otherwise defined herein have the meaning ascribed to them in the Stipulation and Agreements of Settlement dated as of August 5, 2011 (the "Stipulation") previously filed with the Court (Dkt. No. 136-1).

the Settlements represent a truly extraordinary result for the Settlement Class.  The combined Settlements, if approved, would be the fourteenth (14th) largest recovery ever in federal securities class action history, and Lead Counsel believe that the Settlements represent the single largest recovery ever for securities class action claims brought solely under the Securities Act of 1933 (the "Securities Act").  Moreover, the Total Settlement Amount represents roughly 30% to 50% of the reasonably recoverable damages that Lead Counsel would have been able to credibly present to a jury, a percentage well in excess of typical recoveries in securities class actions.  The recoveries are even more exceptional when one considers that they were achieved in the absence of any Department of Justice, Securities and Exchange Commission ("SEC"), or other governmental agency having filed any claims or charges for violations of any federal or state securities laws or regulations arising out of the events at issue in this litigation, much less recovering any money for aggrieved investors.  Taken together, the Settlements represent the largest recovery ever in a securities class action where there was neither a government action on which plaintiffs could at least partly build their case nor a restatement of the financial statements at issue.

The Settlements are the culmination of over two and a half years' worth of vigorous prosecution by Lead Counsel, which included (among other things): (a) Lead Counsel's extensive investigation into the claims asserted; (b) the preparation of two exceptionally researched and detailed complaints; (c) the drafting of two comprehensive sets of motion papers in opposition to the multiple motions to dismiss filed by each of the three groups of defendants (the Wachovia Defendants, KPMG and the Underwriter Defendants); (d) the preparation of additional materials for, and participation in, protracted settlement negotiations with the Wachovia Defendants under the auspices of a highly respected mediator, Judge Daniel Weinstein (Ret.) of JAMS; (e) the completion of comprehensive discovery from Wachovia ; (f) the negotiation, also under the auspices of Judge

Weinstein, and also after multiple days of face-to-face mediation, of the KPMG Settlement; and (g) the negotiation of the final terms of the Stipulation, which is now before the Court for final approval.

Pursuant to the Court's August 9, 2011 Order Preliminarily Approving Proposed Settlements and Providing for Notice (the "Preliminary Approval Order") (Dkt. No. 139) – which preliminarily approved the Stipulation and the Wachovia and KPMG settlements subject to further review at the Settlement Hearing – the Court certified the Settlement Class, for purposes of settlement only, and approved the forms of the long-form Notice, Summary Notice, and Claim Form.[2]  In addition, pursuant to the Preliminary Approval Order, (a) The Garden City Group, Inc. ("GCG"), the Court-appointed Claims Administrator in the Action, has mailed the Notice and Claim Form to over 206,000 potential Settlement Class Members; (b) the Summary Notice has been widely disseminated through the *PR Newswire* and published in *The Wall Street Journal*, *The New York Times* and the *Financial Times*; and (c) the Notice, Claim Form, Summary Notice, Stipulation, Preliminary Approval Order, and Amended Consolidated Class Action Complaint dated May 28, 2010 (the "Amended Complaint"), have been posted on the settlement website, www.WachoviaBondLitigation.com.  *See* Affidavit of Stephen J. Cirami Regarding (A) Mailing of the Notice and Proof of Claim; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date (the "Cirami Affidavit" or "Cirami Aff."), at ¶¶ 2-10.

---

[2] The Settlement Class, as certified in the Court's Preliminary Approval Order, consists of all Persons who purchased or otherwise acquired Bond Class Securities during the Settlement Class Period, and were damaged thereby.  Certain persons and entities are excluded from the Settlement Class as set forth in the Preliminary Approval Order.  Also excluded from the Settlement Class are any persons who exclude themselves by filing a request for exclusion in accordance with the requirements set forth in the Notice.  The basis for class certification is set forth in Lead Bond/Notes Plaintiffs' Memorandum of Law in Support of Motion for (I) Preliminary Approval of Settlements with Wachovia Defendants and KPMG LLP, (II) Certification of the Settlement Class for Purposes of the Settlements and (III) Approval of Notice to the Settlement Class, filed August 5, 2011 (Dkt. No. 137), which is incorporated herein by reference.

The Notice advised Settlement Class Members of the material terms of the Settlements and also advised them of their right to (a) exclude themselves from the Settlement Class; (b) to object to any aspect of the Settlements, the Plan of Allocation, or the Fee and Expense Application; and (c) to submit a Claim Form in order to be eligible to receive a share of the proceeds of the Settlements. The Notice also informed Settlement Class Members of the procedures to be followed to exercise these rights.

The Court-ordered deadline for filing objections to the Settlements, the Plan of Allocation or the Fee and Expense Application, and for submitting requests for exclusion from the Settlement Class, is October 25, 2011.  To date, Lead Counsel have received no objections to the Settlements or Plan of Allocation and only a handful of exclusion requests from individuals.  Lead Plaintiffs will address any objections, and address all exclusion requests collectively, in their supplemental submission to be filed on November 7, 2011, as provided for in the Preliminary Approval Order.

In light of the tremendous results achieved, Lead Counsel's informed assessment of the strengths and weaknesses of the claims and defenses asserted, obtained through over two and a half years of vigorous litigation, the review and analysis of millions of pages of documents and interviews of hundreds of fact witnesses, the current absence of opposition to the Settlements, and the considerable risks and delays associated with continued litigation and trial, Lead Bond Plaintiffs and Lead Counsel believe that the Settlements are eminently fair, reasonable, and adequate. Accordingly, Lead Bond Plaintiffs and their counsel respectfully request that the Court grant final approval of the Settlements.  Finally, the Plan of Allocation, which was developed with the assistance of Lead Bond Plaintiffs' damages expert, is a fair and reasonable method for distributing the Net Settlement Fund to Settlement Class Members, and should also be approved by the Court.

