**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE WACHOVIA PREFERRED SECURITIES
AND BOND/NOTES LITIGATION

Master File No. 09 Civ. 6351 (RJS)

**ECF Case**

## MEMORANDUM OF LAW IN SUPPORT OF
## LEAD BOND COUNSEL'S MOTION
## FOR AN AWARD OF ATTORNEYS' FEES AND
## REIMBURSEMENT OF LITIGATION EXPENSES

**BERNSTEIN LITOWITZ**
**BERGER & GROSSMANN LLP**
Max W. Berger
Chad Johnson
William C. Fredericks
Kurt Hunciker
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
David Kessler
John Kehoe
Christopher L. Nelson
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**ROBBINS GELLER**
**RUDMAN & DOWD LLP**
Darren Robbins
John J. Rice
Keith Park
Luke Olts
 655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile (619) 231-7423

*Co-Lead Counsel For Lead Bond Plaintiffs And The Settlement Class*

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ................................................................................ 1

SUMMARY OF WORK PERFORMED AND RESULTS ACHIEVED ..................... 4

ARGUMENT ........................................................................................................... 6

I.     BOND PLAINTIFFS' COUNSEL'S REQUESTED FEE IS FAIR AND
      REASONABLE AND SHOULD BE APPROVED ............................................ 6

     A.    Bond Plaintiffs' Counsel Are Entitled to an Award of Attorneys' Fees
         from the Common Fund ........................................................................ 6

     B.    The Court Should Award a Reasonable Percentage of the Common Fund ........... 6

     C.    The Requested Fee Is Well Within The Range Of What Courts Have
         Found To Be Fair and Reasonable Under the Percentage Method ..................... 8

     D.    The Requested Fee Is Strongly Supported by the Goldberger Factors ................ 10

         1.    Lead Bond Plaintiffs' Unanimous Endorsement Confers an Initial
             Presumption of Reasonableness on the Requested Fee ................................ 10

         2.    The Action's Magnitude and Complexity Support the Requested Fee ......... 13

         3.    The Risks of the Litigation Support the Requested Fee ............................... 16

             (a)    Risks of Establishing Liability Against the Wachovia
                  Defendants .......................................................................... 16

             (b)    Risks of Establishing Liability Against KPMG ................................... 17

             (c)    The Risks of Establishing Damages, and Related Loss
                  Causation Issues .................................................................. 18

             (d)    General Litigation Risks and The Fully Contingent Nature of
                  Plaintiffs' Counsel's Retention .............................................. 22

         4.    The Quality of Plaintiffs' Counsel's Representation Supports the
             Requested Fee ........................................................................... 25

             (a)    The Results Obtained From Lead Bond Counsel's Efforts, And
                  The Absence of Any "Parallel" Government Actions ........................ 25

(b)   The Court's Observations as to the Quality of Lead Bond Counsel's Work .................................................................27

(c)   The Standing and Expertise of Lead Bond Counsel ...........................28

(d)   The Standing and Expertise of Defendants' Counsel .........................28

5.   The Requested Fee Is Fair and Reasonable In Relation to the Size of the Recoveries and Comparable Fee Awards ...............................................29

6.   The Time and Labor Expended by Plaintiffs' Counsel, Including a "Lodestar Crosscheck," Support the Requested Fee....................................31

7.   Important Public Policy Considerations Further Support the Requested Fee ...........................................................................................35

II.   PLAINTIFFS' COUNSELS' REQUEST FOR REIMBURSEMENT OF LITIGATION EXPENSES SHOULD BE APPROVED ................................................37

CONCLUSION.......................................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anixter v. Home-Stake Production Co.*,
  77 F.3d 1215 (10th Cir. 1996) .................................................................................24

*Backman v. Polaroid Corp.*,
  910 F.2d 10 (1st Cir. 1990)......................................................................................23

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
  472 U.S. 299 (1985)...........................................................................................6, 36

*Bentley v. Legent Corp.*,
  849 F. Supp. 429 (E.D. Va. 1994), *aff'd,* 50 F.3d 6 (4th Cir. 1995) ......................24

*Blue Chip Stamps v. Manor Drug Stores*,
  421 U.S. 723 (1975)..................................................................................................36

*Blum v. Stenson*,
  465 U.S. 886 (1984)....................................................................................................7

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980)....................................................................................................6

*Carlson v. Xerox Corp.*,
  596 F. Supp. 2d 400 (D. Conn. 2009).................................................................9, 30

*Clark v. Ecolab Inc.*,
  No. 07-cv-8623 (PAC), 2010 WL 1948198 (S.D.N.Y. May 11, 2010).....................7

*Dura Pharmaceuticals, Inc. v. Broudo*,
  544 U.S. 336 (2005)..................................................................................................36

*Eisenstadt v. Centel Corp.*,
  113 F.3d 738 (7th Cir. 1997) ....................................................................................24

*Fait v. Regions Financial Corp.*,
  712 F. Supp. 2d 117 (S.D.N.Y. 2010).......................................................................15

*Fait v. Regions Financial Corp.*,
  __ F.3d __, No. 10-cv-2311, 2011 WL 3667784 (2d Cir. Aug. 23, 2011) ..............1, 15, 17, 18

*Fogarazzo v. Lehman Brothers, Inc.*,
  No. 03-cv-5194 (SAS), 2011 WL 671745 (S.D.N.Y. Feb. 23, 2011) .................7, 13

*Freedman v. Value Health, Inc.*,
  135 F. Supp. 2d 317 (D. Conn. 2001).......................................................................24

*Goldberger v. Integrated Resources, Inc.*,
  209 F.3d 43 (2d Cir. 2000)........................................................................*passim*

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983)........................................................................36

*Hicks v. Morgan Stanley*,
  No. 01-cv-10071 (RJH), 2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005)...........................19, 35

*In re 3Com Corp. Securities Litig.*,
  No. C-97-21083, slip op. at 10 (N.D. Cal. Mar. 9, 2001)........................................33

*In re Adelphia Communications Corp. Securities & Derivative Litig.*,
  No. MDL 1529 LMM, 2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006),
  *aff'd*, 272 Fed. Appx. 9 (2d Cir. 2008) ......................................8, 28, 30

*In re American Bank Note Holographics, Inc. Securities Litig.*,
  127 F. Supp. 2d 418 (S.D.N.Y. 2001)........................................................................19, 22

*In re Apple Computer Securities Litig.*,
  No. C-84-20148(A)-JW (N.D. Cal. 1991) ..............................................................24

*In re AremisSoft Corp. Securities Litig.*,
  210 F.R.D. 109 (D.N.J. 2002)........................................................................33

*In re AT&T Corp. Securities Litig.*,
  455 F.3d 160 (3d Cir. 2006)........................................................................26

*In re BankAtlantic Bancorp, Inc. Securities Litig.*,
  No. 07–61542–CIV, 2011 WL 1585605 (S. D. Fla. Apr. 25, 2011) ......................................24

*In re Buspirone Antitrust Litig.*,
  No. 01-CV-7951 (JGK), MDL Dkt. No. 1413 (S.D.N.Y. Apr. 17, 2003).............................34

*In re Cardinal Health Inc. Securities Litig.*,
  528 F. Supp. 2d 752 (S.D. Ohio 2007) ....................................................30, 31, 33

*In re Cendant Corp. Litig.*,
  60 F. Supp. 2d 354 (D.N.J. 1999) ........................................................................30

*In re China Sunergy Securities Litig.*,
  No. 07 Civ. 7895 (DAB), 2011 WL 1899715 (S.D.N.Y. May 13, 2011)..............................37

*In re Comverse Technology, Inc. Securities Litig.*,
  No. 06-CV-1825 (NGG), 2010 WL 2653354 (E.D.N.Y. June 24, 2010)..........................7, 11

*In re DaimlerChrysler AG Securities Litig.*,
  No. 00-0993 (KAJ), slip op. (D. Del. Feb. 5, 2004) ..............................................33

*In re Deutsche Telekom AG Securities Litig.*,
   No. 00-CV-9475 (NRB), 2005 U.S. Dist. LEXIS 45798 (S.D.N.Y. June 9, 2005)...............33

*In re Doral Financial Corp. Securities Litig.*,
   No. 05-cv-4014, slip. op. (S.D.N.Y. July 17, 2007) ....................................................33

*In re Flag Telecom Holdings, Ltd. Securities Litig.*,
   No. 02-cv-3400, 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010)...........................13, 22, 26, 35

*In re Gen. Motors Corp. Securities & Derivative Litig.*,
   No. 06-md-1749, slip. op. (E.D. Mich. Jan. 6, 2009) ............................................33

*In re Global Crossing, Inc., Securities & ERISA Litig.*,
   225 F.R.D. 436 (S.D.N.Y. 2004) ............................................................ *passim*

*In re Global Crossing,*
   No. 02 Civ. 910 (GEL), 2005 WL 1668532 (S.D.N.Y. July 12, 2005)....................................9

*In re Gulf Oil/Cities Service Tender Offer Litig.,*
   142 F.R.D. 588 (S.D.N.Y. 1992) ..................................................................26

*In re IKON Office Solutions, Inc. Securities Litig.*,
   MDL Docket No. 1318, No. 98-CV-4286, 2001 U.S. Dist. LEXIS 1172
   (E.D. Pa. Feb. 6, 2001)..........................................................................23

*In re Initial Public Offering Securities Litig.*,
   671 F. Supp. 2d 467 (S.D.N.Y. 2009)..........................................................7, 8

*In re Interpublic Securities Litig.*,
   No. 02 Civ. 6527 (DLC), 2004 WL 2397190 (S.D.N.Y. Oct. 26, 2004)................................33

*In re JDS Uniphase Corp. Securities Litig.*,
   No. C02-1486 CW, 2007 WL 4788556 (N.D. Cal. Nov. 27, 2007)......................................24

*In re Lernout & Hauspie Securities Litig.*,
   138 F. Supp. 2d 39 (D. Mass. 2001) ...........................................................10

*In re LG Philips LCD Co., Ltd. Securities Litig.*,
   No. 1:07-cv-00909 (RJS), slip op. (S.D.N.Y. Mar. 17, 2011) ...................................7

*In re Lucent Technologies, Inc. Securities Litig.*,
   327 F. Supp. 2d 426 (D.N.J. 2004) ...........................................................12

*In re Marsh & McLennan Cos. Securities Litig.*,
   No. 04 Civ. 8144 (CM), 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009)..................................7

*In re Microstrategy, Inc. Securities Litig.*,
   172 F. Supp. 2d 778 (E.D. Va. 2001) .........................................................31

*In re The Mills Corp. Securities Litig.*,
   265 F.R.D. 246 (E.D. Va. 2009) ..................................................................12

*In re NASDAQ Market-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) .................................................................33

*In re Oxford Health Plans, Inc., Securities Litig.*,
   MDL No. 1222, 2003 U.S. Dist. LEXIS 26795 (S.D.N.Y. June 12, 2003).............................9

*In re Priceline.com, Inc. Securities Litig.*,
   No. 00-cv-1884 (AVC), 2007 WL 2115592 (D. Conn. July 20, 2007) ................................35

*In re Rite Aid Corp. Securities Litig.*,
   146 F. Supp. 2d 706 (E.D. Pa. 2001) .......................................................33, 34

*In re Rite Aid Corp. Securities Litig.*,
   362 F. Supp. 2d 587 (E.D. Pa. 2005) ...................................................26, 30, 33

*In re Rite Aid Corp. Securities Litig.*,
   396 F.3d 294 (3d Cir. 2005).....................................................................34

*In re Sumitomo Copper Litig.*,
   74 F. Supp. 2d 393 (S.D.N.Y. 1999).............................................................33

*In re Telik, Inc. Securities Litig.*,
   576 F. Supp. 2d 570 (S.D.N.Y. 2008)...........................................................16

*In re Tyco International, Ltd. Securities Litig.*,
   535 F. Supp. 2d 249 (D.N.H. 2007).............................................................30

*In re Union Carbide Corp. Consumer Products Business Securities Litig.*,
   724 F. Supp. 160 (S.D.N.Y. 1989)..............................................................31

*In re Veeco Instruments Inc. Securities Litig.*,
   No. 05 MDL 01695, 2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) ..............................6, 31, 37

*In re Wachovia Equity Securities Litig.*,
   753 F. Supp. 2d 326 (S.D.N.Y. 2011)...........................................................14

*In re Warner Communications Securities Litig.*,
   618 F. Supp. 735 (S.D.N.Y. 1985),
   *aff'd*, 798 F.2d 35 (2d Cir. 1986).............................................................22

*In re WorldCom, Inc. Securities Litig.*,
   294 F. Supp. 2d 431 (S.D.N.Y. 2003)...........................................................30

*In re WorldCom, Inc. Securities Litig.*,
   388 F. Supp. 2d 319 (S.D.N.Y. 2005)..........................................................8, 35

*In re Xcel Energy, Inc. Securities, Derivative & ERISA Litig.*,
  364 F. Supp. 2d 980 (D. Minn. 2005) ....................................................................26

*J.I. Case Co. v. Borak*,
  377 U.S. 426 (1964) ............................................................................................36

*Landy v. Amsterdam*,
  815 F.2d 925 (3d Cir. 1987) ................................................................................24

*LeBlanc-Sternberg v. Fletcher*,
  143 F.3d 748 (2d Cir. 1998) ................................................................................37

*Maley v. Del Global Techs. Corp.*,
  186 F. Supp. 2d 358 (S.D.N.Y. 2002) ..................................................8, 32, 35, 37

*McKowan Lowe & Co. v. Jasmine, Ltd.*,
  Nos. 94-5522 (RBK) & 96-2318 (RBK),
  2005 U.S. Dist. LEXIS 32164, (D.N.J. June 30, 2005) ..................................19, 21

*Missouri v. Jenkins*,
  491 U.S. 274 (1989) ........................................................................................13, 31

*Morrison v. National Bank of Australia*,
  130 S. Ct. 2869 (2010) ........................................................................................23

*Newman v. Caribiner International, Inc.*,
  99 Civ. 2271 (S.D.N.Y. Oct. 19, 2001) ..............................................................34

