**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE WACHOVIA PREFERRED SECURITIES
AND BOND/NOTES LITIGATION

Master File No. 09 Civ. 6351 (RJS)

**ECF Case**

**JOINT DECLARATION OF WILLIAM C. FREDERICKS, JOHN J. RICE AND DAVID KESSLER IN SUPPORT OF (A) LEAD BOND PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENTS AND PLAN OF ALLOCATION AND (B) LEAD BOND COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

William C. Fredericks
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
1285 Avenue of the Americas
New York, NY  10019
Tel:  (212) 554-1400

John J. Rice
**ROBBINS GELLER RUDMAN & DOWD LLP**
655 West Broadway
San Diego, CA  92101
Tel:  (619) 231-1058

David Kessler
**KESSLER TOPAZ MELTZER & CHECK LLP**
280 King of Prussia Road
Radnor, PA 19087
Tel:  (610) 667-7706

Dated:  October 10, 2011

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  FACTUAL BACKGROUND AND HISTORY OF THE LITIGATION ........................ 6

    A.   Factual Background ................................................................................ 6

    B.   History of the Litigation ........................................................................ 12

        1.   Commencement of the Bond Action and Organization of the
             Related Cases ........................................................................ 12

        2.   Lead Bond Counsel's Comprehensive Pre-Filing Investigation, and
             the Preparation of the First Consolidated Bond Complaint ...................... 15

        3.   The Wachovia, KPMG and Underwriter Defendants' Initial
             Motions to Dismiss, and Lead Bond Plaintiffs' Response Thereto .......... 18

        4.   Lead Bond Counsel's Continuing Investigation, and the
             Preparation of the Amended Bond Complaint ......................................... 21

        5.   The Defendants' Second Set of Motions to Dismiss, and Lead
             Bond Plaintiffs' Response Thereto .......................................................... 24

        6.   The Court's March 31, 2011 Opinion and Order, and KPMG's
             Motion for Reconsideration .................................................................... 29

        7.   Settlement Negotiations with the Wachovia Defendants ......................... 35

        8.   Further Discovery from Wachovia ........................................................... 39

        9.   Negotiation of the KPMG Settlement ...................................................... 41

        10.  Negotiation of the Stipulation of Settlements and Related Papers,
             and the Court's Preliminary Approval Thereof ....................................... 47

III. LEAD BOND PLAINTIFFS' COMPLIANCE WITH THE COURT'S
    PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE ......... 49

IV.  TERMS OF THE PROPOSED SETTLEMENTS ............................................... 51

    A.   The Wachovia Settlement ....................................................................... 51

    B.   The KPMG Settlement ............................................................................ 53

V.   ALLOCATION OF THE PROCEEDS OF THE SETTLEMENTS ........................... 54

VI.  EVALUATION OF THE PROPOSED SETTLEMENTS ...................................... 57

A.      General Statement ............................................................................ 57

B.      The Risks of Establishing Liability............................................... 58

    1.      Risks of Establishing Liability Against the Wachovia Defendants.......... 58

    2.      Risks of Establishing Liability Against KPMG........................................ 65

C.      The Risks of Establishing Damages, and Related Loss Causation Issues ............ 67

D.      The Risks of Maintaining a Certified Class Through Trial ................................. 73

E.      The Range of Reasonableness of the Settlement In Light of the Likely Recovery and All the Attendant Risks of Litigation................................ 74

F.      The Complexity, Expense and Likely Duration of the Litigation ....................... 75

G.      The Stage of the Proceedings and the Amount of Discovery Completed............ 77

H.      The Ability of the Defendants to Withstand a Greater Judgment........................ 78

I.      The Reaction of the Settlement Class to the Settlements .................................... 80

VII.      THE FEE APPLICATION ............................................................... 81

A.      General Statement ............................................................................ 81

B.      The Quality of Lead Bond Counsel's Representation ........................................ 82

    1.      The Results Obtained from Lead Bond Counsel's Efforts, and the Absence of Any "Parallel" Government Actions ...................................... 82

    2.      The Court's Observations as to the Quality of Lead Counsel's Work ...................................................................... 83

    3.      The Standing and Expertise of Plaintiffs' Counsel................................. 84

    4.      The Standing and Expertise of Defendants' Counsel .............................. 84

C.      The Risks of the Litigation ................................................................. 85

    1.      The Risks Undertaken By Lead Bond Counsel in Pursuing This Action.................................................................. 85

    2.      The Risks of Contingent Fee Litigation Generally, and the Importance of Ensuring the Availability of Top Quality Counsel in High-Risk Contingent Securities Cases.................................................. 87

ii

D.      The Significant Amount of Time and Labor Devoted to the Action by Plaintiffs' Counsel ................................................................................. 92

E.      Awards in Similar Cases ........................................................................ 93

F.      Lead Bond Plaintiffs' Endorsement of the Fee Application ................................. 94

G.      The Reaction of the Settlement Class to the Fee Application ............................ 95

VIII.    THE REQUEST FOR REIMBURSEMENT OF PLAINTIFFS' COUNSEL'S REASONABLE LITIGATION EXPENSES ................................................... 95

IX.    CONCLUSION ......................................................................................... 98

We, WILLIAM C. FREDERICKS, JOHN J. RICE and DAVID KESSLER, under the penalty of perjury, declare as follows:

## I.    INTRODUCTION

1.    We are members of the law firms of Bernstein Litowitz Berger & Grossmann LLP ("BLBG"), Robbins Geller Rudman & Dowd LLP ("RGRD") and Kessler Topaz Meltzer & Check, LLP ("KTMC"), respectively.  BLBG, RGRD and KTMC are the Court-appointed Lead Bond Counsel ("Lead Bond Counsel" or "Lead Counsel") for the Court-appointed Lead Bond Plaintiffs Orange County Employees' Retirement System ("Orange County"), Louisiana Sheriffs' Pension and Relief Fund ("Louisiana Sheriffs"), and Southeastern Pennsylvania Transportation Authority ("SEPTA"), in the above-captioned consolidated securities class action (the "Bond Action" or "Action").  By Order dated August 9, 2011 (Dkt. No. 139), BLBG, RGRD and KTMC were also appointed class counsel for the certified Settlement Class in this Action, which consists of all persons and entities who purchased or otherwise acquired Bond Class Securities[1] from the first date on which any of the Bond Class Securities were offered through and including February 27, 2009 (the "Settlement Class Period"), and were damaged thereby.

2.    We respectfully submit this Joint Declaration in support of (a) Lead Bond Plaintiffs' motion for final approval of the proposed settlements and the proposed Plan of Allocation (the "Final Approval Motion"); and (b) Lead Bond Counsel's motion for an award of

---

[1] Unless otherwise defined herein, all capitalized terms have the meanings ascribed to them in the Stipulation and Agreements of Settlement dated August 5, 2011 (the "Stipulation") previously filed with the Court (Dkt. No. 136-1).  For convenience, "long form" terms such as "Bond/Notes Action" and "Lead Bond/Notes Plaintiffs" as used in the Stipulation have been shortened to, *e.g.,* "Bond Action" and "Lead Bond Plaintiffs."  The "Bond Class Securities" consist of 6 separate Wachovia preferred stock securities (which were issued pursuant to 6 separate Offerings), and 16 separate Wachovia bond or note securities (which issued pursuant to 16 initial public offerings and 8 supplemental public offerings).  A list of all 22 Bond Class Securities is set forth at ¶1(e) of the Stipulation, and on page 1 of the Notice.

attorneys' fees and reimbursement of litigation expenses (the "Fee and Expense Application"). We have personal knowledge of the matters set forth herein based on our active participation in all aspects of the institution, prosecution and settlement of this Action.

3.     The proposed settlements now before the Court provide for a global settlement of the Bond Action in exchange for total settlement payments of $627 million in cash, plus interest thereon, and consist of (a) a $590 million cash settlement with the Wachovia Defendants[2] (the "Wachovia Settlement"), and (b) a $37 million cash settlement (the "KPMG Settlement") with defendant KPMG LLP ("KPMG"), Wachovia's former outside auditor.   The Wachovia Settlement and the KPMG Settlement are referred to collectively herein as the "Settlements," and the Wachovia Defendants and defendant KPMG are collectively referred to as the "Settling Defendants."  If approved, upon the Effective Date the proposed Settlements will resolve all claims asserted in the Bond Action against the Settling Defendants by the Bond Plaintiffs on behalf of themselves and the Settlement Class.  As further described in § IV below, approval of the Wachovia Settlement will (subject to certain conditions that Lead Bond Counsel expect will be satisfied by the date of the Settlement Hearing) also resolve all claims asserted against the Underwriter Defendants.

4.     Based on the exceptional size of the monetary recoveries obtained – both in absolute dollar terms and as a percentage of reasonably recoverable damages, and all in the face

---

[2] The Wachovia Defendants are:  Wachovia Corporation ("Wachovia" or the "Company"), Wells Fargo & Company ("Wells Fargo") (as successor-in-interest to Wachovia), Wachovia Capital Trust IV, Wachovia Capital Trust IX, Wachovia Capital Trust X, Wachovia Capital Markets, LLC, Wells Fargo Securities, LLC, A.G. Edwards & Sons, Inc., G. Kennedy Thompson, Peter M. Carlson, Ross E. Jeffries, Jr., David M. Julian, Mark C. Treanor, Donald K. Truslow, Thomas J. Wurtz, John D. Baker, II, Robert J. Brown, Peter C. Browning, John T. Casteen, III, Jerome A. Gitt, William H. Goodwin, Jr., Maryellen C. Herringer, Robert A. Ingram, Donald M. James, Mackey J. McDonald, Joseph Neubauer, Timothy D. Proctor, Ernest S. Rady, Van L. Richey, Ruth G. Shaw, Lanty L. Smith, John C. Whitaker, Jr., and Dona Davis Young.

of daunting litigation risks – we respectfully submit that the proposed Settlements represent a truly extraordinary result for the Settlement Class.   Based on published data, the combined Settlements, if approved, would be the fourteenth (14th) largest recovery ever in federal securities class action history,[3] and based on their research the undersigned Lead Bond Counsel believe that, if approved, the Settlements would also represent the *single largest recovery ever* for class claims brought solely under the Securities Act of 1933 (the "Securities Act").   Moreover, the total recoveries represent roughly 30% to 50% of the reasonably recoverable total damages that Lead Counsel would have been able to credibly present to a jury, which is well in excess of more typical recoveries in securities class action lawsuits.   The proposed recoveries are even more exceptional when one considers that they were achieved in the absence of any Department of Justice, Securities and Exchange Commission ("SEC") or other governmental agency having even *filed* any claims or charges (let alone having actually recovered anything for investors) for violations of any federal or state securities laws or regulations arising out of the events, facts or occurrences at issue in this action.   Indeed, the proposed Settlements also represent the largest recovery ever in a securities class action where there was neither a government action on which plaintiffs could at least partly build their case nor a restatement of the financial statements at issue.

5.     As previously set forth in Lead Bond Plaintiffs' preliminary approval papers, the proposed Settlements are the culmination of more than two and a half years' worth of vigorous litigation by Lead Bond Counsel, which included, among other things: (a) conducting an extensive investigation into the Settlement Class's claims; (b) preparing two exceptionally

---

[3] *See* "Top 100 Settlements Quarterly Report" updated through June 30, 2011, prepared by the Securities Class Action Services LLC ("SCAS") unit of Institutional Shareholder Services, Inc. (attached hereto as Exhibit 1).

researched and detailed consolidated complaints; (c) drafting two comprehensive sets of motion papers in opposition to the multiple motions to dismiss filed by each of the three separate groups of defendants (the Wachovia Defendants, KPMG and the Underwriter Defendants); (d) preparing numerous additional briefs, and related participation in, protracted settlement negotiations with the Wachovia Defendants under the auspices of a highly respected mediator, Judge Daniel Weinstein (ret.) of JAMS; (e) reviewing and analyzing comprehensive discovery obtained from Wachovia which allowed Lead Bond Plaintiffs to further build their case against KPMG and to complete the due diligence necessary to present the Wachovia Settlement for final approval; (f) the negotiation, also under the auspices of Judge Weinstein and also after multiple face-to-face mediations, of the KPMG Term Sheet, and (g) negotiating the final terms of the Stipulation and the respective Wachovia and KPMG Settlements, which are now pending before the Court.

6.      Pursuant to the Court's August 9, 2011 Order Preliminarily Approving Proposed Settlements and Providing for Notice (the "Preliminary Approval Order") – which preliminarily approved the Stipulation and the separate Wachovia and KPMG Settlements embodied therein pending further review at the Settlement Hearing – the Court has already certified the Settlement Class and approved the contents of the long-form Notice, the Summary Notice, and the Proof of Claim Form ("Claim Form").  In addition, pursuant to the same Order, (a) the Garden City Group, Inc. ("GCG"), the Court-approved Claims Administrator in the Action, has mailed over 206,000 copies of the Notice and Claim Form to potential Settlement Class Members; (b) the Summary Notice has been widely disseminated through the *PR Newswire* and duly published in *The Wall Street Journal, The New York Times* and the *Financial Times*; and (c) copies of the Notice, Summary Notice and Claim Form, as well as copies of the Stipulation, Preliminary Approval Order and Amended Consolidated Class Action Complaint dated May 28, 2010 (the

"Amended Bond Complaint" or "Amended Complaint"), have been posted on the settlement website, *www.WachoviaBondLitigation.com*.  *See* Affidavit of Stephen J. Cirami Regarding (A) Mailing of the Notice and Proof of Claim; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date (the "Cirami Affidavit" or "Cirami Aff."), attached hereto as Exhibit 2, at ¶¶ 7-8, 9.[4]

7.     The Notice advised the Settlement Class Members of the definition of the Settlement Class and of the other material terms of the Settlements, and also advised them of their rights to (a) exclude themselves from the Settlement Class; (b) object to any aspect of the Settlements, the Plan of Allocation, or the Fee and Expense Application; and (c) submit a Claim Form in order to be eligible to receive a share of the proceeds of the Settlements.  The Notice also informed Settlement Class Members of the procedures to be followed to exercise the foregoing rights.

8.     The Court-ordered deadline for filing objections to the Settlements, the Plan of Allocation or the Fee and Expense Application, and for submitting requests for exclusion from the Settlement Class, is October 25, 2011.  To date, Lead Bond Counsel have received no objections, and, as of October 5, 2011, only ten (10) requests for exclusion (all from individual investors) have been received.  Lead Bond Plaintiffs will address any objections and all requests for exclusion collectively, in their supplemental submission to be filed on November 7, 2011, as provided for in the Preliminary Approval Order.

9.     For all of the reasons detailed herein, including the extraordinary results obtained in the face of the significant litigation risks and in the absence of any parallel government claims

---

[4] All papers filed in support of the Final Approval Motion and the separate Fee and Expense Application will also be promptly posted and made available for public review on the settlement website.

(*see* discussion at § VI below), we respectfully submit that both the Wachovia and the KPMG Settlements (as well as the Plan of Allocation) are "fair, reasonable and adequate" in all respects, and that the Court should therefore approve them pursuant to Rule 23(e) of the Federal Rules of Civil Procedure. For similar reasons, as well as for the additional reasons set forth in §§ VII and VIII below, we respectfully submit that Lead Bond Counsel's requests for (a) an award of attorneys' fees equal to 17.5% of the Settlement Fund and (b) reimbursement of litigation expenses in the amount of $860,877.47, are also fair and reasonable, and should also be approved. Indeed, the requested fee is plainly within the range of fees awarded in large securities class actions in this District and in other courts across the country, and the three Court-appointed Lead Bond Plaintiffs – each of which is a large institutional investor – unanimously support the requested fee.

## II.  FACTUAL BACKGROUND AND HISTORY OF THE LITIGATION

### A.  Factual Background

10. In May 2006, Wachovia purchased Golden West, a California-based residential mortgage lender. Golden West's principal asset was its roughly $120 billion portfolio of option adjustable rate mortgage loans, known as the "Pick-A-Pay" portfolio. Pick-A-Pay loans offered a low initial "teaser" interest rate, which later reset to a higher rate. They also allowed borrowers to make a "minimum payment" that was less than the monthly interest due, which had the effect – commonly known as "negative amortization" – of increasing (rather than decreasing) the borrower's outstanding loan balance. If increasing amounts of negative amortization caused the borrower's loan-to-value ratio to exceed certain levels, the loan would automatically "recast" to require much higher fully-amortizing payments over the remaining life of the loan. Amended Bond Complaint (also cited herein as "Am. Bond Compl.") at ¶¶ 84-87.

6

11.     Because of the negative amortization and automatic recast features, Pick-A-Pay loans were potentially much riskier than traditional mortgages, and required extremely conservative underwriting standards.  For example, not only did Pick-A-Pay loans have the potential to increase (rather than decrease) the bank's outstanding dollar exposure, such loans were particularly attractive to high risk borrowers who could afford to make only the minimum monthly payments – and who were also likely to default when (a) their initial "teaser" rates expired and/or (b) their increasing levels of negative amortization triggered their obligation to make fully-amortizing payments.  *Id.* at ¶¶ 85-89.

12.     Given the potential risks associated with Pick-A-Pay loans – and given that the July 2006 to May 2008 period (the "Offering Period") was characterized by declining housing values and increasing investor concern about financial institutions' exposure to mortgage-based (and especially subprime mortgage-based) assets – Lead Bond Plaintiffs allege it was particularly important to investors that Wachovia present accurate and complete information about its exposure to such loans.  *Id.* at ¶ 1.

13.     During the Offering Period, Wachovia and/or its related entities issued 30 sets of Offering Materials for 30 initial or supplemental public Offerings of Wachovia Bond/Note Securities.  These Offering Materials contained various statements concerning the quality of Wachovia's mortgage assets, such as repeated representations that the "pristine" $120 billion Pick-A-Pay portfolio was the product of a "singular focus" on "risk-averse," "prudent" and "conservative" mortgage underwriting practices.  *See* Am. Bond Compl. ¶¶ 92-95, 139, 216-58. Given investors' concerns about declining housing values and financial institutions' exposure to subprime mortgage-backed assets during this period, Lead Bond Plaintiffs allege that such statements were plainly material.

14.     The Pick-A-Pay portfolio, however, was anything but the product of "risk averse," "conservative" or "prudent" underwriting:  to the contrary, based on their extensive pre-filing investigation (*see* § II.B.2 below), Lead Bond Plaintiffs allege that the portfolio was plagued by grossly deficient and dangerously lax loan underwriting practices characterized by, *inter alia*: (a) widespread fabrication and/or inflation of borrower incomes and employment information; (b) rampant use of so-called "Exceptions to Policy" (or "ETPs"), which allowed the bank's loan officers to obtain approval of loans that failed to meet Wachovia's stated underwriting standards; (c) heavy lending to subprime borrowers; (d) use of "instant underwriting" events to approve high-risk loans *en masse* with minimal review; (e) qualifying mortgage applicants against the Pick-A-Pay loan's initial low "teaser" rate, rather than its higher fully-indexed rate; (f) use of inflated property appraisals and resulting understatement of loan-to-value ("LTV") ratios; and (g) blindness to second mortgages ("silent seconds") in the underwriting process.  Am. Bond Compl. ¶¶ 94-144.  The Amended Bond Complaint further alleges how the foregoing rampant deviations from stated underwriting policies and guidelines – which were already well-entrenched during the earlier Golden West era – became all the more dangerous after Wachovia merged with Golden West in 2006, inasmuch as Wachovia lowered stated minimum Pick-A-Pay loan standards still further soon after the merger.  *Id.*  ¶¶ 126-129.  Lead Bond Plaintiffs also allege, based on their own in-depth investigations, how Wachovia's Consumer Risk Management Group concluded by not later than 2008 that the bank's consumer mortgage underwriting guidelines were being "blissfully ignored" in key regions, including its massive California territories.  *Id.*  ¶¶ 130-131.

15.     For similar reasons, Lead Bond Plaintiffs also allege that the financial statements incorporated into the Offering Materials – including Wachovia's year-end financial statements

for the years ending December 31, 2006 and December 31, 2007 (which were audited by defendant KPMG and incorporated into that subset of the Offering Materials that were issued on or after April 23, 2007 – were also materially false and misleading because they reported (a) materially inadequate and understated mortgage loan loss reserves; (b) materially inflated asset values for stated "goodwill" (relating to the Golden West acquisition); and (c) materially inflated levels of "Tier One" capital, all in violation of Generally Accepted Accounting Principles ("GAAP"). *See* Am. Bond Compl. ¶¶ 145-58.

16.     The Amended Bond Complaint also details the Offering Materials' alleged misstatements and omissions regarding Wachovia's significant exposure to subprime collateralized debt obligations ("CDOs") and residential mortgage-backed securities ("RMBS"). For example, as the Amended Bond Complaint alleges, Wachovia had accumulated more than $8 billion of exposure to risky subprime CDOs and RMBS, but failed to report any exposure until October 2007 (when it announced a $438 million write-down of CDOs due to "disruption" in the capital markets).  Am. Bond Compl. ¶¶ 159-71.  Two months later, Wachovia announced that it had reduced its "net" CDO exposure from $1.79 billion to $680 million after taking a $1.1 billion write-down, and disclosed for the first time that it had RMBS exposure of $2.5 billion. However, it was not until January 2008 that Wachovia revealed that its remaining "gross" CDO exposure was $5 billion – yet even then it misleadingly described the vast bulk of this exposure as "hedged with financial guarantors" without disclosing that those "guarantors" lacked the means to cover more than a fraction of this exposure.  *Id.*  ¶¶ 170-88.

17.     The Amended Bond Complaint similarly alleges how Wachovia's belated partial disclosures late in the Offering Period concerning the nature of its Pick-A-Pay loan portfolio (notably its April 14, 2008 revelation that $51 billion, or nearly 62%, of total Pick-A-Pay loan

portfolio was owed by *subprime* borrowers) were limited and incomplete, failed to disclose the true depth of the Company's underwriting problems and related financial exposure, and were accompanied by further false reassurances that the Company adhered to a "conservative in-house appraisal and underwriting approach." Am. Bond Compl. ¶¶ 133-39.  Indeed, as late as the May 29, 2008 Offerings, the Offering Materials also falsely assured investors that Wachovia's capital and liquidity positions were "strong," and that it was so "well capitalized" that it was actually a "provider of liquidity" to the market. *Id.* ¶¶ 139, 189-95, 244-58.