## II.     HISTORY AND BACKGROUND OF THE ACTION

The Court is respectfully referred to the accompanying Joint Declaration of William C. Fredericks, John J. Rice and David Kessler in Support of (A) Lead Bond Plaintiffs' Motion for Final Approval of Class Action Settlements and Plan of Allocation and (B) Lead Bond Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Expenses ("Joint Decl.") for a full discussion of, *inter alia*, the factual background and procedural history of the Action, the extensive investigation undertaken by Lead Counsel, the substantial litigation efforts of Lead Counsel, the findings of Lead Counsel during discovery, the significant risks of continued litigation, and the mediator-assisted negotiations leading to the Settlements.

## III.    THE PROPOSED SETTLEMENTS ARE FAIR, REASONABLE AND ADEQUATE AND SHOULD BE APPROVED BY THE COURT

### A.     The Law Favors and Encourages Settlement

Rule 23(e) requires that the settlement of a class action be approved by the court.  A court may approve a settlement that binds a class only if it determines that the settlement is "fair, adequate, and reasonable, and not a product of collusion." *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000).  This evaluation requires the court to consider "both the settlement's terms and the negotiating process leading to settlement." *Wal-Mart Stores, Inc. v. VISA U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005); *Wright v. Stern*, 553 F. Supp. 2d 337, 343 (S.D.N.Y. 2008).  While the decision to grant or deny approval of a settlement lies within the broad discretion of the trial court, a general policy favoring settlement exists, especially with respect to class actions.  *Wal-Mart*, 396 F.3d at 116; *Wright*, 553 F. Supp. 2d at 343; *In re Veeco Instruments, Inc. Sec. Litig.*, No. 05 MDL 01695 (CM), 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007); *Taft v. Ackermans*, No. 02 Civ. 7951 (PKL), 2007 WL 414493, at *4 (S.D.N.Y. Jan. 31, 2007).  *See also Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982) (The settlement of complex class action litigations are clearly favored by

the courts.).  Moreover, "[c]lass action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation."  *In re Luxottica Group S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006); *see also Weinberger*, 698 F.2d at 73 ("There are weighty justifications, such as the reduction of litigation and related expenses, for the general policy favoring the settlement of litigation.").

Recognizing that a settlement represents an exercise of judgment by the negotiating parties, the Second Circuit has cautioned that, while a court should not give "rubber stamp approval" to a proposed settlement, it should "stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case."  *Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974); *Veeco*, 2007 WL 4115809, at *5.  As stated by the court in *Newman v. Stein*, 464 F.2d 689 (2d Cir. 1972),

> the role of a court in passing upon the propriety of the settlement of a derivative or other class action is a delicate one.  . . . [W]e recognized that since "'the very purpose of a compromise is to avoid the trial of sharply disputed issues and to dispense with wasteful litigation', the court must not turn the settlement hearing 'into a trial or a rehearsal of the trial'."

*Id.* at 691-92 (citation omitted).

## B.    The Settlements Are Procedurally Fair

A strong initial presumption of fairness attaches to a proposed settlement if it is reached by experienced counsel as a result of arm's-length negotiations after meaningful discovery, and great weight is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation.  *Wal-Mart*, 396 F.3d at 116; *In re Sony SXRD Rear Projection Television Class Action Litig.*, No. 06 Civ. 5173 (RPP), 2008 WL 1956267, at *5 (S.D.N.Y. May 1, 2008) ("*Sony*"); *Luxottica Group*, 233 F.R.D. at 315; *see also In re Alloy, Inc. Sec. Litig.*, No. 03 Civ. 1597 (WHP), 2004 WL 2750089, at *1-*2 (S.D.N.Y. Dec. 2, 2004).  A court should find the negotiating process is fair where, as here, "the settlement resulted from 'arm's-length negotiations

and that plaintiffs' counsel have possessed the experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests.'"  *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (citation omitted); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y.) ("So long as the integrity of the arm's length negotiation process is preserved . . . a strong initial presumption of fairness attaches to the proposed settlement."), *aff'd*, 117 F.3d 721 (2d Cir. 1997).

This initial presumption of fairness and adequacy applies here.  The Settlements were reached at a time when the Settling Parties had a thorough understanding of the strengths and weaknesses of their respective positions, were the result of intense, arms'-length negotiations, including several in-person mediation sessions with the substantial assistance of Judge Daniel Weinstein (Ret.), a highly experienced and respected securities class action mediator, under the authority of Lead Bond Plaintiffs, who are each sophisticated institutional investors.  Joint Decl. at ¶¶ 69-78, 88-99.  In addition, no question exists that Lead Counsel – equipped with knowledge from over two and a half years of vigorous litigation, including extensive briefing on two rounds of motions to dismiss, substantial factual investigation and interviews with over 300 confidential witnesses, and a thorough evaluation of Lead Bond Plaintiffs' claims – were fully informed of the merits and weaknesses of the case by the time the Settlements were reached.  Joint Decl. at ¶¶ 5, 30-34, 36-57.  Thus, the Settlements are entitled to a presumption of procedural fairness under Second Circuit law.