*Ohio Public Employee Retirement System v. Freddie Mac*,
  No. 03-CV-4261, 2006 U.S. Dist. LEXIS 98380 (S.D.N.Y. Oct. 26, 2006) ......................8, 30

*Robbins v. Koger Properties, Inc.*,
  116 F.3d 1441 (11th Cir. 1997) ...........................................................................24

*Savoie v. Merchants Bank*,
  166 F.3d 456 (2d Cir. 1999) .........................................................................6, 7, 31

*Searls v. Glasser*,
  No. 91 C 6796, 1994 U.S. Dist. LEXIS 13509 (N.D. Ill. Sept. 21, 1994),
  *aff'd*, 64 F.3d 1061 (7th Cir. 1995) .....................................................................24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ............................................................................................36

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
  396 F.3d 96 (2d Cir. 2005) ...............................................................................7, 33

**STATUTES & RULES**

15 U.S.C. §77k(b) ...........................................................................................................18

15 U.S.C. §77k(e) ....................................................................................................18, 19

15 U.S.C. §78u-4(a)(6) ....................................................................................................8

Fed. R. Civ. P. 9(b) .......................................................................................................14

**OTHER AUTHORITIES**

E.J. Weiss & J.S. Beckerman, *Let the Money Do the Monitoring: How Institutional
   Investors Can Reduce Agency Costs in Securities Class Actions*, 104 Yale L.J. 2053,
   2105 (1995) ...........................................................................................................11

*Third Circuit Task Force Report on Selection of Class Counsel*,
   74 Temp. L. Rev. 689 (Winter 2001) ....................................................................22

## PRELIMINARY STATEMENT

Lead Bond Counsel have successfully recovered $627 million from the Wachovia Defendants and KPMG in full settlement of all claims brought in this action (the "Bond Action" or the "Action") on behalf of the Settlement Class.[1]  The $627 million recovered here ranks as the 14th largest securities class action recovery ever, and the single largest recovery ever in a "pure" Securities Act case, one that did not involve any underlying claims of fraud.  Indeed, given that the total recoveries represent a remarkable *30-50%* of the Settlement Class's reasonably recoverable damages in an action that involved very significant litigation risks, it is not an understatement to recognize the $627 million in total recoveries obtained in this case as one of the most successful securities class actions in history.

The results achieved are also particularly impressive given that (i) no claims of any kind were ever brought by the SEC or any other government entity on behalf of Wachovia investors; (ii) the allegedly inaccurate financial results contained in the Offering Materials have never been restated; and (iii) parallel Securities Act claims brought on behalf of common stock purchasers in *In re Wachovia Equity Sec. Litig.*, No. 08 Civ. 6171 (S.D.N.Y) (RJS) (the "Equity Action") were – in stark contrast to the result obtained here – *dismissed* in their entirety.  The risks of establishing liability in this Action are also well illustrated by, *inter alia,* the uncertainties created by *Fait v. Regions Financial Corp.*, __ F.3d __, No. 10-cv-2311, 2011 WL 3667784 (2d Cir. Aug. 23, 2011) ("*Fait*") – a Second Circuit case that was pending throughout the course of settlement negotiations and that was ultimately decided adversely to plaintiffs just weeks after the Stipulation was signed.  And the risks of establishing damages were just as daunting, given

---

[1] Unless otherwise noted, capitalized terms have the meanings ascribed to them in the Stipulation and Agreements of Settlement dated August 5, 2011 (the "Stipulation") (Dkt. No. 136-1).

Defendants' intentions to present expert testimony to the jury that would argue that any losses suffered by purchasers of Bond Class Securities were due to the unprecedented "financial tsunami" that hit the housing and financial sectors in 2008, rather than due to any misstatements in the Offering Materials at issue.

It is against this backdrop that the undersigned Court-appointed Lead Bond Counsel (consisting of Bernstein Litowitz Berger & Grossmann LLP ("BLBG"), Kessler Topaz Meltzer & Check, LLP ("KTMC") and Robbins Geller Rudman & Dowd, LLP ("RGRD")) – with the express endorsement of three large, sophisticated institutional investor Lead Bond Plaintiffs (the Orange County Employees' Retirement System ("Orange County"), the Louisiana Sheriffs' Pension and Relief Fund ("Louisiana Sheriffs") and the Southeastern Pennsylvania Transportation Authority ("SEPTA")) – respectfully submit this memorandum in support of their request for an award of attorneys' fees equal to 17.5% of the Settlement Fund and reimbursement of their litigation expenses in the amount of $860,877.47.[2]

---

[2] Submitted herewith is the Joint Declaration of William C. Fredericks, John J. Rice and David Kessler in Support of (A) Lead Bond Plaintiffs' Motion for Final Approval of Class Action Settlements and Plan of Allocation and (B) Lead Bond Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Expenses (the "Joint Declaration" or "Joint Decl."). The Joint Declaration contains a more detailed statement of, *inter alia*:  (1) the history of the Bond Action; (2) the nature of the claims asserted; (3) the extensive work performed during the course of the litigation; (4) the history of the arms'-length negotiations that culminated in the execution of the Stipulation; (5) the very significant risks involved in prosecuting the Bond Action; (6) the benefits of the Settlements in light of the reasonably recoverable total damages and overall risks of continued litigation; and (7) the fairness of the Plan of Allocation.  The Joint Declaration also includes as exhibits the separate fee and expense declarations submitted by each of the three Lead Bond Counsel firms and Additional Bond Counsel firms Abraham, Fruchter & Twersky LLP, Glancy Binkow & Goldberg LLP, and Pomerantz Haudek Grossman & Gross LLP (collectively, "Bond Plaintiffs' Counsel" or "Plaintiffs' Counsel"), which contain additional details concerning the amount of time expended and expenses incurred by each Plaintiffs' Counsel firm in prosecuting the Bond Action.

As discussed below, Lead Bond Counsel's requested 17.5% percentage-based fee is well within the range of fees that have been approved in other securities class actions of this size, and is amply supported by each of the relevant factors set forth in *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000) that guide the assessment of fee requests in this Circuit.  Indeed, Lead Bond Counsel submit that if any case merits a fee award at the very "top end" of the customary fee award scale, it is a case such as this where an exceptional recovery has been achieved in the face of significant risk and in the absence of any "parallel" government action or restatement of financial results by the Company.  Yet, the 17.5% fee requested here is not at the very top of the scale, but rather, falls squarely in the middle of the range of reasonable fees approved by courts in this District and around the country.  Similarly, the requested fee award results in a "lodestar multiplier" that is well within the range that courts have regularly accepted when performing a "lodestar crosscheck" on a percentage-based fee.

Significantly, the three Lead Bond Plaintiffs, each of which is a sophisticated institutional investor, fully support Plaintiffs' Counsel's requested fee.  Such endorsements also weigh in favor of approving a requested fee, particularly where, as here, the requested fee is actually *lower* than what would have been permitted by a contractual fee cap that was negotiated *ex ante* by one of the court-approved Lead Bond Plaintiffs.

The *ex post* reaction of the Settlement Class to date also weighs in favor of the requested fee.  Pursuant to the Court's August 9, 2011 Preliminary Approval Order, more than 206,000 copies of the detailed Court-approved Notice have been mailed to potential Settlement Class Members and nominees, and the Summary Notice has been published in three leading newspapers and widely disseminated over the Internet through the *PR Newswire.  See* Joint Decl. at ¶ 6.  The Notice advised Settlement Class Members that Lead Bond Counsel would seek an

award of attorneys' fees of up to 17.5% of the Settlement Fund, plus reimbursement of their litigation expenses. Although the October 25, 2011 deadline for objecting to the requested attorneys' fees and expenses has not yet passed, to date no such objections have been received. *Id.* at ¶ 8.

For all of the reasons set forth herein and in the accompanying Joint Declaration and Lead Bond Plaintiff declarations, Lead Bond Counsel respectfully submit that their request for attorneys' fees and reimbursement of litigation expenses is reasonable, and should be approved.

## SUMMARY OF WORK PERFORMED AND RESULTS ACHIEVED

As set forth in detail in the Joint Declaration, Bond Plaintiffs' Counsel has performed a tremendous amount of work in bringing, prosecuting and resolving this Action including, *inter alia*, the following:

- identifying the potential claims available to purchasers of the Bond Class Securities (Joint Decl. at ¶ 31);

- identifying, reviewing and analyzing thousands of pages of publicly available SEC filings, news articles, analyst reports and other information concerning Wachovia, its Pick-A-Pay portfolio, and the "option-ARM" and subprime mortgage industry (*id.*);

- reviewing all of the Offering Materials for each of the more than 30 separate Offerings of Bond Class Securities for actionable misstatements and omissions (*id.*);

- consulting extensively with Lead Bond Plaintiffs' accounting and damages experts (*id.*);

- conducting a massive and painstaking effort to identify and interview former Golden West, Wachovia and/or Wells Fargo personnel with relevant knowledge, which resulted in (a) the identification of over 1500 potential leads, (b) subsequent efforts to locate and contact over 500 of these leads, and (c) the actual interviewing of nearly 300 confidential witnesses ("CWs") – including former loan officers, real estate appraisers, loan underwriters, branch and area managers, internal audit personnel and headquarters-level executives and supervisors from across the Company and across the country – concerning matters relevant to the claims asserted in the Action (*id.* at ¶¶ 32-34);

- drafting both the detailed First Consolidated Bond Complaint and the later (and even more highly detailed) Amended Bond Complaint (*id.* at ¶¶ 35, 44-45);

- thoroughly researching the relevant law and preparing comprehensive briefs in opposition to six separate sets of motions to dismiss, consisting of hundreds of pages of legal argument and voluminous exhibits, filed by the Wachovia Defendants, the Underwriter Defendants and defendant KPMG, respectively (*id.* at ¶¶ 36-39, 47-57);

- achieving the denial, in substantial part, of each of the Defendants' respective motions to dismiss (*id.* at ¶¶ 58-62);

- obtaining, organizing and reviewing approximately 9 million pages of internal Wachovia and Wells Fargo documents and more than 285,000 pages of internal KPMG documents (*id.* at ¶¶ 79-85, 100-101);

- preparing for, conducting and ultimately concluding the successful negotiation of both settlements – which involved the preparation and exchange of detailed mediation submissions and damages presentations, multiple face-to-face mediation sessions under the auspices of Judge Daniel Weinstein (ret.) and related communications – and which culminated in the negotiation, drafting and execution (on August 5, 2011) of the Stipulation, the Notice, the forms of preliminary and final approval orders, and related Supplemental Agreements (*id.* at ¶¶ 69-78, 88-109); and

- working with Lead Bond Plaintiffs' damages expert to develop the proposed Plan of Allocation (*id.* at ¶¶ 126-133).

This summary only outlines in broad terms the work performed by Bond Plaintiffs' Counsel in this Action.[3]  All told, Bond Plaintiffs' Counsel have already expended over 79,000 hours, representing over $32 million in lodestar time, in this wholly contingent litigation.  Solely as a result of Bond Plaintiffs' Counsel's hard work, and unassisted by any parallel government investigations or regulatory proceedings brought on behalf of Wachovia investors, Lead Bond Counsel were able to achieve one of the largest securities class action recoveries in history.  Indeed, but for Bond Plaintiffs' Counsel's efforts, the complex and undeniably high-risk legal claims of literally thousands of investors who purchased Bond Class Securities *would likely never have even been brought, let alone resulted in the extraordinary $627 million recovery achieved here*.  *See* Joint Decl. at ¶¶ 24-25.

---

[3] For a more complete description of all work performed, the Court is respectfully referred to Section II.B of the Joint Declaration.

<u>ARGUMENT</u>

**I.   BOND PLAINTIFFS' COUNSEL'S REQUESTED FEE IS FAIR AND
      REASONABLE AND SHOULD BE APPROVED**

    **A.   BOND PLAINTIFFS' COUNSEL ARE ENTITLED TO AN AWARD OF ATTORNEYS'
      FEES FROM THE COMMON FUND**

The Supreme Court has long recognized that "a litigant or a lawyer who recovers a
common fund for the benefit of persons other than himself or his client is entitled to a reasonable
attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980);
*see also Goldberger,* 209 F.3d at 47; *Savoie v. Merchs. Bank*, 166 F.3d 456, 460 (2d Cir. 1999).
The purpose of the common fund doctrine is to fairly and adequately compensate class counsel
for services rendered and to ensure that all class members contribute equally towards the costs
associated with litigation pursued on their behalf. *See Goldberger*, 209 F.3d at 47; *In re Veeco
Instr. Inc. Sec. Litig.*, No. 05 MDL 01695, 2007 WL 4115808, at *2 (S.D.N.Y. Nov. 7, 2007).

Indeed, for nearly 50 years the Supreme Court has repeatedly emphasized that private
securities actions provide "'a most effective weapon in the enforcement' of the securities laws
and are 'a necessary supplement to [SEC] action.'" *Bateman Eichler, Hill Richards, Inc. v.
Berner*, 472 U.S. 299, 310 (1985) (quoting *J.I. Case Co. v. Borak*, 377 U.S. 426, 432 (1964)).
*See also* fn. 18 below (collecting additional Supreme Court cases). This statement could hardly
be more true than in the instant case, as the extraordinary recovery here was due entirely to the
efforts of Lead Bond Plaintiffs and their Counsel – and the government did not even file any
securities claims against any defendant (let alone recover any funds) on investors' behalf.