18.     On June 2, 2008, just three days after the last of the Offerings closed, Wachovia announced that its chief executive officer, defendant Thompson, had "retired at the request of the Board."  The next day, *The Wall Street Journal* reported that Thompson had been "forced out" because he had not adequately disclosed significant problems with the Pick-A-Pay portfolio.  As *The Wall Street Journal* reported:

> Mr. Thompson was slow to acknowledge how seriously the bank's credit profile was deteriorating, according to people close to the [Wachovia] board. Data on the performance of Golden West's adjustable rate mortgage portfolio – which Wachovia did not disclose separately after the acquisition – were far worse than internal projections had indicated, one of these people says.  Mr. Thompson remained too optimistic about the company's prospects, this person says.  "What he has been telling the board hasn't been realistic…"

Am. Bond Compl. ¶ 140.

19.     Two weeks later, on June 18, 2008, Wachovia acknowledged that its Pick-A-Pay loans were underwritten so poorly that, as the financial press characterized it, the Company had to effectively re-underwrite them from scratch by re-contacting its borrowers to verify information concerning their ability to repay the loans.  As one commentator observed in the wake of this astonishing announcement, "Is it [Wachovia's] customers who do not understand the risk of this product, or [is it] Wachovia?" *Id.* ¶ 141.

20.     Nonetheless, as late as September 15, 2008, Wachovia's new CEO (Robert Steel) continued to assure investors that the Pick-A-Pay portfolio "will yield quite attractive returns." Am. Bond Compl. ¶ 193.  In reality, however, the Amended Bond Complaint alleges that the Pick-A-Pay portfolio was so severely impaired that Wachovia had fallen into a death spiral, which culminated in the later revelations that the value of the portfolio was actually impaired by tens of billions of dollars, that Wachovia was effectively insolvent, and that it would require extraordinary action by the U.S. Government to prevent it from collapsing into bankruptcy.  For example, following the September 29, 2008 disclosure that Wachovia was on the brink of collapse (and in the wake of new federal tax rules allowing banks to recognize accelerated tax benefits on certain losses), on October 3, 2008 Wells Fargo announced that it would acquire Wachovia – and that it would record a staggering loss of at least $31 *billion* on the Pick-A-Pay portfolio.  Shortly thereafter, Wachovia reported a loss for the third quarter of 2008 of $23.88 billion – one of the largest quarterly losses *ever* reported in the Western world.  And only three months later, Wells Fargo reported that it had identified pre-existing credit impaired loan balances in the Pick-A-Pay portfolio totaling a staggering $59.8 billion (an amount equal to roughly *half* of the entire portfolio).  *Id.* ¶¶ 144, 189-200.

21.     The Bond Plaintiffs thereafter sought relief under the Securities Act on behalf of themselves and a class of similarly situated investors in Bond Class Securities to recover damages sustained as a result of having purchased these securities pursuant or traceable to the Offerings.  As described below, however, this action was never a "popular" case, as only a few investors ever stepped forward to assert any "Bond/Notes claims."  Indeed, as discussed in the next section, if not for the nimble efforts of Lead Bond Plaintiffs and their Lead Counsel, it

appears that many of the claims asserted in this Action would never have been brought at all – let alone litigated to such an extraordinarily successful result.

**B.     History of the Litigation**

        **1.     Commencement of the Bond Action and Organization of the Related Cases**

22.     Beginning in December 2008, three securities class actions alleging claims under §§ 11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§ 77(k), 77(l) and 77(o)) relating to the issuance of Bond Class Securities were filed against the Wachovia Defendants in the Superior Court of the State of California, Alameda County (the "California State Court").[5]

23.     The first of these class actions, captioned *Swiskay v. Wachovia Corporation, et. al.,* No. RG-08426378 (Cal. Sup'r Alameda Cty.), was filed on or about December 18, 2008 on behalf of individual plaintiffs Michael Swiskay and Norman Levin, was brought with respect to three specifically identified Bond/Note Offerings.  The second of these class actions, captioned *Miller v. Wachovia Corporation, et. al.,* No. RG-09431365 (Cal. Sup'r Alameda Cty.), was filed on January 16, 2009, and was brought with respect to one additional Bond/Note Offering.

24.     On January 21, 2009, the Lead Bond Plaintiffs formally entered into the litigation by filing an initial complaint in the California State Court.  That initial state court complaint was both (a) the *first* class action complaint to assert claims on behalf of purchasers of *all* of the 22 Bond Class Securities that had been issued pursuant to *all* 30 Offerings, and (b) the *first* class action complaint to assert claims against defendant KPMG.

---

[5] Section §22(a) of the Securities Act provides for concurrent state and federal court jurisdiction.

25.     It appears that, but for the vigilance and diligence of Lead Bond Plaintiffs, Additional Bond Plaintiffs and Bond Plaintiffs' Counsel, the claims asserted in this Action *would never have even been filed*.[6]

26.     On January 29, 2009, the California State Court ordered the consolidation of the three actions (the "Original Actions") under the caption *In re Wachovia Preferred Securities and Bond/Notes Litigation*, No. RG 08426378, and appointed BLBG, Barroway Topaz Kessler Meltzer & Check, LLP (the predecessor of KTMC) and Coughlin Stoia Geller Rudman & Robbins (the predecessor of RGRD) as co-lead counsel for the putative class.

27.     On March 6, 2009, the consolidated Original Actions were removed from the California State Court to the U.S. District Court for the Northern District of California (the "California Federal Court").  On June 22, 2009, the California Federal Court granted a motion to relate the consolidated Original Actions and ordered their transfer, pursuant to 28 U.S.C. §1404(a), to the U.S. District Court for the Southern District of New York (the "Court").  By Order dated August 20, 2009, the Court (a) consolidated the Original Actions under the caption

---

[6] The "Additional Bond Plaintiffs" consist of (a) individual plaintiffs Arlette Miller ("Miller"), Mr. Levin ("Levin") and Mr. Swiskay (including certain Swiskay family trusts and, collectively with Mr. Swiskay, referred to herein as "Swiskay"), plus (b) three additional institutional plaintiffs – Hawaii Sheet Metal Workers Pension Fund ("Hawaii"), Iron Workers Locals 40, 361, 417 Union Security Funds ("Iron Workers") and the City of Livonia Employees Retirement System ("City of Livonia") – who joined the Bond Action after it had been transferred to this Court to provide "coverage" for certain additional Offerings.  As discussed further below, there was a risk that the Court might decline to include in any certified class purchasers of Bond Class Securities as to which there was no named plaintiff with "statutory standing."  Their inclusion proved to be important because the Court's March 31, 2011 Order (discussed below) later dismissed plaintiffs' claims as to certain Bond Class Securities on that very ground.  Of particular significance here, however, is that by filing the January 21, 2009 complaint on behalf of purchasers of *all* Bond Class Securities, Lead Bond Plaintiffs' and Lead Bond Counsel's actions here tolled the statute of limitations for all such purchasers, *see In re Wachovia Corp.,* 753 F. Supp. 2d 326, 371-72 (S.D.N.Y. 2011) (Sullivan, J.), and thus preserved the ability of additional plaintiffs (such as Hawaii, Iron Workers and City of Livonia) to come in later to preserve the claims of large additional portions of the Settlement Class.

*In re Wachovia Preferred Securities and Bond/Notes Litigation*, Master File No. 09 Civ. 6351 (S.D.N.Y.) (RJS) (and which collectively constitute the "Bond Action"); (b) appointed Orange County, Louisiana Sheriffs and SEPTA as co-Lead Plaintiffs in the Bond Action; and (c) affirmed the California State Court's prior appointment of Lead Bond Counsel as co-lead counsel in the Bond Action.

28.     The Court's August 20, 2009 case management order also directed that the Bond Action be coordinated (for pre-trial purposes only) with a separate putative class action that was also pending before it, but that was brought solely on behalf of investors in Wachovia equity securities (*e.g.*, Wachovia common stock) and which was captioned *In re Wachovia Equity Securities Litigation*, No. 08 Civ. 6171 (S.D.N.Y) (RJS).  The Court further ordered that both of the two aforementioned class actions be coordinated for pre-trial purposes with two individual actions – captioned *Stichting Pensioenfonds ABP, et al. v. Wachovia Corp., et al.*, No. 09 Civ. 04473 (S.D.N.Y.) (RJS), and *FC Holdings AB, et al. v. Wells Fargo & Co., et al.*, No. 09 Civ. 5466 (S.D.N.Y.) (RJS) – which, like *In re Wachovia Equity Securities Litigation,* asserted claims relating only to the purchase of Wachovia equity securities.  The separate *In re Wachovia Equity Securities Litigation*, *Stichting Pensioenfonds ABP* action and *FC Holdings AB* action are hereafter collectively referred to as the "Equity Actions."[7]

29.     From the time that Lead Bond Plaintiffs filed their initial complaint in January 2009 in the California State Court, through the removal and transfer proceedings in the California Federal Court, and thereafter through the entry of the August 20, 2009 case management order in this Court, Lead Bond Counsel managed all relevant case management

---

[7] Neither of the proposed Settlements releases or impacts in any way any claims that any Settlement Class Members may have in their capacity as purchasers of Wachovia common stock or other equity securities, including any claims brought on their behalf in the Equity Actions.

negotiations with counsel for the Defendants (as well as with counsel for the "Equity Plaintiffs" in the separate Equity Actions).  Through these case management negotiations in three separate judicial forums beginning in early 2009 – and during the balance of this litigation in this Court through 2011 – Lead Bond Counsel consistently worked hard to reach agreement with other counsel on procedures that would promote the efficient litigation of all related claims, subject to, however, Lead Bond Plaintiffs' interests in ensuring that the Bond Action was kept sufficiently separate and distinct from the Equity Actions so as to avoid prejudicing the Bond Plaintiffs' interests.  Lead Bond Counsel respectfully submit that their efforts and strategies in this regard proved to be decidedly successful.

> **2.      Lead Bond Counsel's Comprehensive Pre-Filing Investigation, and the Preparation of the First Consolidated Bond Complaint**

30.      Lead Bond Counsel had begun investigating the underlying events at Wachovia that gave rise to the claims in the Bond Action in 2008, and by the first half of 2009 – and well before entry of the Court's August 20, 2009 Order – they had already expanded their legal team to further investigate Lead Bond Plaintiffs' claims.  The resulting investigation was exceptionally comprehensive, and proved to be critical to the success of the case.

31.      Lead Bond Counsel's pre-filing investigation included, among other things, a detailed review and analysis of:

- each of the 30 sets of Offering Materials;

- the large volume of publicly available information from the Offerings Period – including the immediately preceding and succeeding years – issued or disseminated by Golden West or Wachovia (including, after September 2008, Wells Fargo), and including (a) all of their SEC filings; (b) all of their annual and quarterly financial statements, and related earnings announcements; (c) all of their press releases; and (d) all transcripts of their quarterly analyst conference calls;

- a similarly large volume of news articles and wire service reports concerning Wachovia, Golden West and the Pick-A-Pay portfolio, as well as the option-ARM industry generally; and

- all publicly available analyst reports about Golden West and Wachovia (including, after September 2008, Wells Fargo).

Lead Bond Counsel's pre-filing investigation also included:

- consulting with accounting experts concerning Wachovia's multiple alleged accounting violations;

- retaining and consulting with outside damages experts with expertise in securities cases; and

- thoroughly researching the law pertinent to the claims against all Defendants, and the potential defenses thereto.

32.     Finally, and of especially crucial importance to their investigative efforts, Lead Bond Counsel engaged in painstaking and time-consuming efforts to identify, locate and interview literally hundreds of current or former employees of Golden West, Wachovia and/or Wells Fargo who might be reasonably expected to have relevant knowledge concerning the matters that were at the core of Lead Bond Plaintiffs' allegations.  More specifically, Lead Bond Counsel first developed a master list of nearly 1,500 potential leads, and then narrowed that list down to exclude persons (a) who Lead Counsel determined could not be interviewed under applicable ethical rules and/or (b) who Lead Counsel determined, on further review, were unlikely to have information relevant to the specific matters at issue.

33.     After performing the foregoing screening procedures, during the period from the start of the litigation through the filing of Amended Bond Complaint, Lead Bond Counsel ultimately made diligent efforts to locate and contact over 550 former employees whom Lead Counsel believed were reasonably likely to have information directly relevant to the claims asserted in the Bond Action.  Of that group, and after taking into account persons for whom no

16

current phone numbers could be found or who refused, *e.g.,* to return phone calls, Lead Bond Counsel were able to locate and interview approximately 300 confidential witnesses – including several confidential sources who were interviewed on multiple occasions in light of the significance of the information that they had.

34.     The confidential sources that Lead Bond Counsel were able to both locate and interview represented a broad spectrum of former Golden West, Wachovia and/or Wells Fargo personnel, and included, *e.g.,* retired executives, other senior "headquarters-based" managers, regionally-based "territory" and "area" managers, and local managers and other branch office employees who operated "on the ground" at the branch level.  With respect to "field personnel" who operated at the regional or branch level, Lead Bond Counsel searched out and located relevant former employees from all of the major regions in which the Company operated, including the key states of California, Arizona and Florida (which accounted for roughly 60% of Pick-A-Pay loan underwriting), as well as other states and regions covering the Western, Southwestern, Southeastern, Midwestern and Eastern regions of the country.  Moreover, the former employees (and others) that Lead Bond Counsel contacted represented a wide variety of functional responsibilities, including:

     (a)     loan officers who dealt directly with prospective borrowers;

     (b)     outside mortgage brokers who referred prospective borrowers to the Company;

     (c)     in-house real estate appraisers;

     (d)     in-house loan underwriters who were nominally responsible for approving completed loan applications;

     (e)     branch managers and area or regional sales supervisors who had the authority to grant "exceptions to policy";

     (f)     "call center" personnel who dealt with distressed borrowers;

17

(g)      internal "quality review" and/or audit personnel; and

(h)      headquarters level executives and supervisors.

As a result of their extensive investigative efforts, Lead Bond Counsel developed a high level of confidence that the issues that they had identified relating to undisclosed problems with the Pick-A-Pay loan portfolio were systemic and pervasive across the Company, rather than localized issues that were confined to just a handful of branches or "isolated pockets" of the Company's operations.

35.      On September 4, 2009, Lead Bond Plaintiffs filed their Consolidated Class Action Complaint (the "First Consolidated Bond Complaint"), on behalf of themselves and all persons and entities who purchased or otherwise acquired any of the Bond Class Securities in or traceable to any of the Offerings.  The First Consolidated Bond Complaint asserted claims under §§ 11, 12(a)(2) and 15 of the Securities Act against (a) the Wachovia Defendants (including Wells Fargo as Wachovia's successor-in-interest); (b) the Underwriter Defendants; and (c) KPMG.  The First Consolidated Bond Complaint reflected the fruits of Lead Bond Counsel's intensive factual investigation through September 2009, and incorporated numerous factual allegations based upon those confidential sources that they had been able to contact through that date, and upon Lead Counsel's extensive review and analysis of the voluminous Wachovia-related SEC filings, news articles, analyst reports and other documents referenced above.

      3.      **The Wachovia, KPMG and Underwriter Defendants' Initial Motions to Dismiss, and Lead Bond Plaintiffs' Response Thereto**

36.      On November 3, 2009, the Wachovia Defendants, the Underwriter Defendants and KPMG each filed a separate motion to dismiss the First Consolidated Bond Complaint.  The three separate motions to dismiss consisted of over 80 pages of briefs and well over 1,000 pages of exhibits – excluding the similarly voluminous briefing that the Wachovia Defendants

submitted in the separate Equity Actions and sought to "incorporate by reference" in their motions to dismiss in the Bond Action.   *See* Dkt. Nos. 36-41, 44, 62-64 and 66-68.   The Wachovia Defendants, the Underwriter Defendants and defendant KPMG all argued, among other things, that the First Consolidated Bond Complaint should be dismissed in whole or in part because:

(a)     there was no "viable plaintiff" with statutory standing with respect to at least 19 of the 30 Offerings at issue;

(b)     the First Consolidated Bond Complaint "sounded in fraud" and was thus subject to heightened pleading standards of Fed. R. Civ. P. 9(b);

(c)     the statements of the confidential sources cited by Lead Bond Plaintiffs in the First Consolidated Bond Complaint should be disregarded as no more than "mere speculation" and "unsupported conclusions;"

(d)     the First Consolidated Bond Complaint's allegations that the Offering Materials' statements failed to disclose the truth concerning the lax and grossly deficient underwriting of the Pick-A-Pay portfolio were not actionable as a matter of law;

(e)     the First Consolidated Bond Complaint's allegations based on misstated LTV ratios were inadequately pled;

(f)     many of the alleged misstatements concerning the quality of the Company's loan portfolio and risk management practices were inactionable "puffery;"

(g)     the First Consolidated Bond Complaint failed to allege sufficient facts from which one could infer either that (i) the Defendants subjectively believed that the Company's stated loan loss reserves were inadequate or (ii) that the Company's loan loss reserves lacked a reasonable objective basis in fact; and

(h)     the First Consolidated Bond Complaint's claims regarding overstated Tier 1 capital levels, inflated net income and overstated goodwill were all "bootstrapped" claims that should be dismissed for one or more of the same reasons as the complaint's other claims.

In addition, KPMG argued that all of the Bond Plaintiffs' claims against it should be dismissed for failure to adequately allege either (a) that KPMG did not believe in the veracity of its audit opinions which were incorporated into the Offering Materials; or (b) that KPMG's audit opinions were not reasonably supported given their stated basis, or were based

on specifically alleged audit practices that suffered from specifically pled audit deficiencies.

37.     On December 18, 2009, Lead Bond Counsel filed a single, comprehensive 75-page-long brief in opposition to all Defendants' motions to dismiss the Bond Action.  *See* Dkt. No. 76.  Lead Bond Plaintiffs' opposition brief (a) summarized the relevant facts, (b) responded to each of the Defendants' arguments regarding lack of statutory standing as to certain Offerings; (c) rebutted Defendants' contentions that the First Consolidated Bond Complaint "sounded in fraud" (and that even if it did, it was still sufficient under the heightened pleading requirements of Rule 9); (d) cited relevant authority showing that all of the alleged misstatements were actionable and none were mere "puffery;" (e) refuted Defendants' notion that the Court could somehow disregard Lead Bond Plaintiffs' confidential witness statements; (f) argued that Defendants' analysis of the First Consolidated Bond Complaint was improperly compartmentalized and improperly failed to analyze its adequacy based on the totality of the allegations; and (g) responded to each of the Defendants' specific legal and factual arguments regarding the alleged deficiencies in Lead Bond Plaintiffs' allegations concerning the Pick-A-Pay portfolio's allegedly "pristine" loan quality and stated LTV ratios, as well as Wachovia's reported asset valuations, Tier 1 capital levels, and undisclosed CDO exposure.[8]

38.     On February 4, 2010, the Defendants filed their respective reply papers, which consisted of a combined total of 44 pages of additional briefs, plus additional exhibits.  *See* Dkt. Nos. 82-86.

39.     In addition to reiterating their previously asserted arguments, in their reply brief the Wachovia Defendants also vigorously disputed Bond Plaintiffs' contention that the near total collapse of Wachovia just four months after the last Offering at issue was completed was the

---

[8] As with the summary of the various Defendants' arguments set forth above, the foregoing is only a summary listing of the more significant arguments raised in the parties' submissions.

"most obvious" indication of the falsity of the Company's prior representations.  Instead, the Wachovia Defendants asserted that what was "most obvious" about the mid-2008 time period was that "systemic changes rocked every major financial institution in the country," and that the events of September 2008 were "unprecedented" and of an "unforeseeable" magnitude. Accordingly, Defendants argued, "given the historic, intervening market turmoil of September 2008," the subsequent write-downs in the value of the Pick-A-Pay portfolio that Lead Bond Plaintiffs cited in their complaint provided no support for (and "add[ed] nothing" to) any allegations that any statements in the Offering Materials were materially false or misleading when made.  *See* Reply Brief in Support of the Wachovia Defendants' Motion to Dismiss (Dkt. No. 82) at 6-8.

### 4.    Lead Bond Counsel's Continuing Investigation, and the Preparation of the Amended Bond Complaint

40.    By Order dated April 15, 2010 (Dkt. No. 94), the Court advised all parties in the Bond Action and in the assorted Equity Actions that it intended to address the myriad issues raised by the Defendants' multiple motions to dismiss only *once,* and the Court accordingly advised each of the separate plaintiffs in the various related actions that if they believed that they had anything to add to any of their respective complaints, they should promptly seek leave to do so.  Thereafter, pursuant to a further Order of the Court dated May 3, 2010, Lead Bond Plaintiffs, along with the Additional Bond Plaintiffs[9] (collectively, "Bond Plaintiffs"), filed their Amended Bond Complaint on May 28, 2010.

---

[9] Plaintiffs Miller, Levin and Swiskay had previously been included as plaintiffs in the First Consolidated Complaint, and were again included as named "Additional Plaintiffs" in the Amended Bond Complaint.  As discussed below, Hawaii, the Iron Workers and the City of Livonia were added for the first time as named "Additional Plaintiffs" in the Bond Action in the May 28, 2010 Amended Bond Complaint.

41.     Lead Bond Counsel welcomed the opportunity to file an amended complaint in the Bond Action for two reasons.

42.     First, submitting an amended pleading provided Lead Bond Plaintiffs with the opportunity to add three additional institutional investors – Hawaii, Iron Workers and the City of Livonia – as named Additional Bond Plaintiffs.  As discussed at ¶ 25 at fn.6 above, even before the briefing on the November 2009 motions to dismiss, Lead Bond Plaintiffs and their counsel had determined that there was a meaningful risk that claims asserted in connection with certain Offerings would be dismissed for lack of statutory standing for lack of a named plaintiff who had purchased pursuant or traceable to such Offerings.  Accordingly, the opportunity for Hawaii, Iron Workers and the City of Livonia to join the Action as Additional Bond Plaintiffs was an opportunity to provide "coverage" for several additional Offerings and Bond Class Securities, which in turn effectively acted as insurance (which proved to be highly useful) in the event that the Court later adopted Defendants' "lack of statutory standing" arguments.