### C.    The Second Circuit's Standards Governing the Substantive Fairness of Class Action Settlements

Courts within the Second Circuit observe the universal standard for determining whether a proposed class settlement is substantively fair: whether the proposed settlement is "'fair, reasonable, and adequate.'"  *Luxottica Group*, 233 F.R.D. at 310 (citation omitted).  The Second Circuit has

identified nine factors that courts consider in deciding whether to approve the settlement of a class action:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Grinnell*, 495 F.2d at 463 (citations omitted).  All nine factors need not be satisfied.  Instead, the court should look at the totality of these factors in light of the specific circumstances involved.  *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 456 (S.D.N.Y. 2004).

As demonstrated below, the Settlements satisfy the standards set forth in *Grinnell*.  Indeed, the Settlements represent an extraordinary recovery for the Settlement Class, and, in the judgment of Lead Counsel, there is serious doubt that a more favorable result could have been obtained following further litigation.  As such, the Settlements clearly warrant this Court's final approval.

**D.      The Settlements Satisfy the Second Circuit Criteria for Approval**

**1.      The Complexity, Expense and Likely Duration of the Litigation Justifies the Settlements**

"The expense and possible duration of the litigation are major factors to be considered in evaluating the reasonableness of [a] settlement." *Milstein v. Huck*, 600 F. Supp. 254, 267 (E.D.N.Y. 1984).  *See also Strougo v. Bassini*, 258 F. Supp. 2d 254, 258 (S.D.N.Y. 2003) ("'[I]t is beyond cavil that continued litigation in this multi-district securities class action would be complex, lengthy, and expensive, with no guarantee of recovery by the class members.'") (citation omitted).  Here, the Securities Act claims advanced by Lead Bond Plaintiffs involve numerous complex legal and factual matters relating to proof of both liability and damages, especially given the unprecedented and tumultuous condition of the financial markets during 2006-2008, and would have also required

8

expert testimony from both sides on a variety of accounting, valuation, damages and loss causation issues.  *See* Joint Decl. at ¶¶ 135-171.

There can be no doubt that because the Action is settling at this time, the litigants have avoided the delay and expense of continued litigation and trial, and the potential for appeals.  Many hours of the Court's time and resources required to complete discovery, to rule on the anticipated motions for class certification and summary judgment, to consider the numerous pretrial motions that would have been made and to conduct the trial itself have also been spared.  Moreover, had the Court granted KPMG's motion for reconsideration, had KPMG's motion for interlocutory appeal been accepted and granted at the appellate level, or had the Court ultimately granted summary judgment to Defendants on any of Lead Bond Plaintiffs' claims, the Settlement Class's potential recovery could have been significantly reduced or eliminated, and the Defendants might well have been disincentivized to settle.  Moreover, even if the Settlement Class might have been able to recover a larger judgment after a trial, the additional delay through the inevitable post-trial motions and the appellate process would have likely denied the Settlement Class any recovery for years – making the instant Settlements a particularly valuable "bird in the hand."  *See Sony*, 2008 WL 1956267, at *6; *Strougo*, 258 F. Supp. 2d at 261 ("even if a shareholder or class member was willing to assume all the risks of pursuing the actions through further litigation . . . the passage of time would introduce yet more risks . . . and would, in light of the time value of money, make future recoveries less valuable than this current recovery"); *Hicks v. Morgan Stanley & Co.*, No. 01 Civ. 10071 (RJH), 2005 WL 2757792, at *6 (S.D.N.Y. Oct. 24, 2005) ("Further litigation would necessarily involve further costs [and] justice may be best served with a fair settlement today as opposed to an uncertain future settlement or trial of the action.").

Settlements for a total of $627 million at this juncture result in an immediate and substantial tangible recovery without the considerable risk, expense and delay of trial and likely appeals. Lead Counsel submit that this factor weighs heavily in favor of the proposed Settlements.

### 2. The Reaction of the Settlement Class to the Settlements

The reaction of the Settlement Class to the Settlements is a significant factor in assessing its fairness and adequacy. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02-CV-3400 (CM) (PED), 2010 WL 4537550, at *16 (S.D.N.Y. Nov. 8, 2010); *Veeco*, 2007 WL 4115809, at *7. Here, in response to a wide-ranging Court-approved notice program, not a single Settlement Class Member has objected to any aspect of the Settlements to date, and only a handful of exclusion requests have been received from individual investors. Joint Decl. at ¶¶ 6-8, 183. As important, each of the three institutional investors serving as Lead Bond Plaintiffs in this Action supports approval of the Settlements. Joint Decl. at ¶ 184. *See Veeco*, 2007 WL 4115809, at *5 (a settlement reached "under the supervision and with the endorsement of a sophisticated institutional investor . . . is 'entitled to an even greater presumption of reasonableness'") (citation omitted). The reaction of the Settlement Class and support of the Lead Bond Plaintiffs underscores the propriety of the Settlements and supports approval of them.

### 3. The Stage of the Proceedings and Discovery Completed

"There is no precise formula for what constitutes sufficient evidence to enable the court to analyze intelligently the contested questions of fact. It is clear that the court need not possess evidence to decide the merits of the issue, because the compromise is proposed in order to avoid further litigation. . . . At minimum, the court must possess sufficient information to raise its decision above mere conjecture." 4 Alba Conte, Herbert B. Newberg, *Newberg on Class Actions* §11:45, at 127, 128 (4th ed. 2002). There is no question that this case had reached the point where the parties could make an intelligent, informed appraisal of the case.