    **B.   THE COURT SHOULD AWARD A REASONABLE PERCENTAGE OF THE COMMON
      FUND**

The Second Circuit has expressly approved the "percentage-of-the-fund" method for
awards of fees in common fund cases, recognizing that "the lodestar method proved vexing" and

had resulted in "an inevitable waste of judicial resources."  *Goldberger*, 209 F.3d at 48-49; *see also Savoie*, 166 F.3d at 460 (the "percentage-of-the-fund method has been deemed a solution to certain problems that may arise when the lodestar method is used in common fund cases"); *see also Blum v. Stenson*, 465 U.S. 886, 904 (1984) ("In tort suits, an attorney might receive one-third of whatever amount the plaintiff recovers.  In those cases, therefore, the fee is *directly proportional* to the recovery.") (emphasis added).  More recently, the Second Circuit has reiterated with approval how the percentage method "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation," and has noted that the "trend in this Circuit is toward the percentage method."  *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) (citation omitted); *accord In re LG Philips LCD Co., Ltd. Sec. Litig.*, No. 1:07-cv-00909 (RJS), slip op. at 1 (S.D.N.Y. Mar. 17, 2011) (awarding fee based on percentage-of-recovery method); *Fogarazzo v. Lehman Bros., Inc.*, No. 03-cv-5194 (SAS), 2011 WL 671745, at *2 (S.D.N.Y. Feb. 23, 2011) ("[t]he trend in this Circuit is toward the percentage method, which directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation"); *Clark v. Ecolab Inc.*, No. 07-cv-8623 (PAC), 2010 WL 1948198, at *8 (S.D.N.Y. May 11, 2010) (same).[4]

The text of the PSLRA itself also supports awarding attorneys' fees in securities cases using the percentage method, as it provides that "[t]otal attorneys' fees and expenses awarded by

---

[4] *See also, e.g.*, *In re Marsh & McLennan Cos. Sec. Litig.*, No. 04 Civ. 8144 (CM), 2009 WL 5178546, at *14 (S.D.N.Y. Dec. 23, 2009) (McMahon, J.) ("the percentage method continues to be the trend of district courts in this Circuit and has been expressly adopted in the vast majority of circuits"); *In re Comverse Tech., Inc. Sec. Litig.*, No. 06-CV-1825 (NGG), 2010 WL 2653354, at *2 (E.D.N.Y. June 24, 2010) (same); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 480 (S.D.N.Y. 2009) (Scheindlin, J.) (same).

the court to counsel for the plaintiff class shall not exceed a *reasonable percentage* of the amount" recovered for the class.  15 U.S.C. §78u-4(a)(6) (emphasis added); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 355 (S.D.N.Y. 2005) (Cote, J.) (the PSLRA expressly contemplates that "the percentage method will be used to calculate attorneys' fees in securities fraud class actions"); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 370 (S.D.N.Y. 2002) (McMahon, J.) (by using this language, Congress "indicated a preference for the use of the percentage method" rather than the lodestar method).

### C.   THE REQUESTED FEE IS WELL WITHIN THE RANGE OF WHAT COURTS HAVE FOUND TO BE FAIR AND REASONABLE UNDER THE PERCENTAGE METHOD

Before determining whether Bond Plaintiffs' Counsel merit a percentage fee award that is towards the bottom of, in the middle of, or at the top of the reasonable range, it is appropriate to consider as an initial matter what constitutes the "reasonable range."

In the Southern District of New York and elsewhere within the Second Circuit, including in other securities class actions where plaintiffs' counsel have secured recoveries for investors in the multi-hundred million dollar range, courts have approved attorneys' fees ranging as high as 33⅓%.  *See In re IPO Sec. Litig.,* 671 F. Supp. 2d 467, 516 (S.D.N.Y. 2009) (Scheindlin, J.) (approving 33⅓% fee on total recovery of $586 million); *In re Adelphia Commc'ns. Corp. Sec. & Derivative Litig.*, No. MDL 1529 LMM, 2006 WL 3378705, at *3 (S.D.N.Y. Nov. 16, 2006) (McKenna, J.), *aff'd*, 272 Fed. Appx. 9 (2d Cir. 2008) (approving 21.4% fee on total recovery of $455 million); *Ohio Pub. Empl. Ret. Sys. v. Freddie Mac*, No. 03-CV-4261, 2006 U.S. Dist. LEXIS 98380, at *4 (S.D.N.Y. Oct. 26, 2006) (Sprizzo, J.) (approving 20% fee on total recovery of $410 million); *In re Global Crossing, Inc., Sec. & ERISA Litig.*, 225 F.R.D. 436, 469

(S.D.N.Y. 2004)[5] (Lynch, J.) (approving 17.8% fee on total recovery of $408 million); *In re Oxford Health Plans, Inc., Sec. Litig.*, MDL No. 1222, 2003 U.S. Dist. LEXIS 26795 at *13 (S.D.N.Y. June 12, 2003) (Brieant, J.) (approving 28% fee on total recovery of $300 million; *see also Carlson v. Xerox Corp.,* 596 F. Supp. 2d 400, 414 (D. Conn. 2009) (Thompson, J.) (approving 16% fee on total recovery of $750 million).

For the convenience of the Court, attached as Exhibit A is a table listing fees approved (including those cited above) from *all* securities class action cases that have settled for between $100 million and $1 billion since the passage of the PSLRA in 1995 that counsel's extensive research has identified. Whereas 33⅓% appears to mark the top end of the range in cases of comparable size, the requested fee here – 17.5% – falls squarely in the middle. In fact, the average (or mean) fee approved in the 79 cases set forth in Exhibit A is 18.5%, and the average fee approved in the subset of cases within the Second Circuit, which settled between $100 million and $1 billion post-PSLRA, is 18.6%. Similarly, if one considers only the subset of securities class action cases from across the country that have settled in the narrow band of $500 million to $750 million (a range with a midpoint of $625 million), the range of fees approved is similar, but the average fee is 18.4%.

For the reasons set forth below and in the Joint Declaration, Lead Bond Counsel respectfully submit that the exceptional results achieved here, in the face of exceptional risks and in a case in which the government never even filed charges, would plainly justify a fee award at

---

[5] For the rest of the related opinions and orders that comprise the complete set of fee awards in this case, *see also In re Global Crossing,* No. 02 Civ. 910 (GEL), 2005 WL 1668532, at *5 (S.D.N.Y. July 12, 2005); Dkt. No. 619 (Aug. 8, 2005); Dkt. No. 680 (Mar. 2, 2006); Dkt. No. 722 (Oct. 30, 2006); *and* Dkt. No. 773 (Oct. 1, 2007).

the top of any reasonable range relevant to other large cases under *Goldberger* – and that the

17.5% fee requested here, *which is squarely in the <u>middle</u> of that range*, is fully merited.

### D.   THE REQUESTED FEE IS STRONGLY SUPPORTED BY THE *GOLDBERGER* FACTORS

In *Goldberger*, the Second Circuit provided guidance to district courts in this Circuit for

analyzing fee applications by requiring that they consider the following factors in a common

fund case:  (1) the magnitude and complexities of the action; (2) the litigation risks involved; (3)

the quality of class counsel's representation; (4) the size of the requested fee in relation to the

recoveries obtained; (5) the time and labor expended by class counsel; and (6) public policy

considerations.  209 F.3d at 50.  These factors are non-exclusive, and as noted below courts in

this District and elsewhere have also considered, among other things, (7) the presence or absence

of parallel government securities enforcement actions; (8) the reaction of the plaintiff class; (9)

the endorsement of sophisticated lead plaintiffs; and (10) whether the requested fee is in accord

with a fee agreement entered into by an institutional lead plaintiff.

Although none of them is controlling, *each* of the foregoing factors weighs strongly in

favor of approving the requested 17.5% fee here.   Given the involvement of sophisticated

institutional investor lead plaintiffs in this case, Lead Bond Counsel believe it appropriate to

begin the *Goldberger* multi-factor analysis with the latter two factors listed above.

### 1.   Lead Bond Plaintiffs' Unanimous Endorsement Confers an Initial Presumption of Reasonableness on the Requested Fee

In enacting the PSLRA, Congress sought to encourage institutional investors to play an

active role in prosecuting cases under the securities laws, *see In re Lernout & Hauspie Sec.

Litig.*, 138 F. Supp. 2d 39, 43 (D. Mass. 2001) (citing H.R. Conf. Rep. No. 104–369 at 32, 1995

WL 709276 (1995) ("H.R. Conf. Rep.")), and indicated its belief that increasing the role of such

sophisticated investors would "ultimately benefit shareholders and assist courts by improving the

quality of representation in securities class actions." H.R. Conf. Rep. at 28. Similarly, because institutional investors with large financial stakes in an action have a particular interest in ensuring that class counsel are limited to a reasonable fee upon final resolution of a case, courts can have more confidence in the fairness of fee requests in cases subject to the supervision of institutional lead plaintiffs than in other cases. *See* E.J. Weiss & J.S. Beckerman, *Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions*, 104 Yale L.J. 2053, 2105 (1995), *cited with approval by* H.R. Conf. Rep. at 28; *see also Comverse*, 2010 WL 2653354, at *2 (the fact that "PSLRA lead plaintiffs often have a significant financial stake in the settlement" provides them with "a powerful incentive to ensure that any fees resulting from that settlement are reasonable") (citation omitted).

Each of the three Lead Bond Plaintiffs here is precisely the kind of large and sophisticated institutional investor that Congress wanted to supervise this type of litigation, especially as each has a substantial financial interest at stake and has had direct involvement in the litigation from its commencement through settlement. Based on their knowledge of the case and their considered review of the relevant facts (including the results achieved in the face of significant litigation risks and in the absence of any accounting restatement or government action on behalf of Wachovia investors), each Lead Bond Plaintiff has approved and fully supports the requested fee. *See* the respective Declarations of Julie Wynne, Esq. (on behalf of Orange County), Osey McGee (on behalf of Louisiana Sheriffs), and Nicholas J. Staffieri, Esq. (on behalf of SEPTA), attached as Exhibits 3, 4 and 5 to the Joint Declaration.

The unanimous endorsement of Lead Bond Counsel's fee request by the three institutional Lead Bond Plaintiffs strongly supports approval of the requested fee by the Court as well. *See, e.g., Comverse*, 2010 WL 2653354, at *4 ("The fact that this fee request is the product

of arm's-length negotiation between Lead Counsel and the lead plaintiff is significant.")
(approving attorneys' fee of 25% of $225 million recovery); *In re The Mills Corp. Sec. Litig.*,
265 F.R.D. 246, 262 (E.D. Va. 2009) (the fact that "Lead Plaintiffs, IPERS and MPERS—
sophisticated institutional investors—clearly approve of the percentage sought" supported
approval of the requested fee); *In re Lucent Techs., Inc. Sec. Litig.*, 327 F. Supp. 2d 426, 442
(D.N.J. 2004) ("[s]ignificantly, the Lead Plaintiffs, both of whom are institutional investors with
great financial stakes in the outcome of the litigation, have reviewed and approved Lead
Counsel's fees and expenses request") (approving attorneys' fee of 17% of $517 million
recovery).

Moreover, where, as here, the requested fee is not only endorsed *post hoc,* but is also in
accord with a fee agreement entered into by a sophisticated lead plaintiff *ex ante,* the
presumption of the requested fee's fairness and reasonableness is doubly strong. Indeed, in this
Circuit a "fee agreement between … Lead Counsel and [an institutional lead plaintiff] is *prima
facie* evidence of the reasonableness of a fee calculated *according to its terms*," and reflects a
business judgment "to which a court reasonably may give *substantial deference*." *In re Global
Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 468 n.16 (S.D.N.Y. 2004) (emphasis added;
internal citations omitted).

Here, at the outset of the litigation, Lead Bond Plaintiff SEPTA entered into a sliding
scale fee agreement with its counsel, KTMC, which provided for varying percentage levels of fee
awards under a "fee grid," depending upon the ultimate recovery. *See* Staffieri Decl. (Joint Decl.
Exh. 5) at ¶ 10. When the $627 million recovery is applied to this fee grid, a blended award of
17.79% is called for under the SEPTA fee agreement. *Id.* Because the requested 17.5% fee is in
accord with – and indeed lower than – the level specified in a sophisticated lead plaintiff's fee

agreement, the *prima facie* presumption of reasonableness applies. *See In re Global Crossing,* 225 F.R.D. at 464-67 (approving award of attorneys' fee of 18.7% of $205 million recovery).[6]

Similarly, the Supreme Court has observed that court-awarded fees are intended to approximate what counsel would have received had their fee arrangements been bargained for in the marketplace before the results of the action were known. *See Missouri v. Jenkins*, 491 U.S. 274, 285-86 (1989). However, this Court is not forced to speculate as to what fee arrangements an interested, sophisticated investor might have bargained for *ex ante* to bring the high-risk claims at issue here, as the requested fee here was authorized under an *actual* pre-existing agreement.

### 2.    The Action's Magnitude and Complexity Support the Requested Fee

Courts have long recognized that securities class actions are notoriously complex and difficult to prove. *See, e.g.*, *Fogarazzo*, 2011 WL 671745 at *3 ("securities actions are highly complex"); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02-cv-3400, 2010 WL 4537550, at *29 (S.D.N.Y. Nov. 8, 2010) (courts have long recognized that securities class litigation is "notably difficult and notoriously uncertain") (citation omitted).

As detailed in the Joint Declaration at ¶¶ 135-169, virtually every aspect of this litigation confirmed its complexity. For example, as reflected in the 150-page Amended Bond Complaint, this Action alleged a long list of factually and legally complex claims, which the Court's own March 31 Opinion aptly summarized as follows:

> Specifically, the [Bond] Plaintiffs allege that the offering documents contained material misrepresentations and omissions regarding: (1) the risk profile and "pristine" quality of the residential mortgage portfolio; (2) the "conservative in-house appraisal and underwriting approach" to the Pick-A-Pay portfolio; (3) the

---

[6] Pursuant to the parties' fee agreement in that case, later fees approved under the same agreement came to 17.8% of total recoveries of $408 million.

> accuracy of reported loan-to-value ratios; (4) the inadequacy of reported loan loss reserves; (5) the impaired value of Wachovia's CDO holdings; (6) the impaired value of the Golden West franchise and related goodwill; (7) the impaired value of Wachovia's net income, assets, and Tier 1 capital rating; and (8) Wachovia's GAAP compliance. Plaintiffs also allege material misrepresentations and omissions in the audit opinions provided by Defendant KPMG, a claim the Court will separately address.