43.     Second, by the spring of 2010, Lead Bond Counsel's ongoing factual investigation had identified numerous additional former Golden West, Wachovia and/or Wells Fargo employees who had provided Lead Bond Counsel with additional significant information that provided still further support for their already well-pled allegations.

44.     The resulting 150-page long Amended Bond Complaint, which was filed on May 28, 2010, further refined and/or expanded upon each of the First Consolidated Complaint's allegations.  Thus, like its predecessor, the Amended Bond Complaint alleged that the Offering Materials contained material misstatements, and omitted to state facts necessary to make the representations contained in the Offering Materials not materially misleading, concerning (a) the risk profile and quality of Wachovia's $120 billion Pick-A-Pay option adjustable rate residential

22

mortgage loan portfolio (the "Pick-A-Pay Portfolio"); (b) the nature and quality of the in-house appraisals and underwriting processes used in underwriting Wachovia's Pick-A-Pay Portfolio; (c) Wachovia's publicly reported loan-to-value ratios for the Pick-A-Pay Portfolio; (d) the adequacy of Wachovia's reported loan loss reserves; (e) the valuation of Wachovia's CDO holdings; (f) the valuation of the goodwill that Wachovia carried as an asset on its financial statements in connection with its 2006 acquisition of Golden West (whose primary asset was the Pick-A-Pay Portfolio); (g) Wachovia's stated net income; (h) the reported value of Wachovia's total assets and Tier 1 capital; and (i) Wachovia's compliance with GAAP.

45.     As noted above, Lead Bond Counsel believed that their First Consolidated Bond Complaint fully satisfied the applicable pleading standards for defeating a motion to dismiss. Lead Bond Counsel's May 2010 Amended Complaint, however, was bolstered by a remarkable array of specifically pled statements from *more than 50* confidential witnesses ("CWs") – or more than 3 times the already large number of CWs that had been cited in their First Consolidated Bond Complaint.  Although a number of confidential witnesses that Lead Bond Counsel had contacted (or re-contacted) by May 2010 declined to "get involved" or to provide more than background information that was cumulative of similar information provided by other CWs, other CWs, with the passage of additional time, were now more willing to speak candidly about past events.  Indeed, excerpts from and summaries of the detailed CW statements from those witnesses who had been forthcoming (and who were each identified in the complaint by their former job titles and years of service) ended up accounting for a staggering 60 pages (or roughly 40%) of the 150-page Amended Bond Complaint. *See* Am. Bond Compl. at pp. 28-87, ¶¶ 91(a-d), 96-99, 100(a-d), 101(a-c), 103(a-e), 104-106, 107(a-c), 109, 112, 113(a-r), 115(a-p), 118(a-m), 119(a-b), 120(a-d), 121(a-e), 122(a-g), 123(a-b), 125, 128(a-g), 130-31.

46.     In short, by May 2010 Lead Bond Counsel's exceptional investigative efforts, combined with their extensive review of publicly available Wachovia-related documents, had enabled them to put together a remarkably coherent picture of serious and undisclosed problems at the Company, which in turn gave Lead Counsel confidence that they would be able to survive at least the renewed round of motion to dismiss briefing that would inevitably follow their filing of the Amended Bond Complaint.

### 5.     The Defendants' Second Set of Motions to Dismiss, and Lead Bond Plaintiffs' Response Thereto

47.     On July 14, 2010, the Wachovia Defendants, the Underwriter Defendants and KPMG each filed separate motions to dismiss the Amended Bond Complaint.  (Dkt. Nos. 105. 108 and 111) (collectively, the "Second Motions to Dismiss").  This second round of motions to dismiss included over 130 pages of briefs and several hundred additional pages of exhibits (in addition to the more than 1,500 pages of exhibits that were effectively "incorporated by reference" by the Defendants as part of their renewed efforts to dismiss the Bond Action).  (*See* (Dkt. Nos. 105-113).

48.     The Wachovia Defendants' 84-page-long brief in support of their Second Motion to Dismiss posed particular challenges for Lead Bond Plaintiffs, because the Court had granted the Wachovia Defendants' earlier request that they (the Wachovia Defendants) be allowed to combine into one consolidated and lengthy brief their arguments for dismissing both (a) the Bond Action and (b) the class action component of the separate Equity Actions.  The Wachovia Defendants' tactical approach therefore risked causing the Court to focus on the weaker aspects of the Equity Plaintiffs' claims to the detriment of Bond Plaintiffs' claims.  For example, not only did the Equity Plaintiffs assert different legal claims with different legal elements than those asserted in the Bond Action, the factual allegations of the Equity Plaintiffs' class action

complaint were supported by the statements of only nine (9) CWs of their own (and, in Lead Bond Counsel's view, the Equity Plaintiffs' CWs were also not nearly as qualitatively strong or detailed as the typical CW cited by Lead Bond Counsel in the Amended Bond Complaint).

49.     In short, by cleverly "lumping together" their treatment of the Equity Plaintiffs' legal claims and supporting factual allegations with their treatment of the separate and distinct legal claims and factual allegations of the Bond Plaintiffs, the strategy behind the Wachovia Defendants' "combined" Second Motion to Dismiss briefing was clear:  (a) persuade the Court to focus first on issues relating to the Equity Plaintiffs' more weakly supported claims, and then (b) persuade the Court that, on a "deficiency by association" basis, the Bond Plaintiffs' separate and far better pled claims should also be dismissed on "similar" grounds.  Accordingly, the specific arguments raised by the Wachovia Defendants (and by KPMG and the Underwriter Defendants) in support of their Second Motions to Dismiss, although largely repetitive of those raised in their earlier motions to dismiss the Bond Action (*see* § II.B.3 above), were all presented in a far more dangerous form.

50.     Moreover, Defendants' Second Motions to Dismiss the Bond Action also raised certain new legal arguments that clearly posed significant risks for the Bond Plaintiffs' claims.

51.     First, and perhaps most threatening, both the Wachovia Defendants and defendant KPMG vigorously contended that Judge Kaplan's decision in *Fait v. Regions Fin'l Corp.,* 712 F. Supp. 2d 117 (S.D.N.Y. May 10, 2010) – which had been decided only a few weeks before – required dismissal of *all* of the Bond Plaintiffs' claims against KPMG and all of their "accounting claims" against the Wachovia Defendants (*i.e.,* all claims relating to inadequate loan loss reserves, overvalued goodwill and CDO assets, and overstated net income and Tier 1 capital levels).  For example, as KPMG argued:

> What KPMG did each year was to provide an *opinion* on the financial statements, which financial statements included Wachovia management's judgments and estimates related to the allowance for loan losses, certain securities (including CDOs), and goodwill. [However], [a]s Judge Kaplan recently recognized, opinions of this sort are "actionable under Section 11 or 12 only if the complaint alleges that the speaker did not truly hold the opinion at the time it was issued." *Fait v. Regions Financial Corp.,* [712] F. Supp. 2d [117], 2010 WL 1883487, at *3 (S.D.N.Y. May 10, 2010) (dismissing Section 11 claim against auditor).

Mem. of Law in Support of KPMG LLP's Motion to Dismiss the Amended Complaint, dated July 14, 2010, at 8 (Dkt. No. 109).

52.    Similarly, the Wachovia Defendants argued that they could not be held liable for these types of alleged misstatements in their financial statements.   For example, as the Consolidated Mem. of Law in Support of the Wachovia Defendants' Motion to Dismiss the Amended Complaint, dated July 14, 2010 (Dkt. No. 106) ("Wachovia's Second MTD Brief") argued:

> Neither set of plaintiffs allege facts showing that Wachovia's management did not believe that Wachovia's reserves were appropriate.  Such allegations are critical even with respect to Securities Act claims, because the adequacy of loan reserves is not a matter of objective fact.   Rather, reserves are "statements of opinion by defendants," and whether they are misstated depends on whether "defendants did not truly hold those opinions at the time they were made public." *Fait v. Regions Financial Corp.,* 2010 WL 1883487, at *5 (S.D.N.Y. May 10, 2010) (dismissing Section 11 claim against auditor). Although plaintiffs point to subsequent changes in Wachovia's reserve levels and methodology, they set forth no particularized facts that Wachovia at any earlier time experienced or internally predicted losses exceeding their reserves. [Am. Bond Compl.] at ¶¶ 153, 156…. Wachovia's later disclosures – especially in light of the unprecedented intervening collapse of the housing and credit markets – "provide[] absolutely no reasonable basis for concluding that defendants did not think reserves were adequate at the time the registration statement and prospectus became effective." [citation omitted].

*Id.* at 65-66; *see also id.* at 79 (arguing that Bond Plaintiffs' allegations that Wachovia overstated its reported goodwill, net income and Tier 1 capital levels were also inadequately pled "in the absence of particularized allegations that management believed that [such figures were]

materially overstated") (quoting *Fait* at *4).

53.     Second, as the last sentence of the block quote cited immediately above suggests, Wachovia's Second MTD Brief also reflected a new emphasis – previously foreshadowed in the Wachovia Defendants' Reply Brief in support of their earlier motion to dismiss – arguing that the losses suffered by investors in Wachovia securities (including the Bond Class Securities) were caused not by any allegedly false or misleading statements but rather by a "tangle of other factors" that affected the prices of those securities, including the "unforeseen and uncontrollable market forces" that were unleashed in 2008 amid a "once in a century credit tsunami." *Id.* at 81-82.  Although the pleading burdens with respect to causation issues are different under the Securities Act of 1933 (the only statute under which the Bond Plaintiffs brought claims) and the Securities Exchange Act of 1934 (under which most of the Equity Plaintiffs' claims were brought), the Wachovia Defendants' use of loss causation arguments in their Second MTD Brief clearly threatened to adversely influence the Court's assessment of another fundamental issue in the Bond Action – namely, the extent to which evidence concerning the 2008 financial collapse could be used to argue that there were *no* legally cognizable damages in this case (and that any investor losses suffered during the relevant period were all due to an "unforeseen and unforeseeable" financial "tsunami" rather than misleading Offering Materials).

54.     Third, in their Memorandum of Law in Support of the Underwriter Defendants' Motion to Dismiss the Amended [Bond] Complaint, dated July 14, 2010 (Dkt. No. 112) ("Underwriters' Second MTD Brief"), the Underwriter Defendants, on behalf of all Defendants, again took the lead in arguing that there were no "viable plaintiffs" who had sufficient statutory standing to bring claims with respect to 19 of the 30 Offerings at issue.  Although several of the arguments raised in the Underwriters' Second MTD Brief were not new, the brief posed certain

new legal challenges for Bond Plaintiffs because it cited no fewer than *ten* (10) additional cases relating to statutory standing issues (including seven from within this District) that had been decided since the completion of briefing on the first round of motions to dismiss in 2009.  In addition, the Underwriters' Second MTD Brief raised the entirely new argument that, notwithstanding the addition of Hawaii, Iron Workers and City of Livonia as Additional Bond Plaintiffs (and who between them directly "covered" nine additional Offerings of Bond Class Securities), their addition did not "cure" any pre-existing standing issues.  In this respect, the Underwriter Defendants argued that because none of the "original" Bond Plaintiffs ever had statutory standing to bring claims except with respect to the specific Offerings in which they had purchased, the statute of limitations for later filing investors in such Offerings was *not* tolled – with the result that the "one-year-from-discovery" and/or the "three-years-from-the-offering-date" limitations periods under 15 U.S.C §77(m) had expired with respect to the nine Offerings "covered" by Hawaii, Iron Workers and City of Livonia by the time these additional plaintiffs had been added to the Bond Action.  *See* Underwriters' Second MTD Brief at 11-15.

55.     On August 13, 2010, Lead Bond Plaintiffs filed their Combined Memorandum of Law in Opposition to the Wachovia, Underwriter and KPMG Defendants' Respective Motions to Dismiss the Amended [Bond] Complaint (Dkt. No.114) ("Bond Plaintiffs' Second Opp. Brief").

56.     The primary focus of Lead Bond Plaintiffs' brief was to try to distinguish for the Court the separate nature and distinctly different (and, in our view, much better supported) factual allegations of the Amended [Bond] Complaint, as compared to those alleged in the separate Equity Actions – while at the same time covering each of the dozens of discrete legal arguments and points of law asserted in the various Defendants' combined 130 pages of briefing on the Second Motions to Dismiss.  Accordingly, in addition to covering many of the same

points covered in their Opposition to the Initial Motions to Dismiss (*see* § II.B.3 at ¶¶ 36-39 above), Lead Bond Plaintiffs' Second Opp. Brief also sought to (among other things):

- effectively summarize, within the 70-page limit authorized by the Court, the most important aspects of the nearly 60 pages worth of CW statements contained in the Amended Bond Complaint (and distinguishing the allegation based on them from the relatively thin allegations in the Equity Class Action);

- rebut Defendants' new arguments that were based on the recent decision in *Fait*;

- address Defendants' insinuations that the 2008 "financial tsunami" might provide a complete defense to liability; and

- rebut Defendants' updated standing arguments, including but not limited to rebutting their arguments and related case authorities regarding the applicability of *American Pipe* tolling to the recently asserted claims brought by Hawaii, Iron Workers and City of Livonia.

*See id.* at Dkt. No. 114.

57.     On September 15, 2010, the Wachovia Defendants, the Underwriter Defendants and defendant KPMG each filed their respective reply briefs (Dkt. Nos. 116, 118 and 119), which consisted of a combined total of 80 additional pages of legal argument. Suffice it to say that, following the submission of these additional briefs, the many complex and hotly disputed issues raised in the Defendants' respective Second Motions to Dismiss the Bond Action were fully, comprehensively and, perhaps, exhaustively briefed by the parties.

### 6.     The Court's March 31, 2011 Opinion and Order, and KPMG's Motion for Reconsideration

58.     On March 31, 2011, the Court entered its Opinion and Order on the various motions to dismiss that had been filed in both the Bond Action and in each of the separate Equity Actions (the "March 31 Opinion"). The Court's March 31 Opinion denied in substantial part each of the motions to dismiss the Amended Bond Complaint, while dismissing *in their entirety* the claims asserted in the various Equity Actions.

59. As a threshold matter, with respect to the Defendants' various standing-related arguments, the Court agreed that it was necessary to have a named plaintiff (or group of plaintiffs) who purchased in each of the Offerings in order to bring Securities Act claims on a classwide basis with respect to each of those Offerings. *In re Wachovia,* 753 F. Supp. 2d at 368-70. Importantly, however, the Court rejected Defendants' arguments that *American Pipe* tolling did not apply, and adopted Lead Bond Plaintiffs' argument that they had effectively tolled the statute of limitations on behalf of all purchasers of all Bond Class Securities when they filed their original complaint back in January 2009 in the California State Court. 753 F. Supp. at 370-74. Thus, the Court found that Additional Bond Plaintiffs Hawaii, Iron Workers and City of Livonia all had viable claims, which in turn cleared the way for Lead Bond Counsel to continue to pursue claims on a class-wide basis on behalf of investors in an additional nine Offerings.

60. Otherwise, with respect to the merits of the claims asserted in the Bond Action, the Court's March 31 Opinion appeared on its face to represent a sweeping victory for the Bond Plaintiffs. Not surprisingly, however, Defendants had a different view which they imparted to us almost immediately, contending that the March 31 Opinion was unclear on a number of critically important merits issues.

61. In this respect, Defendants contended that they could take advantage of the fact that the March 31 Opinion, while noting that the Amended Bond/Notes Complaint had asserted that the Offering Materials contained more than a half dozen different types of false or misleading statements, *explicitly* sustained only those claims relating to allegedly misstated LTV ratios. As the March 31 Opinion stated:

> Specifically, the [Bond] Plaintiffs allege that the offering documents contained material misrepresentations and omissions regarding: (1) the risk profile and "pristine" quality of the residential mortgage portfolio; (2) the "conservative in-house appraisal and underwriting approach" to the Pick-A-

Pay portfolio; (3) the accuracy of reported loan-to-value ratios; (4) the inadequacy of reported loan loss reserves; (5) the impaired value of Wachovia's CDO holdings; (6) the impaired value of the Golden West franchise and related goodwill; (7) the impaired value of Wachovia's net income, assets, and Tier 1 capital rating; and (8) Wachovia's GAAP compliance.  Plaintiffs also allege material misrepresentations and omissions in the audit opinions provided by Defendant KPMG, a claim the Court will separately address.

***At a minimum***, the Bond[] Plaintiffs have stated a material misrepresentation claim based on the LTV ratios reported in the offering documents. . . . [Bond] Plaintiffs allege that [Wachovia's] stated LTV ratios for [its] residential mortgage portfolio were materially inaccurate "because the appraisers used by Golden West and later Wachovia . . . reported inflated appraisal values." (Bond Compl. ¶¶ 226, 239.)  . . . *[T]he Bond[] Plaintiffs supply <u>ample</u> allegations that the appraisal process was manipulated to produce inflated appraisal values.*  The *Bond[]* Complaint relates <u>*detailed*</u> *CW reports* that other Wachovia employees "regularly called and harassed [appraisers] to 'get the value they wanted'" (*id.* ¶ 122(b)); that managers selected appraisers from a prepared list of those who would "hit" the desired values (*id.* ¶ 122(c)); that offices would order a new appraisal if the first attempt yielded a number too low for the loan to be approved (*id.*); and that appraisers "bent the rules" by increasing appraisal values in response to such pressure (*id.* ¶ 122(g)).  Because "the properties collateralizing the Company's loans . . . were worth materially less than their appraised values" (*id.* ¶ 226), Plaintiffs allege that the corresponding LTV ratios were similarly distorted.  Given *these allegations* about the appraisal process, the Court cannot conclude that the offering document statements regarding LTV ratios are immaterial as a matter of law. . . .  Accordingly, the Court finds that *the Bond[] Plaintiffs* have stated claims under Sections 11 and 12(a)(2).

*In re Wachovia,* 753 F. Supp. 2d at 377-78 (emphasis added).

62.   Lead Bond Counsel continue to maintain the view that the correct reading of the March 31 Opinion was that the Court sustained all of the enumerated categories of claims that it recited above.  To support our reading, we countered that the lack of *any* language elsewhere in the opinion indicating that the Bond Plaintiffs' claims against KPMG or the Underwriter Defendants were being dismissed in any respect (other than certain claims based on standing considerations) supported the interpretation that all of the Bond Plaintiffs' claims were to go forward – and that the Court simply exercised its discretion *not* to analyze each and every

category of false and misleading statement alleged in the Amended Bond Complaint before moving on to analyze certain other issues.  We also reminded Defendants that, as a general rule, absent clear language in a court order granting a defendant's request that certain claims be dismissed, the clear implication is that such claims will go forward.  And arguably this conclusion was particularly justified here, where the Court did not hesitate to dismiss *all* of the claims asserted in the Equity Actions – yet conspicuously declined to dismiss any of the analogous claims contained in the vastly more detailed and well-pled Amended Bond Complaint.

63.     Nonetheless, Defendants advised us that they would continue to assert that there could be no certainty as to what the Court's intentions were with respect to the bulk of Bond Plaintiffs' claims that did not relate specifically to the reporting of inflated LTV ratios.  For example, *both* the Bond Plaintiffs and the separate Equity Plaintiffs alleged that Defendants had made false and misleading statements that Golden West and Wachovia adhered to "conservative" and "risk averse" underwriting standards.  In analyzing such claims in the specific context of its analysis of the Equity Plaintiff's Complaint, the Court indicated that such statements could be properly dismissed as statements of inactionable "puffery" and/or "corporate optimism."  *Id.* at 353-54.  In so ruling, however, the Court also stressed that the Equity Plaintiffs "suppl[ied] no particularized allegations that defendants knew or should have known that their underwriting standards were *not* conservative while publicly maintaining the opposite."  *Id.* at 355 (emphasis in original).  If the Court had intended to find that Wachovia's statements (including those incorporated by reference into the Offering Materials) concerning its "conservative" and "risk averse" Pick-A-Pay loan underwriting practices were indeed mere puffery and hence immaterial as a matter of law, such claims would have been no more actionable for the Bond Plaintiffs than for the dismissed Equity Plaintiffs.  On the other hand, if the gravamen of the Court's concern

32

was that the Equity Plaintiffs had simply failed to support their allegations of rampant deficiencies in Pick-A-Pay loan underwriting, then the Court's ruling would have no adverse ramifications for the Bond Plaintiffs' underwriting claims – which (as noted above) were amply supported by literally *dozens* of CW statements in the Amended Bond Complaint. *See* Am. Bond Compl. at ¶¶ 91(a-d), 100(a-d), 101(a-c), 103(a-e), 104-106, 107(a-c), 108-09, 112, 113(a-r), 115(a-p), 118(a-m), 119, 120(a-d), 121(a-e), 122(a-g), 123-25, 128(a-g) & 131.[10]

64.     Accordingly, notwithstanding Lead Bond Counsel's view that the March 31 Opinion likely represented a sweeping victory for the Bond Plaintiffs, Defendants argued that the scope of the Court's opinion was actually more narrow, that the scope of discovery going forward should be limited to the alleged deficiencies in Wachovia's in-house appraisal procedures (and would exclude discovery into the numerous other underwriting and accounting related subjects put in issue by the Bond Plaintiffs), and that upon further reflection the Court – having dismissed the "parallel" Securities Act claims asserted in the Equity Actions – would inevitably feel compelled to dismiss (or drastically narrow) most or all of the analogous Securities Act claims asserted in the Bond Action.  These arguments presented substantial risk for Lead Bond Plaintiffs.  In sum, although the March 31 Opinion, as written, allowed Bond Plaintiffs to continue forward with respect to *at least one* of their claims, that claim was not their strongest, and there was clearly a substantial risk that their "surviving" claims would be far fewer than they had hoped.