Lead Counsel have negotiated the Settlements after two and a half years of vigorous litigation, which included the identification and informal interviews of hundreds of potential witnesses, extensive research and investigation in preparing the Amended Complaint and responding to two rounds of motions to dismiss filed by three separate groups of defendants.  Lead Counsel also reviewed and analyzed more than 9 million pages of documents produced by Settling Defendants, and consulted extensively with their well-respected damages expert prior to presenting these Settlements for the Court's final approval.  Joint Decl. at ¶¶ 85, 101, 174-177.  Lead Counsel also thoroughly researched the applicable law with respect to Lead Bond Plaintiffs' claims and the Defendants' potential defenses thereto, and exchanged two sets of comprehensive motion to dismiss briefs as well as highly detailed mediation statements in this regard.  As a result, Lead Counsel had a clear picture of the strengths and weaknesses of this case and of the legal and factual defenses that Defendants would likely raise at trial, and accordingly had sufficient information to intelligently negotiate the terms of the Settlements.  *See In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, No. MDL 1500, 2006 WL 903236, at *10 (S.D.N.Y. Apr. 6, 2006) ("The relevant inquiry for this factor is whether the plaintiffs have obtained a sufficient understanding of the case to gauge the strengths and weaknesses of their claims and the adequacy of the settlement."); *In re Excess Value Ins. Coverage Litig.*, No. M-21-84RMB, 2004 WL 1724980, at *12 (S.D.N.Y. July 30, 2004) ("The investigation, discovery, and motion practice conducted to date provide Plaintiffs with 'sufficient information to make an informed judgment on the reasonableness of the settlement proposal.'") (citation omitted); *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 127 F. Supp. 2d 418, 425-26 (S.D.N.Y. 2001).  This factor also supports the Settlements.

### 4.    The Considerable Risk of Establishing Liability

In assessing the Settlements, the Court should balance the benefits afforded the Settlement Class, including the immediacy and certainty of a recovery, against the continuing risks of litigation.

11

*See Grinnell*, 495 F.2d at 463; *Veeco*, 2007 WL 4115809, at *8; *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 177 (S.D.N.Y. 2000), *aff'd sub. nom. D'Amato v. Deutsche Bank*, 236 F.3d 781 (2d Cir. 2001). Here, Lead Bond Plaintiffs would have confronted a number of substantial challenges in establishing liability at both summary judgment and trial.

Cases which arise primarily under Sections 11 and 12 of the Securities Act typically involve complex issues of law and fact and a high degree of litigation risk, and this Action is no exception. In addition, the risks and potential complexities of pursuing the claims asserted in the Action have recently increased in the wake of the Second Circuit's decision in *Fait v. Regions Fin. Corp.*, __ F.3d __, No. 10-cv-2311, 2011 WL 3667784 (2d Cir. Aug. 23, 2011) ("*Fait*"), which was decided less than three weeks after the final terms of the Stipulation were agreed to. Joint Decl. at ¶ 135.

With respect to the Wachovia Defendants, Lead Bond Plaintiffs faced very significant risks of establishing liability involving, among other things, the following issues: (a) the implications of the Court's ruling in its March 31, 2011 Opinion and Order ("March 31 Opinion") that certain allegedly inaccurate statements concerning the nature and quality of the underwriting of the residential mortgages contained in Wachovia's "Pick-A-Pay" loan portfolio were not actionable as a matter of law; (b) the ability of Lead Bond Plaintiffs to prove that the Offering Materials materially misrepresented the Pick-A-Pay portfolio's LTV ratios; (c) the actionability of certain other key alleged misstatements, including (i) the extent to which the Court intended to sustain non-LTV-related claims and (ii) the extent to which inaccurate statements concerning Wachovia's loan loss reserves, goodwill, CDO valuations and Tier 1 capital levels were "opinions" for which Defendants are not liable under *Fait* absent proof that they did not actually believe in their truth; (d) the complex accounting and valuation issues in this case, where the proof would have turned heavily on the jury's reactions to the parties' "battle of the experts"; and (e) the risk that Defendants would be able to

defeat a significant portion of Lead Bond Plaintiffs' claims on statute of limitations grounds.  Joint Decl. at ¶¶ 136-148.

The foregoing risks of litigation apply with at least equal force to KPMG – except that the risks of establishing KPMG's liability with respect to certain issues is even higher than it is with respect to the Wachovia Defendants.  For example, KPMG's potential liability was always limited solely to alleged misstatements contained in the financial statements themselves, and hence never included liability for alleged misrepresentations concerning the nature or quality of the Pick-A-Pay loan portfolio, or its LTV ratios.  Joint Decl. at ¶ 149.

In addition, as a secondary actor, KPMG would likely have argued that it was particularly well-suited to take full advantage of the *Fait* decision, as Lead Bond Plaintiffs' claims against KPMG were (according to KPMG) predicated on KPMG's "mere opinion" as to the reasonableness of Wachovia's "opinion" as to the appropriateness of its reported loan loss reserves and stated valuations of goodwill, CDO assets and Tier 1 capital levels.  In other words, KPMG would have predictably argued that for Lead Bond Plaintiffs to establish KPMG's liability, they would have to establish both Wachovia's "disbelief" in these accounting figures *and* then further establish that KPMG also "disbelieved" the same numbers.  Joint Decl. at ¶ 150.