*In re Wachovia Equity Sec. Litig.,* 753 F. Supp. 2d 326, 377 (S.D.N.Y. 2011). Being able to adequately plead *any* of these claims was in itself an enormously complex undertaking, which involved, among other things, (a) the review of thousands of pages of SEC filings, news articles, analyst reports and other written materials; (b) identifying, locating and interviewing hundreds of confidential witnesses with relevant knowledge; and (c) consulting with accounting and damages and loss causation experts. That the parallel Section 11 claims alleged in the Equity Action were dismissed in their *entirety* for lack of adequate factual support further confirms how complex and challenging it was to plead the factually analogous claims in the Bond Action.

As for the legal complexities of the claims asserted, suffice it to say that Defendants submitted a total of six separate motions to dismiss supported by over 200 pages of legal argument and hundreds of pages of exhibits. As set forth in the Joint Declaration, Defendants' voluminous papers argued, among other things, that Lead Bond Plaintiffs' claims should be dismissed in whole or in part because:

(a)   there was no "viable plaintiff" with statutory standing with respect to many of the 30 Offerings at issue;

(b)   the filing of earlier actions had not tolled the relevant statute of limitations with respect to the Offerings which lacked a "viable plaintiff;"

(c)   the Bond Plaintiffs' allegations "sounded in fraud" and were thus subject to heightened pleading standards of Fed. R. Civ. P. 9(b);

(d)   the statements of Bond Plaintiffs' confidential sources should be disregarded as a matter of law as "mere speculation" and "unsupported conclusions;"

(e)   the statements in the Offering Materials that allegedly mischaracterized the

true nature and quality of the Pick-A-Pay mortgage portfolio and risk management practices were mere "puffery," and hence inactionable as a matter of law;

(f)      the Bond Plaintiffs' pleadings contained no facts from which one could infer either that (i) the Defendants subjectively believed that the Company's stated loan loss reserves were inadequate, or (ii) that the Company's loan loss reserves lacked a reasonable objective basis in fact, and should thus be dismissed under Judge Kaplan's recent decision in *Fait v. Regions Fin'l Corp.*, 712 F. Supp. 2d 117 (S.D.N.Y. 2010); and

(g)      the Bond Plaintiffs' claims regarding overstated Tier 1 capital levels, inflated net income and overstated goodwill were all "bootstrapped" claims that should be dismissed for one or more of the same reasons as their other accounting claims.

Joint Decl. ¶¶ 36-39, 47-54.  In addition, KPMG argued that all of the Bond Plaintiffs' claims against it should be dismissed for failure to show that (1) KPMG did not believe in the accuracy of its audit opinions which were included in the Offering Materials; or that (2) KPMG's audit opinions lacked reasonable support given their stated basis or were predicated on specifically alleged audit practices that were defective.  *See* Joint Decl. at ¶¶ 36, 51.

Leaving aside the complexities of pleading, the Bond Action also clearly raised exceptionally complex issues of proof.  As further discussed in the next section, the proofs relating to issues of liability and damages necessarily required a thorough understanding of complex accounting, valuation and loss causation issues, and would have involved "battles of the experts" on multiple fronts.  Further, had the Settlements not been reached, the potential complexities of pursuing Bond Plaintiffs' claims might well have been increased significantly in the wake of the Second Circuit's decision on appeal of Judge Kaplan's decision in *Fait,* which was decided adversely to plaintiffs just three weeks after the parties executed the Stipulation. Although Lead Bond Counsel believe that *Fait* would not have barred a meaningful recovery in this case, Defendants would have argued to the contrary, and the uncertainties relating to *Fait's* proper interpretation and scope would have led to additional complexities.

15

The "magnitude" of this class action is also apparent, as it involves not simply thousands of investors, but thousands of investors in *30 separate Offerings*.  In sum, the "magnitude and complexity" factor clearly weighs strongly in favor of the requested fee.

### 3.   The Risks of the Litigation Support the Requested Fee

The Second Circuit has identified "the risk of success as perhaps the foremost factor to be considered in determining [a reasonable fee award]."  *Goldberger*, 209 F.3d at 54; *see also In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 592 (S.D.N.Y. 2008) ("Courts have repeatedly recognized that 'the risk of the litigation' is a pivotal factor in assessing the appropriate attorneys' fees to award to plaintiffs' counsel in class actions").  As set forth below, Plaintiffs' Counsel confronted a host of significant risks in establishing both liability and damages.

### (a) Risks of Establishing Liability Against the Wachovia Defendants

Plaintiffs' Counsel faced very significant risks in establishing liability as to the Wachovia Defendants.  As detailed in the Joint Declaration these risks included, among other things:

(1)   the uncertain implications of portions of the Court's March 31 Opinion which suggested that the Offering Materials' representations concerning the allegedly "conservative" and "risk-averse" nature of the Pick-A-Pay portfolio were not actionable as a matter of law (*see* Joint Decl. at ¶¶ 137-138);

(2)   Bond Plaintiffs' ability to prove that the Offering Materials materially misrepresented the Pick-A-Pay portfolio's LTV ratios (*id.* at ¶¶ 139-141);

(3)   the uncertainties as to the actionability of other key alleged misstatements, including but not limited to (a) the extent to which the Court intended to sustain non-LTV-related claims, and (b) the extent to which inaccurate statements concerning Wachovia's loan loss reserves, goodwill, CDO valuations and Tier 1 capital levels were "opinions" for which Defendants are not liable absent proof that they did not actually believe in their truth (*id.* at ¶¶ 142-146); and

(4)   the complex accounting and valuation issues at issue in this case, where the proof would have turned heavily on the jury's inherently unpredictable reactions to the parties' "battle of the experts" (*id.* at ¶¶ 154-167).

In addition, Plaintiffs' Counsel faced the risk that Defendants would be able to defeat a significant portion of the claims on statute of limitations grounds.  The Court's March 31 Opinion adopted Defendants' arguments that claims as to a given Offering should not be allowed to go forward unless there were at least one named plaintiff who had actually purchased Bond Class Securities in that Offering, but also held that the statute of limitations was tolled for all putative class members as to all Offerings by the filing of Lead Bond Plaintiffs' initial state court complaint in January 2009.  As a result, a significant number of Bond Action claims were saved from extinction, including the claims relating to Bond Class Securities that had been purchased by Additional Bond Plaintiffs Hawaii, Iron Workers and City of Livonia (who joined the Bond Action in 2010).  However, the Court's ruling that the statute of limitations had been tolled for all putative class members by the filing of Lead Bond Plaintiffs' original state court complaint turns on a legal question that has divided the district courts and has not yet been decided by any appellate court.  Lead Bond Counsel continue to believe that the Court correctly applied *American Pipe* tolling principles, but the risk remained that this Court's rulings on tolling would have been reconsidered or reversed on appeal, resulting in the potential dismissal of the claims of numerous Settlement Class Members on limitations grounds.  Joint Decl. at ¶¶ 147-148.

#### (b) Risks of Establishing Liability Against KPMG

All of the foregoing risks of establishing the liability of the Wachovia Defendants apply with at least equal force to KPMG.  However, given KPMG's position as outside auditor, KPMG is not exposed to liability on a majority of the allegedly false and misleading statements made by the Wachovia Defendants.  For example, KPMG's potential liability never extended to alleged misstatements concerning the quality of the Pick-A-Pay loan portfolio or its LTV ratios. Notably, the Second Circuit's recent decision in *Fait* would have strengthened KPMG's arguments in support of its Motion to Reconsider on issues relating to the actionability of key

17

statements, including its arguments that inaccurate statements concerning a company's loan loss reserves and asset valuations are "opinions" for which there is no liability unless the Defendants did not actually believe in the truth of their "opinions."  If KPMG's view (which had also been urged by the Wachovia Defendants before they settled) had prevailed on reconsideration or on appeal, it would have greatly increased the risk that Bond Plaintiffs would have been unable to establish liability on their core claims as to any of the Defendants.  Joint Decl. at ¶¶ 149-150.

Moreover, in contrast to Wachovia and the other Wachovia Defendants that were "issuers" of the Bond Class Securities at issue, KPMG also had the opportunity to establish an affirmative "due diligence" defense to liability.[7]  Accordingly – even if *Fait* were found to have no material impact on pre-existing rules for establishing Section 11 liability for auditors, and even if Lead Bond Plaintiffs were able to establish that every challenged aspect of Wachovia's audited financial statements was in fact misstated – KPMG would still have had the opportunity to persuade the jury through expert testimony and otherwise that its audit work was thorough and diligent, and that any misstatements or inaccuracies in the audited financial statements were due, for example, to Wachovia's failure to appropriately inform KPMG of the extent to which the quality of Pick-A-Pay Portfolio and the underwriting of that portfolio was worse than what KPMG had reasonably understood it to be.  Joint Decl. at ¶ 151.

### (c) The Risks of Establishing Damages, and Related Loss Causation Issues

Under the federal securities laws, market loss does not equate with damages.  Indeed, it is fundamental that there can be no recovery in a Section 11 case where the loss was caused by factors unrelated to an alleged false statement or omission, and under §11(e) of the Securities Act

---

[7] Section 11 provides defendants other than the issuer with a "due diligence" defense to liability. *See* 15 U.S.C. §77k(b).

each defendant may limit his, her or its liability to only that portion of the investors' losses that reflects the amount by which the inflation in the price of the securities at issue was caused by the alleged inaccuracies in the Offering Materials.[8]

Here, the amount of damages which Bond Plaintiffs could have reasonably hoped to recover after taking into account causation issues was hotly disputed – and any resolution of this issue would have inevitably boiled down to a "battle of the experts" and the inherent risk that the jury would credit Defendants' experts over those of Lead Bond Plaintiffs. *See Hicks v. Morgan Stanley*, No. 01-cv-10071 (RJH), 2005 WL 2757792, at *6 (S.D.N.Y. Oct. 24, 2005) ("battle[s] of the experts" invariably "create[] a significant obstacle to plaintiffs"); *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 127 F. Supp. 2d 418, 426-27 (S.D.N.Y. 2001) ("[i]n such a battle, Plaintiffs' Counsel recognize the possibility that a jury could be swayed by experts for Defendants, who could minimize or eliminate the amount of Plaintiffs' losses"); *see also McKowan Lowe & Co. v. Jasmine, Ltd.*, Nos. 94-5522 (RBK) & 96-2318 (RBK), 2005 U.S. Dist. LEXIS 32164, at *36-37 (D.N.J. June 30, 2005) (defendants that offered persuasive proof that the alleged misrepresentations did not cause plaintiffs' losses were entitled to summary judgment on plaintiffs' §11 claims).  Defendants' main arguments in this regard included the following:

- *First,* Defendants vigorously argued that the market-changing events of the financial crisis of 2008 constituted an unforeseen and unprecedented crisis (or at least the worst crisis since the Great Depression) that was the actual cause of *all* (or at least most) of any losses suffered by investors in the Bond Class Securities here.  Indeed, as a threshold matter, Defendants pointed out that it was simply absurd to expect a jury to believe that *every* price decline experienced by the Bond Class Securities over more than a two year long period (from the date of the

---

[8] *See* 15 U.S.C. §77k(e) ("[I]f the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable.")

first Offering in July 2006 through the end of the Settlement Class Period) was caused by inaccuracies in the Offering Materials, and that an appropriate damages analysis would necessarily need to begin with a calculation of damages based on analysis limited to statistically significant trading dates. Joint Decl. at ¶ 157;

● *Second* and relatedly, Defendants argued that it was well-understood (*inter alia*) that (a) the basic strategy behind the Pick-A-Pay portfolio, based on historical experience, was that home mortgage loans originated with a 20% or greater equity cushion would experience minimal losses in the event of default, and that (b) substantially more than 50% of the portfolio consisted of mortgages on houses located in California and Florida. Accordingly, Defendants further argued, under normal (or even just plain bad) market conditions, the equity value "cushion" imbedded in the collateral underlying the Pick-A-Pay portfolio would have still been sufficient to insulate Wachovia from substantial financial losses, and that any resulting portfolio stresses (while potentially reducing the value of Wachovia's common stock) would have had minimal impact on the value of Wachovia's Notes and Preferred Stock. However, as Defendants pointed out, conditions in the housing market by the second half of 2008 were not just bad, but amounted to a financial disaster in which home prices generally experienced an unprecedented decline of 26% nationwide, and much worse in California and Florida. In other words, given the size of the "tsunami" that hit the housing markets, huge losses in the Pick-A-Pay portfolio were inevitable *regardless* of other factors alleged in the Amended Bond Complaint (such as inadequate reserves, low-FICO score borrowers, and inadequate income verification). *Id.* at ¶ 158;

● *Third*, Defendants also argued that their alternative explanations as to why the prices of many of the Bond Class Securities declined would gain significant credibility and weight given that by early 2011 the prices of all but a handful of the Bond Class Securities had recovered fully (or nearly so) since the worst days of the Fall 2008 to March 2009 crisis period (when U.S. financial markets hit bottom). According to Defendants, this evidence of price recovery constituted clear evidence of a lack of permanent impairment in the Pick-A-Pay portfolio, and supported the view that the temporary price declines suffered in 2008 were far more likely to have been caused by uncertainty surrounding the financial crisis (and related temporary liquidity concerns) rather than a supposed revelation that the Pick-A-Pay portfolio was not as conservatively underwritten as investors were led to believe. *Id.* at ¶ 159;

● *Fourth*, Defendants also contended that none of the Bond Class Securities had ever defaulted, and accordingly, there would be no recoverable damages with respect to any investors who held such securities through maturity. Given that the Bond Class Securities with respect to 17 of the 30 Offerings at issue in this Action would have matured by the end of August 2013, Lead Bond Counsel therefore had to consider the fact that the longer the case continued, the greater the

20

possibility that recoverable damages would be eliminated for holders of such maturing securities (for example, if the case were taken to trial). *Id.* at ¶ 160; and

- *Fifth*, Defendants also took issue with various aspects of the trading model that Lead Bond Plaintiffs' damages expert used to estimate class-wide damages. For example, Defendants contended that Lead Bond Plaintiffs' expert overestimated the volume of securities actually traded by failing to make appropriate adjustments for intra-day trading. These and numerous other "technical" disputes were the subject of extended discussion during both the Wachovia mediation and the later KPMG mediation. *Id.* at ¶ 161.