---

[10] *Compare also*, *e.g.,* (a) the Court's findings that Equity Plaintiffs' complaint "*contain[ed] no facts*" to support the Equity Plaintiffs' allegations that Wachovia failed to adhere to strict underwriting practices, *In re Wachovia* 753 F. Supp. 2d at 377 (emphasis added), *with* (b) the Court's statements on the very next page of its opinion sustaining the Bond Plaintiffs' LTV/appraisal-related claims based on the Amended Bond Complaint's "*ample* allegations that the appraisal process was manipulated to produce inflated appraisal values" as supported by "*detailed* CW reports." *Id.* at 378 (emphasis added).

65.     Lead Bond Counsel's fears that Defendants would immediately try to reargue or otherwise obtain a very narrow "clarification" of the Court's March 31 Opinion were soon realized.

66.     On April 14, 2011, defendant KPMG filed a Motion for Reconsideration of the Court's March 31 Opinion (the "Motion to Reconsider"), together with a separate letter request, in the alternative, for leave to file an interlocutory appeal of the March 31 Opinion pursuant to 28 U.S.C. §1292(b) (the "1292(b) Letter Brief").

67.     In its Motion to Reconsider, KPMG argued, among other things, that the Court's March 31 Opinion expressly sustained only those claims that were based on Lead Bond Plaintiffs' allegations that the Offering Materials misstated Wachovia's publicly reported LTV ratios – and that accordingly the case should be dismissed on reconsideration as against KPMG because its audit opinions "did not extend to Wachovia's statements regarding LTV ratios." KPMG Motion to Reconsider, at 1.  The Motion to Reconsider plainly threatened to open a proverbial can of worms for Lead Bond Plaintiffs because (a) it was difficult to argue as a factual matter with KPMG's position that its audit opinions (and the Wachovia financial statements that were the subject of those audit opinions) did *not* address LTV ratios for the Pick-A-Pay loan portfolio, and (b) the motion necessarily also begged the question of the extent to which the March 31 Opinion should be read broadly or narrowly with respect to the actionability of the many *other* alleged misstatements plead in the Amended Bond Complaint that the March 31 Opinion did not specifically rule on in the context of the Bond Action (including, for example, whether any of the Defendants could be held liable for alleged misstatements in Wachovia's financial statements concerning (i) the inadequacy of or Wachovia's loan loss reserves; (ii) the overstated value of Wachovia's CDO holdings; (iii) the impaired value of the Golden West

franchise and related goodwill; (iv) the overstated value of Wachovia's net income, assets and Tier 1 capital level; and (v) Wachovia's purported compliance with GAAP).

68.     Equally serious, KPMG's 1292(b) Letter Brief requesting leave to file an interlocutory appeal asserted that, in the alternative, all of Lead Bond Plaintiffs' claims against KPMG (and, by implication, against the Wachovia Defendants and the Underwriter Defendants as well) would need to be dismissed if, contrary to the March 31 Opinion, the Second Circuit were to adopt the rationale of Judge Kaplan as set forth in *Fait v. Regions Financial Corp.,* which was then pending before the Second Circuit.  As KPMG argued:

> The [March 31 Opinion] highlights a difference within the Southern District that has significant ramifications for auditors and issuers alike.  [The March 31 Opinion] concluded that the Bond/Notes Plaintiffs had sufficiently alleged, as actionable, statements concerning loan-to-value ratios that had been distorted by alleged misconduct in the appraisal process…., and that such statements such be treated, at a minimum, as though they were not truly held opinions precluding dismissal at the motion-to-dismiss stage.  The Court's conclusion stands in contrast with another view discussed, but not accepted, by the Court here, namely, that statements made in public securities filings such as those identified in the Amended [Bond] Complaint regarding loan valuation and the appraisal process (and, more significantly for KPMG – others such as the allowance for loan losses, CDO valuation and goodwill impairment) qualify as "subjective opinions" that are actionable only if the amended complaint alleges that the speaker did not truly have the opinion at the time it was made."

KPMG 1292(b) Letter Brief at 1-2 (citing *Fait* and another very recent decent by Judge Kaplan captioned *Tseretelli v. Residential Asset Securitization Trust 2006-A8,* 692 F. Supp. 2d 387, 393-94 (S.D.N.Y. 2010)).

### 7.     Settlement Negotiations with the Wachovia Defendants

69.     Meanwhile, following very preliminary discussions in late 2010 initiated by the Wachovia Defendants, and while the Defendants' motions to dismiss the Amended Bond Complaint were still pending, in February 2011 Lead Bond Plaintiffs and the Wachovia Defendants agreed to enter into a mediation process under the auspices of the Hon. Daniel

Weinstein, a retired California state court judge and one of the most experienced and respected mediators in the United States of complex civil actions, and specifically large securities class actions.  No pre-conditions were set on the mediation (other than that any discussions, and even the existence of the discussions, were to be kept strictly confidential, including from the other defendants and all other parties in the separate Equity Actions).

70.     As part of the mediation process, the parties agreed to exchange formal mediation statements as well as separate materials specifically focused on the issues of damages and "negative causation."  Pursuant to this schedule, and prior to the opening face-to-face mediation session that was scheduled for March 30, Lead Bond Counsel prepared and submitted to the Mediator and opposing counsel the following materials (among other things):  (a) Lead Bond Plaintiffs' detailed opening mediation statement; (b) a summary damages analysis; (c) responses to the Wachovia Defendants' questions concerning Lead Bond Plaintiffs' damages expert's analyses; (d) detailed questions to the Wachovia Defendants concerning their damages and negative causation analyses; and (e) a comprehensive 27-page Reply Mediation Statement submitted on behalf of Lead Bond Plaintiffs.

71.     During the weeks preceding the start of the mediation, Lead Bond Counsel consulted extensively with their damages expert and his staff, both by telephone and in person.  These preparations allowed Lead Bond Counsel to gain a further refined understanding of the range of damages that might plausibly be recovered in the Bond Action under various scenarios under plaintiffs' theory of the case, and to analyze and critique the Wachovia Defendants' damages and negative causation theories as set forth in their pre-mediation submissions.  Lead Bond Counsel also consulted extensively with their damages expert in connection with preparing him for his scheduled presentation on damages (to be given at the opening session of the

mediation), and for the post-presentation questioning that Lead Counsel anticipated would be forthcoming from the Mediator and the Wachovia Defendants and/or their damages expert.

72.     On March 30 and 31, 2011, Lead Bond Plaintiffs and the Wachovia Defendants, by their counsel, met face-to-face for a two-day mediation session under the auspices of Judge Weinstein at the JAMS mediation center in New York City.  During the mediation, both sides made presentations concerning their views of the case, which were supplemented by separate presentations (and subsequent period for questions and answers) by each side's respective damages expert.  Certain additional confidential factual information was also exchanged during the parties' discussions, and, at the request of Judge Weinstein as mediator, Lead Bond Counsel prepared a supplementary presentation overnight to present at the opening session of the second day of the mediation on March 31.

73.     Despite the extended and frank discussions, no settlement was reached at the end of the second day of the March 30-31 mediation session, and the two sides remained far apart. Nonetheless, after consulting with Judge Weinstein and before breaking up at the end of the day on March 31, both sides concluded that enough progress had been made to warrant scheduling a further set of mediation meetings with Judge Weinstein in April 2011, although there was no assurance whatever that further discussions would lead to a settlement.

74.     The day after the March 30-31 mediation session adjourned, the Court issued its March 31 Opinion.

75.     As discussed above, Lead Bond Plaintiffs viewed the Court's March 31 Opinion as a significant victory.  However, Lead Bond Plaintiffs also recognized that Defendants' arguments that the March 31 Opinion was written in a way that left the door open to limit the scope of any surviving claims to only those which were squarely based on alleged misstatements

of the Pick-A-Pay portfolio's LTV ratios, which in turn were not (in Lead Bond Counsel's view) the strongest of the claims asserted in this Action, had some viability.  Moreover, Lead Bond Counsel also recognized that even if the March 31 Opinion was intended to be read broadly in Bond Plaintiffs' favor (as Lead Bond Counsel believed), there was also still a substantial risk that Defendants would be able to relitigate a significant number of key issues if the pending Second Circuit appeal in *Fait* resulted in an adverse decision for plaintiffs.

76.     In early April 2011, both Lead Bond Plaintiffs and the Wachovia Defendants spent a significant amount of time analyzing the impact of the March 31 Opinion on the Bond Plaintiffs' Amended Complaint and the Wachovia Defendants' defenses thereto.  During this period, at Judge Weinstein's request, both sides prepared confidential memoranda for the mediator setting forth their respective analyses of the March 31 Opinion and their views as to its impact on renewed settlement discussions.  Indeed, as a result of the March 31 Opinion, it was unclear for a time whether the parties would even agree to resume settlement discussions, or whether, for example, the Wachovia Defendants would join KPMG in a high-stakes gambit to try to obtain reconsideration or a substantial narrowing of the March 31 Opinion.

77.     In the end, in the wake of the March 31 Opinion, the Wachovia Defendants and Lead Bond Plaintiffs, with the encouragement and active involvement of Judge Weinstein, agreed to resume the negotiation process.  Accordingly, following the submission of additional mediation materials and various pre-mediation conference calls, the two sides met again in New York City for another full day of protracted face-to-face meetings, presentations and arm's-length negotiation on April 28, 2011.

78.     In the evening of April 28, 2011, counsel for the Wachovia Defendants and Lead Bond Plaintiffs reached agreement on the provisions of a term sheet for the settlement of the

38

claims asserted against the Wachovia Defendants (the "Wachovia Term Sheet"), which contemplated a resolution of the Bond Action as against the Defendants other than KPMG in exchange for their payment of $590 million in cash. It was also agreed in principle that any settlement would include the Underwriter Defendants as "Released Parties" under the Wachovia Term Sheet. The Wachovia Term Sheet, however, contemplated that Lead Bond Plaintiffs would continue the litigation of their claims against KPMG.

### 8.      Further Discovery from Wachovia

79.      Notwithstanding the unprecedented size of the recovery contemplated by the Wachovia Term Sheet for a "pure" Securities Act case, Lead Bond Counsel determined (and Judge Weinstein agreed) that it was both necessary and appropriate to conduct further due diligence from a liability perspective to obtain assurance that the Wachovia Settlement warranted seeking final approval, and that there were no significant and previously unknown adverse facts that would have warranted a materially higher settlement. However, rather than delay the settlement process, Lead Bond Counsel negotiated a key provision of the Wachovia Term Sheet, which required the Wachovia Defendants to begin producing immediately additional relevant documents and witnesses, and which simultaneously preserved Lead Bond Plaintiffs' *unilateral* right to terminate the Wachovia Settlement at any time prior to moving for final approval in the event that an even larger recovery was warranted by their due diligence.

80.      This discovery, as described in detail below, not only served to confirm the fairness of the Wachovia Settlement, but it also allowed Lead Bond Plaintiffs to better prepare their case against KPMG and provided additional leverage in settlement negotiations with KPMG. To minimize the possibility of any significant delays in obtaining production of these important materials, the Wachovia Term Sheet also provided that any disputes concerning the

scope of any discovery requests served on the Wachovia Defendants would be subject to prompt and binding resolution by Judge Weinstein.

81.     Lead Bond Counsel immediately prepared a set of detailed document requests for service on the Wachovia Defendants covering a wide array of topics pertinent to the claims in the case, including the Golden West portfolio, Wachovia's underwriting policies and practices, loan performance documents and documents related to KPMG, to name a few.

82.     Although the Wachovia Defendants began producing responsive materials within a matter of days of Lead Bond Counsel's having first requested them, other materials were produced only after extensive meet and confers and negotiations regarding the scope of certain requests and the manner of making them available to Lead Bond Counsel.

83.     The bulk of the Wachovia Defendants' production was loaded onto a computer database, which enabled Lead Counsel to review and analyze documents with maximum efficiency.  Among other document review strategies employed, Lead Bond Counsel organized the documents according to custodians and subject-matter, and used electronic "search terms" and other techniques to identify specific communications, reports and other materials that were relevant to the claims and defenses in this litigation, all of which allowed Lead Bond Counsel to prioritize and focus on particularly relevant Wachovia departments, reports, and personnel.  Similarly, search terms and other techniques were used to locate documents relevant to Wachovia's acquisition of Golden West and its Pick-A-Pay loan portfolio.

84.     Lead Counsel also analyzed Wachovia and Golden West loan underwriting policies and practices, Similarly, Lead Counsel collected and reviewed internal Wachovia documents concerning loan performance to independently assess the extent to which Wachovia's

loan underwriting practices conformed with – or deviated from – what was represented in the Offering Materials.

85.     In total, Lead Bond Counsel reviewed and analyzed a total of approximately 9 million pages of internal Wachovia and Wells Fargo documents concerning the matters alleged in the Amended Complaint.

86.     In addition, Lead Bond Counsel served Wachovia with an initial list of persons with knowledge whom Lead Bond Counsel wished to interview or depose in connection with the matters alleged in the Amended Complaint.  Ultimately, Lead Bond Counsel interviewed fifteen (15) current Wells Fargo and/or Wachovia personnel (including former Wachovia and/or Golden West personnel now employed by Wells Fargo), which supplemented the valuable information that Lead Bond Counsel had previously obtained from others with relevant knowledge.

87.     Based on their thorough prior investigations and their review of all of the discovery produced by Wachovia/Wells Fargo, Lead Bond Plaintiffs and their counsel concluded that there was significant evidence that would have supported the primary claims asserted in the Amended Complaint, but that the evidence was often technical and subject to different interpretations, including interpretations that a jury might have found sufficient to support Defendants' positions that the Offering Materials contained no misstatements or omissions that were material. After assessing the risks associated with those competing interpretations, Lead Bond Plaintiffs and their counsel, while they had been fully prepared to litigate in the event that the claims asserted against the Wachovia Defendants were not settled, decided to proceed with the Wachovia Settlement.

### 9.     Negotiation of the KPMG Settlement

88.     In early May 2011, Lead Bond Counsel and KPMG's counsel (Williams & Connolly LLP) spoke by telephone to explore the possibility of commencing settlement

discussions.   No prior settlement discussions had occurred between these parties.   Shortly

thereafter, on May 5, 2011, counsel for KPMG and Lead Bond Plaintiffs participated in a

conference call with the Court.   During this conference call, both sides jointly requested – and

the Court granted – a 45-day extension of the existing briefing schedule with respect to KPMG's

pending Motion to Reconsider in order to allow KPMG and Lead Bond Plaintiffs a reasonable

window to pursue settlement discussions.

89.     Lead Bond Plaintiffs' and KPMG's initial efforts to settle the case through direct

bilateral negotiations between their respective counsel without a mediator quickly faltered, as it

became apparent from the parties' initial communications that Lead Bond Plaintiffs' and

KPMG's settlement positions were far apart.   However, rather than abandon further discussions,

Lead Bond Plaintiffs and KPMG agreed in late May 2011 to retain Judge Weinstein (who had

mediated the successful settlement negotiations with the Wachovia Defendants) to try to breathe

life into the negotiation process with KPMG, and the parties thereafter scheduled two days of

face-to-face mediation meetings under Judge Weinstein's auspices for June 13 and 14 in New

York City.

90.     Pursuant to an agreed pre-mediation schedule and the mediator's

recommendation, Lead Bond Counsel again prepared (a) a comprehensive mediation brief,

which focused on the specific challenges of establishing the liability of KPMG (a secondary

actor whose alleged misconduct was a step removed from that of its client, Wachovia), and (b) a

revised damages analysis (which had to be adjusted compared to Lead Bond Plaintiffs' earlier

damages analyses with respect to the Wachovia Defendants) to reflect, *inter alia,* the fact that

certain Offerings at issue did not include any KPMG-audited Wachovia year-end financial

statements that were alleged to be materially false or misleading[11]).   In preparation for the KPMG mediation, Lead Bond Counsel also reviewed KPMG's mediation brief and related summary damages analyses, and also worked with Lead Counsel's damages expert to (a) prepare supplemental pre-mediation questions to KPMG regarding its damages analyses and (b) prepare Lead Bond Plaintiffs' responses to KPMG's questions regarding Lead Bond Plaintiffs' expert's damages analyses.

91.     The mediation against KPMG was particularly challenging because, as discussed in § II.B.6 above, (a) the only claim that the Court unambiguously sustained in its March 31 Opinion against the Defendants was Bond Plaintiffs' claim that the Offering Documents misstated the true loan-to-value (LTV) ratios underlying the Pick-A-Pay loan portfolio, and (b) none of the financial statements that KPMG audited contained any representations as to the Pick-A-Pay portfolio's LTV ratios.   Moreover, KPMG vigorously reasserted in the mediation all of the additional arguments that it had raised in its Motion to Reconsider and 1292(b) Letter Brief, including its argument that this Court had failed to properly apply Judge Kaplan's opinion in the *Fait* case, which was then on appeal to the Second Circuit.   As also discussed in § II.B.6 above, KPMG contended that the *Fait* decision, if affirmed by the Second Circuit, would require dismissal of all claims asserted against it in the Bond Action, given the absence of any factual allegations in the Amended Bond Complaint of KPMG's "subjective disbelief" (*i.e.,* that KPMG rendered audit opinions that it did not actually believe in).

92.     With respect to liability issues, KPMG also vigorously defended the quality of its underlying audit work.  For example, KPMG asserted that even if the Court did not reconsider its

---

[11] The first *audited* Wachovia financial statements that post-dated Wachovia's October 2006 acquisition of Golden West and the Pick-A-Pay portfolio were not issued until late February 2007.

March 31 Opinion as to it (and even if the *Fait* decision was not decided favorably for defendants), the evidence would show that KPMG acted with reasonable diligence at all times and would therefore be able to establish its "due diligence defense" as a complete bar to any liability on all claims asserted against it in the Bond Action.

93.    KPMG also argued that its liability with respect to a large number of the Offerings at issue was limited at best.  To give just one example, KPMG argued that it would be easy for it to show that there was no causal connection between KPMG's allegedly inaccurate audit opinion on Wachovia's year-end financial statements for 2007 (which was issued on February 28, 2008) and any losses that investors suffered in connection with several large Preferred Stock Offerings that occurred in the second half of April 2008 because Wachovia had issued updated and "superceding" unaudited financial results in early April 2008 which had disclosed increased loan loss reserves and a materially heightened risk of exposure to credit losses on the Pick-A-Pay portfolio compared to what was contained in the February 28, 2008 audited financial statements.  And as was the case with the Wachovia Defendants, KPMG also argued that its experts would show that any losses suffered by investors in Bond Class Securities were caused not by any alleged misstatements in the Offering Materials, but by a "financial tsunami" that was unprecedented and unforeseeable.

94.    In addition, as part of their settlement negotiations with KPMG, Lead Bond Plaintiffs also had to take into consideration KPMG's potential proportionate fault defenses, which provided an additional level of complexity to already complicated issues of damages and causation.

95.    On June 13 and 14, 2011, the parties participated in a two-day face-to-face mediation session under Judge Weinstein's auspices at JAMS's offices in New York City.  Lead

Bond Counsel also arranged to have their damages expert attend the first day of the KPMG mediation on June 13.

96.     During the course of the June 2011 KPMG mediation, Lead Bond Counsel presented their various responses to each of KPMG's arguments. These responses included many of the arguments that Lead Bond Plaintiffs had previously addressed during the briefing on the Defendants' various motions to dismiss, as well as additional arguments based on analyses provided by their damages expert and information concerning the nature and scope of KPMG's audit work that Lead Bond Counsel had derived from their ongoing discovery and review of internal Wachovia documents (*see* § II.B.8 above).

97.     Unfortunately, following various presentations on issues of liability and damages by both sides, the parties made only limited progress towards a possible settlement at the June 13-14 mediation. Accordingly, the mediation broke up with the parties still far apart, and with no assurance whatsoever that the parties would be able to close the significant gap between them without having to resume full-blown litigation.

98.     After the June 13-14 mediation broke up, Lead Bond Plaintiffs and KPMG continued to engage in separate one-on-one communications with Judge Weinstein to try to narrow and, if possible, resolve their differences. When progress continued to be difficult, Judge Weinstein recommended that both sides be given additional time to evaluate their respective positions, and that the parties request a series of short extensions of the Court's original 45-day "stay" of litigation (including the Court's stay of further proceedings on KPMG's pending Motion to Reconsider). The Court granted each of these requests, and Lead Bond Plaintiffs (while also continuing with discovery) used this time to continue their negotiations with KPMG.

99.    On June 28, 2011, Lead Bond Plaintiffs and KPMG finally reached sufficient common ground to enter into a term sheet (the "KPMG Term Sheet") to settle all claims asserted against KPMG for $37 million in cash.

100.    Under the KPMG Term Sheet, KPMG agreed to produce to Lead Bond Counsel significant documentary and other information concerning the claims asserted in the Action (and including more particularly the claims asserted against KPMG), and also agreed that Lead Bond Plaintiffs would have the right to terminate any proposed settlement with KPMG in the event that their due diligence showed, at any time prior to moving for final approval, that it was not fair, reasonable and adequate.

101.    Lead Bond Counsel requested, reviewed and analyzed over 285,000 pages of internal KPMG documents which concern the claims asserted by Bond Plaintiffs against KPMG. These documents include the relevant portions of KPMG's work-papers from its audits of Wachovia's annual financial statements which were included in the Offering Materials for the majority of the Offerings at issue, and which were alleged to contain materially false and misleading statements.

102.    In addition, under the KPMG Term Sheet, Lead Bond Counsel negotiated with KPMG to make available multiple former members of its Wachovia audit team to be interviewed by Lead Bond Counsel regarding the nature, scope and content of KPMG's annual audits of Wachovia's financial statements, and other matters relating to alleged misstatements or omissions in Wachovia's Offering Materials generally.

103.    At the conclusion of the discovery process with respect to KPMG, Lead Bond Plaintiffs and their counsel determined that there was significant evidence that would have supported the primary claims asserted against KPMG in the Amended Complaint, but that the

evidence was not conclusive.  For example, the documents were often technical and subject to different interpretations, including interpretations that would have supported Defendants' positions that KPMG's audit opinions (assuming they were actionable at all under *Fait*) contained no misstatements or omissions that were material.  In sum, Lead Bond Counsel's further discovery from KPMG confirmed that they had not underestimated the risks of proving the facts necessary to establish their claims against KPMG at the time they negotiated the KPMG Settlement (*see also* discussion of the risks of litigation at §§ VI.B – VI.C below).