Also, in contrast to Wachovia (and certain other Wachovia-controlled entities also named as defendants) that were the "issuers" of the Bond Class Securities, KPMG had the opportunity to establish an affirmative "due diligence" defense to liability.  Accordingly – even if *Fait* were found to have no material impact on pre-existing rules for establishing Section 11 liability for auditors, and even if Lead Bond Plaintiffs were able to establish that every challenged aspect of Wachovia's audited financial statements was in fact misstated – KPMG would still have had the opportunity, through expert testimony and otherwise, to persuade the jury that its audit work was thorough and

13

diligent, and that any misstatements or inaccuracies in the financial statements were due, for example, to Wachovia's failure to appropriately inform KPMG of the extent to which the quality of Pick-A-Pay portfolio and the underwriting of that portfolio was much worse than what KPMG (and the public at large) had understood it to be.  Joint Decl. at ¶ 151.

Finally, and particularly in the wake of the $590 million Wachovia Settlement, KPMG would have also argued that it was entitled to favorable proportionate fault and judgment reduction treatment as a non-settling defendant.  Accordingly, as a practical matter, Lead Bond Plaintiffs were never likely to be able to recover more than a fraction of the total damage amount against KPMG.  Joint Decl. at ¶ 152.

### 5.    The Considerable Risk of Establishing Damages

Lead Bond Plaintiffs also faced substantial risks in establishing damages had the litigation continued.  *See In re Indep. Energy Holdings PLC Sec. Litig.*, No. 00 Civ. 6689 (SAS), 2003 WL 22244676, at *3-*4 (S.D.N.Y. Sept. 29, 2003) (noting difficulty of proving damages in securities cases).

Under the federal securities laws, market loss does not equate with damages.  Indeed, it is fundamental that there can be no recovery in a Section 11 case where the loss was caused by factors unrelated to the alleged false statement or omission, and under Section 11(e) of the Securities Act each defendant may limit his, her or its liability to only that portion of the investors' losses that reflects the amount by which the inflation in the price of the securities at issue was caused by the alleged inaccuracies in the Offering Materials.  *See* 15 U.S.C. §77k(e) ("[I]f the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary

to make the statements therein not misleading, such portion of or all such damages shall not be recoverable.").  Joint Decl. at ¶ 155.

In this case, the amount of damages which Lead Bond Plaintiffs could have ultimately recovered for the Settlement Class after taking into account causation issues was a matter of serious and significant dispute.  Joint Decl. at ¶ 156.  Some of Defendants' main arguments in this regard included the following:

First, Defendants argued that the market-changing events of the financial crisis of 2008 constituted an unforeseen and unprecedented crisis that was the worst crisis since the Great Depression, and that it was this crisis that was the actual cause of all (or at least most) of any losses suffered by investors in the Bond Class Securities.  Similarly, Defendants contended that it was simply absurd to expect a jury to believe that every price decline experienced by the Bond Class Securities over more than a two-year long period (from the date of the first offering in July 2006 through the end of the Settlement Class Period) was caused by inaccuracies in the Offering Materials, and that an appropriate damages analysis would necessarily be based on an analysis limited to statistically significant trading dates.  Joint Decl. at ¶ 157.

Second, Defendants argued that it was well-understood (*inter alia*) that (a) the basic underwriting theory behind the Pick-A-Pay portfolio, based on historical experience, was that home mortgage loans originated with a 20% or greater equity cushion would experience minimal losses in the event of default, and that (b) more than 50% of the portfolio consisted of mortgages on houses located in California and Florida.  Accordingly, Defendants argued, under normal (or even just plain bad) market conditions, the equity value "cushion" imbedded in the collateral underlying the Pick-A-Pay portfolio would have still been sufficient to insulate Wachovia from substantial financial losses, and any resulting portfolio stresses (while potentially reducing the value of Wachovia's common

15

stock) would have had minimal impact on the value of Wachovia's Notes and Preferred Stock. However, as Defendants pointed out, a jury could have found that conditions in the housing market by the second half of 2008 were not just "bad," but amounted to a financial disaster in which home prices generally fell an unprecedented 26% nationwide, with much worse declines in California and Florida.  In other words, given the size of the "tsunami" that hit the housing markets (particularly in California and Florida), Defendants argued that huge losses in the Pick-A-Pay portfolio were inevitable regardless of other factors alleged in the Amended Complaint (such as inadequate reserves, low-FICO score borrowers, and inadequate income verification).  Joint Decl. at ¶ 158.

Third, Defendants also argued that their explanations as to why the prices of many of the Bond Class Securities declined was supported by the fact that by early 2011 the prices of all but a handful of the Bond Class Securities had recovered fully (or nearly so) since the worst days of the Fall 2008 to March 2009 period (when U.S. financial markets hit bottom).  According to Defendants, this price recovery constituted clear evidence of a lack of permanent impairment in the Pick-A-Pay portfolio, and that the temporary price declines suffered in 2008 were far more likely to have been caused by uncertainty surrounding the financial crisis (and related temporary liquidity concerns) rather than a supposed revelation that the Pick-A-Pay portfolio was not as conservatively underwritten as investors were led to believe.  Joint Decl. at ¶ 159.

Fourth, Defendants also pointed out that none of the Bond Class Securities had ever defaulted, and argued that there would be no recoverable damages with respect to any investors who held such securities through maturity.  Given that the Bond Class Securities with respect to 17 of the 30 Offerings at issue in this Action would have matured by the end of August 2013, if this case were taken to trial the prospects were remote that there would be any recoverable damages for continuing holders of such securities by the date the trial started.  Joint Decl. at ¶ 160.

Fifth, Defendants also took issue with various aspects of the trading model that Lead Bond Plaintiffs' damages expert used to estimate class-wide damages. For example, Defendants contended that Lead Bond Plaintiffs' expert overestimated the volume of securities actually traded by failing to make appropriate adjustments for intra-day trading. Joint Decl. at ¶ 161.