Based on their experts' damages analyses and consideration of the foregoing issues, the Wachovia Defendants averred that total recoverable damages that could be found by a jury in this Action were likely zero and that even if there were any damages, their experts would be able to present highly persuasive evidence that an overwhelming percentage – *if not all* – of the alleged damages were caused by the "financial tsunami" and/or other factors not properly attributable to any allegedly inaccurate statements contained in the Offering Materials. *Id.* at ¶ 162.[9]

For their part, based on their extensive consultations with their damages expert, Lead Bond Counsel determined that the maximum range of reasonably recoverable damages that they would have been able to credibly present to a jury in this Action – *assuming that they prevailed on all of their liability claims* – was between roughly $1.2 and $2.05 billion. *Id.* at ¶¶ 163-165. Thus, in terms of considering reasonable damages outcomes, a jury could have reasonably determined that damages in this case were as high as roughly $2.05 billion – or as little as *zero*. *Id.* at ¶ 166.

---

[9] In the wake of the $590 million Wachovia Settlement, KPMG would have also argued that it was entitled to favorable proportionate fault and judgment reduction treatment as a "non-settling defendant." Accordingly, although Bond Plaintiffs' reasonably recoverable total damages were in the range of $1.2 to $2.05 billion, as a practical matter Bond Plaintiffs were never likely to be able to recover more than a fraction of that amount against KPMG. Joint Decl. at ¶ 152.

In sum, the only certainty regarding damages was that the cause of the losses would be vigorously contested, and the risk of recovering *nothing* was all too real even if Bond Plaintiffs otherwise "ran the table" on liability. In any event, the numerous, specific and serious risks of litigation presented by the facts of this case also weigh strongly in favor of the requested fee.

### (d) General Litigation Risks and The Fully Contingent Nature of Plaintiffs' Counsel's Retention

In evaluating the contingent litigation risk, the Third Circuit Task Force on Selection of Class Counsel has specifically recognized that:

> It is plaintiffs' counsel who work to obtain whatever recovery any member of the class who has not opted out of the litigation will receive. The fact that there will be no payment if there is no settlement or trial victory means that there is greater risk for plaintiffs' counsel in these class action cases than in cases in which an hourly rate or flat fee is guaranteed. The *quid pro quo* for the risk, and for the delay in receiving any compensation in the best of circumstances, is some kind of risk premium if the case is successful.

Report, 74 Temp. L. Rev. 689, 691–92 (Winter 2001) (footnote omitted). *See also Flag Telecom*, 2010 WL 4537550, at *27 ("Courts in the Second Circuit have recognized that the risk associated with a case undertaken on a contingent fee basis is an important factor in determining an appropriate fee award."); *Am. Bank Note Holographics*, 127 F. Supp. 2d at 433 (it is "appropriate to take this [contingent-fee] risk into account in determining the appropriate fee to award"); *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 747–49 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986) (citing cases).

The risk of no recovery in complex cases of this type is real, and is heightened when plaintiffs' counsel press to achieve the very best result for those they represent. Indeed, even if Lead Bond Plaintiffs here had defeated Defendants' summary judgment motions and prevailed at trial on both liability and damages, no judgment would have been secure until after the rulings on the inevitable post-judgment motions and on the equally inevitable appeals became final – a

process that would likely take years.  Lead Bond Counsel know from experience that despite the most vigorous and skillful efforts, a firm's success in contingent litigation, such as this, is never assured, and there are many class actions in which plaintiffs' counsel expended tens of thousands of hours and received *nothing* for their efforts.  *See* Joint Decl. at ¶ 203 n.20 & n.21 (collecting numerous examples of cases where judgment was entered for defendants after years of costly litigation at summary judgment, at trial, on post-trial motions, or on appeal).  Indeed, even judgments affirmed on appeal by an appellate panel are no assurance of a recovery.  *See, e.g., Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (after 11 years of litigation, and following a jury verdict for plaintiffs and an affirmance by a First Circuit panel, plaintiffs' claims were dismissed by an *en banc* decision and plaintiffs recovered nothing).

Similarly, even the most promising multi-hundred million dollar cases can be eviscerated by a sudden change in the law after years of litigation.  *See, e.g., In re Alstom S.A. Sec. Litig.*, Master File No. 03-CV-6595 (VM) (after completion of extensive foreign discovery, 95% of plaintiffs' damages were eliminated by the Supreme Court's reversal of 40 years of unbroken circuit court precedents in *Morrison v. Nat'l Bank of Australia*, 130 S. Ct. 2869 (2010), which forced such a small settlement that plaintiffs' counsel – which included two of the Lead Bond Counsel firms in this case – had to write off more than 51,000 hours of attorney time ($21 million lodestar, as well as $2 million in expenses).  *See* Joint Decl. at ¶ 203.  Countless other significant cases have been lost after the investment of tens of thousands of hours of attorney time and millions of dollars on expert and other litigation costs at summary judgment or after trial.[10]  In fact, as recently as earlier this year, one of the Lead Bond Counsel firms in this case

---

[10] For illustrative examples, *see, e.g., In re IKON Office Solutions, Inc. Sec. Litig.*, MDL Docket No. 1318, No. 98-CV-4286, 2001 U.S. Dist. LEXIS 1172 (E.D. Pa. Feb. 6, 2001) (summary

had achieved one of the first favorable jury verdicts related to the subprime scandal, only to see it thrown out by the court on a J.N.O.V. motion after a six week trial.  *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, No. 07–61542–CIV, 2011 WL 1585605, at *24 (S. D. Fla. Apr. 25, 2011).[11]

Unlike counsel for the Defendants, who are paid substantial hourly rates and reimbursed for their expenses on a regular basis, Plaintiffs' Counsel have not been compensated for any of their time (over 79,000 hours) with a lodestar value of over $32 million, or reimbursed for any of their more than $860,000 in litigation expenses incurred over the more than 2½ years that have passed since the Action was commenced.  Moreover, Plaintiffs' Counsel would not have been compensated for their time at all had they been unsuccessful in this Action – and as the numerous cases cited above and in the Joint Declaration attest, there is simply no truth to the argument that a large fee is guaranteed by simply commencing a securities class action.  Because the fee to be awarded in this matter is entirely contingent, the only certainties from the outset were that there would be no fee without a successful result, and that a successful result, if any, could be achieved only after lengthy and difficult effort.   Lead Bond Counsel therefore respectfully submit that the fully contingent nature of their retention in this high-risk action

---

judgment for accountants on loss causation grounds); *Eisenstadt v. Centel Corp.,* 113 F.3d 738 (7th Cir. 1997) (affirming grant of summary judgment for defendants); *Searls v. Glasser,* No. 91 C 6796, 1994 U.S. Dist. LEXIS 13509 (N.D. Ill. Sept. 21, 1994), *aff'd,* 64 F.3d 1061 (7th Cir. 1995); *Freedman v. Value Health, Inc.*, 135 F. Supp. 2d 317 (D. Conn. 2001) (securities case dismissed on summary judgment).

[11] For other illustrative examples, *see, e.g., Robbins v. Koger Props., Inc.,* 116 F.3d 1441 (11th Cir. 1997) (reversal of jury verdict of $81 million against accounting firm after a 19-day trial); *Bentley v. Legent Corp.*, 849 F. Supp. 429 (E.D. Va. 1994), *aff'd,* 50 F.3d 6 (4th Cir. 1995) (directed verdict after plaintiffs' presentation of its case to the jury); *Landy v. Amsterdam*, 815 F.2d 925 (3d Cir. 1987) (directed verdict for defendants after five years of litigation;); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict following two decades of litigation); *In re Apple Computer Sec. Litig.*, No. C-84-20148(A)-JW (N.D. Cal. 1991) ($100 million jury verdict vacated on post-trial motions); *In re JDS Uniphase Corp. Sec. Litig.*, No. C02-1486 CW, 2007 WL 4788556 (N.D. Cal. Nov. 27, 2007) (defense verdict after four weeks of trial).

weighs strongly in favor of the requested fee, and should be given serious consideration by the Court.

### 4.    The Quality of Plaintiffs' Counsel's Representation Supports the Requested Fee

A number of considerations may be relevant to assessing the quality of class counsel's representation of a plaintiff class, including the Court's own observations, class counsel's experience and standing at the bar, and the quality of the opposing counsel whom class counsel had to litigate against.  The acid test for evaluating "quality of the representation," however, is the quality of the *results achieved* for the class members whom they were appointed to represent.

### (a) The Results Obtained From Lead Bond Counsel's Efforts, And The Absence of Any "Parallel" Government Actions

For all the reasons detailed in the accompanying Settlement Brief, Lead Bond Counsel respectfully submit that the results that they obtained for the Settlement Class in this Action are simply outstanding by any measure.  These results, without more, weigh strongly in favor of finding that the quality of Lead Bond Counsel's representation here was at the top end of the scale.

In addition, it is also significant that Lead Bond Counsel obtained these outstanding results without the benefit of (a) an accounting restatement by Wachovia (or withdrawal of any audit opinions by KPMG), or (b) any government action, at any level, alleging that any Defendants had misled Wachovia investors in any respect.  While the Settlements represent the 14th largest securities class action recovery ever, based on Lead Bond Counsel's research it appears that *each* of the 13 securities actions which resulted in a larger gross dollar recovery involved *both* a parallel SEC or related government action *and* an accounting restatement.  In other words, this is the single largest recovery ever in a securities class action not involving a restatement or government action.

As Judge Mukasey of this District observed, "[T]his is not a case where plaintiffs' counsel can be cast as jackals to the government's lion, arriving on the scene after some enforcement or administrative agency has made the kill."  *In re Gulf Oil/Cities Serv. Tender Offer Litig.,* 142 F.R.D. 588, 597 (S.D.N.Y. 1992).  Here, it is undisputed that Bond Plaintiffs' Counsel were the *only* "lion" anywhere in the picture.  *See also Flag Telecom*, 2010 WL 4537550, at *27 (absence of governmental action on which plaintiff could "piggy-back" supported award of requested fee); *In re AT&T Corp. Sec. Litig.*, 455 F.3d 160, 173 (3d Cir. 2006) (conclusion that fee award was fair and reasonable was strengthened by fact that class counsel was not aided by the efforts of any governmental investigation, thus, "the entire value of the benefits accruing to class members is properly attributable to the efforts of class counsel"); *In re Xcel Energy, Inc. Sec., Derivative & ERISA Litig.*, 364 F. Supp. 2d 980, 994, 999 (D. Minn. 2005) (the fact that plaintiff's counsel had not benefited from any "meaningful governmental investigation . . . [or] restatement of financials" supported 25% fee award); *In re Rite Aid Corp. Sec. Litig.*, 362 F. Supp. 2d 587, 590 (E.D. Pa. 2005) (affirming second fee award of 25% in case involving $319.6 million in total recoveries because plaintiffs' counsel had obtained "unprecedented results without relying on the fruits of any official investigation").

The ability to achieve $627 million in settlements without a government agency even bringing an action (much less actually recovering something for investors) further highlights the quality of the representation in the instant matter and fully supports the requested fee.  Lead Bond Counsel therefore respectfully submit that the fact that they had to rely *entirely* on their

own efforts in achieving such outstanding results is a very significant factor that weighs heavily in finding that the "quality of counsel" here was exceptional.[12]

### (b) The Court's Observations as to the Quality of Lead Bond Counsel's Work

The Court may, of course, also take into account its own observations of the quality of Lead Bond Counsel's representation during the course of this litigation. Here, representatives of the Lead Bond Counsel firms have appeared on multiple occasions before the Court; in addition, the Court has personally reviewed (*inter alia*) the Amended Bond Complaint, Lead Bond Counsel's briefs in opposition to the various Defendants' Motions to Dismiss, and the numerous papers submitted to the Court in connection with both preliminary and final approval of the Settlements, all of which have been prepared by Lead Bond Counsel. Although this work represents only a small fraction of the total work that Plaintiffs' Counsel have performed in the course of litigating this case, we respectfully submit that the quality of that work is reflective of the quality, thoroughness and professionalism of the effort that Plaintiffs' Counsel have devoted to all aspects of this Action on behalf of the Bond Plaintiffs and the members of the Settlement Class.[13]

---

[12]   We note that while Lead Bond Counsel were litigating this Bond Action, counsel for the Equity Plaintiffs were pursuing the "parallel" Equity Actions, and that the Equity Actions included "parallel" Securities Act claims based on common stock offering materials that incorporated many of the same false and misleading statements that were also incorporated into the Offering Materials for the Bond Class Securities. However, as set forth in the Joint Decl. at ¶ 190 n.19, Lead Bond Counsel never relied on any work performed by the Equity Plaintiffs' Counsel.

[13] Indeed, but for the vigilance and diligence of Lead Bond Plaintiffs and Lead Bond Counsel, it appears likely that none of the claims asserted in this Action covered by the Settlements would ever have been filed. *See* Joint Decl. at ¶¶ 24-25. Such factors also evidence the quality of Lead Bond Counsel's representation here.

### (c) The Standing and Expertise of Lead Bond Counsel

Lead Bond Counsel are highly experienced in prosecuting securities class actions, and worked diligently and efficiently to prosecute the Bond Action.  Their experience and track record in complex securities class action litigation are summarized in the firm resumes attached to their respective declarations.  *See* Exhibits 6A-3, 6B-3 and 6C-3 to the Joint Decl.  All three firms are consistently ranked among the top plaintiffs' firms in the country.  Further, each firm has taken complex securities fraud class action cases to trial, and are among the few firms to have done so.  Lead Bond Counsel respectfully submit that their willingness and ability to litigate cases through trial added critical leverage in the settlement negotiations.