### 10. Negotiation of the Stipulation of Settlements and Related Papers, and the Court's Preliminary Approval Thereof

104.    During the late spring and early summer of 2011, Lead Bond Counsel had prepared and begun to negotiate the various terms of a draft "Stipulation of Settlement" with the Wachovia Defendants, with the goal of submitting the final terms and conditions of the Wachovia Settlement to the Court before the end of the summer.  By early July, however, Lead Bond Counsel also faced the prospect of having to negotiate the final terms and conditions of a Stipulation of Settlement with KPMG, and of trying to maximize the prospects that both the Wachovia and KPMG Settlements would be able to go forward as smoothly and economically as possible.

105.    Accordingly, in early July 2011, Lead Bond Counsel decided to cease its prior "bilateral" negotiations with the Wachovia Defendants over the terms of a "Wachovia-only" Stipulation of Settlement, and to commence "trilateral" negotiations with both the Wachovia Defendants and defendant KPMG over the terms of a single "global" Stipulation of Settlements that would embody the terms of both proposed Settlements in a single document.

106.    Although a significant amount of work that had already been done up until that point on negotiating a draft "Wachovia-only" Stipulation of Settlement that could be used as the

foundation for a broader "global" Stipulation, the need to negotiate every disputed passage and provision of the "global" Stipulation with *two* sets of defense lawyers (as opposed to just Wachovia as before) complicated and slowed down the negotiating process.   In addition, the draft "global" Stipulation had to go through multiple rounds of revisions and extremely careful review by counsel for all parties in order to ensure that the legally distinct and fully severable terms of the two separate Settlements were maintained throughout.   Notwithstanding the difficulties and complexities of preparing one agreement embodying both Settlements, Lead Counsel believed that pursuing this approach would ultimately maximize the extent to which administration of the separate Wachovia and KPMG Settlements could be coordinated efficiently, reduce possible confusion among Settlement Class Members, eliminate potentially duplicative costs, and streamline the review and approval process as to both Settlements for the Court.

107.    As part of the negotiation and drafting process, in addition to drafting the terms of the final Stipulation now pending before the Court, Lead Bond Counsel also negotiated with Defendants the forms of the proposed Notice and of the proposed preliminary and final approval orders.    Lead Counsel also separately negotiated the terms of the separate "supplemental agreements" with the Wachovia Defendants and defendant KPMG, respectively, which set forth certain terms and conditions under which the Wachovia and KPMG Settlements, respectively, could be terminated.   The negotiation of these provisions, as well as the negotiations over at least one other basic issue -- the scope of the releases to be granted to the Defendants under the respective Settlements -- continued up until the final hours before the Stipulation was signed.

108.    On August 5, 2011, the parties executed the Stipulation setting forth the final and complete terms and conditions of each proposed Settlement.   Consistent with Lead Bond

Plaintiffs' desire to avoid any unnecessary delay in the anticipated schedule for proceeding with the consummation of the Settlements, Lead Bond Plaintiffs immediately submitted the Stipulation (together with the various exhibits thereto) to the Court for preliminary approval. In conjunction therewith, Lead Bond Plaintiffs also prepared and filed their Brief in Support of Lead Bond Plaintiffs' Motion for Preliminary Approval, Certification of Proposed Settlement Class and Issuance of Notice (Dkt. No. 137). Lead Bond Counsel also submitted a letter to the Court setting forth a proposed schedule that would allow for the remaining contingencies for approval to be satisfied, without unnecessarily delaying the date for holding a final approval hearing on both Settlements.

109.    On August 9, 2011, the Court entered the proposed Preliminary Approval Order, thereby preliminarily approving both Settlements and certifying the proposed Settlement Class for all purposes relating to settlement.

## III.    LEAD BOND PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE

110.    The Court's August 9, 2011 Preliminary Approval Order (a) directed that notice be disseminated to the Settlement Class; (b) set October 25, 2011 as the deadline for Settlement Class Members to submit objections to the Settlements, the Plan of Allocation and the Fee and Expense Application; (c) also set October 25, 2011 as the deadline for any putative Settlement Class Members to request exclusion from the Settlement Class; and (d) set a final approval hearing date of November 14, 2011.

111.    Pursuant to the Preliminary Approval Order, Lead Bond Counsel instructed GCG, the Court-approved Claims Administrator for the Settlements, to begin disseminating copies of the Notice and the Claim Form by mail and to publish the Summary Notice in accordance with the Preliminary Approval Order. The Notice contains a thorough description of the Settlements,

the Plan of Allocation and Settlement Class Members' rights to: (a) participate in the Settlements; (b) object to any aspect of the Settlements, the Plan of Allocation and/or the Fee and Expense Application; or (c) exclude themselves from the Settlement Class.  The Notice also informs Settlement Class Members of Lead Bond Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 17.5% of the Settlement Fund, and for reimbursement of litigation expenses in an amount not to exceed $1,800,000 plus interest.  To disseminate the Notice, pursuant to the terms of the Preliminary Approval Order, GCG obtained information from Wells Fargo (as successor-in-interest to Wachovia) and from banks, brokers and other nominees regarding the names and addresses of potential Settlement Class Members.  *See* Cirami Aff. at ¶¶ 3-6.

112.    On August 26, 2011, GCG disseminated an initial batch of over 2,200 copies of the Notice and Claim Form (the "Claim Packet") by first-class mail.  *Id.* at ¶ 4.  As of October 5, 2011, GCG had disseminated over 206,000 Claim Packets.  *Id.* at ¶ 7.

113.    In accordance with the Preliminary Approval Order, between September 9 and 12, 2011, GCG caused the publication of the Summary Notice in the national editions of *The Wall Street Journal* and *The New York Times*, as well as in the *Financial Times* and over the *PR Newswire*.  *See id.* at ¶ 8.

114.    Lead Bond Counsel also caused GCG to establish a dedicated settlement website, *www.WachoviaBondLitigation.com*, to provide potential Settlement Class Members with information concerning the Settlements and access to downloadable copies of the Notice, Claim Form and Summary Notice, as well as copies of the Stipulation, the Preliminary Approval Order and the Amended Bond Complaint.  *Id.* at ¶ 10.

115.    As set forth above, the deadline for Settlement Class Members to file objections to the Settlements, the Plan of Allocation and/or the Fee and Expense Application is October 25, 2011.  Despite the dissemination of over 206,000 Claim Packets, as of October 5, 2011, only ten (10) requests for exclusion have been received (all from individual investors) (*see* Cirami Aff. ¶ 11); and no objections to either Settlement, the Plan of Allocation or Lead Bond Counsel's request (as set forth in the Notice) for a 17.5% fee award and reimbursement of expenses have been received to date.[12]

## IV.    TERMS OF THE PROPOSED SETTLEMENTS

116.    The proposed Settlements provide for a total recovery of $627 million in cash, plus interest thereon.  If approved, the proposed Settlements will resolve all claims asserted in the Bond Action against the Settling Defendants and (subject to certain conditions noted below) all claims asserted against all other previously named defendants (namely, the Underwriter Defendants), together with their  affiliated persons and/or entities.

### A.    The Wachovia Settlement

117.    In full and complete settlement of the Released Bond/Notes Claims (as defined below) which were or could have been asserted in this Action against the Wachovia Defendants and the other Wachovia Releasees (as defined below), the Wachovia Defendants have paid into escrow on behalf of Bond Plaintiffs and the Settlement Class the sum of $590 million in cash, subject to the terms and conditions of the Stipulation.

118.    Pursuant to the Wachovia Settlement, and on its Effective Date, Bond Plaintiffs and the other members of the Settlement Class on behalf of themselves, their heirs, executors,

---

[12] Lead Bond Counsel will address any additional issues resulting from objections or exclusions filed subsequent to today in reply papers to be submitted, pursuant to the terms of the Preliminary Approval Order, by November 7, 2011 (the "Supplemental Submission").

administrators, predecessors, successors, affiliates and assigns, shall release and forever

discharge, and shall be forever enjoined from prosecuting, any of the Wachovia Releasees with

respect to any Released Bond/Notes Claims.

119.    "Released Bond/Notes Claims," as defined in the Stipulation at ¶ 1(pp), means:

> any and all claims and any and all causes of action of every nature and description, including both known claims and Unknown Claims, whether based on federal, state, local or foreign statutory law or common law, rule or regulation, whether fixed or contingent, foreseen or unforeseen, matured or unmatured, accrued or unaccrued, liquidated or unliquidated, existing now or to be created in the future, whether direct, representative, class or individual in nature, that Lead Bond[] Plaintiffs or any other member of the Settlement Class (a) asserted in the Bond[] Action, or (b) could have asserted in any forum that arise out of, are based upon or are related to the allegations, transactions, facts, matters or occurrences, representations or omissions involved, set forth, or referred to in the Amended Bond[] Complaint and that arise out of or are based upon the purchase or other acquisition or sale of the Bond Class Securities during the Settlement Class Period.

Released Bond/Notes Claims, however, do *not* include, release, bar waive, impair or otherwise

impact (a) any claims asserted in the separate Equity Actions (including *In re Wachovia Equity*

*Sec. Litig*, No. 08 Civ. 6171 (RJS)); (b) any claims relating to the enforcement of the

Settlements; or (c) any claims against any Underwriter Defendant that does not execute a release

(an "Underwriter Defendant Release") of any claims which that Underwriter might have against

any Bond Plaintiff by November 7, 2011 (five business days prior to the date of the November

14 Settlement Hearing).  *Id.*

120.    "Wachovia Releasees," as defined in the Stipulation at ¶ 1(qqq), means

> the Wachovia Defendants and the Underwriter Defendants, their respective present and former direct and/or indirect parents, subsidiaries, divisions and affiliates and their respective present and former employees, members, partners, principals, Section 16 Officers, directors, agents, attorneys, advisors, administrators, representatives, accountants, auditors, insurers, and agents; the predecessors, successors, estates, heirs, executors, trusts, trustees, administrators, and assigns of each of them, in their

capacity as such; and any firm, trust, corporation or other entity in which any Wachovia Defendant or Underwriter Defendant has or had a controlling interest, and the Immediate Family members of the Individual Defendants.

The term Wachovia Releasees, however, excludes (a) any Underwriter Defendant that fails to provide Lead Bond Counsel with an Underwriter Defendant Release by November 7, 2011, and (b) any of the KPMG Releasees.  *Id.*

121.    The Stipulation provides that the Wachovia Defendants may elect to terminate the Wachovia Settlement (but not the KPMG Settlement) in the event that Settlement Class Members representing in excess of a certain amount of shares of Wachovia preferred stock or interests in Wachovia bonds/notes exclude themselves from the Settlement Class.  In addition, ¶ 38 of the Stipulation gave Lead Bond Plaintiffs the right to withdraw from the Wachovia Settlement at any time prior to the filing of their motion for final approval if, in their good faith discretion, they determined that information produced during their due diligence rendered that Settlement unfair, unreasonable or inadequate.  For the reasons set forth herein and in the memorandum in support of the Final Approval Motion, however, Lead Bond Plaintiffs have determined that the Wachovia Settlement is fair, reasonable and adequate in all respects.

**B.      The KPMG Settlement**

122.    In full and complete settlement of the Released Bond/Notes Claims (as defined above) which were or could have been asserted in this Action against KPMG and the other KPMG Releasees (as defined below), KPMG has paid into escrow on behalf of Bond Plaintiffs and the Settlement Class the sum of $37 million in cash, subject to the terms and conditions of the Stipulation.

123.    Pursuant to the KPMG Settlement, and on its Effective Date, Bond Plaintiffs and the other members of the Settlement Class on behalf of themselves, their heirs, executors,

administrators, predecessors, successors, affiliates and assigns, shall release and forever

discharge, and shall be forever enjoined from prosecuting, any of the KPMG Releasees with

respect to any Released Bond/Notes Claims.

124.   "KPMG Releasees," as defined in the Stipulation at ¶ 1(aa), means

KPMG and its present and former parents, subsidiaries, divisions and
affiliates and their respective present and former employees, members,
partners, principals, Section 16 Officers, directors, agents, attorneys,
advisors, administrators, representatives, accountants, auditors, insurers,
and agents; the predecessors, successors, estates, heirs, executors,
administrators, and assigns of each of them in their capacity as such, and
any firm, trust, corporation, or other entity in which KPMG has or had a
controlling interest.

The term KPMG Releasees, however, does not include any of the Wachovia Releasees.  *Id.*

125.   The Stipulation provides that KPMG may elect to terminate the KPMG

Settlement (but not the Wachovia Settlement) in the event that Settlement Class Members

representing in excess of a certain amount of shares of Wachovia preferred stock or interests in

Wachovia bonds/notes exclude themselves from the Settlement Class.  In addition, ¶ 38 of the

Stipulation gave Lead Bond Plaintiffs the right to withdraw from the KPMG Settlement at any

time prior to the filing of their motion for final approval if, in their good faith discretion, they

determined that information produced during their due diligence rendered that Settlement unfair,

unreasonable or inadequate.  For the reasons set forth herein and in the Final Approval Motion,

however, Lead Bond Plaintiffs have determined based on all the extensive work and analysis

they have done to date that the KPMG Settlement, like the Wachovia Settlement, is fair,

reasonable and adequate in all respects.

## V.   ALLOCATION OF THE PROCEEDS OF THE SETTLEMENTS

126.   Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all

Settlement Class Members who want to participate in the distribution of the Settlement Fund

must submit a valid Claim Form and all required information that is postmarked no later than December 28, 2011.  As set forth in the Notice, after deducting all appropriate taxes, notice and administrative costs and Court-approved attorneys' fees and litigation expenses, the balance of the Settlement Fund (the "Net Settlement Fund") will be distributed according to a plan of allocation approved by the Court.

127.    If approved by the Court, the proposed Plan of Allocation set forth in the Notice will govern how the Net Settlement Fund will be distributed among the Settlement Class Members who submit timely and valid Claim Forms (the "Authorized Claimants").  Lead Bond Counsel developed the Plan of Allocation in consultation with Lead Bond Plaintiffs' damages expert, and believe that the plan provides a fair and reasonable method to equitably allocate the Net Settlement Fund among the Authorized Claimants.

128.    The Plan of Allocation, which is set forth at pages 10-14 of the Notice, was designed as a method for allocating the Net Settlement Fund among the Authorized Claimants based on the losses they suffered as a result of the wrongdoing alleged in the Bond Action.  As described in the Notice, the computations under the Plan of Allocation are not intended be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover at trial.   Instead, the calculations under the plan are merely a method to weigh the claims of Settlement Class Members against one another for the purposes of making *pro rata* allocations of the Net Settlement Fund.

129.    Under the Plan of Allocation, a "Recognized Loss Amount" or "Recognized Gain Amount" will be calculated for each purchase/acquisition of the Bond Class Securities during the Settlement Class Period that is listed in the Claim Form and for which adequate documentation is provided.   The calculation of Recognized Loss or Gain Amounts will depend upon which

securities were purchased/acquired, when they were purchased/acquired, and in what amounts, and whether the securities were sold, and if so, when they were sold, and in what amounts.[13]

130.    The Plan of Allocation is structured so that the portion of the Net Settlement Fund created by the Wachovia Settlement (the "Wachovia Fund") will be distributed on a *pro rata* basis to all eligible Authorized Claimants based on their Settlement Class Period purchases/acquisitions of *any* of the Bond Class Securities.  In contrast, the portion of the Net Settlement Fund created by the KPMG Settlement (the "KPMG Fund") will be distributed on a *pro rata* basis to all eligible Authorized Claimants based on their Settlement Class Period purchases/acquisitions, if any, of the *subset* of the Bond Class Securities that were first offered to the public on or after April 23, 2007.[14]

---

[13] For example, as described in the Notice, on September 29, 2008 it was publicly announced that the federal government had brokered a proposed agreement under which Wachovia would be sold to Citigroup for $1 per share and the government would guarantee Wachovia loan losses to the extent they exceeded $42 billion.  Recognizing that Settlement Class Members who purchased/acquired Bond Class Securities subsequent to that announcement were likely no longer relying on any alleged misstatements and omissions in the Offering Materials at issue in the Bond Action, the Plan of Allocation provides that the calculated Recognized Loss and Gain Amounts based on purchases on or after September 29, 2008 shall be reduced by 90%. In addition, under the Plan of Allocation, Recognized Loss and Gain Amounts resulting from purchases/acquisitions of any of the Bond Class Securities that were required to be dismissed from the Action by the Court based on in its March 31 Opinion are discounted by 50% to reflect the difficulty that Bond Plaintiffs would have faced in obtaining a reversal of the relevant portion of that opinion (and in obtaining any recovery from the Defendants with respect to these securities) had the litigation continued against the Defendants.

[14] As detailed in the Notice, the claims asserted against the Wachovia Defendants relate to each of the public offerings of Bond Class Securities that occurred during the Settlement Class Period (the "Offerings"), while the claims asserted against KPMG relate only to that subset of the Offerings that incorporated Wachovia's KPMG-audited financial statements for the years ended December 31, 2006 and/or December 31, 2007.  Therefore, under the Plan of Allocation, only those Settlement Class Members who purchased or otherwise acquired Bond Class Securities that were first offered to the public on or after April 23, 2007 will be eligible to participate in the distribution of the KPMG Fund.  Those securities are referred to in the Plan of Allocation as the "KPMG Bond Class Securities".

131.    Additionally, in the interests of fairness, the Plan of Allocation provides that Settlement Class Members are eligible to share in the Wachovia Fund only to the extent that they suffered an overall net recognized loss on their purchases/acquisitions of the Bond Class Securities during the Settlement Class Period; similarly, Settlement Class Members are eligible to participate in the KPMG Fund only if they suffered an overall net recognized loss on their purchases/acquisitions of the KPMG Bond Class Securities.[15]

132.    In sum, the Plan of Allocation, which was developed in consultation with Lead Bond Plaintiffs' damages expert, was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on the strength of their claims and whether they actually suffered losses on their transactions in the Bond Class Securities attributable to the alleged wrongdoing.   Accordingly, Lead Bond Counsel respectfully submit that the Plan of Allocation is fair and reasonable and should be approved by the Court.

133.    As noted above, as of October 5, 2011, more than 206,000 copies of the Notice, which contains the Plan of Allocation, and advises Settlement Class Members of their right to object to the proposed Plan of Allocation, have been sent to potential Settlement Class Members. S*ee* Cirami Aff. at ¶ 7.  To date, no objections to the proposed Plan of Allocation have been received.

## VI.    EVALUATION OF THE PROPOSED SETTLEMENTS

### A.    General Statement

134.    With respect to the substantive terms of a settlement, the standards governing approval are well-established.  Courts in this Circuit have long evaluated the fairness, adequacy

---

[15] A "net recognized loss" with respect to Settlement Class Period purchases/acquisitions of the Bond Class Securities and the KPMG Bond Class Securities means that the total of the Claimant's Recognized Loss Amounts with respect to all purchases/acquisitions of such securities exceeds the total of the Claimant's Recognized Gain Amounts.

and reasonableness of a class action settlement utilizing the so-called "*Grinnell* factors," which

are as follows:

> …(1) the complexity, expense and likely duration of the litigation; (2) the
> reaction of the class to the settlement; (3) the stage of the proceedings and
> the amount of discovery completed; (4) the risks of establishing liability;
> (5) the risks of establishing damages; (6) the risks of maintaining the class
> action through the trial; (7) the ability of the defendants to withstand a
> greater judgment; (8) the range of reasonableness of the settlement fund in
> light of the best possible recovery; and (9) the range of reasonableness of
> the settlement fund to a possible recovery in light of all the attendant risks
> of litigation.

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 117 (2d Cir. 2005) (quoting *City of

Detroit v. Grinnell,* 495 F.2d 448, 463 (2d Cir. 1974) (citations omitted).  For the reasons set

forth below we believe that both Settlements easily surpass this Circuit's standards for final

approval.

### B.    The Risks of Establishing Liability

135.    Cases such as this, which arise under Sections 11, 12 and 15 of the Securities Act,

typically involve complex issues of law and fact and a high degree of litigation risk, and this

Action is no exception.  In addition, the risks and potential complexities of pursuing the claims

asserted in the Bond Action have recently increased significantly in the wake of the Second

Circuit's decision in *Fait,* which was decided in late August 2011 – less than three weeks after

the final terms of the Stipulation were agreed to.  Although the analysis overlaps to a significant

extent, we will first discuss the risks of establishing liability as to the Wachovia Defendants, and

then consider the even greater risk factors associated with the claims asserted against KPMG.

### 1.    Risks of Establishing Liability Against the Wachovia Defendants

136.    With respect to the Wachovia Defendants, Lead Bond Plaintiffs faced very

significant risks of establishing liability involving, among other things, the following liability

issues:  (a) the implications of the Court's ruling (in its March 31 Opinion) that certain allegedly inaccurate statements concerning the nature and quality of the underwriting of the residential mortgages contained in Wachovia's "Pick-A-Pay" loan portfolio were not actionable as a matter of law; (b) Bond Plaintiffs' ability to prove that the Offering Materials materially misrepresented the Pick-A-Pay Portfolio's LTV ratios; (c) the actionability of certain other key alleged misstatements, including (i) the extent to which the non-LTV-related claims were sustained and (ii) the extent to which inaccurate statements concerning Wachovia's loan loss reserves, goodwill, CDO valuations and Tier 1 capital levels were "opinions" for which Defendants are not liable absent proof that they did not actually believe in their truth; (d) the complex accounting and valuation issues at issue in this case, where the proof would have turned heavily on the jury's inherently unpredictable reactions to the parties' "battle of the experts"; and (e) the risk that Defendants would be able to defeat a significant portion of Bond Plaintiffs' claims on statute of limitations grounds.