In sum, based on the Wachovia Defendants' expert's analysis of damages, the Wachovia Defendants averred that total recoverable damages that could be found by a jury in this Action were zero, or *at best,* near zero, after taking into account their evidence that all (or at least an overwhelming percentage) of any putative damages were actually caused by the "financial tsunami" and/or other factors not properly attributable to any allegedly inaccurate statements contained in the Offering Materials. Joint Decl. at ¶¶ 162, 166 and 170.

For their part, Lead Bond Plaintiffs had always appreciated that any credible estimate of damages would have to take into account loss causation (or "negative causation") considerations. Accordingly, at Lead Counsel's request, Lead Bond Plaintiffs' damages expert performed various estimates of potentially recoverable damages using a number of different methodologies that used various market indices (and various combinations thereof) as a proxy for the expected impact of reasonable negative causation arguments. These indices were then applied to adjust observed changes in market price that occurred on various sets of potentially relevant dates, including (a) all dates within the Settlement Class Period involving disclosures of news relating to the home mortgage industry generally or Wachovia specifically; (b) all such dates within the Settlement Class Period but controlled to include only dates on which there were statistically significant price changes; and (c) all dates within the Settlement Class Period involving statistically significant price changes, as controlled to eliminate dates not involving disclosures of Wachovia-specific or Wachovia-related news. In connection with performing the foregoing analyses, an event study was

17

performed that covered the relevant multi-year period to identify "broadly relevant" news days and "Wachovia-specific" news days, and customary regression analyses were used to identify dates on which price movements in the most heavily traded Bond Class Securities were statistically significant.  Moreover, for each of the foregoing damages scenarios, damages were estimated based on two different legal assumptions:  (a) the assumption that the involuntary conversion of three preferred stock securities that took place on December 31, 2008 constituted a "market disposition" of those securities within the meaning of §11(e)(2) of the Securities Act, and (b) the assumption that said conversions did not constitute a "market disposition."  Joint Decl. at ¶ 163.

Based on the foregoing detailed analyses, predicated on the specific facts of this case, Lead Bond Plaintiffs' expert initially developed a range of reasonably recoverable damages of between roughly $1.569 and $2.505 billion.  However, in the wake of Lead Counsel's intense discussions over damages-related questions and the Court's ruling on standing, Lead Counsel (in consultation with their damages expert) modified Lead Bond Plaintiffs' initial damages estimates to take into account (a) the Court's March 31, 2011 dismissal of all claims predicated on certain smaller Offerings for which there was no named plaintiff with standing; (b) Defendants' arguments that damages would inevitably be reduced over time as certain Bond Class Securities were paid off in full (as to both principal and interest) before this case would be tried to a judgment; and (c) certain modest "technical" adjustments to Lead Bond Plaintiffs' expert's trading model assumptions that would not (in Lead Counsel's view) have been worth disputing in front of a jury.  Joint Decl. at ¶ 164.

Taking into account these further adjustments and after further consultations with their damages expert on the specific facts of this case, Lead Counsel have determined that the maximum range of reasonably recoverable damages that they would have been able to credibly present to a jury

18

in this Action was between roughly $1.2 and $2.05 billion.  Accordingly, Lead Counsel's best estimate is that the total amount of the Settlements represents approximately 30% to 50% of maximum reasonably recoverable damages.  Joint Decl. at ¶ 165.

Finally, it should be stressed that the risks of establishing a "high end" damages result could well have been significantly complicated here by both the Second Circuit's *Fait* decision and Defendants' efforts to reargue their motions to dismiss based on perceived "ambiguities" in the Court's March 31 Opinion,.  For example, if this Court were to (a) clarify its March 31 Opinion in a way that made clear that the Offering Materials' statements regarding the "pristine," "conservative" and "risk-averse" nature of the Pick-A-Pay portfolio were "inactionable puffery," or that narrowed the "actionable" claims to the LTV-related claims; and/or (b) hold on reconsideration post-*Fait* that some or all of Lead Bond Plaintiffs' "accounting misstatement claims" (for inaccurate accounting entries for loan loss reserves, goodwill, CDO assets and/or Tier 1 capital levels) were opinions, then Defendants might well have been able to attribute a significant percentage of any putative damages to investor reliance on "opinions" that, even if mistaken, were arguably inactionable.  Joint Decl. at ¶ 167.

As is clear from the above discussion, the presentation of damages is a complex matter that would require the presentation of expert testimony.  As a result, Lead Counsel always knew that the trial of the Action would ultimately involve a "battle of experts" on this issue – a battle in which no party is ever assured to prevail.  Lead Counsel believe that reliable and convincing expert testimony can be provided on the damages issues, and that a judgment could ultimately be obtained for damages available under the law.  However, there are substantial risks in presenting expert testimony.  It is always possible that, in the unavoidable "battle of experts," a jury might disagree with the Lead Bond Plaintiffs' damages expert, or find Defendants' expert more persuasive.  *See,*

19

*e.g.*, *PaineWebber*, 171 F.R.D. at 129 (noting unpredictability of outcome of battle of damage experts); *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 744-45 (S.D.N.Y. 1985) ("In this 'battle of experts,' it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found to have been caused by actionable, rather than the myriad nonactionable factors such as general market conditions."), *aff'd*, 798 F.2d 35 (2d Cir. 1986). *See also In re Cendant Corp. Litig.*, 264 F.3d 201, 239 (3d Cir. 2001) ("establishing damages at trial would lead to a 'battle of experts' . . . with no guarantee whom the jury would believe"). As a result, proving damages, even assuming the Lead Bond Plaintiffs prevailed on liability, is difficult. *See Veeco*, 2007 WL 4115809, at *9. This factor also weighs in favor of the Settlements since there was a very real risk that the Settlement Class would have recovered an amount significantly less than the $627 million – or even nothing at all.