### (d) The Standing and Expertise of Defendants' Counsel

The quality of the work performed by Lead Bond Counsel in obtaining the Settlements should also be evaluated in light of the quality of the opposition.  *See, e.g., In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.,* No. 03 MDL 1529 (LMM), 2006 WL 3378705, at *3 (S.D.N.Y. Nov. 16, 2006) (McKenna, J.) ("The fact that the settlements were obtained from defendants represented by 'formidable opposing counsel from some of the best defense firms in the country' also evidences the high quality of lead counsel's work").  Here, the Defendants were represented by some of the country's most prestigious law firms – namely Fried, Frank, Harris, Shriver & Jacobson, LLP for the Wachovia Defendants, Williams & Connolly LLP for KPMG, and Sidley Austin LLP for the Underwriter Defendants – which all vigorously defended the Action throughout.  That Lead Bond Counsel were able to negotiate such outstanding recoveries in the face of such formidable (and well-financed) opposition is a telling testament to the skill and dedication that they brought to every phase of this litigation.

In sum, all of the customary metrics indicative of exceptional "quality of representation" also weigh in favor of the requested fee here.

**5.    The Requested Fee Is Fair and Reasonable In Relation to the Size of the Recoveries and Comparable Fee Awards**

As noted in § I.C above, the requested 17.5% fee falls *squarely in the middle* of the "range of reasonableness" based on fees awarded by courts across the nation in other large securities cases settling in the $100 million to $1 billion range, including in the multi-hundred million dollar cases from within this District and Circuit – and the requested fee is actually less than the 18.4% average for fees awarded in those securities class action cases that have settled for between $500 million and $750 million.

These datapoints alone suggest that the requested 17.5% fee here is justified in relation to the size of the recovery.  However, the Court should also appropriately consider the extent to which the other *Goldberger* factors, considered in their totality, merit an upward or downward departure from a "middle of the range" fee award.

Lead Bond Counsel respectfully submit that, on the facts of this case, the only adjustment that would be appropriate here would be to award an even larger fee, and that the only factor that precludes them from seeking a materially larger fee here is their commitment to honor the "fee cap" that was established *ex ante* under the SEPTA Fee Agreement.  Indeed, as set forth herein, every other *Goldberger* factor would argue for a decidedly better-than-average, if not a "top-end," percentage fee.  *A fortiori,* the requested middle-of-the-range 17.5% fee is fully merited.

Without belaboring the point, Lead Bond Counsel respectfully submit that a closer review of the "comparable" cases considered above only highlights several of the many respects in which the fee request here compares quite favorably to those approved by other courts.  For example, as previously discussed above, it appears that (1) *no* other securities class action has *ever* settled for a larger amount without the benefit of a "parallel" government investigation into securities law violations (if not criminal convictions and/or large SEC settlements), and (2) *no*

other securities class action has *ever* settled for more in the absence of an accounting restatement.  *See* Exhibit B attached hereto (listing top 15 securities class action settlements).

Indeed, some of the biggest securities class action cases – including cases involving fee awards either equal to or significantly *greater* than that requested here – involved **both** major government investigations **and** a large accounting restatement.  *Compare, e.g.*:  *Cardinal Health* (18% fee awarded on $600 million recovery in case involving both gov't action and restatement); *HealthSouth Stockholders* (17.6% fee awarded on $537.5 million recovery in case involving both gov't action and restatement); *Adelphia* (21.4% fee awarded on $455 million recovery in case involving both gov't action and restatement); *Freddie Mac* (20% fee awarded on $410 million recovery in case involving both gov't action and restatement); *Global Crossing* (17.8% fee awarded on $408 million recovery in case involving both gov't action and restatement); and *Rite Aid* (25% fee awarded on $319.6 million recovery in case involving both gov't action and restatement); *see also Xerox* (16% fee awarded on $750 million recovery in case involving both gov't action and accounting restatement).[14]

In addition, Lead Bond Counsel respectfully submit that there have been very few securities class action settlements exceeding $500 million (or even $100 million) in which the recovery obtained as a percentage of reasonably provable maximum damages is close to the 30-50% recovered in the instant matter – even in cases involving both government actions and

---

[14] Although so large that they are not comparable to the instant action, as set forth in Exhibit B, all of the "mega" securities class action cases that have settled for $1 billion or more also involved *both* highly publicized government actions (if not criminal convictions) *and* massive accounting restatements.  *See, e.g., In re Tyco Int'l, Ltd. Sec. Litig.,* 535 F. Supp. 2d 249, 265-74 (D.N.H. 2007); *In re WorldCom, Inc. Sec. Litig.,* 294 F. Supp. 2d 431, 439 (S.D.N.Y. 2003); *In re Cendant Corp. Litig.,* 60 F. Supp. 2d 354, 359 (D.N.J. 1999).

restatements.   Under *Goldberger,* it is clear that achievement of such an outstanding result should be rewarded with a commensurate fee.

In short, a review of the requested 17.5% fee as a percentage of the Settlements, particularly in light of the other *Goldberger* factors and a review of fee awards in other large cases, provides further support for granting the request in full.

###     6.     The Time and Labor Expended by Plaintiffs' Counsel, Including a "Lodestar Crosscheck," Support the Requested Fee

The Second Circuit also permits courts to utilize a lodestar "crosscheck" to further test the reasonableness of a percentage-based fee.  *See Goldberger,* 209 F.3d at 50.  The "lodestar" is calculated by multiplying the number of hours expended on the litigation by each particular attorney or paraprofessional by their current hourly rate, and totaling the amounts for all timekeepers.[15]

Additionally, "[u]nder the lodestar method of fee computation, a multiplier is typically applied to the lodestar."  *Global Crossing,* 225 F.R.D. at 468.  "The multiplier represents the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors."  *Id.* (citing *Goldberger,* 209 F.3d at 47); *Savoie,* 166 F.3d at 460; *see also In re Cardinal Health Inc. Sec. Litig.,* 528 F. Supp. 2d 752, 761 (S.D. Ohio 2007) ("the Court rewards [] lead counsel that takes on more risk, demonstrates superior quality, or achieves a greater settlement with a larger lodestar multiplier"); *In re Microstrategy, Inc. Sec.*

---

[15] Both the Supreme Court and courts in this Circuit have long approved the use of current hourly rates to calculate the base lodestar figure as a means of compensating for the delay in receiving payment that is inherent in class actions, inflationary losses, and the loss of access to legal and monetary capital that could otherwise have been employed had class counsel been paid on a current basis during the pendency of the litigation.  *See In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.,* 724 F. Supp. 160, 163 (S.D.N.Y. 1989); *Veeco,* 2007 WL 4115808 at *9; *Missouri v. Jenkins*, 491 U.S. 274, 284 (1989).

*Litig.*, 172 F. Supp. 2d 778, 788 (E.D. Va. 2001) ("to achieve the other objectives of a fair and reasonable fee award under the PSLRA, namely, to reward lead counsel for the favorable result achieved for the class and to provide an incentive for competent lawyers to pursue such actions in the future on an essentially contingent basis, the ultimate award must be *substantially greater* than the lodestar figure") (emphasis added).

In this entirely contingent action, Bond Plaintiffs' Counsel have collectively spent more than 79,000 hours, representing a lodestar of $32,736,353.30, in investigating, prosecuting and ultimately settling these claims  The vast majority of this time (roughly 68,000 hours or 86%) was expended by Lead Bond Counsel, with the remainder incurred by Additional Bond Counsel in connection with the prosecution and/or resolution of the Action.[16]  All time spent by Plaintiffs' Counsel on litigating this matter was reasonably necessary and appropriate – and they respectfully submit, that the results achieved further confirm that the time spent on the case was entirely proportionate to the amounts at stake.   At the same time, Lead Bond Counsel also litigated efficiently and allocated work assignments to avoid duplication of efforts.

Based on a 17.5% fee, Bond Plaintiffs' Counsel's combined lodestar of $32,736,353.30 would yield a "crosscheck" multiplier of roughly 3.35.  Joint Decl. at ¶ 211.  Like the requested 17.5% fee award, the inferred 3.35 lodestar multiplier here also falls well within the range of multipliers awarded in other complex cases, including other securities class actions that were certainly no more exceptional than this one.

Simply stated, in complex contingent litigation, lodestar multiples of 3 or greater are commonly awarded in this Circuit and throughout the nation.  *See Maley*, 186 F. Supp. 2d at 369

---

[16] The time expended by each legal professional and paraprofessional who worked on this matter (including their hourly rates and the resulting lodestar for each individual and law firm) is set forth in the respective firm fee declarations.  *See* Joint Decl. at Exhibits 6A – 6F.

(awarding fee equal to a 4.65 multiplier as "well within the range awarded by courts in this Circuit and courts throughout the country"); *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 736 & n.44 (E.D. Pa. 2001) and *In re Rite Aid Corp. Sec. Litig.*, 362 F. Supp. 2d 587, 590-91 (E.D. Pa. 2005) (awarding fees of 25% in case involving combined recoveries of $319.6 million with multiplier of 4.5 to 8.5 with respect to one recovery and 6.96 lodestar for the other, for an aggregate multiplier of roughly 6.7); *In re 3Com Corp. Sec. Litig.*, No. C-97-21083, slip op. at 10 (N.D. Cal. Mar. 9, 2001) (awarding fee equal to 18% and 6.67 multiplier in case involving recovery of $259 million); *Cardinal Health*, 528 F. Supp. 2d at 767-70 (awarding fee equal to 18% and 5.9 multiplier in case involving recovery of $600 million, and commenting that [g]iven the outstanding settlement in this case and the noticeable skill of counsel, a lodestar multiplier greater than the average would not be unwarranted or unprecedented").[17]   Case law involving fee awards in other similarly large and complex types of class actions stand for the same proposition. *See, e.g., Wal-Mart*, 396 F.3d at 123 (multiplier of 3.5 approved on appeal); *In re NASDAQ Market-Makers Antitrust Litig.,* 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (awarding 3.97 multiplier, and finding fee awards of 3 to 4.5 to be "common"); *In re Sumitomo Copper Litig.,* 74 F. Supp. 2d 393, 399 (S.D.N.Y. 1999) (similarly finding 3 to 4.5 multipliers to be common).

---

[17] *See also In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 130-35 (D.N.J. 2002) (awarding 21.6% fee equal to 4.3 multiplier in case involving $194 million recovery); *In re DaimlerChrysler AG Sec. Litig.*, No. 00-0993 (KAJ), slip op. at 1 (D. Del. Feb. 5, 2004) (awarding fee equal to 22.5% and 4.21 multiplier in case involving $300 million recovery); *In re Gen. Motors Corp. Sec. & Deriv. Litig.*, No. 06-md-1749, slip. op. at 2 (E.D. Mich. Jan. 6, 2009) (awarding 15% fee equal to 3.7 multiplier in case involving $303 recovery); *In re Doral Fin. Corp. Sec. Litig.*, No. 05-cv-4014, slip. op. at 5 (S.D.N.Y. July 17, 2007) ($129 million recovery for class; awarding fee equal to a "reasonable multiplier of 10.26"); *In re Deutsche Telekom AG Sec. Litig.*, No. 00-CV-9475 (NRB), 2005 U.S. Dist. LEXIS 45798, at *13-*14 (S.D.N.Y. June 9, 2005) ($120 million recovery for class; awarding fee equal to 3.97 multiplier); *In re Interpublic Sec. Litig.*, No. 02 Civ. 6527 (DLC), 2004 WL 2397190, at *12 (S.D.N.Y. Oct. 26, 2004) ($96.4 million recovery for class; awarding fee equal to a 3.96 multiplier).

Moreover, the lodestar "crosscheck" is exactly that – a rough crosscheck that is not intended to supplement the primacy of the percentage-based method.  For example, as the court expressly noted in *Rite Aid*, 146 F. Supp. 2d at 736 n.44, if high multipliers are not allowed in cases involving large dollar recoveries, then the lodestar approach "begins to dominate and supersede the percentage of the recovery formula," particularly in those exemplary cases where the recovery greatly exceeds the norm for such litigation.  *Id.; see also In re Rite Aid Corp. Sec. Litig.,* 396 F.3d 294, 307 (3d Cir. 2005) ("the lodestar cross-check does not trump the primary reliance on the percentage of the common fund method").  Courts in this District have similarly emphasized that the lodestar crosscheck should not override the percentage approach where class counsel's efforts have produced exceptional results.  For example, in *In re Buspirone Antitrust Litig.,* No. 01-CV-7951 (JGK), MDL Dkt. No. 1413 (S.D.N.Y. Apr. 17, 2003), Judge Koetl awarded a 33 ⅓% fee with an 8.46 multiplier.  Similarly, in *Newman v. Caribiner Int'l, Inc.,* 99 Civ. 2271 (S.D.N.Y. Oct. 19, 2001), U.S. District Judge (now Circuit Judge) Gerald Lynch observed that

> I wanted to note that, in my view, there is no difficulty with the fact candidly acknowledged in the papers that, in terms of the time expended, this is a profitable case for the plaintiffs' lawyers who worked on it.  Contingency type percentage settlements serve an important purpose … so it is important in awarding or approving a fee settlement in a case of this kind not to be [blinded] that in this particular case, calculated on an hourly basis, [that] this is a very large, high proportion to what hourly charges would have been.

*Id.* at 6.  Judge Lynch then appropriately proceeded to approve a percentage-based fee that equated to a 7.7 multiplier.  *Id.*

For the same reasons as discussed above, given the outstanding results achieved solely due to class counsel's independent efforts in the face of substantial litigation risk, a multiplier at the very highest end of the acceptable spectrum would be justified.  However, the requested

multiplier of 3.35 falls well within the range of "lodestar crosschecks" that are regularly approved in complex class actions, and should also be approved here.

### 7.    Important Public Policy Considerations Further Support the Requested Fee

Finally, although it is a factor that is too often given only cursory attention, public policy considerations constitute a final but nonetheless very significant factor to consider in evaluating a fee request.  *See Goldberger*, 209 F.3d at 50; *Flag Telecom*, 2010 WL 4537550, at *29; *see also WorldCom*, 388 F. Supp. 2d at 359  ("to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives"); *In re Priceline.com, Inc. Sec. Litig.*, No. 00-cv-1884 (AVC), 2007 WL 2115592, at *5 (D. Conn. July 20, 2007) (fee awards in complex securities cases "help[] to perpetuate the availability of skilled counsel for future cases of this nature"); *Hicks*, 2005 WL 2757792, at *9 ("[t]o make certain that the public is represented by talented and experienced trial counsel, the remuneration should be both fair and rewarding"); *Maley*, 186 F. Supp. 2d at 369 ("courts recognize that such awards serve the dual purposes of encouraging representatives to seek redress for injuries caused to public investors and discouraging future misconduct of a similar nature").