### (a) Actionability of Statements Describing the Pick-A-Pay Portfolio As "Pristine," "Conservative" and "Risk-Averse."

137.   The Amended Bond Complaint's central allegations are that Wachovia materially misrepresented that its Pick-A-Pay loan portfolio was of "pristine" credit quality and was characterized by "conservative" and "risk-averse" loan underwriting practices, when in fact the portfolio had substantial exposure to subprime borrowers and its underwriting practices were riddled with "exceptions to policy" and routinely approved loans to borrowers whose stated income and job titles were grossly exaggerated or simply made up.  However, in the context of dismissing substantively similar claims in the separate Equity Actions on the grounds that the Equity Plaintiffs had provided "no facts" to support such claims, the Court's March 31 Opinion *also* indicated that Wachovia's highly positive but general characterizations of the nature and

quality of the Pick-A-Pay portfolio – even if false – were immaterial statements of "puffery" or mere "corporate optimism," and were therefore not actionable as a matter of law.   As discussed in greater detail at § II.B.6 above, Defendants had already indicated their intention to seek clarification from the Court as to whether these statements were, or were not, actionable as a matter of law.   Although Bond Plaintiffs believe that the clear weight of authority holds that such statements are actionable, case law on the issue remains divided and there could be no assurance as to how this Court would have ruled on a motion for clarification, or how the Second Circuit might subsequently decide the issue.

138.   Moreover, even assuming *arguendo* that the Court were ultimately to uphold the actionability of these statements, Lead Bond Plaintiffs would have still had the risk of actually establishing that such statements were materially false or misleading.   As discussed above, based on Lead Bond Counsel's independent investigations and subsequent discovery, Lead Counsel believed that they would have been able to present strong evidence that the quality of the Pick-A-Pay portfolio and its underwriting was *not* conservative.   However, the Wachovia Defendants would have been able to present significant evidence showing that investors in Bond Class Securities understood that (a) the underwriting of the Pick-A-Pay portfolio was based overwhelmingly on the quality of the collateral and low LTV ratios, with much less emphasis placed on the borrower's creditworthiness; and (b) Golden West's past history of relying on this "collateral-based" approach to lending had resulted in extremely low default rates, and that in light of this history its underwriting approach could be justifiably characterized as "conservative" and "risk averse" even if it involved lending to a significant number of borrowers with low FICO scores or lower-than-stated personal incomes.

### (b) **The Risks of Proving that Wachovia Materially Understated Relevant LTV Ratios.**

139.   The Court's March 31 Opinion expressly sustained Bond Plaintiff's specific allegations that the Offering Materials had reported understated LTV ratios for the Pick-A-Pay portfolio.   In so holding, the Court referenced the Amended Bond Complaint's "ample allegations that the loan appraisal process [for Pick-A-Pay loans] was manipulated to produce inflated appraisal values." *In re Wachovia*, 753 F. Supp. 2d at 378.

140.   However, in contrast to the literally *dozens* of witnesses from all over the country who supported Bond Plaintiffs' allegations that Pick-A-Pay loans were routinely extended to borrowers with low FICO scores, phony reported incomes and bogus job titles (*see, e.g.,* Am. Bond Compl. ¶¶ 96-99, 100(a-d), 113(a-r), 115(a-p), 118(a-m)), the number of CWs who indicated that Wachovia manipulated its property appraisals was more modest (*see id.* ¶¶ 122(a-g)).   In addition, the extent of the alleged manipulations in the appraisal area clearly would have been a hotly contested issue in the case; for example, several CWs suggested that the inflation in appraised values was more at the margins (*e.g.*, bumping up an appraised value by "$10,000" or by "5%" to meet underwriting guidelines) (*id.* at ¶¶ 122(f), (g)).   In other cases, the CWs primary concern was not the lack of a valid appraisal *per se*, but rather the practice in some offices of getting a "second opinion" from a different appraiser if the first appraisal came in too low to approve the loan – a practice that may be suspicious but is not inherently wrong or illegal.   *See id.* ¶¶ 122(c), (d), (e).   Similarly, Lead Bond Counsel's discovery could lead a trier of fact to conclude that even though some appraisals underlying the Pick-A-Pay Portfolio were inflated, they may not have been inflated on such a broad scale to have had a material impact on Wachovia's overall reported LTV ratios.

141.    In addition, in the absence of any CW or other source who personally admitted to preparing a fraudulently inflated appraisal, proving the widespread use of phony appraisals would have been particularly problematic and risky at trial.  For example, it would have been extremely difficult to get any appraisers to admit on the stand that they personally prepared any inflated appraisals, as such an admission would be grounds for having their professional appraisal licenses revoked.  And although Lead Bond Plaintiffs might try to use expert testimony to challenge the accuracy of Wachovia's appraisals, such testimony would have been subject to an intense "battle of the experts," and might potentially be complicated by the fact that in certain regions all or most property appraisers may have had a tendency to overvalue properties during the relevant period (thereby making it all the harder to show that Wachovia's appraisals were any less accurate than industry average).  And finally, as further discussed below, in the wake of the Second Circuit's *Fait* decision there is also arguably uncertainty as to whether stated LTV ratios, to the extent they are based on subjective appraisals of the underlying collateral value, are "opinions" which are not actionable absent proof that the Wachovia Defendants did not actually believe in their accuracy.

### (c) Actionability of Wachovia's Representations Concerning Loan Loss Reserves, Goodwill, CDO Assets and Tier 1 Capital Levels.

142.    As discussed above at § II.B.6, Defendants asserted that the Court's March 31 Opinion was ambiguous given that it did not expressly sustain any of Lead Bond Plaintiffs' claims that the Offering Materials contained inaccurate statements concerning Wachovia's loan loss reserves, goodwill, CDO valuations and Tier 1 capital levels.  Accordingly, even as of March 31, there was a meaningful risk that the Court would, either in response to KPMG's Motion to Reconsider or on a subsequent motion for clarification, dismiss all of these claims as inadequately pled.

143.   In addition, the risk that each of these claims would ultimately be dismissed increased significantly just weeks after the Stipulation was signed.  Specifically, on August 23, 2011, the Second Circuit issued its decision in the *Fait* case, which held – as Defendants had argued – that a company's representations that its allowance for loan losses is adequate is an "opinion" which is only actionable if the speaker actually believes that the "opinion" is *not* accurate.  *See Fait v. Regions Financial Corp.*, __ F.3d __, No. 10-cv-2311, 2011 WL 3667784 (2d Cir. Aug. 23, 2011).  The contours, scope and limitations of the *Fait* decision have yet to be fleshed out.  However, as presaged by KPMG's Motion to Reconsider, it is certain that if the Settlements had not been reached, all Defendants would have tried to expand the scope of the *Fait* decision to dismiss not only Bond Plaintiffs' loan loss reserve claims, but also their claims alleging that the Offering Materials inflated the value of Wachovia's reported goodwill, CDO valuations, LTV ratios (*see* preceding section) and Tier 1 Capital levels (which would have had to be reduced in proportion to any write-downs needed to correct for Wachovia's inadequate loan loss reserves and overstated goodwill and CDO asset valuations).  Because Bond Plaintiffs never couched their allegations against Defendants in terms of intentional fraud or bad faith, there was plainly a significant risk that all of the foregoing claims would be dismissed as being predicated on mere statements of "opinion," and hence subject to a heightened burden of pleading bad faith or scienter that could not be met on the face of the Bond Plaintiffs' pleadings.

### (d)  The Risks of Actually Proving Understated Loan Loss Reserves or Overstated Goodwill, CDO and/or Tier 1 Capital Valuations.

144.   Assuming that Bond Plaintiffs' loan reserve, goodwill, CDO and Tier 1 capital level claims survived any Motions to Reconsider or renewed motions to dismiss in the wake of *Fait,* at best the Bond Plaintiffs would have still faced significant risks in trying to prove their claims at trial.

63

145.   For example, even pre-*Fait,* proof that Wachovia's loan reserves were inadequate under GAAP, or that its reported goodwill and CDO asset valuations were overstated in violation of GAAP, would have involved a vigorously contested "battle of the experts" – or, perhaps more accurately, a series of such battles involving dueling accounting experts, mortgage portfolio valuation experts and CDO valuation experts.  The proofs with respect to such matters would have been highly technical, and hence particularly subject to the inherent risks of trying to assess how a jury might react to the competing parties' respective expert testimony.

146.   Moreover, in the wake of *Fait,* it is entirely conceivable that, in addition to the "battle of the experts" as to the *accuracy* of Wachovia's statements concerning the adequacy of its loan loss reserves and its reported goodwill and CDO valuations, Bond Plaintiffs would have *also* had to prove the Defendants' lack of subjective belief in those same figures.  To the extent such a requirement would be construed as equivalent or similar to proving *scienter,* there could certainly be no assurance, based on Lead Bond Counsel's independent investigation or on their subsequent discovery, that such a requirement could be met in this case.

**(e)  Statute of Limitations Risks**.

147.   The Court's March 31 Opinion adopted the Defendants' arguments that claims as to a given Offering should not be allowed to go forward unless there were at least one named plaintiff who had actually purchased Bond Class Securities in that Offering, but also held that the statute of limitations was tolled for all putative class members as to all Offerings by the filing of Lead Bond Plaintiffs' initial state court complaint in January 2009 (which was expressly brought on behalf of purchasers in all of the Offerings).  As a result of this second aspect of the Court's ruling, a significant number of Bond Action claims were saved from extinction, including the class claims relating to Bond Class Securities that had been purchased by Additional Bond

Plaintiffs Hawaii, Iron Workers and City of Livonia (who did not join the Bond Action until 2010).

148.     However, although Lead Bond Counsel believe that this Court's ruling that the statute of limitations had been tolled for all putative class members by the filing of Lead Bond Plaintiffs' earlier state court complaint was decided correctly, we recognize that it turns on a question of law that has divided the district courts and that has yet to be decided by any court of appeals (including the Second Circuit).   Accordingly, had this case gone to trial or been appealed, there was a risk that the portions of the March 31 Opinion dealing with tolling would have been reconsidered or reversed, and that the claims of a substantial number of Settlement Class Members would be dismissed in their entirety as time-barred.

### 2.     Risks of Establishing Liability Against KPMG

149.     All of the foregoing risks of litigation apply with at least equal force to KPMG – except that the risks of establishing KPMG's liability with respect to certain issues is even higher than it is with respect to the Wachovia Defendants.   For example, KPMG's potential liability was always limited solely to alleged misstatements contained in the financial statements themselves, and hence never included liability for alleged misrepresentations concerning the nature or quality of the Pick-A-Pay loan portfolio, or its LTV ratios.

150.     In addition, as a secondary actor, KPMG would likely have argued that it was particularly well-suited to take full advantage of the *Fait* decision, as Bond Plaintiffs' claims against KPMG were (according to KPMG) predicated on KPMG's *opinions* as to the reasonableness of Wachovia's *opinions* as to the appropriateness of the Company's reported loan loss reserves and stated valuations of goodwill, CDO assets and Tier 1 capital levels.   As a general matter, Bond Plaintiffs note that it is typically harder to infer wrongful intent or other bad faith conduct on the part of an auditor as compared to the company itself, given that (a) the

company's officers are closer to the actual operations of the company than the auditors, and hence more likely to be aware of when accounting numbers are inaccurate or lack reasonable basis, and (b) it is typically easier to establish a motive to inflate numbers (or to suppress adverse facts) with respect to the company or its officers than it is with respect to its auditors.

151.    Finally, in contrast to Wachovia and the other Wachovia Defendants that were the "issuers" of the Bond Class Securities at issue in this Action, KPMG also had the opportunity to establish an affirmative "due diligence" defense to liability.  Accordingly – even if *Fait* were found to have no material impact on pre-existing rules for establishing Section11 liability for auditors, and even if Bond Plaintiffs were able to establish that every challenged aspect of Wachovia's audited financial statements was in fact misstated – KPMG would still have been able through expert testimony and otherwise to persuade the jury that its audit work was thorough and diligent, and that any misstatements or inaccuracies in the financial statements were due, for example, to Wachovia's failure to appropriately inform KPMG of the extent to which the quality of Pick-A-Pay Portfolio and the underwriting of that portfolio was worse than what KPMG (and the public at large) had understood it to be.

152.    Finally, and particularly in the wake of the $590 million Wachovia Settlement, KPMG would have also argued that it was entitled to favorable proportionate fault and judgment reduction treatment as a "non-settling defendant."  Accordingly, although Bond Plaintiffs' reasonably recoverable total damages were in the range of $1.2 to $2.05 billion, as a practical matter Bond Plaintiffs were never likely to be able to recover more than a fraction of that amount against KPMG.

153.    For all of the foregoing reasons, Lead Bond Counsel respectfully submit that the additional $37 million that they were able to recover from KPMG on behalf of the Settlement

Class also reflects an outstanding result which weighs strongly in favor of approving the KPMG Settlement.

### C.      The Risks of Establishing Damages, and Related Loss Causation Issues

154.     In addition to their defenses to liability, all Defendants would have asserted very substantial defenses regarding damages and causation.

155.     Under the federal securities laws, market loss does not equate with damages. Indeed, it is fundamental that there can be no recovery in a Section 11 case where the loss was caused by factors unrelated to the alleged false statement or omission, and under §11(e) of the Securities Act each Defendant may limit his, her or its liability to only that portion of the investors' losses that reflects the amount by which the inflation in the price of the securities at issue was caused by the alleged inaccuracies in the Offering Materials. *See* 15 U.S.C. §77k(e) ("[I]f the defendant proves that any portion or all of such damages represents other than the depreciation of the value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable.").

156.     In this case, the amount of damages which Bond Plaintiffs could have ultimately recovered after taking into account causation issues was a matter of serious and significant dispute. Some of Defendants' main arguments in this regard included the following:

157.     First, Defendants vigorously argued that the market-changing events of the financial crisis of 2008 constituted an unforeseen and unprecedented crisis (or at least the worst crisis since the Great Depression) that was the actual cause of *all* (or at least most) of any losses suffered by investors in the Bond Class Securities here. Indeed, as a threshold matter, Defendants pointed out that it was simply absurd to expect a jury to believe that *every* price

decline experienced by the Bond Class Securities over more than a two year long period (from the date of the first Offering in July 2006 through the end of the Settlement Class Period) was caused by inaccuracies in the Offering Materials, and that an appropriate damages analysis would necessarily need to begin with a calculation of damages based on analysis limited to statistically significant trading dates.

158.     Second, and relatedly, Defendants argued that it was well-understood *(inter alia)* that (a) the basic strategy behind the Pick-A-Pay portfolio, based on historical experience, was that home mortgage loans originated with a 20% or greater equity cushion would experience minimal losses in the event of default, and that (b) substantially more than 50% of the portfolio consisted of mortgages on houses located in California and Florida.  Accordingly, Defendants further argued, under normal (or even just plain bad) market conditions, the equity value "cushion" imbedded in the collateral underlying the Pick-A-Pay portfolio would have still been sufficient to insulate Wachovia from substantial financial losses, and that any resulting portfolio stresses (while potentially reducing the value of Wachovia's common stock) would have had minimal impact on the value of Wachovia's Notes and Preferred Stock.  However, as Defendants pointed out, conditions in the housing market by the second half of 2008 were not just "bad", but amounted to a financial disaster in which home prices generally experienced an unprecedented decline of 26% nationwide, with much worse declines in California and Florida.  In other words, given the size of the "tsunami" that hit the housing markets, all Defendants would have vigorously argued that huge losses in the Pick-A-Pay Portfolio were inevitable *regardless* of other factors alleged in the Amended Bond Complaint (such as inadequate reserves, low-FICO score borrowers, and inadequate income verification).

159.    Third, Defendants also argued that their alternative explanations as to why the prices of many of the Bond Class Securities declined would gain significant credibility and weight given that by early 2011 the prices of all but a handful of the Bond Class Securities had recovered fully (or nearly so) since the worst days of the Fall 2008 to March 2009 crisis period (when U.S. financial markets hit bottom).   According to Defendants, this evidence of price recovery constituted clear evidence of a lack of permanent impairment in the Pick-A-Pay portfolio, and that the temporary price declines suffered in 2008 were far more likely to have been caused by uncertainty surrounding the financial crisis (and related temporary liquidity concerns) rather than a supposed revelation that the Pick-A-Pay Portfolio was not as conservatively underwritten as investors were led to believe.

160.    Fourth, as Defendants also pointed out, none of the Bond Class Securities had ever defaulted, and accordingly there would be limited to no recoverable damages with respect to any investors who held such securities through maturity.   Given that the Bond Class Securities with respect to 17 of the 30 Offerings at issue in this Action would have matured by the end of August of 2013, the prospect of there being any recoverable damages for continuing holders of such securities if this case were taken to trial was decidedly remote.

161.    Fifth, Defendants also took issue with various aspects of the trading model that Lead Bond Plaintiffs' damages expert used to estimate class-wide damages.   For example, Defendants contended that Lead Bond Plaintiffs' expert overestimated the volume of securities actually traded by failing to make appropriate adjustments for intra-day trading.   (These and numerous other "technical" disputes were the subject of extended discussion during both the Wachovia mediation and the later KPMG mediation.)

162.     In sum, based on their experts' damages analyses, the Wachovia Defendants averred that their experts would be able to present highly persuasive evidence that an overwhelming percentage – *if not all* – of the alleged damages figure was caused by the "financial tsunami" and/or other factors not properly attributable to any allegedly inaccurate statements contained in the Offering Materials.

163.     For their part, Lead Bond Plaintiffs had always appreciated that any realistic or credible estimate of damages would have to take into account loss causation (also known as "negative causation") considerations.   Accordingly, at Lead Bond Counsel's request, Lead Plaintiffs' damages expert performed various estimates of potentially recoverable damages using a number of different methodologies that used various market indices (and various combinations thereof) as a proxy for the expected impact of reasonable loss causation arguments.   These indices were then applied to adjust observed changes in market price that occurred on various sets of potentially relevant dates, including (a) all dates within the Settlement Class Period involving disclosures of news relating to the home mortgage industry generally or Wachovia specifically; (b) all such dates within the Settlement Class Period but limited to dates on which there were statistically significant price changes; and (c) all dates within the Settlement Class Period involving statistically significant price changes, as controlled to eliminate dates not involving disclosures of Wachovia-specific or Wachovia-related news.   In connection with performing the foregoing analyses, an event study was performed that covered the relevant multi-year period to identify "broadly relevant" news days and "Wachovia specific" news days, and customary regression analyses were used to identify dates on which price movements in the most heavily traded Bond Class Securities was statistically significant.   Moreover, for each of the foregoing damages scenarios, damages were estimated based on two different legal

assumptions:   (a) the assumption that the involuntary conversion of three preferred stock securities (CUSIP nos. 929903219, 929903276 and 929903EF) that took place on December 31, 2008 constituted a "market disposition" of those securities within the meaning of §11(e)(2) and (b) the assumption that said conversions did not constitute a "market disposition."[16]   Although all of the foregoing analyses were performed on a subset of Bond Class Securities that were estimated to account for roughly 80% of total damages, index adjustments were not performed with respect to certain Bond Class Securities constituting roughly 20% of total damages; in general, however, the impact of not making such adjustments for the entire set of 30 separate Offerings was deemed not material.

164.   Based on the foregoing detailed analyses, which were predicated on the specific facts of this case, Lead Bond Plaintiffs' damages expert initially developed a range of reasonably recoverable damages of between roughly $1.569 and $2.505 billion.   However, in the wake of Lead Bond Counsel's intense discussions over damages related questions and the Court's ruling on standing, Lead Bond Counsel (in consultation with their damages expert) modified Bond Plaintiffs' initial damages estimates to take into account (a) the Court's March 31 dismissal of *all* claims predicated on certain smaller Offerings for which there was no named plaintiff with standing (and also no immediate prospect of finding one); (b) Defendants' arguments that damages would inevitably be reduced over time as certain Bond Class Securities were paid off in full (as to both principal and interest), including Lead Counsel's judgment that it was highly unlikely that this case would be tried to a judgment before August 2013 when numerous

---

[16] There is virtually no case law on this singularly arcane point of law.   For one of the few colorably relevant cases, *see In re Broderbund/Learning Co. Sec. Litig.,* 294 F.3d 1201, 1204-05 (9th Cir. 2002) (finding that "market disposition" occurred when plaintiff's shares were exchanged for those of an acquiring corporation as part of a merger transaction), although the differences between the two scenarios under each of the multiple permutations considered were relatively small (*i.e.* not more than $70 million and typically much less).

additional securities were scheduled to mature; and (c) certain modest "technical" adjustments to Lead Bond Plaintiffs' damages expert's trading model assumptions that would not (in Lead Bond Counsel's view) have been worth disputing in front of a jury (*e.g.,* by making a very modest 5% reduction to reported trading volume assumptions to eliminate the effects of intra-day trading and possible double counting of certain dealer-reported trades – an adjustment that was still substantially smaller than what Defendants' experts would have argued for).

165.    Taking into account these further adjustments and after further consultations with their damages expert, on the specific facts of this case Lead Bond Counsel have determined that the maximum range of reasonably recoverable damages that they would have been able to credibly present to a jury in this Action was between roughly $1.2 and $2.05 billion. Accordingly,  Lead Bond Counsel's best estimate is that the total amount of the Settlements now pending before the Court ($627 million) represents approximately 30% to 50% of maximum reasonably recoverable damages ($627/$1.2 billion = 52.25%; $627/$2.05 billion = 30.6%).

166.    In contrast, as discussed above, *even if Bond Plaintiffs had ultimately established the inaccuracy of <u>every</u> statement alleged to have been materially false or misleading in the Amended Bond Complaint,* Defendants would have still been prepared to argue that recoverable damages were *zero*.   Accordingly, in terms of considering a reasonable damages outcomes (rather than just the very top "high end" of the reasonably recoverable range), a jury could have plausibly determined that damages in this case were anywhere from roughly $2.05 billion to *zero* – even if liability were otherwise established.   As discussed below, resolution of disputed damages and related causation issues would have inevitably boiled down to an inherently unpredictable "battle of the experts" and the jury's reaction to sophisticated statistical analyses of complex and highly technical facts.   In such circumstances, at the time the Stipulation was

executed neither side could have any assurance as to where the jury would ultimately settle upon damages within the $0 to roughly $2.05 billion spectrum.