### 6.   The Risks of Maintaining the Class Action Through Trial

Had the Settlements not been reached, there is no assurance that a class would have been certified. And since a court may exercise its discretion to re-evaluate the appropriateness of class certification at any time, there is no assurance it would have been maintained if initially certified. *See Chatelain v. Prudential-Bache Secs., Inc.*, 805 F. Supp. 209, 214 (S.D.N.Y. 1992) ("Even if certified, the class would face the risk of decertification."). Absent settlement, Lead Counsel expected that Defendants would seek to have many of the claims of the class not certified on, *inter alia*, standing grounds, or would have sought to alter the class period. The Settlements avoid any uncertainty with respect to these issues. Joint Decl. at ¶169.

### 7.   The Reasonableness of the Settlements in Light of the Best Possible Recovery and the Attendant Risks of Litigation

In general, the adequacy of the amount offered in settlement must be judged "not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the

strengths and weaknesses of plaintiffs' case." *In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984), *aff'd*, 818 F.2d 145 (2d Cir. 1987). "[T]he Court is not to compare the terms of the Settlement with a hypothetical or speculative measure of a recovery that might be achieved by prosecution of the litigation to a successful conclusion." *Veeco*, 2007 WL 4115809, at *11. The Court need only determine whether the Settlements fall within a "'range of reasonableness.'" *PaineWebber*, 171 F.R.D. at 130 (citation omitted); *Newman*, 464 F.2d at 693 ("[I]n any case there is a range of reasonableness with respect to a settlement.").

The Settlements here easily satisfy this test. As discussed above, the $627 million represents a recovery of roughly 30%-50% of the reasonably recoverable damages that Lead Counsel would have been able to credibly present to a jury, well in excess of more typical recoveries in securities class action lawsuits. Joint Decl. at ¶¶ 170-171. *See also Indep. Energy*, 2003 WL 22244676, at *4 (noting few cases tried before jury result in the full amount of damages claimed). The Second Circuit has described the "'range of reasonableness'" as "'a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in . . . any litigation.'" *Wal-Mart*, 396 F.3d at 119 (quoting *Newman*, 464 F.2d at 693).

In addition, in analyzing the reasonableness of the Settlements, the Court should consider that the Settlements provide for payment to the Settlement Class now, rather than a speculative payment many years down the road, without any further risk to the Settlement Class. *See AOL Time Warner*, 2006 WL 903236, at *13 (where the settlement fund is in escrow and earning interest for the class, "the benefit of the Settlement will . . . be realized far earlier than a hypothetical post-trial recovery"). In light of the complex legal and factual issues present here regarding liability and damages, the unpredictability of a lengthy and complex trial and the appellate process that would most likely

follow, the fairness of these substantial Settlements is apparent.  *See Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 366 (S.D.N.Y. 2002).

### 8.     The Ability of the Defendants to Withstand a Greater Judgment

The court may also consider a defendant's ability to withstand a judgment greater than that secured by settlement.  *See Grinnell*, 495 F.2d at 463.  However, the fact that Wachovia and KPMG could have paid more money does not render the Settlements unreasonable.  *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 538 (3d Cir. 2004) ("[T]he fact that DuPont could afford to pay more does not mean that it is obligated to pay any more than what the . . . class members are entitled to under the theories of liability that existed at the time the settlement was reached."); *Sony*, 2008 WL 1956267, at *8 ("a defendant is not required to 'empty its coffers' before a settlement can be found adequate") (citation omitted).

At the time the Stipulation was signed in early August 2011, the publicly available financial statements of Wachovia's parent corporation, Wells Fargo, indicated that Wachovia and/or Wells Fargo had sufficient financial resources to pay a larger judgment than $590 million.  Nonetheless, it must be remembered that just three years earlier (in early August 2008) Wachovia, which was then an independent entity, was the fourth largest banking corporation in the United States based on its publicly reported financial statements – and yet Wachovia's own CEO later admitted the company was on the brink of insolvency by September 2008, and that it only averted bankruptcy and receivership as a result of the extraordinary government-brokered and subsidized bailout efforts that led to its acquisition by Wells Fargo in October 2008.  Joint Decl. at ¶ 179.  Although the cause of these calamitous events (unforeseeable and unprecedented "economic tsunami" or foreseeable consequence of Wachovia's own inadequately disclosed and imprudent conduct) was the subject of vigorously contested litigation in this Action, there can be no dispute that the events of 2008 shook

virtually all observers' confidence in the financial stability and liquidity of even the country's biggest banks. *Id*.

Moreover, only days after signing the Stipulation in early August 2011, stock markets around the world again shuddered, with leading market indices plummeting by more than 20% – and with the biggest declines being suffered by U.S. and European banking corporations. In light of the events of 2008 and the even more recent events, it would be plainly incorrect to conclude that there was "no risk" that the Wachovia Defendants would have been able to pay a substantially greater judgment in the future – perhaps three or four years hence – after the completion of formal discovery, trial, and resolution of the inevitable post-trial motions and appeals. Joint Decl. at ¶ 180.