Similarly, for decades the Supreme Court has consistently recognized that the public has a particularly strong interest in incentivizing top-quality plaintiffs' counsel to pursue private actions under the federal securities laws to protect investors, to deter violations and to help maintain the integrity of the nation's securities markets.  As stated by Justice Ginsburg, "This Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission (SEC)."

*Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 313 (2007) (citations omitted).[18]

Indeed, as Congress recognized in passing the PSLRA in 1995:

> Private securities litigation is an indispensable tool with which defrauded investors can recover their losses without having to rely on government action. Such private lawsuits promote public and global confidence in our capital markets and help to deter wrongdoing and to guarantee that corporate officers, auditors, directors, lawyers and others properly perform their jobs. This legislation seeks to return the securities litigation system to that high standard.

H.R. Conf. Rep. at 31 (1995).  Simply stated, the SEC, a vital but seriously understaffed agency whose inadequate funding has been the subject of numerous news stories and other accounts in recent years, does not have anywhere near the budget or personnel to ensure enforcement of the securities laws, and if anything its problems have grown only more severe in recent years.  *See* Joint Decl. at ¶ 208.  If the vitally important public policy of supplementing SEC enforcement through effective private litigation is to be carried out, the courts should award fees that appropriately reward plaintiffs' counsel for obtaining outstanding results for the many risks that they assume in prosecuting securities class actions.

The importance of this public policy is particularly evident in this case.  Scarcely a handful of securities law enforcement actions have been brought by any government authorities (including the SEC) against any financial institutions in the wake of the 2008 financial collapse, notwithstanding that it defies credulity to believe that none of the leading financial institutions

---

[18] *See also,  J. I. Case Co. v. Borak*, 377 U.S. 426, 432 (1964) (private securities actions provide "a most effective weapon in the enforcement" of the securities laws and are "a necessary supplement to [SEC] action"); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730 (1975) (recognizing that private enforcement of Commission rules "[provides] a necessary supplement to Commission action"); *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 (1983) ("the interests of plaintiffs in [private securities suits] are significant"); *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (same);  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) ("The securities statutes seek to maintain public confidence in the marketplace" and "[t]hey do so by deterring fraud, in part, through the availability of private securities fraud actions").

were responsible for the crisis *and* for failing to adequately disclose to investors the extent of the risks that they were exposed to as a result of their pre-crisis misconduct.  Consistent with this pattern, here the SEC *did not even file a complaint* against any of the Defendants – yet Lead Bond Counsel have recovered *$627 million* on behalf of investors.  Such recoveries are only possible where plaintiffs' counsel receive rewards commensurate with the magnitude of their successes – *especially* in cases where there is no public governmental complaint or investigation that plaintiffs can use to help build their claims – because assuredly there will be significant losses in other similarly risky cases brought against similarly powerful financial institutions who, after all, can afford to retain the very best lawyers in the world to defend them.  Joint Decl. at ¶ 209.

For the foregoing reasons, public policy considerations provide strong further support for a "top end" award of attorney's fees here – let alone for a fee that is well within the established measures of reasonableness.[19]

## II.    LEAD BOND COUNSEL'S REQUEST FOR REIMBURSEMENT OF LITIGATION EXPENSES SHOULD BE APPROVED

It is well established that counsel who create a common fund are entitled to the reimbursement of expenses that they advance to a class.  *LeBlanc-Sternberg v. Fletcher,* 143 F.3d 748, 763 (2d Cir. 1998); *In re China Sunergy Sec. Litig.,* No. 07 Civ. 7895 (DAB), 2011 WL 1899715 at *6 (S.D.N.Y. May 13, 2011); *Veeco*, 2007 WL 4115808, at *10.

---

[19] The reaction of the Settlement Class may also be considered in assessing the reasonableness of a requested fee.  *See Veeco*, 2007 WL 4115808, at *10; *Maley*, 186 F. Supp. 2d at 374.  Although the October 25, 2011 deadline for objections to the requested fee has not yet passed, no objections have been received to date.  Lead Bond Counsel will address any objections to the request for fees and expenses that may be received in a supplemental submission to be filed on November 7, 2011.

For the Court's convenience, the Joint Declaration and individual declarations submitted on behalf of each individual Plaintiffs' Counsel firm include exhibits summarizing the various categories of expenses they incurred in the course of prosecuting the Bond Action.  *See* Joint Decl. at Exhs. 6A – 6F.  These expenses include the costs of experts and consultants, online legal and factual research, developing and maintaining the electronic discovery platform that counsel used to search, review and analyze Defendants' documents productions, court fees, travel expenses, copying costs, facsimile charges, court reporting services, postage and delivery expenses, and Judge Weinstein's mediation fees.  Plaintiffs' Counsel respectfully submit that the expenses sought here ($860,877.47) were all reasonably and necessarily incurred, and are of the type that is customarily reimbursed in securities cases.  *See, e.g., Global Crossing*, 225 F.R.D. at 468.

## CONCLUSION

The total recoveries of $627 million under the proposed Settlements represent an extraordinary result achieved in a high risk case in the face of determined adverse parties and without the benefit of *any* government actions (let alone recoveries) on behalf of investors.  Lead Bond Counsel respectfully submit that if any case merits a fee award at the very "top end" of the customary fee award scale, it is *this* type of case – yet here the requested 17.5% fee is not at the top of the scale, but is *squarely in the middle* of the range of fees awarded in other large cases. The requested fee is also lower than the percentage expressly authorized under the *ex ante* fee agreement negotiated by one of the Lead Bond Plaintiffs, and all Lead Bond Plaintiffs (which are all large and sophisticated institutional investors) have also unanimously approved the requested fee *ex post* based on the results achieved and the other factors discussed in their respective Declarations.

Accordingly, for all of the reasons set forth herein and in the Joint Declaration, Lead Bond Counsel respectfully request that the Court grant their request for an award of attorneys' fees equal to 17.5% of the Settlement Fund, and for reimbursement of their litigation expenses in the amount of $860,877.47.

Dated: October 10, 2011

Respectfully submitted,

**BERNSTEIN LITOWITZ**
**BERGER & GROSSMANN LLP**

By:  /s Max Berger
Max W. Berger
Chad Johnson
William C. Fredericks
Kurt Hunciker
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**

By:  /s David Kessler
David Kessler
John Kehoe
Christopher L. Nelson
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**ROBBINS GELLER**
**RUDMAN & DOWD LLP**

By:  /s John J. Rice
Darren Robbins
John J. Rice
Keith Park
Luke Olts
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile (619) 231-7423

## EXHIBIT A

## FEE AWARDS ON PSLRA SECURITIES CLASS ACTION SETTLEMENTS FROM $100 MILLION TO $1 BILLION

| | Case Name | Settlement Amount (in millions) | Fee Award % |
|---|---|---|---|
| 1 | In re UnitedHealth Group Inc. PSLRA Litig., 643 F. Supp. 2d 1094, 1106 (D. Minn. 2009) | $926 | 7% |
| 2 | Carlson v. Xerox Corp., 596 F. Supp. 2d 400, 414 (D. Conn. Jan. 14, 2009) | $750 | 16% |
| 3 | In re Countrywide Fin. Corp. Sec. Litig., No. 07-cv-05295, Dkt. No. 1062, slip op. at 4 (C.D. Cal. March 4, 2011) | $601.5 | 7.7% |
| 4 | In re Cardinal Health, Inc. Sec. Litig., 528 F. Supp. 2d 752, 770 (S.D. Ohio 2007) | $600 | 18% |
| 5 | In re IPO Sec. Litig., 671 F. Supp. 2d 467, 516 (S.D.N.Y. 2009) | $586 | 33.3% |
| 6 | In re HealthSouth Corp. Stockholder Litig., No. 03-cv-1500, Dkt. No. 1112, slip op. at 2 (N.D. Ala. Feb. 12, 2008), Dkt. No. 1617, slip op. at 1 (N.D. Ala. June 12, 2009); Dkt. No. 1721, slip op. at 2 (N.D. Ala. July 26, 2010) | $537.5 | 18.1% |
| 7 | In re Lucent Tech., Inc., Sec. Litig., 327 F. Supp. 2d 426, 442 (D.N.J. 2004) | $517 | 17% |
| 8 | In re BankAmerica Corp. Sec. Litig., 228 F. Supp. 2d 1061, 1066 (E.D. Mo. 2002) | $490 | 18% |
| 9 | In re Merrill Lynch & Co., Inc. Sec., Derivative & ERISA Litig., No. 07-cv-9633, 2009 WL 2407551, at *1 (S.D.N.Y. Aug. 4, 2009) | $475 | 7.8% |
| 10 | In re Dynegy Inc. Sec. Litig., Master File No. H-02-1571, Dkt. No. 686, slip op. at 1 (S.D. Tex July 7, 2005) | $474 | 8.7% |
| 11 | In re Raytheon Co. Sec. Litig., No. 99-12142, Dkt. No. 645, slip op. at 9 (D. Mass. Dec. 6, 2004) | $460 | 9% |
| 12 | In re Waste Management Sec. Litig., No. 99-2183, Dkt. No. 248, slip op. at 14 (S.D. Tex. Apr. 29, 2002)  (Waste Management II) | $457 | 7.9% |
| 13 | In re Adelphia Commc'ns Corp. Sec. & Derivative Litig., No. 03 MDL 1529 LMM, 2006 WL 3378705, at *3 (S.D.N.Y. Nov. 16, 2006), aff'd, 272 Fed. Appx. 9 (2d Cir. 2008) | $455 | 21.4% |
| 14 | In re Qwest Communications Int'l, Sec. Litig., No. 01-cv-1451, 2006 U.S. Dist. LEXIS 71267, at *31 (D. Colo. Sept. 29, 2006), 625 F. Supp. 2d 1143, 1154 (D. Colo. May 27, 2009) | $445 | 15% |
| 15 | Ohio Pub. Employees Ret. Sys. v. Freddie Mac., No. 03-CV-4261, 2006 U.S. Dist. LEXIS 98380 at *4 (S.D.N.Y. Oct. 26, 2006) | $410 | 20% |
| 16 | In re Global Crossing Sec. & ERISA Litig., 225 F.R.D. 436, 469 (S.D.N.Y. 2004); No. 02 Civ. 910 (GEL), 2005 WL 1668532, at *5 (S.D.N.Y. July 12, 2005); Dkt. No. 619 (Aug. 8, 2005); Dkt. No. 680 (Mar. 2, 2006); Dkt. No. 722 (Oct. 30, 2006);   Dkt. No. 773 (Oct. 1, 2007) | $408 | 17.8% |
| 17 | In re Marsh & McLennan Cos., Sec. Litig., No. 04-civ-8144, 2009 WL 5178546, at *19-20 (S.D.N.Y. Dec. 23, 2009) | $400 | 13.5% |
| 18 | In re Cendant PRIDES Litig., No. 98-2819, Dkt. No. 178, slip op. at 47 (D.N.J. June 11, 2002); Dkt. No. 192, slip op. at 2 (D.N.J. Feb. 1, 2006) | $374 | 7.7% |

**EXHIBIT A**

**FEE AWARDS ON PSLRA SECURITIES CLASS ACTION SETTLEMENTS FROM $100 MILLION TO $1 BILLION**

| | Case Name | Settlement Amount (in millions) | Fee Award % |
|---|---|---|---|
| 19 | In re Refco, Inc. Sec. Litig., No. 05 Civ. 8626 (JSR), Dkt. No. 757, slip op. at 2 (S.D.N.Y. Oct. 27, 2010); Dkt. No. 781, slip op. at 2 (S.D.N.Y. Mar. 22, 2011) | $367.3 | 12.3% |
| 20 | In re Rite Aid Corp. Sec. Litig., 146 F. Supp. 2d 706, 736 (E.D. Pa. 2001) (awarding 25% of $193 million with multiplier of 4.5 to 8.5); 362 F. Supp. 2d 587 (E.D. Pa. March 24, 2005) (reaffirming award of 25% of $126.6 million with 6.96 multiplier) (muliplier in chart is weighted average of 6.5 and 6.96) | $319.6 | 25% |
| 21 | In re Williams Sec. Litig., No. 02-cv-72-SPF, Dkt. No. 1638, slip op. at 2 (N.D. Okla. Feb. 12, 2007) | $311 | 25% |
| 22 | In re General Motors Corp. Sec. and Derivative Litig., No. 06-md-1749, Dkt. No. 139, slip op. at 2 (E.D. Mich. Jan. 6, 2009) | $303 | 15% |
| 23 | In re Oxford Health Plans, Inc. Sec. Litig., MDL No. 1222, 2003 U.S. Dist. LEXIS 26795, at *13 (S.D.N.Y. June 12, 2003); Dkt. No. 369, slip op. at 8 (S.D.N.Y. June 12, 2003) | $300 | 28% |
| 24 | In re DaimlerChrysler AG Sec. Litig., No. 00-0993 (KAJ), Dkt. No. 971, slip op. at 1 (D. Del. Feb. 5, 2004) | $300 | 22.5% |
| 25 | In re Bristol-Myers Squibb Sec. Litig., 361 F. Supp. 2d 229, 231 (S.D.N.Y. 2005) | $300 | 4% |
| 26 | Wyatt v. El Paso Corp., No. 02-2717, Dkt. No. 376, slip op. at 2 (S.D. Tex. Mar. 9, 2007) | $285 | 14.4% |
| 27 | In re Tenet Healthcare Corp. Sec. Litig., No. 02-8462, Dkt. No. 296, slip op. at 3 (C.D. Cal. May 26, 2006); Dkt. No. 444, slip op. at 9 (C.D. Cal. Dec. 4, 2008) | $282 | 13.9% |
| 28 | In re HealthSouth Bondholder Litig., No. 03-cv-1500, Dkt. No. 1113, slip op. at 2 (N.D. Ala. Feb. 12. 2008); Dkt. No. 1722, slip op. at 2-3 (N.D. Ala. 2010) | $267 | 11.5% |
| 29 | In re 3Com Corp. Sec. Litig., No. C-97-21083, Dkt. No. 180, slip op. at 12 (N.D. Cal. Mar. 9, 2001) | $259 | 18% |
| 30 | In re Charles Schwab Corp. Sec. Litig., No. C 08-01510 WHA, 2011 WL 1481424, at *8 (N.D. Cal. Apr. 19, 2011) | $235 | 9.2% |
| 31 | In re Comverse Tech., Inc., Sec. Litig., No. 06-1825, 2010 WL 2653354, at *6 (E.D.N.Y. June 23, 2010) | $225 | 25% |
| 32 | In re Waste Management, Inc. Sec. Litig., No. 97 C 7709, 1999 WL 967012, at *3 (N.D. Ill. Oct. 18, 1999) | $220 | 20% |
| 33 | In re Sears, Roebuck & Co. Sec. Litig., No. 02-7527, Dkt. No. 289, slip op. at 7 (N.D. Ill. Jan. 8, 2007) | $215 | 14.8% |
| 34 | In re The Mills Corp. Sec. Litig., 265 F.R.D. 246, 266 (E.D. Va. 2009) | $202.8 | 18% |
| 35 | In re CMS Energy Sec. Litig., No. 02-cv-72004, 2007 U.S. Dist. LEXIS 96786, at *14 (E.D. Mich. Sept. 6, 2007) | $200 | 22.5% |
| 36 | In re WellCare Health Plans, Inc. Sec. Litig., No. 07-1940, Dkt. No. 278, slip op. at 2 (M.D. Fla. May 4, 2011) | $200 | 17% |