167.   Finally, it should be stressed that the risks of establishing a "high end" damages result could well have been significantly complicated here by both the Second Circuit's *Fait* decision and by the possibility of Defendants successfully narrowing the Court's March 31 Opinion previously discussed in detail at § II.B.6.  For example, if this Court were to narrow its March 31 Opinion to find that (a) the Offering Materials' statements regarding the "pristine," "conservative" and "risk-averse" nature of the Pick-A-Pay Portfolio were "inactionable puffery;" (b) the "actionable" claims were limited to the LTV-related claims; and/or (c) some or all of Bond Plaintiffs' "accounting misstatement claims" (for inaccurate accounting entries for loan loss reserves, goodwill, CDO assets and/or Tier 1 Capital levels) were not actionable, then Defendants would have had the ability to eliminate large portions of any investor losses suffered here.

168.   Lead Bond Plaintiffs and their counsel believe that their claims were meritorious and that maximum reasonably recoverable damages were conceivably as much as $2 billion had they "run the table" on both liability and damages.  For the reasons set forth in this section and in section VI.B immediately above, however, Lead Bond Counsel respectfully submit that there can be no serious dispute that the $627 million worth of Settlements now pending before the Court are manifestly fair and reasonable when its exceptional benefits are weighed in light of the very, very significant risks, burdens and uncertainties of continued litigation.

### D.     The Risks of Maintaining a Certified Class Through Trial

169.   Although Lead Bond Plaintiffs believe that they would have faced no particularly significant hurdles in getting *most* of the claims asserted in this matter certified on a class-wide basis, we note that the Court's March 31 Opinion held that claims with respect to more than a

73

dozen Offerings of Bond Class Securities would have been dismissed in the absence of a named

plaintiff with statutory standing who had purchased in or pursuant to that Offering.  *In re*

*Wachovia,* 753 F. Supp. 2d at 368-70.  Although the Additional Bond Plaintiffs stepped forward

(including Hawaii, Iron Workers and City of Livonia) to protect the interests of purchasers in

certain Offerings not already "covered" by the existing named plaintiffs, at least some Offerings

remained "uncovered" by any plaintiff at the time the Settlements were finalized.  By virtue of

the Settlements (and Lead Bond Plaintiffs' actions dating back to January 2009 to include

purchasers of *all* Bond Class Securities in *all* Offerings in the proposed class), however, *all*

members of the originally proposed class will be entitled to share in the proceeds of the

Settlements.[17]

      **E.**      **The Range of Reasonableness of the Settlement In Light of the Likely**
                    **Recovery and All the Attendant Risks of Litigation**

      170.    Lead Bond Counsel believe that the evidence in this Action would be comprised

of documents and testimony which, when pieced together, would show that the Offering

Materials (including KPMG's audit opinions which were included therein) contained materially

false statements and/or omitted to disclose material facts necessary to make statements contained

therein not misleading, and that reasonably recoverable damages were in the range of $1.2 to

2.05 billion. The Wachovia Defendants, the Underwriter Defendants and KPMG, however,

would present a completely different picture of the relevant facts and circumstances on liability,

which would have predictably been supported by formidable expert opinions.  Moreover,

Defendants would have also presented credible expert arguments from a nationally known

---

[17] To reflect the real risk that this Court's March 31 Opinion would be sustained and that purchasers of "uncovered" Bond Class Securities would ultimately have their claims deemed uncertifiable for lack of a named plaintiff with statutory standing, the Plan of Allocation discounts the calculation of "recognized claim amounts" with respect to such securities by 50%. *See* § V above.

damages consulting firm that recoverable damages were zero, or at best, near zero after taking into account negative causation factors which Defendants' expert believed would eliminate the overwhelming majority, if not *all*, of Bond Plaintiffs' damages claims.  Moreover, in the wake of lingering questions raised by Defendants as to the intended scope of the Court's March 31 Opinion – and the new questions raised by the Second Circuit's recent decision in *Fait* just weeks after the Stipulation was signed – it is unclear what claims Lead Bond Plaintiffs would have ultimately been allowed to present, as a matter of law, to the jury, even if they could prove all the underlying facts as alleged in the Amended Bond Complaint.  *See generally* §§ VI.B and C above.

171.    In sum, as discussed more fully throughout this Joint Declaration, the outcome of the Action against each of the Defendants was uncertain.  In contrast, any uncertainties as to whether Settlement Class Members will obtain a ***very*** substantial recovery in this Action will be eliminated if the Settlements are approved.  Indeed, here the proposed $627 million in total recoveries, or roughly 30% to 50% of what damages would have been reasonably presented to a jury, plainly fall at the *high* end of a "reasonable range" of recovery on a risk-adjusted basis.  Accordingly, the "range of reasonableness" factor also weighs overwhelmingly in favor of approving the Settlements.

### F.    The Complexity, Expense and Likely Duration of the Litigation

172.    As the preceding paragraphs have shown, this Action is replete with complexity with respect to issues of liability, damages and negative causation.  Lead Bond Counsel have already expended a substantial amount of time and effort interviewing approximately 300 confidential witnesses that were utilized in crafting two robust complaints, reviewing approximately 9 million pages of documents produced by Wachovia and over 285,000 additional pages of documents produced by KPMG.  Nonetheless, tens of thousands of hours of additional

attorney time would have needed to be spent before this case could be tried.  In addition –

leaving aside the expense and time that would be required to complete fact discovery – the nature

of the issues presented would have inevitably involved extensive and complex fact discovery

relating to disputed matters of accounting and auditing standards, valuation, damages and loss

causation, which in turn would have inevitably led to complex and hotly disputed motions for

summary judgment.

      173.    Moreover, whatever the outcome of a trial – which would have likely lasted

weeks and required the testimony of literally dozens of witnesses – it is more probable than not

that any losing party would have taken one or more appeals to the Court of Appeals for the

Second Circuit, and perhaps even to the Supreme Court.  Indeed, KPMG had already filed a

motion for leave to file an interlocutory appeal to the Second Circuit under 28 U.S.C. §1292(b)

at the time the KPMG Settlement was reached, and the other Defendants would have almost

certainly joined in any such appeal if the Wachovia Settlement had not been reached.  All of the

foregoing would have delayed, for years, the ability of the Settlement Class to recover *anything*

in this Action – let alone amounts greater than the extraordinary $627 million in recoveries under

the proposed Settlements.  In sum, the Settlements that have been reached at this juncture in the

litigation clearly result in a tangible, very substantial and immediate recovery for the members of

the Settlement Class, while avoiding the equally manifest expense, delay and risks of completing

formal fact and expert discovery, and taking the case through trial and the inevitable appeals.

And notwithstanding the present low interest rate environment, given the time value of money

over a 3 to 5 year time horizon, even a future recovery in excess of the proposed Settlements

might well be less valuable to Settlement Class Members than the comparatively prompt receipt

of the substantial benefits under the proposed Settlements.

### G.     The Stage of the Proceedings and the Amount of Discovery Completed

174.     As set forth earlier in this Joint Declaration, Lead Bond Counsel have (among other things) conducted an exhaustive pre-filing investigation, gone through two separate rounds of comprehensive briefing on the various Defendants' separate motions to dismiss, consulted at length with both accounting experts and their highly experienced damages expert, exchanged additional mediation briefs and related materials (including portions of each side's expert damages analyses) with both Wachovia and KPMG, survived the Defendants' motions to dismiss, participated in over five full days' of face-to-face mediation sessions (including two with the relevant parties' damages experts present) and dozens of mediation-related phone calls under the auspices of one of the country's foremost mediators during which the strengths and weaknesses of the parties' respective positions were thoroughly aired and dissected by the participants, including Judge Weinstein.

175.     In addition, prior to the commencement of the mediation with KPMG, Lead Bond Plaintiffs were already well into the process of obtaining and reviewing relevant documents and had started their interviews of Wachovia/Wells Fargo witnesses – a process that not only helped better prepare Lead Bond Plaintiffs and their counsel for their negotiations with KPMG, but also allowed them to thoroughly confirm the fairness, reasonableness and adequacy of both the Wachovia Settlement and the KPMG Settlement as a precondition to those Settlements becoming final.

176.     The full extent of the comprehensive investigative and discovery work that Lead Bond Counsel conducted before finally agreeing to settle this Action – including their review of over 9 million pages of relevant documents from Wachovia and KPMG and their pre-filing and post-filing interviewing of approximately 300 witnesses – has been described above.  And as also discussed above, this investigative and discovery work covered each of the key loan

underwriting, appraisal, loan loss reserve, liquidity, capital reporting, CDO exposure and related accounting and valuation issues that were at issue in the Bond Action.

177. For the foregoing reasons, we respectfully submit that there can be no serious question but that Lead/Bond Notes Counsel had sufficient – and indeed extensive – information concerning the relevant factual, expert and legal issues to *thoroughly* evaluate the strengths and weaknesses of the Settlement Class's claims with respect to both the Wachovia Defendants and defendant KPMG.

## H. The Ability of the Defendants to Withstand a Greater Judgment

178. The courts have held that, in assessing the adequacy of a class action settlement, a court may also consider the financial condition of the defendants and the ability of the defendants to withstand a substantially greater judgment.

179. At the time the Stipulation was signed in early August 2011, the publicly available financial statements of Wachovia's parent corporation, Wells Fargo, indicated that Wachovia and/or Wells Fargo had more than sufficient financial resources to pay a larger judgment than $590 million. Nonetheless, it must be remembered that just three years earlier (in early August 2008) defendant Wachovia, which was then an independent entity, was the *fourth largest* banking corporation in the United States based on *its* publicly reported financial statements – and yet Wachovia's own CEO later admitted in sworn testimony that the Company was on the brink of insolvency by September 2008, and that it only averted bankruptcy and receivership as a result of the extraordinary government-brokered and subsidized bailout efforts that led to the announcement of its acquisition by Wells Fargo in October 2008. *See* Am. Bond Compl. at ¶¶ 195-96. Although the cause of these calamitous events (unforeseeable and unprecedented "economic tsunami" or foreseeable consequence of Wachovia's own inadequately disclosed and imprudent conduct) were the subject of vigorously contested litigation in this very

Action, there can be no dispute that the events of 2008 shook virtually all observers' confidence in the financial stability and liquidity of even the country's biggest banks.

180. Moreover, only days after signing the Stipulation in early August 2011, stock markets around the world again shuddered, with leading market indices plummeting by more than 20% – and with the biggest declines being suffered by U.S. and European banking corporations. Neither Lead Bond Plaintiffs nor their counsel purport to have any "inside information" that would indicate that Wells Fargo's most recent financial statements paint a falsely optimistic assessment of the current financial condition of Wells Fargo or its wholly-owned Wachovia subsidiary. However, particularly in light of the events of 2008 and the even more recent events of just a few weeks ago, we respectfully submit that it would be plainly incorrect for the Court to find there was "no risk" that the Wachovia Defendants would have been able to pay a substantially greater judgment in the future – perhaps three or four years' hence – after the completion of formal discovery, trial and resolution of the inevitable post-trial motions and appeals. A very substantial bird in the hand (in the form of $590 million in cash that has been fully invested in securities backed by the full faith and credit of the United States) can truly be worth more than even a firm assurance – which was certainly not present here – of ultimately being able to obtain an as-yet uncollected *judgment* for an equal or larger amount at some unknown point years into the future.

181. With respect to KPMG, Lead Bond Counsel believe that it may have the ability to pay a substantially larger sum than the $37 million that is being paid in connection with the KPMG Settlement. However, as discussed above, as a practical matter the prospects for recovering a substantially greater sum from KPMG would have almost certainly been limited as a result of the judgment reduction and proportionate fault arguments that KPMG would have

raised in connection with the Wachovia Settlement.  In this respect, KPMG would have argued that even if it lost the case at trial, it would be entitled to a judgment credit measured by *the greater of* the amount Wachovia actually paid as part of the Wachovia Settlement or the amount that the Wachovia Defendants bore responsibility for the overall losses to the Settlement Class. If KPMG's arguments were accepted, this would have greatly reduced any judgment that KPMG would have actually been required to pay to Bond Plaintiffs and the Settlement Class.

182.    Alternatively, even in the event that Lead Bond Counsel could have somehow successfully exposed KPMG to full joint and several liability for the full amount of any uncollected damages remaining after payment of the $590 million under the Wachovia Settlement, KPMG's ability to pay, for example, a hypothetical future judgment worth hundreds of millions dollars at some indefinite point in the future (after a trial and inevitable appeals) would certainly not be free from doubt.

**I.    The Reaction of the Settlement Class to the Settlements**

183.    As detailed in § III above, as of October 5, 2011, (a) more than 206,000 Court-approved Claim Packets have been mailed to persons who have been identified as potential Settlement Class Members, and (b) the Court-approved Summary Notice (which references the settlement website where fulsome information about the Settlements and the rights of Settlement Class Members in connection therewith are also provided) has also been printed in *The Wall Street Journal*, *The New York Times* and the *Financial Times* and been widely disseminated through the internet and related business news sources through the *PR Newswire*.  To date, however, no objections to either of the Settlements or the Plan of Allocation have been received. To the extent necessary, Lead Bond Plaintiffs will address any objections or exclusion requests received hereafter in their reply papers in support of their motion for final approval.

184.    The reaction of the three Lead Bond Plaintiffs, each of which is a large institutional investor, is, however, already known – and each strongly endorses both of the proposed Settlements.  *See* the declarations submitted on behalf of Lead Plaintiffs Orange County, Louisiana Sheriffs and SEPTA, attached hereto as Exhibits 3 – 5, respectively.

## VII.    THE FEE APPLICATION

### A.    General Statement

185.    Lead Bond Counsel are applying for a fee award of 17.5% of the Settlement Fund (the "Fee Application") on behalf of Plaintiffs' Counsel.[18]

186.    In determining whether a requested award of attorneys' fee is fair and reasonable, district courts are guided by the factors first articulated by the Second Circuit in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974).  As summarized more recently in *Goldberger v. Integrated Res., Inc.,* 209 F.3d 43 (2d Cir. 2000), these factors include:

> … (1) The time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation…; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Goldberger*, 209 F.3d at 50.  Based on consideration of each of the foregoing factors as further discussed below, and on the additional legal authorities set forth in the accompanying Memorandum of Law in Support of Lead Bond Counsel's Motion for an Award of Attorneys'

---

[18]  In addition to Lead Bond Counsel, the law firms retained by the Additional Bond/Note Plaintiffs (namely, the law firms of Abraham, Fruchter & Twersky, LLP, Glancy Binkow & Goldberg LLP, and Pomerantz Haudek Grossman & Gross LLP) (the "Additional Counsel" and, collectively with Lead Bond/Notes Counsel, "Bond Plaintiffs' Counsel" or "Plaintiffs' Counsel") have also submitted declarations attesting to the time and expenses they expended in connection with the prosecution of the Bond Action.  We respectfully submit that the time and expenses incurred by the Additional Counsel are also appropriately considered by the Court, given that their work has also benefitted meaningful portions of the Settlement Class.

Fees and Reimbursement of Expenses (the "Fee Memorandum") being filed contemporaneously herewith, we respectfully submit that Lead Bond Counsel's requested fee should be granted.

### B.    The Quality of Lead Bond Counsel's Representation

187.    A number of considerations may be relevant to assessing the quality of class counsel's representation of a plaintiff class, including the Court's own observations, class counsel's experience and standing at the bar, and the quality of the opposing counsel whom class counsel had to litigate against.  Ultimately, however, the acid test for evaluating "quality of the representation" is the quality of the *results achieved* for the class members whom they were appointed to represent.

### 1.    The Results Obtained from Lead Bond Counsel's Efforts, and the Absence of Any "Parallel" Government Actions

188.    Here, for the reasons previously detailed above, we respectfully submit that the results obtained by Lead Bond Counsel are simply extraordinary by any measure.  To the extent that the "proof is in the pudding," the results achieved, without more, weigh strongly in favor of finding that the quality of Lead Counsel's representation here as Class Counsel was at the top of the scale.

189.    As detailed herein, both the Wachovia Settlement and the KPMG Settlement were due to Lead Bond Counsel's hard work, persistence and skill in a case that presented very significant litigation risks.  More particularly, it also bears repeating here that Lead Bond Counsel obtained this result without the benefit of (a) an accounting restatement by Wachovia (or withdrawal of any audit opinions by KPMG) or (b) any government action, at either the state or federal level, alleging that Defendants had misled Wachovia investors in any respect.  The Settlements presently pending before the Court represent the 14th largest securities class action recovery in history, based on published information.  *See* Exhibit 1 hereto.  We believe that *each*

of the 13 securities actions that resulted in a larger recovery (as a matter of gross dollars) involved both an accounting restatement and a parallel government action.   In other words, it appears that the Settlements here reflect the *single largest recovery* ever achieved in a case where class counsel did not have the benefit of either an internal investigation leading to a restatement or an SEC or other government action.

190.    We respectfully submit that the fact that Lead Bond Counsel had to rely *entirely* on their own efforts – and that they were able to achieve such an outstanding result notwithstanding – is a very significant factor that favorably distinguishes this case, and one that clearly weighs heavily in finding that the "quality of counsel" here was exceptional.[19]

## 2.    The Court's Observations as to the Quality of Lead Counsel's Work

191.    The Court may, of course, also take into account its own observations of the quality of Lead Counsel's representation during the course of this litigation.   Here, representatives of the Lead Counsel firms have appeared on multiple occasions before the Court; in addition, the Court has personally reviewed (*inter alia*) the Amended Bond Complaint, Bond Plaintiffs' briefs in opposition to the various Defendants' Motions to Dismiss, and the numerous papers submitted to the Court in connection with both preliminary and final approval of the Settlements, all of which have been prepared by Lead Bond Counsel.   Although this work represents only a fraction of the total work that Lead Counsel have performed in the course of litigating this case, we respectfully submit that the quality of that work is reflective of the

---

[19] We note that while Lead Bond Counsel were litigating this Action, counsel for the Equity Plaintiffs were pursuing the "parallel" Equity Actions, and that the Equity Actions included "parallel" Securities Act claims based on offering materials for common stock offerings that incorporated many of the *same* false and misleading statements that were also incorporated into the Offering Materials for the Bond Class Securities.   However, Lead Bond Counsel *never* relied on any of the work performed by the Equity Plaintiffs' Counsel.

quality, thoroughness and professionalism of the effort that Lead Counsel have devoted to all aspects of this Action on behalf of the Bond Plaintiffs and the members of the Settlement Class.

### 3.    The Standing and Expertise of Plaintiffs' Counsel

192.    Lead Bond Counsel are highly experienced in prosecuting securities class actions, and worked diligently and efficiently in prosecuting the Bond Action.  Lead Bond Counsel's experience and track record in complex securities class action litigation are summarized in the firm resumes attached to their respective declarations.  All three firms are consistently ranked among the top plaintiffs' firms in the country.  Further, each firm has taken complex securities fraud cases to trial, and we are among the few firms that have done so.  We believe this willingness and ability to prosecute cases through trial added valuable leverage in the settlement negotiations.

### 4.    The Standing and Expertise of Defendants' Counsel

193.    The quality of the work performed by Lead Bond Counsel in obtaining the Settlements should also be evaluated in light of the quality of the opposition.

194.    Here, the Defendants were represented by some of the country's most prestigious law firms, which vigorously and ably defended the Action throughout.   Specifically, the Defendants in the Action were represented by the following law firms:  Fried, Frank, Harris, Shriver & Jacobson, LLP, on behalf of the Wachovia Defendants; Williams & Connolly LLP, on behalf of defendant KPMG; and Sidley Austin LLP, on behalf of the Underwriter Defendants. Despite this formidable and undeniably well-financed opposition, Lead Bond Counsel were nonetheless able to present a case that was sufficiently strong that they were able to successfully negotiate the outstanding recoveries that are reflected in the proposed Settlements – a fact which makes Lead Bond Counsel's success here all the more impressive.

195.    In sum, all relevant metrics indicative of exceptional quality of counsel here weigh in favor of the requested fee award.

###    C.    The Risks of the Litigation

###        1.    The Risks Undertaken By Plaintiffs' Counsel in Pursuing This Action

196.    This prosecution was undertaken by Plaintiffs' Counsel on an entirely contingent-fee basis. The risks assumed by Plaintiffs' Counsel in bringing these claims have been detailed above and those same risks are equally relevant to an award of attorneys' fees.

197.    From the outset, Plaintiffs' Counsel understood that they were embarking on a complex, expensive and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Plaintiffs' Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable litigation costs that a case such as this requires. With an average lag time of several years for cases of this type to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Plaintiffs' Counsel have received *no* compensation whatever during the nearly three years since they first began investigating the claims asserted in this matter in the latter part of 2008, and have also incurred $860,877.47 in litigation expenses during the same period in prosecuting the Action for the benefit of the Settlement Class Members.

198.    With hindsight, the case has obviously proved to be very successful for investors. As shown above, however, few investors of any stripe ever expressed any interest in pursuing this Action at the time it was first brought (or indeed, at any time before the Settlements were first announced). In contrast to "popular" securities class actions, which can attract interest from literally dozens of institutional investors (and their counsel) who seek to intervene in the case to

assure that their interests are protected, here the only investors who ever came forward to litigate this Action are the Lead Bond Plaintiffs and the handful of Additional Bond Plaintiffs who have all worked together with Lead Bond Counsel.  Plaintiffs' Counsel bore all of the risk that no recovery would be achieved, and despite the most vigorous and able efforts of counsel here success in this Action was far from assured.

199.    Indeed, perhaps the clearest illustration of the extent to which this was an extremely high risk case is the fact that this Court, in its March 31 Opinion, *dismissed with prejudice* and in their entirety the parallel claims brought under the Securities Act in the Equity Actions on behalf of a subclass of Equity Plaintiffs who purchased shares of Wachovia common stock pursuant to three separate sets of secondary common stock offerings.  And the threat of an adverse ruling by the Second Circuit in the *Fait* decision continued to loom over settlement negotiations, even after this Court's March 31 Opinion had sustained most (but not all) of Lead Bond Plaintiffs' claims.