With respect to KPMG, Lead Counsel believe that it may have the ability to pay a substantially larger sum than the $37 million that is being paid in connection with the KPMG Settlement. However, as a practical matter, and as discussed above, the prospects for recovering a substantially greater sum from KPMG would have almost certainly been limited as a result of the proportionate fault arguments that KPMG would have raised. KPMG would have argued that even if it lost the case at trial, it would be entitled to a judgment credit measured by the greater of the amount Wachovia paid in settlement or the amount of losses of the Settlement Class for which the Wachovia Defendants bore responsibility. If KPMG's arguments were accepted, this would have greatly reduced any judgment that KPMG would have actually been required to pay. Joint Decl. at ¶ 181.

Accordingly, Lead Counsel submit that the Court should find that the *Grinnell* factors, taken together, weigh overwhelmingly in favor of approval of the Settlements.

IV.    THE PLAN OF ALLOCATION OF THE SETTLEMENT FUND IS FAIR
       AND REASONABLE AND SHOULD BE APPROVED

The standard for approval of a plan of allocation is the same as the standard for approving a

settlement as a whole: "'namely, it must be fair and adequate.'"   *Maley*, 186 F. Supp. 2d at 367

(citation omitted); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005).  "'As

a general rule, the adequacy of an allocation plan turns on . . . whether the proposed apportionment is

fair and reasonable' under the particular circumstances of the case."  *In re Visa Check/Mastermoney*

*Antitrust Litig.*, 297 F. Supp. 2d 503, 518 (E.D.N.Y. 2003), *aff'd sub nom. Wal-Mart Stores, Inc. v.*

*VISA U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) (citation omitted).  A plan of allocation "'need only

have a reasonable, rational basis, particularly if recommended by "experienced and competent" class

counsel.'"  *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, No. 02 Cv. 5575(SWK), 2008 WL

2941219, at *4 (S.D.N.Y. July 30, 2008) (citations omitted); *see also WorldCom*, 388 F. Supp. 2d at

344 (same).   Courts enjoy "broad supervisory powers over the administration of class-action

settlements to allocate the proceeds among the claiming class members . . . equitably."  *Beecher v.*

*Able*, 575 F.2d 1010, 1016 (2d Cir. 1978).

If approved by the Court, the proposed Plan of Allocation, fully described in the Notice, will

govern how the Net Settlement Fund will be distributed among the Settlement Class Members who

submit timely and valid Claim Forms (the "Authorized Claimants").  Lead Counsel developed the

Plan of Allocation in consultation with Lead Bond Plaintiffs' damages expert, and believe that the

plan provides a fair and reasonable method to equitably allocate the Net Settlement Fund among the

Authorized Claimants.  Joint Decl. at ¶ 127.  *See Veeco*, 2007 WL 4115809, at *13.

The Plan of Allocation was designed as a method for allocating the Net Settlement Fund

among Authorized Claimants based on losses suffered as a result of the wrongdoing alleged in the

Action and takes into account when Settlement Class Members purchased and when and whether

Settlement Class Members sold their Bond Class Securities.  This is fair and reasonable, as there is no rule that a settlement benefit all class members equally.  *See Veeco*, 2007 WL 4115809, at *13; *Global Crossing*, 225 F.R.D. at 462.  Indeed, it is appropriate for allocations to be based upon, among other things, the relative strengths and weaknesses of class members' individual claims and the timing of purchases of the securities at issue.  *See Luxottica*, 233 F.R.D. at 317; *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 259 (E.D. Va. 2009); *see generally In re Holocaust Victim Assets Litig.*, 413 F.3d 183, 186 (2d Cir. 2001).  Otherwise, certain class members may receive an inequitable windfall, to the detriment of others.  *PaineWebber*, 171 F.R.D. at 133.  Joint Decl. at ¶¶ 128-132.

Lead Counsel believe that the Plan of Allocation is fair and reasonable, and respectfully submit that it should be approved by the Court.  It should be noted that, to date, not one objection to the Plan of Allocation has been filed, which also supports its approval by the Court.  *See Veeco*, 2007 WL 4115809, at *14; *Maley*, 186 F. Supp. 2d at 367.

## V.     CONCLUSION

The Settlements reached in the Action are a historic result, even more so given very difficult obstacles to proving Defendants' liability and resulting damages at trial.  For the foregoing reasons, the Settlements and Plan of Allocation are fair, reasonable and adequate, and should be approved.

Dated: October 10, 2011                          Respectfully submitted,

                                                 **BERNSTEIN LITOWITZ**
                                                    **BERGER & GROSSMANN LLP**

                                                 By: /s Max Berger
                                                 Max W. Berger
                                                 Chad Johnson
                                                 William C. Fredericks
                                                 Kurt Hunciker
                                                 1285 Avenue of the Americas
                                                 New York, NY 10019
                                                 Telephone: (212) 554-1400
                                                 Facsimile: (212) 554-1444

                                                 **KESSLER TOPAZ**
                                                    **MELTZER & CHECK, LLP**

                                                 By: /s David Kessler
                                                 David Kessler
                                                 John Kehoe
                                                 Christopher L. Nelson
                                                 280 King of Prussia Road
                                                 Radnor, PA 19087
                                                 Telephone: (610) 667-7706
                                                 Facsimile: (610) 667-7056

                                                 **ROBBINS GELLER**
                                                    **RUDMAN & DOWD LLP**

                                                 By: /s John J. Rice
                                                 Darren J. Robbins
                                                 John J. Rice
                                                 Keith Park
                                                 Luke Olts
                                                 655 West Broadway, Suite 1900
                                                 San Diego, CA 92101
                                                 Telephone: (619) 231-1058
                                                 Facsimile (619) 231-7423

#585460