## EXHIBIT A

## FEE AWARDS ON PSLRA SECURITIES CLASS ACTION SETTLEMENTS FROM $100 MILLION TO $1 BILLION

| | Case Name | Settlement Amount (in millions) | Fee Award % |
|---|---|---|---|
| 37 | In re AremisSoft Corp. Sec. Litig., 210 F.R.D. 109, 130-35 (D.N.J. 2002) | $194 | 21.6% |
| 38 | In re Motorola Sec. Litig.,  No. 03-287, Dkt. No. 531-2, slip op. at 9 (N.D. Ill. Sept. 7, 2007) | $190 | 15.1% |
| 39 | In re Bristol-Myers Squibb Sec. Litig., No. 00-1990 (SRC), Dkt. No. 367, slip op. at 2 (D.N.J. May 11, 2006), *aff'd* 2007 WL 2153284 (3d Cir. 2007) (unpublished) | $185 | 19.8% |
| 40 | In re Maxim Integrated Prods. Inc. Sec. Litig., No. 08-832, Dkt. No. 312, slip op. at 2 (N.D. Cal. Nov. 1, 2010) | $173 | 17% |
| 41 | In re Juniper Networks, Inc. Sec. Litig., No. 06-4327, Dkt. No. 623, slip op. at 1-2 (N.D. Cal. Aug. 31, 2010) | $169.5 | 5.3% |
| 42 | In re Schering-Plough Corp. Sec. Litig., No. 01-829, 2009 WL 5218066, at *5-*6 (D.N.J. Dec. 31, 2009) | $165 | 23% |
| 43 | In re Dollar General Corp. Sec. Litig., No. 3:01-0388, Dkt. No. 209, slip op. at 16 (M.D. Tenn. May 24, 2002) | $162 | 20.9% |
| 44 | In re Broadcom Corp. Class Action Litig., No. 06-05036, Dkt. No. 355, slip op. at 1 (C.D. Cal. Aug. 11, 2010) | $160.5 | 18.5% |
| 45 | In re Brocade Sec. Litig., No. 05-2042, Dkt. No. 496, slip op. at 13 (N.D. Cal. Jan. 26, 2009) | $160 | 25% |
| 46 | In re MicroStrategy, Inc. Sec. Litig., 172 F. Supp. 2d 778, 790 (E.D. Va. 2001) | $154 | 18% |
| 47 | In re Satyam Computer Svc. Sec. Litig., No. 09-MD-2027, Dkt. No. 365, slip op. at 2 (S.D.N.Y. Sept. 13, 2011) | $150.5 | 17% |
| 48 | In re AT&T Wireless Tracking Stock Sec. Litig., No. 00-8754, Dkt. No. 82 (S.D.N.Y. Jan. 29, 2007) | $150 | 15% |
| 49 | In re Broadcom Corp. Sec. Litig., No. 01-275, 2005 U.S. Dist. LEXIS 41993, at *14 (C.D. Cal. Sept. 14, 2005) | $150 | 25% |
| 50 | In re Merrill Lynch & Co., Inc. Sec., Derivative & ERISA Litig., No. 07-cv-9633, Dkt. No. 326, slip op. at 2-3 (S.D.N.Y. Dec. 2, 2009) (bondholders) | $150 | 15% |
| 51 | Schwartz v. TXU Corp., No. 02-2243, 2005 WL 3148350, at *24-*34 (N.D. Tex. Nov. 8, 2005) | $150 | 22.2% |
| 52 | In re Charter Comms. Sec. Litig., No. 02-cv-01186, 2005 WL 4045741, at *12-22 (E.D.Mo. June 30, 2005) | $146.3 | 20% |
| 53 | In re Sunbeam Sec. Litig., 176 F. Supp. 2d 1323 (S.D. Fla. 2001); No. 98-08258, Dkt. No. 897, slip op. at 3 (S.D. Fla. Aug. 5, 2002); Dkt. No. 907, slip op. at 11 (S.D. Fla. Aug. 9, 2002) | $141 | 25% |
| 54 | In re Biovail Corp. Sec. Litig., No. 03-8917, Dkt. No. 277, slip op. at 2 (S.D.N.Y. Aug. 8, 2008) | $138 | 16% |
| 55 | Carpenters Health & Welfare Fund. v. the Coca-Cola Co., 587 F. Supp. 2d 1266, 1272 (N.D. Ga. 2008) | $137.5 | 21% |
| 56 | In re Electronic Data Sys. Corp. Sec. Litig., No. 03-110, Dkt. No. 292, slip op. at 2 (E.D. Tex. Mar. 7, 2006) | $137.5 | 17.48% |

**EXHIBIT A**

# FEE AWARDS ON PSLRA SECURITIES CLASS ACTION SETTLEMENTS FROM $100 MILLION TO $1 BILLION

| | Case Name | Settlement Amount (in millions) | Fee Award % |
|---|---|---|---|
| 57 | In re Informix Corp. Sec. Litig., No. C 97-1289 CRB, 1999 U.S. Dist. LEXIS 23579, at *6 (N.D. Cal. Nov. 23, 1999) | $136.5 | 30% |
| 58 | In re Computer Associates Class Action Sec. Litig., No. 98-4839 (TCP); In re Computer Associates 2002 Class Action Sec. Litig., No. 02-1226, 2003 WL 25770761 at *4 (E.D.N.Y. Dec. 8, 2003) | $133.5 | 25.3% |
| 59 | In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., No. 246 F.R.D. 156, 178 (S.D.N.Y. Sept. 5, 2007) | $133 | 24% |
| 60 | In re Doral Fin. Corp. Sec. Litig., No. 05-md-1706, Dkt. No. 107, slip op. at 2 (S.D.N.Y. July 17, 2007) | $129 | 15.25% |
| 61 | In re Delphi Corp. Sec. Litig., 05-md1725, 248 F.R.D. 483, 502-05 (E.D. Mich. Jan. 11, 2008); Dkt. No. 417, slip op. at 2-3 (E.D. Mich. June 26, 2008) | $128 | 18% |
| 62 | Spahn v. Edward D. Jones & Co., No. 04-86, Dkt. No. 233, slip op. at 9-10 (E.D. Mo. Oct. 25, 2007) | $127.5 | 21.2% |
| 63 | In re Symbol Techs., Inc. Sec. Litig., No. 02-CV-1383, Dkt. No. 143, slip op. at 3 (E.D.N.Y. Oct. 14, 2004); La. Mun. Police Emps. Ret. Sys. v. Deloitte & Touche LLP, No. 04-621, Dkt. No. 83, slip op. at 2 (E.D.N.Y. Sept. 12, 2006) | $126 | 10.9% |
| 64 | In re Bristol-Myers Squibb Co. Sec. Litig., No. 07-5867, Dkt. No. 78, slip op. at 1 (S.D.N.Y. Dec. 8, 2009) | $125 | 17% |
| 65 | In re New Century Sec. Litig., 2:07-cv-00931, Dkt. No. 504, slip op. at 1 (C.D. Cal. Nov. 15, 2010) | $124.8 | 11.5% |
| 66 | Dusek v. Mattel, No. 99-10864, Dkt. No. 271, slip op. at 14 (C.D. Cal. Sept. 29, 2003) | $122 | 27% |
| 67 | In re Lernout & Hauspie Sec. Litig., No. 00-CV-11589 (PBS), Dkt. No. 930, slip op. at 9 (D. Mass. Dec. 22, 2004) and Dkt. No. 1007, slip op. at 7 (D. Mass. July 18, 2005) | $120.52 | 20% |
| 68 | In re Bank One Sec. Litig. First Chicago S'holder Claims, No. 00-CV-0767, Dkt. No. 351, slip op. at 3 (N.D. Ill. Aug. 26, 2005) | $120 | 22.5% |
| 69 | In re Deutsche Telekom AG Sec. Litig., No. 00-CV-9475, 2005 U.S. Dist. LEXIS 45798, at *12-*13 (S.D.N.Y. June 9, 2005) | $120 | 28% |
| 70 | In re Peregrine Sys. Inc. Sec. Litig., No. 02-CV-870, Dkt. No. 839, slip op. at 2 (S.D. Cal. Nov. 15, 2006); Dkt. No. 758, slip op. at 2 (S.D. Cal. Oct. 22, 2009) | $117.5 | 22% |
| 71 | In re Mercury Interactive Corp. Sec. Litig., No. 05-3395, 2011 WL 826797, at *3 (N.D. Cal. Mar. 3, 2011) | $117.5 | 22% |
| 72 | In re Ikon Office Solutions, Inc. Sec. Litig., 194 F.R.D. 166 (E.D. Pa. 2000) | $111 | 30% |
| 73 | In re CVS Corp. Sec. Litig., No. 01-11464, Dkt. No. 191, slip op. at 7 (D. Mass. Sept. 7, 2005) | $110 | 25% |
| 74 | In re DPL Inc. Sec. Litig., 307 F. Supp. 2d 947, 954 (S.D. Ohio 2004) | $110 | 20% |

## EXHIBIT A

## FEE AWARDS ON PSLRA SECURITIES CLASS ACTION SETTLEMENTS
## FROM $100 MILLION TO $1 BILLION

| | Case Name | Settlement Amount (in millions) | Fee Award % |
|---|---|---|---|
| 75 | In re Conseco, Inc. Sec. Litig., No. 1:00-cv-585, Dkt. No. 157, slip op. at 1-2; Dkt. No. 171 at 19;  (S.D. Ind. Aug. 7, 2002) | $105 | 14.6% |
| 76 | In re Old CCA Sec. Litig./In re Prison Realty Sec. Litig., No. 3:99-458, 2001 U.S. Dist. LEXIS 21942, at *3 (M.D. Tenn. Feb. 9, 2001) | $104 | 30% |
| 77 | In re American Express Fin. Adv. Sec. Litig., No. 04-1773, Dkt. No. 170, slip op. at 8 (S.D.N.Y. July 18, 2007) | $100 | 27% |
| 78 | In re AT&T Corp. Sec. Litig., 455 F.3d 160 (3d Cir. 2006) | $100 | 21.25% |
| 79 | In re Honeywell Int'l Inc. Sec. Litig., No. 2:00-cv-03605 (DRD), Dkt. No. 256, slip op. at 1 (D.N.J. Aug. 26, 2004) | $100 | 20% |

**EXHIBIT B**

# TOP 15 SECURITIES CLASS ACTION SETTLEMENTS UNDER THE PSLRA

| | Case Name | Settlement Amount (in millions) | Gov't Action | Restatement |
|---|---|---|---|---|
| 1 | Enron | $7,242 | Yes | Yes |
| 2 | WorldCom | $6,156 | Yes | Yes |
| 3 | Cendant | $3,318 | Yes | Yes |
| 4 | Tyco | $3,200 | Yes | Yes |
| 5 | AOL Time Warner | $2,500 | Yes | Yes |
| 6 | Nortel I | $1,142 | Yes | Yes |
| 7 | Royal Ahold | $1,100 | Yes | Yes |
| 8 | Nortel II | $1,074 | Yes | Yes |
| 9 | McKesson HBOC | $1,043 | Yes | Yes |
| 10 | UnitedHealth | $926 | Yes | Yes |
| 11 | HealthSouth (combined) | $804.5 | Yes | Yes |
| 12 | Xerox | $750 | Yes | Yes |
| 13 | Lucent[1] | $667 | Yes | Yes |
| | **Wachovia Bond Action** | **$627** | **No** | **No** |
| 14 | Countrywide | $601.5 | Yes | No |
| 15 | Cardinal Health | $600 | Yes | Yes |

[1] Institutional Shareholder Services, Inc's "Top 100 Settlements Quarterly Report" (Joint Decl. Exh. 1) lists *Lucent* as having a settlement value of $667 million.  However, as shown in Exhibit A, Lead Bond Counsel's research shows that the value of the settlement to the securities class at time that fees were awarded in that case was $517 million.  Arguably, therefore, the Wachovia settlement should actually rank higher than the 14th largest class PSLRA securities action settlement.  However, regardless of the precise ranking of cases, Lead Bond Counsel are unaware of any list of "top 15" biggest recoveries which lists any case – other than the instant one – that did not involve a government action.