200.    In sum, the risks of litigation in this case were anything but purely theoretical.  To the contrary, the risks here were so concrete that they capsized the parallel Securities Act claims brought in the related Equity Actions, and it was only Lead Bond Counsel's negotiating skills – *and their preparedness, based on years of prior and exceptionally diligent spade work, to negotiate from a position of strength when the opportunity presented itself* – that enabled them to avoid the consequences of *Fait* (which was adversely decided on appeal by the Second Circuit just weeks after the Stipulation was executed).

2. **The Risks of Contingent Fee Litigation Generally, and the Importance of Ensuring the Availability of Top Quality Counsel in High-Risk Contingent Securities Cases**

201.   As a general matter, it should also be observed that there are numerous cases where plaintiffs' counsel in contingent-fee cases such as this have expended thousands of hours, only to receive no compensation whatsoever.

202.   Lead Bond Counsel know from personal experience that despite the most vigorous and competent of efforts, a law firm's success in contingent litigation, such as this, is never assured – and that many able plaintiffs' law firms have suffered major defeats after years of litigation, after expending tens of millions of dollars of time, without receiving any compensation at all for their efforts.

203.   For example, earlier this year, two of the Lead Bond Counsel here, BLBG and RGRD, and another firm, recently suffered a total loss on their combined investment of more than $21 million in lodestar time (and a further write-off of more than $2 million) in a large securities class action in this District against a French company, Alstom S.A.  *See In re Alstom S.A. Sec. Litig.,* Master File No. 03-CV-6595 (VM), Declaration of Thomas E. Egler dated Sept. 30, 2011 (Dkt. No. 387) ("Egler Decl.") at ¶ 86.  Following extensive (and expensive) fact discovery conducted largely overseas, the size of the previously certified plaintiff class was eviscerated based on the Supreme Court's June 2010 decision in *Morrison v. Natl Bank of Australia*, 130 S. Ct. 2869 (2010), which held that only investors who purchase their shares on U.S. exchanges can bring claims for damages under the Securities Exchange Act.  Because the Alstom plaintiffs' previous estimate of recoverable damages was reduced by approximately 95% as a result of the *Morrison* decision, they were ultimately forced to settle for only $6.95 million – an amount so small that lead counsel's subsequent request for an award equal to roughly 30% of the settlement (or $1.95 million) was not even enough to cover plaintiffs' counsel's out-of-

pocket litigation expenses (which exceeded $3 million), let alone *any* of the value of their more than 51,000 thousand hours of work on the case (which had a total lodestar value of more than $21 million).  Egler Decl. at ¶¶ 6, 16, 86.  Countless other significant cases have been lost after the investment of tens of thousands of hours of attorney time and millions of dollars on expert and other litigation costs at summary judgment[20] or after trial.[21]   In fact, as recently as earlier this year, KTMC had achieved one of the first favorable jury verdicts related to the subprime scandal, only to see it thrown out by the court on a J.N.O.V. motion after a six week trial.  *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, No. 07–61542–CIV, 2011 WL 1585605, at *24 (S. D. Fla. Apr. 25, 2011).

204.    Clearly, there is no truth to the argument that a large fee is guaranteed by virtue of the commencement of a class action. It takes hard and diligent work by skilled counsel to develop facts and theories which will persuade defendants to enter into serious settlement negotiations, or which, alternatively, will succeed at trial.  Similarly, because the fee to be awarded in this matter is entirely contingent, the only certainty from the outset was that there

---

[20] For illustrative examples, *see, e.g.*, *In re IKON Office Solutions, Inc. Sec. Litig.*, MDL Docket No. 1318, No. 98-CV-4286, 2001 U.S. Dist. LEXIS 1172 (E.D. Pa. Feb. 6, 2001) (summary judgment for accountants on loss causation grounds); *Eisenstadt v. Centel Corp.,* 113 F.3d 738 (7th Cir. 1997) (affirming grant of summary judgment for defendants); *Searls v. Glasser*, No. 91 C 6796, 1994 U.S. Dist. LEXIS 13509 (N.D. Ill. Sept. 21, 1994), *aff'd*, 64 F.3d 1061 (7th Cir. 1995); *Freedman v. Value Health*, *Inc.*, 135 F. Supp. 2d 317 (D. Conn. 2001) (securities case dismissed on summary judgment).

[21] For illustrative examples, *see, e.g., Robbins v. Koger Props., Inc.,* 116 F.3d 1441 (11th Cir. 1997) (reversal of jury verdict of $81 million against accounting firm after a 19-day trial); *Bentley v. Legent Corp.*, 849 F. Supp. 429 (E.D. Va. 1994), *aff'd,* 50 F.3d 6 (4th Cir. 1995) (directed verdict after plaintiffs' presentation of its case to the jury); *Landy v. Amsterdam*, 815 F.2d 925 (3d Cir. 1987) (directed verdict for defendants after five years of litigation;); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict following two decades of litigation); *In re Apple Computer Sec. Litig.*, No. C-84-20148(A)-JW (N.D. Cal. 1991) ($100 million jury verdict vacated on post-trial motions); *In re JDS Uniphase Corp. Sec. Litig,* No. C 02-1486 CW, 2007 WL 4788556 (N.D. Cal. Nov. 27, 2007) (defense verdict after four weeks of trial).

would be no fee without a successful result, and that such a result would be realized only after a lengthy and difficult effort.

205.   Lawsuits such as those described above are exceedingly expensive to litigate successfully.  Outsiders often focus on the gross fees awarded, but ignore the fact that those fees are used to fund enormous overhead expenses incurred during the course of many years of litigation, are taxed by federal, state, and local authorities, and when reduced to a bottom line, are far less imposing to each individual firm involved than the gross fee awarded appears.

206.   In understanding the general risks of contingent litigation, it is also necessary to understand the economics of running a law office. It is generally accepted that a law office's overhead is well in excess of 50% of its gross billing fees. This amount is necessary to cover expenses such as associate, clerical and staff salaries, office rent, insurance, and office computer information and data management systems (among other things), which expenses must be paid regardless of whether counsel are ultimately awarded fees for work on their cases which result in a meaningful recovery.  Moreover, even though a major fee may be anticipated within a certain period of time, the actual payment of the award may be delayed due to, *e.g.,* objections and appeals, which can occasionally result in considerable hardships.

207.   Another factor is the contingency fee firm's loss of the use of fees earned, but unpaid, during the course of the litigation. Law firms representing paying clients receive their fees regularly and immediately. Those fees are then available to them for investment (such as the hiring of additional experienced attorneys and more junior associates and the leasing of additional office space), which in turn has the prospect of generating additional revenues over time.  A contingent fee law firm typically sacrifices this "time value" of money, whereas large defense firms (who seem to be constantly and continuously expanding) are able to immediately

reinvest the value of attorneys' fees, for the simple reason that they are able to actually collect the value of their time soon after it is incurred, typically through monthly (or at least quarterly) billing.  Nor do the laws of market economics exempt top-tier plaintiffs' counsel from having to compete with the best defense firms to hire either quality young associates, or more experienced counsel with significant private or public sector experience dealing with securities law enforcement issues – or from frequently having to advance (and thereafter carry) the costs of retaining the same kinds of high-priced expert talent that defense firms can immediately pass on to their clients for payment (while plaintiffs' counsel also bear the risk of having to "eat" these and all other litigation costs if the case is unsuccessful).

208.    Moreover, for decades the United States Supreme Court (and countless lower courts) have repeatedly and consistently recognized that the public has a strong interest to have experienced and able counsel enforce the federal securities laws and related regulations designed to protect investors from the pernicious effects of false and misleading statements that are made in connection with the issuance or subsequent purchase or sale of publicly-traded securities.  *See Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (private securities actions provide "'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action.'") (citation omitted).  Indeed, as Congress recognized in passing the Private Securities Litigation Reform Act of 1995 ("PSLRA"),

> Private securities litigation is an indispensable tool with which defrauded investors can recover their losses without having to rely on government action.  Such private lawsuits promote public and global confidence in our capital markets and help to deter wrongdoing and to guarantee that corporate officers, auditors, directors, lawyers and others properly perform their jobs. This legislation seeks to return the securities litigation system to that high standard.

H.R. Conf. Rep. No. 369, 104th Cong., 1st Sess. 31, at 31 (1995). Simply stated, the SEC, a vital but seriously understaffed agency whose inadequate funding has been the subject of numerous news stories and other accounts in recent years, does not have anywhere near the budget or personnel to ensure enforcement of the securities laws, and if anything its problems have grown only more severe in recent years.[22] If the critically important public policy of supplementing SEC enforcement through effective private litigation is to be carried out, the courts should award fees that appropriately reward the best plaintiffs' counsel for obtaining outstanding results in the face of the many risks that they assume in prosecuting securities class actions.

209. The importance of this public policy is particularly evident in this case. Scarcely a handful of securities law enforcement actions have been brought by any government authorities (including the SEC) against any financial institutions in the wake of the 2008 financial collapse, notwithstanding that it defies credulity to believe that none of the leading financial institutions were responsible for both the crisis *and* for failing to adequately disclose to investors the extent of the risks that they were exposed to as a result of their pre-crisis misconduct. Consistent with this pattern, here the SEC was apparently either unwilling or unable *to even file a complaint*

---

[22] For commentary on how the SEC's inadequate staffing and budget problems go back for at least the last 20 years, according to SEC chairmen appointed by both Republican and Democratic presidents, s*ee, e.g.,* Statement of SEC chairman Arthur Levitt, Hearings on S. 1260 before the Subcommittee on Securities of the Senate Comm. on Banking, Housing, and Urban Affairs, 105th Cong. (Oct. 29, 1997) ("Private actions are an especially important supplement to the [SEC's] enforcement program today because of the phenomenal growth of the securities industry during a time when the Commission's staff and budget levels have remained relatively constant"); *and* Testimony of SEC chairman Richard C. Breeden, Hearings on the Securities Investor Protection Act of 1991 before the Subcommittee on Securities of the Senate Comm. on Banking, Housing and Urban Affairs, 102d Cong. 15-16 (Oct. 2, 1991) ("Private actions under [the securities laws] have long been recognized as a 'necessary supplement' to actions brought by the Commission and as an 'essential tool' in the enforcement of the federal securities laws. Because the Commission does not have adequate resources to detect and prosecute all violations of the federal securities laws, private actions perform a critical role in preserving the integrity of our securities markets.").

against any of the Defendants – yet Lead Bond Counsel have recovered *$627 million* on behalf of investors.   Such recoveries are only possible where plaintiffs' counsel receive rewards commensurate with the magnitude of their successes – *especially* in cases where there is no public governmental complaint or investigation that plaintiffs can use to help build their claims – because assuredly there will be significant losses in other similarly risky cases brought against similarly powerful financial institutions who, after all, can afford to retain the very best lawyers in the world to defend them.

### D.   The Significant Amount of Time and Labor Devoted to the Action by Plaintiffs' Counsel

210.   Attached hereto as Exhibits 6A - F are declarations from Plaintiffs' Counsel in support of the request for an award of attorneys' fees and reimbursement of litigation expenses. Included with each counsel's declaration is a schedule that summarizes the lodestar of the firm, as well as the expenses incurred by category (the "Fee and Expense Schedules").[23]  The attached declarations and the accompanying Fee and Expense Schedules indicate the amount of time spent by each attorney and paraprofessional employed by Plaintiffs' Counsel, and the lodestar calculations based on their current billing rates.  As set forth in each declaration, the declarations were prepared from contemporaneous daily time records regularly prepared and maintained by the respective firms, which are available at the request of the Court.   The hourly rates for attorneys and paraprofessionals included in these schedules are the same as the regular current rates charged for their services in non-contingent matters and/or which have been accepted in other securities or shareholder litigation.   For attorneys or paraprofessionals who are no longer

---

[23] The first page of Exhibit 6 contains a summary chart of the hours expended and lodestar amounts for each Plaintiffs' Counsel firm, as well as a summary of each firm's total litigation expenses.

employed by Plaintiffs' Counsel, the lodestar calculations are based upon the billing rates for such person in his or her final year of employment.

211.    As shown by the attached declarations, Plaintiffs' Counsel have expended 79,011 hours in the prosecution and investigation of the Bond Action.   The resulting lodestar is $32,736,353.30.   Under the lodestar approach, the requested fee yields a multiple of approximately 3.35 ─ that is, a multiple of 3.35 times the value of the time expended by Plaintiffs' Counsel.   As discussed in the accompanying Fee Memorandum, this multiplier is within the range of multipliers awarded in actions where similar settlements have been achieved.

212.    Lead Bond Counsel's efforts at all times were results driven and focused on advancing the litigation to bring about the most successful outcome that was reasonably achievable for Lead Bond Plaintiffs and the Settlement Class, whether through settlement or trial.   The substantial time and expense incurred by Bond Plaintiffs' Counsel have achieved precisely such an outcome, and accordingly this factor also weighs strongly in favor of the requested fee.

### E.    Awards in Similar Cases

213.    Awards of attorneys' fees that have been approved in other large securities class action cases have been compiled and discussed in Lead Bond Counsel's accompanying Fee Memorandum.   For the reasons set forth therein, the 17.5% fee requested is well within the range of fee awards that have been approved in other large litigations.   Here, we respectfully submit that a percentage-based award at the very top end of the percentage fee range would have been fully justified by the extraordinary (and indeed unprecedented) results achieved by counsel in this Action; accordingly, we respectfully submit that Lead Counsel have earned a fee award that is comfortably *within* that range.

### F.      Lead Bond Plaintiffs' Endorsement of the Fee Application

214.    Lead Bond Plaintiffs, each of which is a sophisticated institutional investor, have evaluated the Fee Application and believe it to be fair and reasonable.  In coming to this conclusion, each of the Lead Bond Plaintiffs – which supervised and monitored both the prosecution and the settlement of the Action – has concluded that Lead Bond Counsel have earned the requested fee based on the outstanding recovery obtained for the Settlement Class in a case that involved serious risks.  These sophisticated institutional investors also appreciate that in this case the results achieved are entirely the product of Lead Bond Counsel's own skill and hard work, as they had to build the case on their own without the benefit of any "parallel" public government investigation or government-filed actions.  *See* Declaration of Julia E. Wyne, Esq., Assistant CEO of External and Legal Operations for the Orange County Employees Retirement System, in Support of (A) Lead Bond Plaintiffs' Motion for Final Approval of Class Action Settlements and Plan of Allocation and (B) Lead Bond Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Expenses; Declaration Of Osey McGee, Jr., Executive Director, Louisiana Sheriffs' Pension And Relief Fund, In Support Of (A) Lead Bond Plaintiffs' Motion For Final Approval Of Class Action Settlements And Plan Of Allocation And (B) Bond Counsel's Motion For Award Of Attorneys' Fees And Reimbursement Of Expenses; and Declaration of Nicholas J. Staffieri, Esquire, of Southeastern Pennsylvania Transportation Authority, in Support of (A) Lead Plaintiffs' Motion for Final Approval of Class Action Settlements and Plan of Allocation and (B) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Expenses, attached hereto as Exhibits 3 – 5, respectively.

215.    In addition, the requested 17.5% fee is expressly permitted under the terms of the fee retainer entered into with Lead Bond Plaintiff SEPTA.  We respectfully submit that the views of a sophisticated lead plaintiff as reflected by an agreement negotiated *ex ante* are entitled to a

presumption of reasonableness – and should be entitled to a doubly-strong presumption of reasonableness where the permitted fee has been endorsed not only *ex ante,* but also unanimously by three separate institutional investor lead plaintiffs *ex post* on the basis of the extraordinary results actually achieved.

216.    Accordingly, Lead Bond Plaintiffs' unqualified endorsement of Lead Bond Counsel's request for attorneys' fees award constituting 17.5% of the Settlement Fund should be given meaningful weight in the Court's consideration of the fee award.

### G.    The Reaction of the Settlement Class to the Fee Application

217.    As noted above, as of October 5, 2011, over 206,000 Claim Packets have been mailed to potential Settlement Class Members advising them that Lead Bond Counsel would apply for an award of attorneys' fees in an amount not to exceed 17.5% of the Settlement Fund. *See* Cirami Aff. ¶ 7 and Ex. A thereto at ¶¶ 5, 76.   In addition, the Court-approved Summary Notice has been published in the national editions of *The Wall Street Journal* and *The New York Times* as well as in the *Financial Times*, and transmitted over the business wires and through the Internet via the *PR Newswire*. *Id.* at ¶ 8).   To date, no objections to the attorneys' fees set forth in the Notice have been received.   Should any objections be received, they will be addressed in Lead Bond Counsel's reply papers.

### VIII.  THE REQUEST FOR REIMBURSEMENT OF PLAINTIFFS' COUNSEL'S REASONABLE LITIGATION EXPENSES

218.    Lead Bond Counsel, on behalf of themselves and the Additional Bond Counsel firms, seek reimbursement from the Settlement Fund in the total aggregate amount of $860,877.47 for litigation expenses that were reasonably incurred by Plaintiffs' Counsel in connection with commencing, prosecuting and settling the claims asserted in this Action.

219.    From the beginning of the case, Plaintiffs' Counsel were aware that they might not recover any of their expenses, and, even in the event of a recovery, would not recover any of their out-of-pocket expenditures until such time as the Action might be successfully resolved. Plaintiffs' Counsel also understood that, even assuming that the case was ultimately successful, reimbursement for expenses would not compensate them for the lost use of the funds advanced by them to prosecute the Action.  Accordingly, Plaintiffs' Counsel were motivated to (and did) take appropriate steps to avoid incurring unnecessary expenses and to minimize costs (where doing so would not compromise the vigorous and efficient prosecution of the case).

220.    As set forth in the Fee and Expense Declarations (provided in Exhibits 6A – F hereto, and as summarized on the first page of Exhibit 6), the respective Plaintiffs' Counsel law firms have incurred a total of $860,877.47 in unreimbursed litigation expenses in connection with the prosecution of the Bond Action.  These expenses, as attested to in the respective firm Declarations, are reflected on the books and records maintained by each Plaintiffs' Counsel law firm. These books and records are prepared from expense vouchers, check records and other source materials, and provide an accurate accounting of the litigation expenses incurred in this matter.  Plaintiffs' Counsel's expenses are set forth in detail in each firm's declaration, each of which identifies the specific category of expense, *e.g.*, on-line research, experts' fees, out-of-town travel costs, the costs of electronic discovery, photocopying, telephone, fax and postage expenses, and other costs actually incurred for which Plaintiffs' Counsel seek reimbursement. These expense items are billed separately by Plaintiffs' Counsel, and such charges are not duplicated in the respective firms' billing rates.

221.    Of the total amount of expenses, $300,672.53 was expended on Lead Bond Plaintiffs' experts, of which the vast majority was for Lead Bond Plaintiffs' damages expert.  As

noted above, Lead Bond Counsel retained a damages expert to assist in the prosecution and resolution of the Action.   The damages expert assisted Lead Bond Counsel during the preparation of the two detailed complaints and briefing on the motions to dismiss, and actively participated in the settlement negotiations with the Defendants.  In addition, as described above, the damages expert assisted Lead Bond Counsel with the development of the proposed Plan of Allocation.

222.    Another large component of the litigation expenses was for online legal and factual research.   In addition to researching the law pertaining to the claims asserted in the Action, Lead Bond Counsel necessarily spent considerable time and expense performing factual research.   Lead Bond Counsel's factual research included out-of-pocket investigatory costs associated with identifying and locating witnesses, which included former employees of Wachovia that served as confidential witnesses in the Amended Complaint, using a variety of online fee-charging databases and service providers.  The charges for on-line research amounted to more than $98,000.00.

223.    Another significant part of the litigation expenses that was necessarily incurred relates to the size of the Defendants' document productions.  Because these productions were made primarily in electronic format, it was necessary for Lead Bond Counsel to retain the services of a specialist firm to host a secure, Internet-based electronic document database that could be used to search, review, and/or code the relevant documents.  These document database costs were more than $126,000.00.

224.    Additionally, Lead Bond Counsel paid $87,043.71 for mediation fees charged (whether directly or indirectly through JAMS) by the mediator in this matter, Judge Weinstein.

225.    The other expenses for which Plaintiffs' Counsel seek reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.   These expenses include, among others, court fees, costs of out-of-town travel, support staff overtime, miscellaneous copying costs, long distance telephone and facsimile charges, and postage and delivery expenses.

226.    All of the litigation expenses incurred by Plaintiffs' Counsel, which total $860,877.47, were reasonably necessary to the successful litigation of this Action, and have been approved by the Lead Bond Plaintiffs.

227.    In view of the complex nature of the Action, the expenses incurred were reasonable and necessary to pursue the interests of the Settlement Class.   Accordingly, Lead Bond Counsel respectfully submit that the $860,877.47 in total litigation expenses incurred should be reimbursed in full from the Settlement Fund.

## IX.    CONCLUSION

228.    In view of the extraordinary and unprecedented recovery for the Settlement Class in the face of very significant litigation risks, and of all of the other relevant factors discussed above, Lead Bond Counsel respectfully submit that the Wachovia Settlement, the KPMG Settlement and the Plan of Allocation should be approved as fair, reasonable and adequate. Similarly, based on the extraordinary and unprecedented results achieved, the substantial litigation risks overcome, the quality of work performed, the time and effort expanded, the fully contingent nature of the fee, the complexity of the case and all of the other relevant factors discussed above, Lead Bond Counsel respectfully submit that the requested fee in the amount of 17.5% of the Settlement Fund should be approved as fair and reasonable, and that their request for reimbursement of total litigation costs and expenses in the amount of $860,877.47 is also fair and reasonable, and should also be approved.

98

We each declare, under penalty of perjury under the laws of the United States, that the foregoing facts are true and correct.

EXECUTED on October 10, 2011.

_____
William G. Fredericks

_____
John J. Rice

_____
David Kessler

#578422

99

We each declare, under penalty of perjury under the laws of the United States, that the foregoing facts are true and correct.

EXECUTED on October 10, 2011.

_____
William C. Fredericks

_____
John J. Rice

_____
David Kessler

#578422

99

We each declare, under penalty of perjury under the laws of the United States, that the foregoing facts are true and correct.

EXECUTED on October 10, 2011.

_____                    _____
    William C. Fredericks                          John J. Rice

_____
    David Kessler

#578422

99